I259hoc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

      v.                      17 CR 779 (KBF)

CHI PING PATRICK HO ,

            Defendant.

------------------------------x

                               New York, N.Y.
                               February 5, 2018
                               12:06 p.m.

Before:

                HON. KATHERINE B. FORREST

                               District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
DANIEL CHARLES RICHENTHAL
DOUGLAS SAMUEL ZOLKIND
PAUL A. HAYDEN
     Assistant United States Attorneys

KRIEGER KIM & LEWIN LLP
     Attorneys for Defendant
EDWARD YOUNG KYU KIM
JONATHAN BOLZ
               -and-
DECHERT
     Attorneys for Defendant
ANDREW J. LEVANDER
BENJAMIN E. ROSENBERG

ALSO PRESENT:  RYAN CAREY, FBI

I259hoc

1          (In open court; case called)

2          THE COURT:  Good afternoon, everyone.  Please be

3     seated.

4          MR. RICHENTHAL:  Good afternoon, your Honor.

5          Daniel Richenthal, Douglas Zolkind of the United

6     States Attorney's Office and Paul Hayden of the Criminal

7     Division Fraud Section for the government.  With us is Special

8     Agent Ryan Carey of the FBI.

9          THE COURT:  Good afternoon to all of you.

10          MR. LEVANDER:  Good afternoon your Honor.

11          Andrew Levander from Dechert representing Dr. Ho.

12          MR. KIM:  Edward Kim, Jonathan Bolz from Krieger Kim &

13     Lewin on behalf of Dr. Ho.

14          MR. ROSENBERG:  Benjamin Rosenberg also from Dechert.

15          THE COURT:  The Court does note that Mr. Ho is here

16     and present in court.

17          Good afternoon, sir.

18          THE DEFENDANT:  Good afternoon.

19          THE COURT:  One thing that I wanted to mention, and my

20     deputy may have called you about this, Mr. Levander, is to get

21     the pro hacs in.

22          MR. LEVANDER:  The appearances, yes.  I apologize.

23     I've missed four days of work in the last forty years.  I was

24     on the road for twelve days and I got the worst case of flu

25     that I have ever had, was out all last week.  So, I owe you

1    that.

2          THE COURT:  It's fine.  I only noticed it because when

3    I was going through the --

4          MR. LEVANDER:  We'll take care of that.

5          And I also ask the court, as a ministerial matter, I

6    understand that authorization has been given for laptops or

7    iPads to my cocounsel, and we'd like to get that extended.  So

8    if I submit an order on that, or however you do that, to get

9    authorization.

10         THE COURT:  Yes.  So let's talk about that for a

11   moment.  Just so that, Mr. Kim, so that you understand why I

12   denied one request of yours for that.  I am happy to generally

13   have people if they want to come in with electronic devices,

14   come in with electronic devices as they need then.  As you

15   folks know, for reasons that I won't go into, there's a long

16   history in this courthouse about when electronic devices can be

17   brought into the courthouse and not and why they are generally

18   precluded unless there's specific authorization and things of

19   that nature.

20         So, I think, Mr. Kim, just before the last conference

21   I had gotten a request for electronic devices and I just

22   didn't -- not that I have to understand exactly why you would

23   want to access your device, but not sort of having any

24   understanding as to why there would be a need in that kind of

25   conference, I denied.  Now, I assume with that said that what

I259hoc

1  you're talking about when you're looking for an electronic

2  device is a computer and not a phone because your attorney card

3  would get your phone in, and same thing with Mr. Levander, your

4  attorney card gets your telephone in.  So it's really only for

5  computers or iPads or something of that nature.

6      So I've sort of given in and so today -- yesterday I,

7  particularly since we had the bail application coming up, I

8  said yes, and so it's fine.  I really don't have a principal

9  reason why I would not allow devices in.  I just want to make

10  sure that I'm paying attention.  Okay.

11      So, Mr. Levander, on the Southern District website is

12  a form.  Download it.  Submit it.  Good to go.

13      MR. LEVANDER:  Thank you very much.

14      THE COURT:  But, unfortunately, it has to be done each

15  and every time there's a hearing.  Unless you have, for trial,

16  obviously we can do one.  Or if we knew in advance that there

17  were going to be X dates, you could put them all on a single

18  order, but that changes.

19      Today our agenda, I believe, is as follows.  I want to

20  get a report from the government on the production of

21  discovery.  I'm looking at ECF no. 32.  And that lists the

22  various things we had discussed at the last conference.  And I

23  want to hear from the defense if there are any issues with

24  discovery that need to be raised with the Court.  We'd like to

25  now talk about the initial motion practice that may be

I259hoc

1    contemplated.  There had been a reference to some initial

2    motion practice in the bail application.  And then at the last

3    conference folks said when we came back we'd be prepared to

4    talk about the timing of it.  And then I'd like to come up with

5    a trial date so that we know what the target is that we're

6    shooting at.

7           So let's start though, first, with the government.

8    Why don't you, Mr. Richenthal, why don't you just gives us a

9    report, please, if you would, on discovery.

10          MR. RICHENTHAL:  Before I begin, your Honor, if I may,

11   let me note this proceeding is obviously occurring in English.

12   It's our understanding that Mr. Ho is fully comfortable and

13   fluent in English.  And actually all of the proceedings in this

14   case so far have been in English.  Obviously, if he were to

15   change his mind and wish to have an interpreter, that is

16   perfectly fine with the government.

17          THE COURT:  Mr. Levander, do you believe there's any

18   reason for an interpreter for Mr. Ho?

19          MR. LEVANDER:  Not at this time, your Honor.

20          THE COURT:  Do you --

21          MR. LEVANDER:  I don't anticipate there being need for

22   one but, obviously, if we got into some Cantonese or Mandarin

23   things, it's possible we would all need some help.  But at this

24   point, Dr. Ho was trained here in the United States as a

25   physician, he lived here for over a decade, and I think he's

1    quite fluent in English.

2              THE COURT:  You communicate with him in English?

3              MR. LEVANDER:  I do.

4              THE COURT:  Thank you.

5              Next item.

6              MR. RICHENTHAL:  So with respect to discovery, the

7    government is on track, indeed ahead of schedule.  Consistent

8    with the discussion at the prior conference and your Honor's

9    January 9 order, we produced, on January 10, all of the e-mails

10   cited in the complaint, several search warrants, and certain

11   other materials, including statements of the defendant, that

12   the defense had requested us to prioritize.  And, again, that

13   was produced on January 10, which I think was at least five

14   days ahead of the schedule that had been discussed in court.

15   We then produced the defendant's own e-mails on January 16,

16   which I think was a couple weeks in advance of the schedule

17   discussed by the Court.

18             The next deadlines are this Thursday, February 8,

19   where we owe an update with respect to electronic devices and

20   an update with respect to the Classified Information Procedure

21   Act and classified discovery.  We're on track to be able to

22   provide that update.  Indeed, I conferred with the defense in

23   advance of this afternoon's proceeding and I advised them that

24   we expect to be able to get Mr. Ho's devices and USB drives,

25   that is the contents of those items to the defense in the next

I259hoc

1    few days and we'll provide a further update by Thursday as

2    requested by the Court and we'll also provide an update with

3    respect to CIPA and classified discovery, if any.

4         The next deadline is March 2.  That's subpoena

5    returns.  We're on tack to meet that deadline.  I think we

6    actually, once again, may come in before it.  There could be a

7    potential delay with the vendor.  We've made a substantial

8    production of materials to the vendor, and we anticipate making

9    a second substantial production soon.  The reason we're doing

10   that now is we want the vendor to complete its work in advance

11   of March 2.  And we're reasonably confident of that, although

12   we don't control the vendor.  So I'd say in sum we're on track

13   or ahead of school.

14        In addition, let me note, consistent with the Court's

15   order, Mr. Ho's property is obviously available to him and has

16   been available to him and the defense did make arrangements to

17   and, in fact, did inspect that property.

18        THE COURT:  All right.  Let me just ask a couple of

19   questions and then I'll hear from the defense as to whether

20   there are any issues from you folks want to raise.

21        What's the volume, Mr. Richenthal, now that you've

22   produced some of this discovery?  Let me get a sense of it.  We

23   talked before at the last conference, and I did review the

24   transcript.  So I'm familiar with what we said last time, but

25   it was still a moving target, if you will.

I259hoc

1       MR. RICHENTHAL:  So I can't give an estimate sitting

2  here, standing here this afternoon, as to the volume that's

3  made its way to the vendor.  I can say Mr. Ho's own e-mails,

4  which have been provided in their entirety, are extremely

5  voluminous.  We're talking multiple accounts, thousands and

6  thousands of e-mails.  That was given to the defendant

7  electronically as a complete set exactly as we received it from

8  Google and various providers so the defense can cut it however

9  it wishes.

10      With respect to subpoena returns, I don't have a

11  better estimate than I have.  If it's helpful, we can put that

12  in our letter on Thursday.  We can say here is the rough volume

13  transmitted to the vendor to date, here is the volume to be

14  transmitted in the future.

15      THE COURT:  Why don't we see where we go in terms of

16  scheduling and other matters, and it may or may not be

17  necessary for me to get down into the weeds on the volume of

18  discovery.  Sometimes it's useful if there are issues about how

19  much time review will take or something of that nature, but

20  we'll take it step by step.

21      MR. RICHENTHAL:  With respect to devices, I don't have

22  volume data.  I've actually asked the FBI for that.  I haven't

23  gotten an answer yet.  Mr. Ho had a few phones and a computer.

24  So depending on the volume of the material on the computer, it

25  could be very voluminous or it could be much more cabined.  He

1     also had some USB drives as well.

2                THE COURT:  Thank you.

3                Mr. Levander, Mr. Kim, any issues that need to be

4     raised with the Court on the discovery to date?

5                MR. LEVANDER:  To date, no, your Honor.

6                THE COURT:  All right.  So then let's move to the next

7     item and I should also mention on the agenda, of course, is the

8     bail application.  I hadn't listed that when I was going

9     through the agenda items but that accounts for the bulk of the

10    materials that I brought out with me onto the bench today.

11               Let's talk about the -- any initial motions that you

12    folks are thinking of bringing.  I don't need you to argue

13    them, but to give me a schedule and trial date.

14               Mr. Levander.

15               MR. LEVANDER:  So let me address those in turn.

16    First, with regard to the anticipated motions, what we'd like

17    to do is to send a letter by next Monday to the government that

18    is in the form of requesting essentially particulars or

19    information and, depending how that's responded to, and the

20    government can have a week, whatever the Court says they need

21    two weeks, that's fine by me.  We may then have a bill of

22    particulars motion or we may not.  We may be able to resolve it

23    without the Court's intervention.  So that would be the first

24    set of motions.

25               Substantive motions we have little -- some of the

I259hoc

1  discovery but there's a huge amount to come, and that's going

2  to affect our analysis, as will the bill of particulars or the

3  information requested, and so I would like to put on as a

4  tentative date for substantive motions the middle of April.

5  And, obviously, if there's a problem in terms of the discovery

6  or issues that come up before then, obviously, we would give

7  the Court as much opportunity as possible to rearrange that

8  schedule if necessary.  But I think middle of April is a

9  realistic time for filing substantive motions.

10          THE COURT:  All right.  And then what are your

11  thoughts in terms of, at this point in time, trial?

12          MR. LEVANDER:  So, you know, part of that is going to

13  be affected by the bail ruling, your Honor, frankly.  So I'd

14  rather see how that comes out first.  Because it cuts two ways,

15  the bail issue.  If our client remains in jail, that's a

16  horrible circumstance for him, and I think it's not the right

17  result, and so he'll want to push the case sooner, but there's

18  a lot of work to be done.  But when he's in jail, it also slows

19  things up because I don't know that your Honor has ever been

20  over to the MCC but the room literally is about the size of

21  this corner of the table.

22          THE COURT:  I've done a, what I call a deep dive

23  deeper than most people get into the MCC.

24          MR. LEVANDER:  And the notion of sitting there with

25  the number of counsel that are involved here in a complex case

I259hoc

with tens and tens of thousands of documents, some of which are
going to be in foreign languages, to try to prepare our client
is just going to be very, very difficult.

