UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 17 Cr. 779 (LAP)

CHI PING PATRICK HO,

Defendant. Jury Trial

------------------------------x

New York, N.Y.
November 26, 2018
3:52 p.m.

Before:

LORETTA A. PRESKA
District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: DANIEL RICHENTHAL
DOUGLAS ZOLKIND
CATHERINE GHOSH
PAUL HAYDEN
Assistant United States Attorneys

BENJAMIN ROSENBERG
EDWARD KIM
KATHERINE WYMAN
JONATHAN BODANSKY
JONATHAN BOLZ
Attorneys for Defendant

ALSO PRESENT: Ryan Carey, F.B.I.
Aashna Rao, Paralegal
Peter Calabrese, Paralegal

(In open court; jury not present)

MR. ZOLKIND: Your Honor, we just wanted to confirm, we're going to start around 4:00. If openings take us till about quarter or ten to 5, is the Court expecting us to call our first witness today?

THE COURT: No. No.

MR. ZOLKIND: Okay. Wanted to be sure. Thank you.

(Jury present)

THE COURT: Won't you be seated.

Now, ladies and gentlemen, now that you've been sworn, I'd like to give you some preliminary instructions to guide you in your participation in this trial.

As I told you previously, it's your function in this case to decide the issues of fact. Your decision on the issues of fact is to be based solely on the evidence. Nothing I say is evidence. Nothing any of the lawyers says is evidence. Questions by themselves are not evidence. Objections are not evidence. Testimony that has been excluded or which you're told to disregard is not evidence. The evidence consists primarily of the sworn testimony of the witnesses, and of the exhibits that are received into evidence.

Also, in some instances there might be facts that the lawyers agree to, which are also evidence. They're called stipulations. And if that happens, I'll tell you about it at the time.

Also, there will be some documents translated from other languages received into evidence, and you must accept the translations as being true and correct translations of the underlying documents.

Now there are two types of evidence -- direct and circumstantial. Strangely enough, direct evidence is direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of one or more facts from which you may infer or conclude the existence or nonexistence of other facts. That sounds complicated, but today is a perfect example of a day to illustrate circumstantial evidence. The shades are all drawn here in the courtroom so we can't see if it has begun to rain outside or not. But let's imagine that somebody came in the back door with a dripping raincoat and umbrella. From those facts we would conclude, based on our experience, that it had begun to rain outside. So the dripping raincoat and umbrella is circumstantial evidence of the fact that it began to rain. So that's all there is to it.

We'll talk about this again at the end of the case, but for now, please keep in mind that you may consider both direct and circumstantial evidence.

How do you decide what to believe and what not to believe? Listen to the witnesses, watch them, and observe them, and then decide whether you believe or disbelieve them in the same way that you decide those questions in your everyday

life. Did the witnesses know what they were talking about? Were they candid, honest, and truthful? Did they have a reason to falsify or exaggerate their testimony? Use your common sense and your good judgment to evaluate their testimony, based on all of the circumstances.

Now it's very important that you keep an open mind throughout the case. Don't form any judgments until all of the evidence is concluded and you've heard the Court's instructions on the law. Remember also that the evidence comes in step by step. First a witness testifies on direct examination, and then the witness is subject to cross-examination by the other side. First the government presents its evidence, and then the defendant has the opportunity to present evidence. And remember there could be two or more sides to every story, and you won't be in a position to form any judgments until you've heard all of the evidence and heard the Court's instructions on the law.

Now would you be sure, please, that no one you know is in the courtroom where I don't know it. It's particularly important that your friend or relative not be present when you folks are in the jury room. For example, if the lawyers and I are speaking about whether a particular piece of evidence is properly brought before you for your consideration and I decide that it's not proper for you to hear it, then you go to Chinatown for lunch with your pal and your pal says, so what

about that evidence? Well, if that happens, we might have to do the whole thing over again. So if anyone you know is in or comes into the courtroom, let me know at the earliest opportunity, please.

You're going to hear this one a bunch of times during the case. Please do not discuss the case among yourselves or with anyone else. You'll discuss it among yourselves only after all of the evidence is in and you've heard the Court's instructions on the law. Until then, please keep all of your thoughts and your impressions to yourself. I don't care if someone comes in here with purple, pink, and green hair. You are to say nothing about it until you've heard all the evidence and the Court's instructions on the law.

