UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 17 Cr. 779 (LAP)

CHI PING PATRICK HO,

Defendant. Jury Trial

------------------------------x

New York, N.Y.
November 28, 2018
9:36 a.m.

Before:

LORETTA A. PRESKA
District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: DANIEL RICHENTHAL
DOUGLAS ZOLKIND
CATHERINE GHOSH
PAUL HAYDEN
Assistant United States Attorneys

BENJAMIN ROSENBERG
EDWARD KIM
KATHERINE WYMAN
JONATHAN BODANSKY
JONATHAN BOLZ
Attorneys for Defendant

ALSO PRESENT: Ryan Carey, F.B.I.
Aashna Rao, Paralegal
Peter Calabrese, Paralegal

(Trial resumed; jury not present)

THE COURT: Good morning, counsel. Won't you be seated.

ALL COUNSEL: Good morning, your Honor.

THE COURT: All right, friends. What would you like to start with?

MR. ZOLKIND: Your Honor, we could start with either of the two issues we've teed up. We could start with the travel charts, since we started talking about that yesterday afternoon.

THE COURT: Sure. Who's got the chart?

MR. ZOLKIND: We emailed it to your Honor. I have a copy here I can pass up.

THE COURT: Yes. Would you pass the copy up. Forgive me.

Thank you.

So is the controversy about 9/29, 10/27, and 12/13 that don't have any email or text message entries?

MR. ZOLKIND: That is the government's understanding, yes.

THE COURT: Is that right?

MR. ROSENBERG: That's exactly right.

THE COURT: Okay. So would you just remind me, now that I've thought about it a little more, the relevance of the fact of the defendant's presence in this country --

MR. ZOLKIND: Yes, your Honor.

THE COURT: -- is what?

MR. ZOLKIND: And I'll just start extremely briefly by just noting that the standard of relevance, as the Court well knows, is a very low standard. And I think that standard is easily met by the inclusion of these three additional lines on the chart, for multiple reasons. I'll just tick through them, and not necessarily in any particular order.

But for example, the Court heard testimony from Mr. Riccardi-Zhu yesterday. One of the things he talked about, or was asked about, I think by both sides, was frequency with which the defendant flew into the United States. He gave an answer to that question. This chart helps to corroborate his response, whether or not the entries had anything to do with emails or entries to the US. That's one reason.

A larger reason that it's relevant, your Honor, is that I think one of the ways the defense has tried to portray their client is as someone who was very busy with NGO activities here in the United States, at the UN, doing things that had nothing to do with Chad and Uganda, and we think that if the chart were limited to only show times that he came into the US and sent emails or text messages related to the schemes, it would create the implication that there might well be many other trips that he took to the US where it had nothing to do with the events in this case. And what this chart makes very

clear is that during the time period at issue, about almost a two-year time period, the vast majority of trips he took to the US, he did do something, whether it was email or text messages or what have you, something of relevance to the events in this case. And we think that putting in context the frequency with which he was in the US and the frequency with which he did things relevant to this case in the US is relevant.

And then just even more broadly, we think it is relevant for the jury to have an accurate understanding of what -- a case where one of the charges is based on actions taken in the United States, it is relevant for them to have an understanding of the frequency with which he was in the United States.

And my last point, your Honor, is that it's not at all prejudicial, and in fact, the same information is available in records that are coming into evidence. We don't think there's any objection. So for example, the defendant's passport will be in evidence; the underlying CBP records will be in evidence. So the evidence is going to be there. It's a question of whether it's in a form that the jury can readily access.

THE COURT: Yes, sir. Mr. Rosenberg.

MR. ROSENBERG: Judge, very briefly. The fact that he's in the United States is not relevant to this case. I think to put it on the chart implies to the jury that there was something untoward about him being here.

THE COURT: Off the record.

(Discussion off the record)

MR. ROSENBERG: We do not -- well, the point here is it's not relevant to any point. These are not tied to any email or visits to the UN. The jury shouldn't be speculating about what it is or isn't. Putting it on the chart, it's not highly prejudicial. We don't contend that. But I think putting it on the chart draws attention to it, to these visits in a way that's unnecessary and not fair to the defendant.

THE COURT: Why is it not fair?

MR. ROSENBERG: Because it leads the jury to wonder what he's doing and speculate about what he's doing in the United States and whether there's anything untoward about that, and it shouldn't be there. This should be selected visits by Chi Ping Patrick Ho, and to put them there, and that would be that, and these are visits the government contends something happened in connection with the wrongdoing with which he's challenged.

THE COURT: Thank you.

Anything else?

MR. ZOLKIND: Your Honor, the last point I guess worth making is that Mr. Riccardi-Zhu did testify that the defendant came into the US, attended events, went to meetings related to the UN. He said clearly he didn't know all the things he was doing. And so I think there has been evidence already

presented that he was in the US doing things unrelated to the events in this case.

THE COURT: Anything else, Mr. Rosenberg?

MR. ROSENBERG: No, your Honor.

THE COURT: Thank you.

I'll permit the entries to remain on Exhibit 2603. First of all, in fact, the entries do corroborate the testimony of Mr. Riccardi-Zhu with respect to the frequency of the defendant's visits to the United States. That the majority of those visits is shown by emails and the like to have something to do with the acts at issue in the case is also of relevance.

It is of relevance that the defendant was just present in the United States, whether or not having to do with the scheme, because the case is based on his actions in the United States.

There was testimony and I believe in the openings counsel talked about the actions that took place in the United States, and given that the defendant is a foreign national and that some of the activities on which the case is based took place outside the United States, there is probative value to the defendant's presence in the United States.

Also, there really is absolutely no prejudice to this. I know Mr. Rosenberg used the word "unfair," but I didn't hear anything unfair about it. And as to his point that the jury might speculate what the defendant was doing in the United

States on those three visits, Mr. Riccardi-Zhu in fact testified that Mr. Ho spent time on NGO projects and on non-NGO projects during his time in the United States.

For all of those reasons, the objections to 2603 are overruled.

Next.

MR. ROSENBERG: I think next is the government's motion, and we had a cross-motion. I don't know what your Honor's preference is as to who should proceed.

THE COURT: Well, I guess the government put in its reply last night, so why doesn't the government start.

MR. RICHENTHAL: I don't need to repeat anything we have in our letter. We think it's a narrow principle, and frankly, we're surprised it's controversial at all. The defense is able to and has already signaled that it intends to cross Mr. Gadio on any number of reasons why it alleges that he invented the story about cash. It absolutely has no need whatsoever to use statements from lawyers for the government in doing that, because the facts speak for themselves. What we said is not evidence, as your Honor told the jury numerous times, appropriately so. And indeed, even if there were a hypothetical case, which your Honor need not reach, where this might be appropriate, this certainly isn't it. Because the critical fact here, it is indisputable, was stated by the witness before he heard the government counsel say anything at

all. So clearly he didn't invent it as a result of the government counsel's statements. I'm not even sure the defense is going to attempt to show that, because it's just so silly. But under 403, given how silly it is, the only conceivable purpose of doing this would be to deeply confuse or distract the jury, attack in a personal way the counsel at this table. It's utterly irrelevant, inappropriate, and should be precluded.

THE COURT: Mr. Rosenberg.

MR. ROSENBERG: Your Honor, there's no attack on the counsel at their table, and there's nothing absurd about the argument. The question here is what Dr. Gadio's motivation has been, consistently, and will be when he steps up and testifies.

THE COURT: What do you say to the fact that the $2 million in cash story was related by the witness prior to these statements by the government?

MR. ROSENBERG: I think -- I don't know if all versions of the story are the same, if all mentions about where he saw it and didn't see it are the same.

THE COURT: What's that got to do with inventing it?

MR. ROSENBERG: Because it has to do with whether he stays with the story, changes the story, and what his motivations are as he sits here today and has been throughout all of the statements and all of the 3500 materials.

THE COURT: I mean, I have to tell you, I don't

understand your argument that the statements of the government somehow incentivized the witness to retell, elaborate on, or whatever else, the $2 million in cash story. I don't understand that.

MR. ROSENBERG: Your Honor, I think there just isn't any case where we wouldn't be able to ask a cooperating witness, or nonprosecuted witness, didn't the government tell you this and isn't this why you said that, and this is why you --

THE COURT: But how does that work in this case?

MR. ROSENBERG: Because his story continued. I don't know that it was consistent, I don't know yet what it is, but I think there --

THE COURT: Well, you've got the 3500 material.

MR. ROSENBERG: I think there are inconsistencies in the 3500 material what he said after the tape. Not on all points, certainly, but I think those are things we're allowed to explore, and the jury will decide whether those inconsistencies are material, not material, and --

THE COURT: Why do the government statements in any way incentivize the witness?

MR. ROSENBERG: Because they tell him what he's up against, what the government believes to be the case, and they led him to, or the jury can reasonably find they led him to, certain statements.

THE COURT: The statements you're objecting to do not have the government saying what they want the witness to say.

MR. ROSENBERG: But they tell him that what their assessment of his truthfulness are, and they are statements of fact that he made certain false statements in his bail application.

THE COURT: But you're allowed -- all right. What else?

MR. RICHENTHAL: Just to be clear --

THE COURT: I'm sorry. Mr. Rosenberg, had you finished?

MR. ROSENBERG: I am, your Honor.

THE COURT: Thank you.

MR. RICHENTHAL: I just wanted to say what we're not asking your Honor to preclude, because I heard Mr. Rosenberg say something that is not in the motion. We have no objection whatsoever to Mr. Gadio being cross-examined on his meetings with us, his understanding of the purpose of those meetings. Classic cross-examination. So if the insinuation is somehow we fed a story to him, it's not true, but they're entitled to cross-examine him. What we're talking about is our statements in court and only our statements in court.

THE COURT: I know.

MR. RICHENTHAL: So Mr. Rosenberg I think spoke more broadly. That's not our motion.

MR. ROSENBERG: Your Honor, just to be clear, I was analogizing to the statements they made. I think that they should be considered the same way. I understand the Court's inclination. In other words, I think that just as we can ask, what did the government say to you, we can also say, didn't you hear the government say this and didn't this lead you to think that and be motivated to do the other? That's our point.

THE COURT: All right. Off the record.

(Discussion off the record)

MR. RICHENTHAL: For what it's worth, we also have no objection to crossing Mr. Gadio on the allegations in the complaint, which are the government's allegations and are materially distinguishable from the argument Mr. Rosenberg wants to make. Certainly they can ask, didn't the government allege X, and if they want to try to develop on cross-examination that that somehow created an incentive to lie, they're free to attempt to do so. It's not true, but they're free to attempt to do so. This is a very, very limited motion.

THE COURT: All right. On the government's motion to preclude defense counsel from cross-examining Mr. Gadio with respect to the government's statements in court, the government's motion is granted.

First of all, I still don't understand how those statements could have incentivized the witness to change or do

anything with respect to the $2 million cash story which he had already told, so that makes no sense at all to me.

Secondly, as I noted, the witness told the $2 million cash story prior to these statements by the government.

Thirdly, certainly defense counsel has as at their disposal plenty of material to base their argument that the witness lacks veracity. As the government pointed out, the defense is free to cross-examine the witness on whether he did or did not make full disclosures to pretrial services, the defense is free to cross-examine the witness with respect to his motivations arising out of the nonprosecution agreement, so the defense has plenty of material to do what it says it wants to do.

Lastly, this testimony does not merely pass the 403 test. There's very little probative value to it. And maybe it's my lack of ability to understand how the government statements might have incentivized the witness, but there's very little probative value. The prejudicial value, however, is extreme. In order to counter these statements, the government would have to essentially present a trial within a trial, talking about how bail decisions are made, how investigations proceed, how the government makes decisions with respect to charging people, nolle'g people, and the like, and how they did so in this instance. It would be a trial within a trial. It would confuse the jury. And accordingly, that

testimony and that cross-examination topic is precluded.

I'll just note on the record that with respect to the second portion of the government's motion relating to how the $2 million in cash was used, the defense has informed all of us that it does not intend to elicit that information, and accordingly, the motion is moot.

What else, friends?

MR. ROSENBERG: Your Honor, we have our cross-motion *in limine* related to redaction on the nonprosecution agreement.

THE COURT: Correct. What else would you like to say about that?

MR. ROSENBERG: Your Honor, I would just like to state on that, the reason we moved on that is as follows:

The portion we ask to be redacted summarizes the key points of Dr. Gadio's testimony. The jury will read it and, instead of focusing on what his testimony was, what he said, whether they believe it or they don't, they will accept this written statement on it. There will be challenges, of course, here to his testimony and his credibility, but this will be the one thing that the jury takes back into the room with it. It sets it forth, summarizes it in terms that are obviously carefully prepared and calibrated, and summarized, you know, three or four lines, and they won't do what the jury is supposed to do, which is go back and think about the testimony, exactly what was said, what his demeanor was, and matters of

that nature. This is prejudicial, and therefore, under 403, I think it's unfairly prejudicial to the defendant.

I think it can be redacted easily. The government suggests that the jury will ask about what's behind the redaction or think there's something nefarious, but of course the Court I believe has instructed the jury with respect to other redactions, and can here, that they're not to speculate about what's there or not there.

THE COURT: So you think they'll follow that instruction but not the other instructions about weighing all of the evidence, including the witness' testimony?

MR. ROSENBERG: I think they will -- I think that it's very hard and very compelling to any person, when they have something written and summarized in short fashion before them, to say, okay, that's what he said, that's it.

THE COURT: Okay.

MR. ROSENBERG: And I think that's much harder than doing the job that the jury, as I said, is supposed to do and entrusted to do, to weigh the evidence presented by and testified to by the live witness.

THE COURT: Thank you.

Does the government have anything to respond?

MR. ZOLKIND: Your Honor, we cited at the end of our submission last evening the *Skelos* case. I was one of the prosecutors on that case and so I can just -- I've got the

printout of Judge Wood's ruling on the record with respect to this issue, if the Court would like to review it. I think the issue there was virtually indistinguishable from the issue here, and what Judge Wood said and I think what's insightful is, in the context of a cooperation agreement, it is of course the norm that the cooperation agreement recites what the defendant has pled guilty to, including a description of the conspiracy, often involving the defendant at trial, and there's never any suggestion that that should be redacted. That is of course always, or virtually always, the subject of vigorous cross-examination. Here, it's a different type of agreement. The cross-examination may be more vigorous, or just as vigorous, and that's fully appropriate.

But the point is, this part of the nonprosecution agreement is a core term of the agreement. It is what the witness has accepted responsibility for, and it cannot be excised from the agreement. So I don't think it's fair to say that it's a summary provided by the government. It's a statement of the witness' admission that he had signed and agreed to, and obviously he can be crossed on it, but it's part of the agreement.

And I should also say, the defense has squarely opened on -- I think they said literally, Gadio cannot be trusted, and so his credibility has been cast into doubt, and it's important for the jury to understand what he accepted responsibility to

in connection with getting this benefit, this nonprosecution agreement.

THE COURT: Yes, sir.

MR. ROSENBERG: It is important for the jury to consider his credibility, but a statement signed by him on September 14, 2018 isn't a prior consistent statement, unlike what it appears the government is arguing his interview was. This was done in the course of getting a deal and well after he had the motivation to lie, etc. The document, the agreement can most certainly be understood without all of the details provided. It was provided in order to be shown to the jury and it's prejudicial, as I said. It could simply say that he was involved in a bribery scheme in which Dr. Ho, on behalf of CEFC, was involved in Chad. That's the essence of it. The jury would understand that. There's no need for the rest of it.

THE COURT: Okay. The cross-motion is denied.

First of all, as the government points out, a recitation of the conduct that a defendant is taking responsibility for is a standard part of cooperation agreements and nonprosecution agreements in this district. And there's not any suggestion that that is in any way prejudicial to the trial of a co-defendant.

Secondly, as counsel has already suggested to the jury, this witness will be subject to vigorous

cross-examination as to his recollections, as to his motivations, and the like. And the suggestion that the jury will blindly pick up this piece of paper and accept it without regard to the witness' testimony or the cross-examination is really quite laughable. The jury is not going to be confused because I have full faith and confidence in defense counsel's ability to raise the credibility questions that they have suggested in the opening.

Accordingly, the cross-motion to redact the nonprosecution agreement is denied.

What else, friends?

MR. ZOLKIND: Your Honor, Mr. Kim flagged for us this morning in court that there is -- we obviously provided the defense with a list of exhibits we anticipate getting to with Dr. Gadio. And he informed us this morning that one of those exhibits is one that they will object to. I don't know -- I'm not sure I'll get to it in the morning, but if the Court would like to address it now.

THE COURT: Why don't you tell me what it is, please.

MR. ZOLKIND: Yes. And maybe we can bring -- Ms. Rao is gone. Let me pull up --

THE COURT: Yes, sir.

MR. ZOLKIND: -- a copy of it.

THE COURT: Off the record.

(Discussion off the record)

MR. ZOLKIND: Is it on your screen, your Honor?

THE COURT: Oh, yes. Thank you.

MR. ZOLKIND: Okay. And Ms. Rao, so if you could zoom in on the top text message.

I'll walk you through this, your Honor.

So this is a text message exchange between Dr. Gadio and his son Boubker Gadio, who was also his business partner. And you can see the time, the date stamp is December 21, 2014. And so that's about a week or two after the sort of famed incidents involving the $2 million. They're talking about a couple different things in this chain.

So in the first one -- Ms. Rao, if you can just highlight the last --

THE COURT: Excuse me, please. It's from the son?

MR. ZOLKIND: It is from the witness to his son.

THE COURT: Ah.

MR. ZOLKIND: And then there will be a response from his son.

THE COURT: Okay.

MR. ZOLKIND: We can start right here, in the top one.

Oh, I'm sorry. I apologize. I apologize. All of my colleagues are telling me I'm wrong.

THE COURT: I read the part that said "From Son."

MR. RICHENTHAL: So did we.

MR. ZOLKIND: Literally everyone at both tables except

me could see that I was wrong.

The first message is from --

THE COURT: I know I'm not a tech guy, but --

MR. ZOLKIND: I apologize.

So Ms. Rao, if you could highlight the line beginning, "Any feedback from our friends in China."

And your Honor, I think the context and the testimony will be that what they're talking about now here, the witness and the son, in terms of feedback from CEFC, is feedback with respect to their request to get paid and their request for a contract. That's really what they're focused on at this point.

THE COURT: The request of the Gadios to be paid.

MR. ZOLKIND: Exactly.

THE COURT: And the request by CEFC for a contract, or the request of the Gadios?

MR. ZOLKIND: The request of the Gadios for a contract.

THE COURT: Okay.

MR. ZOLKIND: So in Chad, there were sort of two things going on. One was the issue involving the $2 million, and then sort of separate and apart from that, as the Court will see, there was an ongoing concern of Dr. Gadio that he wasn't getting a contract and he wasn't getting paid or promise --

THE COURT: Yes, we heard the paid stuff.

MR. ZOLKIND: He eventually got paid, but for a while he was very concerned about not getting paid. So here what's happening is that when his son said "any feedback," I think he's referring to that.

THE COURT: Yes.

MR. ZOLKIND: Could we go to the next chain, or next message.

The next one is from Gadio to his son, and if we just highlight beginning, "No, our Chinese friends are strange." And go to the end of that.

So he says, "No, our Chinese friends are strange," I think meaning they haven't heard a response about the contract. "Let us give them another week. Otherwise, we'll go to Chad early January and destroy their reputation and strategies in Chad. The president will listen to me."

And if we go to the response now from his son.

And if we could highlight just beginning with, "And I sincerely think," down to "with us." Two more lines.

THE COURT: Okay.

MR. ZOLKIND: So Boubker responds, "I sincerely think they," meaning CEFC, "they will reply favorably. Their attempt to buy the president to put us to the side did not work. Big companies don't like middlemen. It's normal, but they don't have a choice with us."

So, your Honor, I think this exchange is relevant and

admissible for a couple different reasons. One of the reasons this is admissible -- and actually, Mr. Rosenberg just referenced the hearsay rule involving prior consistent statements. So this was a communication between Gadio and his son two weeks after the events in Chad, where they are referring to what happened in Chad as a "attempt to buy the president." So I think there's really no question, based on how the defense opened, that part of their theory is that Gadio at some point changed his story after being arrested to make up the idea that the $2 million was a bribe. Here, you know, it's the father and son talking. They're not using a legal term like "bribe," but they call it an "attempt to buy the president." So we think that's very clearly a prior consistent statement and comes in under the contours of that rule, because the defense is going to be attacking Gadio's credibility on any number of grounds, including by arguing that he's fabricating this story. So that's one reason we think it's admissible for the truth.

A second reason, and it goes more to the prior text messaging chain, if you go up, you can see Gadio uses language about going to Chad and intending to destroy the reputations of CEFC, and this comes up, this sort of theme recurs, that Gadio and his son get very upset at various points with CEFC, and I think there's arguably a line of cross-examination or impeachment of Gadio that he has a bias against CEFC, that he

feels he was treated poorly, and that he has, you know, a vendetta, so to speak, and so that is a line of impeachment of him, and we have a fair right to raise it on direct examination and bring out for the jury what his potential bias, if any, might be.

So I think those two reasons make this text message squarely admissible.

THE COURT: Okay. Yes, Mr. Kim.

MR. KIM: Your Honor, I think the government is reaching here. We don't object to the first two text messages. We don't object to the relevance of the subject matter. It's the last message, which is not even from the witness who's going to be testifying. It's not a prior consistent statement, because it is not a statement of a declarant witness. It's a statement made by the declarant witness' son. So it does not qualify as a prior consistent statement. And it's hearsay. And it fails under 403 as well, your Honor. Obviously, we litigated this issue heavily, Dr. Gadio's ability to make statements like this, and now we're talking about statements made by his son. I just don't think there's any reason that allows that statement to come in.

THE COURT: As to the third one.

MR. ZOLKIND: Your Honor, again, a couple points.

So one is that the second text message really does not -- I mean, it's equivalent to a conversation, and so what

we're talking about is striking the responsive part of the statements in a conversation. The middle text message, which highly suggests a strong bias by Gadio, is made much more understandable when put in the context of what they're talking about. They're talking about what they perceive as an attempt by CEFC to cut them out of the deal by bribing the president. And so that explains and puts into context why Gadio is saying, you know, these things about going to Chad and destroying their reputation. That's one answer, your Honor.

A second answer is that Gadio was the CEO of their firm Sarata. His son Boubker was working under him as his employee and as his agent, and so I think it's fair to say that Boubker's statement is attributable, on an agency theory, to Gadio.

And then the last point, your Honor, is that we will certainly lay a foundation with Gadio when he's on the stand, you know, when you got this text message, what was your reaction to it, how did you respond, did you agree with it, that sort of thing. And I fully expect that he would say, with respect to the statements, the attempt to buy the president, he never wrote back, oh, you know, no, they didn't try to buy the president, or, what are you talking about, that he agreed that that was a fair characterization. And so in other words, his nonresponse here, the fact that he didn't challenge it, that is implicitly an adoption of what the son said. And I think there

really can't be any other way to read it. If Gadio had thought that his son was incorrect in saying that they tried to buy the president, surely he would have said, Boubker, what are you talking about? And that didn't happen.

So I think for all those reasons, it would be unfair to exclude it, and it is proper as a prior consistent statement.

THE COURT: Anything else?

MR. KIM: Your Honor, I think these arguments are pretty creative, they're novel, but they're just wrong. We're talking about a message sent from somebody else trying to get that in as -- the government has been using this argument -- bootstrapping a lot of things into this case, your Honor, and --

THE COURT: Which argument are we bootstrapping at this moment?

MR. KIM: Your Honor, putting things in context. I don't think this message -- the witness can testify about what he saw, he can testify about why he said what he said in his message, but then to put in the son's response, to then get in the father's reaction to what the son said, your Honor, it's a slippery slope. There's really no end to that. It's hearsay. It should be precluded. And under 403, your Honor, it's unfair prejudice here, your Honor, for the jury to see a statement by the son saying there were attempts to buy the president, "to

put us on the side." For the purposes the government is proffering, even if it were permissible, it should be excluded.