So, you had mentioned the last time sometime in early
2019.  That would be my desire.  But if our client is still in
jail that affects our view of when it should be.

THE COURT:  So let's pick two dates to be shooting at.
We can do one date for if the defendant remains in and then
another date if the defendant is released.

What's your -- if the defendant is in, what are your
thoughts, Mr. Levander, about the timing of when the defense
would want to proceed?

MR. LEVANDER:  So I haven't fully conferred with
everybody but November 1ish.

THE COURT:  My deputy is going to look but I think
that should be fine.

THE DEPUTY CLERK:  November 5.

THE COURT:  And if the defendant is released now or in
the relatively near future what would be your thought?

MR. LEVANDER:  Something like mid January.

THE COURT:  Joe.

THE DEPUTY CLERK:  January 14.

THE COURT:  Let me ask -- thank you, Mr. Levander.

Let me talk to the government.

Actually, first of all, do the motions and then we'll

I259hoc

1   turn to the discussion of the trial schedule.

2           On the bill of particulars, it sounds like you folks

3   have some runway still to go down in terms of discussions as to

4   whether or not that will be something the government is willing

5   to respond to.

6           MR. RICHENTHAL:  We haven't seen the defense letter.

7   Mr. Levander advised us that was coming, and I said in sum we

8   may well be willing to give information.  I suspect it will not

9   be in the form of a bill, which is a pretty standard response

10  on our side, but we'll take a look in good faith what he

11  requests and if we can provide more information and try to

12  narrow the issues we're obviously happy to do that.

13          THE COURT:  Thank you.  Then in terms of other

14  substantive motions I don't see why, with a November or January

15  trial date, that would present any kind of problem.  So I think

16  that that timing should be just fine.

17          Mr. Richenthal.

18          MR. RICHENTHAL:  I agree.  And let me note that

19  subject to any Rule 16(d) orders the defense already has all

20  search warrant affidavits that Mr. Ho might have standing to

21  seek to suppress.  So they're well positioned already to bring

22  suppression motions and I suppose motions directed at the face

23  of the indictment if they're contemplating that kind of motion.

24          THE COURT:  So here is what we'll do.  I agree that

25  I'd prefer to have motions to suppress sooner rather than later

1    because sometimes they take hearings that are -- require people

2    to bring witnesses in and set aside more time for busy folks.

3    And for motions that are directed to the face of the

4    indictment, obviously, that is in everybody's interest in

5    getting those teed up as soon as possible.

6            But I'm going to leave it in Mr. Levander's hands.  If

7    he's content to do April 16, that would be the middle of April,

8    a Monday in the middle of April.  Then, fine, I would assume

9    that if you develop a view that there is a very strong motion

10   to dismiss the indictment, bring it on as soon as you

11   reasonably can.  I'd like to get that in advance of April 16 if

12   I could but if you brought that as part of your April 16 motion

13   I'm not going to not review it, but I would expect if you

14   believe that there was something that was really facially

15   deficient we could get that teed up.

16           So on April 16 the defense would bring one memorandum

17   of law with any motions in it.  So include it all, in other

18   words, in the same memorandum.

19           I'm not going to set a page limit, although I always

20   prefer to have things narrower.  For civil cases I have 25

21   pages.  That does not apply in criminal cases.  Just do what

22   you can to keep it short.  April 16.

23           MR. LEVANDER:  That's fine, your Honor.  Thank you

24   very much.

25           THE COURT:  Now, Mr. Richenthal, understanding that

I259hoc

1  you don't know what you're going to get but you're likely to

2  get something, do you want like three weeks?

3          MR. RICHENTHAL:  I was going to ask for four, for two

4  reasons.  One is it sounds from the defense moving papers

5  they're anticipating a number of motions.  And the second

6  reason is I commence a multiple-week trial on April 16, and

7  while we are a multiple team --

8          THE COURT:  May 16 is fine.

9          And then, Mr. Levander, two weeks for reply?  Mr. Kim?

10  Yes?

11          MR. LEVANDER:  Thank you.

12          THE COURT:  So that's May 30.

13          MR. RICHENTHAL:  Finally, your Honor, just because --

14          THE COURT:  Hold on one second.  Let me just ask Joe.

15  Is that -- what's the Memorial Day weekend?

16          MR. LEVANDER:  It's the weekend before the May 30.

17          THE COURT:  Is it?  Let's move that then to June 4.

18  That way people don't have to spend that particular weekend

19  working on the drafting and the revising of the reply, right.

20  You can write me out of what's going to keep you professionally

21  occupied, and some other judge can take that lovely spot of

22  having ordered you to work over that weekend.  But June 4 for

23  the reply.

24          So the dates would be April 16, May 16, June 4.  That

25  will be reflected in an order.  That's the motion practice.

1          I've got both of you standing up.  I didn't see who

2    stood up first.

3          Mr. Richenthal.

4          MR. RICHENTHAL:  I can't see behind me, so I didn't

5    see either.  I was just going to say with respect to motions

6    that they're of a different type, but we do anticipate there

7    may be some motion practice under CIPA.  I think we alluded to

8    that last time, and we'll provide some more information in the

9    coming days, but I didn't want to leave that unsaid given that

10   we're discussing this now.

11         THE COURT:  So with CIPA, as you folks know, and I've

12   been down that road now several times, it would be helpful if

13   you could confer in advance about the process that you would

14   like to use and that you think would be acceptable to all sides

15   and to have an agreement on that protocol, because if I'm going

16   to meet with one side alone, and then the other side alone or

17   I'm going to get -- there are various ways of doing this.  It's

18   useful to me if you have agreement on the protocol.  And if you

19   don't, then we'll resolve it in another way.

20         Mr. Levander.

21         MR. LEVANDER:  I just popped up just to be clear.

22   June 4 is the reply date but not the hearing date, I assume.

23         THE COURT:  Correct.

24         MR. LEVANDER:  Because I just know I'm going to be out

25   of town then.

I259hoc

1          THE COURT:  If there is a suppression motion brought

2     on April 16, you folks should be aware that my practice is

3     typically if I think that there is a conceivable issue, without

4     deciding that there should, for instance, be a Franks hearing

5     or anything else, I am very likely to nonetheless ask you to

6     set aside time just for calendaring purposes.  And I'll make

7     that clear, that it's not that the Court has in any way made a

8     preliminary determination as to the strength or the issues.

9     It's really just a calendaring process so that we are sure,

10    particularly given that we'll be in the early summer, to make

11    sure that people set aside time.

12         So that, I believe, takes care of the agenda that I

13    had apart from the bail application.  But before we get to the

14    bail application let me solicit from you folks:  Do you have

15    any additional matters?

16         We should also set another conference date.

17         Nothing?

18         MR. RICHENTHAL:  Nothing from us, your Honor.

19         MR. LEVANDER:  Nothing from us, your Honor.

20         THE COURT:  So what we'll do is I'm going to set

21    another conference date right now for a check-in conference.

22    We are at the point -- and we'll set -- the trial date will

23    either be November 5 or January 14.  After we've determined the

24    bail application, we'll solidify one or the other of those.

25    That trial date, whichever it is, will be a firm trial date.

I259hoc

1          Mr. Richenthal, actually before we get to my next

2     point, tell me how long this trial is going to last, best

3     estimate at this point.

4          MR. RICHENTHAL:  So, we're still working that through

5     in part because, as your Honor knows, there was another

6     defendant and the investigation we've announced publicly is

7     ongoing.  So with those caveats, I think we're looking at a

8     multiple-week trial.  I recognize "multiple" could be two or

9     ten.  It's somewhere in between.  If I were forced to give an

10    answer now, I'd say three weeks, four weeks, something like

11    that.  But I think we'll be prepared in the next month or two

12    to give a more firm estimate.

13         THE COURT:  Are you building into that estimate what

14    you anticipate the defense would want to put on or are you

15    thinking only of your case in chief?

16         MR. LEVANDER:  That estimate was based on a rough case

17    in chief of say three weeks and a rough defense case of one

18    week, emphasis on the word "rough."  We have not conferred with

19    the defense about this and, needless to say, I suspect they're

20    not ready to give an estimate at all and, of course, they don't

21    have to announce that they're putting a case on.

22         THE COURT:  Here is what I think we'll do.  I think

23    everybody would be wise to put aside six weeks from November 5

24    up until Christmas or the winter holidays in any event.  And if

25    it's going to go longer than that, or it would be January 14 to

I259hoc

1  the end of February, right.  If it's going to go longer than

2  that, we need to talk about it, depending where the trial date

3  is, because we may want to move it earlier than November 5 or

4  we may want to move it a week or so earlier than January 14.

5  So put aside six weeks.

6          Is that acceptable to everybody?  And then we'll

7  adjust as need be.

8          MR. LEVANDER:  Yes, your Honor.

9          MR. RICHENTHAL:  Yes, your Honor.

10          THE COURT:  So we've got that blocked.  And let's then

11  figure out which of our blocks we're going to have.  Now I was

12  about to say -- yes, Mr. Levander.

13          MR. LEVANDER:  You said you were going to set a next

14  hearing date.

15          THE COURT:  Exactly.  So what I was about to say was

16  that I'll set a next hearing date but because we're going to be

17  on track with motions coming in and things of that nature, if

18  there is no reason for us to meet on this next hearing date,

19  then you folks can confer and just write me a one-line letter

20  and just we'll adjourn it and I'll probably then put another

21  date on a couple of months later.  But it's just to allow us to

22  book time to insure that we're not going to -- that we have a

23  time to meet and that we're not going to run into issues that

24  are surprising to us at some later point.

25          So, Joe, what do we have a couple of months from now?

I259hoc

1   Maybe early, what do we have, maybe early -- we're in February,

2   maybe early April?

3            THE DEPUTY CLERK:  Friday, April 13 at noon.

4            THE COURT:  You know, I am morally certain that I just

5   scheduled something for that slot.  I see it's open right

6   there.

7            Let's make it 12:30.  I'm pretty sure I gave something

8   to a clerk this morning, to Amy this morning for the 13th in

9   there.  So let's do 12:30.  So April 13 at 12:30.

10            MR. LEVANDER:  Fine, your Honor.

11            MR. RICHENTHAL:  That's fine, your Honor.

12            THE COURT:  So that's what we'll do for our next

13   conference date.  Okay.

14            Now let's move on to what I assume is the last item on

15   the agenda, which is the bail application.  Is there anything

16   that we should address prior to that?

17            Nothing else.  Okay.

18            Let me start then by reciting the information that I

19   have received in connection with this application and the

20   standard that I believe we are operating under so that we can

21   get ourselves on the same page.  If I am -- if you folks

22   disagree with the standard and/or you believe I should have

23   additional information I assume you will raise it with me.

24            I have reviewed the following materials.  The

25   December 1, 2017 bail application that had some exhibits with

1    it, along with the transcript that was in front of Magistrate

2    Judge Freeman dated actually December 1.

3            I have also received and reviewed the January 5, 2018

4    bail application with associated exhibits from the defense, and

5    the February 1, 2018 government submission on the bail

6    application and exhibits.

7            In addition to those materials, I have also reviewed

8    the pretrial services report which was prepared back on

9    December 1.  I guess it was updated.  So December 1, 2017 at

10   11:20 a.m.

11           The application will be reviewed under Section 3142.

12   It's a de novo application under the U.S. v. Leon case, but

13   also under 3145(b) it allows for a review.  And that standard

14   that sends us back to 3142.

15           Under 3142, as I understand it, the government is only

16   seeking bail on the basis of risk of flight, not on safety.

17   And, therefore, it's a two-part standard, if you will.  The

18   government bears the burden of showing by a preponderance of

19   the evidence that the defendant -- that there is a risk of

20   flight by the defendant that will result in his not appearing

21   for hearings and trial.

22           Part two of that is once the government has met that

23   standard, then there is a second standard which has to then be

24   met, which is showing by a preponderance of the evidence that

25   there is no condition or combination of conditions that could

I259hoc

reasonably assure or would reasonably assure the appearance of

the defendant in court.  So it's a two-part standard.