Please do not read anything about the case, don't listen to anything about the case, and most of all, do not do any research on the case. We all know that in this day and age, people younger than I have as their first impression to look it up. This is one time when you may not do that. After the case is over and we have a verdict, that's all fine. But between now and then, you are to do no research on the case. Well, why is that? We have rules of evidence, as you know, and they've been worked out over hundreds of years, with the idea of having only the most reliable evidence put before juries, so that's why we have the rules. If you look something up and you get a piece of evidence that might not ever have been

admissible, then that's not fair.

Also, you'll know something and the lawyers won't know that you know it, so they won't have the opportunity to point out to you if it's not correct or to counter the evidence or anything else. So it's just not fair. So I'll ask you, please, do not do any research on anything having to do with this case.

Don't allow anyone to speak with you about the case. If anyone attempts to speak with you about the case, let me know at the earliest opportunity.

Also, in the same light as investigation, in the old days, it used to be that the enterprising juror went out and looked to see if you could see the stop sign behind the bushes. Same thing. They had to do that case over again too. So no research, no investigation, no nothing.

Now if you wish, you may take notes. If you do, please put your name on the notebook and leave the notes in the jury room overnight when you go home. And remember that the notes are for your own personal use. They're not to be read or shown to anybody.

I will reiterate what I told you at the lunch break. If you see anyone who is involved in the case, you are not to speak with them and they are not to speak with you. You'll be doing your jobs. You will not be being rude.

Couple more words on trial procedure. In two seconds,

as soon as I'm finished, the lawyers will have an opportunity to make opening statements. The statements are not evidence, because remember, nothing the lawyers say is evidence. The statements serve no purpose other than to let the lawyers have an opportunity to tell you what they expect the evidence to be. But remember, the only evidence comes from the witnesses and the exhibits.

After the opening statements, that would be tomorrow morning, we'll begin hearing from the witnesses. Each witness will first give direct examination, and then he or she may be cross-examined by the other side. Sometimes there's even redirect and recross.

After all the evidence has been received, the lawyers will have an opportunity to sum up, or to give closing statements. They might review the evidence with you, they'll make arguments to you about what they think the evidence does or does not show, but again, those summations are not evidence.

And finally, after the summations, I'll instruct the jury on the law. And following my instructions, you go into the jury room, review all the evidence, review any exhibits you want to look at, and discuss the evidence among yourselves. And then, based on your evidence and the discussion of it, you'll determine your verdict.

Now at the conclusion of the trial, I will tell you in detail what the government must prove in order to convict the

defendant. For the moment, however, I'll just ask you to remember throughout the trial that the defendant is presumed innocent and the government has the burden of proving guilt beyond a reasonable doubt. The indictment against the defendant is only an accusation, and it's not proof of guilt or anything else. The defendant, therefore, starts the case out with a clean slate.

This burden of proof beyond a reasonable doubt is different from the burden that is imposed upon a plaintiff in a civil case, and it's on the government until the end of the case. Again, I'll tell you more about this on the instructions at the end of the case, but at the moment, I'll just tell you that this burden means that the defendant and his lawyers need not present any evidence in the case if they choose not to. They could sit in silence through all these proceedings without saying a word, but you could draw no adverse inference against the defendant if that's what he chose to do. You may not find the defendant guilty unless and until you are unanimously convinced beyond a reasonable doubt of the guilt of the defendant based upon the evidence in the case.

So with that, ladies and gentlemen, we'll begin with the opening statements of counsel.

I'll ask the government to start. Mr. Hayden.

MR. HAYDEN: This case is about greed and corruption, about more than $2 million in bribes, cash hidden in gift

boxes, international wire transfers, and promises of future riches. Bribes offered and paid by the defendant, that man, Chi Ping Patrick Ho, offered and paid to the leaders of two African nations. All done in an effort to corruptly obtain business for a multibillion-dollar Chinese oil company.

During this trial you're going to hear about two bribery schemes that were global, but each began right here in New York. The first scheme involved the Republic of Chad, a country in Africa. The defendant and his business associates offered $2 million in cash to the top public official in Chad, the president. They concealed the cash in gift boxes, and they offered this bribe in an effort to obtain valuable oil rights.