MR. ZOLKIND: Your Honor, if I can make one last point, I think what would be misleading to the jury is if the defense is allowed to cross-examine Gadio along the lines of, you never called this a bribe until you started meeting with the government, and I think that's very clearly the line of cross-examination they want to do, and this message shows clearly that Gadio viewed it as a bribe, or, as they put it, an attempt to buy the president, two weeks after the event took place. And so I think it squarely rebuts that line of cross-examination.

THE COURT: Anything else?

MR. KIM: Your Honor, there are ways under the rules for the government to do that, which would be calling the son, or calling someone else to whom the defendant made the prior consistent statement and having that declarant witness available to be cross-examined about it. This is not the way to do it.

THE COURT: Okay. First of all, the statement, it seems to me, has to come in because of completeness, particularly in light of Mr. Gadio's earlier text message in the middle of this page.

Secondly, it does operate as a prior consistent statement in light of the defense's obvious intention to

suggest that Mr. Gadio's testimony with respect to any attempted bribe is a recent fabrication. Accordingly, I'll permit the third statement to come in.

And for the record, of course, the defense has not challenged the first two statements.

What else, friends?

MR. ZOLKIND: Nothing else from the government.

MR. KIM: Nothing from us, your Honor.

THE COURT: All right. Why don't you run out if you have to, and we'll check on the jury. Thank you.

(Recess)

(Continued on next page)

(In open court; jury present)

THE COURT: Welcome, friends. Won't you be seated.

We continue with the direct examination of Mr. Gadio.

Mr. Zolkind.

MR. ZOLKIND: Thank you, your Honor.

CHEIKH TIDIANE GADIO, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. ZOLKIND:

Q. Good morning, Dr. Gadio.

A. Good morning, sir.

Q. Let me turn now to your first meeting with the defendant, Patrick Ho. Remind us, when did you first meet the defendant?

A. We first met in September 2014 at the United Nations in New York.

Q. And why were you in New York in the United Nations in September 2014?

A. I had two reasons to be in New York. One was then I was a special envoy of the Organization of Islamic Cooperation and representing that organization in the Central African Republic crisis; and the second, so I came to work with the Secretary General of OIC, and the second reason was that a group of diplomats or former diplomats was working to help the transition from the United Nations program called MDG, Millennium Development Goals.

Q. Millennium Development Goals?

A. Yes, MDG, and there was a transition in preparation to the SDG, Sustainable Development Goals. So that was the two reasons why I was in New York.

THE COURT: Sir, I'm going to ask you just to move that microphone up so it's right -- yes, sir. That's wonderful.

THE WITNESS: Okay. Thank you. Thank you, your Honor.

THE COURT: Thank you.

BY MR. ZOLKIND:

Q. Was there a UN event taking place in September 2014?

A. Yes. Each month of September, they have the UN General Assembly and all countries send -- send a representative to New York to the General Assembly.

Q. All right. And were you an official of any country at that time?

A. No.

Q. All right. You said you had been Foreign Minister of Senegal but you had stepped down by this point, is that right?

A. I'm sorry. Can you repeat the question?

Q. I apologize.

A. Yeah.

Q. You had testified yesterday that you served as Foreign Minister of Senegal. Is that right?

A. Exactly.

Q. And just remind us when you stepped down from that position.
A. October 2009.
Q. All right. So in 2014 you were with -- your organization was called OIC, is that right?
A. Exactly.
Q. Okay. And were you also running the private consulting firm that you testified about yesterday?
A. Yes.
Q. And again, just remind us what the name of that firm was.
A. Sarata International. Sarata, that's S-A-R-A-T-A. That's a consulting firm. And also I had a nonprofit, actually, a profit and a nonprofit. The nonprofit was IPS, institute for Peace and Security.
Q. Okay. All right. Now before this time in September 2014, did you know who Patrick Ho was?
A. No.
Q. And had you ever heard of China Energy Fund Committee, or CEFC?
A. No.
Q. How did you come to meet Patrick Ho in September 2014?
A. Common friend, former Foreign Minister of Serbia, who was the year before the President of the General Assembly -- you know, each year one country, one foreign minister is appointed as the President of the General Assembly, so he was the

chairman and he was preparing to run for the position of United Nations Secretary General, so he called a few friends around the world to come and have a discussion about those issues.

Q. Do you recall the name of the friend that you're referring to?

A. Yes. His name is Vuk, V-U-K, Jeremic. Vuk Jeremic.

Q. All right. And what did Vuk Jeremic say to you with respect to the defendant?

A. He told me about one of his friends from China who was doing a lot of work with the United Nations, ECOSOC, United Nations Economic and Social Organization, and also he told me that he works with an oil company called CEFC, China Energy Fund Company, and he said, you should meet him because he's a good friend of ours, number one; number two, you know, his company is very powerful in China, and they are interested in oil in Africa, and he himself is interested in helping his company be introduced to Chad, the Central African Republic called Chad.

Q. Okay. And did Mr. Jeremic say anything additional to you with respect to what the defendant or his company's interest in the country of Chad was?

A. I think that was like the main introduction he made at first, and then later, we discussed the fact that CEFC could provide also to Chad, you know, other areas of interest such as infrastructure, you know, banking system, military equipment,

things like that, but that's later.

Q. Okay. All right. So after Mr. Jeremic told you about Patrick Ho and CEFC and their interest in Chad, what happened next?

A. He organized a meeting between Dr. Ho and myself, so I paid him a visit to a hotel near the United Nations and I think it was in the morning, some morning, and we had a very good conversation.

MR. ZOLKIND: Your Honor, at this time I'd like to offer a stipulation between the parties. It's No. Government Exhibit S, like stipulation, 7.

And Ms. Rao -- well, let me offer it first.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit S-7 received in evidence)

THE COURT: What kind of stipulation?

MR. ZOLKIND: It is a factual stipulation. It's titled Stipulation of Certain Items Seized from Chi Ping Patrick Ho and Cheikh Gadio.

THE COURT: Okay. And you know, ladies and gentlemen, this is evidence for your consideration, and the facts stated in the stipulation must be accepted as true.

MR. ZOLKIND: If we could just zoom in on the first paragraph. I'm just going to read a portion of it.

It states that the parties have stipulated and agreed:

No. 1. Agents of the Federal Bureau of Investigation arrested Cheikh Gadio on or about November 17, 2017. In connection with that arrest, agents seized from Gadio, among other things, the following electronic devices: They're collectively defined as "the Gadio Phones."

If we could go to next paragraph.

No. 2. The Gadio Phones were extracted onto reports by an FBI specialist, pursuant to a judicially-authorized search warrant.

No. 3. The following government exhibits contain true and correct copies of excerpts from the extraction reports of the Gadio Phones:

And then there's a list of exhibits, the corresponding device, and whether it's a text message or an image.

And we can take that down.

(Continued on next page)

BY MR. ZOLKIND:

Q. Let me now show you what has been marked for identification as Government Exhibit 1195, and I will just note that pursuant to the stipulation I just read, this was a text message exchange extracted from one of your phones. Do you recognize this exchange, Dr. Gadio?

A. Yes, I do.

Q. And are you involved in it?

A. Yes.

Q. All right. And does it generally relate to the subject you have been testifying about?

A. Yes.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1195.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 1195 received in evidence)

MR. ZOLKIND: If we could publish that to the jury, please.

THE COURT: Yes.

MR. ZOLKIND: If we could just zoom on the top text message here.

Q. All right. Dr. Gadio, just to orient ourselves in terms of how to read this message, do you see on the left side it says "inbox"?

A. Yes.
Q. And on the top right you see message, it says Gadio responding to one of your phones.
A. Um-hum.
Q. Then it says "to". And there is a phone number and the name of contact in your phone. Do you see that?
A. Yes, I do.
Q. And it says "from," and there is another phone number and another contact from your phone?
A. Um-hum.
Q. And then there is a time next to it?
A. Yes.
Q. And then another time stamp. Under "read," it says "Status: Read." Do you see that?
A. Yes.
Q. And then there is the message itself.
A. Um-hum.
Q. So is this a text message to you or from you?
A. It's a text message to me.
Q. Do you recognize who it's from?
A. Yes.
Q. Who is that?
A. I'm sorry?
Q. Who is the text message from?
A. Damjam. Damjam is the main assistant to Vuk Jeremic.

Q. And Mr. Jeremic was the person that was connecting you to the defendant; is that right?
A. He was organizing, yeah, the meeting with Dr. Ho.
Q. And could you please read the text message that Mr. Jeremic's assistant sent to you.
A. OK. He says, "Please come at 8:30 sharp tomorrow to see Patrick Ho. The address is Trump Tower on First and 47th Avenue, Apartment 78B, CEFC."
Q. And did you in fact attend a meeting with the defendant the next day, September 26, 2014?
A. Yes, I did.
Q. All right. And was it at that address Apartment 78B at Trump Tower?
A. Yes.

MR. ZOLKIND: If we could bring up now marked for identification Government Exhibit 1196.

Q. Pursuant to the party's stipulation, this was also extracted from one of your phones. And would you tell us if you recognize this exhibit.

And Ms. Rao, maybe you can just flip through it.

A. Yes, I do.
Q. What are we seeing in this exhibit.
A. A nice sight of New York, New York City.
Q. Are these photographs --
A. And the United Nations headquarters.

Q. Do you recognize when these photographs were taken?
A. Yes, that's the same day, the day of the first meeting with Dr. Ho.
Q. All right.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1196.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibit 1196 received in evidence)
Q. Dr. Gadio, where were these photographs taken?
A. They were taken in the Trump Tower -- from the Trump Tower -- in Dr. Ho's apartment.
Q. And what was your understanding as to who owned, or operated, or used that space at Trump World Tower?
A. I believe it was CEFC.
Q. And this was the view from one of the windows?
A. Yes.
Q. Just flip through the photos. Do you recognize what building we are looking at in the last photo?
A. This one is the United Nations building.
Q. Do you recall who took these photos?
A. Yes, I did.
Q. Sorry, I didn't hear the answer. Who took them?
A. Yes. I said yes. You asked me if I took these pictures. Yes.

Q. OK, thank you. Dr. Gadio, when you were first introduced to Patrick Ho --

Well, let me ask, was this meeting with him the first time you were introduced to him?

A. I think -- I believe we met first in I think a meeting of the international diplomatic group, and we shook hands, and it was not really a formal introduction or formal meeting. Yes.

Q. Was this meeting at the Trump World Tower the first time you had a discussion with him?

A. That's really the meeting where, yeah, we met and we discussed.

Q. When you met, how did the defendant identify himself to you?

A. That he was working for an organization called CEFC, and they have interests in Africa, and he described the company as a powerful company in China, and working with the defense committee of the party and so on, that type of presentation.

Q. So to be clear, when he said that he was working on behalf of CEFC, did you understand him to be describing a for-profit company or a nonprofit NGO?

A. Since the discussion was about oil -- Chad oil I think it was -- we were discussing basically as CEFC, China Energy Fund Company, for-profit organization.

Q. Did he tell you where the CEFC oil company was headquartered?

A. Yes, in Shanghai, China.

Q. Who else was present for this meeting at that office space?

A. I believe Damjam, Damjam was there; maybe another lady was there. I don't really have a perfect recollection of the people who were there exactly. What I remember clearly, of course, is Dr. Ho, and I believe Damjam was there to introduce us, and like I said another lady was helping for the meeting, but I don't remember other people.

Q. Let me show you what has been marked now for identification as Government Exhibit 2. Do you recognize this document?

A. Yes, that's from me.

Q. And what is this?

A. It's a note I wrote to myself after I left the meeting.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 2.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 2 received in evidence)

MR. ZOLKIND: Ms. Rao, if you could publish that, please.

Q. So, again, when did you write this note to yourself?

A. That's on the 26th, the same day.

Q. And what was the reason that you wrote the note?

A. I was trying to remember the main points that we discussed, Dr. Ho and myself, to prepare -- deliver those informations

later to President Deby of Chad.
Q. All right. So using this to the extent it's helpful in refreshing your memory, just tell us what the main points the defendant conveyed to you during that meeting at the office space near the UN?
A. So, I wrote basically meeting Mr. Patrick -- I called him Mr. Patrick -- from China Energy, who told me that their company was a powerful company working with the defense committee, energy, on energy issues for China, that they wanted President Deby not only to be a partner but a friend.
Q. Let me just pause you. Who is Deby?
A. President Deby is the leader -- the president of the Republic of Chad.
Q. OK.
A. So and then I put between brackets that Libya has already collapsed, Nigeria -- Niger was collapsing and Mali was in war and was going to go also, so it was important for President Deby to build a partnership with CEFC. That line may be a discussion that I had with Dr. Ho. Because these are my traditional arguments myself, so it's me who explained after the discussion with Dr. Ho that President Deby should not only be a partner but a friend, based on the fact that three African countries -- neighboring countries of Chad -- have been already taken down by terrorist organizations.
Q. So when you say that you told the defendant that in your

view Deby should be not only a partner but a friend, you mean not only a business partner but also a strategic friend of China?

A. A strategic ally, yes, and strategic friend.

Q. And what does oil relationship refer to?

A. Oil relationship meant that CEFC was interested -- specifically that one, Dr. Ho told me that they were specifically interested in the Chadian oil specifically.

Q. And what did military equipment refer to?

A. That their company was also working in the area of military equipment.

Q. And when you say their company, what do you mean?

A. CEFC.

Q. And what did the defendant say with respect to CEFC's military equipment?

A. I think he just mentioned the fact that they work in that area, they can also sell military equipment if Chad was interested. And they knew also that Chad was a country with a strong military tradition and interest in those equipment, yeah.

Q. And what was the next thing the defendant talked about?

A. OK, so he said that they don't work only in oil relationships, military equipment, but they are also interested in helping Chad build its social infrastructure and its banking system.

Q. And what does the infrastructure refer to?
A. I think it would be roads, hospitals, airport, you know, that type of infrastructure.
Q. Just to be clear, based on the conversation you had with the defendant, did you understand him to be talking about CEFC donating infrastructure, or building it in exchange for profits?
A. At this stage, my belief was that this was their offer, like the four areas of interest they had with Chad, and we did not get really to the discussion of how the infrastructure or banking system would be developed. I think they were telling me -- he was telling me the expertise of his company. Those are the four areas of interest in Chad.
Q. And the last line says trip to N'Djamena soonest?
A. Exactly. I needed to organize a trip to N'Djamena soonest.
Q. Where is N'Djamena?
A. N'Djamena is the capital city of Chad in central Africa.
Q. During your discussion with the defendant here, did you talk at all about whether you or how you would be compensated for your work?
A. We did not get into the details, but it was clear that it's going to be CEFC working with our consulting firm, Sarata, to achieve the goals of CEFC, be introduced to Chad and particularly to the president of Chad, and then help them get business in Chad. And in my mind and in our discussion it was

clear that we will be compensated.

Q. By the way, during your meeting with the defendant, what language were you speaking and what language was he speaking?

A. We were speaking in English.

Q. All right. Did appear to be fully fluent in English?

A. He speaks better English than me.

Q. All right. And through your relationship with the defendant, did you learn whether he also speaks any other languages?

A. Yeah, of course I think he speaks Chinese.

Q. Now, with respect to CEFC's interest in oil in Chad, did the defendant explain why he wanted an introduction to the president?

A. Not then, not directly that day. I think he showed a real interest in Chad. To be honest about it, I was surprised, because Chad oil -- you know, it's known in Africa that the most important -- well, the best quality oil is out of Nigeria, Angola. It's the first time I heard somebody say they were interested in Chad's oil. It was not the best quality of oil in the world.

Q. Just to be clear, did the concept of the defendant and CEFC wanting an introduction to the president of Chad, the person, did that come up in this meeting?

A. Yes, that they wanted to be introduced to him.

Q. Did the defendant explain why they wanted a meeting with

the president himself?

A. Not quite, not really.

Q. Dr. Gadio, just to be crystal clear, is the president of Chad the chief executive of the Chadian government?

A. He is.

Q. And is there anyone above him in the Chadian government?

A. No.

Q. Now, I think you said that Mr. Jeremic when he was telling you about Patrick Ho told you that he also did work at the UN and with respect to ECOSOC; is that right?

A. ECOSOC, yes.

Q. OK. During the meeting that you had with the defendant, did he mention any issues that seemed to be related to ECOSOC or his NGO?

A. Not that I remember, not in that meeting.

Q. During your meeting with the defendant, did he talk at all about being interested in doing charitable or humanitarian work in Chad?

A. Not at that stage, no.

Q. Did he ask at all about NGOs that were already operating in Chad?

A. No.

Q. Just to be clear, did he express an interest in anything other than business opportunities for CEFC the oil company in Chad?

A. I think that was the main thrust of our discussion, and I believe we did exchange also a discussion about the leadership role of Chad in the Sahel region, so that it was, you know, it was good to build like alliance or partnership with the president of Chad for his leadership role in the region.
Q. Now, Dr. Gadio, did you in fact know President Deby of Chad?
A. Very well. Very well by then, yeah.
Q. How did you know him?
A. You know, as a foreign minister of Senegal, I attended from 2000, the year we started creating the African Union -- which was a new organization -- I attended every single meeting of the African Union, meeting of ministers and meetings of heads of state, and President Deby was there for every meeting he attended, and he was particularly remarkable in his Pan African commitment, his commitment to the continent as a whole, and to the security of the continent, and speaking very often as a leader. Then I'm interested in him because I'm a Pan Africanist, so I started greeting him, getting to know him. But our true friendship started in 2007, seven years later. We started interacting and having discussion, and that's how I got to know him. In 2012, after I left the government, I stayed -- you know, two or three years I was out of contact with President Deby. In 2012 we started a new relationship, very, very close relationship.

Q. And as of late 2014, do you know approximately how long President Deby had been the president of Chad?
A. Yes. I think he came to power in 1990. Their country was in war against Libya, and their president then was accused of, you know, massive violations of human rights and killing people and jailing. He worked with that president, and then he became a dissident; he left and organized an army to overthrow that regime, and then that's how we started. And by that time, I knew him, like we said in 2000, he was already like nine years in charge of Chad.
Q. Let me somehow you Government Exhibit 1503. Do you recognize this photo?
A. Yes.
Q. Who is that a photo of?
A. That's president Idriss Deby.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1503.

MR. KIM: No objection.

THE COURT: Received.

MR. ZOLKIND: We also offer 1503A the face plate and 1503B the name plate.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibits 1503, 1503A and 1503B received in evidence)

MR. ZOLKIND: And we can take that down.
Q. Let me bring up now what has been marked for identification as Government Exhibit 1511. Do you recognize this photo?
A. Yes, that's the continent of Africa.
MR. ZOLKIND: And, your Honor, we offer Government Exhibit 1511.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibit 1511 received in evidence)
MR. ZOLKIND: If we could publish that to the jury.
Q. Dr. Gadio, if you could just describe where -- let's start with your home country. Where is Senegal?
A. Senegal is the most western country on this map, right there.
Q. What's the capital?
A. Dakar.
Q. The capital?
A. Of Senegal, yes.
Q. If we could zoom back out, if you could just describe where the Republic of Chad is.
A. Just on top you see Libya, and then Chad underneath, and Sudan on the right. Niger. Chad is right there in the middle.
Q. OK. And that's the capital, N'Djamena?
A. N'Djamena, yes.
Q. Now, you spoke just a moment ago about being a

Pan-Africanist; is that right?
A. Yes, sir.
Q. Can you just describe briefly what your ideology or your political agenda was as a Pan-Africanist.
A. You know, when Africans were taken out of the continent and enslaved in the U.S. and so on, some of the intellectuals from Trinidad and Tobago, Sylvester-Williams; Marcus Garvey from Jamaica; William Du Bois from the United States; they launched a concept at the end of the 19th Century call the Pan-Africanism, which is people of African descent, from the continent abroad, should all get together to rebuild Africa. That's what's called the African Renaissance. Unfortunately, when we got independence led by the president of Ghana Nkrumah, who was the leader of Pan-Africanism on the continent, our leaders did not follow Nkrumah, so we ended up having 54 African states instead of having the United States of Africa. So, I'm among the people who still believe that we can achieve the world of the United States of Africa.
Q. Was President Deby supportive or unsupportive with respect to the agenda that you just described?
A. He is a proponent, a strong proponent of the United States of Africa, and which means a common army, common defense system, common currency, common diplomacy and so on. And he is really the one who is now the spokesperson of that agenda.
Q. Dr. Gadio, you said that in addition to running the private

firm Sarata, I think you said that you were a member of a nonprofit institute IPS; is that right?
A. Exactly.
Q. Did president Deby ever support that organization financially?
A. He did.
Q. And about how often would he provide financial support to the IPS organization?
A. Often when I traveled to N'Djamena to come and talk to him about IPS, then he would pay for my trip, and sometimes he would give support to IPS. The most important figure we got was like 20,000 euro.
Q. So just to be clear, he would give you donations to IPS on occasion, most significant of which was 20,000 euros?
A. Exactly, which is approximately $21,000.
Q. And what form was that donation?
A. Cash.
Q. Now, to be clear, when you were serving as foreign minister of Senegal, did President Deby ever provide you with any sort of financial support?
A. Absolutely not.
Q. And I think you said that you are now serving as a congressman in Senegal; is that right?
A. Exactly.
Q. And did President Deby support your campaign in any way?

A. Not at all.
Q. Have you ever run for any other political office in Senegal?
A. Yes, I run for the president of Senegal in 2012.
Q. OK. What was the outcome of that race?
A. Poor outcome. It was mainly about message, because I was not ready to run -- no funds, no electoral machine -- but I had a very strong message that I wanted my people to hear, so I ran. I came out I believe eight out of 14, and it was a very low percentage of votes, but I believe my ideas prevailed.
Q. All right. And do you hope to run for president of Senegal again in the future?
A. Absolutely. I was hoping for this 2019, but because of this situation I think I'm going to postpone it.
Q. All right. Let me show you what has been marked now for identification as Government Exhibit 1197. And pursuant to the parties' stipulation this was extracted from your cell phone. Do you recognize this text message exchange, Dr. Gadio.
A. Yes, I do. Yes, I do.
Q. And does it relate to the events in New York in September of 2014?
A. Yes.

MR. ZOLKIND: Your Honor, the government offers 1197. And let me check. If I could have just one moment.

First, let me offer Government Exhibit 1197.

MR. KIM: No objection, your Honor.

THE COURT: Received.

(Government Exhibit 1197 received in evidence)

MR. ZOLKIND: Your Honor, pursuant to a stipulation that was read yesterday regarding translations of French and Chinese documents, the government offers 1197-TX, which is the English translation.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 1197-TX received in evidence)

MR. ZOLKIND: If we could bring up 1197-TX, which is, as I said, the English translation.

Q. Dr. Gadio, do you see this text message exchange here?
A. Yes, I do.
Q. Who were you exchanging text messages with?
A. With President Deby of Chad.
Q. All right. What language did you communicate with President Deby? What language was that in?
A. We use French.
Q. So you can see, the parties have agreed on a translation here.
A. Yes.
Q. All right. Do you see the date of this text message is September 26, 2014?
A. Yes.

Q. So was that the same day as your meeting with the defendant?
A. Yes.
Q. If you could read the text message that you sent to President Deby.
A. OK. In English.
Q. Please.
A. OK. "Dear President and Highly Esteemed Elder, I am in New York and would be honored to come to say hello to you for five to ten minutes. I wish to talk to you about the CAR" -- Central African Republic -- "and the Dakar International Forum on peace and security in Africa (December 15-16). Most respectfully Minister CT Gadio."
Q. And why was President Deby in New York in September of 2014?
A. Yeah, he came for the General Assembly.
Q. And did you in fact meet and speak with him at that time?
A. Yes, we did.
Q. In addition to the issues that you raised in your text message here, did you speak to him at all about the issues that the defendant had raised during a meeting you had with him?
A. I did.
MR. ZOLKIND: We can take down this text message.
Q. If you can just describe generally the nature of the conversation you had with President Deby in New York in

relation to what the defendant had told you about CEFC's interest in Chad.

A. Yes. I went to a special session on the Central African Republic, because I was told by the foreign minister of Chad that it was the best way to meet with President Deby quickly. So, I went there and he saw me, came to me, and we had a brief discussion, and I told him that I was approached by friends who wanted to come and see him; they work for a powerful Chinese company called CEFC and they wanted to come to Chad and meet him. And he told me, you know, do you really know them? Are you really confident that it's going to be useful? Because I have received so many delegations and nothing has come out of that. But I told him, no, these people were introduced by former foreign ministers, good friends, so I trust that it can be useful for your country. So, he said any time after when I go back you can come in October, you can talk about it first, and then you can bring the delegation whenever you want.