And with that said, I have reviewed the papers and so

I'm happy to listen to argument that you folks would like to

present.  And, in particular, I think the defense should

respond to the arguments that the government has made.  They

haven't had an opportunity -- they've had an opportunity but I

haven't received a written submission in response to the

government's papers.  But that's not a problem.  We can do that

orally.

So, it's the defense application.  Mr. Kim, are you

going to be addressing that?

MR. KIM:  I am, your Honor.  And with the Court's

permission, if I could address the Court from the lecturn.

THE COURT:  I would prefer that.  Thank you.

Mr. Kim, did you have any -- are there any materials

that I haven't mentioned that you think I should have mentioned

as among those that I have received and reviewed?

MR. KIM:  No, your Honor.

THE COURT:  Is the standard -- do you agree with the

legal standard as I have stated it?

MR. KIM:  I do, your Honor.

THE COURT:  All right.

MR. KIM:  Your Honor has obviously seen the

submissions we've put in and the Court, I'm sure, has

I259hoc

1    thoroughly reviewed the record from the initial bail argument.

2         Your Honor, we respectfully submit that the original

3    bail conditions that we proposed were sufficient, but we have

4    increased our proposed package and believe that that revised

5    package addresses the concerns that were raised by Magistrate

6    Judge Freeman.

7         THE COURT:  Just so that I'm clear, I was going over

8    this this morning.  As I understand the package that you're

9    proposing, it's reflected on the last paragraph of the first

10   page of the January 5 application, which is at ECF no. 29.  It

11   consists of four pieces:  Home incarceration, electronic

12   monitoring, a personal recognizance bond of $10 million of

13   which 2 million would be in cash and the remainder would be

14   assured by five financially responsible persons and then,

15   lastly, a global waiver of extradition.

16        Are those the terms?

17        MR. KIM:  That's correct, your Honor.

18        THE COURT:  All right.

19        MR. KIM:  So, your Honor, I'm not going to repeat

20   every argument here but I do want to focus on what I think is

21   the central issue.  Your Honor is correct.  I think the

22   standard requires the government to first establish by a

23   preponderance of the evidence that Dr. Ho is likely to flee.

24   But, assuming we can get beyond that question, the fundamental

25   question is:  Are there any possible conditions that could

I259hoc

1    reasonably assure Dr. Ho's return to court, any possible

2    conditions that could reasonably assure this man's return, a

3    68-year-old man, not in the greatest of health, a former

4    cabinet level official in Hong Kong who has never had any prior

5    contact with the criminal justice system here in this country

6    or anywhere else in the world.

7         Now the Bail Reform Act presumes release.  There is no

8    automatic carve-out for foreigners.  What that means is that

9    your Honor must consider every possible form of release and

10   only if the Court deems that none of them are sufficient should

11   your Honor order detention.

12        THE COURT:  Well now you keep using the word

13   "possible," which is exactly why I wanted to focus on the four

14   that you have set forth in your application.  You've not gone

15   beyond -- there is no creativity that I have to apply here to

16   things that are possible but not set forth in the application,

17   right?  You've got home incarceration, electronic monitoring,

18   money, and the extradition waiver.

19        MR. KIM:  Your Honor, I actually think if the Court

20   thinks that the package we have proposed is insufficient then

21   the Court is free and actually obligated to consider other more

22   restrictive conditions.

23        THE COURT:  If I had things in my mind.  But what I

24   want to make sure of is I don't want there to be one that you

25   think would be sufficient that you've not offered up right now.

I259hoc

1  I mean you folks have cited cases with other conditions that

2  are not included in yours and so I assume that that was

3  intentional.  And -- but go ahead.  I just want to make sure

4  that you don't hang me up on "possible."

5       MR. KIM:  I understand, your Honor.  I think what I

6  would say in response is that we have proposed, I think

7  consistent with the Bail Reform Act, we have proposed a set of

8  conditions that we believe are the least restrictive that would

9  reasonably assure Dr. Ho's return to court.  Now, obviously, if

10  the Court is alluding to arrangements that have been made in

11  other cases in this district involving private security,

12  obviously the Court -- if the Court were to say to us today

13  that the package that we proposed is insufficient but that some

14  measure of private security could be worked out, that that

15  might placate the Court, I think we certainly would want to

16  consider any conditions that the Court would think are

17  necessary here.

18       Our proposal we believe, as I said, your Honor, is the

19  least restrictive set of conditions.  We don't believe

20  additional conditions would be necessary but we obviously have

21  to discuss that with the Court.

22       Now, as I said, your Honor, we believe that there

23  absolutely are conditions that could reasonably assure Dr. Ho's

24  return and the conditions we have proposed would do just that.

25       If the Court allows, I'd like to spend a little time

I259hoc

1    just talking briefly about Dr. Ho's history and

2    characteristics.  I'll talk a little bit about his ties to the

3    United States, and some of the arguments the government raises

4    with respect to those ties, his foreign ties and his travel

5    abroad.

6        THE COURT:  You're going to tell me also, I think, I

7    assume, at the end if the Court is thinking about and

8    considering what you have proposed, which includes home

9    incarceration, what that home would be since the defendant

10   doesn't have a home in this district.

11       MR. KIM:  I can do that, your Honor.  The short answer

12   now, just to short circuit it, is that prior to the initial

13   bail argument we had looked into basically a corporate

14   apartment, furnished apartment that would be available for

15   Dr. Ho to rent.  Our proposal would be that should the Court

16   approve this package we would then submit that -- that address

17   to pretrial services to insure that pretrial services is

18   satisfied with the conditions.

19       And I'll note, your Honor, the address of that

20   apartment is at 417 East 57th Street.  And so we have a

21   specific building in mind and we know that there is

22   availability in there.  And we believe also would be conducive

23   to electronic monitoring as well.

24       So as I mentioned, your Honor, Dr. Ho is a 68-year-old

25   man.  He is not in the greatest health.  He's had a long and

distinguished career in public service, including service as a

cabinet level appointment in the Hong Kong government.

Now the government has said that that life of service

is all a facade and they try to through a cloak of criminality

over everything Dr. Ho had done professionally, particularly on

behalf of the NGO. As Exhibit A they've highlighted Dr. Ho's

efforts at the NGO to advance Chinese business interests,

including those of the Energy Company.

Now that may not be how the government would prefer

things work. But there's nothing wrong or illegal about that

arrangement. In fact, it was totally transparent. The NGO

made no secret of the fact that it was funded by the Energy

Company. The chairman of the Energy Company was the public

head of the NGO. And the explicit mandate of that organization

of Dr. Ho was to further the Chinese government's One Belt One

Road initiative to invest in infrastructure and expand Chinese

business opportunities abroad. In fact, this is Dr. Ho's

passion.

At the MDC, your Honor, Dr. Ho has recently given a

widely attended lecture on globalization and opportunities to

do business with China and has started teaching GED classes as

well.

So this is not the facade of criminality the

government will try and cast it to be. It's a product of

Dr. Ho's passion.

I259hoc

1          Now, the more fundamental point from Dr. Ho's history

2     and characteristics, your Honor, is that he is internationally

3     prominent and recognized.  If he were to flee, he would be a

4     very visible fugitive.

5          I'll talk a little bit about his compelling ties with

6     this country.  The government in this case just sort of -- they

7     throw up their hands and they say well precedent doesn't really

8     matter, you win some, you lose some.

9          We respectfully submit that what other judges in this

10    building have done with respect to very similarly situated

11    defendants should matter.  It should inform what the Court does

12    in this case.

13         The bottomline is this.  Similarly situated defendants

14    in this building have routinely been granted bail.  We've cited

15    many examples in our letter.  But I want to highlight just a

16    few right now.  The first is the case of Chan Ming Fon.  That

17    was an accounting fraud case in which a Taiwanese national who

18    is a resident of both Taiwan and Singapore, with extensive

19    overseas ties, no meaningful ties to this country; in fact,

20    that defendant had not stepped foot in the United States for

21    the 16 years prior to his arrest.  As the government reported

22    during the bail argument he had confessed to the authorities on

23    two separate occasions about his involvement in his criminal

24    activities.  His guidelines were life, although they were

25    capped at the statutory maximum of 20 years.  And Judge Swain

I259hoc

<sub>1</sub> granted bail and permitted conditions allowing this defendant,

<sub>2</sub> Mr. Chan, to buy an apartment in New York City so he could

<sub>3</sub> reside here during trial.

<sub>4</sub>      The second case is that of Benhamou, an insider

<sub>5</sub> trading case in which a citizen and resident of France -- now,

<sub>6</sub> France does not extradite its citizens to the United States.

<sub>7</sub> He had no meaningful ties to this country.  Bail was granted.

<sub>8</sub> And he was allowed to rent an apartment in New York City.

<sub>9</sub>      The third case the U.S. v. Bodmer, which is a Swiss

<sub>10</sub> national -- again, Switzerland does not extradite its own

<sub>11</sub> here -- was granted bail and allowed to live with friends in

<sub>12</sub> Washington, D.C.

<sub>13</sub>      THE COURT:  Can you remind me who had the Benhamou and

<sub>14</sub> the Bodmer cases?

<sub>15</sub>      MR. KIM:  Sure, your Honor.

<sub>16</sub>      In Benhamou Magistrate Judge Maas is the one who made

<sub>17</sub> the bailing ruling.  In Bodmer that was Judge Scheindlin.

<sub>18</sub>      Now those are all examples of cases in which

<sub>19</sub> defendants with extensive overseas ties, no meaningful ties to

<sub>20</sub> this country, and in some cases hailing from countries in which

<sub>21</sub> extradition would be impossible, were granted bail in this

<sub>22</sub> courthouse?

<sub>23</sub>      Now in this case, your Honor, Dr. Ho has compelling

<sub>24</sub> ties to this country.  We've proffered a number of cosigners.

<sub>25</sub> And they are significant sources of ties here.  The government

dismisses them as friends from decades ago.  That's actually not accurate.  They are lifelong friends who have kept in touch throughout the decades, the last few decades in fact.  Now they may not see each other every week or every day.  But, in fact, a group of cosigners got together with Dr. Ho as recently as July of 2017.

But we live in a different time now, your Honor.  As the Court is well aware, it's certainly possible to maintain meaningful friendships with lifelong friends by phone, by e-mail, electronically, across state lines, across country lines.  And that is exactly what's happened here.

Now, the most powerful testament to the depth of those relationships and friendships is the willingness of these cosigners to pledge their own assets as security for bond here.  Dr. Ho has no intention of ruining the lives of these lifelong friends.

If the court has any concerns about the genuine strength of those bonds, we can make the cosigners available to answer questions from the Court, and they can tell your Honor directly about the depth of their decades-long friendship with Dr. Ho.

Now, the government I think has advanced another theory in response and has said on multiple occasions that they believe that Dr. Ho would flee and then make these cosigners financially whole.

1    First of all, the government has failed to address the

2    fact that the bail package that we are proposing has been

3    significantly increased.  The higher bond amount makes it

4    financially impossible for Dr. Ho to make the cosigners whole

5    were he to flee.

6    The government's only response to that is to speculate

7    that Dr. Ho must have access to more resources.  Now, they

8    don't offer specific facts that back this up.  And as made

9    clear in the Bodmer case, your Honor, speculation like that is

10   not enough.  It's not enough for the government to wave its

11   hands and say that Dr. Ho may or may not have access to a

12   vastly greater pot of money.

13   Also just note for a second, your Honor, the

14   inconsistency in that very argument.  On the one hand, the

15   government is suggesting that Dr. Ho is unscrupulous enough to

16   violate this Court's order and flee and, on the other hand,

17   they're saying he's a man of great character because he's

18   formed these lifelong bonds and he's not going to leave his

19   friends in the lurch, he's going to do the right thing and make

20   them whole.

21   More fundamentally, your Honor, there is nothing,

22   nothing in Dr. Ho's history or characteristics that suggest

23   that he's the kind of man who would be willing to betray his

24   friends and subject them to financial ruin.