The second scheme was similar but involved the Republic of Uganda, another country in Africa. The defendant and his associates sought to bribe two of the top officials in Uganda -- the president and the foreign minister. The defendant schemed to pay them millions of dollars of cash and wire transfers, along with offering them a cut of future profits -- again, all in an effort to obtain business for the Chinese oil company.

How was the defendant able to get access to such high-ranking officials? In both of these schemes he took advantage of the fact that he ran a nonprofit organization, which was fully funded by the oil company. This position gave him access to some of the most powerful leaders around the

globe, including at the United Nations right here in Manhattan. He also held meetings here in New York, and he wired money through banks here in New York.

But you'll learn that while the defendant led a nonprofit, what drove him to Chad and Uganda was money. Business. You see, the oil company already had operations in Asia and Europe, but they were looking to expand into the African market. But the defendant and his associates didn't want to take time to win business the right way, in a competitive role. After all, someone else might get that deal. So they cheated. They decided to offer bribes to gain an unfair advantage. And the defendant used his nonprofit organization to try to make it look like those bribes were something else, something legitimate. But as the evidence will show, those payments weren't charitable donations. They weren't political contributions. They were bribes -- money offered to the top officials in Chad and Uganda in exchange for business.

What the defendant did wasn't just wrong, and it certainly wasn't business as usual. It was corrupt and it was criminal, and that is why we are here today.

Ladies and gentlemen, this opening statement is the government's opportunity to give you an overview of the evidence that we're going to show you in this case. First, I'm going to talk about what the evidence is going to show; second,

I'm going to talk about the different types of evidence that you're going to see; and third, I'll give you a brief overview of the charges.

So what will the evidence show? You'll learn that the defendant is a citizen of China, and during these schemes he was working on behalf of a multibillion-dollar Chinese company called CEFC China Energy, or just CEFC for short. The company is headquartered in Shanghai, China, with operations and offices around the world. It's a massive company, engaged primarily in the oil business and banking, as well as many other things.

Now while the defendant worked on behalf of this massive company, he did so carefully, indirectly. You'll learn that the defendant wasn't, at least on paper, an employee of the oil company. Instead he was the secretary general of a nonprofit organization, or NGO, that the oil company funded. In fact, the nonprofit NGO also went by the same abbreviation as the energy company, CEFC. Running an NGO allowed the defendant to pass himself off as a humanitarian, a man solely interested in promoting causes like sustainable development, energy security, and clean water. And through his position at this NGO, the defendant gained access to powerful leaders across the globe; access that was brokered in many cases right here in Manhattan.

His NGO participated in official United Nations

events. It looked impressive. But behind closed doors, the defendant was focused on business -- business for CEFC, the multibillion-dollar oil company that funded his NGO. He used his NGO to gain access to world leaders who could benefit the oil company's business, and he used the cover of his NGO to pay bribes where he felt it was necessary to get the job done. Bribes for business. This for that.

You'll see he carried out the same game plan in both Chad and Uganda. The defendant wanted to break into the African market, so he threw money at the top leaders of both countries. In Uganda, the scheme resulted in business being directed to the defendant and CEFC. In Chad, however, his scheme backfired. The president rejected the bribe and was furious about it. But as you'll learn, the law makes it a crime to offer a bribe, whether or not the foreign official accepts it and whether or not the bribe successfully leads to any business or profits. And you'll see overwhelming evidence that the defendant did exactly that. He schemed and conspired to corrupt the official decision-making process in Chad and Uganda. He offered millions of dollars in bribes, and he did so in an effort to gain business.

Now I'd like to talk about the two schemes in greater detail.

First, the Chad scheme. This is the scheme to pay $2 million cash to the president of Chad to secure oil rights

potentially worth hundreds of millions of dollars. The scheme began in the fall of 2014, when the defendant and his business associates sought out oil projects in Chad. At that time CEFC had operations in Asia and Europe but had not yet established themselves in Africa. To change this, the defendant wanted to go straight to the top, to engage directly with the president of Chad. But the defendant didn't know the president, so he sought out someone who did, a man named Cheikh Gadio. Gadio was the former foreign minister of Senegal, a country in West Africa. Gadio was connected to some of the most powerful officials in Africa, including the president of Chad. So the defendant paid Gadio to introduce him to the president.