Q. And you can bring them where?

A. To Chad, to N'Djamena, to the capital city.

Q. Let's bring up what has been marked for identification as Government Exhibit 7A. Do you recognize this e-mail exchange, Dr. Gadio?

A. Yes. Yes.

Q. And does it appear to relate to the same topic you have been testifying about?

A. Yes.

MR. ZOLKIND: The government offers Government Exhibit 7A.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 7A received in evidence)

MR. ZOLKIND: Ms. Rao, let's start by zooming in on the top header there.

Q. Who do you recognize this e-mail to be from?

A. I believe it's Damjam. I'm not very good with his last name.

Q. I won't ask you to pronounce it.

A. Yeah.

Q. But Damjam was Mr. Jeremic's assistant; is that right?

A. Main assistant, yeah.

Q. OK. And you see the subject line is "forward: Chad trip"?

A. Yes.

Q. OK. Let's go down to the lower e-mail in the chain. All right. Do you see that this e-mail is sent from somebody signed Anna?

A. Um-hum, yes.

Q. Do you see where it says, "Thank you Anna." And if you could just read her title and her signature block.

A. Yeah, secretary to Dr. Patrick Ho. Then there is the phone number and address.

Q. Then you go up and you see she wrote, "Here is the list of delegations to Chad Republic."

A. Yes.

MR. ZOLKIND: Ms. Rao, if you would highlight that at the top there.

Q. OK. Then there is a list of six names.

A. Yes.

Q. Who did you understand this to be a list of?

A. The delegation of CEFC.

Q. Sorry. You said the delegation of CEFC?

A. Yes, a delegation of CEFC wanting to visit Chad, to come to Chad, yeah.

Q. And, by the way, I think you've used the term delegation. Delegation, what does that word refer to?

A. Oh, like when a company selects a few people and sends them to a mission, we usually call them the delegation of CEFC -- not CEFC -- but the delegation sent to whatever country for economic reasons, public or private, we usually say delegation.

Q. Who is the first person listed in the delegation?

A. Yes, Dr. Patrick Ho.

Q. OK. And do you see that for each of the people listed here there is a parentheses that specifies a particular entity name?

A. Yes.

Q. One of them is listed there. The next person who is listed is CEFC China Energy Companied Limited, CEFC Beijing Petroleum,

the next one is CEFC Beijing Petroleum, next one is the same thing Beijing Petroleum, and then there's CEFC China Energy Company Limited Kazakhstan. Did you have any understanding at all between the distinctions between the various CEFC entities?
A. Not at all.
Q. And at this time, still in October of 2014, who did you view as the leader of the CEFC group with respect to the work in Chad?
A. Like I said yesterday, the main facilitator of CEFC relationship with Chad to me has always been Dr. Patrick Ho.
Q. When you say always, you mean as of this time?
A. I mean like in that process. When we started this process he was my main interlocutor, and we worked together to make this relationship possible.
Q. Now, in this early time period October, November 2014, were you in contact with the defendant?
A. October? I was -- yeah. Yes, yes.
Q. What are some of the ways you communicated with the defendant?
A. We used text message. We used telephone sometimes. But I was mainly working with Damjam to organize a trip to N'Djamena.
Q. OK. And through the communications you had with the defendant leading up to the first meeting that you had with Deby in Chad, did the defendant tell you of any immediate concern he had with respect to Chad?

A. Yes, yes.
Q. What was the immediate concern that he expressed to you?
A. I think -- I don't have a very good recollection if that discussion started in New York or right after, but I know there was a huge crisis between Chad and China on a fine imposed on CNPC, which is the China National Petroleum Company, which is a different company from CEFC. And that company had some serious problems with Chad and was find $1.2 billion. And Dr. Ho was interested in seeing how we can work with Chad and the president to get that fine taken care of, reduced, lessened or whatever.
Q. Let me show you what has been marked for identification as Government Exhibit 1514. Do you recognize that photograph?
A. Yes.
Q. And what is that?
A. That's CNPC.
Q. That's the logo?
A. And the logo, yeah.
MR. ZOLKIND: The government offers Government Exhibit 1514.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibit 1514 received in evidence)
Q. Now, based on what the defendant told you, what was your understanding of the distinction between the CNPC company and

the CEFC company that the defendant represented?

A. Like you asked, my understanding -- my understanding was CNPC was really the national company of China and was like, how do we say that, attached -- you know, overseen or supervised by the state, was directly linked to the state of China, while CEFC seems to be directly linked to the party, the defense committee, but the party defense committee, which is the most powerful committee I believe in the system, and it's the energy department, the energy department of the defense committee. So then you will say CNPC for the state and CEFC rather close to the party. That was my understanding.

Q. And that's based on what you were told by who?

A. The discussion I had with Dr. Patrick Ho.

Q. Now, based on what the defendant told you, what was your understanding as to who had imposed the $1.2 billion fine on this oil company, CNPC?

A. It was the president of Chad, President Deby.

Q. And why had that fine been imposed, as you understood it?

A. President Deby was very upset with CNPC, because there was a provision in their contract that they would not only extract the oil and take it away but they will deal with environmental damage done to the land of Chad. And according to the president, despite several warnings, CNPC continued to do the damage to the environment and, you know, people were dying, agriculture was dying, and he got very mad and he imposed a

$1.2 billion of fine. And he was also planning on ending the contract of CNPC if they don't comply and repair whatever damage was made to the environment.
Q. Now, what did the defendant tell you regarding why he was concerned about this fine on CNPC?
A. My understanding was that Chad cannot have this type of big issue with China, and then if CEFC tries to enter the Chadian market to also help Chad and develop things in Chad, it will be very difficult to sell in China if Chad was still having this hostile relationship with the national company CNPC.
Q. So again to be clear, what was the defendant's interest -- as you understood it from your discussions with him, what was his interest in resolving the dispute between Chad and CNPC?
A. That was the only way to clear the way for CEFC to be able to do business with Chad.
Q. In your discussions with the defendant about this issue, did he express any concern about the actual issues that had caused the Chadian government to impose the fine in the first place?
A. Not really, not really.
Q. For example, do you recall any discussions about the health and safety of the local employees in Chad?
A. The discussion was mainly about if, you know, we become friends with President Deby and you are the friend of President Deby, we can discuss and find a way to lessen the charges or

take care of the fine, but it was not about the substance was it fair or unfair, you know, how to fix the environmental issues; that was not the discussion.

Q. I'd like to show you now what has been marked for identification as Government's Exhibits 1012, 1013 and 1014. And these are all pursuant to the parties' stipulation extracted from your phones. Take a look at that one. Take a quick look at this one. Then take a quick look at 1014. We will go through them in more detail, but do you recognize generally what these documents are?

A. Yes.

Q. And what are they?

A. Text messages between me and Dr. Ho.

MR. ZOLKIND: Your Honor, the government offers Government's Exhibits 1012, 1013 and 1014.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibits 1012, 1013 and 1014 received in evidence)

Q. Let's go to 1012 first. So, is this a message from you or to you?

A. It's a message from me.

Q. And who are you sending the message to?

A. To Dr. Patrick Ho.

Q. What's the date?

A. October 20.
Q. And if you could just read your text message.
A. "Dear friend, I am on my way to Chad. Talked to The Boss himself last night. He warmly welcome my visit today. I already mentioned you in our agenda. Will keep you posted. Cheers."
Q. When you say "talked to The Boss," who's the boss?
A. The president of Chad.
Q. You addressed the defendant by saying dear friend. Did you consider yourself a friend of the defendant?
A. We just knew each other. So in terms of both of us being from a diplomatic background, I always call the person I was introduced to and who looked like a kind person or a nice person, I start calling them dear friend. But we started at the time trying to develop a friendship, yes.
Q. Let's bring up 1013. And if we could just zoom in on the top text. This is another message from you to Patrick Ho?
A. Yes.
Q. On October 21?
A. Yes.
Q. And if you could just read your text message.
A. I'm saying, "Dear friend, I have the notes I took about Chad. Can you briefly remind me the problem China wants to resolve with Chad? Cheers. I'm seeing the boss in 2 to 3 hours."

Q. What was the problem you were referring to here?
A. I believe that I took notes of those issues that we discussed earlier, you know, the interest of CEFC oil and infrastructure and so on, but then I couldn't remember, you know, properly the fine issue. I think it was the fine that he wanted me to talk with the president about, but I couldn't remember the whole issue, so that's why I asked him could you remind me the problem China wants to resolve with Chad.
Q. If we could bring up Government Exhibit 1014. So you text Patrick Ho here again October 21, and you say, "The news are excellent. I will call you when I am alone."
A. Yes.
Q. What were you referring to there?
A. I think the meeting went very well with the president. He was interested in all the areas that I mentioned about a possible relationship with CEFC, a strong relationship with CEFC, and also he was very open about trying to resolve the fine with CNPC.
Q. This initial meeting here, October 21, 2014, who was present for that meeting?
A. I think I was with the president and his chief of staff, I think.
Q. All right. No one from CEFC was at that meeting.
A. No, no, no.
Q. And go to 1014. Sorry, let's go to the second page --

second to last message.

OK. Here you write, "Just landed back in N'Djamena. I will send you an e-mail in a couple of hours to make some strategic propositions. We may need to meet and do some planning before meeting The Boss." Is that right?

A. Yes.

Q. All right. We can take that down.

During your meeting with President Deby, what did you describe as the defendant's and CEFC's main interests with respect to Chad?

A. First of course the oil, the oil partnership, oil business. Then I tried to show that it was not only about oil, it was possible to work like -- when you say you want to build a strategic partnership with a company, then you have to embrace like other areas, so we discussed infrastructure, banking services and, you know, military also we mentioned.

Q. Let's bring up Government Exhibit 16 for identification. Do you recognize this e-mail?

A. Yes, I do.

Q. All right. Who is it between?

A. It's me sending a report after the meeting with President Deby to Dr. Ho.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 16.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 16 received in evidence)

Q. If we can bring that up and just zoom in on the first page, please. So this e-mail is from you; is that right?
A. Yes, it is.
Q. And who is it addressed to?
A. To Dr. Ho.
Q. I see here the e-mail address is hocppatrick@gmail.com; is that right?
A. Yes.
Q. Was that the only e-mail address the defendant used, or did he have more than one?
A. I think sometimes he used, how do you call it, company, company e-mail, sometimes he used this g-mail.
Q. All right. Subject line, what did you write there?
A. Meeting report -- urgent. Yeah, urgent.
Q. All right. Let's go to the attachment. What did you title your report here?
A. "Meeting Report from Encounter with President Deby."
Q. And it's a fairly lengthy document, but let's go through some portions of it. So if you could zoom in on the area titled "Establishing Trust on your Behalf." And if you could just read what you wrote here. If you don't mind reading it aloud.
A. Yes. "Establishing Trust on Your Behalf: I started the

meeting by telling the president that you and I are very good friends from our memberships at CIRSD (Vuk's center) and that you flew all the way from Hong Kong to New York to see me face to face in hopes that I can take you to him, reason being that you have heard so many goods things about our friendship (the president and I) and the trust that he confides in me.

"I informed him that I replied to you that all of this was true but I rather travel to his country to explain to him the situation and seek an appointment for you and to introduce you as a good friend and a powerful Chinese leader in your capacity as deputy chair and SG" -- secretary general -- "of China Energy Fund."

Q. Was this a fair summary of how you started your meeting with President Deby?

A. Yes.

Q. All right. Let's go to the next section titled "Main Points From Discussion of Your Offer."

All right. You wrote, "the president was pretty impressed when I talked about you, your work and your offer to him, being the following:"

The first bullet point there, if we can highlight that, it says, "Cutting a deal to reduce and lessen the outstanding fine in place."

Do you see that?

A. Yes.

Q. And to be clear, what's the fine that you are referring to here?

A. That's the fine against CNPC, the other company.

Q. Was that something you discussed with President Deby?

A. Yes.

Q. And generally speaking, how did Deby react to your discussion or expression of interest in reducing or lessening that fine?

A. At the time when he discussed -- when he talks about the fine with CNPC, he gets very angry, and so that did not make it easy to convince him that he has to do something about it. But after the discussion and explanation, you know, he had to keep in mind that China, the U.s. and other countries is a powerful strategic partner, and that he should try to find a compromise, a solution. So that's the type of discussion we were having. He was reminding me what they did, and I was reminding him that strategically it would be a good idea to find a compromise and to move on.

Q. All right. And was this in fact something that the defendant had directed you to raise with President Deby?

A. Yeah, he suggested that I try to discuss the issue with President Deby and to help find a solution.

Q. Go to the second bullet point. It says "Change His" -- first of all, who is "his"?

A. President Deby's status.

Q. Change President Deby's status with China from a 'good partner' to a 'best friend.' And then you refer to the situation in neighboring countries.
A. Um-hum.
Q. What did that refer to in terms of changing his status?
A. You know, in international diplomacy you have this concept like in human relations, countries say they're friends, they love each other, that type of concept. So here the suggestion was to be a good partner of China is good, but to be a best friend, that gives you of course more opportunities, more opening, more investment, more interest from China. So, I was suggesting that we work with him to change his status with China from good partner to a best friend. And then I was trying to argue that, you know, dealing with the current situation in the region, countries were falling apart and it was urgent to do something about it.
Q. And this change in status, was that connected to the idea of doing not just oil business but also business in other sectors?
A. Yes, yes, global partnership, many areas.
Q. Let's turn to the third bullet point. You wrote, "Make him Politically" -- that's Deby again, right?
A. Yes.
Q. Make Deby politically your key ally in the most strategic region of Africa today. Then you go on to see secret or very

confidential financial assistance will be provided to him (Deby) for his political campaigns in his country. Do you see that?
A. Yes.
Q. First, when you wrote "make him politically your key ally," who does the "your" refer to?
A. Your is China and CEFC.
Q. To make Deby a key ally to CEFC?
A. Yes.
Q. And then you refer to providing secret or very confidential financial assistance for political campaigns; is that right?
A. That's true, yes.
Q. Now, just to be clear, Dr. Gadio, when you included this bullet point in your report here, was this something that you had in fact discussed with the defendant?
A. Not at all.
Q. Was it something that you had discussed with President Deby when you met with him?
A. No, not at all.
Q. Can you just please explain why it was you were including -- or what you were suggesting by including this bullet point in your report?
A. You see, I was speaking here, technically I was speaking on behalf of Patrick Ho, Dr. Patrick Ho. What I was saying here was like a suggestion that I was making to him to keep in mind

that if you want to make him your key political ally in the most strategic region of Africa because of the war against terror and all those issues, it is important to follow up his current political situation and leadership and try to help him when it's time to do that, because at this time there was no political campaign, no presidential election, nothing was in the planning. It was just a way of suggestion coming from me.

Q. And what did you envision -- if the relationship with CEFC and the government of Chad had blossomed over the years, what did you anticipate that this could include?

A. Yes, you know, in this part of Africa where we are from, we have serious issues of campaign financing, campaign reform, campaign laws. Usually people provide assistance -- companies, big companies -- to political leaders. And I don't know if you have this problem in the United States, but campaign financing is a big issue and, you know, as of now that's how it works, companies do provide financial support to, you know, political campaigns.

Q. All right. So am I right in understanding then you're advising that as part of a relationship, CEFC should be prepared to provide campaign assistance once Deby was back in the presidential campaign?

A. Exactly, to have it in mind, yeah.

Q. Now, by the way, after you sent this report to the defendant, did he ever ask any questions about the advice to

provide campaign assistance?
A. No, we did not -- we never discussed it after that.
Q. OK. All right. Let's take a look at the fourth bullet point here. Do you see that you wrote "establishing a trust fund to support his social programs, infrastructure development, military equipment, etc."?
A. Yes.
Q. What were you referring to here?
A. I was thinking of if really CEFC and Chad were to build a strategic partnership to make Chad their key allies -- the key ally in the region -- one way to do that would have been to officially have like what we call a trust fund.
Let's say when you say that for social programs and infrastructure in Chad CEFC has made a donation of $50 million in two years or three years, that would be officially mentioned to everybody and then put in a trust fund, and comanaged between Chad and CEFC, and they will determine, you know, the strategic programs that they want to fund together. That's what I call a trust fund.
Q. And then take a look at bullet number five, "Help him" -- Deby -- "establish or reform his banking system."
A. Yes.
Q. Whose idea had that come from?
A. That was -- the idea of CEFC could deliver that service, I presented it to the president, that he should be interested in

it, and he said that's fine.
Q. OK. Let's move on to the next section of your report, entitled "The President's Reply".
And, Dr. Gadio, if you would read the reply that you wrote here in this report.
A. OK. "the president was very impressed by my presentation and replied this:
"Listen, you are a friend and a brother" -- he was talking to me -- "To tell you the truth, I had already made the decision to officially cancel the Chinese oil company's exploitation permit by the end of this month. Remember, I gave them one month to pay $1.2 billion to repair the bridge of their contract and the multiple violations of our arrangements. I wanted reparation for the damage inflicted to the environment and to the physical well beings of their Chadian employees. Today I have seven of them who are gravely ill and I had sent 2 or 3 to France otherwise they would be dead by now. I owe them reparations. It is a moral issue for me."
Q. If we can move on to the next part of the paragraph.
A. "It's a moral issue for me, not a financial issue. I gave them one month and I did not act for one year. My decision was made but now that they used the right person to get access to me, I am ready to reconsider my position. Of course we need to negotiate hard and end up with a win-win situation. I respect China and I know the many opportunities one can get with them

in terms of development but believe me I have excellent financial offers from the Australians, Americans, Europeans for these hundreds of oil wells I gave them" -- CNPC -- "plus all these months without making money out of these wells have cost me a real loss but I am open once again because of you. Bring them tomorrow, day after tomorrow, but I am ready to talk to them." CEFC.

Q. And was this a fair reflection of what the president in fact said to you during your meeting with him?

A. It's almost verbatim like word for word, yeah.

Q. OK. What did you understand President Deby to mean when he was talking about excellent financial offers from the Australians, Americans and Europeans for these hundreds of oil wells?

A. My understanding was after the fine and when CNPC was suspended for a while, other oil companies showed interest in the Chadian oil and that they were ready to move on. I even believe some companies were ready to sign an MOA, a memorandum of understanding, with Chad, and they were really interested.

Q. And why were you telling the defendant that oil companies from Australian and Europe and the United States were interested in Chadian oil wells?

A. Just to show that it was not a void, other people were competing, other oil companies were interested.

Q. Let's go to the next section of your report entitled "4.

Proceeding Forward".

I won't ask you to read the whole thing, but if you could just summarize what exactly were you saying to the defendant in this section of your report.

A. Yeah, here I was talking about our company, our consulting firm, doing the job of introducing CEFC to the president of Chad, and I wanted to know exactly how CEFC perceived our mission.

Q. Meaning what exactly?

A. Our mission, like did they want me, just us to introduce them to the president of Chad, and then they will financially compensate us for the work we have done; or do they want to engage in like real a mediation, like I said, to successfully help you get through this process. If that's the case, I suggest you make me a significant financial offer that we can negotiate and agree to in writing. So I was seeking like a formal relationship, an agreement to make sure that all the work we were doing would be compensated for that fairly.

Q. If we can go to the next section of your report titled "My Apprehension From Past Experiences," and if you can just read the second paragraph there, beginning "In particular..."

A. "In particular a few important reasons why in this case we need to be clear from now forth and have a written agreement in place."

(Continued on next page)

BY MR. ZOLKIND:
Q. And let's go to the next section. You wrote, "Re-establishing ties with China experience."
A. Yes.
MR. ZOLKIND: If we could zoom in on that paragraph, please.
Q. So you wrote here, "Through the process to re-establish ties with your country, I was not fairly compensated for my hard work and efforts. As you may or may not recall, I am the one as foreign minister who fought hard during a 6-month marathon to resume the diplomatic ties between China and my country (Senegal)."
THE COURT: Slowly.
MR. ZOLKIND: My apologies, your Honor.
Q. "Taiwan did everything to oppose my move. They poured money, bought allies, but I was determined to succeed. We all know how Senegal is strategically important for Chinese African policy. When all was said and done and I had the privilege to sign on October 25, 2005 the resumption of Senegal/China diplomatic relations before the entire world, China gave several millions of US dollars to our former president and I received nothing, although I was the principal mediator. The president kept the whole thing for himself, and I complained to my Chinese counterparts and they never did anything despite several promises, which ended up being broken promises."

Do you see that?
A. Yes, I do.
Q. So let me break that down, if I could.
When you referred to the resumption of Senegal/China diplomatic relations in 2005, what was your position at that time?
A. I was Foreign Minister of Senegal.
Q. And when you wrote that China gave several millions of US dollars to your former president and you received nothing, when you said that China gave several millions of US dollars, who were you referring to specifically?
A. I was told that it came from like business -- business partners who accompanied the process of diplomatic -- resumption of diplomatic ties between the two countries.
Q. And when you wrote that Chinese interests had given the money to the former president of Senegal, did you believe that to be true when you wrote it here in this report?
A. Not at all. And I said several times that I deeply regret writing --
Q. Let me -- sorry.
A. Yes.
Q. Let me just make sure you understood my question. When you wrote that the money was given to the president of Senegal, was that something that you had heard or believed might be true?
A. I do not know it for a fact. I heard it.

Q. Okay. But you don't know one way or the other whether it happened.
A. But, you know, if I stick only to facts, I'm not sure it happened at all.
Q. Okay. When you wrote that not a single dollar came your way, although you were the principal mediator, was that true?
A. Was that -- I'm sorry?
Q. Was that true that not a single dollar of that, of the monies from the Chinese interests, that not a single dollar went your way?
A. That I heard about, yes.
Q. Okay.
A. Mm-hmm.
Q. Dr. Gadio, why were you telling the defendant all of this?
A. I was under the impression that because nothing was signed, no formal agreement, no formal relationship, that we may end up being in a situation where the job will be done and we'll not be compensated, and wanting to be compensated, I think I really went too far.
Q. Okay. And I apologize. I think I might have cut you off when you said you regretted writing something.
A. Yes.
Q. Why don't you finish explaining what it is that you were trying to say there.
A. You know, I'm entering a world that I don't know very well,

which is the world of business, and I'm trying to -- trying to convince my partners and trying to use arguments to put pressure, and like I said, this is what I believe. This is completely out of character for me. This is not me. This is not what I have done all my life. And, you know, I take responsibility because I wrote it. I own completely what is in this sentence. But like I said, I don't like it at all, because I never took bribe, I never asked for bribes from anybody, and to write this because just you want to be compensated was a grave mistake, and -- and I take responsibility for that mistake.

Q. Let's move to the next section of your report, where you wrote, "My Ambitions."

A. Yes.

Q. You wrote, "Having my center, my radio station, my political party, preparing to run again for the highest office in my country, I need to earn real financial resources to face all these charges and future challenges. Therefore I need to enter in business with you, not only for Chad but for any other African country, where I can open doors for you and your powerful committee."

A. Mm-hmm.

Q. What political aspirations were you referring to there?

A. Like presidential aspiration, wanted to run again for office in Senegal.

Q. Okay. And when you say that you wanted to earn real financial resources, just to be clear, what was your goal here in trying to work with CEFC to get a deal done in Chad?
A. To really, you know, make -- make real money. If you get a contract for any block from Chad for $2 million, whatever the percentage, you will get real money, so that was my aspiration. I thought that if we really can achieve that contract, it would be very good for us and we'll earn honest, you know, in a very honest way, some good money to prepare for our political ambitions.
MR. ZOLKIND: Okay. We can zoom back out but stay on that page for a moment.
Q. After sending this report to the defendant, did he ever follow up and ask you any questions about the statements you made about Chinese business interests paying money to the president of Senegal?
A. No, we never discussed that issue.
Q. Did he ever bring up that concept or express any reaction to the fact that you put that in your report to him?
A. No.
MR. ZOLKIND: Let me go to the last bullet on the page. If we can just highlight that or zoom in on the last bullet there, at the very bottom. Starting "In Dubai."
Yes. Thank you.
Q. You wrote, "In Dubai we can come to a formalized written

agreement on my role and status in this mediation and formalize what I should expect if all of this is successfully concluded."