25   I want to talk a little bit about Dr. Ho's travel

I259hoc

because that's another point that the government has raised.
Now, they suggest that the fact that Dr. Ho is a world traveler
is a liability here and they've listed various countries,
they've attached his passport, they make a point of noting that
he's been to two dozen countries, I believe, including Russia
and Iran.

In fact, your Honor, Dr. Ho's frequent travel cuts
the other way. First of all, Dr. Ho's travel to this country
has been extensive. The government says that Dr. Ho visited
this country a few times a year. That's actually an
understatement. Over the last five years he's visited this
country approximately 40 times, often on extended multi-week
trips. And, more broadly, Dr. Ho's career, his livelihood has
been built on his ability to travel around the world, but in
particular to the United States, to give speeches, to deliver
marks at conferences that are scheduled here in this country.

And if he were to flee -- we've laid this out a little
bit in the initial bail argument, your Honor -- but if Dr. Ho
were to flee, he would be fold by an international Red Notice.
He wouldn't be able to travel freely. And in light of the way
of how he's lived his life so far, that would not be a tenable
existence for him. That is no way for a man of Dr. Ho's
stature and the history that he has, that would be no way for
him to live.

Taking a step back, your Honor, just to flesh this

I259hoc

out. How would he even flee? Assuming your Honor imposed

electronic monitoring, Dr. Ho would have to cut off his ankle

bracelet, do this under the nose of pretrial services, obtain

fake travel documents, slip out across the border and gain

access to another country all while being subject to

international media scrutiny. And the government has pointed

out the vast amount of publications that have reported on this

case. Now, nothing in Dr. Ho's history or characteristics

suggests that: A, he would even want to do this; or B, that he

would have the ability to do it even if he wanted to.

And the experience in this courthouse, your Honor, and

your Honor may know this better than I do, is that it is

exceedingly rare for someone under electronic monitoring and

home incarceration to flee. It is an incredibly effective tool

for insuring appearance to court.

Now, the government speculates that Dr. Ho could flee

to China, Chad, and Uganda, among other places. Again, they

point out his travel to Russia and Iran. Now all of those

countries have one thing in common, one thing. Dr. Ho has

never lived in any of those countries. And to be clear, and I

think the government now concedes this as well, Dr. Ho does not

have a resident ID in China, which means he's not entitled to

work there, he's not entitled to buy a residence there. He's

not entitled to open up a bank account in China.

I want to highlight in the statement that the

I259hoc

1   government made in it's letter at page two.  They say that

2   Dr. Ho has significant personal wealth in China.  That is not

3   accurate.  His assets are held in Hong Kong, not China.  And as

4   a noncitizen of China, he is not allowed to have bank accounts

5   there.

6          Now the government keeps saying vaguely that --

7          THE COURT:  One of the issues that you confront,

8   Mr. Kim, with the location of assets is that the government

9   makes a point that they can't test what his assets are and,

10  indeed, the statement that you've just made about what he can

11  and cannot do in China is something that I take your statement

12  as an officer of the court as something as to which you've got

13  knowledge.  I have no knowledge as to what the rule -- as to

14  the rules and regulations on the Chinese mainland for those

15  things.

16         But for a moment let me just sort of accept that what

17  you're saying is correct.  I think the point the government is

18  making with regard to assets is they could be vast and those

19  assets, they can't test where the bottom is, which renders the

20  bond and the ability to make whole, if you will, any

21  financially responsible persons who sign themselves up for a

22  portion of the $8 million, that that would be something that is

23  then left open to great question.

24         MR. KIM:  I understand, your Honor.

25         I think the Bodmer case is actually particularly

I259hoc

1    instructive here because in that case the government, I think

2    they were dealing with a Swiss banker, and they said that

3    Bodmer had great experience concealing the assets of other

4    people in hidden accounts abroad.  And they said, Judge, in

5    that case they said, Judge, we have no idea what assets Bodmer

6    has.  And given his expertise, we're sure that he secreted his

7    own assets abroad and so what we're dealing with is an

8    understated snapshot of his financial wealth.

9            Now I think the court in that case appropriately

10   rejected that because that is not the standard here, Judge.  I

11   think -- I suppose for every defendant who walks into this

12   courthouse, the government could stand up and say well he might

13   have cash under his mattress that we don't know about.  He

14   might have a Swiss bank account that we're not aware of.  That

15   kind of speculation is not enough under the Bail Reform Act.

16   And they can stand up here and say given his foreign assets

17   that they have a less clear picture of it.  Well, your Honor,

18   the burden is on them and it is not enough for them to stand up

19   and give speculation unsupported by the facts that there are

20   assets -- vast assets elsewhere.

21           Your Honor, I'll note here as well that there is no

22   basis to believe, based on Dr. Ho's prior employment as a

23   doctor, administrator, government official, the head of an NGO,

24   that he has vast resources at his disposal, vast private wealth

25   that we're unaware of.

I259hoc

1    Now, I think the government's alternative here, and I

2  expect the government to respond in this fashion, is to say

3  that Dr. Ho's, quote unquote, connections would be willing to

4  fund his flight from justice.  Again, that's pure speculation.

5  It's not supported by evidence.  There is no facts proffered to

6  believe that anyone would be willing to take the extraordinary

7  step of helping Dr. Ho to flee.  And it's the kind of

8  speculation that the court rejected in the Bodmer case.

9    And I think that they've hinted before that the Energy

10  Company might be willing to assist Dr. Ho fleeing from justice.

11  Now, the fact that the Energy Company is not an American

12  company is irrelevant.  The government may not be as familiar

13  with this company as it is with household names here in this

14  country, but the government should not be using foreignness or

15  unfamiliarity as a proxy for all things sinister.  There are

16  plenty of companies in the United States and Europe that have

17  been accused of wrongdoing often by this office in this

18  courthouse.  It is another thing entirely to suggest that a

19  company would move heaven and earth to help an associate flee.

20  And notably the company at issue here, the Energy Company, has

21  not been charged with a crime.  The government has gone to

22  great lengths to assure everyone that the chairman of that

23  company is not a target of this investigation.

24    Now, Mr. Levander alluded to this a little bit

25  earlier, but I think a significant consideration here as well

I259hoc

1   is the ability of the defense to adequately prepare this case

2   for trial.  There's voluminous discovery, significant portions

3   of which are in a foreign language.  It would be crippling for

4   the defense to have Dr. Ho incarcerated.  He would be unable to

5   meaningfully assist in the preparation of his own defense here.

6           THE COURT:  Now why -- I understand, of course, that

7   if an individual has the kind of restrictions that exist at the

8   MCC that there are some logistical issues that arise from that,

9   that impact how counsel interacts with Mr. Ho.  But,

10  nevertheless, it is done all the time that people make

11  discovery available on computers.  Counsel can go, even have a

12  paralegal go and sit there day, after day, after day working

13  with the defendant.  So there are ways in which cases are

14  everyday prepared for trial, even complex cases, with a fair

15  amount of financial information with the restraints imposed by

16  institutional entities such as the MCC.

17          MR. KIM:  Your Honor, I would just say a couple things

18  in response.

19          First, I think it is exceedingly rare for a case of

20  this complexity, given the volume of discovery, the factual

21  allegations involving activities in multiple other countries,

22  the language issues, the fact that many of these documents are

23  written in another language.  I think those pose pretty unique

24  challenges in this case.  There have certainly been cases, and

25  I don't mean to take it lightly in other cases where the

I259hoc

defense has been challenged to prepare their clients for trial.

I think this, given the confluence of factors in this case,

presents a uniquely difficult case to prepare for trial.

And I'll also note, your Honor, that while on paper

the MCC may be open to counsel to visit and sit with clients

for long periods of time, the practicalities are very

different, your Honor.  It is very, especially with the large

volume of electronic discovery in a case where most of the

government's evidence here hinges on what is in these

documents, it is impractical, in fact, very difficult to be

able to go through in a meaningful manner with clients who are

incarcerated at the MCC.

Now, your Honor, before I sit down I did want to

address this point about extradition as well.  Both parties, I

think, have discussed the case of Iat Hong.  I'll note the

denial of his extradition was not previously made public before

the government's letter.  But it's unclear why his extradition

was denied.  The government has not proffered a reason why.

But the government's takeaway from that case is an

interesting one, Judge.  They say that the theoretical

possibility of extradition does not support release because

extradition is never guaranteed, and I want to say a few things

in response.

First, the government has it backwards.  Their

argument is essentially that Dr. Ho should be detained because

I259hoc

1   of the theoretical possibility that extradition would not be

2   granted should he flee.  Now, of course, that rationale applies

3   to just about any country on earth, that extradition is never

4   guaranteed.  But, second, that's actually the reverse of the

5   analysis required under the Bail Reform Act.  We should not be

6   locking at what would happen if Dr. Ho theoretically were to

7   flee.  We should be focused, instead, on whether Dr. Ho is the

8   kind of person who would even try to flee and whether there are

9   conditions that would reasonably assure that he won't flee.

10          And to take a step back, your Honor, we have only gone

11   down this road because the government claimed during the

12   initial bail arguments that there was not even an extradition

13   treaty with Hong Kong and that extradition was, therefore,

14   impossible.  The government now, of course, concedes that is

15   not the case.

16          Now as to the point on the global waiver, your Honor.

17   I don't think any --

18          THE COURT:  I'm sorry.  You said the point on --

19          MR. KIM:  On the global waiver of extradition.  I

20   don't think anyone is qualified to stand up here and say

21   that --

22          THE COURT:  Before you get to the global waiver, let's

23   go to another point that the government makes, which is one of

24   the subparts of the agreement which was attached to the

25   government's papers, and this is the extradition agreement

between the United States and Hong Kong includes a provision

which exempts, if you will, cases which may have a political

nature. And the government has pointed out that there are

statements, a number of statements in the press which have

suggested -- and this is the foreign press -- which have

suggested that there is political motivation to the prosecution

here.

Now, that is not a view that the government here

shares, that Mr. Richenthal has indicated the government -- he

does not believe that that is, in fact, the case; vigorously

disagrees with that.

But the point is that the concerns regarding

extradition become more significant if the ability to extradite

may on its face be nonexistent if one of the views is going to

be or if a significant view is going to be that the prosecution

is one that does not need to be recognized.

MR. KIM: Your Honor, I think we -- in this case I

take your point. I think we may be a far cry from nonexistent.

The government has drawn from statements in the press about

this case. I suppose if we wanted to marshal our own

statements made into other points from the press we could

easily do that. The point is I think that we have not seen a

statement from the Hong Kong government, or the Chinese

government for that matter, saying that they would deny

extradition here.

1    But I think taking a more -- this point more broadly,

2    as I mentioned the cases that I've mentioned before, Bodmer,

3    Benhamou, countries which categorically did not extradite their

4    own, I think courts refused to take that and -- on that basis

5    for a detention.

6    Now, the I think the government has cited to Article

7    III of this treaty, and there are a number of other provisions

8    which point to, to say that there would be litigation risks if

9    there were extradition proceedings in another country, and I

10   repeat my statement that that line of reasoning applies to just

11   about every case here, your Honor.  Somebody could flee to

12   another country.  There is always litigation risk.  This is not

13   an uncommon provision in extradition treaties to give the

14   requesting or I guess the host country an opportunity to object

15   on certain bases.  So that is not an extraordinary provision in

16   the extradition treaty.

17   Now, as to the point about the global extradition

18   waiver.  I don't think anyone is qualified to stand up here and

19   say the global waiver wouldn't have absolutely no effect

20   anywhere in the world.  And I'm not saying that it would

21   definitely be honored in every part of the world.  But it is

22   significant for a number of reasons.  At a minimum, it would

23   make things more difficult for Dr. Ho.  And let me be clear

24   about the circumstances under which it would do that.  If

25   Dr. Ho were to decide to cut off his ankle bracelet and flee,

I259hoc

1    if he were to somehow evade capture by the U.S. authorities

2    despite intense media scrutiny, and if he were to land in

3    another country, that is when the global extradition waiver

4    would be relevant.