You'll learn that the defendant first met with Gadio right here in Manhattan, steps from the United Nations. Following this meeting, the defendant reported back to his boss, the chairman of the multibillion-dollar oil company, that he had set in motion their plan to receive special attention and support from the president of Chad.

A couple weeks later, in November of 2014, the defendant flew into Chad with other representatives from the CEFC oil company. Along with Gadio, they met with the president, and the president was receptive. He presented the defendant and CEFC with the opportunity to obtain an extremely valuable block of oilfields. But at this first meeting, they didn't go into any of the details, like how much CEFC would

need to pay in order to acquire those rights. All the defendant knew was that the president would make the final decision on whether or not to sell the rights to CEFC and at what price.

The defendant was eager to seal the deal. So through Gadio, he requested to set up a second meeting with the president of Chad, almost immediately on the heels of the first meeting. Gadio thought this was a bad idea. It was too soon. CEFC had not done any work yet to figure out what price it would offer for the oil. But the defendant insisted on a second meeting right away. Why? Why did the defendant want this second meeting so badly? Why did he want to get in front of the president in person, even before any negotiation on the details of the oil rights had taken place? Because he had a plan -- bribe the president; throw money at him to make sure the negotiation goes the way the defendant wants it to go. You see, during the second meeting with the president of Chad, the defendant and his associates presented the president with several gift boxes, but they didn't just contain gifts. Hidden inside was $2 million in cash. Money for an oil deal. This for that.

You'll learn, however, that the defendant's corrupt plan backfired. The president of Chad saw this as a blatant attempt to bribe him, and he was furious. He confronted the defendant and the other oil company representatives. He

demanded to know why they had tried to pay him off. After the president spoke, the first person to respond was the defendant. And what did he say? He didn't try to deny it. He didn't try to say the president was mistaken or misunderstood. No. The defendant said he was impressed by the president's reaction.

Then the defendant and his associates, they spoke quickly and privately. They came up with a solution. They convinced the president to keep the money and they would write him a letter stating the $2 million in cash was really just a charitable donation. And they did just that. You'll learn that after leaving Chad, the defendant did draft a short letter to the president, saying that the oil company wished to make a $2 million donation for the president to use at his personal disposal. But along with that letter, the defendant worked on a second document that he included with that letter. An agreement between the oil company and the government of Chad that said that the Chadian government would support the oil company in obtaining oil rights in Chad, because, call it a donation or not, the defendant was focused on business. If he could get that business by labeling secret cash in a box a donation, that was just fine.

Let's now talk about the defendant's second bribery scheme, the scheme involving Uganda. He played much the same game, just with different players. This time he didn't offer just one bribe; he offered multiple to two high-level officials

in Uganda, the foreign minister and the president. You'll learn that in 2014 and 2015, the defendant, using his status as the head of that nonprofit NGO, met multiple times in New York with the foreign minister of Uganda. At the time the foreign minister was serving a one-year term as one of the highest-ranking officials at United Nations, the president of the General Assembly. During these private meetings, they discussed ways to connect the defendant and his associates at the oil company to the president of Uganda. As it happened, the president of Uganda was the foreign minister's brother-in-law, and the foreign minister promised that he could easily bring the two sides together.

So the defendant developed a relationship with the foreign minister. In public the defendant appeared with him at UN events, where the defendant gave speeches and he talked about lofty humanitarian goals, but in private, the defendant was focused on how the foreign minister could open doors for CEFC to pursue all sorts of business in Uganda.

In late 2015, the foreign minister's term at United Nations ended, and he returned to his powerful position in Uganda. By that point the groundwork had been laid. The foreign minister was ready to help the defendant, and the defendant was more than willing to pay up. The foreign minister reached out to the defendant. He requested a contribution/donation for a so-called foundation that the

foreign minister wished to launch. And he provided the account information for an international wire transfer. The defendant eagerly responded that he was ready to renew their mutual commitment and agreement.

But you'll see that this talk about a donation was just all winks and nods. The defendant didn't ask anything about what the foundation was or what sort of work it would do. As far as the defendant was concerned, all that mattered was the foreign minister wanted to get paid. But before he paid up, the defendant made crystal clear what he wanted in exchange. The defendant demanded an invitation to the inauguration of the president of Uganda, who had just been reelected. In email after email, the defendant demanded meetings with the president and other top Ugandan officials, and he insisted that before traveling to Uganda, the foreign minister provide him with a list of specific projects that CEFC could participate in.