Why was it important to you to have a formalized written agreement with CEFC?

A. Because the way things were moving, there were a lot of "my dear friend," you know, "my brother," we were very -- in terms of words, we were saying very nice things to each other, but, you know, the heart of the matter for business is basically to have a contract or an agreement, and that seemed very difficult, despite all my requests that we formalize the relationship, and I did not want to get into an informal relationship where you don't know exactly what you are working for and when you will be compensated.

Q. And Dr. Gadio, did you ever wind up getting that formal contract that you had requested from the defendant?

A. Unfortunately not.

MR. ZOLKIND: We could take that down.

And if we could go to Government Exhibit 17.

Q. Do you recognize this email exchange, Dr. Gadio?

A. Yes, I do, mm-hmm.

MR. ZOLKIND: Okay. And if we turn to the last page.

Oh, I'm sorry. The government offers Government Exhibit 17.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 17 received in evidence)

MR. ZOLKIND: If we could publish it and go to the last page first. And if we could just zoom in there.

BY MR. ZOLKIND:

Q. So Dr. Gadio, do you see that this chain starts with the email we just looked at where you send the defendant your report?

A. Yes.

Q. Okay. And then if we just go up a little bit to the response, October 22nd at 5:06.

A. Mm-hmm.

Q. All right. And was this the defendant's reply to the report that we just looked at?

A. Yes.

MR. ZOLKIND: And if we could just zoom in on the top two lines.

Q. You see the defendant responded, "Dear Friend, Thank you for a very thorough report and a very candid message. Please be well assured that we remember and appreciate help from good friends."

What did you understand him to mean in saying that you should be well assured that CEFC -- or "we remember and appreciate help from good friends"?

A. Yes. Simply not considering my request for an agreement or a contract, we were still talking nicely to each other, but it

was not concrete to me.
Q. And if we go up to the next email he writes in the chain, bottom of page 1, going on to the next page. Do you see he wrote.

"My Dear Friend, CEFC Energy Company would like to thank you for your kind and effective work. We would like to consider you as a strategic partner and close friend in Africa. We would like to support you and your organization in your political endeavor in your country and in Africa, regardless of the outcome of this deal.

"We would honor and extend to you our appreciation for your effort, and when this deal is done, even more appreciation will follow. We shall discuss about all these."

First off, when the defendant referred to CEFC Energy Company there at the top, what CEFC entity did you understand him to be talking about?
A. Energy company to me is always the oil company.
Q. And what did you understand him to mean in saying that they'd like to consider you as a strategic partner?
A. Yes, like a request that we had made ourself, to be a strat -- to built up strategy partnership between our two companies.
Q. Meaning that you'd be doing more than just brokering the initial introductions to the president?
A. Yes. Yeah, like working, opening the doors in Chad but --

but in other African countries and having like a long-term relationship.

Q. And what did you understand the defendant to mean in saying "We would honor and extend to you our appreciation for your effort, when this deal is done even more appreciation will follow"?

A. I understand that I would not have a formal agreement or contract, but a way will be found to, you know, to try to address our issues, but I will not have like a formal contract or formal agreement.

Q. What was your reaction to that response to your request for a formal contract?

A. Well, not very happy, of course.

MR. ZOLKIND: All right. Let's go to the first page at the top. And if we could highlight the whole thing and focus on the last paragraph, beginning where it says, "We can then meet."

Yeah, the last four lines. Thank you.

Q. So you respond to the defendant and say, in part of this email, "We can then meet around 9:30 p.m. and formalize our agreement in a short MOU that we will discuss and sign. I accept your offer of a strategic partnership between us even beyond this operation. We can start our new alliance with an MOU comprising a few concrete figures for our Chad operation and build a framework for further projects."

What's the MOU you were talking about?
A. A memorandum of understanding, which is form of agreement between -- some kind of beginning of a formal agreement between CEFC and Sarata.
Q. Okay. Did you ever get that formal MOU?
A. Not at all.
MR. ZOLKIND: If you could bring up Government Exhibit 18.
Q. Do you recognize what's been marked for identification as Government Exhibit 18?
A. Yes, I do.
Q. And is that an email exchange between you and the defendant?
A. Yeah, and Dr. Patrick Ho.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 18.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 18 received in evidence)
MR. ZOLKIND: If we could publish that to the jury.
And if we could zoom from the header through the first paragraph.
BY MR. ZOLKIND:
Q. All right. Who's this email from?
A. I'm sorry?

Q. Who is the email from?
A. It's from Dr. Ho to me.
Q. And you see he says here, "New development and surprises. Just as we are preparing for the trip, our partner, China Oil, informed us that their problem in Chad has been largely resolved. The Chad government has made and signed an agreement with them to settle the issues. And we are also coming on board with them in the project in Chad. They asked us not to discuss about such when we meet the president."
So China Oil, what company did you understand that to refer to?
A. CNPC, the other company. CNPC.
Q. CNPC?
A. Yeah.
Q. So what essentially did you understand the defendant to be telling you in this paragraph?
A. To me there was an aspect of challenging the report that I wrote before, explaining that the president was amenable to a settlement and was open to discussion, and he was informing me that he got other news that this issue was settled. I did not feel very good about the reaction because I thought it was almost challenging my honesty, and I knew for a fact that what I said was exactly what the president told me.
Q. All right. But at any rate, he's telling you here that he's learned that CNPC has resolved its dispute over the

$1.2 billion fine?
A. Yes.
MR. ZOLKIND: If we go to the second paragraph of the defendant's email.
And if we could just highlight beginning "One thing" to the end of the paragraph.
Q. You see that the defendant said, "One thing for certain is that we do not wish to disrupt the agreement between Chad and China Oil. And we are also certain that we treasure an opportunity to meet and befriend the president in confidence."
So if the dispute between CNPC and Chad over the $1.2 billion fine had been resolved, at least according to the defendant had been resolved, what was your understanding as to why he still, as he put it, would treasure an opportunity to meet and befriend the president in confidence?
A. Yeah, my understanding was that the desire to meet the president of Chad and to build a relationship with him was not just about the CNPC fine, you know, it would be like larger and in terms of other opportunities in Chad.
MR. ZOLKIND: Okay. If we could bring up Government Exhibit 20 for identification.
Q. Do you recognize this document?
A. Yes.
Q. And who's this email between?
A. That's from my son, Boubker, and myself.

Q. And what's the subject matter of your discussion?
A. He's saying, "Please see the draft MOU." He prepared a draft MOU.
Q. Okay. And did that relate to CEFC?
A. Yes.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 18.
MR. KIM: No objection.
THE COURT: Received.
MR. ZOLKIND: I apologize. The government offers Government Exhibit 20.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 20 received in evidence)
MR. ZOLKIND: Okay.
BY MR. ZOLKIND:
Q. But now that this is in front of the jury, Dr. Gadio, if you could just tell us who is in the From line.
A. Who is -- I'm sorry?
Q. Who's the email from?
A. From Boubker, Boubker Gadio. That's my son.
Q. All right.
A. Son and partner in Sarata.
Q. Okay. And he's sending this to you?
A. Yes.

Q. And what's the subject line?
A. The subject is a draft MOU, memorandum of understanding.
Q. All right. And if we can turn to the attachment.
And what is the attachment that your son Boubker sends you?
A. Yeah, he drafted, you know, traditional like memorandum of understanding. That's a model of a memorandum of understanding.
Q. All right. And I see it says here, "This Memorandum of Understanding (hereinafter 'the MOU') is made as of [a date to be entered] by and between Sarata Holding --" And again, what's Sarata?
A. That's our consulting firm.
Q. "-- represented by Dr. Cheikh Tidiane Gadio, and CEFC Energy Company Limited, represented by Dr. Chi Ping Ho... collectively referred to as 'the parties.'"
MR. ZOLKIND: And if we just go to the last page of the draft MOU, and if we could just zoom in on the signature block.
Q. Who did you anticipate signing this on behalf of Sarata?
A. Myself.
Q. Who did you anticipate signing this on behalf of CEFC Energy Company Limited?
A. Yeah, Dr. Ho.
Q. And did you in fact at some point propose this sort of MOU

to the defendant?
A. Yes.
Q. Did he or did anyone else from CEFC ever sign this or any MOU?
A. No.
MR. ZOLKIND: If we could bring up now for identification what's been marked as Government Exhibit 1022. And then 1023. And then 1024.
Q. Do you recognize those exhibits, Dr. Gadio?
A. Yes, I do.
Q. And what are they?
A. Okay.
Q. Just in general. What type of exhibit is it?
A. Text, text message.
Q. Okay. And is it related to your dealings with CEFC?
A. Yes.
MR. ZOLKIND: Your Honor, the government offers Government Exhibits 1022, 1023, and 1024.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibits 1022, 1023, and 1024 received in evidence)
MR. ZOLKIND: All right. So let's bring up Government Exhibit 1022. If we could zoom in on the text message.
BY MR. ZOLKIND:

Q. First off, Dr. Gadio, what's the date?
A. The date is October 24.
Q. And who's this text message from?
A. From Anna, assistant to Dr. Ho.
Q. Okay. And what does the defendant's assistant Anna say to you here?
A. That the meeting with Chairman Ye, who is the chairman of CEFC, will be on October 28 at 11 a.m.
Q. All right. And what meeting did you understand her to be referring to here?
A. It was invited Sarata -- we were invited to China to meet with CEFC, the management and the chairman of CEFC.
Q. And who invited you to this meeting in China to meet with the various individuals from CEFC?
A. It was facilitated and organized by Dr. Ho.
Q. Okay. And did that happen before any CEFC trip to Chad?
A. Exactly.

MR. ZOLKIND: And if we just pull up 1024.

Q. And do you see in the top text message, Anna wrote, "Hi, Dr. Gadio, Dr. Patrick Ho would like to have dinner with you tonight at around 7:30 p.m.," at a certain hotel.

And did you in fact, Dr. Gadio, go to China in October 2014?
A. Yes, I did.
Q. Okay. Do you recall whether you attended this meeting with

Patrick Ho at the hotel in Beijing?
A. That dinner -- frankly, I don't have a good recollection of that. I don't know if it was canceled, postponed or -- I don't remember. I was not, you know -- I really don't remember that.
Q. That's fine.
A. Yeah.
Q. All right. Did anyone else from your firm, Sarata, come to the trip to China as well?
A. Yes, the managing director, my son, Boubker.
Q. Okay. All right. And so you and your son attended a meeting. Who from CEFC was at the meeting?
A. Chairman Ye, the big boss of CEFC; Dr. Ho, Mr. Zang, Mr. Liu, two or three other guests. I think the translator, French/Chinese was there, and maybe, you know, one or two other people that I'm not very familiar with but who were invited around the table.
Q. Okay. Just to make sure it's clear, was the defendant present at this meeting?
A. Yes, yes.
Q. And you mentioned some other folks.
MR. ZOLKIND: Let's bring up Government Exhibit 1507, which is already in evidence.
Q. Do you recognize this individual?
A. Yes, this is Chairman Ye.
Q. Okay. And what was your understanding of his position?

A. That he was the chairman of CEFC. I think that's the name. I understood Chairman Ye, chairman of CEFC.
Q. Okay. As you understood it, was there anyone higher than him --
A. No.
Q. -- in the CEFC hierarchy?
A. No.
MR. ZOLKIND: Okay. Let's bring up 1509, which I believe is also in evidence.
Q. Do you recognize him?
A. Yes.
Q. Who is that?
A. This is Mr. Zang. He was the head of the Beijing office.
Q. Okay.
A. Yeah.
Q. And is that Zang, Z-A-N-G?
A. Yes.
MR. ZOLKIND: All right. And your Honor, I don't think we offered 1509B, the nameplate, so we'll offer that now.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 1509B received in evidence)
Q. And sorry. What was your understanding, based on the discussions you had in China, of the position that Mr. Zang had at the company?

A. Yeah. Dr. Ho told me several times that Mr. Zang was a key element in the CEFC, you know, power structure. He told me that he's running their Beijing office and he can be even considered like the No. 2 guy in the organization.

MR. ZOLKIND: Okay. And if we could bring up Government Exhibit 1508. And this has not been admitted yet, so just for identification.

Q. Do you recognize 1508?

A. Yes.

Q. And who is that?

A. Mr. Liu.

Q. Is that someone that you met with as well?

A. Yes, several times.

MR. ZOLKIND: All right. The government offers Government Exhibit 1508.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 1508 received in evidence)

MR. ZOLKIND: And we'll also offer 1508A, the faceplate, and B, the nameplate.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibits 1508A and 1508B received in evidence)

BY MR. ZOLKIND:

Q. And based on what you were told during your meetings in China in October 2014, what was your understanding of Mr. Liu's role or function at CEFC?
A. I understood that he was also very powerful in the system and he was the chief engineer of the system, yeah.
Q. Okay. All right. Where did this meeting take place?
A. It was like in a, you know, what they call guest house. It's like a special residence where, you know, important people can -- important people. Like, you know, big companies or government offices, big guys can receive their guests.
Q. Okay. Did you say it's a guest house?
A. Yeah, I think it's -- some people call it guest house or special residence. Usually it belongs to the state or it belongs to big companies, but it's a private place where you can meet, have food and everything, yeah.
Q. And just remind us, what city were you in?
A. Beijing. We met in Beijing.
Q. All right. When you got to this meeting in the sort of guest dining area, was everyone that you've mentioned present there at this meeting?
A. Yes. The people I mentioned before.
Q. Okay. Who took the floor to speak first?
A. Yeah. You know, Dr. Ho made the introduction. He presented me, like introduced me, and said who I was and the type of relationship we could build, and then he introduced

Chairman Ye, and I knew some other members of the delegation, CEFC delegation, so he basically did the introduction, the facilitator for that meeting -- meeting. It was a lunch meeting.

Q. And did the defendant talk at all about the CEFC company in his remarks?

A. Yes.

Q. And just describe, to the best of your recollection, what the defendant said in terms of describing the CEFC company.

A. Yes. That it was a growing company, very, you know, becoming more and more powerful. I think that they made it to the Fortune 500. And Chairman Ye was like, you know, and the whole team were doing a very good job, strengthening CEFC in China and around the world and that they were really, you know, a big, big company.

Q. Did the defendant say anything in his remarks with respect to the company's interests in Chad or in Africa?

A. In Africa in general, but in Chad in particular, and if I remember well, you know, he insisted that I could be really helpful in opening the doors in Africa in general and Chad in particular.

Q. And when you say that he talked about wanting to open the doors in Africa and in Chad in particular, did he describe opening the doors to what?

A. To business partnerships between CEFC and African

countries.
Q. Do you recall any discussion about where else in the world, if anywhere, CEFC had expanded or had operations?
A. I don't have a good recollection of countries where they were operating.
Q. Okay. All right. You mentioned during your first meeting privately with the defendant in New York where I think you testified you talked about a couple different specific areas, oil, infrastructure, etc.?
A. Yes.
Q. Did the defendant talk about those specific areas during this meeting in China?
A. I think the emphasis really was on like generally speaking, opening -- building partnerships with African countries and with the interest in Chad and also, the oil, oil partnerships. I don't remember specifically getting into, you know, military, discussion of military weapons and -- but the -- yeah, I think he reminded us, he reminded me and my son, banking services, infrastructure, that CEFC was doing a lot. He may have mentioned, you know, that they operate also in military equipment, but it was not the focus or the central issue of the introduction to CEFC.
Q. Okay. All right. After the defendant made these remarks, who spoke next?
A. I think Chairman Ye took the floor. And now in terms of --

I'm trying to remember if after Dr. Ho I was given the floor to say something or if we went straight to the answer -- or the comments by Chairman Ye, but I believe Chairman Ye took the floor and made some very nice remarks and welcoming us and saying that he was very happy about the prospect of building this partnership and that he never traveled to Africa in his life and he was looking forward to traveling to Africa and perhaps making Chad his first stop or something like that, yeah.

Q. Okay. And did the other business executives -- I think you mentioned Mr. Zang and Mr. Liu -- did they speak as well?

A. Yes, but not very much into -- getting into details, you know. Like in many companies, once the chairman has spoken and, you know, has said most important aspect, people sometimes make some comments, yeah, you know, we really look forward to the relationship. And it's a very type of protocol, particular language, diplomatic language. What I really, you know -- what I was really impressed with was the introduction by Dr. Ho, the very comprehensive and, you know, well delivered, and then Dr. -- Chairman Ye also insisting on his company's amenability to start real business with Africa.

Q. And did the defendant or Chairman Ye, did they talk at all about how or why they saw Chad as fitting into their strategic goals in Africa?

A. I don't recall something specific told about Chad, why the

choice of Chad. I don't remember. I don't remember, yeah.
Q. All right. Now again, I know you had testified that Mr. Jeremic, when he was first introducing you to the defendant, sort of told you that the defendant did activities at the UN and had an NGO.
A. Yes.
Q. During this meeting in Beijing, did the defendant talk at all about any interests in doing humanitarian or charitable work in Chad?
A. Not that I remember, no.
Q. Okay. And did any of the other CEFC executives talk about wanting to do charity or humanitarian work in Chad?
A. Not that I remember, except when Chairman Ye says, you know, we are really excited about this partnership, we'll work with Chad to develop its infrastructure, to develop this and that, that I remember, but it was not specific, and it was not, you know, we did not really talk humanitarian issues, yeah.
Q. Did anyone from CEFC bring up the topic of making a charitable donation to Chad?
A. Not -- not at that meeting, no.
MR. ZOLKIND: If we could bring up Government Exhibit 1026.
Q. All right. Again, pursuant to the parties' stipulation, this was extracted from one of your phones.
Do you recognize this text message?

A. Yes, I do.
Q. And who is it from?
A. From Anna, assistant of Dr. Patrick Ho.
MR. ZOLKIND: And your Honor, the government offers Government Exhibit 1026.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 1026 received in evidence)
Q. All right. So again, now that it's in front of the jury, just who is this text message from?
A. From Anna, assistant to Dr. Patrick Ho.
Q. All right. And do you recall getting this message from her?
A. Yes.
Q. And when was this relative to the trip you had taken to China?
A. I'm sorry. What was the question?
Q. Was it before or after the trip you took to China?
A. I think it's after, after.
Q. Okay. All right. And you see the date here is November 3, 2014?
A. Yes.
Q. All right. And she tells you, "Dear Dr. Gadio, Dr. Ho would like you to check email. Pls login to this email: kimosabehk@yahoo.com HK. PIN: Just4brother." And she says,

"In the draft box please see 'Confidential message for Dr. Gadio.' After seeing the file, pls discard it and the draft, and log out. Thanks."

First off, had you ever seen the defendant use this email address, kimosabehk?

A. No, that was the first time.

Q. Okay. And prior to getting this text message, had you ever had a situation where someone asked you to log in to an email account and read an email in the draft folder and then delete it?

A. No.

Q. All right. Do you recall, were you able to follow these instructions to find this email message?

A. No. I think I failed, or it did not work out, yeah.

MR. ZOLKIND: Okay. All right. Let's go to Government Exhibit 27.

Q. And do you recognize this email?

A. Yes, I do.

Q. And who is this email from?

A. From kimosabe, from Dr. Ho.

MR. ZOLKIND: Okay. Your Honor, the government offers Government Exhibit 27.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 27 received in evidence)

Q. All right. So on November 3, 2014, you received this email from the kimosabehk email account, is that right?
A. Yes.
Q. All right. And what was your understanding as to who was sending you this message?
A. Dr. Ho, because I was told before, yeah.
Q. And what's the subject line?
A. It was a confidential message to me.
Q. All right. Let's go to the attachment.
All right. I'm not going to ask you to read the entire message, but if we go to the third paragraph beginning "China National Oil" and go through the first line of the next paragraph.
A. Okay.
MR. ZOLKIND: One more line.
Yeah. Thanks.
Q. All right. If you could read here what the defendant wrote you.
A. "China National Oil (a state-own enterprise) has been working closely with CEFC Energy Company (a private company, privately run but with very close connections with the highest echelon of the Chinese government). Lately, China National Oil has run into a series of corruption charges involving almost the entire management. And they are desperately trying to distribute risks for ongoing and committed projects. And CEFC

has been called in to assume as many of its overseas projects as feasible.

"One such project is in Chad. China National Oil had started the initial investments and now oil has been found and is becoming profitable."

Q. And to be clear, what was your understanding as to what company China National Oil was?

A. CNPC.

Q. Okay. And at the beginning here where it says, "China National Oil (a state-own enterprise)," what did you understand that to mean?

A. Yeah. What I said before, that CNPC was linked to the state, was owned by the state of China.

Q. All right. And CEFC Energy Company, and it says "(a private company, but with very close connections to the Chinese government)."

A. Yes.

Q. What did you understand it to mean by saying it's a private company?

A. That it was run like a private operation.

MR. ZOLKIND: Okay. All right. Let's back out of that and go to the last paragraph on that page.

Yeah.

Q. All right. And so here, the defendant writes to you, "If the president," I think referring to Deby, "decides on levying

a big fine on China National Oil and it agreed to it, as told to us by our friends in China, then all is well. In that case we would be grateful if the president could kindly remind China National Oil that CEFC is a good friend of the president and the president would like to see China National Oil working closely with CEFC in Chad. That will help us, CEFC, leverage our position when dealing with China National Oil about investing in their operations in Chad."

What did you understand the defendant to be saying to you here?

A. Yeah. Some form of facilitation, you know, for -- for CEFC made by the president of Chad to, you know -- when dealing with CNPC, so yeah, basically, I think they wanted some help or some facilitation from the president of Chad between like -- facilitate the relationship between the two companies that will allow CEFC to come in maybe more easily and to get involved in, you know, oil operations in Chad.

Q. And so to be clear, was CNPC, or China National Oil, was that company currently operating in Chad?

A. Yeah, it had a contract long time ago.

Q. And was CEFC operating in Chad?

A. Not yet, no. CEFC, not yet.

Q. CEFC, right.

A. Yeah.

Q. And so what did you understand they were asking the

president, or asking you to request the president to help them with?

A. Yes. Some facilitation to allow them to perhaps come, you know, be more comfortable coming into the Chadian market. They wanted the president, who already talked to CNPC about it.

MR. ZOLKIND: If we could go now to the second page, the first full paragraph.

Q. The defendant writes here, "If the president decides that what we heard in China was nothing but a rumour and the verdict with China National Oil was not finalized yet, and such had been told to the China National Oil in no uncertain terms, then we would like to actively participate in the discussion and planning with the president on how to restructure the project and also other projects in Chad. And a meeting with the president will be requested expeditiously."

So what did you understand the defendant to be saying in this paragraph?

A. Yes. Remember, I reported that the president of Chad was interested in finding a solution to the fine, then I received a message telling me, from Dr. Ho, that he heard that the problem was already solved, and then there was -- back to Chad, you know, people were saying that, not so fast, you know, it's still -- discussion was still going on. And so I guess he was saying that if it's a rumor and that the problem was not solved, they were ready to help, work with the president of

Chad to restructure the whole thing and to try and solve the problem and that they would request a meeting with the president to discuss the issue.

But here, I don't know if the precision is important or not, but what happened really is, you know, you have the oil ministry in charge of the oil, and you have a national agency in charge of the oil, and you have -- because people hear, the president, the president. It's not that the only thing you have to do is the role. And the importance of oil in African countries and how the president want to have an eye on everything, 'cause it's a national treasure -- treasure, it's a national sovereignty issue, and that's why he oversees directly some of those major transactions. But in that particular case, why he was discussing with me these oil ministers -- or oil minister were also discussing with CNPC and they came to some kind of arrangement, instead of paying $1.2 billion, CNPC was ready to pay $400 million cash -- not cash, maybe a check or something, but $400 million, and then to give to Chad as a country 10 percent of its oil share in Chad, in the oil infrastructure and everything, so that was the arrangement, and the president was not aware, when he was talking to me, that they were reaching such a compromise.