5         But I say all of that to highlight the more

6    fundamental reason why the waiver of extradition is

7    significant.  Because it demonstrates Dr. Ho's mind-set.  He

8    has no issue with making it more difficult to flee and live a

9    life of exile, no issue with making it more difficult to fight

10    extradition because he has no intention of fleeing.

11         The question for this court is not:  What would happen

12    if Dr. Ho were to flee?  The question is:  Would this

13    internationally recognized public servant even try to flee?

14    Are there conditions that would reasonably assure his return to

15    court?  We respectfully submit that we have proposed conditions

16    that are more than adequate to do that.

17         Now, the Bail Reform Act does not require guarantee.

18    The law presumes that there will be bail and that presumption

19    applies in this case.  The package we propose is more than

20    sufficient to reasonably assure Dr. Ho's return to court.  We

21    respectfully submit that your Honor should order him released

22    on bail.  Thank you.

23         THE COURT:  Thank you, Mr. Kim.

24         Mr. Richenthal.

25         MR. RICHENTHAL:  Would you like me to go to the podium

1     as well?

2             THE COURT:  Yes.  It's just easier to get a projection

3     of your voice.

4             Mr. Richenthal, one thing that I am curious about is

5     the extent to which in FCPA cases you're aware of bail being

6     denied.  I'm talking now about the particular kind of case.

7     And related to that is what the sentencing exposure would be in

8     an FCPA case where there was a conviction, whether it be by

9     trial or whether it be by plea.  Because I know that you've

10    cited in your papers the significant sentencing exposure based

11    upon what the government is aware of now and based upon the

12    charging instrument as it stands right now.  But we all know

13    that sentencing exposure is perhaps one thing in terms of how

14    something was initially charged but if it turns out that in the

15    history of time no FCPA case has ever resulted in ten years in

16    prison that would be obviously of interest.

17            MR. RICHENTHAL:  So taking those questions in order, I

18    have not done an exhaustive canvassing of FCPA cases.  And

19    often cases that could be brought under the FCPA are actually

20    brought in other ways.  So I'm not in a position to give your

21    Honor analogous FCPA cases.

22            I can certainly say there are numerous cases in which

23    defendants are denied bail in this and other courts.  Mr. Kim's

24    point that we're waving our hands at other cases is true in the

25    sense that each case is unique.  For example, they cite the

I259hoc

1    Jeffrey Webb, et al case in the Eastern District of New York.

2    And they say what is true, which is some defendants were

3    detained and some weren't.  Does that mean Mr. Ho should be

4    released or does that mean he should be detained?  The truth is

5    it means neither of those things.  You have to look at this

6    case.  Reza Zarrab in this courthouse was detained, with very

7    high level connections to the government of Turkey.  Does that

8    mean Mr. Ho should be detained?  No.  They are different men

9    from different countries in different circumstances.

10          So I don't have a case that's the perfect case.  I

11   don't think they do either, by the way.  None of the cases

12   they've cited involve former government officials.  None of the

13   cases they've cited, to my knowledge, resulted in sentences

14   even approaching what the guidelines here suggest should be

15   appropriate.

16          But I don't have a case for your Honor.  I don't

17   suggest otherwise.

18          THE COURT:  Go to the sentencing exposure because, for

19   instance, and it just does affect the way I would think that a

20   defendant would think about the consequences of flight if he

21   knew through advice based upon -- and I'm not suggesting in any

22   way that any lawyer would ever tell or advise a defendant

23   knowing that there was going to be flight -- but advising a

24   defendant generally on the consequences and how one plays out a

25   particular case, presumably counsel will talk about the way in

which cases have, if there is a conviction, what that might

result in.  If it turns out that most FCPA cases either result

in no jail time or three years of jail time, that's a different

kettle of fish, I think, than if we're talking about ten years.

I just don't know to tell you the truth.  So you've got the

broad background.

MR. RICHENTHAL:  So, I also don't know in the sense I

can't give your Honor statistics.  But to us the FCPA is just

one form of the bribery statute.  So if I can expand the lens

slightly, as your Honor no doubt is aware, there are numerous

cases in which people face very significant prison time as a

result of bribery.

In this case in particular -- and I keep returning to

this case because your Honor is obligated to look at this case

on its own merits -- the guidelines analysis we've done, which

is set forth in our letter, is based on the assumption that

Mr. Ho was convicted only of FCPA and, indeed, only of one of

the two schemes; the Uganda or the Chad Scheme.  The guidelines

still exceed ten years in prison.  And the reason that's so is

because the sentencing manual treats the FCPA as one of a

number of bribery offenses.  They all fall under 2C1.1.  All of

them.  Whether it's FCPA, 666, arm services fraud, they're all

under 2C1.1.  And they all start at a base offense level of

twelve, which is very robust in and of itself.  They then go

up, among other things, based on who you bribed:  Was the

I259hoc

person a high level official and did you do more than one
bribe?

Well here we're talking very high level officials and
we're talking multiple bribes.  And they also go up based on
the sum of the bribe, that is the quantum, the amount of money
at issue.  Here, we're talking millions of dollars.

So even putting aside the money laundering counts,
which do admittedly carry higher guidelines, putting aside
management and those kind of things, if you just look within
the four corners of 2C1.1, you're looking at very high
guidelines, and you're looking at them for good reasons.  We're
well ahead of trial, nevermind conviction, nevermind
sentencing.

But one of the things that's, in our judgment, very
important in any bribery case, FCPA or otherwise, is
deterrence.  These are exceedingly difficult cases to ferret
out, to investigate, to prosecute.  This case kind of proves
the point.  It takes years.  It takes documents in multiple
countries.

So if we were to get there -- I'm not presuming
anything, but just based on your Honor's questions, if we were
to get there, I think you'd hear me or one of my colleagues
stand up and say a severe sentence is absolutely warranted.
We've said it in domestic bribery cases like Sheldon Silver.
We've said it in international bribery cases like the one

I259hoc

1    involving Ng Lap Seng and the coconspirators.  And we've said

2    it in other cases as well.  So, that's the sentencing exposure.

3           If I could step back, though.  You have a 68-year-old

4    man.  He's, by the way, not in the terrible health the defense

5    says.  There is no evidence of that whatsoever.  He has

6    hypertension for which he takes medications.  Not making fun of

7    hypertension, but that's not a serious medical problem when

8    you're on medication for it.  You have a 68-year-old man.  At

9    an absolute minimum, if he flees it will take years to get him

10   back.  Years.  The Hong case itself proves that.  So you have a

11   68-year-old man who knows certainly he can be free for years in

12   his home country.  That's the minimum.

13          Now, he's deeply connected with the highest levels of

14   that country.  His passport, by the way, refers to him as

15   Chinese because he's Chinese.  This distinction being drawn

16   between Hong Kong and China is meaningful for certain purposes,

17   no doubt.  But it is not this wall, the two shall never meet.

18          So he knows at an absolute minimum if he returns home

19   it will be years before he sees this Court.  That's the

20   minimum.  He can be of great assurance he'll never be

21   extradited.  Never.  I mean the Department of Justice Office of

22   International Affairs has basically told us the odds of Mr. Ho

23   being extradited in the circumstances of this case approach

24   zero.

25          Now I don't know, first of all, Mr. Kim doesn't know,

I259hoc

1    first of all, but there is no precedent for extraditing someone

2    like Mr. Ho.  So he knows those things.

3         What else does he know?  He knows the sentencing

4    guidelines are exceedingly high.  He knows the statutory

5    maximum is very high.  He knows the evidence, and it's only a

6    piece of it.  It took 54 pages to explain.  Much of it is from

7    his own mouth or to him, e-mails in black and white.

8         THE COURT:  Why don't you spend a little bit of

9    time -- I do understand that in the indictment there is a

10   lengthy description of it, but I think it would be useful on

11   the record to have you go through the weight of the evidence.

12        MR. RICHENTHAL:  So I'll do that but let me just

13   respond to one point Mr. Kim made.

14        Mr. Kim said, in sum, and I may get the exact quote

15   wrong, that this was all transparent, this was all aboveboard.

16   But that's nonsense.

17        The Energy NGO here filed 990s, that's form 990 with

18   the Internal Revenue Service.  Those 990s describe the

19   purported mission of the NGO.  They don't say anything about

20   advancing the interests of a foreign energy company and

21   government.  That's not at all what they say.  They don't say

22   that because, of course, that would be utterly inconsistent

23   with a 501(c)(3) charitable organization.  They couldn't say

24   the truth.  Because the truth would cause them to lose their

25   charitable status.  The truth would give away what they're

I259hoc

doing.  What they're doing -- and by "they" I mean Mr. Ho and

his coconspirators -- are using an NGO to advance the interests

of a for-profit company.  So that's the stage.

Now, what did Mr. Ho do as alleged in the complaint

set out over 54 pages?  He executed with at least one

coconspirator two different schemes to advance the interests of

that Shanghai-based energy conglomerate.  They're referred to

in the complaint, and I believe in the indictment as well, as

the Uganda Scheme and the Chad Scheme.  So taking those in

order what Mr. Ho basically did is he conveyed bribes or offers

to bribe.

THE COURT:  It's not so much that I need a

description.  What I'm interested in is your recitation of the

weight of the evidence.  So assume that I understand the Uganda

Scheme and the Chad Scheme insofar as they are broadly outlined

in the indictment.  Talk to me about the weight of the evidence

and that would include, for instance, the nature of the

evidence.

MR. RICHENTHAL:  So --

THE COURT:  How strong is your case?

MR. RICHENTHAL:  Very strong.

So here's an example.  Page 27 of the complaint.  Top

of that page.  It's an e-mail from Mr. Ho to an Energy NGO

employee who serves as the deputy to Ho at that Energy NGO.

And what Ho is doing in that e-mail is he's forwarding a chain

1    concerning the request of his codefendant -- and by codefendant

2    I mean as charged in the complaint, not yet indicted --

3    Mr. Gadio.  And it's talking about who Mr. Gadio is; that

4    people at the Energy Company are desperate about the

5    prospective joint venture with a Chinese state-owned oil

6    company; and that they're going to use Mr. Gadio to make that

7    happen.  And it refers expressly to remunerations for work

8    done, that's payments to Gadio for making the connection.

9         And what happens next?  As your Honor can see from the

10   heading on page 27, Mr. Ho causes the Energy Company -- let me

11   pause there for a moment.  That's not a typo.  He caused the

12   Energy Company, not the NGO, to pledge $2 million to the

13   president of Chad.

14        So, remember this is a man purportedly acting in a

15   charitable interest.  But what is he actually doing?  He is

16   causing a global energy conglomerate based in Shanghai to

17   pledge $2 million to the President of Chad.

18        That's not my reading of what happens next.  If your

19   Honor looks at page 27, 28, and so on, you'll see e-mail after

20   e-mail, most of which are not translated, by the way, because

21   Mr. Ho principally operated in English.  These are the actual

22   words.  Talking about what they're doing.

23        So, for example, subparagraph (c) on page 28, so this

24   is 28(c), Mr. Ho's secretary is e-mailing Gadio, copying Ho

25   himself -- this is not done without his knowledge -- with the

I259hoc

1    subject line "signed letter by executive one of the Energy

2    Company."  Again, not the NGO.  This is all very, very clear.

3    And the e-mail it attaches a letter in French to the President

4    of Chad.  And that letter is the letter that pledges $2

5    million.

6           That's just one example.  And so I could keep going

7    with this.  But here is the bottomline.  This complaint is

8    basically a complaint about what the defendant said and what

9    was said to him in the course of engaging in two bribery

10   schemes about remunerations, about gifts, about the interest in

11   sectors of various businesses in Uganda and in Chad, and about

12   connecting the desire to have those business opportunities for

13   the company -- not the NGO, the company -- connected to those

14   gifts and connected to those payments.

15          Now I mentioned earlier that's not my interpretation

16   of the e-mails.  I'm saying that because the e-mails, in our

17   judgment, speak for themselves.  But they are backed up by wire

18   records.  They are backed up by bank records.

19          So just to use an example.  You know, the $500,000

20   that makes its way from Hong Kong to a purported foundation in

21   Uganda, as requested by the Ugandan foreign minister, that's

22   routed through New York.  We have that record.  That's not

23   something we're hoping to get through an MLAT.  We have it.  So

24   there is no question it was paid.  There is no question where

25   it came from.  There is no question where it went.  And the

1  e-mails explain what it's for.