And when he got the invitation to the inauguration, and received the assurance that he would get access that he needed to those Ugandan officials who would be able to steer business to CEFC, the defendant was ready to pay up. He wired $500,000 to the account that the foreign minister had provided.

But the corrupt scheme did not stop with the foreign minister. The defendant also schemed to bribe the president of Uganda, the foreign minister's brother-in-law. The defendant

suggested to his boss, the chairman of the oil company, that money be provided in cash as a supposed donation to the president's reelection campaign. Of course the president had just been reelected. This made no sense. But that didn't matter to the defendant. Business mattered. So as he was about to board the plane to Uganda, the defendant told the foreign minister that he needed special assistance with customs in Uganda because they were bringing some "very nice gifts for your president."

What did the defendant and CEFC want in exchange for their money? As I said, it was simple. Business. Business for CEFC. After wiring the $500,000 and landing in Uganda with those very nice gifts, the defendant and his associates met with the president, the foreign minister, and other Ugandan officials. They got the inside track on a variety of profitable business opportunities. The defendant reported back to his boss at CEFC that the visit and the discussions were successful and that the president was highly supportive of cooperating with CEFC in fields like energy, infrastructure, finance, agriculture, and tourism. The president had even agreed to carve out a large piece of land near Lake Victoria for the oil company to develop into a high-end tourist resort.

(Continued on next page)

MR. HAYDEN: Shortly after the trip to Uganda, the defendant got back in touch with the Foreign Minister. He said the CEFC had decided what their first priority would be, the company wanted to acquire a Ugandan bank. The defendant promised that the Foreign Minister and the President could be partners in the venture, so that if CEFC profited, those officials would be able to line their pockets too. And, sure enough, a few months later the Foreign Minister learned of a Ugandan bank that was looking to be acquired, and who did he direct this opportunity to? The defendant and CEFC. This for that.

That's a summary of what happened. So, how will the government prove this to you? You're going to see documents like e-mails, text messages and bank records. For example, you will see the reports that the defendant wrote to his boss at the oil company on the progress of his meetings with the government officials in Chad and Uganda.

You will see the agreement the defendant wanted, which said that the government of Chad would help CEFC obtain those oil rights. And you will see the defendant worked on that agreement in the very same e-mail that he also wrote the letter calling for the $2 million donation for the President of Chad to use at his personal disposal, even though the money had already been handed over. These documents make crystal clear that the defendant wanted business for the oil company and was

willing to pay officials to get it. This for that.

Now, as I said, the evidence will show the defendant carried out these schemes in his capacity as the head of a nonprofit NGO, and you will see that in his e-mails and reports he often referenced various global policy issues, because running that NGO gave him access to resources and global leaders that could open the doors for the oil company.

But you won't just see the defendant's words; you are also going to hear the defendant captured on a recorded call. Before either the Chad or the Uganda scheme, the defendant was asked to make a contribution to another foreign official, and you will hear how the defendant responded. He said that any major contribution would only come after the defendant saw what he would get in return, because, as he put it, it's give and take. As I said earlier, the defendant's focus was simple: This for that; money for business.

You will also hear from multiple witnesses. For example, you will hear from an employee of the defendant's nonprofit NGO who reported directly to the defendant, and you will hear from an international consultant who connected the defendant to both Gadio and the Foreign Minister of Uganda along with plenty of other business opportunities.

Who else will testify? You will hear from Cheikh Gadio. Gadio will give you an inside view of the Chad scheme. He will tell you about what he saw and what he heard. He will

tell you that although he didn't see the $2 million in cash with his own eyes, he saw the President's reaction and anger, and he heard the defendant's response.

As you will learn, Gadio was arrested and charged with conspiring to bribe the President of Chad along with the defendant. You will hear that Gadio has agreed to cooperate with the government, and that he is testifying under a nonprosecution agreement with the government. So, ladies and gentlemen, you should scrutinize his testimony here. And when you do, you will see all the ways in which it is corroborated or backed up by other evidence in this case -- evidence like contemporaneous e-mails and text messages.

Now, keep in mind the evidence will come in in bits and pieces; no single witness or document will give you a full picture. But at the end of this trial we'll have another opportunity to speak with you and explain how all that evidence fits together.