Q. All right. Let me try to make sure I understand everything that you just explained.

So let me go first to -- I think you were explaining

that in Chad, oil is seen as a national treasure?
A. Not only in Chad but in all African countries, yes.
Q. Okay. Let's back up for a second. So based on your experience as Foreign Minister of Senegal and your experience in this part of Africa for many years, can you please explain your understanding of the extent to which President Deby or other presidents like him -- well, let's focus on President Deby -- the extent to which President Deby was influential or powerful when it came to oil in Chad.
A. Yes. You know, we have the political and constitutional system that puts the president of the republic as the center of the power structure, and the most important element, followed by the parliament and the justice system. And then the president usually appoints the prime minister and the prime minister appoints members of the cabinet. But it's the president who basically selects also the members of the cabinet. So the president is very powerful. But his main responsibility is to be in charge of defense of the territory, defense of the country's interests, and defense of the country's main assets. And main assets, oil is considered a main asset. Energy is considered a main asset. So that's why the president can trust his oil minister to do the job, but final decision on energy, on oil, on gas and everything, those important assets, the final decision belongs to the president, because if a deal is done and it's a bad deal, people will

criticize the president directly for selling out, for, you know, not giving a good presentation to the country, those type of issues, so he takes the responsibility.
Q. So if any deal were to be done between the country of Chad, or the government of Chad and a company like CEFC, who in Chad would have the final decision as to whether or not to do a deal and at what price?
A. The president.
MR. ZOLKIND: Could we just bring back up Government Exhibit 27.
Q. I had one more question for you on it.
MR. ZOLKIND: If we could just zoom in on the last paragraph of the defendant's letter to you here.
Q. You see he wrote, at the end of his letter, "My good friend, and brother, Please kindly convey our very best wishes to the president and please also impress upon him that CEFC would work closely with him and support him in his position and strengthen the bonds and cooperation between our two countries and peoples." Do you see that?
A. Yes.
Q. And when the defendant referred here to supporting the president and strengthening the bonds, did you know specifically what he was referring to?
A. Strengthening the president --
Q. Let me ask you this way. Did the defendant tell you what,

if anything, specifically he was referring to here?
A. No. We did not have a discussion on this.
MR. ZOLKIND: Okay. We can take that down.
And if we could bring up Government Exhibit 31.
Q. Do you recognize this document, Dr. Gadio?
A. Yes. Yes, I do.
Q. And who is this an email exchange between?
A. Me and Dr. Patrick Ho.
MR. ZOLKIND: And your Honor, the government offers Government Exhibit 31.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 31 received in evidence)
Q. All right. So you see this is an email from the defendant, just I think the day after the report that you just looked at?
A. Yes.
Q. Okay. So the next day you get this email, and if we could zoom in on the top email, please.
Do you see that the defendant wrote, "If what was heard on the radio/TV were true and the president decided to go along with that decision, it will be all right with us, but in that case, please kindly request the president to make known China National Oil that the president knows CEFC and likes how it operates and welcomes CEFC as a major partner of China National Oil in the Chad project. That would help us a lot at

home."

So again, what did you understand the defendant to be requesting of you here?

A. Yes. To make the case of their -- with the president that they were interested in not only the special partnership but they wanted the president to kind of -- how do you say that -- defend, make the case for them with CNPC and explain the relationship that he has with -- with CEFC.

Q. All right. Dr. Gadio, were you able to arrange a meeting in Chad between President Deby and the defendant and others from CEFC?

A. Yes.

Q. And were you present for that meeting as well?

A. I was there, yeah.

Q. All right. And in total, during the course of your relationship with the defendant, how many trips did the defendant make to Chad to meet with President Deby, as far as you're aware?

A. Maybe -- maybe four trips. I know one in November, one in December. I think there's one between, around February, perhaps, and one in March. I'm quite sure about those November, December, and March, and thinking of maybe one in February, but I'm not quite certain. I have to look at the documents.

Q. All right. Okay. Let's go to the first meeting in Chad.

MR. ZOLKIND: And if we could bring up Government Exhibit 34.

Q. Do you recognize this document?

A. Yes, I do.

Q. And is this an email related to the first trip to Chad?

A. Yes.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 34.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 34 received in evidence)

MR. ZOLKIND: All right. And if we could just zoom in on the top part first.

BY MR. ZOLKIND:

Q. Who is this email from, Dr. Gadio?

A. Yeah, from Anna, the special assistant to Dr. Ho, to send to me.

Q. All right. And in her email she writes, "Greetings. Hope you enjoyed your time in China. Attached please find the passport copies of the CEFC China delegation to Chad."

And again, just to be clear, CEFC China, what entity do you understand that to refer to?

A. The China energy company, like the oil company.

Q. Okay. Let's go to the first attachment.

MR. ZOLKIND: If we could zoom in there.

Q. What do you understand this list to be a list of?
A. A list of the delegation, the CEFC delegation.
Q. Okay. And I think, again, I know we're getting close to lunch, but if I could just ask you to keep your voice up and right into the microphone.
A. Okay. No problem.
Q. Thank you, sir.
A. You're welcome.
Q. Who is the first person listed on this CEFC delegation?
A. He is; Dr. Patrick Ho.
Q. Okay. And in general, based on your experience as foreign minister and involvement in international business, did it signify anything to you that the defendant was listed first on the delegation list?
A. Yes. Usually either the head of the delegation or the main facilitator or the person who organized the trip is always like listed first, generally speaking.
Q. Okay. All right. And then the second person there is Zang. Do you see that?
A. Yeah, Mr. Zang, yes.
Q. Is that one of the people that you met?
A. Yes.
Q. In China?
A. In Beijing, yes.
Q. All right. And the next person, Mr. Liu, is that another

person that you met in China?
A. Yes.
MR. ZOLKIND: If we could bring up Government Exhibit 1038.
Q. And pursuant to the parties' stipulation, this is a text message from your phone.
A. Yes.
Q. Do you recognize this text message?
A. Yes, I do.
Q. Who are you texting with?
A. That was from -- one was like between Dr. Ho and myself.
MR. ZOLKIND: Okay. Your Honor, we offer Government Exhibit 1038.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 1038 received in evidence)
Q. All right. Do you see the date here is November 7, 2014?
A. Yes.
Q. And in the first text message from the defendant to you, he writes, "My dear brother, any news from the president"?
A. Yes. Yes.
Q. Okay. And if you could --
If we could zoom in on your response and have you read your response. Just the first half --
A. Mm-hmm.

Q. -- up through "work with CEFC."

A. Yes. "Excellent news, my brother. Just left the president. He will be very happy to welcome you and your delegation on Tuesday morning. He has agreed in principle to work with CEFC."

Q. So first, when you say "Excellent news" and you just left the president, what meeting with the president were you referring to?

A. I had a meeting with the president about preparing for CEFC visit, first visit to China.

Q. Okay.

A. And then I reported on the Beijing trip and had a global discussion on how I thought that CEFC may be very interesting for Chad.

Q. All right. And when you said "he has agreed in principle to work with CEFC," who is the "he"?

A. The president.

Q. And what did you mean in saying that he's agreed to work in principle with CEFC?

A. On all the issues that were raised, that he agreed to work with CEFC.

Q. And just explain, what does it mean, in your own mind, to agree to work in principle?

A. Yes. You know, you can reject an offer from a company, say you are not really interested or you already have offers from

other companies, but when you say that -- what they say is very interesting: I'm interested in working with them. It's just in principle. You do not reach the stage where everything is said and done and you are about signing a contract or something. It's just that he agreed in principle that it's okay for them to come and to present their company and he's interested in working with them.

Q. All right. And if we could go to the last text message in the chain.

MR. ZOLKIND: And just highlight, or zoom in on the last text, please.

Q. So you wrote to the defendant, "Your official translator can do the first part of our conversation. For the one on one with the head of the delegation (you I guess) he wants me to remain and translate."

When you said "he wants me to remain and translate," who is the "he"?

A. The president.

Q. Okay. And why were you referring to the defendant as the head of the delegation, or saying that that's what you guess?

A. Yes. That's, you know -- I thought -- because I knew the status he explained to me of Mr. Zang, and I knew Mr. Zang was coming and Mr. -- Dr. Ho was of course coming, so if the president wanted a one on one, who was going to sit with him, is it Dr. Ho only or Mr. Zang, so I said he wants a meeting, a

one on one with the head of the delegation, you, I guess, you know, that's a way of actually asking him who is going to be the, you know -- do the one on one with the president.
Q. And did the defendant respond at all to say someone else would be the head of the delegation?
A. No.
MR. ZOLKIND: Let's bring up Government Exhibit 39.
Q. All right. Do you recognize what's been marked here as Government Exhibit 39?
A. Yes.
Q. And is this an email on the same subject?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 39.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 39 received in evidence)
MR. ZOLKIND: All right. If we could first zoom in on the header and the first part of it.
BY MR. ZOLKIND:
Q. And do you see here, the same day as that preliminary meeting you had with President Deby, is that right?
A. Yes.
Q. All right. And you email the defendant and say, "Just a quick update because when you arrive, we need a preparatory

meeting before we go and sit with the president."

I want to move to the second to last paragraph.

After providing a description to the defendant, you wrote, "This is just a glimpse of what I discussed with the president. The rest I will keep until you get here and I will tell you the full story in a one on one discussion. All that I can say is that prospects are excellent for you and I hope they will be for me too."

What did you mean in saying that you thought the prospects were excellent for you?

A. Actually, the first perhaps aspect would be why the one on one discussion, because very sensitive national security issues were raised, and I said earlier that I cannot discuss those things on email. That once he gets there, we'll have a one-on-one, and the president intended also to have a one-on-one on those sensitive national security issues. And then he told me, the president, that he was absolutely interested in working with CEFC on Block H, and Block H is the most important oilfield now in Chad -- and that was in 2014, I don't know the status today -- available for sale. And he thought that would be excellent for his country and for CEFC. So that's why I said that prospects are excellent for you to acquire Block H, and of course if you acquire Block H, if I'm compensated fairly, I hope it will be also for me.

Q. All right. So first of all, to be clear, the name of the

oilfield is Block H, is that right?
A. Block -- block, yeah, Block H.
Q. Okay. And the president told you about that during your preliminary meeting, is that right?
A. Yes, yes.
Q. All right. And when you say the prospects are excellent for you, to be clear, were you talking about the prospects for CEFC with respect to Block H or with respect to selling military equipment to Chad?
A. I think it was mainly -- these prospects here were about Block H. Block H would be available to them.
Q. And how did you believe that the prospects would be excellent for you too if CEFC wound up purchasing Block H?
A. Because I thought it was going to be a quick sell, they wanted to buy, to do oil business in Chad, the president was offering what was the most interesting oil block in the country. I thought it would be great for them and for me.
Q. Okay. Now let's go back to what you started talking about before, the issue of the military equipment.
A. Yes.
Q. So I think you testified that that subject was something that the defendant brought up in your very first meeting with him here in New York, is that right?
A. Yes. It was mentioned as, yeah, the four areas where the CEFC can work with Chad. (Continued on next page)

Q. So, with respect to military equipment, what had the defendant told you about what CEFC could offer to Chad?
A. It was not very specific. It's late in the process that I received a brochure from CEFC that I actually gave to the president, and we had a very good discussion about what they can do, what they can sell as military equipment to Chad.

And also I think the president was more interested in the civilians treatment, because, you know, the Sahel region you have desert, big areas of land not covered by administration, so that's how you have terrorist infiltration. We need to help civilians, and I believe CEFC had the capacity, the ability to deliver those. And also they had like tanks and different military treatment, quite modern, and the president was very impressed when he looked at the brochure.
Q. And to be clear, it was someone from CEFC who had provided you a brochure on military equipment that they could sell to Chad; is that your testimony?
A. Yes. Yes.
Q. All right. Let's bring up Government Exhibit 1041. Do you recognize this text message?
A. Yeah, that's me to President Deby.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1041.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 1041 received in evidence)

MR. ZOLKIND: Also, pursuant to the stipulation over translations, we offer 1041-TX, which is the English translation.

MR. KIM: No objection.

THE COURT: Received.

MR. ZOLKIND: If we could bring up the English translation of your text message to President Deby.

Q. So, what's the date here?

A. 11 November, 2014.

Q. If you could read your text message -- I should say the translation of your text message to President Deby.

A. Yes. "I extend my respect, Mr. President. I have well arrived at N'Djamena as well as our friends. We are completely at your disposal. Deep respect and highest consideration."

Q. So what event were you here for for the president?

A. I'm sorry?

Q. What were you here in Chad to meet the president for? What was the purpose?

A. To bring the CEFC delegation to him. That was the first meeting.

Q. When you say your friends, is that a reference to CEFC?

A. Yes.

Q. Let's bring up Government Exhibit 43. First of all, take a look at the date here.

A. Yes.
Q. Take a look at the date on the e-mail.
A. Yes, November 13.
Q. And if we just flip through the photos. Do you recognize these photos?
A. Yes, I do.
Q. What are these photos of?
A. On the right?
Q. No, just in general, what event are these photos from?
A. Yeah, that's from the meeting with the president.
Q. Your Honor, the government?

MR. ZOLKIND: The government offers Government Exhibit 43.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 43 received in evidence)

Q. All right. If we could just zoom in, bring up the top document and zoom in here.

Dr. Gadio, are you actually included on this e-mail here?
A. No, I don't see my e-mail.
Q. OK. And do you recall ever seeing these photos before you began preparing for your trial testimony in this case?
A. No.
Q. OK. Again, the date here is November 13, 2014?

A. Yes.
Q. And if we go -- if we take a look at the photos. Who do you see there in the first two photos?
A. Yes. Who do I see?
Q. Yeah, who is in those first two photos?
A. President Deby and Dr. Patrick Ho.
Q. And where is that photo taken?
A. This is in the back meeting room of the president where he welcomes his guests.
Q. And were you physically present for that meeting?
A. Yes, I was there.
Q. And do you recall the photos being taken?
A. Yes.
Q. If we can go to the next photo. And the next one.
All right. And do you recall taking this group photo here?
A. Yes, I do.
Q. If we could just go from left to right across the screen and tell us if you can identify who is in the photo?
A. Yes, Dr. Liu, myself, Dr. Ho, President Deby, Mr. Zang, and I'm not very familiar with the last person on the picture, but I know, I remember him. I don't remember the name.
Q. OK. All right. Ms. Rao, are there any other photos attached to this e-mail? That's the last one. OK.
Let's go back for a moment to the prior photo. Dr.

Gadio, you saw a couple photos of the defendant shaking hands with President Deby and then you saw a group photo. Is that right?
A. Yes.
Q. Did every member of the CEFC delegation get a private photo with the president?
A. I don't remember that, no.

MR. ZOLKIND: Your Honor, is this a reasonable place to break for lunch? I'm about to move into the substance of the meeting.

THE COURT: Certainly.

Ladies and gentlemen, let's take the lunch break. Would you follow the normal rules of not discussing the case among yourselves or with anyone else. Please leave your notebooks in the jury room. Remember not to do any research about the case.

It looks like the sun is out, so why don't you return at ten after two. Have a pleasant lunch. I will expect a weather report when you return. Thank you for your attention.

(Jury not present)

THE COURT: Anything else on the record, friends?

MR. ZOLKIND: Not from the government, your Honor.

MR. ROSENBERG: Not from the defense.

(Discussion held off the record)

(Luncheon recess)

A F T E R N O O N S E S S I O N

2:20 p.m.

(Jury present)

THE COURT: Welcome back, ladies and gentlemen. Thank you for being so prompt.

MR. ZOLKIND: Your Honor, if could just start with two housekeeping matters. I believe we offered Government's Exhibits S9 and S10, two stipulations, portions of which were read into the record. I don't believe they were actually formally admitted, so let me now offer S9 and S10.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibits S9 and S10 received in evidence)

CHEIKH TIDIANE GADIO, resumed.

DIRECT EXAMINATION (Continued)

BY MR. ZOLKIND:

Q. All right. Dr. Gadio, I want to move into asking you about that first meeting between CEFC and President Deby in Chad in November of 2014.

Before I get there, before we broke for lunch you were testifying about the e-mail in which you said something to the effect of any prospects will be excellent for you and I hope they will be for me too. Do you recall that e-mail?

A. Yes, I do.

Q. I just want to ask clearly, Dr. Gadio, if CEFC had entered

into an oil deal with the government of Chad, what was your expectation in terms of how in general you would be compensated?

A. If I were able to convince them to sign an agreement, then we would have determined the percentage of our compensation, because that's usually how it works. You are told whatever the price, we give you one percent, two percent, you know, whatever it is. That's usually how it goes. But we were expecting to negotiate a compensation.

Q. So you expected at the end of any deal to receive some to-be-decided or to-be-negotiated some percentage of the deal?

A. Exactly.

Q. Let me ask about the meeting with the president.

So with respect to this first meeting in Chad, where was the meeting held?

A. Usually it's held in what they called a presidential compound, and there is a meeting room where the president receives his guests, foreign dignitaries, foreign political leaders, heads of state or business partners.

Q. And who participated in this first meeting from the CEFC side?

A. From my recollection, it's Dr. Ho, Mr. Zang, Dr. Liu and the translator.

Q. And who participated from your first Sarata?

A. Myself, and for the first meeting was myself and my son

Boubker.
Q. And what about from the Chadian government side?
A. It was the president and the chief of staff.
Q. Can you explain who spoke first, who got things going.
A. Usually following the protocol, when guests come in to see the president, he first -- after greeting the visitors, the guests, then he would make the opening statement and welcome them in his country and say that his country is available for business and that he was very happy to receive the CEFC delegation.
Q. After President Deby made his opening remarks, who spoke next?
A. Dr. Patrick Ho in turn also introduced the CEFC delegation and made the opening statement.
Q. OK. And can we just bring up -- we have seen it before, but let's bring up Government Exhibit 2, which is already in evidence. If we could just zoom in on that e-mail.
Do you recall testifying that these were the notes you took during your first meeting with the defendant here in New York?
A. Yes.
Q. During the remarks that Patrick Ho made at this November 2014 meeting with President Deby, did he speak about any of the subjects that he talked to you about and which are reflected here in your notes?

A. Yes, that was the first meeting, so he did that in the introduction.
Q. So let's go through them. With respect to oil relationships, what if anything do you recall the defendant saying during the meeting with President Deby?
A. My recollection was that -- is that CEFC was very interested in doing business in Chad regarding the oil business, and I think he insisted a lot on the fact that they chose Chad as their gateway to Africa, to enter into the African market, and that's why they were pleased to be in Chad and to discuss directly with the president opportunities in the area of oil and other interests of the country -- other opportunities.
Q. Just to be clear, when you say they -- when you say the defendant said that they chose Chad as the gateway to Africa, who is the they?
A. CEFC as a company.
Q. What about with respect to infrastructure, was that a subject that the defendant spoke about during this meeting?
A. Yes. I don't remember specifically him emphasizing or insisting too much on the other aspect, but all those aspects were on the table for discussion.
Q. And what about the possibility of CEFC selling military equipment to Chad?
A. Just like a topic, like what CEFC can deliver, the areas of

expertise. I don't think there was a specific point where we discussed military equipment as such.

Q. All right. We can take that down.

After the defendant made his statements during this meeting, who spoke after him?

A. I think Mr. Zang also made a statement on behalf of the company and insisted on really the fact that the company was available to do business with Chad, that type of opening remarks.

Q. During this meeting in Chad, this first meeting with CEFC, was there any discussion about any specific oil opportunities?

A. Yes, the president went on a long -- after they finished, you know, opening remarks, he made a long statement on his country's needs for more oil business with different companies like CEFC, and infrastructure building, and he explained the history of the country, all the problems they had to build their infrastructure system, and he insisted on the fact that the most important oil fields in the country at this stage, at that time, was Block H.

Q. What did the president say with respect to why Block H was the most important oil field available in Chad?

A. He explained that according to studies that were already done, Block H was such a huge block that spilled over to Libya, Sudan and Chad, of course, but they were told that the most important reserves of Block H were in Chad, and that it was a

good block because the Libyans have already started exploiting their part of the reserve, the oil reserves, so he believed that it was really an excellent opportunity for any company interested in oil business.

Q. Did the president make any reference whether any other countries or any other oil companies had also expressed interest in this oil block?

A. My recollection is I think he mentioned Malaysia, Brazil, that they showed interest. And I believe that he even said Brazil signed an MOU. And you know the life span of an MOU is six months; if within six months you don't take action, the MOU is gone, so the country has the right to put the asset back on the market.

Q. Of the various topics that were discussed during this meeting in November of 2014, approximately how much of the discussion focused on oil and Block H?

A. I think most of the discussion was around oil in Block H, but I know the president insisted also on infrastructure.

Q. And in general, how would you describe the reaction of the defendant and his colleagues from CEFC to what the president was saying in regard to Block H?

A. I think they showed him that they were very interested and they understand that like his enthusiasm, why he was presenting about Block H, and they believed it was a good block, it was very interesting, and they were also very happy that the

president was thinking of them in terms of like ready to discuss Block H with their company.

Q. OK. How did the -- how did the meeting come to an end in terms of -- what were the next steps, or what was to come next in terms of the discussions specifically with regard to Block H?

A. I think the president invited CEFC to consider making the next move, which are to make sure that they have all the technical data, the good information about Block H, that they should send a team on the ground to go see and visit Block H, and that he really wanted to move fast to sell that block because the country was in dire need of financial resources.

That's what I remember him summarizing. And he also insisted on an international airport that he wanted CEFC to consider as an emergency in terms of infrastructure.

Q. So, with respect to the next steps regarding Block H, you mentioned sending a team. As you understood it, what would the team's role be with respect to moving the process forward on Block H?

A. Yes. You know, once the seller says that I have a block available, then the buyer should send the technical team to the ground to go see for themselves, you know, where the location is. Then in some situations data centers exist already, which is like work that has been done in the '60s, '70s, all the technical data, but their experts have to go on the ground, see

the location, then come back and look at the technical data. That's what they call the technical study in that process.

Q. And in terms of a potential buyer, a company like CEFC, in terms of the information they would need, why would a technical study or a data center, why would that provide relevant information in terms of moving forward in a negotiation over these oil rights?

A. The final goal of the whole process is to agree on a price, and the only way to set up the price and have a common agreement of the value of the asset is for each part, the government of Chad will say this is the value of the asset, but CEFC after doing their own homework, a technical study and a asset management, will come become and say this is worth $2 billion, $3 billion, and then the discussion can start.

Q. Now, Dr. Gadio, during this November 2014 meeting in Chad, did the defendant say anything about being interested in doing charitable or humanitarian work in Chad?

A. We did not get to that.

Q. Did the defendant make any mention of giving a financial donation to Chad during this meeting?

A. No, not at all.

Q. And, Dr. Gadio, if you can just keep that microphone right up.

A. All right, sorry.

Q. Could we just test the microphone and see if it's working.

A. Yes. I said, no, not at all.
Q. Just to be clear, did anyone else from the CEFC delegation during this trip to Chad make any statements or comments in regard to charitable or humanitarian work or a donation?
A. No, not at all.
Q. Can you please bring up for identification Government Exhibit 45.
Do you recognize this document, Dr. Gadio?
A. Yes, I do.
Q. Who is this e-mail between?
A. Between Dr. Ho and myself.
MR. ZOLKIND: The government offers Government Exhibit 45.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibit 45 received in evidence)
Q. So, again now that it's in front of the jury, who is this e-mail from?
A. It's from Dr. Ho to me.
Q. And what's the date on the e-mail?
A. That's November 18, 2014.
Q. All right. And do you recall what the date was of that first meeting in Chad that you were just testifying about?
A. Yes, it was like a few days before, two or three days before.

Q. Let's go to Government Exhibit 1046-TX. I apologize, 1041-TX.
Dr. Gadio, does looking at this text message refresh your recollection of the specific date of that first CEFC meeting in Chad?
A. Yes.
Q. And what was that date?
A. This message was sent on the 11th of November, so the meeting should have taken place maybe the 12th.
Q. OK. So around the 11th or the 12th?
A. Yes.
Q. All right. Let's go back to Government Exhibit 45. So we were looking at this before. This was from the defendant to you on November 18.
A. Yes, November 18.
Q. All right. So about a week after that meeting; is that right?
A. Yes, a week or so.
Q. If we could just zoom in on the top half.
I will start reading about halfway down where it says, "We hope." Do you see the defendant wrote, "We hope to arrange through your good self again a follow up visit before the end of this month to follow up on a few initiatives we discussed and present some of our thinkings about strategic partnership with the president."