2          For example, there are other documents as well.  And

3  we've talked a lot about e-mails.  But in many cases these are

4  actually more than e-mails.  They're actually reports.  Mr. Ho

5  or his assistant actually transmit reports back to China about

6  what he's doing and whether it's a good idea.  These are

7  written documents that are principally attachments to e-mails.

8  And the documents make crystal clear this is a quid pro quo.

9  They're not giving money to the President of Chad because they

10  care deeply about Chad.  They're giving money to the President

11  of Chad because they're in the oil business.  This is not the

12  actions of a charitable organization.  This is the actions of a

13  man using a charitable organization as a front to pay bribes.

14          Now I've been talking about both schemes

15  interchangeably because the truth is they're sort of part and

16  parcel of one story.  But the point I began with is even if

17  Mr. Ho is only convicted of one of the two, the guidelines are

18  effectively the same.  His conduct is effectively the same.

19  His role in it is effectively the same.  So in many ways you

20  can conceive of this case as being two entirely different

21  bribery cases.

22          Now it's appropriately charged together.  One man.

23  One company.  One set of conduct.  One set of meetings.  But

24  conviction on one alone would be devastating.  So I go back to

25  where I started.

I259hoc

1          You have a 68-year-old man facing a complaint that's

2     54 pages long that's only the tip of the proverbial iceberg.

3     He knows if he returns home at a minimum it will be years,

4     minimum, until he ever sees this courtroom again.  That alone

5     is a risk worth taking.

6          And if he knows -- and he's a very sophisticated man

7     so one can presume he does -- what's most likely to happen if

8     the United States seeks extradition is nothing.

9          The reason we cited the articles in which various

10    foreign papers, including the ones connected to the Chinese

11    government, frivolously allege this case is political is not

12    because it's political.  That assertion is utterly frivolous.

13    But when multiple foreign papers in the defendant's own country

14    and own city, some of which are connected to his government,

15    make that allegation, and that is an expressed carve-out from

16    the treaty that gives us great concern.

17         Let's be very clear.  Mr. Ho does not need to get on a

18    plane at JFK to get to China.  He can go into Canada where he

19    has family members and then get on a plane to China.

20         THE COURT:  Well presumably the Red Notices would kick

21    in with some place like Canada.

22         MR. RICHENTHAL:  If he were to remain in Canada.  But

23    my point is to make this happen he doesn't have to get on a

24    plane a few miles from here.  He can cross the border and then

25    get on a plane to China and then before we know it the Red

I259hoc

1  Notices are meaningless, or he can go to the Chinese consulate

2  or the Chinese mission and, again, the Red Notices are

3  meaningless.

4        I don't have a crystal ball.  But what I know is the

5  incentive to flee is massive.  The resources to flee are

6  massive.  And the reason to stay is nothing.  I mean the

7  defense --

8        THE COURT:  Well, the argument is that the same

9  travel, for instance, that the government cites as a reason to

10  be concerned with flight is, in fact, a description of the

11  manner of life of the defendant and that the defendant would

12  not want to live the remainder of his life unable to go

13  anywhere; that his life is currently built upon international

14  communications and interactions and it would be preclusive for

15  much of that.

16        MR. RICHENTHAL:  I would have two responses.  One is

17  it's a heck of a lot better than the MCC.  So if his choice is

18  I can't fly all over the world but I'm at home with my millions

19  of dollars and my high level connections and everyone thinks

20  that my case is political to begin with, they don't assume I'm

21  guilty, or my other choice is to remain incarcerated.  That

22  doesn't make Mr. Ho a bad person.  It just makes him rational.

23  That choice is obvious.  The first is a lot more attractive.

24        The second point is if you look at where he's

25  traveled, these are not all countries that recognize a Red

1    Notice or have very friendly relations with the United States.

2    He may well not be able to go to, say, the United Kingdom, but

3    Chad, Uganda, Iran, Russia.  I could keep going with this.

4    These are not all countries that Mr. Ho could not go to if he

5    so felt inclined.

6         And many of these country, including Russia, he's

7    visited more than once.  Typically he goes where the oil is

8    because that's what he's really doing.

9         But, I can't speculate as to his future travel

10   intentions.  What I can say is a rational person deprived of

11   the ability to go to a certain set of countries while living a

12   very comfortable life in one's home country versus remaining

13   incarcerated will choose to flee.  It doesn't make him a bad

14   man.  It just makes him a man.

15        And the question for this Court is:  Are there

16   conditions that can reasonably assure his appearance?  Your

17   Honor got the legal standard right.  We have no quibble with

18   anything your Honor said about the legal standard.

19        THE COURT:  So let's talk about why the government

20   views a combination of home detention or incarceration and

21   electronic monitoring and possibly some form of surveillance

22   combined with that which either could be random drop-ins by

23   pretrial or it could be additional video monitoring, or it

24   could be live surveillance.  Why would that not work?

25        MR. RICHENTHAL:  Let me take sort of the proposal as

1    given first and then I'll talk about some of the possible sort

2    of additions.

3              So the proposal as given essentially -- this is not

4    unusual, it's a pretty standard proposal in this courthouse --

5    is if I flee, I lose money and people close to me will lose

6    money.  But, Mr. Ho has a lot of money.  The Shanghai-based

7    energy conglomerate -- let me pause for a second.  It's

8    absolutely true the company is not charged with a crime.  It's

9    true that the chairman of the company is not targeted.  We've

10   said that.  But it's also true that Mr. Ho is actively

11   e-mailing with people at that company everyday from the MCC.

12   He's not cutoff.

13             And if your Honor reads the e-mails, and we have, he's

14   talking about mounting a public relations campaign for his

15   defense.  He talking about the operation of the company.  He is

16   very senior there.

17             So even if the company as an entity or the chairman as

18   a man did not wish to help him, plenty of people there would.

19   This is a massive, massive energy conglomerate.  It's based in

20   Shanghai but it has projects all over the world.  It has

21   projects elsewhere in Asia.  It has projects in Europe.  It

22   would not be difficult for Mr. Ho to draw on his personal or

23   professional connections to have a lot more money at his

24   disposal than the seven to eight million dollars that he admits

25   he has.  And we have no insight really into the rest.

I259hoc

          So the idea that he would stay for fear of losing $2

million -- and that is the figure, it's two.  He's proposing a

$10 million bond but he's going to put up 2.  Two is only

one-quarter of his wealth as he's admitted it.  Nevermind his

friends.  Nevermind former officials.  Nevermind the company.

That's a trade worth making, give up one-quarter of your wealth

for freedom.

          Now, as to the people that are going to sign the bond,

I don't know these people.  But as your Honor knows it's not

unusual in a white collar case with a sophisticated high

profile defendant to find some people who believe in you,

rightly.  I'm not knocking those people.  They believe in you.

They want you at liberty.  They want to see you succeed.

That's natural.

          But the question is:  Will Mr. Ho stay in the United

States facing these charges and this evidence because a handful

of people who he rarely sees are willing to sign a bond?

That's not a bet that we think this court should take.

          And to be clear it's our burden -- I'm not suggesting

otherwise.  Mr. Kim keeps suggesting that I am suggesting

otherwise.  It is not anyone's burden but ours.  But we have

met it and then some.  So we just don't think the financial

piece of this is sufficient because he has so much more we

barely have insight to and what we have insight to suggests

it's big and it's abroad and we'll never get it.  That's the

I259hoc

1   financial case.

2           Now your Honor suggested perhaps there are other

3   conditions out there, some form of surveillance.  It's

4   possible, and I think we'd want to look at them.  We'd want to

5   maybe talk to the marshal service.  We'd want to investigate

6   them.  But I can tell you, based on other cases in this

7   courthouse, that that's really hard.  Right.  Ankle bracelets

8   can be cut off.  Paul Ceglia cut his off.  Other people in

9   other districts have cut them off.  They can also go on the

10  fritz.  They are rechargeable.  The battery can cease working,

11  or so it can seem.  Things happen.

12          As for some sort of live surveillance, I don't know

13  exactly what that would be.  I can imagine a camera of some

14  kind.  It's hard for me to envision how we could act quick

15  enough to act on it.  I don't think the FBI has the resources

16  to be watching a camera 24 hours a day and then sort of rush to

17  the apartment if they see something untoward.  It just doesn't

18  seem tenable.

19          The only thing that's come up in this courthouse, it

20  came up in the Reza Zarrab case, and it also came up in the Ng

21  Lap Seng case -- I think Mr. Kim alluded to this -- is some

22  form of private security.

23          We vehemently oppose that.  We've opposed it every

24  time it's come up, with exceptions that are completely inapt

25  here.  Judge Berman denied that in the Reza Zarrab case,

I259hoc

rightly so.  Judge Broderick granted it in the Ng Lap Seng case
and we vigorously opposed it and we think that was wrong.

THE COURT:  Tell me why, why you oppose it.

MR. RICHENTHAL:  Well, as a base matter, again, Mr. Ng
presented, and indeed still presents, an extreme risk of
flight.  So our view is there's nothing that can be done to
keep him here.

But with respect to private security itself, we
opposed it for a variety of reasons.  Point one, we don't think
that wealthy defendants should be able to buy their way out of
jail.  That's like a core principle of our system.  We don't
think they should be able to buy their way out by having a
private security force at their disposal as a principle.  As a
more practical answer to your Honor's question, the incentives
for a private security force are exactly the opposite of what
you would want.  They are typically paid weekly or monthly,
which means they have incentive to keep the person out.  They
are paid by the person they are purportedly preventing from
fleeing, which means not only do they have an incentive to keep
him or her out, they have an incentive to not report to this
court or to pretrial services things they see that are a
problem.  Because if they do that and the person gets remanded
their pay stops.  And that incentive is not just for the
company as a company.  It extends down to the officer level,
the guard level.  At least in my experience the officers are

I259hoc

 1  paid hourly.  There's nothing wrong with that as a concept.

 2  But human beings respond to incentives.  If you're paid hourly

 3  by the very person you're protecting and you see something that

 4  violates a bail order, whether it's flight or using a cellphone

 5  or anything else, how likely are you to report it?  And that's

 6  not speculative.  In the Ng Lap Seng case itself, contrary to

 7  the express instructions of Judge Broderick, the private

 8  security company in that case took Mr. Ng to a restaurant

 9  multiple times.  He was not permitted to go to a restaurant

10  once.  They took him there multiple times.  They only stopped

11  doing it when they got caught.  They also inexplicably failed

12  to recharge his ankle bracelet multiple times.  They stopped

13  searching everyone visiting his apartment on the theory that

14  some people had been there so many times it was okay.  They'd

15  probably defend themselves differently but I'm telling you

16  that's what happened.  They started eating food the defendant

17  himself had someone make for them.  One can imagine that's

18  probably not a great idea if them falling asleep is all that

19  prevents him from leaving.

20          I'm not knocking the company as a company.  But the

21  principle is when you have a private company paid by the hour

22  week or month to guard someone, the incentives are the opposite

23  of what we want.  And the training is not the Federal Bureau of

24  Prisons or the Marshal Service.  They are not professionals

25  charged by oath to protect and secure the defendant.  They're

I259hoc

1    private guards.  It's inappropriate as a matter of principle.

2    It's inappropriate practically.  But it's also not being

3    proposed here.

4           If your Honor wants to rule against the present bail

5    package with leave to present another one, I suppose that's not

6    inappropriate.  And if they want to come back and argue about

7    private security, we can tailor our responses to the actual

8    proposal.  But we were against that proposal in every case.

9           Judge Berman wrote on this.  There's an opinion in the

10   Zarrab case about why this is inappropriate.  I would

11   respectfully suggest your Honor look at that.

12          There are other cases around the country in which

13   people have written on this.  I'm aware of only one case

14   anywhere in the country of anything remotely similar in which

15   the court has granted a private security force to keep a

16   defendant out of jail.  That is the Ng Lap Seng case.  We

17   fought against it.  We still fight against it.  We didn't win.