Let me now just talk briefly about the charges. Judge Preska will instruct you on the law for each charge at the end of this trial, and you should follow her instructions. I'm just going to provide a very brief overview.

First, the defendant is charged with violating the Foreign Corrupt Practices Act or FCPA. That's a law which outlaws the offering or paying of bribes to foreign officials when the purpose of the bribe or the offer is to gain a

business advantage.

Second, the defendant is charged with international money laundering. As you will learn, it is a crime to send money into or out of the United States when the purpose of that transfer is to promote certain other crimes, including foreign bribery. And you will see that in both the Chad and Uganda schemes, the defendant wired money into and out of banks right here in New York.

And, third, the defendant is charged with conspiracy. Conspiracy is just another word for an agreement between two or more people to break the law. So, the defendant is charged with conspiring or agreeing with others at the oil company, conspiring both to pay bribes and to send money to and from the United States to promote the payment of those bribes.

Ladies and gentlemen, I'm about to sit down, but before I do, let me ask you to do three things during the course of this trial: First, listen carefully to the evidence as it comes in; second, follow Judge Preska's instructions on the law; third, use your common sense, the same common sense you use every day.

If you do those three things, the defendant will receive a fair trial, and at the end of the trial you will return the only verdict that is consistent with the law and the evidence: The defendant is guilty.

THE COURT: Thank you.

And from the defense. Mr. Rosenberg?

MR. ROSENBERG: Thank you, your Honor. Ladies and gentlemen, the payments in this case were not bribes. There were payments -- with that there is no dispute -- but there were no bribes. And that's the problem with the case against my client Dr. Patrick Ho. This is a bribery case with no bribes, and that's why Patrick Ho is not guilty.

What makes a bribe a bribe? For starters, the person paying the bribe asks for something in return. The bribe isn't a gift, it's a trade. I give you this; you give me that.

Another thing about bribes, they tend to be secret. People making bribes usually want to hide them so there is no paperwork and no documentation.

In this case Dr. Ho and his colleagues asked for nothing in return and were given nothing in return. No trade for benefit, no this for that. And the payments were not hidden; they were documented by letters. In one instance a letter was requested and it was promptly provided by Dr. Ho, and in the other instance Dr. Ho and his colleagues asked for the letter.

Now, before I speak more about the payments, let me briefly talk about the organizations that are involved in this case and Dr. Ho's job with them.

The evidence will show that there was a large company based in China named CEFC Energy. And CEFC Energy paid for and

supported not-for-profit nongovernmental organizations that worked on energy issues, think tanks, and the NGO that's relevant to this case shared a name with the for-profit company; it was crawled CEFC Hong Kong or CEFC Limited. So, the names themselves will tell you that there was nothing hidden about the relationship between them, and, in fact, CEFC Energy Company's website advertised the fact that it funded CEFC Hong Kong. And, as you saw from the slides that the government put up, the two entities had identical logos, just different colors.

Now, companies around the world have foundations associated with them, think tanks associated with them -- Exxon Mobil has the Exxon Mobil Foundation. Shell has the Shell Foundation -- and all of them are focused on doing good and on improving the names of the for-profit companies whose name they share.

Dr. Ho was the head of CEFC Hong Kong, the think tank, and from that position he gave speeches, he wrote articles, he organized symposia, conferences on energy and related issues. He was on panels at the United Nations and on panels organized by other NGOs. But let me be perfectly clear about this, while Dr. Ho had no formal title at the for-profit CEFC Energy, given that CEFC Energy funded CEFC Hong Kong it was absolutely part of Dr. Ho's job -- in addition to things that I just talked about -- to look for business opportunities for CEFC Energy

across the many fields in which it did business. His job was to network and to build good will around the world for CEFC Energy, and to that end he put leaders from different countries in touch with CEFC Energy. There was nothing at all hidden about this.

And that's precisely what Dr. Ho was doing in Chad and in Uganda. He was in those countries because he was doing his job. He was helping CEFC Energy build long-term relationships in both countries. CEFC Energy unquestionably made payment in both countries. As I told you at the outset, CEFC Energy got nothing in return for them, and it did not ask for special treatment.

So, why did it make the payments? For the same reason that companies the world over donate money every day: To build good will.