Do you see that.

A. Yes, I do.

Q. What did you understand the defendant to be asking?

A. I think they were requesting -- the defendant was asking for another meeting with the president.

Q. If we can zoom out. And zoom in on the -- yes, please do that paragraph, Ms. Rao.

Do you see that the defendant wrote here, "Please, my brother, give the president a call and present to him our requests. Number one, we would be most grateful if the president could make known to China National Oil in Chad that the president knows us well, is a dear friend of CEFC, and would like to see CEFC participating in China National Oil projects in Chad."

Do you see that?

A. Yes, I do.

Q. And again China National Oil you understood to refer to what company?

A. CNPC.

Q. And again what did you understand this request to be here?

A. They are once again asking the president to mediate or to work out the relationship between CEFC, CNPC and Chad.

Q. You see number two, he writes, "We would be most grateful if the president could grant us an audience with him next week towards the end of November, preferably around November 28, 29,

and of course at a time and date that the president sees fit."

Do you see that?

A. Yes, I do.

Q. Did the defendant tell you why he wanted to meet with the President Deby again about ten days after this?

A. It was not specifically mentioned here.

Q. If we could pull up Government Exhibit 2046 for identification, and 1048 as well.

Do you recognize those two text messages?

A. Yes, I do.

Q. Who are those texts with?

A. With Dr. Ho.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1046 and 1048.

MR. KIM: No objection, your Honor.

THE COURT: Received.

(Government Exhibits 1046 and 1048 received in evidence)

Q. Let's start with 1046. Do you see, Dr. Gadio, that this was sent from the defendant the same day as the e-mail we just looked at?

A. Yes.

Q. And what did the defendant write to you in this text message?

A. "Please read e-mail."

Q. And if we could go to 1048. Do you see this text message was sent by the defendant next day, November 19?
A. Yes.
Q. If you could please read what he wrote to you on that day.
A. "Dear brother, I send you an e-mail about our need to contact the president. Please read mail and revert. Thanks."
Q. Did you know why the defendant was sending you these multiple requests to set up a second meeting with President Deby?
A. At this stage, no.
Q. What was your view as to whether or not CEFC should seek a second meeting with President Deby at this time?
A. I was not in agreement with the idea of soliciting or asking the president to set up yet another meeting. I felt it was high time to move on to concrete things, next concrete steps, and that I thought it was not really appropriate to go back and ask the president to meet a delegation again.
Q. Did you think there was anything further to discuss at this stage?
A. Not really. I felt it was time for actions.
Q. By the way, Dr. Gadio, at that first meeting in Chad in November, do you have any recollection of whether the defendant or anyone else from CEFC provided any gifts to President Deby?
A. I don't remember. I don't have a -- how do you say that --
Q. Recollection?

A. -- recollection, yeah, I don't have a recollection of any gift delivered to the president.

Q. If we can bring up Government Exhibit 49 for identification. Do you recognize this e-mail, Dr. Gadio?

A. Yes, I do.

Q. Who is this an e-mail between?

A. Between myself and Dr. Ho.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 49.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 49 received in evidence)

Q. All right. This is a somewhat lengthy e-mail, so let's just go through it. If we start at the very top, please.

You said this is from you to the defendant, is that correct?

A. Yes, it's me.

Q. I apologize, Ms. Rao, if we could start on page 3.

Do you see that the chain starts with the e-mail that the defendant sent to you asking for the second meeting in Chad?

A. Yes.

Q. All right. Now let's go up to page 1.

And is this your response to the defendant's e-mail?

A. Yes, on the 19th.

Q. OK. Let's start with the first paragraph, and if you could read where you wrote "Firstly..."

A. Yes. "Firstly, I believe that President Deby had been overly kind and generous with us (CEFC and me) in terms of his time and willingness to help CEFC enter the African business market through his country and with my facilitation. At this stage our reaction should not be another trip for more discussion but rather we should carefully craft our offer to him so that he will not think that we are all about talk and not actions. When he left his office last time, he kept me behind and clearly stated this, 'I hope my brother that this time I found the right partners and all that was said tonight will quickly materialize. My brother please do the necessary follow up and consider this as a mission that I have trusted you with, as you are a quality and close collaborator of mine.'"

Q. Thank you. Just to be clear, Dr. Gadio, when you wrote here that "Our reaction should not be another trip for more discussion but, rather, we should carefully craft our offer to him," who is the him there?

A. Him is the president.

Q. And why was the offer going to be crafted to President Deby?

A. Because the package -- the ultimate decision belongs to him.

Q. I'm sorry. The ultimate decision belongs to him?
A. Yeah, about acquiring Block H, the ultimate decision belongs to the president.
Q. By the way, was that something that the president actually talked about during that first November 2014 meeting?
A. Yes, he insisted that it -- it would be like I said, it would be good to send a technical team and to work out a proposal or something, but to come up with a quick decision. He was interested in a quick decision.
Q. I'm sorry. My question though is: During that first CEFC meeting with President Deby, did he talk about the fact that the ultimate decision of whether or not to enter into a deal with CEFC would be his decision to make?
A. Actually, I believe that for all oil companies in the world it's self-evident that in Africa if you acquire a major block like this you have to talk to the president.
Q. Let's go to the third paragraph beginning "Therefore I strongly suggest ..."

OK. You wrote, "Therefore, I strongly suggest that the only right moves CEFC has to make at this juncture is to:

"1. Prepare a mission of a technical team which will go to Chad to collect all the characteristics of this offer (my firm can facilitate the necessary contacts locally to make this happen)."

So I think you talked about this. Just to be clear,

what is the technical team and the technical mission that you're referring to here?

A. A CEFC technical team coming to Chad specifically to go on the field and collect all the characteristic -- what I call characteristics, all the data, information available on Block H.

Q. And that's what you said would allow CEFC to come up with its proposal of a price?

A. Exactly.

Q. OK. And then you wrote, "2. Make a financial offer to the president for the allocation of this huge bloc."

A. Yes.

Q. In terms of sequence, when were you advising the CEFC to make its financial offer?

A. Once number one was fulfilled, which was to get the technical team to do the work, make the assessment. Then that's the only time they can really come to the president and say we have seen all the details, the data, the characteristics, this block is worth whatever amount and we're going to make you this offer.

Q. OK. And is it even possible to make a financial offer to the president without first having done the technical study?

A. Absolutely impossible.

Q. Then you say, number 3, you say, "Reward him." Who does him refer to there?

A. The president.
Q. "Reward him" -- President Deby -- "with a nice financial package as an entry ticket in the Chadian oil market and later gas market and other key business opportunities (packaged to include money for his social projects, for instance a significant donation for his refugee camps of Chadians displaced by the central African crisis, and one major big investment like a hospital, or a building or something of that nature." Do you see that?
A. Yes, I do.
Q. What again sequentially when were you advising the defendant to provide this entry ticket?
A. Once number one and number two were taken care of. Number one is the technical study. Number two the financial offer for the block. And number three, the nice financial package as an entry ticket.
Q. And to be clear, would the entry ticket come after the offer is made or after further discussion? I mean at what point exactly would your advice have been to make the entry ticket?
A. My experience of entry ticket is that once the technical study is done, the financial offer is ready, and general agreement is in place, and then the lawyers go and start working on the contract. That's when the mediators or whoever will present the country will talk to the buyers and discuss

the issue of an entry ticket.
Q. And at that point has negotiation, in your experience, already taken place with respect to what the price would be?
A. Negotiation is concluded, everything is set. Before the signing ceremony of the buying of the asset, that's where usually the entry ticket is discussed, because if you discuss it afterwards it's too late, it's at that stage.
Q. All right. Now, why did you believe that CEFC should be prepared to propose this sort of entry ticket package with the donation and the investment as part of doing a deal in Chad?
A. Because as the president has told them several times, this was the most important asset that the country had to propose to partners.
Q. Sir, what was the most important asset?
A. Block H. And because it was huge and very important to the country and to the president, I thought that if the opportunity was given to CEFC and a chance to acquire the asset, it would be great to think of an entry ticket.
Q. And just could you explain, based on your own experience, how an entry ticket would be provided. So to take the examples that you put in your e-mail, if a company were interested in making a significant donation to refugee camps and making a major investment in a hospital or building, what are the mechanics of how that entry ticket would be provided to the country?

A. It usually follows all the procedures and rules of international cooperation, which is after the discussion between the president's team and the buyer's team, they agree that the buyers will provide, let's say, $50 million, $30 million, to the country as an entry ticket. Then they will discuss the timing when the entry ticket will be given to the country. And usually it's done by either they transfer the contribution by, you know, sending the money to the central bank, or to the treasurer, or writing the check to the country, or even building the infrastructure itself.

Just as an example, I negotiated an entry ticket in 2005. One component was a museum of Black civilization. It will be inaugurated, like delivered to Senegal on the 6th of December. So, it took more than ten years to achieve the project. So, that is what we call an entry ticket.

Q. After you sent this e-mail to the defendant laying out these three stages, did he ever speak with you about any of your suggestions here?

A. No.

Q. And in particular with respect to your suggestion regarding the entry ticket package, did he ever ask you any questions about that, or follow up with you about that?

A. You see, in that particular stage I was interested in knowing that they agreed to send a technical team, and, secondly, to make the financial offer to the president, and

then I would have insisted. Because the other name of entry ticket is signing bonus -- here in the U.S. I think you call it a signing bonus -- so we were far from signing anything, so that's why I was not expecting a reaction right away on point 3, but point 1 and 2 were extremely important to me.

Q. Again, just to be clear, did the defendant ever follow up with you or ask any questions with respect to your advice regarding an entry ticket?

A. No.

Q. And did CEFC's dealings with Chad ever progress to the point where an entry ticket package would have been appropriate, in your view?

A. We did not reach that stage.

Q. And as far as you know, did the defendant or CEFC ever discuss an entry ticket package with President Deby?

A. Not at all.

Q. And as far as you know, did the defendant or anyone from CEFC ever in fact provide an entry ticket package to Chad?

A. No, not at all.

Q. If we could go zoom out of that, and starting at the end of that page, going into the next page, so the beginning "Secondly ..."

So next you wrote to the defendant, "Secondly, based on our first successful encounter with the president in which he designated me as his only channel to CEFC, we need to

formalize the relationship between CEFC and my consulting firm, and sign some form of a legally binding agreement. The agreement will clearly state how much my firm will earn from successfully helping CEFC conclude these projects in Chad, starting with the acquisition of Block H through my facilitation with the president. Same thing when we proceed to other African markets. I do have a draft letter of intent ready for our institutions to consider and sign."

Do you see that?

A. Yes, I do.

Q. Had the defendant responded yet to any of your requests for a formal written contract?

A. No, not really.

Q. At this point had you yet been compensated for any work that you were doing on behalf of the defendant and CEFC?

A. Not yet.

Q. Had the defendant made any specific promise to compensate you?

A. Not formally, no.

Q. Can we bring up for identification Government Exhibit 54A.

Do you recognize this e-mail, Dr. Gadio?

A. Yes, I do.

Q. Who is this between?

A. From Dr. Ho to me.

MR. ZOLKIND: The government offers Government Exhibit

54A.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 54A received in evidence)

Q. Do you see here another somewhat lengthy e-mail between you and the defendant?

A. Yes.

Q. And let me start at the -- what's the date on this e-mail here?

A. I think it's November 25, 2014.

Q. OK. That's about six days after the e-mail you sent that we just looked at?

A. Yes, sent on the 19th.

Q. All right. Let's start at the second paragraph, first sentence. If we could just zoom in on that second paragraph.

So do you see the defendant wrote, "At the outset, I wish to clarify that we, CEFC and company, reiterate our position that we wish very much to work with the president of the Chad Republic. And our previous request of visiting the president again in the very near future represented our earnest attempt to follow through with the understanding of our cooperation --"

THE COURT: Slowly.

Q. "Attempt to follow through with the understanding of our cooperation with the president. We wish to be guided by the

president's suggestions of how we should package this cooperation for the benefit of the Chad people and of the president's position, as it will be pompous for us to assume that we understand the need of the Chad people more than their president."

Did you understand what the defendant was saying here?

A. Let's say that's not the answer I was expecting.

Q. If you could back out of that, and let's go to the next paragraph, the first two lines.

Do you see the defendant wrote here, "Therefore, we would like to propose a second visit with the president on and around December 10, so that we could prepare for this meeting properly. I will be accompanied by GM Zang whom you met in Beijing and in Chad."

Do you see that?

A. Yes.

Q. And so am I right in understanding that six days after the e-mail you wrote, the defendant was again requesting that second meeting with the president of Chad?

A. Yes.

Q. Let's just go back very quickly to Government Exhibit 49 in the e-mail we just looked at. If we could just zoom in on 1 and 2 there.

Now, as you testified, your advice to the defendant was that before seeking a second meeting in Chad, CEFC should

follow these various steps; is that right?
A. Exactly.
Q. At the time that defendant sent you this follow-up e-mail, had CEFS, as far as you knew, sent any technical team to Chad?
A. No, not yet.
Q. And had they begun crafting a financial offer to the president?
A. No, not yet.
Q. Had they engaged in any negotiation with the president over Block H?
A. No, not yet.
Q. Let's go back to 54A.
If we could zoom back in on the paragraph beginning, "therefore, we would like..."
Do you see after requesting again the second visit, the defendant wrote --
If we can highlight this --
"I will be accompanied by GM Zang, whom you met in Beijing and in Chad."
Do you see that?
A. Yes, I do.
Q. And that's the same Mr. Zang that you've testified about before; is that right?
A. Yes.
Q. Did the phrasing that the defendant used here signal

anything to you in terms of the relative roles of the defendant and Mr. Zang?

A. Yes, like Dr. Ho is bringing the delegation, and he said he will be accompanied by general manager Zang.

(Continued on next page)

MR. ZOLKIND: All right. So we can back out of that.
Q. And you see at the end of that paragraph, the defendant wrote, "Purposes of this visit are"?
A. Yes, I see.
Q. Okay. And then let's go from there through Nos. 1 through 3. So he says the first purpose will be to be guided by the president on how CEFC could work with the president in developing the energy potential in Chad, especially with the development of Block H. And he says, we will also bringing a technical team. Do you see that?
A. Yes, I do.
Q. And then No. 2, second purpose, to listen to the president about how else we could develop the other potentials in Chad and to improve the living standards of its people. Do you see that?
A. Yes.
Q. What did you understand that to refer to?
A. The first and second or just the second.
Q. Sorry. The second one.
A. The second one.

Yes, you know, to have another general discussion with the president about what -- what the two partners, like CEFC and the government of Chad can do together, but I believe that the first meeting and all the interaction before have given a clear idea what the president wanted and what was his

expectation, working with a big company like CEFC.

Q. To be clear, when the defendant wrote that these are the three purposes for which CEFC wanted a second meeting, the first one here refers to Block H and the second one refers to developing other potentials in Chad. What specifically, if anything, did you understand the defendant to be referring to there?

A. Here, like one good news would be like one of my advice, that the technical team should come, was mentioned in that first part, that the technical -- we'll also bring a professional team, which will stay behind if necessary to visit the prospective site. That's what I was proposing. And work out the technical details of the project. So I think for the first time I'm seeing something that seems concrete in reference to what I was suggesting.

Q. Okay. And that's part of what's listed there as No. 1, is that right?

A. Yeah, like in No. 1.

MR. ZOLKIND: Okay. Ms. Rao, could you highlight in No. 2 where it says, "Listen to the president about how else we could develop the other potentials in Chad."

Q. What, if anything, did you understand that to refer to?

A. It was not like precise and very concrete, and like I said, I had -- I was under the impression that we had lengthy discussions with the president about his country's needs, you

know, like I said, airport and, you know, hospitals and roads and everything was already explained, but I can understand, you know, this actual request, but I believe that it was already mentioned.

Q. Okay. In other words, you didn't think there was a need for a second meeting on that point.

A. On that specific point, not really.

MR. ZOLKIND: Okay. And if we could highlight No. 3, Ms. Rao.

Q. When the defendant referred to the third purpose being to formulate a working arrangement among the president, your consulting company, and CEFC company, what did you understand him to be referring to there?

A. In perhaps, you know, the consulting company, my company, and CEFC was like good news for us because we have been asking all the time, when are we going to have like an agreement or something signed, but what he said before, working arrangement among like the president, I did not really understand what the president had to do with a working arrangement between us and CEFC, but it was mentioned and I did not pay too much attention to it, but I do not see really what the president was doing here.

MR. ZOLKIND: Okay. If we could back out of that.

All right. And Ms. Rao, if we could zoom in on the last part of the email, "Dr. Gadio, I am in receipt," through

the end of that paragraph.

Q. Okay. And do you see here that the defendant wrote, "Dr. Gadio, I am in receipt of your invitation to participate in the meeting in Senegal in mid December, but prior commitments prevent me from doing so." And then he talks about --

MR. ZOLKIND: Ms. Rao, if you could just highlight where he said, "CEFC would like to be a co-organizer."

Q. "CEFC would like to be a co-organizer of this meeting and would support the meeting with 100,000 US dollars." Do you see that?

A. Yes, I do.

Q. Now what was this meeting in Senegal in mid December?

A. Yes. I was tasked by president of France then, Mr. Hollande, and the president of Senegal, to organize, through my efforts, Dakar International Forum on Peace and Security, so we were looking for sponsors, and in the private sector, and several oil companies like Shell, Total, and so on, you know, made pledges, and I insisted that CEFC be part of it, and I got this pledge of support from Dr. Ho.

Q. This Dakar forum, the meeting in Senegal, was that being run by your for-profit or your not-for-profit?

A. IPS, not-for-profit, Institute for Peace and Security. Not-for-profit.

Q. And again, what was your position at IPS?

A. I was the president of IPS.
Q. And did you view the defendant's pledge to provide a hundred thousand dollars of support for this forum or this meeting, did you view that as being part of your personal compensation on this deal?
A. Not at all.
Q. Did you expect that money to benefit you personally or to go to IPS?
A. Not even IPS. To go straight to the Dakar forum organizing committee, that I was also leading.
Q. And do you see in the next paragraph --
MR. ZOLKIND: Ms. Rao, if you could highlight the next sentence.
Q. The defendant writes, "If you decide to accept this offer, please let us know soon so that our logo and title could be printed onto the final program for the meeting and we would make good this offer when we meet in Chad." Do you see that?
A. Yes, I do.
Q. Did it surprise you at all that the defendant wanted to have CEFC's logo and title printed on the program materials?
A. Not at all. That's the regular request from sponsors.
Q. Had you been involved in other meetings, getting sponsors as head of IPS and in other functions that you've had over the years?
A. Oh, yes, several times.

Q. And based on your involvement in those, in that work and your work in government affairs, how common or uncommon is it for companies or NGOs to publicize the fact that they'd made a donation or given a contribution to a good cause?
A. They always do.
Q. And as you understand it, why do they always publicize that fact?
A. Because it's good for the reputation of their company to be involved in like peace and security in Africa, to help organize a forum or discussion, or to be part of anything related to development cooperation and just make a donation, contribution of support to the organizing committee, to buy airline tickets, you know, hotel reservation for participants, that's -- it looks good, and companies like to make that known.
MR. ZOLKIND: If we could bring up Government Exhibit 55A for identification.
Q. Do you recognize this email?
A. Yes, I do.
Q. And who is this email between?
A. From me to Dr. Ho.
MR. ZOLKIND: And your Honor, the government offers Government Exhibit 55A.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 55A received in evidence)

MR. ZOLKIND: If we could just zoom in here on the first two big paragraphs.

BY MS. GHOSH:

Q. And Dr. Gadio, I'm not going to ask you to read this aloud, but if you could just take a look at it and explain in sum what you were saying to the defendant in this part of the email.

A. First of all, I told him that I pass on the information to the organizing committee -- it's an international organizing committee, composed with Europeans and Africans and so on. So I pass on the information that some friends of mine are ready to pledge, will pledge $100,000 to support the committee's work, and that people were very happy and thrilled. And then I tried to give them an idea of the importance of their contribution, but also the fact that the budget was 2 million US dollars and 2 and .5 -- 2.5 million have already been pledged and are still in the process of being collected, and the Senegal government made a pledge of 600,000. Same thing for France; they made a pledge of 600,000.

Q. Your organization and the people who were organizing this forum, were they excited about the hundred thousand dollars pledged from the defendant?

A. Absolutely. And they were grateful. That's the following sentence. They were very grateful.

MR. ZOLKIND: If we could bring up Government Exhibit 56.

Q. And Dr. Gadio, do you recognize this as another email between you and the defendant?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 56.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 56 received in evidence)
Q. All right. Dr. Gadio, what's the date on this email?
A. This one is November 26, 2014.
Q. And who is it from?
A. From Dr. Ho to me.
MR. ZOLKIND: All right. If we could just zoom, Ms. Rao, on the top two lines of the email.
Q. Do you see the defendant begins by saying, "Thank you for your long mail and very detailed thoughts," and he says, "The most pertinent issue at this time is to arrange for a meeting with the president in Chad as soon as feasible." Do you see that?
A. Yes, I do.
Q. Now again, at this time has CEFC sent any technical team?
A. No, not yet.
Q. Have they come up with a proposal of how much to offer for Block H?
A. Not yet.

Q. Have they started any sort of negotiations over the price?
A. Not yet.
Q. Dr. Gadio, did you have any reaction to the fact that the defendant was not following your advice to not go ahead with the second meeting?
A. Obviously their position was quite firm about the fact they wanted the second meeting, and they insisted despite -- I insisted, they insisted, so we kind of disagreed, but we had to do it finally.
Q. And did you in fact ultimately set up that second meeting in Chad?
A. Yes, I did.

MR. ZOLKIND: If we could zoom out and just go to the second to last line of the top email.

Q. Do you see here that the defendant ended his email by writing, "We will probably arrive via the company plane early in the morning of December 7 and leave around midnight of the same day after meeting with the president"?
A. Yes, I see it.

MR. ZOLKIND: All right. We could take that down.

Q. And let's talk about that second meeting in Chad.

MR. ZOLKIND: Could we bring up Government Exhibit 1057.

Q. Do you recognize this document?
A. Yes, I do.

Q. And is this communication with the defendant?
A. Yes, text message between Dr. Ho and myself.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1057.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 1057 received in evidence)
Q. And what's the date on this text message?
A. That's November 26.
Q. And what did you -- if you could just read what you wrote to Patrick Ho.
A. Yeah. "The president has approved Monday December 8 for our meeting with him. I will arrive in N'Djamena with my son and partner Boubker Gadio on Sunday night. Cheers."
Q. All right. And as you recall, did the second meeting in fact happen on December 8?
A. Yes.
MR. ZOLKIND: If we could bring up Government Exhibit 202.
Q. Do you recognize this email, Dr. Gadio?
A. Yes.
Q. And is this another exchange with the defendant?
A. Yes. With Dr. Ho, yeah.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 202.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 202 received in evidence)

Q. If we just look first at the header.

A. Yes.

Q. What is the date of this exchange between you and the defendant?

A. That's December 6, 2014.

Q. About two days before that meeting?

A. Yes.

MR. ZOLKIND: If we could go down to page 2, going into page 3. Starting at the bottom with the email at 12:47.

Yeah, we could stop there.

Q. Do you see this starts --

MR. ZOLKIND: If we could just highlight it, Ms. Rao, at the top left.

Q. December 5, 2014, an email from cywong. Do you recognize who that is?

A. Yes.

Q. Who is that?

A. That's Anna.

Q. And again, what was her position, as you understood?

A. Assistant to Dr. Patrick Ho.

Q. All right. You see she wrote, "Dear Dr. Gadio, Please see the delegation private jet schedule."

MR. ZOLKIND: Ms. Rao, if you could just highlight that so we're all on the same page.

Q. Arrive at Chad 12 noon on December 8. Depart from Chad 22 -- is that 10 p.m. on --

A. Yes.

Q. -- on December 9.

A. Mm-hmm.

Q. Okay. And if we go up to your response.

MR. ZOLKIND: We may need to zoom out a little there.

Q. You respond that you're in the midst of organizing this huge international forum and that it's a huge sacrifice to leave Dakar the whole day and therefore it's better to arrive early on Monday. What was your concern here, Dr. Gadio?