18          THE COURT:  So let's move beyond the privately -- I've

19   actually gotten it's a sore point for you.

20          MR. RICHENTHAL:  I wouldn't say it's a sore point.  I

21   think it's an important one.  There's an increasing trend in

22   this country --

23          THE COURT:  Okay.  I got it.

24          MR. RICHENTHAL:  This case.  Private security isn't

25   even being offered, although, again, we're against it.

I259hoc

1  68-year-old man.  Massive incentive to flee.  Resources to

2  flee.  Hasn't lived in the United States in decades.

3      THE COURT:  So I get all the points.  Are there any

4  new points?  You don't have to summarize.

5      MR. RICHENTHAL:  The only new point I would make is

6  this global waiver of extradition.  It's not the case that no

7  one knows what it means.  It's been litigated in multiple

8  courts for years.  And courts have uniformly concluded it means

9  basically nothing.  United States Department of Justice Office

10  of International Affairs has concluded it means basically

11  nothing.  That's true generally but it's also true in

12  particular here.  Because Hong Kong's legal system, as it is,

13  is generally derived from common law, as is ours, given Hong

14  Kong's history with United Kingdom.  Common law jurisdictions

15  in particular reject this idea, according to the Office of

16  International Affairs.  I am not an expert on this.  They are.

17  They have told us repeatedly this is basically not worth the

18  piece of paper.  And so it doesn't change the dynamic, which is

19  there are always exceptions in a treaty.  Political is only one

20  of them.  There's no assurance it will ever work.  There's

21  every reason to believe he's going to try.  There's every

22  reason to believe if he doesn't he'll be convicted, which is

23  why he'll try.  And there's every reason to believe if he makes

24  it back he will not be looked at like a piraya.  He will be

25  looked at as a man who escaped a political case.  That's not

1    what this case is.  But he shouldn't be allowed to seek bail

2    and return to a jurisdiction and then say well it was all

3    political.  At the end of the day all he's saying is I'll lose

4    some money if I flee so you should let me be bailed on those

5    conditions.  That's not sufficient.  In our judgment nothing is

6    sufficient, but you're right to cut me off with respect to

7    private security because that's not on the table.  What's on

8    the table is not enough.

9         THE COURT:  All right.  Just to be clear I raised

10   private security.  It wasn't you.  So you weren't going off on

11   a tangent.  I just know that it seems as if you have -- you've

12   expressed to me adequately the views that you have.

13        All right.  So are you all set?

14        MR. RICHENTHAL:  I don't believe I have anything else,

15   your Honor.  All I was going -- I was going to tick through

16   some of the other points that Mr. Kim made.  I don't think it's

17   necessary.

18        All I will say is that with respect to Hong Kong

19   versus China, the passport says China because he's Chinese.  He

20   has a card that authorizes him to travel to mainland China.

21   But your Honor needs to look as cases as they stand.  And when

22   you have a man this well connected in Hong Kong, who is deeply

23   and intimately connected to a Chinese energy conglomerate in

24   Shanghai, who is still talking to people at that energy company

25   and people at that energy company are making public statements

1    about the case, including some anonymously, to suggest it's

2    political, it is fanciful to believe that somehow if he made it

3    to Hong Kong the Chinese authorities wouldn't allow him to

4    cross the border into mainland China.  Of course they will.

5                THE COURT:  Mr. Kim.

6                MR. KIM:  Your Honor, may I address some of those

7    points very briefly?

8                THE COURT:  Very briefly and then what I'd like to do

9    is take a five-minute break and then I want to come back and --

10    but go ahead.

11                MR. KIM:  I don't want to belabor this point, but on

12    the private security, Judge Rakoff also permitted that in the

13    Marc Dreier case and wrote an extensive opinion about why he

14    believed that was actually appropriate.

15                Let me just say this, your Honor.  Mr. Richenthal

16    talked at length about the strength of the case.  We will have

17    much more to say about that at a later time.  But suffice it to

18    say that we agree.  The government has done a great job of

19    proving potential willingness to pay, make donations to two

20    countries here.  And what is not included in the complaint,

21    we've now seen in the initial wave of discovery, is the context

22    for a lot of discussion about those payments.  They focus on

23    providing countrywide aid, including military support,

24    donations for schools and healthcare.

25                So, your Honor, sure the complaint reads fine when

1   you're taking that into consideration, but when you take a step

2   back and look at the context, we're talking about charitable

3   aid on a country level.

4          Now let me also say this, your Honor.  The government

5   went at length about the rational calculus that the defendant

6   faces.  Now, I'll start by saying that the core fallacy, the

7   shaky foundation on that, on the government's argument is that

8   you start with the consequences of what happens if somebody

9   flees.  Now, of course every defendant in this building I think

10  it's fair to say would rather be sitting in another country

11  than sitting confined in the MCC or the MDC.  Every defendant

12  faces that same calculus.

13         Now, again, the proper analysis here is not what

14  happens if Dr. Ho flees.  It is based on what we know about

15  this man's history and characteristics, is he going to flee?

16  Does he have a desire to flee?  Are there conditions that can

17  reasonably assure his return?

18         Judge Scheindlin made an interesting point in the

19  Bodmer case, your Honor, again dealing with a Swiss national

20  from Switzerland from which he could never be extradited, she

21  made this point.  She said:  If you accept the government's

22  argument that because extradition is impossible he should be

23  detained, then no individual from Switzerland ever should be

24  granted bail, fill in the blank, the list of other countries

25  that categorically do not extradite their own.  Citizens of

1    France should never be granted bail.  But that is not our

2    system.  That is not the standard of government.

3         THE COURT:  I think it's a little bit different

4    because I think that you have to weigh the motive to flee in

5    that calculation.  In other words, if there is a strong motive

6    to flee, then the lack of ability to extradite with any teeth

7    becomes an argument that is more in the government's favor.  If

8    there's not much motive to flee and you're only just past a

9    preponderance, then perhaps that fact that you're a Swiss

10   national cuts the other way or is neutral or something like

11   that.  I think it's a little bit different than how -- I

12   haven't read Judge Scheindlin's opinion -- but how you

13   characterized it.

14        MR. KIM:  I accept the premise if there's a strong

15   motive to flee, then you start looking at the consequences of

16   being able to extradite.  I think what's happening here is

17   we're conflating the analysis.

18        Let's me talk about that first point.  If there's a

19   strong desire to flee.  I was remiss in not saying this

20   earlier.  That Dr. Ho, we have now spent hours together, and I

21   can tell the court he's a man who treasures his honor.  He

22   values the worth of his name.  He's not some nameless

23   bureaucrat or executive who is dragged off a plane and arrested

24   here.  He is a former cabinet level official in Hong Kong, your

25   Honor.  His work and his life are built on his reputation and

I259hoc

1    his character.  He has every incentive to stay and fight and

2    defend these charges.

3         Now Dr. Ho, frankly, would rather face these charges

4    and be convicted after trial than to flee in disgrace.  That is

5    not an option for this man, your Honor, based on everything he

6    has done so far.  Based on the trajectory of his life, flight

7    is not an option.  He has no intention of fleeing.

8         THE COURT:  All right.  Thank you.  Let's take a short

9    break, we've been going for about an hour and ten minutes, and

10   then we'll come back.  Just a short break.  About five minutes.

11   Thank you.

12        (Recess)

13        THE COURT:  For the reasons that I'm going to state

14   I'm going to deny the bail application.  I'm going to deny it

15   with leave to renew, as with all bail applications, and I'll

16   explain why, and I'll explain what would need to, in my view,

17   be proffered to additionally support such an application.

18        The standard as we've all discussed and agreed is

19   under 3142.  A factor that is extremely important to me that

20   undergirds motivation to flee, because that's what we're

21   talking about, we're talking about risk of flight, and lots of

22   things that flow from that is the weight of the evidence.

23   Because if the evidence is not properly being weighed by this

24   court and if the defendant knows that or views that there is a

25   very good likelihood, strong likelihood -- I know that,

Mr. Kim, you're going to defend this case, Mr. Levander, you're going to defend this case, you'll defend it vigorously, but if a defendant understands that his defense is a robust defense that has got a very serious chance of prevailing, and that context will reveal that what we're talking about are not bribes but are something else, then his motivation not to flee is commensurately lowered. But if the defendant views the weight of the evidence as very strong, then the likelihood of conviction is higher and the likelihood of spending time behind bars is commensurately higher. And so the weight of the evidence is exceedingly important to me because I do think that it informs the motivation.

The weight of the evidence here I view as extremely strong, frankly, based upon what has been proffered to date. All that I have is -- and it's not all, I shouldn't say that because it sounds like it's not very much. It's actually a robust indictment that -- charging instrument that's got a great deal of detail. I agree with the government that the way in which they have presented the evidence that they have in the indictment is based upon what the defendant himself said, what was said to him. There are references to wire records, bank records, and other documentation. And these are things which do not require, for instance, the weak testimony of an otherwise infirm cooperating witness. Now there may be infirm cooperating witnesses, but that might be on top of what is

I259hoc

otherwise a robust presentation.  So the strength of the case, as I perceive it, and the weight of the evidence is strongly in favor of the government.

I hear Mr. Kim's point that there will be context which can be put around this.  At this point in time I don't have any sense of that.  And what I have is a sense that if the government is able to prove the case that is set forth in the indictment, then it meets the elements of the crime charged, I believe.  And you folks if you don't -- if you think there's infirmities in the indictment you'll bring those to me but based upon my review of the statute that is my current belief.

So that weight of the evidence I think is appropriately placed in 3142(g) as a very prominent factor. It's obviously against the backdrop of the nature and the circumstances of the offense charged.  This kind of bribery is one which is taken extremely seriously and is deemed to be one which carries serious consequences if proven.  And bribery, I want to mention, is a crime which is based on a view that there is a lack of integrity in the exchange of money.  I say that because the assertion here by the government is that while no one is denying that Mr. Ho is certainly a very prominent man with a long and proud history of public service, which is real. I think that against that is that the alleged unlawful acts are suggestive of a willingness, if proven -- again, this is based upon what the court is seeing in the allegations -- would

I259hoc

1    suggest that the history and characteristics are not all

2    one-sided; that there is a way in which the bribery could

3    indicate that there is an individual who has at times been

4    willing to break the rules.

5           So that is of importance to me as I weigh the very

6    good history and characteristics in terms of public service

7    against also the nature of the conduct and as laid out against

8    the backdrop as set forth in the indictment.

9           The age also -- and I'm now talking about the history

10   characteristics -- we're in 3142(g)(3).  The age of Mr. Ho I

11   think cuts both ways.  The government has argued Mr. Ho's age

12   cuts in favor, if you will, of flight because of the desire not

13   to spend a long period of time when one is 68 years old behind

14   bars in a foreign country.  And also the -- if there was

15   flight, the duration and the length of time it would take at a

16   minimum to come back to the United States makes that something

17   which is -- would be more appealing to somebody who is 68 than

18   if they were 35, I would think.  Particularly when I think the

19   duration of a sentence, without knowing it, I'm going to assume

20   that a duration of a FCPA sentence may be somewhere in the

21   vicinity of say three to ten years as opposed to ten plus in

22   terms of what people are frequently sentenced to.  That

23   duration of sentence doesn't mean that the consequences of the

24   crime are not -- are not serious consequences.  Any felony

25   conviction is a serious consequence and incarceration for any

I259hoc

1    period of time is a serious consequence.  But it is suggestive

2    that the period of incarceration for an individual who is 68 of

3    three years has a different magnitude and sense of relativity

4    than if they are 35 years old.