To be sure, companies make donations because it's a good thing, donations help people, they further good causes, but companies also make donations to be well thought of, so that when a government is thinking about potential business partners in the future, it will show that company has shown a commitment to this country, it really wants to be a partner with this country for the long term.

So, let me talk specifically about the donations in this case. You will hear about a $2 million donation made by CEFC Energy to the Chadian government. There is no dispute

that the donation was made in cash. But making a donation in cash doesn't make it a bribe. It just isn't that simple. Gifts -- even large ones, and even donations made by companies -- can be in cash. In fact, you will learn that the circumstances in Chad made cash an understandable choice here.

But, more importantly, the President of Chad accepted the donation on behalf of his country, and he wanted it documented, and so Dr. Ho immediately prepared the letter the president requested. The president got the letter, and he could disclose it in any way he wanted.

And consider also what happened after CEFC Energy made the donation: Nothing. There was no this for that; there was nothing in return; and CEFC never said, hey, wait a minute, what happened to our donation, what did we get for it? They never complained about that at all. In fact, you will see that CEFC Energy didn't show much interest at all in signing the contracts.

So, when you listen to the evidence of what happened in Chad, keep in mind what didn't happen, because that speaks volumes.

Now, the government mentioned a witness who will testify about this, Cheikh Gadio. He will testify about what happened in Chad. And the government's contention about what it says about the key meeting in Chad is based entirely on his testimony. You will learn though that his testimony cannot be

trusted. He is charged in this case, and he was arrested, but he was a very ambitious man. He planned to run to be the president of Senegal, and fighting a criminal case would have been a disaster for him, and so he figured out just what to say to get him off the hook, and in exchange the government agreed to dismiss all of the charges against him in exchange for his testimony.

You will also learn that Dr. Gadio's testimony on key points falls apart when compared to the documents that were written during the events at issue, including especially his own documents. There will be much more to say about Dr. Gadio's testimony at the end of the trial, but for now I would just ask you to listen to that testimony and to compare what he says against the contemporaneous documents. When you do that, I submit you will see that his testimony simply doesn't add up.

Let me talk about the donations to Uganda. Just as with Chad, you will see plenty of discussion between CEFC and the people in Uganda about potential partnerships, about opportunities in infrastructure, energy and banking. The government will make much about Dr. Ho's efforts to meet with the Foreign Minister and President of Uganda as if there was something wrongful about that, but as I told you, that was precisely Dr. Ho's job, to interact with world leaders, and that's what he did.

You will see evidence of a CEFC donation made in May

2016 to a foundation that was run by Uganda's Foreign Minister. You will learn when that donation was made Dr. Ho asked for and received a letter from the foundation acknowledging the donation, and you will also learn that the story here is the same as in Chad: After the donation was made, no business resulted; there was no trade for a benefit; no this for that; and no complaints from CEFC about why it had spent that money. There was nothing in return.

We ask you, ladies and gentlemen, as you sit through the case to listen carefully to the evidence that will be presented, follow the Court's legal instructions at the conclusion of the case, and to use your common sense. And we ask you to do one more thing: As you listen to the testimony and review the evidence in the case, ask yourselves: What does a bribe look like? I submit to you it doesn't look like this. Thank you.

THE COURT: Thank you.

Ladies and gentlemen, we are going to take the break now for the evening. You will remember what are going to be referred to as the usual instructions: Do not do any research on the case. Do not speak to anyone about the case. If someone says to you what do you think, the answer is I think nothing; I'm not talking to you. Do not talk with anyone about the case. If anyone tries to talk with you about the case, let me know at the earliest opportunity.

We will begin the testimony tomorrow at 10 sharp. Ms. Phillips has ordered coffee for you for 9:15, so if you want to have time to drink it, come right in. And remember there won't be as much of a line, but you still do have to go through the line, so come in time to have your coffee before we start tomorrow morning.

You are excused for the night. If you took notes, please take them into the jury room and leave them there overnight.

Good afternoon, ladies and gentlemen.

(Jury not present)

THE COURT: Counsel, do you have anything else on the record?

MR. RICHENTHAL: Not from the government, your Honor.

MR. ROSENBERG: Not from defense.

THE COURT: Thank you folks. Off the record.

(Discussion held off the record)

(Trial adjourned to November 27, 2018 at 10 a.m.)