A. Yes. Did not want to -- I was like president of the organizing committee. I could not go, leave the country, leave Senegal for too long. And then I wanted also, you know, like the meeting with the president to -- that we respect the decision, the time that was offered to us.

Q. And Dr. Gadio, I'm going to ask you again to speak right into the microphone.

A. Okay. Sorry.

Q. All right. If we go up to defendant's response to you. You see that he wrote, "Dear Dr. Gadio, We do understand your constraint of time and we are as desperate to accomplish this," and he talks about the difficulties with the flight

arrangements. Do you see that?
A. Yes, I do.
MR. ZOLKIND: Okay. If we can back out of that.
And then if we just go to the top email in the chain.
Q. All right. And this is again from the defendant to you, is that right?
A. Yes.
Q. And do you see he writes again that he was traveling and in flights but he had his office call to liaise with "our Beijing office to execute your requests." And he says, "We look forward to meeting with the president on December 8, Monday."
A. Mm-hmm, yes.
Q. And he says, We expect to meet him only on that day and the departure is scheduled on December 9 at night because of airplane and flight crew regulations. Do you see that?
A. Yes.
Q. And then the last sentence, he writes, "Director Zang of Beijing will be organizing for this trip, and he should have from Beijing all the details regarding our position."
A. Yes.
Q. What did you understand him to mean in saying that Mr. Zang was organizing for the trip?
A. That perhaps I was expecting some discussion about the substance of the offers by CEFC, if they were coming with some, you know, interesting proposal to the president, maybe he would

be -- he will have the Monday for the company to come deal with the proposal.

Q. Are you speculating or are you saying what the defendant actually told you?

A. I'm trying to understand the words, "will be organizing."

Q. Did you in fact know what the defendant meant by that?

MR. KIM: Objection.

A. Not really.

THE COURT: Sir, if counsel says "objection," would you just hold your answer for a minute, please.

THE WITNESS: Yes, your Honor.

THE COURT: All right. The witness answered.

Counsel.

Q. And again, Dr. Gadio, to be clear, what was your understanding from what the defendant had told you about Mr. Zang's position in the CEFC company?

A. He told me that he was almost the No. 2 guy in the company, after Chairman Ye, that he was very powerful in the organization.

Q. And what was your understanding of the defendant's role with respect to the company's involvement in Chad?

A. That he was -- he was the main facilitator of the relationship between CEFC and Chad.

MR. ZOLKIND: Okay. All right. Let's bring up Government Exhibit 1059.

Q. Do you recognize Government Exhibit 1059?
A. Yes, I do.
Q. And who are you communicating with in this text message?
A. This is President Deby.
Q. Did it relate to the upcoming meeting?
A. Yes.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1059 as well as 1059TX, which is the translation.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibits 1059 and 1059TX received in evidence)

MR. ZOLKIND: If we could bring up 1059TX, please.

BY MR. ZOLKIND:
Q. All right. What's the date of this text message from you to President Deby?
A. That's December 7, 2014.
Q. All right. So is that the day before the meeting with CEFC?
A. Exactly.
Q. All right. And if you could just read the text message that you wrote.
A. "Mr. President and Dear Elder, I am in the plane in route on N'Djamena. Arrival at midnight 30." You know. "Our

friends arrive tomorrow at noon. If possible we would like to be received by the end of day Monday 8. Our friends come with excellent offers. May god bless you always."

Q. And what did you mean when you said that "our friends come with excellent offers"?

A. I was referring to the mail we read before, like the three parts, where Dr. Ho was explaining that they would bring a technical team that will remain behind, will be left in Chad after they finish discussion, and that they wanted also to discuss, you know, the president's social projects and things like that, so that's what I was referring to.

MR. ZOLKIND: Can you bring up Government Exhibit 1060.

Sorry. Let me go back to ask one follow-up question on 1059.

1059TX.

Q. Now when you wrote, "Our friends come with excellent offers," did you know specifically what offers, if any, the defendant or others from CEFC planned to present President Deby?

A. Not -- not at all. I referred just to the mail we read before with the three steps proposed by Dr. Ho.

MR. ZOLKIND: All right. If we could bring up 1060, please.

Q. All right. And do you recognize this as a text message

from Patrick Ho?
A. Yes.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1060.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 1060 received in evidence)
Q. All right. Here, December 8, 2014. And you sent a text message to the defendant saying, "We are in the lobby"?
A. Yes.
Q. And what was going on there, as far as you recall?
A. "We are in the lobby." I believe I came with government official car and Boubker to pick them up to go to the meeting with the president.
Q. Okay. All right. And you see the time stamp there, 3:36 p.m.?
A. Yes.
Q. Do you recall approximately when you picked them up to go to the meeting with President Deby?
A. Yes. I think it's in the afternoon. I don't remember exactly if it was at 5 or 4, but I know the meeting took place right after 5 or something like that. Around that time.
Q. The meeting with President Deby took place sometime around --
A. Yes. I don't remember the exact time. But I know it's in

the afternoon and, you know, when we were leaving, it was dark, so we spent time and -- yeah.
Q. Where was the second meeting with President Deby held?
A. In the same room of the presidential compound.
Q. And who attended from your firm Sarata?
A. Me and my son, Boubker.
Q. Okay. Who attended from CEFC?
A. Was a big delegation, but I remember Dr. Ho, Mr. Zang, Mr. Liu, the French translator, and maybe one or two other people.
Q. Okay. And just to be clear, the defendant and Mr. Zang and Mr. Liu were among the people there, is that right?
A. They were there, yeah.
Q. And how about from the Chadian government side, who attended?
A. The president and his chief of staff.
Q. Approximately how long did the meeting last with the president?
A. He gave us like 45 minutes, but I think we went like one hour and a half and perhaps even two hours. It was a long meeting.
Q. All right. When you say he gave you 45 minutes, do you know how much was allotted?
A. Yeah, because he had something, some other important things to do, but he finally stayed like one hour and a half to maybe

even more.
Q. Okay. All right. So the second meeting in Chad, the group is arrayed in the president's meeting room. Who took the floor to speak first?
A. As usual, the president will welcome the delegation and make the opening statements.
Q. And in summary, what do you recall President Deby saying when he introduced the meeting?
A. That he was very happy to receive once again our friends from CEFC and he expect the meeting to be very productive and that we will, you know, come to some important decisions and that type of statement.
Q. Okay. After President Deby made his opening remarks, who took the floor to speak next?
A. As usual, Dr. Ho will take the floor and make an opening statement, introduce the delegation, followed by Mr. Zang also.
Q. If we could go back. Sorry. The defendant spoke. After he finished his statement, then did you say it was Mr. Zang to speak next?
A. Yes.
Q. Okay. All right. Now I'd like to pull up Government Exhibit 54A again and focus on the third paragraph where it says, "The purposes of the visit are."

All right. And do you recall testifying about this email a few moments ago where the defendant lists out, 1, 2, 3,

the purposes of his second visit to Chad?
A. Yes.
Q. All right. Let's go through them.
So with respect to No. 1, where it says, to be guided by the president on how CEFC could work with the president in developing the energy potential in Chad, especially the development of Block H, do you see that?
A. Yes.
Q. What, if anything, do you recall the defendant saying with regard to Topic No. 1?
A. I think we were still at the same level of showing interest for Block H and -- and making the announcement at this time that a technical team was there and, you know, they would stay on the ground and do some work, but I don't remember specific discussion about, you know, Chad and the potential for very significant -- like a very significant discussion. I know they mentioned their interest again for Block H.
Q. Of the various topics that were discussed during the December 2014 meeting in Chad, how significant was the discussion of oil and Block H?
A. I think that it took also the major -- how do you call it -- like --
THE COURT: Topic?
THE WITNESS: Yes, like the major topic. Thank you, your Honor.

A. -- the major topic of the discussion. Other issues were discussed, but it was a center -- the central point or issue.
Q. Sorry. I'm just going to ask you one more time to speak into the microphone, if you don't mind. The acoustics in the courtroom can be difficult.
A. Yeah. I'm sorry. Sorry.
Q. No, no. Don't apologize.
Did you say that it was the central topic?
A. Yes.
Q. How about with respect to Item No. 2 here, with respect to the other potentials in Chad? Do you recall what, if anything, the defendant spoke about on that topic?
A. I don't remember specifically the CEFC delegation or Dr. Ho bringing like proposals or suggestions clearly on these issues, but I remember the president, you know, giving long development once again, in a very enthusiastic manner, on how he was interested in getting partners for, you know, the international airport project and different infrastructure projects, but I don't remember, was he answering a question raised by CEFC, was -- was he -- what really impressed, you know, remained in my mind was how -- how the president took a long time to explain serial, you know, series of projects that he was interested in having a partnership with -- with CEFC on.
Q. And you see the No. 3 on the defendant's list where it says, "To formulate a working arrangement among the president,

your consulting company, and CEFC"?
A. Yes, I see it.
Q. Was that a topic that was discussed at all during this December 2014 meeting in Chad?
A. We did not get to that, and frankly, I don't believe the president would have even allowed discussion, this type of discussion.
Q. Dr. Gadio, during the December 2014 meeting in Chad, was there any mention by the defendant or anyone else at CEFC about making a charitable donation to the Chadian people?
A. Not during the meeting.
Q. Was there any mention of CEFC providing humanitarian assistance to Chad?
A. Not during the meeting.
Q. During this main part of the meeting was there any discussion of anything other than business opportunities for CEFC?
A. Yes. I think so. Yeah, I believe that -- that were the main -- the main issues.
Q. Sorry. My question might not have been clear. But was there any discussion of any topic other than business opportunities for CEFC?
A. Then my answer is no.
Q. All right. Now you said the meeting lasted about an hour and a half, is that right?

A. Yeah, or even a little bit more.

Q. Okay. Could you just describe how the meeting ended, what happened at the end.

A. At the end of the meeting president was apologizing that he had to go, and then the CEFC delegation wanted to have a picture, a group photo, so, you know, they were rushed by the protocol, but we got the group picture. And then when they were leaving the room, somebody reminded them that the gifts were not delivered to the --

Q. If I could just pause you.

A. Okay.

Q. The person who provided the reminder about gifts, was that someone from CEFC or Chad or someone else?

A. I think that's the lady who was with the delegation.

Q. Which delegation?

A. CEFC. She came running, actually, and said, you forgot the gifts.

Q. And when this woman from the CEFC delegation ran in and made the statement about the gifts, where were you?

A. We were still in the -- in the meeting room with the president.

Q. And where was the defendant?

A. I believe we were -- we were still in the meeting room with the president. Only part of the delegation opened the door, and when they were getting out, then they were reminded and

they all came back in.
Q. All right. And when the woman from the CEFC delegation made the remark about the gifts, do you recall what, if anything, the defendant said?
A. Nobody said anything, but he asked Mr. President, yeah, we have -- we have gifts, but I cannot say in the room who exactly said, we have gifts package, but they confirmed what the lady was saying, and the president say, okay, then bring them quickly because I have to leave.
Q. Okay. Did you see the gifts?
A. Yeah, they were entered by -- 'cause when they came in, the security, of course, you know -- every -- in every presidential palace you go now, gifts are not taken directly to the meeting. Security will take them and screen them. So they were with the security and protocol. Once the lady reminded people, then they went to pick up the gifts, and the security brought them inside to where the meeting was taking place.
Q. And were the gifts wrapped?
A. Yeah, they were all wrapped, yeah.
Q. Approximately how many different gifts were they, what sizes were they?
A. To be honest, I did not count, but the impression would be around eight. If I say eight, it's either six, seven, or nine, ten, but it's around eight, yeah.
Q. And about how big were they?

A. I'm sorry?
Q. About what was their size?
A. Yeah, the size would be (indicating). Some of them would be like this and some, a little bit bigger, but they were wrapped, from -- from what I remember.
Q. I'll just note for the record it looked about 1 to 2 feet or so.
A. Like, perhaps from the size of this TV screen or a little bit bigger, larger, but they were not like the gift that two people need to carry together, you know. People could handle those gifts and bring them in.
Q. Okay.
THE COURT: All right. We'll take the 1 to 2 feet as well.
THE WITNESS: Thank you, your Honor.
Q. When those gifts were brought into the room, who were they presented to?
A. To the president directly.
Q. What happened after the gifts were presented directly to the president?
A. He thanked the delegation and left.
Q. And what did you do next?
A. I also -- everybody actually left. We all went back to our hotel.
Q. And did you see the gifts get opened?

A. Not at all.
Q. All right. You said you went back to your hotel, is that right?
A. Yes, exactly.
Q. After you got to your hotel, what happened next?
A. So when I arrived, I stayed in the lobby for a little while to greet some people, and then I went to my room. And I got a phone -- a call from the reception saying that a driver from the president's office want to talk to me. So when I pick up the phone, he said, the president wants you to come back immediately. He wants to see you.
Q. And when you got this phone call saying that the president wanted to see you immediately, approximately how much time had passed since the end of the meeting where the gifts were handed over?
A. You know, it takes like -- traffic at that time, to go back to the hotel, maybe one hour, one hour something; around maybe that, one hour, yeah.
Q. Okay. All right. So after you got that call, what did you do?
A. I put back my shoes and -- I was getting -- starting to relax, so I put everything back and -- and rushed downstairs and went to the driver, back to the president's office.
Q. Okay. And at that time when you got in the car, did you know what was going on?

A. Not at all. I had no idea.
Q. Where did you go?
A. To the president's compound and to the meeting room.
Q. And when you got into the meeting room, who was there?
A. The president and his chief of staff.
Q. All right. And was anyone present for this meeting apart from you, the president, and his chief of staff?
A. It was only the three of us.
Q. All right. Describe President -- well, let me ask: By this point, by the point you were in front of President Deby, about how much time had passed from when the gifts were handed over?
A. Maybe two hours, two hours and a half, yeah.
Q. Describe President Deby's demeanor when you first saw him in that office.
A. When I looked in, I look at his face and knew that something was going on, because that's a person for like over seven years or more, every time he sees me, the first thing is a big smile. He shows his, you know, affection with me. Even in tough situations, I have seen him always smile or laugh. So this time there was really no, no smile, and but he stood up and kindly greeted me as he does and then asked me to sit down.
Q. And how did President Deby's demeanor, during the whole course of the meeting that you're about to describe, how did his demeanor compare to other times you'd seen him over the

years you've known him?
A. Very, very different. I have never seen him in that state, like having this kind of attitude. He was really, really angry. I would say even furious. He was speaking like I have never seen him before.
Q. What did President Deby say to you?
A. He said, My brother, do you know that the box, the gift box I received, some of them had money, cash in them? Were you aware of it? And I said, Absolutely not. I'm just learning it now. And then, you know, he turned to his chief of staff and said, You see, I knew he was not aware of it. And he said, My brother, this is extremely, extremely grave, and totally unacceptable. And he said, You know, why, why people believe that all African leaders are corrupt? That's his statement. And he say, To be honest with you, my first reaction was to send the special forces to go pick up the delegation and expel them from Chad. That was my first reaction. And then my chief of staff told me that I should be fair and call you first to find out, because you brought them here. You introduced them to us. We should know if you knew about this and what is your position on this. He said, That's the reason why I called you. But I'm -- I feel insulted, I feel disrespected, and I really don't understand. And he said, But what -- what -- to use a, you know, a French expression that we all use often when we are in this type of situation, he said, Who do they think they are?

No. Who do they think I am and who do they think they are? He said, I'm extremely, you know, upset about this, and we need to call them right away and to settle this thing. Basically, if I remember, my recollection, you know, it's around those lines that he expressed himself.
Q. What, if anything, did President Deby say about how much money was in those boxes?
A. Yes, he said, My security counted the money and they told me it was $2 million in cash.
Q. Did President Deby tell you why he was so upset?
A. You know, when he say, why people think all African leaders are corrupt, and why people have such disrespect for us, that type of -- I guess it's basically his -- not I guess. I know because that, all the, you know, events in his life that was reported in books and everywhere, that he has no compromise on that type of issues and problems. He -- he doesn't like people present -- viewing him as a corrupt person that you can give money. That's how he felt.
Q. Dr. Gadio, what was your reaction when you learned about the $2 million in cash in the boxes?
A. I was also very surprised, I was shocked, and I was very, very concerned about the hurt the president was feeling and was expressing, and I was in support to him in terms of we African people, and the way we are perceived, you know, and I was very supportive of the president, and my first reaction was that,

surprise and shocked, but I wanted to follow up -- follow also his guidance on how we will handle this situation.

Q. Dr. Gadio, based on your involvement with the defendant over all the weeks and months leading up to this and based on your discussions with him, and based on your participation in this meeting, what was your understanding of what that money was?

A. You see, when I -- when the president explained and when I listened, his reaction was telling me clearly that he thought it was an attempt to bribe him, and that was also, you know, my analysis of money wrapped in gift box and given to somebody, you know, and put in other gift boxes and given to somebody, cannot be anything else but a bribery attempt. That's how I felt about it, and, you know -- me and the president.

Q. Dr. Gadio, what happened next that evening?

A. At first he wanted the protocol and security to see if they can get the CEFC delegation to come back in the evening, and I think they did not succeed. I don't remember the exact reason, but I think they did not succeed. So the president say, okay, let's go get some rest and we'll do it tomorrow. That's my recollection of why we did not do it the same night and we did it the next night -- or the next day.

Q. Did you speak again with the defendant that evening?

A. No.

Q. All right. So did you go back to your hotel at that point?

A. Yes, I did went back and I -- I did go back to the hotel and I -- I briefed my son, of course, and I talked to my wife also, you know.
Q. And when you say you spoke to your wife --
A. Yeah.
Q. -- was she there in person?
A. No, no, no. She -- she's in, like in a neighboring country, Equatorial Guinea, but you know, when men panic, they call their wives looking for support and help, yeah.
Q. Okay. The next morning, what's the first thing that happened?
A. I contacted Dr. Ho, I tried to, you know -- you remember there were like three aspects in his proposal to see the president. One aspect was the relationship between CEFC and our consulting firm. And by that time I was really worried that things may complete -- turn like, you know, very, very -- I forget how you say it in English -- get very bad or something, and I thought we put like three months of work almost for nothing. So I still wanted to discuss with him the issue of our agreement, where do we stand with the agreement, before we go back and see the president.
Q. Okay. All right. And I'll come back to that in a moment.
When you spoke to the defendant the next morning, did you say anything about the $2 million or your meeting with the president or anything like that?

A. Never. I would never disclose what the president wanted to discuss directly with the delegation.

Q. Okay. Did you give the defendant any heads up at all about --

A. Absolutely not.

MR. ZOLKIND: Let's bring up Government Exhibit 1062 for identification.

Q. And do you recognize this as a text message with the defendant?

A. Yes. Yes.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1062.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 1062 received in evidence)

Q. Dr. Gadio, could you just read off the date and time of this text message.

A. Yes. So that's December 9, 2014, at 10:35 a.m.

Q. All right. And was that the next morning after the events you just described?

A. Yes.

Q. And if you could read what you text messaged to the defendant.

A. Yeah. I said, "Dr. Ho, the Boss," I mean the president, "just called. He wants to see you and me now. I am coming to

pick you up."
Q. And had the president just called you?
A. Yeah. When I say he called me, it's either he text me or he asked his chief of staff, and I think in this case it was his chief of staff who called me and said, The president wants you to come right away with Dr. Ho.
Q. Okay. All right. And again, when you sent the text message to the defendant saying that President Deby wants to see you and him, did you convey at all to the defendant why the president wanted to see you again?
A. Not at all.
Q. And did you tell the defendant that you had seen the president for a second time the night before?
A. Not at all.
MR. ZOLKIND: We can take that down.
Q. Where did you go at that point?
A. I went to that -- I think their hotel, and from there we went in our cars to go see the president.
Q. And was the meeting in the same location as the one the previous evening?
A. Exactly.
Q. Okay. Who attended this second meeting that morning?
A. So the president and his chief of staff, myself, Dr. Ho, Mr. Zang, Dr. Liu, and the translator, the French -- French -- Chinese/French translator.

Q. All right. And that translator was a member of which delegation?
A. CEFC.
Q. Okay. And did your son Boubker attend that meeting?
A. No, he did not.
Q. How did President Deby's demeanor that morning compare to what you'd seen the night before?
A. He was more relaxed. He welcomed the delegation.
Q. Did the president start that meeting as he did in the past?
A. You know, he -- he's a very -- how do you say that -- courteous man, so he stood up and shake everybody's hand and say, you know, welcome and everything, but me, of course, I knew what was going on so I know that he was hiding his -- his anger and he was getting ready to say what he wanted to say.
Q. Okay. After those introductions, what did President Deby say to the defendant and the CEFC delegation?
A. Yeah. He said, Sir, I was told yesterday after you left by my security and protocol that among the gift box that were brought to me, delivered to me, some of them had like cash money, and they counted the money and it was $2 million. And he said, You know, I was very, very shocked and angry, and my first reaction that I discussed with my chief of staff was to expel you from Chad. I was very angry because I don't know why people believe all African leaders are corrupt, and this is not just acceptable. I want a clear explanation. And, you know,

he repeated this kind of sentences about how -- how upset he was and why he couldn't accept this type of attitude and behavior.
Q. After the president made his initial remarks, who was the first member of the CEFC delegation to respond?
A. Just as usual, Dr. Ho took the floor.
Q. And what did the defendant say?
A. Dr. Ho said, Mr. President, I'm very impressed by your reaction and your attitude, your rejection of the gift, and this is why I believed I was right to propose Chad as the entry point for CEFC for doing business in Africa, and to be our gateway, gateway to Africa, like our entry point, entry door or entry point to Africa, and he said he was really impressed. He insisted on that. And then he said, Now, you know, our delegation's response to what you just said will be conveyed by Mr. Zang.
Q. Now did you see the defendant confer or speak with anyone before he made that statement to President Deby?
A. I think it was a spontaneous reaction.
Q. After the defendant said that he was impressed by President Deby's rejection of the gift boxes, what happened next?
A. When he finished his statement, my recollection is that there was a brief exchange between Mr. Zang, Dr. Ho, and Mr. Liu. I think for two minutes they spoke among themselves, in Chinese, of course, and I did not -- I believe Mr. Zang

speaks only Chinese. So they spoke, for two minutes, and then Mr. Zang started off speaking.
Q. So just to be clear, so after the defendant made his statement, then the defendant and Mr. Zang and Mr. Liu spoke privately in Chinese?
A. Yeah, they had a brief exchange. I do not look at my watch to say how -- how long it lasted, but they had a brief exchange in Chinese.
Q. Okay. And again, your best approximation, about how long did they speak?
A. Maybe two minutes. It was very brief.
Q. Okay. All right. Once they finished that conversation, who spoke up?
A. Mr. Zang.
Q. And I think you said Mr. Zang only spoke Chinese, is that right?
A. That's my understanding.
Q. Okay. And who was translating for Mr. Zang?
A. The translator, French/Chinese translator.
Q. All right. And again, President Deby spoke what language?
A. French only. Pick up a little bit of English, but French only.
Q. All right. From your recollection did this conversation happen with the translator relatively fluidly or was it difficult? And how would you describe it?