5           International prominence I think is also a factor

6    which cuts both ways.  On the one hand, I believe that it is --

7    and I credit that there is an argument, a very strong argument

8    to be made that Mr. Ho is living a life which requires, and

9    he's able to contribute through his international prominence to

10   international dialogue on a variety of issues and his life is

11   built around travel, and also his reputation and the importance

12   of his reputation.  On the other hand, it's also suggestive of

13   potentially if there is an ability to find harbor in some of

14   the countries where he has achieved that prominence,

15   particularly with certain press reports talking about the

16   particular criminal prosecution here being politically

17   motivated.  It's not at all clear to this court that that

18   international prominence would take a negative hit.  In other

19   words, the reputational issues here I think are unclear.  This

20   defendant has not necessarily built his international

21   prominence as within the United States.  It's international

22   prominence that's largely located outside of the United States

23   of which the United States is aware.  Therefore, a hit within

24   the United States reputationally may or may not have the kind

25   of consequences that are being discussed outside of the United

1    States.  In other words, it might not be embarrassing if you're

2    living in Hong Kong to have fled to Hong Kong if you believe

3    that the U.S. prosecution was politically motivated.

4         Now in terms of friendships and other contacts in the

5    United States.  I think it's important to the Court that this

6    defendant does not have any family ties in the United States.

7    He doesn't have a current residence in the United States.  It

8    would be a temporary residence, which obviously has

9    consequences that are different from just having a street

10   address but also have to do with the way in which somebody has

11   sunk their feet into the fabric of a community, and that is

12   lacking.

13        Also, the lack of assets in the United States.  Again,

14   that's not just about can you find the money, because

15   presumably money could be sent here, but it's about whether or

16   not there are assets which are descriptive of sinking oneself

17   into the fabric of a community.  And the lack of a true

18   business in the United States again here is also one that is

19   suggestive, yet again, that the majority of the defendant's

20   life in all ways is located outside of the United States.

21        I have considered the defendant's, obviously his

22   strong international reputation, his physical characteristics.

23   I would say he looks to the court in terms of his demeanor as

24   an individual who doesn't have any obvious medical conditions.

25   That does not mean that one can't have all kinds of medical

1  conditions but the defendant does not appear to the court to be

2  frail in any particular way.  And so I do take into account his

3  age and his medical issues and I don't minimize them but I also

4  don't think that they are strong enough to counter the points

5  that I have already made.

6        I do think it's important to the court that the

7  factors as a whole result in a view by this court that the

8  standard of a preponderance of the evidence has been met to

9  demonstrate risk of flight.  The government needs to show that

10  by a preponderance, not by clear and convincing evidence or

11  some higher standard, but by a preponderance, and they have

12  done that.

13        I then turn to whether there are any conditions or a

14  combination of conditions which could reasonably assure the

15  defendant's appearance.  And I find that the conditions as

16  proposed do not and the additional condition of surveillance

17  that I have considered does not.

18        The reason for that is as follows.  One, the

19  conditions are, as the government has stated, essentially in

20  part money, which is important, but the lack of insight into

21  the defendant's assets have countered that somewhat.  I don't

22  have any real sense that the money in and of itself is enough

23  to tie the defendant strongly here.  In other words, money that

24  for an individual the loss of it would result in a serious -- a

25  serious negative consequence in his life, I don't -- that's

I259hoc

when money can be very effective.  I don't have a sense that

that is the case here.  I don't know whether or not the

defendant would be, given his age, willing to -- not that I

have to know, but my view is by a preponderance the money

itself cannot counter what I view, based upon the weight of the

evidence, and the motive of the defendant possibly to flee, to

flee, because having even reduced circumstances is perhaps more

appealing by quite a bit than having -- being incarcerated at

the age of 68.  In addition, the $2 million is only a piece of

the defendant's known wealth.  But, in any event, I think this

is one of those circumstances where money alone is not really

the issue.  It's whether or not, for instance, there is -- if

the defendant flees, is there any way to really reasonably

assure his appearance by, for instance, extradition.  So

extradition is not certainty.  There's not a guarantee.  It's

just is there any reasonable assurance if there is flight that

extradition would be one of the combination of conditions which

could reasonably assure his appearance.  And the answer is no

here because there are no teeth that appear in the extradition.

The extradition by all accounts would be very time-consuming,

very resource-intensive in terms of attention and time.  The

track record of getting people out of Hong Kong is not

significant.  And the global waiver of indictment, while I will

say I have actually accepted one in the past when it related to

Canada and where I also had other attachments to property and

1   had received various things that are akin to a deed in lieu, I

2   did accept one.  But here that would not be in the court's mind

3   sufficient because that is another piece of litigation.  One

4   would have to litigate that contract.  So, the possibility of

5   extradition does not provide the court any comfort.

6   Now, I agree with Mr. Kim, who, by the way, probably

7   presented the single most eloquent bail application I've ever

8   heard, an extraordinarily well constructed bail application

9   which has made it difficult for this court to really, as I

10  think about it, it's a decision that I, as you know, had to

11  take a break to get my thoughts in order on.  But, as Mr. Kim

12  had carefully stated, the government is not entitled to

13  absolute certainty.  And, again, I agree with that.  But that's

14  not what we're talking about.  We're also talking about a

15  reasonable assurance and extradition does not provide a

16  reasonable assurance.

17  I've also thought about, what about home detention,

18  home incarceration with electronic monitoring.  But this court

19  has had experience with electronic monitoring not working.  It

20  is an ex post situation.  It is one where, depending upon how

21  quickly the monitoring occurs it can result in flight even

22  with, frankly, the bracelet on and an inability actually to get

23  to the person.  Here, I don't think that the bracelet would

24  stay on.  I think that the issue is would it come off.

25  Now it doesn't have to be clipped off.  It can be a

I259hoc

lot less sophisticated than that.  They do run on batteries.

You have to plug them in periodically, every 24, 48 hours,

depending on who you're talking to.  So simply running the

battery out can be one way of doing it.  The court has had the

experience of when the battery runs out, if there's a pattern

of the battery running out, then sometimes pretrial doesn't pay

as much attention to it.  If there is no pattern of the battery

running out and that, therefore, electronic monitoring is only

as good as its history of being monitored.

        Now it is always the case that one can increase the

level of pretrial monitoring of the bracelet.  One can always

receive assurances on a 24-hour basis that it's been plugged

into the wall.  But that all is suggestive of a level of

oversight that is quite burdensome and is also suggestive of a

lack of confidence if the court were to impose such a thing in

the defendant sticking around unless there was such oversight

in place.

        So monitoring is not in and of itself sufficient.

When we combine that with home detention, the problem is that

monitoring with home incarceration or home detention can be

useful when somebody has a -- has their feet set in the

community, when they are otherwise embedded in the fabric of

the community, because then the home has also additional

meaningful importance.  Often there are people there.  Often

there are other reasons to stay there.  But here it would just

1    be a place other than a jail cell.  Now, that's not

2    insignificant and that does not mean that the defendant would

3    necessarily, because of that, flee.  But what it does mean is

4    that some of the reasons why home incarceration and home

5    detention work are not present here.

6            I also have considered the additional security as a

7    possibility.  I think that for the reasons that the government

8    has stated that is not something which this court is at this

9    point in time willing to suggest would counter these other

10   issues that I've already raised.  The training of the officers

11   is different.  They are not bound by the same oath as law

12   enforcement officers.  And the example that Mr. Richenthal

13   raised with the Ng Seng case of not having that work well is

14   really quite, quite concerning.

15           So I have considered the package that was proposed and

16   in light of the Court's view of the risk of flight, which I

17   have found by a preponderance of the evidence exists, at this

18   time I don't believe that there is any condition or combination

19   of conditions which could reasonably assure the defendant's

20   presence.

21           I want to return, however, to the point that a lot of

22   the court's view was based upon, a very significant portion of

23   the court's view is based upon its lack of any reason at this

24   point to have anything seriously to undermine the weight of the

25   evidence as proffered by the government.  If it turned out that

I259hoc

1    we -- that I believe that the weight of the evidence is far

2    diminished, then the Court's concerns about the defendant

3    wanting to flee go down.  The chances of the defendant being

4    incarcerated right now for, as an innocent man who has not

5    engaged in criminal conduct, that is a difficult -- that

6    becomes different as well.  He's always operating under an

7    assumption of innocence, but the court does need to take into

8    consideration how the very strong weight of the evidence plays

9    out in this proceeding.

10           Thus, for all of the reasons which I have stated, the

11   court finds by the standard that we've already discussed that

12   the defendant should not be released on bail at this time.

13           I do, however, specifically state that this was with

14   leave to renew the application and in advance of any renewed

15   application what I would want to receive is from the defense a

16   submission which indicates how they would characterize certain

17   things.  I know it would be previewing a strategy.  It may be

18   that they're able to do that in camera or in some other way

19   which would allow the court then to assess where we are.  But

20   there needs to be some counter to what the government is

21   presenting at this time.  So this is not a situation where

22   there has to be the kind of changed circumstances that one

23   would normally associate with a renewed bail application.  What

24   I'm suggesting is that simply making a different proffer might

25   be something that would assist.

I259hoc

1     I don't, however, want to give you false hope with

2   that.  I don't want to by saying that suggest that people who

3   often read the tea leaves and believe that the court is a

4   hair's-breadth away from granting bail.  I am not.  But I would

5   be very interested in having an application that was done in

6   such a manner if a -- let me put it differently.  If a bail

7   application is going to be made, having that be part of it,

8   having that kind of proffer be part of it.

9        The court will refer to this transcript as its

10  findings on this bail application.  While the court needs to

11  make findings, the law in this circuit allows the court to make

12  oral findings based upon a written transcript, having the

13  written transcript then constitute the written findings.

14  Therefore, if an appeal from this bail application is taken,

15  then this transcript would provide the written record for the

16  parties to do so.

17       All right.  I think that that concludes our purpose

18  for today.  Thank you, folks.  We're adjourned.

19       MR. RICHENTHAL:  Sorry.  Two small matters, your

20  Honor.

21       THE COURT:  All right.

22       MR. RICHENTHAL:  So, one, if your Honor were to

23  contemplate in camera review, we'd like to be heard on that.

24  I'm not sure the law --

25       THE COURT:  Step by step.

I259hoc

1          MR. RICHENTHAL:  I'm not sure the law permits that.

2     Let me just say that for now.

3          THE COURT:  Step by step.

4          MR. RICHENTHAL:  Agreed.

5          And, second, I was going to move for exclusion of

6     time.  I was originally going to ask until April 13, which is

7     our conference date.  But I think in light of the nature of

8     this case, the ongoing production of discovery, motion

9     practice, CIPA, etc., it may just be appropriate to exclude it

10    all the way until the trial date.  But if your Honor wants to

11    go step by step we would ask for exclusion to April 13 so we

12    can continue production of discovery, defendants can continue

13    to review discovery and contemplate motion practice.

14         THE COURT:  This is one of those situations where I --

15    the government -- the defense position is extremely important.

16    They have indicated that should the defendant not be released

17    on bail they would want a very quick trial consistent with

18    their ability to prepare.  And so we've talked about

19    November 15 as the date.  If that is going to be advanced in

20    light of this or if the defense wanted to think about that, the

21    court stands ready to have the case tried on whatever schedule

22    the defense would like.  And also, of course, let me know your

23    position on any exclusion of time, whether to April 13 or to

24    some other date, Mr. Levander.

25         MR. LEVANDER:  Okay on April 13.  Piece by piece.  And

I259hoc

1  we will think about our options, your Honor.

2  THE COURT:  So two things then.  Then the Court does

3  prospectively exclude time between today and April 13, 2018 to

4  allow the continued review of discovery, the contemplation of

5  motions and the consideration of trial strategy.  Those matters

6  are in the interests of justice and outweigh the interests of

7  the defendant and the public in a speedy trial.  So that time

8  is prospectively excluded.

9  The trial currently shall be set for November 15 is I

10  think what we said or November 16, 2018.

11  15th, 2018.  But if in light of --  November 5.

12  Sorry.  I'm sorry.  November 5.  I thought the hand with five

13  was saying 15th not 16th.

14  November 5, 2018.  If anyone has an application to

15  make on that, they should do so promptly because I will set it

16  down in stone and would hope that you all would do so as well.

17  My trial dates tend to be hard trial dates.  With that said, an

18  advancing of the trial date is not usually the issue.  It's

19  whether people want to make it later.

20  Mr. Levander, you had something else?

21  MR. LEVANDER:  That's it, your Honor.

22  THE COURT:  That's it.  Thank you.  We are adjourned.

23  (Adjourned)

24

25