A. I think it was a difficult statement made by Mr. Zang. Yeah. It was not a very easy statement.
Q. In terms of translation, was it easy to understand or was it --
A. Yeah, yeah. He would make a statement once and the translator would translate for President Deby and for me.
Q. All right. What did Mr. Zang say?
A. He started by saying, Mr. President, let me express regret for this. Obviously, he said this -- he said, I don't know what we were trying, you know, to achieve. We did it so poorly that you got very upset and you told us that it was wrong, what we were trying to do, and I apologize on behalf of our company. That Mr. President, that was not really our intention. You know, the way we perhaps delivered what we were, you know -- our message was totally wrong. We did not really intend this to be a gift, a gift to you. This was intended to be a donation to your country, to your causes, or something. That type of explanation. That's what he told the president.
Q. Now when you heard Mr. Zang say that CEFC intended the $2 million cash as a donation to the people, did you believe him? Did you believe that explanation?
A. Obviously you can only be skeptical, because I have never seen a donation to a country, through all the rules of the financial corporations, being done in gift boxes in cash.
Q. And prior to this meeting, had the defendant said anything

to you about CEFC planning to make a charitable donation during this trip?
A. Not at all.
Q. Had he, the defendant, said anything about CEFC planning to make charitable donations to Chad at any point?
A. No. We did not discuss it at all.
Q. What about others at CEFC, Mr. Zang or Mr. Liu or the chairman, had anyone said anything prior to this exact moment about CEFC planning to donate humanitarian assistance to Chad?
A. Not at all.
Q. How did President Deby respond when he heard Mr. Zang's explanation?
A. He challenged the concept of donation. He said, you know, that donations are not made this way, and I really do not appreciate what happened, and you know that donations are made like through international transfers, wires, checks, you know, something sent to the treasurer of the country, central bank or whatever you want to -- but $2 million in cash, you know, I'm sorry, but it's really a problem, and that's basically -- he did not accept it as -- I don't think he accepted the explanation. But he was still very, you know, diplomatic and correct in his answer.
Q. All right. Describe, how did that meeting come to an end?
A. Now the president said, Listen, if it was really meant to be a donation, my position is this: We will return the money,

the gift box, the $2 million, you will take it back to China, and then you can convey it through like regular channels, you know, international transfer, whatever banking prefers, or wire, whatever, you can send it back. And then Mr. Zang took the floor to say that it would be humiliating for CEFC to take the money back and take it to China but he really wants the president to believe him that it was intended as a donation, and that he's asking the president to be really open and not, you know, be that tough on them. And that's when the president's chief of staff said that maybe some kind of arrangement would be made that the money is taken, is sealed and kept in the prime minister's office or like central bank or whatever and you write a letter, formal letter of donation and send it back as soon as you land in China. When the letter arrives, then we can remove the money and make it public, make -- take it to a cabinet meeting and the president will say, our partners from CEFC have made a donation of this and that and then we will make it public. And he made that suggestion.

Q. Ultimately at that time was the money kept in Chad or taken back to China, as far as you know?

A. The president said clearly he doesn't want the money in his compound. He said, whatever arrangement you will make between, among yourselves, that's fine, but the money is not staying in my compound. Take it away. And then the delegation, CEFC

delegation took the floor to say that's fine, they will write the letter as soon as they arrive. So the money was left in Chad.

Q. All right. Where did you go after that meeting?

A. I went back to my hotel.

Q. Did you speak with the defendant about the $2 million incident?

A. Not at all.

Q. Why didn't you ever speak to him about it?

A. My impression was that we were all embarrassed by the situation and just to make it kind of go away. Some type of arrangement was made that a letter would be sent later and try to just find some kind of arrangement. So maybe that's why I did not mention the issue. He did not mention the issue. We never discussed the issue.

Q. Did he ever offer any sort of explanation for the money?

A. Not at all. We never discussed -- he answered it as such.

MR. ZOLKIND: Your Honor, is this a reasonable point for a short break or -- I could keep going if the Court would prefer.

THE COURT: Ladies and gentlemen, we're going to break about 4:30. How are you now? Do you want to keep going? Are you able to keep going?

All righty. Let's keep going, please.

MR. ZOLKIND: All right.

THE COURT: Thank you, ladies and gentlemen.

MR. ZOLKIND: Okay. If we could go back to Government Exhibit 55A for a moment.

I'm sorry. Could we just take this down for a moment. Ms. Rao, is this in evidence?

Yeah? Okay. Sorry. We could put 55A back up.

All right. I'm told it's not in evidence. So at this time the government will offer Government Exhibit 55A.

MR. KIM: I think it's in evidence, but no objection.

THE COURT: Okay. Received.

MR. ZOLKIND: Thank you.

BY MR. ZOLKIND:

Q. All right. So Dr. Gadio, do you see this email between you and the defendant shortly before the December 2014 trip to Chad?

A. Yes, I do.

Q. Okay. If we go to the second page and the second to last paragraph there, "CEFC will reimburse," do you see that the defendant wrote, "We are also prepared to enter into an agreement with you and your consulting company for your role and effort in assisting our business in Chad"?

A. Yes.

MR. ZOLKIND: Okay. If we back out of that.

And if we go to the top.

Q. You see in your response there at the very top of the page,

on the first line of your response, do you see that you wrote, "Regarding partnership between CEFC and our firm (Sarata), we agree to finalize an agreement and a roadmap in N'Djamena"?
A. Yes.
Q. During this December 2014 trip to Chad -- and I think you started to talk about this before, but -- did you speak with the defendant about your request for a formal contract with CEFC?
A. Yes.
Q. And when did that discussion take place?
A. I think first time we met in Chad, right after the -- before the first meeting. I'm trying to remember if it's before the first meeting or the next day. I know the next day I sent him a message about us meeting again to discuss the agreement that we were supposed to discuss in Chad. So I would say maybe the next day.
Q. Okay. And just in general, what was the defendant's response with respect to finalizing an agreement and a roadmap with your firm Sarata?
A. You know, the best of my recollection, it was like the same type of discussion we always had. There was no concrete outcome or decision made that day in N'Djamena, or I don't remember, yeah.
MR. ZOLKIND: Can we bring up Government Exhibit 1061 for identification.

Q. All right. Do you recognize this as a text message between you and the defendant?
A. Yes, I do.
MR. ZOLKIND: And your Honor, the government offers Government Exhibit 1061.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 1061 received in evidence)
Q. All right. Dr. Gadio, what was the date of this text message from you to the defendant?
A. That was 9th of December, 2014.
Q. And were you still together in Chad at that point?
A. Yes.
Q. And if you could just read the text message that you sent to the defendant.
A. Yes. "Dear Dr. Ho. We need to see you before you and us leave. Honestly we are not very happy with the agreement between Sarata International Consulting and CEFC because there is none in fact. MOU," memorandum of understanding, "with the Big Boss will be reviewed by us on his request before any final deal. Therefore Sarata needs to sit with you and clearly agree on something. Your change of mind about the funds for the forum," Dakar forum, "will badly hurt my reputation with international partners. Cheers."
(Continued on next page)

Q. OK. So you first refer to being not very happy because there is still no agreement between Mr. Sarata and CEFC; is that right?
A. Yes, exactly.
Q. And then you say the MOU -- or memorandum of understanding -- with Big Boss will be reviewed by us before any deal, remind us what is the MOU that you are referring to there.
A. I believe it's one of the outcomes of the meeting before, like the day before when we had this meeting, and the angle of having an MOU between CEFC and the government of Chad related to Block H that was discussed and decided, and before the president told us once we get a suggestion, proposal, a draft, you have to work on it -- I had them work on that draft.
Q. So why were you telling the defendant that any MOU with President Deby will be reviewed by you before a final deal?
A. Because we really were feeling at that time that we were being sidelined, like, how do you say, put on the side, and that perhaps CEFC will engage in a direct relationship with the president, and maybe that's how also we were not informed about the gift and all the problems, you know, that happened afterwards.

So we were reminding CEFC that no matter what, in the final decisions we will have to intervene, because we have the mandate from the president.

Q. The mandate?
A. Plan date, yeah.
Q. Meaning the mandate to review and approve the MOU before it goes to the president?
A. I mean like once it is drafted, we have -- we had our say before it is approved by the president.
Q. And do you recall looking at e-mails before where the defendant had said that CEFC would donate $100,000 for the Dakar forum that your organization was going to be running in Senegal?
A. Yeah, for the control, yes.
Q. Do you recall those e-mails?
A. Sorry?
Q. Do you recall the e-mails that we looked at?
A. Yes, I do.
Q. OK. Do you recall the defendant asking for CEFC's logo to be put on materials?
A. Exactly.
Q. So when you wrote here --
Ms. Rao, if you would highlight the last three or four lines where it says "your change of mind about the funds for the forum will badly hurt my reputation with international partners," what were you referring to there?
A. Because I already told the organizing committee, the financial segment of the organizing committee, that we got

$100,000 from CEFC, so it was put in the budget right away and they started spending the money while waiting for the money to come in, and then I realized later, like on the 9th, like five days later I realize the CEFC will not be able to make that donation and it was too late, and it will become a debt that we had to pay, because I made the announcement to the organizing committee, so it was my responsibility now to pay for the $100,000 that they already put in the budget.

Q. If we could bring up Government Exhibit 64 for identification.

Do you recognize this e-mail, Dr. Gadio?

A. Yes.

Q. Who is this e-mail from and to and copied to?

A. It's from Dr. Ho, someone else, and I'm cc'd there in that e-mail.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 64.

MR. KIM: No objection.

THE COURT: Received.

(Plaintiff's Exhibit 64 received in evidence)

Q. Can we just down from the top to the list 1, 2, 3.

Do you see chinaenergyfund.org? Was that another e-mail of the defendant?

A. Yes.

Q. Do you see the e-mail begins Dear Audrey?

A. Um-hum.
Q. Do you know who that is?
A. I think one of the assistants of Dr. Ho, I think. I believe, yeah.
Q. And the subline is "Important follow-up tasks".
A. Yes.
Q. And do you see that the defendant wrote here, "Dear Audrey, as I have again discussed and reminded director Zang just before we departed N'Djamena, please follow up closely the following tasks and prompt for early execution and early delivery." And then number one refers to the contracts proposed by your company. Do you see that?
A. Yes, I do.
Q. And number two refers to remunerations.
A. Yes.
Q. And what did you understand remunerations for works completed at the formative stages, what did that mean to you?
A. Yeah, being compensated for the work we had already done.
Q. All right. And then you see number 3, it says, "Make good our pledge of donating $100,000 U.S. dollars to Dr. Gadio's forum." Do you see that?
A. Yes. I see that.
Q. And do you recall what your reaction was to seeing this e-mail?
A. Yeah, I thought that we had made some progress, that the

contract now will be examined and perhaps approved, and that we will be paid, compensated for the work we have done, and that the embarrassment we had about the Dakar forum perhaps will be reversed and the donation will come.
Q. All right.
A. The donation will come before the forum.
Q. So to be clear, you're saying you were hoping that the $100,000 pledge to the Dakar forum would be made good; is that right?
A. Exactly. I thought we were back on track.
Q. What's the date of that e-mail?
A. December 10, 2014.
Q. How long was that after the December 2014 meeting in Chad that you have been describing?
A. Yeah, eight, nine, so that's the next day.
Q. So let's bring up Government Exhibit 80. Do you recognize this as an e-mail between you and the defendant?
THE COURT: Yes.
MR. ZOLKIND: The government offers Government Exhibit 80.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibit 80 received in evidence)
Q. What's the date on this e-mail, Dr. Gadio?
A. It's on the 18th of December.

Q. So about eight days after the e-mail we just looked at?
A. Yes.
Q. Do you see here that you write to the defendant and in the second line there you request swift action? Do you see that?
A. Yes.
Q. All right. And then number one you write, "Delivering on the commitment of helping the Dakar forum for $100,000. Unfortunately this commitment has not been met as of yet."
A. Yes.
Q. Number two, compensating the first phase of our partnership where Sarata has opened all of the doors to CEFC to access and engaged in deals with the president of Chad himself. Unfortunately, your recommendation has not been acted upon."
A. Yes.
Q. "Responding quickly to our global consultancy contract offer, unfortunately this also has not been done."
A. Yes.
Q. Do you see that?
A. Yes.
Q. Dr. Gadio, what were you feeling at the time that you wrote this e-mail?
A. I was not very optimistic obviously because the issue of delivery was --
Q. Sorry.
A. The issue of delivery on the promises and the commitments

was still an issue for us, because I'm reminding on all three points things have not been executed taken care of, yeah.
Q. Dr. Gadio, at this point had you made any progress on the formal contract you had requested?
A. No.
Q. Had you received any compensation for the work you had been doing since September?
A. At this stage, no.
Q. Had you received the $100,000 donation that the defendant pledged to Dakar forum?
A. No.
Q. Had the forum taken place by this point?
A. Sorry.
Q. Had the forum taken place?
A. Yes, it was 14-16 December, so the 18th was two days after the forum.
Q. So on some of those printed materials for the forum had you in fact conclude included CEFC's name and logo as a sponsor?
A. We did, certain things, yes.
Q. After all of that, and after you learned about the $2 million, why didn't you walk away from this deal?
A. Maybe that's what I should have done, but I did not do it. Once again, we had worked so hard to reach that stage, and we were expecting compensation, and we had spent our own money, you know, to prefinance our activities with Chad and so on.

And the second aspect, the government of Chad, President Deby, despite his reaction and all the things he did, he badly needed that contract, so I thought I should just continue.
Q. And again were you -- were he hoping it was still possible that a deal could take place between Chad and CEFC?
A. I still thought that we would get to the Block H and things will be done properly and we will sign between Chad and CEFC.
Q. And if that had happened, how much did you believe that you and your son and your firm would profit?
A. The expectations were high on our side. You know, if you are targeting $3 billion, you know, 10 percent of $3 billion is $300 million, one person will be $30 million. So in any case even one percent would have been perfect for us.
Q. It would have been a lot of money.
A. $30 million, a lot of money.
Q. All right. With respect to that $2 million that was presented in Chad, remind us what was the plan that had been agreed in Chad in terms of the next step with respect to that money.
A. Yeah, the next step was that as soon as the CEFC delegation goes back home, that they would write a letter to the president of Chad to explain their donation and the destination, you know, what it was meant for and everything. That was the deal.
Q. All right. Let's bring up Government Exhibit 81 for identification. Do you recognize this document, Dr. Gadio?

A. Yes, I see the e-mail for now.

MR. ZOLKIND: The government offers Government Exhibit 81.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 81 received in evidence)

Q. So, let's just wait for it to come up on the screen. If we can zoom in on the header there.

All right. Who is this e-mail from?

A. I think it's from Anna.

Q. Why don't we zoom out and see if there is a signature line.

A. Yeah, it's from Anna.

Q. And who is it to?

A. Secretary to Dr. Patrick Ho.

Q. Who is the e-mail to?

A. To me.

Q. Who is copied on the e-mail?

A. Dr. Patrick Ho.

MR. ZOLKIND: Your Honor, we will also offer Government Exhibit 81-TX, which is the English translation of the attachment.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 81-TX received in evidence)

Q. All right. And do you recognize what the attachment --

well, sorry. Let's just go back quickly to Government Exhibit 81 just to see the original.

So, do you see that the defendant's secretary sends you this e-mail and says, "Attached please find the signed letter by Mr. Zang. Please provide an address so I can send the hard copy out."

A. Yes.

Q. If we just go to the attachment here, what is this?

A. That's the draft letter in French. That's the letter in French, not the draft. It's the letter in French.

Q. And this is the one you received from the defendant's secretary?

A. Yes.

Q. All right. Now we can bring up the English translation.

I will read -- Ms. Rao if you can zoom in on the middle half of that second paragraph.

Do you see this letter from CEFC says, "In its capacity as a good friend of the Chadian government and Chadian people, China CEFC Energy Company Limited expresses its sincere wish and its support for the development of Chad. In order to do this, we would like to make a donation of $2 million U.S. to the government of Chad from us as a development fund." and then it goes on.

Just to be clear, what was your understanding as to why the amount referenced in this donation letter was $2

million US dollars?
A. Because that was delivered in Chad during the December meeting, that's the $2 million that was referred to.
MR. ZOLKIND: Ms. Rao, if you could highlight the phrase where it says, "We would like to make a donation of 2 million."
Dr. Gadio, did you have any reaction to the way this letter was phrased saying we would like to make a donation of $2 million U.S. Dollars?
A. I thought it was already delivered to Chad.
Q. Sorry. You thought what was already delivered?
A. The $2 million. So I did correct the draft in French, and I changed, because for me the money was already made available to the government of Chad.
Q. Just to be very clear about it, what if anything was inaccurate about the way that this letter was drafted by CEFC?
A. "Would like to make a donation," it's an announcement of a donation that will be made. To me it was already made, it was already made available to the Chadian -- to Chad -- to the president, yes.
Q. If we can bring up Government Exhibit 83. Do you recognize this e-mail, Dr. Gadio?
A. Yes, I do.
Q. All right. Is this on the same subject?
A. Yes.

MR. ZOLKIND: The government offers Government Exhibit 83.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 83 received in evidence)

Q. If we can just zoom in on the top portion, please. All right. So, this is from you responding to Anna, is that right?

A. Yes.

Q. And who is copied there?

A. Dr. Ho -- yeah, Dr. Ho and Boubka.

Q. All right. And if you could read your response to the letter that you received.

A. Yes, I wrote, "If I may give an advise, this letter is not well written. If you need help we can provide. If you are fine with it then send it as is and I will find the DHL address of the Chad presidency for you. We still did not get any feedback about the consultancy agreement with Sarata, and other serious issues and important commitments from you. Thanks."

Q. And when you said this letter is not well written, why did you believe that the letter was not well written?

A. Yes, if you put back the letter, I will explain. Like in French I was thinking of -- the French was not good at all, and I thought also, you know, the president would not feel comfortable saying that people are promising to send him a donation that is already delivered in his country. So, I did

two things. The form of the letter I thought in French it was poorly written, and this the content I think I made a change, not a big change, but I tried to make it fit a little bit more the reality.

Q. The last part of your e-mail here is saying you still did not get any feedback about the consultancy agreement; is that right?

A. Yes.

Q. And you say other serious and important commitment issues. Are you referring to the items that you listed in the e-mail we looked at before?

A. Yes.

Q. All right. Let's bring up Government Exhibit 1084. Do you recognize this exhibit, Dr. Gadio?

A. Yes, I do.

Q. Who is this exchange with?

A. My son, Boubka.

MR. ZOLKIND: The government offers Government Exhibit 1084.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 1084 received in evidence)

Q. Why don't we bring up the first text message first. All right. In this first text message who is it from and who is it to?

A. It's from my son Boubka to me.
Q. And what is the date here?
A. That's -- 12 -- yeah, December 21, 2014.
Q. All right. So approximately how long was this after the December 2014 meeting in Chad where the $2 million incident happened?
A. December 9 and December 21, like 12 days.
Q. And let me direct your attention --
Ms. Rao, if you can just highlight the last sentence of it.
Do you see your son writes to you, "Any feedback from our friends in China?"
A. Yes.
Q. What did you understand your son to be asking you about?
A. Still about the contract, the agreement, I think mainly that was the issue.
Q. To be clear, the contract and the agreement between who and who?
A. CEFC and our company, our consulting firm.
Q. If you go to the next text message. All right. Is this your response to your son?
A. Um-hum, yes.
Q. OK. And if we could highlight, Ms. Rao, from where it says "No our Chinese" and bring that down to the bottom.
And you respond to your son, "No our Chinese friends

are strange. Let us give them another week. Otherwise we will go to Chad early January and destroy their reputation and strategies in Chad. The president will listen to me."

What were you saying there?

A. That's not a very nice statement. I said that's not a very nice statement from me. But I was translating my frustration and I'm telling my son that if there is any desire to go around us and to get us out of the process, we know how to convince the president that this is not good for him and for his country.

Q. When you said you were channeling your frustration, why were you frustrated?

A. Because still no contract, no agreement with CEFC, and the work was still going on.

Q. If we can go down to the next text message. Is this your son's response to you?

A. Yes.

Q. Can you highlight, Ms. Rao, from "and I sincerely think" through where it says "with us".

Do you see your son responded here, "I sincerely think they will reply Favorably. Their attempt to buy the president to put us to the side did not work. Big companies don't like middle men it's normal but they don't have a choice with us."

Do you see that?

A. Yes, I do.

Q. And when Boubker said "I sincerely think they will reply favorably," who did you understand the "they" to be?
A. CEFC.
Q. And when he referred to "their attempt to buy the president," what did you understand him to be referring to?
A. Talking about CEFC and referring to the December incident, the $2 million cash.
Q. Did you agree with your son's characterization of that incident as an attempt by CEFC to buy the president?
A. Yeah, we were in agreement about everything regarding this incident.
Q. Why, Dr. Gadio, did you see that incident as an attempt by CEFC to, as your son put it, buy the president?
A. I could not understand a delivery of $2 million once again in a gift box and in cash, and then I believe it was smuggled in a pack of -- you know, a series of gift boxes -- and we were not informed, we were not aware, nobody knew.
If the president and his close secretary, for instance, were the only one to get access to those boxes and open them, then the president had a choice. If he is a corrupt person, he would be fine with it; if he is not a corrupt person, then we have the type of situation we have.
But the idea was to -- we really believed it was to get us out of the way and it was meant for the president, because when you make a donation of $2 million to a country,

you know, everybody knows the way to do it properly.

MR. ZOLKIND: Your Honor, it's just about 4:30. Is this a good point to break?

THE COURT: Yes, sir. Thank you.

Ladies and gentlemen, we are going to break for the day now. Would you be kind enough to follow the normal instructions: Leave your books in the jury room, no research, no discussions. Let's all make a big effort to be here to start at ten tomorrow. Your coffee will be here at 9:15.

Ladies and gentlemen, I will let the audience go down first. Go down and get out of the way so that the jurors are not -- thank you, jurors. Good night.

And, audience, you go down and get out of the way so the jurors are not harassed on the way out.

(Jury not present)

THE COURT: Anything else on the record?

MR. ROSENBERG: Nothing from the defense.

MR. ZOLKIND: Nothing else.

(Trial adjourned to November 29, 2018 at 10 a.m.)

INDEX OF EXAMINATION


Examination of: Page

CHEIKH TIDIANE GADIO

Direct By Mr. Zolkind . . . . . . . . . . . . . 295


GOVERNMENT EXHIBITS


Exhibit No. Received

S-7 . . . . . . . . . . . . . . . . . . . . 299

1195 . . . . . . . . . . . . . . . . . . . 301

1196 . . . . . . . . . . . . . . . . . . . 304

2 . . . . . . . . . . . . . . . . . . . . . 306

1503, 1503A and 1503B . . . . . . . . . . . 313

1511 . . . . . . . . . . . . . . . . . . . 314

1197 . . . . . . . . . . . . . . . . . . . 318

1197-TX . . . . . . . . . . . . . . . . . . 318

7A . . . . . . . . . . . . . . . . . . . . 321

1514 . . . . . . . . . . . . . . . . . . . 324

1012, 1013 and 1014 . . . . . . . . . . . . 327

16 . . . . . . . . . . . . . . . . . . . . 331

17 . . . . . . . . . . . . . . . . . . . . 347

18 . . . . . . . . . . . . . . . . . . . . 350

20 . . . . . . . . . . . . . . . . . . . . 353

1022, 1023, and 1024 . . . . . . . . . . . . 355

1509B . . . . . . . . . . . . . . . . . . . 358

1508 . . . . . . . . . . . . . . . . . . . 359

1508A and 1508B . . . . . . . . . . . . . . 359

1026 . . . . . . . . . . . . . . . . . . . 365
27 . . . . . . . . . . . . . . . . . . . . 366
31 . . . . . . . . . . . . . . . . . . . . 374
34 . . . . . . . . . . . . . . . . . . . . 376
1038 . . . . . . . . . . . . . . . . . . . 378
39 . . . . . . . . . . . . . . . . . . . . 381
1041 . . . . . . . . . . . . . . . . . . . 385
43 . . . . . . . . . . . . . . . . . . . . 386
S9 and S10 . . . . . . . . . . . . . . . . 389
45 . . . . . . . . . . . . . . . . . . . . 397
1046 and 1048 . . . . . . . . . . . . . . 400
49 . . . . . . . . . . . . . . . . . . . . 402
54A . . . . . . . . . . . . . . . . . . . . 411
55A . . . . . . . . . . . . . . . . . . . . 420
56 . . . . . . . . . . . . . . . . . . . . 422
1057 . . . . . . . . . . . . . . . . . . . 424
202 . . . . . . . . . . . . . . . . . . . . 425
1059 and 1059TX . . . . . . . . . . . . . 429
1060 . . . . . . . . . . . . . . . . . . . 431
1062 . . . . . . . . . . . . . . . . . . . 446
1061 . . . . . . . . . . . . . . . . . . . 457
80 . . . . . . . . . . . . . . . . . . . . 462
81 . . . . . . . . . . . . . . . . . . . . 466
81-TX . . . . . . . . . . . . . . . . . . . 466
83 . . . . . . . . . . . . . . . . . . . . 469

1084 . . . . . . . . . . . . . . . . . . . 470

PLAINTIFF EXHIBITS

Exhibit No. Received

64 . . . . . . . . . . . . . . . . . . . . 460