UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 17 Cr. 779 (LAP

CHI PING PATRICK HO,

Defendant.

------------------------------x

New York, N.Y.
November 29, 2018
9:30 a.m.

Before:

LORETTA A. PRESKA
District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: DANIEL RICHENTHAL
DOUGLAS ZOLKIND
CATHERINE GHOSH
PAUL HAYDEN
Assistant United States Attorneys

BENJAMIN ROSENBERG
EDWARD KIM
KATHERINE WYMAN
JONATHAN BODANSKY
JONATHAN BOLZ
Attorneys for Defendant

ALSO PRESENT: Ryan Carey, F.B.I.
Aashna Rao, Paralegal
Peter Calabrese, Paralegal

(Trial resumed; jury not present)

THE COURT: Good morning, counsel. Won't you be seated.

Mr. Rosenberg, I think this is your dime here.

MR. ROSENBERG: Thank you, your Honor. Our motion in limine is simple. There are two summary charts that the government intends to introduce into evidence, and we submit they may be used as demonstratives to the jury but not to go back -- not to be admitted into evidence and to go back into the jury room. The reason is they summarize materials that the jury can read itself, and should read itself, and not rely on or not be preoccupied by the descriptions that are set forth in the summary chart.

THE COURT: Not that I could read them -- and I know no one's fault because they print in such a tiny fashion -- but I did not think there were any characterizations. I thought it was quotes.

MR. ROSENBERG: Your Honor, I have copies of both that are readable; they are characterizations.

THE COURT: Does somebody have one that I can read?

MR. ROSENBERG: Yes.

THE COURT: Thank you. OK, I got it. Thank you. Go ahead.

MR. ROSENBERG: That in sum is our argument, and they are characterizations -- sometimes quotes, sometimes

characterizations. Any characterization shouldn't be a substitute. The evidence itself is what the jury should read, that's why we submit this shouldn't go back to the jury.

MR. RICHENTHAL: The Federal Rules of Evidence could say that, but they don't. The Second Circuit could have said that, it hasn't; it said the opposite for decades, which is that in complex trials summary charts are admissible, period, and they go back with deliberations, period.

Putting that aside, this is the first we have ever heard the defense had a concern about characterizations. If they have a concern, we will take it under advisement; but to be clear, what they're calling characterizations is neutral language describing exhibits in evidence.

This is so plainly within the heart of 1006, I don't think I need to say much more.

THE COURT: Sir?

MR. ROSENBERG: Your Honor, I believe in the cases where the Second Circuit has admitted, typically they have been voluminous materials, often difficult for the jury to read, including, for example, phone records, things that were matched up. These are e-mails, almost entirely e-mails and text messages; they have been shown to the jury, I think the jury can read them.

MR. RICHENTHAL: I mean let me just give a granular example of what the jury would have to do in order to replicate

that. They would have to locate -- and, by the way, it can do this if it wishes, so there is no unfair prejudice whatsoever. These materials are totally admissible, and the defense concedes. But if it wished to do so, what it would have to do is the following: It would have to find exhibits -- all of which are noted on there -- in multiple sources, in multiple places. Some of them are several pages long, some of them are translated from Chinese or French. It would then have to find the part that relates to this scheme -- because as your Honor knows there are plenty of parts that do not -- it then would have to line it up temporally, that is, chronologically with other exhibits, and so on and so forth. This is an extraordinarily painstaking process. We know that because we did it. It is plainly admissible under 1006.

THE COURT: Anything else, Mr. Rosenberg?

MR. ROSENBERG: No, your Honor.

THE COURT: OK. Number one, the chart is clearly admissible under 1006. I will note that the government states in its letter that it produced these charts to the defense on November 19. Today is November 29, and last night overnight was the first we heard of any of this.

I will also note that the defense letter states a couple of times there are certain inaccuracies in the chart. To date, so far as I know, the inaccuracies the defense claims have not been pointed out. To the extent that the

characterizations are in any way inaccurate, apparently this morning is the first time we have heard of that.

There is no reason we had to have this fire drill. The defense shall confer with the government. If there are any complaints, you do it N-O-W, now; it is too late for this. But, in any event, the chart is clearly admissible as to a summary chart.

Usually the court gives an instruction to the jury when receiving a chart under this rule that states that the actual evidence is the underlying documents, which they will have access to; the chart is merely something to assist them in their deliberations. If counsel wishes some different instruction, let me know. Anything else?

MR. RICHENTHAL: Since we're all here and the jury's not here, can I just put a couple things on the record now?

THE COURT: Yes, please.

MR. RICHENTHAL: First, in leaving court last night I think a juror may have forgotten something, so after he had left he came back, and he said to the government team you can take the elevator first; we didn't say anything in response. But in case he thinks we didn't say anything in response because we're not nice people, could your Honor just maybe remind the jurors that there is a reason we won't even say thank you to them.

Second, last night the defense identified for us one

potential defense witness and introduced roughly 30 pages or so of 26.2 material. Two points on that.

One, a substantial amount of material was redacted; it just said attorney/client privilege. Under Rule 26.2(c) your Honor has to review those redactions. We would ask the defense to make them available for the Court for in camera review.

Second, we had both some questions and concerns about the witness for a variety of concerns. I don't think I need to put those on the record. We've asked the defense for a proffer to try to narrow the dispute, if any.

Finally, we're moving quickly, which is nice. I think we may rest as early as early next week; it could even be as early as Monday. I wanted to advise the Court of that and also let the Court know that that may change, because we're still waiting, I think, on three or four stipulations from the defense that would require at least four witnesses and potentially a fact witness as well, so hopefully we can resolve that.

I think that's all I have for your Honor this morning.

THE COURT: OK. When do we anticipate the attorney/client material to be sent in.

MR. KIM: Your Honor, I could show the Court now if you'd like to look at it in the robing room.

THE COURT: If you have it, that would be great; we can do it.

MR. KIM: OK. I can come up, your Honor.

THE COURT: Sure. Just hand it up.

MR. KIM: Actually, I actually have it electronically, your Honor, if that's OK.

THE COURT: Oh, dear.

MR. KIM: Or we can wait. We can print it out and send it in or do it a different way.

THE COURT: If you are able to forward it to us, we will print it here. Mr. Kim, speak with Ms. Phillips.

Is there anything else you want on the record, friends?

MR. RICHENTHAL: Not from us, your Honor.

THE COURT: OK, off the record.

(Discussion held off the record)

THE COURT: On the record, friends.

MR. RICHENTHAL: The parties have conferred regarding the two summary charts, your Honor, and although the defense advised there were inaccuracies plural, it only identified one. Specifically, with regard to March 31, 2015, the defense has advised that in its view a certain exhibit, GX 134, should not be listed on the entry for that date. I think it thinks it should have only been listed elsewhere. So, we will look into that. If that's correct, we will simply remove it or redact it. Other than that, it advised there are no other inaccuracies, just that single one.

THE COURT: OK. Is the chart coming in with the current witness?

MR. RICHENTHAL: No, your Honor.

THE COURT: OK, thank you.

With respect to the attorney/client material that Mr. Kim has handed up, the page that talks about an outline is clearly the work of a lawyer, so that may remain redacted.

The only other material that was redacted were two lines of awful handwriting that talked about the content of the -- let me do it again -- it looks like counsel's notes to himself about matters to inquire of the witness about, so that's also clearly work product or whatever. So, I will sustain those redactions.

MR. KIM: Your Honor, can we redact the word "awful" from today's transcript?

THE COURT: Truth is a defense, right?

Did the government have some other discussion about this witness?

MR. RICHENTHAL: We got the 26.2 material at 9 or 10 p.m. last night; we e-mailed and asked some questions.

THE COURT: OK. So, when you're ready on that.

MR. RICHENTHAL: We haven't heard answers yet, so I don't think it's ripe for your Honor's consideration.

THE COURT: OK. Is there anything else you want to talk about now?

MR. RICHENTHAL: The only thing I will just note for the record is I've advised the defense that we intend to deliver a classified letter to your Honor around lunchtime concerning certain materials the defense has declined to receive, and we're going to make a copy of that letter available for the defense to review.

THE COURT: All right. Thank you.

May I give these back, please.

(Recess)

MR. RICHENTHAL: Two small matters for the record, your Honor. We conferred further with the defense regarding the March 31, 2015 entry. We have advised them that we don't think it's inaccurate and so we don't intend to remove that reference. It's not clear to me whether they continue to think that the reference to GX 134 with respect to March 31, 2015 remains inaccurate. Our view is that it is not inaccurate.

THE COURT: Mr. Rosenberg?

MR. ROSENBERG: I'm going to look at the exhibit now, and I now understand the explanation for why it's there. I just want to look at it again.

MR. RICHENTHAL: Second, the defense has advised me that it's changed its mind and it would like to see the materials that were the subject of the classified letter to which I referred. Since we have already drafted the letter, I think we will simply give it to your Honor with the enclosures

and the defense with the enclosures instead of giving the defense one without the enclosures.

THE COURT: Fine. When do you expect that?

MR. RICHENTHAL: Around lunchtime.

THE COURT: OK. Thank you.

MR. ZOLKIND: We will bring up the witness.

THE COURT: Counsel, on the record. Ms. Phillips informs me that the same juror who was late Monday -- Tuesday -- that when Ms. Phillips called the cell number the juror had provided, it was dead silent, it didn't ring, didn't do anything, so I am just passing that along to you. Ms. Phillips is going to check on the juror again. Just let me know if you think we ought to do anything.

MR. RICHENTHAL: Without identifying the specific juror, can your Honor advise whether it's a member --

THE COURT: It's an alternate.

MR. RICHENTHAL: Thank you. Can the parties maybe confer?

THE COURT: Of course.

The juror is not present. I note it's 10:13.

MR. RICHENTHAL: I think the parties have no objection to the dismissing that juror. We have three alternates. Neither party knows which juror it is, and we have no objection to dismissing her.

THE COURT: Ms. Phillips is trying the cell phone

again. We will report to you the outcome, and then we will probably follow your suggestion.

(Pause)

The juror's phone rang this time and went to voice mail. So, do you want to proceed and excuse the juror? What do you want to do, friends?

MR. KIM: The defense is fine excusing her, your Honor. We're fine excusing her.

MR. RICHENTHAL: We also have no objections to excusing her. We're not asking your Honor to do that, but we have no objection to that happening.

THE COURT: Ms. Phillips is checking downstairs to see if she is on line.

There is no line. All right. I think we will go ahead and excuse that alternate.

MR. RICHENTHAL: Does your Honor want to tell the remaining jurors that she is not going to be there, just so they don't wonder if something happened.

THE COURT: When she comes in, I will ask Ms. Phillips to inform her that she has been excused.

(Continued on next page)

(Jury present)

THE COURT: Good morning, ladies and gentlemen. You have brought the most fabulous weather back with you. Thank you.

Mr. Lamagna and Ms. Glasgow, slide over one. I'm going to excuse alternate number 1, Ms. Rodriguez. She is constantly late and makes everybody wait, so that's what is going on this morning, so you can adjust your seats.

DEPUTY COURT CLERK: She just got here.

THE COURT: What do you want me to do?

Come on up so to the side bar, please.

(At the side bar)

THE COURT: What do you want me to do?

MR. RICHENTHAL: I think our view is if she is here, we should keep her because we're starting now and she is here now.

MR. KIM: We had the opposite inclination just because of what was just said.

MR. RICHENTHAL: I don't think the tardiness is a merits issue.

THE COURT: I will let her sit. If she is late at all hence forth, she is out. Any objection?

MR. KIM: That's fine.

MR. RICHENTHAL: That seems reasonable.

THE COURT: Let's go.

(In open court)

THE COURT: As Ms. Rodriguez has just arrived, we're going to seat her despite what I just said.

Good morning, ma'am.

We continue with the direct examination of Dr. Gadio. Won't you be seated, friends.

Counsel.

CHEIKH TIDIANE GADIO, resumed.

DIRECT EXAMINATION (Continued)

BY MR. ZOLKIND:

Q. Good morning, Dr. Gadio.

A. Good morning.

MR. ZOLKIND: Ms. Rao, could you please bring up for identification Government's Exhibits 203, 204 and 205 for the witness. If you could just show Dr. Gadio the date there and the subject line. And go to the attachment, please.

Q. Do you recognize what these documents are, Dr. Gadio?

A. Yes, I do.

Q. What are they?

A. I'm sorry?

Q. What are they?

A. The picture?

Q. Yes.

A. Yeah.

Q. Just generally speaking what is this a photo of?

A. That's the picture at the end of the meeting.
Q. From the December 2014 meeting in Chad?
A. Yes.
MR. ZOLKIND: Your Honor, the government offers Government's Exhibits 203, 204 and 205.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibits 203, 204 and 205 received in evidence)
Q. If we could just bring up 202 -- sorry -- 203 first -- and publish that to the jury. If you can zoom in on the very top header.
All right. Dr. Gadio, just to be clear, are you on this e-mail chain here?
A. This one, no.
Q. Do you see that it's from CY Wong to the defendant dated December 15, 2014?
A. Yes.
Q. And if you can just read the subject line.
A. Photos of Dr. Ho in Chad.
Q. All right. And let's go to the attachment to this photo. If we can zoom in. And again now that this is in front of the jury, what do you recognize this photo to be?
A. The end of the meeting picture.
Q. And to be clear, Dr. Gadio, was this group photo taken

before or after the gift boxes were brought in and presented to President Deby?
A. I think it's before. It's at the end of the meeting.
Q. I'm sorry, I didn't hear what you said.
A. I said just after, at the end of the meeting. This picture was taken just at the end of the meeting, before the gift box.
Q. Before the gift box?
A. Yes.
Q. I will just remind you again, because of the acoustics in the courtroom, keep your voice up and speak right into the mic.
A. All right.
Q. Thank you.
A. You're welcome.
Q. Going from left to right, can you identify anyone in the photo who you recognize?
A. Of course myself.
Q. Just starting on the left, do you know who that is on the far left?
A. I do not remember very much the first person on the picture.
Q. All right.
A. And then myself, Dr. Ho, President Deby, Mr. Zang, my son Boubker. I recognize the other person as an official from Chad, but I don't know him very well.
Q. The person on the far right is an official from Chad, but

you don't recognize him very well?
A. No. I think he may be the director general of the Agency for Hydrocarbon, but I'm not very sure honestly.
Q. All right. Can we go to Government Exhibit 204.
If you can just look at the header, and you see this is another e-mail regarding photos from the meeting in Chad same date.
A. Yes.
Q. Let's look at that attachment. To be clear, who do you see in the photos here with the president?
A. I see Dr. Ho on the left, the president in the middle and Mr. Zang on the right.
Q. OK. If we could take that down and go to 205. And if we could turn to the attachment. Just for the record, who do you see in this photo?
A. Dr. Ho and the president of Chad.
Q. And, Dr. Gadio, to be clear, did every member of the CEFC delegation get a private photo with President Deby?
A. I don't remember. I don't recall.
Q. Let's bring up Government Exhibit 1085 for identification.
Do you recognize this as a text message with the defendant?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 1085.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 1085 received in evidence)

Q. What's the date on this text message, Dr. Gadio?

A. December 22, 2014.

Q. All right. So that's a couple weeks after that second meeting with Chad?

A. Yes.

Q. If you could read the message that you wrote to the defendant.

A. Yes. "Dr. Ho, season's greetings. I am truly worried about your silence after all of my e-mails and unanswered questions regarding our partnership. Is there any problem? Cheers Dr. CT Gadio."

Q. What was your concern here, Dr. Gadio?

A. Still no progress on the agreement between my company and CEFC.

Q. Can we bring up Government Exhibit 86 for identification. Do you recognize this e-mail?

A. Yes, I do.

Q. And does it relate to the subject matter of the meeting in Chad?

A. Yes.

MR. ZOLKIND: Your Honor, we offer Government Exhibit 86.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibit 86 received in evidence)

MR. ZOLKIND: Ms. Rao, if you could zoom in first on the first e-mail in the chain.

Q. Do you see here on December 18 the defendant's secretary e-mailed you, "Attached please find the signed letter by Mr. Zang."

A. Yes.

Q. And go to the response. You see that you responded about a week or so later saying, "Greetings. The presidency of Chad called me yesterday. They want to know what happened to the letter about the donation?"

A. Yes.

Q. Had you in fact received a call when you sent this e-mail?

A. Yes, I got a call from the chief of staff.

Q. OK. And I think we looked yesterday. You had sent an e-mail suggesting that you revised the letter because you said it was poorly written. Do you recall that testimony?

A. I did, yes.

Q. So, had you heard any response from the CEFC since you made that suggestion?

A. No, it took some time.

Q. And in Chad at that second meeting had there been any discussion about a timeline for when this donation letter would

be provided?
A. I think the chief of staff during that meeting, after the incident and the discussion about the incident, insisted that the letter should come right away as soon as they go back to China.
Q. By this point, approximately how much time had passed since that meeting?
A. From the 9th to the 26th, like 17 days perhaps.
Q. OK. By the way, you wrote here that you received a call. How many phones did you typically have, Dr. Gadio?
A. A lot of phones. I always use my Senegalese phone, which is my regular number, and I don't want to use it when I travel for roaming issues. Then I have an international phone call -- an international telephone, that's my French number. And then usually when I go off to a country, I try to have a local number; it makes it cheaper in terms of communications.
Q. Dr. Gadio, did you ever -- in addition to the various phones you've described, did you ever use apps or phone applications in order to make and receive phone calls?
A. Usually with my wife we communicate with WhatsApp.
Q. WhatsApp.
A. WhatsApp, yeah.
Q. When you stayed at hotels, did you ever use the hotel room phones?
A. Not for international calls but for local calls, yes.

Q. OK. So, for example, when you were in Chad, during the meetings you've described in Chad, did you ever make local calls using the hotel room phone?
A. I received, rather. I received, but I used my cell phone to make local calls because I had a local cell phone.
Q. All right. If you could bring up Government Exhibit 89. All right. If you could zoom in on the first half of the e-mail chain.
Do you recognize this e-mail?
A. Yes, I do.
Q. And is it again regarding the same subject matter you have been describing?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 89.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibit 89 received in evidence)
(Continued on next page)

BY MR. ZOLKIND:
Q. Dr. Gadio, who is this email from?
A. It's from me.
Q. And who is it to?
A. To Ms. Anna, the assistant of Dr. Ho. And it was cc'd to Dr. Ho too.
Q. All right. And do you see that you wrote here, "Good to hear from you. Send my greetings to Dr. Ho. Happy and blessed new year to your entire Africa team, and especially to your CEO. I suggest that I make a few corrections to the letter and send it back to you by tomorrow. Then have it signed, scan it and email it back to me. This way I can make sure it will reach the right person who will hand it over to the president. This scanned letter will be good enough for the president to send the donation to refugees and other humanitarian causes as it was agreed on. The original copy will be handed over during our next trip to Chad."
Do you see that?
A. Yes, I do.
Q. To be clear, Dr. Gadio, what was your understanding regarding who the defendant and CEFC had intended this money for at the time it was presented to President Deby?
A. On December 8?
Q. At the time of the meeting in Chad, when the gift boxes were presented, what was your understanding in terms of who the

defendant and CEFC intended the money for?
A. To the president.
Q. Since that time, other than sending you the donation letter, had the defendant said anything to you regarding CEFC's intentions for that money?
A. No.
MR. ZOLKIND: Could we bring up Government Exhibit 92.
Q. And do you recognize this email?
A. Yes, I do.
Q. Okay. And is this, again, regarding that letter?
A. Yes.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 92. And Government Exhibit 92TX, which is the translation of the attachment.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibits 92 and 92TX received in evidence)
MR. ZOLKIND: And if we could just zoom in -- sure. So we'll start there.
BY MR. ZOLKIND:
Q. Do you see the email starts -- the chain starts with the email we were just looking at?
A. Yes.
MR. ZOLKIND: All right. And if you go up. And if we

could just highlight the top portion of the letter, Ms. Rao. The header and the first email.

Q. Who is this from here?

A. That's from me.

Q. Okay. And again, to the defendant and his assistant?

A. Yes.

MR. ZOLKIND: And if we could just go down to the body of the email.

Q. Do you see that you wrote, "Here we go with the amended version of the letter. Put it in letterhead, send it back to me. I will make sure the president receives it in less than 24 hours"?

A. Yes.

MR. ZOLKIND: All right. And let's just go to the attachment to this document.

Q. Okay. What are we looking at here?

A. That's the French version that I helped redraft.

MR. ZOLKIND: Okay. All right. If we pull up Government Exhibit 92TX, which is the stipulated English translation.

A. Mm-hmm.

Q. And actually, before we look at this, I'd like to go back to Government Exhibit 81 first.

All right. So do you see here Government Exhibit 81, which you testified about yesterday?

A. Yes.

Q. You see that this is the original version that you received from CEFC?

A. Mm-hmm, yes.

Q. And if we go to the attachment, 81TX, in the second paragraph, do you see the sentence beginning, "In order to do this"?

A. Yes.

Q. And the original draft said, "We would like to make a donation of 2 million US dollars to the government of Chad from us as a development fund"?

A. Yes, I see that.

Q. All right. Now let's go to 92TX, which is your revised version.

A. Mm-hmm.

Q. And if we could highlight the paragraph beginning, "In our desire."

A. Yes.

Q. Do you see that you wrote here, "In our desire to form friendly relations with the people and the government of Chad, China Energy Fund Company Limited would like to express its sincere support for your development policies by making available to you a donation of 2 million US dollars." Do you see that?

A. Yes.

Q. Why did you make the change from referring to a donation that CEFC would like to make to a donation that is being made available?
A. Because to me, the donation was already made available. It was already in Chad. I thought it was more accurate to put it that way.
MR. ZOLKIND: Let's bring up Government Exhibit 94.
Q. All right. And do you recognize this as another email between you and the defendant and his assistant regarding that same letter?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 94.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 94 received in evidence)
Q. All right. So in this email now on January 12, 2015, what does Anna, the defendant's assistant, what does she send you here?
A. Yes, she send me the letter, signed letter, and asked for the address and letter -- contact to send the letter by regular mail.
Q. And sir, did CEFC in fact sign the revised version of the letter that you provided?
A. Yes, I think so, yeah.

MR. ZOLKIND: Okay. If we go to the attachment.
Q. Does this appear to be the revised version of the letter that you provided?
A. Yes.
Q. All right. And whose name appears above the signature there?
A. Mr. Zang.
Q. All right. And that's the same Mr. Zang, as you understood it, who had been at that meeting in Chad, is that right?
A. Yeah, who was at the meeting, yes.
MR. ZOLKIND: Okay. All right. If we could go to Government Exhibit 95.
Q. And do you recognize this email?
A. Yes. I do.
Q. Who is this email to?
A. To the president's chief of staff.
MR. ZOLKIND: Your Honor, we'll offer Government Exhibit 95 as well as 95TX.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibits 95 and 95TX received in evidence)
MR. ZOLKIND: And Ms. Rao, why don't we just bring up the English translation, 95TX.
BY MR. ZOLKIND:

Q. All right. Do you see this email starts from you and it's addressed to Hassan DC Deby Tchonai Elimi?
A. Yes.
Q. Who is that?
A. That's the chief of staff. Director of cabinet -- cabinet director.
Q. All right. And what are you sending or conveying to President Deby's chief of staff?
A. The current letter by CEFC signed by Mr. Zang.
MR. ZOLKIND: All right. And if we could just go to the attachment, that should be the attachment to 95.
Okay. There it is.
If we go to Government Exhibit 1096.
Q. Do you recognize this text message?
A. Yes, I do.
Q. Who did you exchange the text message with?
A. With president's chief of staff.
MR. ZOLKIND: Your Honor, we offer Government Exhibits 1096 and 1096TX.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibits 1096 and 1096TX received in evidence)
MR. ZOLKIND: And Ms. Rao, if we could please bring up the translation, 1096TX.

BY MR. ZOLKIND:
Q. And Dr. Gadio, do you see that you sent this text message about a day after the email we just looked at?
A. Yes.
Q. All right. Who are you texting here?
A. To the president's chief of staff.
Q. And what did you say to him?
A. "Excellent year 2015, my dear brother, check your email when you can. Regards."
Q. And what were you referring to, telling him to check his email?
A. Calling his attention on the fact that a letter -- the signed letter was sent.

MR. ZOLKIND: Okay. We can take that down.

Q. All right. Dr. Gadio, I'd like to ask you some additional questions now about your nonprosecution agreement.
A. Yes.
Q. And again, just remind us, approximately when were you arrested in this case?
A. November '17 -- 2017.
Q. Were you ever indicted by a grand jury?
A. No.

MR. ZOLKIND: If we could bring up what's in evidence as Government Exhibit 2701.

Q. And remind us, what is Government Exhibit 2701?

A. Yeah, that's the NPA.
Q. The NPA, did you say?
A. Yes, the NPA, the nonprosecution agreement.
Q. What's the date on this agreement?
A. September 14, 2018.
Q. And approximately when were the charges that had been brought in September 2017, approximately when were those charges against you dismissed?
A. The same day, September 14, 2018.
Q. My apologies. I may have misspoken.
The charges that were initially brought in November of 2017, when, approximately, were those charges dismissed?
A. On September 14, 2018.
Q. Okay. And to your understanding were they dismissed before or after you signed and entered into this nonprosecution agreement with the government?
A. After we signed, my lawyer and myself.
Q. Now you testified that after being arrested by the FBI, you agreed to participate in an interview, is that right?
A. Yes, I did.
Q. When did that interview take place?
A. The same day, on September 17 -- sorry, on November 17, 19 -- 2017.
Q. When you say the same day, you mean the same day you were arrested?

A. The same day I was arrested.
Q. And again, have you reviewed the recording or the transcript of that interview?
A. Never.
Q. Between the date of your arrest and the date that you signed the NPA about 11 months later, did you attend meetings with the government?
A. Yes, I did.
Q. If you could just describe in general terms what happened during the meetings with the government.
A. Me and my lawyers met the government several times to discuss the case and to discuss the documents presented to us by the government.
Q. And did the government in fact show you documents?
A. I'm sorry?
Q. Did the government in fact show you documents?
A. Yes, they did.
Q. What kind of documents?
A. Mainly my emails and, you know, any other document they thought relevant, but my emails; we discussed basically my emails.
Q. And do you recall approximately how many different documents you looked at during your meetings with the government?
A. Tons, tons of documents. Several, several documents,

several binders, yes.

MR. ZOLKIND: And if we could bring up Government Exhibit 2701 again.

And if we could zoom in on the paragraph beginning, "On the understanding," and just the first area, going up through No. 1.

And Ms. Rao, if we could just highlight where it begins, "Will not criminally prosecute," on the fourth line down, and stop where the No. 1 is, those three or four lines.

BY MR. ZOLKIND:

Q. Okay. Dr. Gadio, do you see here that the nonprosecution agreement says that, "The government will not criminally prosecute Cheikh Gadio for his involvement in a bribery scheme in which Chi Ping Patrick Ho, on behalf of CEFC, provided approximately $2 million in cash to the president of Chad, concealed within one or more gift boxes, during a business meeting in Chad in or about December 2014"? Do you see that?

A. Yes, I do.

Q. And Dr. Gadio, in order for you to get that benefit, what's your understanding of your main obligation?

A. To tell the truth.

MR. ZOLKIND: Ms. Rao, if we could take off that highlighting and zoom down a bit, where it says -- yeah, we could zoom in on the whole numbered area.

And if you could include the line right above it as

well.

BY MR. ZOLKIND:

Q. We'll go to No. 1. Do you see it says, "Gadio has previously admitted and hereby affirms that, No. 1, when Gadio learned of this $2 million cash payment shortly after it was made, he understood that Ho and CEFC intended it as a bribe offer to the president of Chad"? Do you see that?

A. Yes, I do.

Q. What gave you that understanding?

A. As explained before, the way it was delivered and the whole incident itself.

Q. Would you explain what you mean by that.

A. What I mean by that was, it was difficult to believe that a donation of $2 million could be made that way, like in gift box and then it was delivered, not even told to the person, like to the president. He was not told, "Mr. President, we brought you this and that." It was just put in gift box and left behind. And he -- they discovered it afterwards and called me back and went through all this process of trying to understand what happened, and the feelings and the sentiments we had were that this was not like normal procedure, and we disagreed with the gesture, and the president made it very clear after our meeting, and the conclusion was, it was meant for the president, and under those circumstances, I could not really believe that it was anything else but a bribery attempt. But I

kept calling it bribery attempt because it was rejected.
Q. When you say rejected, by?
A. By the president.
Q. It says here, No. 2, "Gadio recognized that this bribe offer was wrong and unlawful, but he," Gadio, "nonetheless continued to assist Ho and CEFC in their efforts to finalize a deal with the president of Chad, at least in part because Gadio expected to receive significant compensation if such a deal was finalized."
And again, Dr. Gadio, why did you continue working on a deal that you believed was wrong and unlawful?
A. Because I really believed that we have put -- we have put so much energy to get to that level and to finalize a contract between CEFC and the government of Chad, we felt really we deserved compensation for all the work we have done.
Q. Finally, here, No. 3 says, the last item that you have affirmed, "Gadio assisted Ho and CEFC by, among other things, drafting and conveying a letter purporting to prospectively pledge the $2 million for humanitarian causes, despite Gadio's understanding that Ho and CEFC had intended the money for the president of Chad's personal benefit."
Do you see that?
A. Yes, I do.
Q. Let me ask you now some additional questions about this letter.

When was the donation letter finalized and conveyed to President Deby?
A. I think it was in January, around January 12th or 13th.
Q. January 2015?
A. Yeah, January 2015, yeah.
MR. ZOLKIND: Okay. We could take down the document.
Q. Now had you had experiences with significant donations prior to these events in December 2014?
A. Yes.
Q. And based on your experience as the Foreign Minister of Senegal and your experience as the head of the IPS organization, were you familiar with any sort of procedure or protocol for making a significant donation?
A. Yes.
Q. Could you describe for the jury the protocol that you had become familiar with.
A. Yes. Usually it starts by a notification. You are informed that your government will receive a donation from an international organization or from another government. In my case, I over -- supervised a process with Saudi Arabia, for instance. Got a phone call, got the information, I reported to my president, and then the foreign minister and myself, we discussed how we were going to proceed. And the different steps usually are exchange of letters, sometimes, usually, and then we agree to have a signing ceremony.

Q. Did you say a signing ceremony?

A. A signing ceremony, yeah. Like the Saudi delegation visits Senegal or Senegalese delegation goes to Saudi Arabia and, you know, we sit down sometimes, usually before the media, and then we sign the protocol, saying that, you know, this -- that country or that international organization has made a donation and mentioned the amount. And it's followed by a communique, usually.

Q. Communique?

A. A communique, yeah. Like the receiving end, which is -- if it's Senegal, will issue a communique with the Saudis to say -- to thank the Saudis and to recognize that we got this donation; and the Saudis can also, from their country, make a communique that they have decided to make a donation to Senegal.

Now when it's like not a government organization, like a private organization making donation to IPS, you know, it's good for the record to say that they contributed to an institute for peace, therefore, they issue not -- they issue a communique, they sign, and then after that they also make it public in terms of record, so you can verify any time you want that they have made that donation to IPS.

Q. And with respect to the protocol, in terms of what you were familiar with in your experience, what were the typical ways in which the money would be transmitted for a significant donation?

A. Through international wiring, international transfer. I don't remember like experience where a check is given directly. Country's, you know, like minister of finance often take over and they organize the transfer to the country's treasury department or to the country's central bank. It doesn't go straight, you know, to me or to my president or to whoever. It's just done between institutions.
Q. All right. And again, just to be clear, in your own experience, how common or uncommon is it for a company or an NGO to publicize a donation that is made?
A. It is always the case.
Q. After you sent the donation letter in this case, after you conveyed it to President Deby, did CEFC hold any sort of ceremony or public event to announce the donation, as far as you're aware?
A. No, not that I'm aware of.
Q. And as far as you're aware, did CEFC issue any sort of press release or public statement announcing the donation?
A. Not that I know of.
Q. By the way, let me go back for a moment to the meeting in Chad in December 2014.
A. Yes.
Q. Specifically the second meeting where the issue of the 2 million cash was discussed.
A. Yes.

Q. At that meeting, as far as you recall, did President Deby or his chief of staff say anything in the presence of CEFC regarding whether any public statement would be made about the donation once the letter was received?

A. I don't remember exactly a discussion taking place on that particular issue. What I know is that that's the traditional procedure. Like when the donation is received, the concerned government or party also tries to make it known through their own ways, but usually the party that is making the donation is the one that makes a communique, a, you know -- publicize. Because they're doing something good, a positive action, then they make it public, usually.

Q. Understood. So just to be clear, as far as you recall, based on what was said in front of the members of CEFC during that meeting in Chad in December 2014, do you recall President Deby or his chief of staff or anyone else from Chad saying anything about making that donation public?

A. I don't recall hearing that from them directly. It was my -- my deduction or spec -- you know, understanding that's -- like what I just explained about how donations are made.

Q. Did you ever see any public statement or any sort of publicity from the government of Chad regarding any donation from CEFC?

A. Not personally.

MR. ZOLKIND: I'd like to bring up what is already in

evidence as Government Exhibit 2706.
Q. Do you see here, Dr. Gadio, that this is a document titled Donation Agreement?
A. Yes, it is.
MR. ZOLKIND: And Ms. Rao, if you could just highlight the parties at the top.
Q. Do you see the first one is CIRSD, or the Center for International Relations and Sustainable Development, represented by Vuk Jeremic? Do you see that?
A. Yes, I do.
Q. And is that an organization that you're familiar with?
A. Yes; very familiar, actually.
Q. All right. And --
A. Yeah.
Q. And then do you see the other party to the agreement is CEFC?
A. Yes.
MR. ZOLKIND: Okay. And Ms. Rao, if you could just --
Q. Let me first begin by asking, prior to your involvement in this trial, had you ever seen this document before?
A. This, this --
Q. This particular document.
A. No, no.
MR. ZOLKIND: All right. Ms. Rao, if you could just go through it slowly.

Q. Do you see the donation agreement includes clauses on the subject of the agreement?
A. Yes, I see, mm-hmm.
Q. Okay. And then Part 2, do you see there's a discussion of the mutual rights and obligations?
A. Yes.
Q. And do you see there's a reference --
MR. ZOLKIND: Could we just go back up for a moment.
Q. -- to the amount of the donation, $1 million in this case?
A. Mm-hmm.
Q. And there's a reference to how quickly the donation will be made; do you see that?
A. Yes.
Q. And do you see there is various other legal language about the donation being irrevocable and various other terms and conditions of the donation?
A. Yes.
MR. ZOLKIND: And if we go to the next page.
Q. Do you see there's a clause 2.6, refers to the tax obligations in connection with the donation?
A. Mm-hmm, yes.
Q. And 2.7 refers to provisions regarding how any claim or dispute or controversy are going to be handled? Do you see all that?
A. Yes, I do.

Q. All right. Do you see that on behalf of CEFC it's signed by C. O. Lo?
A. Yes.
Q. I think you testified to this yesterday. Do you recall who that is?
A. Yes, I think he's the deputy to Dr. Ho.
Q. Now as part of the sort of international protocol that you were familiar with, how common or uncommon was it, in your own experience, for a donation to be accompanied by a legal agreement along these lines?
A. I think that's the rule. That's the --
Q. You say that's the rule?
A. That's the rule, yeah.
Q. As far as you're aware, did CEFC propose any sort of contract with respect to this $2 million donation to Chad?
A. No.
Q. And was any contract between Chad and CEFC signed in relation to the $2 million donation, as far as you're aware?
A. No.
MR. ZOLKIND: We could take this down.
Q. After the what you've been calling donation letter, after that letter was conveyed to President Deby, did the defendant ever reach out to you, ask you anything about that donation?
A. In terms of follow-up?
Q. Yeah. After you sent that letter to President Deby, did

the defendant ever follow up with you about the donation?
A. No.
Q. In all of your dealings with the defendant after that letter was sent, did he ever make any reference to the $2 million again?
A. We never spoke about it.
Q. Let me turn now to another topic.
MR. ZOLKIND: Ms. Rao, could you please bring up Government Exhibit 99 for identification.
Q. Do you recognize this email?
A. Yes, I do.
Q. And what's the general subject matter of the email?
A. Letter of appointment 2015.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 99.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 99 received in evidence)
Q. Who is this email from?
A. It's from Anna, the assistant of Dr. Ho.
Q. Okay. And who is it to?
A. To me.
Q. And who's copied?
A. Dr. Ho.
Q. And who else is copied there?

A. I'm not familiar with the other person, "colo."
Q. C.O. Lo?
A. Yes, C.O. -- oh, that's Mr. Lo, Andrew Lo, perhaps. But I'm not really familiar with that.
Q. All right.
A. Yeah.
Q. And do you see the subject line there is Letter of Appointment 2015?
A. Yes.
Q. And did the defendant's assistant Anna write, "Dear Dr. Gadio, Attached please find the letter of employment 2015"? Do you see that?
A. Yes.
MR. ZOLKIND: Let's go to the attachment.
If we could just zoom in on the -- actually, that's perfect. Okay.
Q. Now before we get to the text here, Dr. Gadio, you had sent multiple emails that you testified about asking for a formal contract between your firm Sarata and CEFC, is that right?
A. Yes. Yes.
Q. I think you also testified yesterday about a proposed MOU. Do you recall that?
A. Yes, I do.
Q. Now was this letter of appointment that you received here what you had in mind?

A. No.
Q. Why not?
A. Because it changes the status of the relationship between like two partners working together and having a contract or an agreement to one of the partners becoming the employee, the employee -- the employer, yeah, of the other partner. It just changed from a contract or an agreement to an appointment, a letter of appointment. And for us a contract is binding.
Q. Sorry. I didn't hear.
A. I say a contract is binding, is more binding, an agreement is more binding than just a letter of appointment.
MR. ZOLKIND: Okay. And let's bring up just for a moment what's already in evidence as Government Exhibit 2703.
Q. Do you see here this is a CEFC document titled Consulting Agreement?
A. Yes.
Q. And do you see --
MR. ZOLKIND: Ms. Rao, if you could highlight in the front paragraph that it's between CEFC and Vuk Jeremic.
A. Yes.
Q. Okay. And again, prior to you preparing for your testimony in this trial, had you ever seen this document?
A. No.
MR. ZOLKIND: Okay. And Ms. Rao, if you could just go slowly through the consulting agreement here with Mr. Jeremic.

Q. Do you see that it has various legal terms?
A. Yes.
Q. It describes consulting services?
A. Yes.
Q. Do you see in Part 2 there, there's a term listed?
A. Yes.
Q. Part 3, compensation listed, do you see that?
A. Yes.
MR. ZOLKIND: Keep going.
Q. Do you see in the beginning of the next page there's terms relating to taxes and annual fees? Do you see that?
A. Yes.
Q. Part 4, there's legal provisions regarding confidentiality; do you see that?
A. Yes, I do.
Q. And then in Section 5 it says, Applicable Law and Jurisdiction, "The laws of Hong Kong shall govern this agreement"?
A. Yes.
Q. "The courts of Hong Kong shall have the jurisdiction to settle any dispute or claim in connection with this agreement"?
A. Yes.
Q. Did you ever receive from CEFC a formal legal contract that looked anything like this?
A. Not at all. Actually, we sent a proposal to sign the same

type of agreement. You know, if you compare the one we sent, the draft agreement, it's almost identical to this one. That's the one we sent, but that's not the one -- we did not sign, actually. We just got a letter of appointment.

Q. Okay. Let's go back to that letter of appointment, Government Exhibit 99.

MR. ZOLKIND: If we could look at the attachment.

And if we could zoom in on where it says "consulting fee," and then there's a list of three items.

Q. Okay. So in CEFC's letter of appointment to you, it says here, "The consulting fee, upon your signing back this appointment letter, consists of, No. 1, an immediate payment of US $100,000 to you as a donation to support your activities towards the formation of an African union and similar purposes." Do you see that?

A. Yes, I do.

Q. Now you testified yesterday about a pledge that the defendant had made to donate a hundred thousand dollars to support the Dakar forum, the meeting that your organization was holding. Do you recall that?

A. Yes, I do.

Q. Had the defendant or CEFC made good on that pledge to donate $100,000 to the Dakar forum?

A. No.

Q. What did you understand this here -- the reference to a

hundred thousand dollar donation in Bullet No. 1 here, what did you understand that to refer to?
A. I think it was a direct support to me and my institute but was not really related to the Dakar forum.
Q. Okay. When you say it was support for your institute, what institute are you referring to?
A. Institute for Peace and Security, promoting also African unity and Pan-Africanism.
Q. All right. And again, is that a for-profit or not-for-profit organization?
A. Not-for-profit.
Q. In your view --
MR. ZOLKIND: And Ms. Rao, if we could just highlight the two words over where it says "donation."
Q. In your view, if this $100,000 was really a donation, was it accurate to describe it as part of your consulting fee --
A. No.
Q. -- based on the prior line?
A. Like a donation is not a consulting fee.
MR. ZOLKIND: And again, just to be clear, Ms. Rao, if you could highlight "consulting fee" in the prior line.
Q. Sir, did you believe that any sort of donation to your organization belonged in a document describing what your consulting fee would be for the work you were doing?
A. No. Technically it's not -- it's not -- it's not the same

thing, like support to IPS, and then this is Sarata seeking a, you know, commercial contract or a private business contract. I think it's different, yeah.

Q. Okay. No. 2 listed here is "an additional US $100,000 in recognition of the work that you have contributed during the formative stages of your relationship with CEFC"?

A. Mm-hmm.

Q. What does that refer to, as you understood it?

A. Reimbursing the cost that we have spent, but here it says, "in recognition of the work you have contributed." It's like paying our services. But that was -- that was not our perception, yeah.

Q. Okay. And No. 3 says, "a further sum of US $200,000 to be disbursed to you in two installments during 2015." And what did that refer to, as you understood it?

A. I think starting at that point, we're talking about consulting fees, yeah. The last -- this point.

Q. And consulting fees for what work?

A. For the work Sarata did for CEFC for like four or five months, starting in October till this date in February.

Q. Okay. And to be clear, were you and your firm Sarata, at this time, were you continuing to do work on behalf of CEFC?

A. Yes.

MR. ZOLKIND: Let's bring up Government Exhibit 100.

Q. Do you recognize this email?

A. Yes, I do.
Q. And what is this email?
A. I think that's banking information, and I'm presenting the two organizations that we just discussed, Sarata and IPS.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 100.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 100 received in evidence)
Q. All right. And again, so this is an email from you, and who were you sending it to?
A. To Anna, Anna, Dr. Ho's assistant.
Q. All right. And you say, "Dear Anna, As a reply to your text, here are the information you asked. Keep in mind that we run two companies."
A. Yes.
Q. "Full name Dr. Cheikh Tidiane Gadio. 1st Company Name, Sarata International Consultancy. 2nd Company Name, Institute for Pan-African Strategies."
Why were you making clear here that there's two separate organizations?
A. I was ensuring that everything that is consulting fees related to Sarata go to Sarata and everything goes to Sarata, and everything that is like donation, support for our institute can go to the institute directly.

MR. ZOLKIND: Let's bring up Government Exhibit 104.
Q. All right. Here, do you recognize this email?
A. Yes, I do.
Q. And is this correspondence on the same subject?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 104.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 104 received in evidence)
MR. ZOLKIND: All right. If we could just zoom in on the top email there.
BY MR. ZOLKIND:
Q. Who is this from?
A. That's from me.
Q. Okay. And who is it to?
A. To Anna.
Q. And who's copied there?
A. Dr. Ho and Mr. Lo and Boubker.
Q. All right. And if you could read the text of your email.
A. Okay. "Please find attached our reply to your letter of appointment and also our consultancy agreement previously submitted."
Q. Okay.
A. "Many thanks."

MR. ZOLKIND: Let's turn to the first attachment. If we could scroll down.

And just zoom in on the first paragraph, if you would.

In fact -- I'm sorry. I meant to start with the next paragraph.

Q. Okay. And just in general, if you could just explain -- this is a lengthy document, but what were you doing in this response to CEFC's letter of appointment?

A. Mm-hmm. Yes. Just arguing basically that Sarata International is a consultancy firm and we -- we do like help connect organizations and governments and -- or government agencies in Africa, and it's based on our, you know, network, our contact with high government officials in Africa, and -- yes.

Q. And -- I'm sorry. I didn't mean to cut you off.

A. Yeah. And of course we are explaining why our consultancy is compensated, depending on the business deals, you know, and our -- explaining our retainer fees, policies and the scope of our work, so here, we're saying for instance, basic retainer fees does not include any costs such as transportation, hotels. CEFC should specify how it will cover these expenses.

Q. Let's back up slightly. We looked before at CEFC's what they call a letter of appointment that listed the $100,000 donation.

A. Yes.

Q. And the fees for the formative stages and then the additional fees.
A. Yes.
Q. Do you recall that?
A. Yes.
Q. What was your reaction to whether or not -- did you believe that was a fair proposal of how to compensate you for the work you were doing?
A. Not at all.

MR. ZOLKIND: Okay. If we could zoom out of there and go to -- I think it's page 3.

Yeah. Right here. And beginning where it says "Moreover." Thank you.

Q. So you write here in your response:

"Moreover, I would like to address each one of the points covered in the composition of your proposed consulting fees.

"Point 1. I accept and thank you for your immediate payment of US $100,000 as a donation to 'support my activities towards the formation of an African union and similar purposes.'"

Okay. And so what was your reaction to that aspect of the proposal?

A. You know, after all these efforts and letters and asking for payment, asking for, you know -- we thought it was just

easier to -- to move quickly on this, accept the donation, and then go discuss the other substantive issues.

Q. All right. To be clear, when you wrote this here, were you agreeing that a $100,000 donation was part of your compensation for the work you were doing?

A. We just put it that way to -- to make sure that at least those 100,000 promised will come our way, because we have worked -- we didn't want to confirm that it was part of our consulting fees because we know -- we know it's not a consulting fee, but we accepted the donation.

Q. Now with respect to the Dakar forum --

A. Yes.

Q. -- I think you testified yesterday that the money had been committed?

A. Yes.

Q. And what was your plan? If you received the $100,000 donation here, what was your plan in terms of how to use that $100,000?

A. It was -- it was quite sure that we would be using it to pay back all the debts that we contracted during the Dakar forum because the $100,000 pledge was already made and the money was put in the budget, like I said yesterday, and executed, so used. And people did not give us any chance to get away with the fact that, you know, we did not receive the money. They were expecting us to pay it back. So we knew that

$100,000 must go to pay our debts from the Dakar forum.
Q. All right. Let's go to Point 2. You wrote here, "I must confess that I am very surprised by your proposed US $100,000 for the initial accomplishments our consultancy has made for CEFC in the 'Chad operations.'"
A. Mm-hmm.
Q. And then when you're quoting there, is that from the contract that you had previously sent?
A. Yes.
MR. ZOLKIND: All right. Let's go down to the next paragraph.
Q. You say, "With respect to the Chad operations, both of these operations have not only been fully and well accomplished but the results of our encounters with the president have surpassed expectations due to our relationship with him since our consultancy's hard work --"
THE COURT: Slowly.
MR. ZOLKIND: My apologies, your Honor.
Q. "-- our consultancy's hard work has enabled CEFC to be offered blocks of oil for exploration and exploitation purposes and other potential opportunities, such as taking shares in the Chad-Cameroon pipeline, etc. Therefore, I believe we should be compensated for now a fair amount of at least US $500,000, as the total opportunity value being given to CEFC due to Sarata International Consultancy is in the multimillions of dollars

(other known consultancy firms have been compensated over $5 million for such great achievements). Also --"

THE COURT: Slowly.

Q. "Also, it is difficult to comprehend a 2 million-dollar gift to the president and only 100,000 dollar to the facilitator who made all of this possible."

Let me stop there. Dr. Gadio --

MR. ZOLKIND: Ms. Rao, maybe you could zoom in or highlight just that last sentence.

Q. Dr. Gadio, when you referred to a "2 million-dollar gift to the president," what money were you referring to?

A. To the December '14 -- December 2014 donate -- money that was brought to the president in gift box.

Q. Okay. I'm just going to ask you, or remind you again to keep your voice up, if you don't mind.

A. Okay.

Q. Thank you.

When you referred to only a hundred thousand dollars to the facilitator who made all this possible, who were you referring to?

A. To Sarata International.

Q. All right. That's your firm?

A. Yes.

Q. Now when you wrote this letter, was this not several weeks after you had helped the defendant and CEFC to revise that

letter and send it to the president of Chad?
A. Yes, mm-hmm.
Q. So why, Dr. Gadio, did you refer here to money given to the president as opposed to a donation to the people of Chad?
A. Because it's not my -- you know, we did not really change our perception of the donation, what it was, and so, you know, spontaneously wrote 2 million-dollar gift because that's what we thought it was.
Q. And again, when you say you didn't really change your perception, what do you mean by that?
A. If we truly believed that it was -- like initially it was conceived as a donation, $2 million donation to the people and the government of Chad, then we would not complain that after five months of hard work, we'll be paid $100,000, and then a gift was made before us of $2 million to the president of Chad. We did not believe it was given to the government and the people of Chad. As such, we were aware of the arrangement that was made. For us it was just to get away from -- with the problem and move on to what was for us the contract that we wanted between Chad and CEFC, and that was it. So that's why the language remained here as such.
Q. And just to skip ahead for a moment, after you sent this letter, did the defendant ever correct you and say anything about, you know, hey, this was a donation to the people of Chad?

A. Nobody -- nobody reacted to that on the CEFC side.

MR. ZOLKIND: Okay. Let's zoom out.

And if we go to the next page and highlight Point No. 3.

Q. You write, "I accept and approve that further sum of US $200,000 be attributed to our consultancy, but it should be given at specific times during 2015 since usually retainer fees are paid January 1st and July 1st."

A. Yes.

Q. Were you essentially accepting the final portion, $200,000 in retainer fees?

A. Yes.

MR. ZOLKIND: And if we could go to the next paragraph.

Q. So here, at the end of your response, you say, "Furthermore, I request that CEFC review and sign our proposed consultancy agreement and additional protocol to establish a legally binding working relationship." Do you see that?

A. Yes.

Q. Did you ever get that legally binding formal contract that you were requesting?

A. No, we did not.

Q. All right. And if we turn to the second attachment that you included in your email here. What's this here?

A. Yes, that's the consultancy agreement that we proposed.

MR. ZOLKIND: Okay. And if we could just flip through this for the jury.

Okay. We can take that down.

Let's bring up Government Exhibit 105.

Q. Do you recognize this document?
A. Yes, I do.
Q. And does this relate to the same subject matter?
A. Yes.

MR. ZOLKIND: Your Honor, we offer Government Exhibit 105.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 105 received in evidence)

Q. Now who is this email from, Dr. Gadio?
A. That's from Mr. Lo.
Q. And again, just remind us what you understood his position to be?
A. I think he was -- I believe he was the deputy, deputy of Mr. -- of Dr. Ho.
Q. Okay. All right. And is he responding here to the letter that you wrote which we just looked at?
A. Yes.

MR. ZOLKIND: All right. And if we could just zoom in, Ms. Rao, on the sentence at the bottom beginning, "My humble view."

Q. Do you see that he wrote, "My humble view is that you may consider signing back our offer first, so that remittance can be made to you accordingly. In China, anything can be solved amiably through friendly contact. After all it is only the beginning of our relationship, and we need to work on the security of trust than legal document." What was your reaction to that statement?
A. Yeah, that I was not getting the reply I was expecting.
Q. And just if you could explain what you mean by that.
A. Yes. You know, we were still proposing an agreement, a legally binding relationship, and he was advising us just to take it easy, to take what is available now and then, you know, things will evolve and we perhaps will move to something else, but for now this was like the level of, you know, where they wanted to -- to be, and --
Q. And when --
A. Yeah.
Q. -- when he wrote at the top here, "consider signing back our offer first, so that remittance can be made to you," what did you understand "remittance" to refer to?
A. To payment, perhaps the first settle -- installment of both the donation and the 100,000 that were proposed.
MR. ZOLKIND: Let's bring up Government Exhibit 107, please.
Q. Do you recognize this email, Dr. Gadio?

A. Yes.
Q. Okay. Does this also relate to that letter of appointment?
A. Exactly.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 107.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 107 received in evidence)
Q. All right. And who is this email from, Dr. Gadio?
A. That's from me to Anna.
Q. And who are you copying?
A. Copy to Dr. Ho and Mr. Lo and Boubker.
Q. Okay. All right. And you write in your email, "Please find attached our letter of acceptance"?
A. Yes, yes.
MR. ZOLKIND: And if we could go to the attachment.
Q. All right. And I won't ask you to read this whole document, but just in summary, what were you saying or agreeing in this letter that you responded?
A. Mm-hmm. You see that second paragraph, "We take note of CEFC's decision not to engage at this stage in a more formal relationship with Sarata by signing a formal consultancy contract but" etc. So the idea was we had our back on the wall -- against the wall because we worked so hard for four, five months and still no contract, no formal agreement, and we

got this letter of appointment, so the choice was either to say thank you, stop everything and we lose all our investment and all our resource and energy put in this process, or we take what, you know -- it was like, to me, a power relationship. We did not have the power to really get what we wanted. We insisted several times. So we had to just take what was offered to us. But clearly we have made our point that this is not what we wanted and, you know, we wrote it several time and we kept insisting that we wanted a formal contract.

MR. ZOLKIND: All right. We can take that down.

Q. After you sent this letter accepting CEFC's appointment letter, did you in fact receive an initial payment from CEFC?

A. Yes, sir. This letter was in February. I think the first payment was in March, I believe.

MR. ZOLKIND: All right. Your Honor, I'd like to offer a stipulation between the parties. It's Government Exhibit S-1.

THE COURT: Yes, sir.

MR. ZOLKIND: And let me first just offer that into evidence.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit S-1 received in evidence)

MR. ZOLKIND: The stipulation is titled Stipulation as to Bank Accounts, International Wires, and if we could go to

the paragraph regarding 2008.

So it provides, The parties stipulate and agree -- and it is a factual stipulation -- that "Government Exhibit 2008 consists of true and correct copies of wire transfer records that were made at or near the time of their creation by, or from information transmitted by, a person with knowledge of the matters set forth in the records, and that were kept in the course of a regularly conducted activity of Hong Kong and Shanghai Banking Corporation Limited," which is known as HSBC Hong Kong, "as a regular practice of that activity."

And pursuant to that stipulation, the government offers Government Exhibit 2008.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 2008 received in evidence).

THE COURT: And of course, ladies and gentlemen, this stipulation is evidence for your consideration, and you must accept the stated facts as true.

MR. ZOLKIND: Ms. Rao, if we could publish that and bring up page 4.

All right. I apologize for the somewhat grainy copy, but -- if you could zoom in on the top.

BY MR. ZOLKIND:

Q. Dr. Gadio, can you see on the top right there the date of this document?

A. Yes. That's March 25, 2015.

MR. ZOLKIND: Okay. And if you scroll down slightly. Keep going.

Q. On the lower left there, do you see the sender?

A. Yes, yes.

Q. On the lower left. Sorry.

A. Yeah, I see it, yes.

Q. What is that?

A. Patrick Ho.

Q. Okay. And what's the name of the debit account holder listed under it?

A. Patrick Ho, yeah.

Q. Sorry. Just below that signature, what entity name do you see?

A. CEFC LTD.

MR. ZOLKIND: Okay. And if we could go up.

Q. Do you see in the middle line there where it says remittance currency and the amount?

A. Yes, US dollars.

Q. What's the amount?

A. $200,000.

Q. Okay. And on the right side, do you see an account name and number?

A. Yes. Sarata International Consulting.

Q. Okay. And again, what's that?

A. That's our consultancy company.
Q. Okay. And where was your bank account located?
A. In Dubai. For Sarata International, it was located in Dubai.
Q. Okay. All right. And that's part of the United Arab Emirates?
A. Yes.
Q. Now do you recall that in the appointment letter that we had just looked at, No. 1 was a $100,000 donation to support the activities of IPS and so forth?
A. Yes.
Q. And Item No. 2 was $100,000 as a consulting fee to support your -- to compensate you for the activities in the formative stages. Do you recall that?
A. Yes, yes.
Q. Did you have an understanding as to why here both of those are grouped together into a single $200,000 wire to Sarata's bank account?
Let me ask a better question.
A. Yes.
Q. Did the defendant tell you why those two wires were grouped together into a single wire into Sarata's bank account?
A. Yeah, we did not discuss -- we did not discuss the issue. And then when the letter of appointment came, that issue was not resolved. You know, we moved back -- we moved quickly to

the fact that this was not an agreement, this was not a contract, and we -- we did provide those two bank information, but, you know, the payment was made to this one and we -- we did accept it.
Q. Understood. My question, just to be clear, was: Did the defendant tell you why the -- what was described as a $100,000 donation, why that was grouped together with a $100,000 part of your consulting fee?
A. Yeah, that's what I'm saying, that we did not discuss the issue.
Q. Okay.
A. We did not really discuss the issue. And I don't think they changed their mind about the fact that they wrote this appointment letter and decided that, you know, they would make the payment for 200,000 and explain why they did it that way. We did not discuss it to change anything, so I guess that's why it went this way.
Q. At some point did CEFC send you another payment?
A. Another payment, yes.
MR. ZOLKIND: Okay. And if we could pull up page 8 of the same document.
And again, if we just zoom on the top portion there.
Q. Can you see the date on the top right?
A. Yes. On July 2, 2015.
Q. July 2, 2015?

A. Yes.
Q. What's the currency and the amount?
A. 200,000 US dollars.
Q. Okay. And was that wired to the same account that your firm maintained in Dubai?
A. Yes.
MR. ZOLKIND: Okay. All right. We can take that down.
Q. Let me turn briefly to another subject.
Dr. Gadio, you testified that you're not a citizen of the US but you're a lawful permanent resident or a green card holder, is that right?
A. Yes.
Q. Now prior to being arrested in this case, did you file US tax returns on an annual basis?
A. Yes.
Q. And did anyone assist you in filing US tax returns?
A. Yes. I co-filed with my wife, and a CPA was doing the job for us.
Q. Okay. And when you say a CPA, you mean an accountant?
A. Yes, accountant, yeah.
Q. All right. Prior to being arrested in this case, what was your understanding as to whether or not you had an obligation to declare income that you earned outside the US on your US tax returns?

A. For like 20 years of being a green card holder, my understanding has always been that every dollar, money I make in the United States, in the US territory, that I should pay tax on that, you know, income; that everything else that I make outside of the US was not involved in my, you know, income in the US. That's how I wrote -- each year I will write a letter to the CPA, to the accountant, to say, this year I did not make any money in the United States, except the years where I did, then I sent a copy of the check. If I'm paid for a lecture from a university, I will send the check, a copy, and then I will pay tax on that one.

(Continued on next page)

BY MR. ZOLKIND:

Q. So, to be clear, on your U.S. tax returns, did you declare the money that you were paid by CEFC?

A. No.

Q. And did you declare any money that you held in bank accounts that were maintained outside the United States?

A. No, I did not.

Q. And again at the time you filed those tax returns, did you believe you had an obligation to declare that information?

A. Prior, no. Before the arrest, no, I did not know.

Q. Since being arrested in this case, has your understanding of your U.S. tax obligations changed at all?

A. Yes, completely.

Q. OK. And just briefly, how has your understanding changed?

A. Now I realize that a green card holder is given the same treatment as a U.S. citizen, and any income you have anywhere in the world should be reported when you file with the IRS here in the United States.

Q. What if anything are you doing to comply with your U.S. tax obligations now?

A. We have hired a bigger firm and asked them to do tax work for us, pay back taxes that we owe. And then this year, 2017, it was filed properly because now we have the information.

Q. You said you hired a bigger firm; is that right?

A. Yes.

Q. You mean an accounting firm?
A. Accounting firm, yeah.
Q. Does your nonprosecution agreement in this case cover your failure to comply with U.S. tax law?
A. Exactly, yeah, absolutely, yeah.
Q. And, again, what did that agreement require with respect to taxes?
A. For me to pay my back taxes, and then to file amended taxes, to take care of, you know, everything that is related to taxes that I did not understand before, to do it properly now.
Q. Let me turn now to the time period of the spring of 2015, so in the months that came after that December 2014 meeting in Chad.
A. Yes.
Q. Did there come a time when the defendant and CEFC -- or the defendant and others from CEFC -- met with President Deby for a third time?
A. In March, yeah, in March 2015.
Q. OK. Let's bring up Government Exhibit 118.
Your Honor, I apologize. Was there a time that the Court --
THE COURT: I will let you know.
MR. ZOLKIND: OK.
THE COURT: Thank you.
Q. Do you recognize Government Exhibit 118?

A. Yes. Yes. I'm sorry.
Q. All right. Does it relate to that third meeting?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 118.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 118 received in evidence)
Q. All right. So, if we start here on the third page and zoom in, do you see that the chain begins with you sending the defendant and Anna bank account information?
A. Yes.
Q. Is that the same e-mail we looked at before?
A. Yes.
Q. Now let's go up to page 1 of the same chain. And on March 25 do you see that Anna, the defendant's assistant wrote, "Dear Dr. Gadio, attached please find the bank receipt. Please let us know the available time for the president to meet the CEFC delegation (possibly Monday, March 30)". Do you see that?
A. Yes, I do.
Q. What was the date of this e-mail?
A. March 25.
Q. So that's asking for a meeting possibly five days later.
A. Yes.
Q. Can you zoom out and go to the top. If you could read your

response. First, who did you e-mail your response to?
A. To Anna and copied -- Anna and Dr. Ho, yeah.
Q. All right. If you could read your response.
A. "Doctor Ho. The president has agreed to see us on Sunday or Monday. He has insisted that because of the war situation and the need of extreme confidentiality, he wants to meet a very small delegation, ideally you and me only, or a maximum of three. You, me, plus one more. Hope this is OK. And let me know what format is better for you and who else will attend the meeting with you and me. Thanks."
Q. Dr. Gadio, what was your understanding as to why President Deby wanted to meet only with you and the defendant?
A. OK. I would say some sensitive national security issues are involved, but it was because of the war situation. He was really at war in the neighboring country of Nigeria against Boko Haram, the terrorist organization.
Q. I don't want to ask about those national security issues in any detail. My question was really what was your understanding as to why the defendant specified a third person of the group as being you, him and the defendant?
A. Because the president --
Q. I apologize, your Honor, I think I misspoke.
THE COURT: Go ahead.
Q. Let me re-ask the question.
My question is: What was your understanding as to

why --

Just so I can be clear, Ms. Rao, if you could highlight the second line where it says he wants to meet a very small delegation, ideally you and me only for a maximum of three. OK.

So, Dr. Gadio, when you said you and me only, who is the you and me?

A. Dr. Ho, myself.

Q. OK. And so why were you saying that if there is a small delegation ideally of you and me, why the defendant is part of that small delegation?

A. Because he and me were the main facilitators of the relationship between CEFC and Chad.

Q. Now, the date on this is March 26, 2015?

A. Yes.

Q. So that's more than three months after the December 2014 meeting in Chad; is that right?

A. Yes.

Q. I know I asked you before about your understanding of the role that defendant was playing with respect to Chad back in November and December 2014. What was your understanding of the role he was playing with respect to CEFC's operations in Chad as of March 2015?

A. He's still the main facilitator.

Q. Let's bring up Government Exhibit 117. Do you recognize

this e-mail?
A. Yes, I do.
Q. Does it relate to that third meeting in Chad?
A. Yes.

MR. ZOLKIND: Your Honor, we offer Government Exhibit 117.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 117 received in evidence)

Q. All right. Do you see this is an e-mail from Anna --
A. Yes.
Q. -- the defendant's assistant to you, and copying a number of people including the defendant? Do you see that?
A. Yes.
Q. All right. She writes, "Dear Dr. Gadio, attached please find the passports of the CEFC delegation." Do you see that?
A. Yes, I do.
Q. If we turn to the next page -- sorry -- the first page of the attachment. If we can just zoom in on the delegation list. Again, who is the first person listed on the CEFC delegation?
A. Yes, Dr. Ho.
Q. Let's bring up Government Exhibit 1126. What's the date of -- I should start by saying, do you recognize this text message?
A. Yes, I do.

Q. This is with the defendant with regard to that same trip?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 1126.
MR. KIM: No objection.
THE COURT: Received.
(Government's Exhibit 1126 received in evidence)
Q. What's the date of your text message here to the defendant?
A. March. March 31.
Q. And where were you at the time you sent this message?
A. We were in N'Djamena, capital of Chad.
Q. And if you could read the text message you sent?
A. Yes. "Please ask Dr. Ho and Mr. Zang to be ready for 9:45. I will be at Soluxe hotel at 9:35."
Q. So were you going to pick them up at their hotel?
A. Yes.
Q. And where were you going to go from there?
A. To go see the president.
MR. ZOLKIND: Take that down.
Q. OK. Let's talk about the third meeting in Chad.
A. Yes.
THE COURT: May I interrupt you. Will this be a time to take a short break?
MR. ZOLKIND: It would be an excellent time.
THE COURT: All right.

Ladies and gentlemen, would you please follow the normal rules of not discussing the case among yourselves. Take your books if you are using them into the jury room. I will see you in a couple of minutes. Thank you.

(Jury not present)

THE COURT: Anything else on the record, counsel?

MR. ZOLKIND: No, your Honor.

THE COURT: Thank you. I will see you in a couple minutes.

(Recess)

(Jury present)

THE COURT: Thank you for allowing us to take that break, ladies and gentlemen.

THE COURT: Thank you, ladies and gentlemen. We continue with the direct examination of Dr. Gadio.

Counsel.

MR. ZOLKIND: Thank you, your Honor.

CHEIKH TIDIANE GADIO, resumed.

DIRECT EXAMINATION BY (Continued)

BY MR. ZOLKIND:

Q. So, Dr. Gadio, with respect to the third meeting in Chad between the CEFC delegation and President Deby, first of all, who attended from your firm, Sarata?

A. I'm sorry. Who attended from?

Q. From your firm, Sarata.

A. Myself.
Q. OK. Who attended from the CEFC side?
A. Dr. Ho, Mr. Zang. I believe that Mr. Liu was there. I believe he was there.
Q. And what about from the Chadian side?
A. It was president, chief of staff, and I'm not quite sure, but I believe one of the -- no, it was the president and his chief of staff, yeah.
Q. OK. Now, you testified a bit today and for a while yesterday regarding the incident of the $2 million cash back in December of 2014. Do you recall that?
A. Yes.
Q. And you testified about the donation letter being sent in early January of this year 2015; is that right?
A. Yes.
Q. Was this meeting here in Chad the first time that the defendant and President Deby were face to face since that incident, as far as you are aware?
A. Yes.
Q. During that meeting, did the defendant make any reference to the $2 million?
A. No.
Q. Did he say anything at all about charitable or humanitarian giving in Chad?
A. No.

Q. Did anyone else from CEFC reference anything about those topics?
A. Not that I remember.
Q. During this meeting in Chad, what was the focus of the defendant's comments?
A. I think this time CEFC came with a proposal.
Q. And what was that proposal?
A. From the discussion on Block H, they had moved now to a discussion about the 10 percent owned by the government of Chad from the fine with CNPC.
Q. And if you could just break down, so remind us what was the fine on CNPC that you're referring to?
A. You remember the government of Chad had a serious problem with CNPC related to environmental damage done to the country, and the president fined CNPC $1.2 billion U.S. The final arrangement that was made was CNPC would pay $400 million, and then CNPC offered to give to the government of Chad, to give them back 10 percent of all their assets in Chad, including the infrastructure, and then 10 percent of any oil revenue.
Q. And again just to remind us, was CNPC the state-owned oil company in Chad?
A. Yes, China National Petroleum Company.
Q. You said in the course of resolving its dispute with the Chadian government, it paid $400 million plus gave the Chadian government 10 percent rights to various of its oil operations?

A. Exactly, and infrastructure, yeah.

Q. All right. And so as the defendant and his colleagues described it during this third meeting in Chad, what was CEFC interested in buying?

A. They were interested in buying back the 10 percent given to the government of Chad by CNPC.

Q. OK. So, the 10 percent the government of Chad had gotten from CNPC is what CEFC was now interested in acquiring?

A. Exactly.

Q. OK. So after that proposal was raised by the CEFC side, how did President Deby respond?

A. He said it was fine, we can start the relationship with this acquisition, and he was ready to put his technical team and financial experts to meet with the CEFC delegation and to agree, you know, on asset pricing, like to agree on how much CEFC would pay for the 10 percent.

Q. Let's bring up what has been marked for identification as Government Exhibit 1129. Do you recognize this text message chain?

A. Yes.

Q. And who is it with?

A. With Dr. Ho.

Q. All right. And does it regard that deal that you have just been testifying about?

A. Yes.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 1129.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 1129 received in evidence)

Q. Ms. Rao, if we could zoom in first on the top text message.

What's the date of this message?

A. The same day, March 31,.

Q. And when you say the same day, you mean the same day as what?

A. The meeting.

Q. The meeting with President Deby?

A. Yes.

Q. And who is this message from?

A. Dr. Ho.

Q. OK. And if you could read the defendant's message to you.

A. "My friend, message from China: If package is over $200 million, it will be difficult for us to accept."

Q. Let's go to your response. And do you respond the same day?

A. Yes.

Q. And if you could read your reply to the defendant.

A. "200 million euro or dollar plus a significant amount of renminbi" -- the Chinese currency -- "or the global offer should be only $200 million?" It's a question.

Q. So, Ms. Rao, we can put those two messages on top of each other.

So just if you could explain how you understood the defendant's message to you and what you were asking in response.

A. OK. We already had the meeting, and Dr. Ho was telling me that from China, from their headquarters, the decision was to limit the offer to $200 million for the 10 percent. And I was asking to get more clarification before I conveyed the message. Was it 200 million euro or $200 million -- which makes a difference -- and was it those 200 million plus a significant amount of Chinese currency, or do they mean that the global offer can only be $200 million?

Q. OK. If we can go to the next message in the chain. You see here the defendant replied back to you?

A. Yes.

Q. And he wrote, "Quick deal, $200 million U.S. upfront from 10 percent rights, plus some arms and renminbi discount loans."

A. Yes.

Q. First of all, be clear, the 10 percent rights that he was referring to there, is that the same rights that you testified about before that the Chadian government had acquired from CNPC?

A. Yes, that's the same 10 percent.

Q. And when the defendant said, "Quick deal: $200 million

U.S. upfront for those rights, plus some arms and renminbi by discounsel loans," what did you understand him to be referring to there?

A. So, $200 million U.S. was available right away. The arms is in reference to the confidential discussions that we talked earlier about, the president wanting to see one or two persons because of the war situation in the zone. And then renminbi discount loans means that Chad can contract loans in China, and the government can accept that the loan be financed with renminbi plus the discount that the government can give to Chad on those loans.

Q. All right. If we go to the next message, and if you can read your reply.

A. Yes.

Q. Can you read your reply aloud, please.

A. "I will await our friend's figures and will do the go between. Hoping for the best."

Q. What did you mean by saying that you'll await our friend's figures?

A. Because the president had tasked his technical and financial team to work on the offer -- the financial offer to CEFC on the 10 percent, how much it was valued by the Chadian government, and that team was working there.

Q. Ms. Rao, you can take this down.

So, during this trip to Chad in late March 2015, was

there a negotiation between the Chadian side and the CEFC side regarding the 10 percent rates?
A. Yes, they did have a direct negotiation.
Q. And just in terms of the sort of bottom line, how did those negotiations go?
A. It went very poorly and ended very bitterly because --
Q. You said it ended very --
A. -- bitterly.
Q. Bitterly?
A. Yeah, bitterly, yeah.
Q. And what was your understanding as to the sticking point, if any, as to why it ended so bitterly?
A. The gap was too wide between what the government of Chad thought was reasonable as compensation for the 10 percent and what CEFC thought it was worth.
Q. OK. Now, Dr. Gadio, up until and through this meeting in Chad, who at CEFC had been your primary point of contact on the Chad discussions?
A. Always with Dr. Ho.
Q. And at any point after this trip to Chad did you come to see any change with respect to who represented CEFC's interests in Chad?
A. In March, or sometime later in the process? Later in the process, yeah, in May, I received a message from Dr. Ho telling me that from now on to talk directly to Mr. Zang who is in

charge of the Chad operations from now on.
Q. And just in terms of your own observations over the months that followed from March through May and into the following year, did you in fact see any change in terms of who represented CEFC's interest in Chad?
A. Once again, I'm trying to understand the question.
Q. My apologies.
A. I'm sorry.
Q. Setting aside the e-mail that you got telling you that the defendant would be moving on to other projects, did the person or the individuals at CEFC that you personally dealt with on the Chad discussions, did that change from being Dr. Ho to being someone else?
A. Me, I continued to work with Dr. Ho until the month of May, but I felt that some other people were taking more responsibility, like Dr. Liu, for instance, being more and more an interlocutor.
Q. All right. And after the point in May, who from your perspective at CEFC became this sort of central focal point with respect to CEFC's interest in Chad?
A. The mail I received said Mr. Zang, but in reality I worked with Mr. Liu.
Q. All right. And let's bring up Government Exhibit 141. Do you recognize this e-mail?
A. Yes, I do.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 141.

MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 141 received in evidence)

Q. All right. What's the date on this e-mail, Dr. Gadio?

A. That's May 5, 2015.

Q. Who is it from?

A. It's from Anna, the assistant of Dr. Ho.

Q. And who is it to?

A. To me.

Q. Do you see here that the defendant's assistant wrote, "Dear Dr. Gadio, thank you for your e-mail. We have confirmed with" -- what does GM stand for?

A. I believe it's general manager.

Q. "We have confirmed with general manager Zang's secretary, Li Wei, that your message was well received. Dr. Ho has currently moved into other projects, and this project is in the hands of GM Zang, the decision and related issues of this project are made by GM Zang." Do you see that?

A. Yes.

Q. Is this e-mail you referred to just a moment ago?

A. Yes.

Q. So just to be clear, from this point forward, what was your understanding in terms of who was the main focal point for CEFC

with respect to Chad?
A. The e-mail indicates Mr. Zang, but, like I said, in reality we were working directly with Mr. Liu. So, I would say that Mr. Liu was the new focal point, perhaps supervised by Mr. Zang.
Q. OK. And when you're referring to Mr. Liu, is that the individual on the board above you on the top right?
A. Yes.
Q. Again, just to be clear, prior to receiving this e-mail, what was your understanding as to who at CEFC was the main focal point with respect to Chad?
A. Dr. Ho.
Q. Take that down.
Dr. Gadio, from this point forward, did you and your son and your firm Sarata, did you continue to work toward a the potential oil deal between Chad and CEFC?
A. Yes.
Q. And approximately how long did those discussions continue?
A. Up to 2016, I think, way into 2016.
Q. Did CEFC and the government of Chad ultimately reach any deal, as far as you know?
A. No.
Q. With respect to the 10 percent rights, as you understood it, what was the main sticking point that prevented a deal from being reached?

A. Like I said, there was a huge gap between the financial offer from CEFC, $200 million, and then the Chadian government was around like $1 billion, and then this agreement, and we were not able to reconcile the two figures.
Q. Now, Dr. Gadio, in connection with your connection on this deal, did you ever have any other reason at some point to get back in touch with the defendant again?
A. Yes. We did ask Dr. Ho's help when -- you remember the wire we received in our bank in Dubai was signed by Dr. Ho, so the bank was asking us once again to back up a letter of appointment, everything we gave them --
Q. Sorry. You said the bank was asking you to back up?
A. Yeah, because we already gave them the letter of appointment; they said it was not enough; they wanted a contract. So, we get in touch with Dr. Ho to ask him to help us get that contract to take to the bank.
Q. If we could bring up Government Exhibit 176 for identification. Do you recognize this e-mail?
A. Yes.
Q. OK. Is this between you and the defendant on the subject you were just testifying about?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 176.
MR. KIM: No objection.

THE COURT: Received.

(Government's Exhibit 176 received in evidence)

Q. So at the top here, who is this e-mail from?

A. It's from me.

Q. And who is it to?

A. To Dr. Ho.

Q. OK. And the subject line?

A. Draft contract and draft appointment letter to send to CEFC.

Q. What's the date on this e-mail?

A. October 26, 2015.

Q. So about five months or so after the period that you were just testifying about before?

A. Yes.

Q. All right. And you wrote here, "Dear Dr. Ho, it was great seeing you in Beijing."

Ms. Rao if you could highlight.

I need your assistance obtaining a consultancy contract with your Hong Kong office. Our company Sarata is registered under my son Boubker's name in Dubai. His bank is asking him to provide invoices sent to CEFC and a contract to justify the funds transferred.

Do you see that?

A. Yes, I do.

Q. At this point in response to this request, did you

ultimately get the formal contract you requested?
A. No we did not.
Q. And what, if anything, happened with respect to your bank's inquiry into the matter?
A. The bank closed the account.
Q. Let me turn finally, Dr. Gadio, just to one brief other subject.

Can we bring up what is I believe already in evidence as Government Exhibit 1504. Do you recognize this individual?
A. Yes, I do.
Q. Who is that.
A. His name is Sam. He is the foreign minister of Uganda.
Q. Do you recall his last name?
A. I never memorized really his last name.
Q. OK. But you knew him as Sam. And again what was his position?
A. We were both foreign ministers at the same time, so he's a foreign minister of Uganda.
Q. And if we could bring up for identification Government Exhibit 1510. Do you recognize this photo?
A. Yes.
Q. Who do you recognize that to be?
A. This is President Yoweri Museveni of Uganda.
Q. We offer Government Exhibit 1510.

MR. KIM: No objection to Exhibit 1510 A or B.

THE COURT: Thank you. Received.

(Government's Exhibits 1510, 1510A and 1510B received in evidence)

Q. How did you know President Yoweri Museveni of Uganda?

A. When I became foreign minister in 2000, until I left in 2009, we met regularly in Addis Ababa, and that's where the African headquarters is, so twice a year they have assembly of heads of state, and I would go and attend as foreign minister, and I would meet him. That's how I got to know him. And he is a major figure, political figure in Africa.

(Continued on next page)

MR. ZOLKIND: We could take down that photo.

BY MR. ZOLKIND:

Q. Dr. Gadio, do you recall testifying that at a meeting in Chad with President Deby, you said that the defendant referred to Chad as one of CEFC's potential gateways to Africa?

A. Yes.

Q. Did the defendant, in all of your discussions with him, ever talk to you about CEFC's interests in doing business in Uganda?

A. We never -- we never discussed that.

MR. ZOLKIND: I have no further questions, your Honor.

THE COURT: Thank you.

Would you like to begin some cross?

MR. KIM: Sure, your Honor.

THE COURT: Yes, sir.

CROSS-EXAMINATION

BY MR. KIM:

Q. Good afternoon, Dr. Gadio.

A. Good afternoon, sir.

Q. You are a politician in Senegal, correct?

A. Yes.

Q. You previously served as foreign minister of that country, right?

A. Yes.

Q. For about ten years?

A. Yes.
Q. And you currently are serving as a congressman in Senegal, right?
A. That's true.
Q. You are a member of Parliament, right?
A. Yes.
Q. Congressman is an elected position in Senegal?
A. Yes, it is.
Q. So you campaigned to be elected to that, right?
A. Exactly.
Q. And you grew accustomed to speaking in front of large groups, right?
A. I'm sorry?
Q. You grew accustomed to speaking in front of large groups, right?
A. Yes, I do.
Q. Now you have your sights set on an even higher position in Senegal, right?
A. That is true.
Q. You previously ran to be elected president of that country?
A. Yes, I did.
Q. And you absolutely want to be the president of Senegal, don't you?
A. I do agree with the concept, absolutely.
Q. Well, you absolutely want to campaign to be president of

Senegal, correct?
A. That I would say no.
Q. Do you recall testifying yesterday that you absolutely wanted to campaign to be president of Senegal?
A. No. When I say no, like when you say absolutely want to be president of Senegal, you know, those are decisions by the people of Senegal, but I -- I -- yes, personally, I want to lead my country one day.
Q. So you absolutely would like to be the president of Senegal, correct?
A. Thank you, yes, mm-hmm.
Q. Now --
THE COURT: Stay close to the microphone. It doesn't work if you back away.
MR. KIM: Yes, your Honor, I will try to do that.
Q. Now I want to direct your attention to your first meeting with Dr. Patrick Ho.
A. Yes.
Q. You met Patrick Ho through Vuk Jeremic, correct?
A. Yes, I did.
Q. And Jeremic was the former PGA of United Nations, right?
A. Former?
Q. PGA, President of the General Assembly, is that right?
A. Yes.
Q. And you met Dr. Ho in about September of 2014, is that

right?
A. That's true.
Q. You met with both Dr. Ho and Jeremic's assistant, GM Zang, correct?
A. Yes.
Q. And during that meeting Dr. Ho told you about the meeting with CEFC, right?
A. That's true.
Q. And in that meeting you discussed the company's strong links to the PRC's Defense Committee, right?
A. That's true.
Q. And also the defense -- I'm sorry. You also talked about the company's interest in partnering with President Deby, right?
A. Yes.
Q. And the company's interest in building a friendship with him, right?
A. Yes.
Q. During that meeting you also discussed a number of different interests across different industries, right?
A. Yes.
Q. Including oil, right?
A. Yes.
Q. Military equipment?
A. Mm-hmm, yes.

Q. Social infrastructure?
A. Yes.
Q. And banking, right?
A. Yes.
Q. Now CEFC, the company, which I'll refer to as CEFC Energy, later --
THE COURT: Slow it down.
MR. KIM: Slowing down, your Honor.
THE COURT: Okay.
Q. CEFC Energy later engaged your company, Sarata, as consultants, correct?
A. Yeah, we -- we started working together.
Q. Sarata started working with CEFC Energy, right?
A. Yes.
Q. And Sarata, the owner or the officials of Sarata include you and your son Boubker, correct?
A. Exactly.
Q. And your role was to perform consulting activities for business generation in Africa, right?
A. Yes.
Q. The focus of your activities for CEFC Energy was Chad, right?
A. The focus, yes.
Q. Now your role essentially was to be a middleman, is that right?

A. That's true.
Q. You had performed a similar role before, is that right?
A. Yes.
Q. And you did not view that role as unusual, correct?
A. No.
Q. Now we're going to spend some time talking about the course of the negotiations between CEFC Energy and Chad.
A. Mm-hmm.
Q. But before we do that, I want to be very clear. The negotiations between CEFC Energy and Chad that you were involved in, they never resulted in a deal, is that right?
A. At the end, yes. Yes.
Q. Now when you first met Dr. Ho, your understanding was that CEFC Energy was looking for someone to introduce them to President Deby, correct?
A. Yes.
Q. You agreed to be that person, right?
A. Exact.
Q. And you started to communicate with President Deby on behalf of CEFC Energy, right?
A. Yes.
Q. As far as you knew, CEFC Energy was relying on you to communicate with President Deby, correct?
A. Yes.
Q. You weren't aware of CEFC Energy having any other channel

to communicate with President Deby, right?
A. I was not aware, yes.
Q. Now I want to focus your attention on the time period before the meetings in Chad in December of 2014.
A. Mm-hmm.
Q. During that time period your testimony is that Dr. Ho never said anything to you about passing a bribe, correct?
A. No.
THE COURT: No, he did not?
THE WITNESS: No, he did not.
THE COURT: Thank you.
MR. KIM: Thank you, your Honor.
Q. Now let me direct your attention to the first meeting in Chad that you have testified about.
A. Yes.
Q. That meeting occurred approximately November 11th of 2014, correct?
A. Yes.
Q. Let me show you Government Exhibit 43 in evidence.
MR. KIM: Why don't we turn to the second page of that, Mr. Calabrese. And scroll down to the last photo, please.
Q. You were shown that photograph during your direct examination, right?
A. Yes.

Q. And that's a photograph that was taken during that first meeting, is that your testimony?
A. Yes.
MR. KIM: You can take that down now. Thank you.
Q. Now, Dr. Gadio, you initially proposed having that meeting in a confidential setting, right?
A. This meeting? The first meeting?
Q. Yes.
A. Yes.
Q. I'm sorry?
A. Yes.
Q. And during that meeting President Deby offered a block of oil wells to CEFC Energy, right?
A. Yeah, he presented a block of oil, yeah, that he was ready to offer CEFC if they wanted to get it.
Q. Okay. So to be clear --
A. Yeah.
Q. -- President Deby presented a block of oil wells --
A. Yes.
Q. -- to CEFC Energy to buy?
A. Yes, if they were interested to buy it.
Q. If they were interested in buying it, is that correct?
A. Yes, mm-hmm.
Q. And that block of oil wells is the block that we've been calling Block H?

A. Exactly.
Q. Now President Deby in that meeting offered CEFC Energy the opportunity to buy all of Block H, right?
A. Yes.
Q. And President Deby made that offer without any preconditions, right?
A. You know, the usual precondition to buy a block of oil is to know what you're buying, which means to do the technical study, to know the value of the asset. Those things are kind of understood when you make an offer like this.
Q. Okay. Well, isn't it true that you had CEFC Energy that President Deby had made them an offer without any preconditions?
A. I'm concerned by the concept "precondition," but what I'm saying is like he was not putting any particular condition to making the offer to CEFC, and like I said, that's just the first -- you know like when you sign an MOU, it's okay. You can -- the offer is made to you. But then like I said, you have requirements before you get to do it, you know, the buying, buying the asset.
Q. Okay. So there are requirements that would come between getting an offer and buying an asset; that's your testimony, right?
A. Yes, yes.
Q. My question was whether President Deby made that offer

without any conditions.

MR. ZOLKIND: Your Honor, I think it's been asked and answered.

THE COURT: Yes, we've been through it a few times.

Q. Now there was no discussion of a bribe during that meeting, right?

A. Not at all.

Q. And your testimony is that CEFC Energy ultimately did not pursue a deal to buy all of Block H, right?

A. Yes.

Q. Now, Dr. Gadio, do you consider yourself to be knowledgeable about oil deals?

A. I'm not an expert.

Q. How many oil deals have you brokered?

A. That was my first experience working on an oil deal.

Q. You're talking about the oil deal between CEFC Energy and Chad, that was your first experience?

A. Yes, yes.

Q. And that is your only experience, Dr. Gadio?

A. I can say yes, yes, that's my only experience.

Q. And to be clear, that deal never happened, right?

A. Yeah. Finally, it did not work out.

Q. So you've never actually brokered a successful oil deal, right?

A. No.

Q. Now at some point in the course of the negotiations the terms of the deal changed, right?
A. Yes.
Q. So it started out with President Deby offering all of Block H --
A. Yes.
Q. -- right?
A. Mm-hmm.
Q. And it eventually changed to an offer to purchase 10 percent of that block, right?
A. Yeah, but it was not his offer. It was CEFC's offer.
Q. Now to be clear, we're talking about 10 percent of that same block of oil wells, right, Block H?
A. Not really. We're talking about 10 percent of CNPC asset that's an old contract between CNPC and China -- and Chad. The Block H he was referring to was a new block, like I said, in the border of Sudan, Libya, and Chad, so it was not like buying back the block already operated by CNPC.
Q. Now you testified about -- I think just a little while ago, talked about the needing of the technical team that eventually happened during the course of the negotiations, is that right?
A. Yes.
Q. At some point in the discussions between CEFC Energy and Chad, CEFC Energy received technical and financial information about that 10 percent, right?

A. Yes, they did.
Q. Your understanding was that CEFC Energy needed that technical information in order to make their decision about the acquisition of the 10 percent, right?
A. That's true.
Q. But before CEFC Energy could receive that technical and financial information, they had to sign a nondisclosure agreement, right?
A. That's true.
Q. Or an NDA, as it's often called?
A. NDA, yes.
Q. Now CEFC did not sign an NDA until June of 2015, isn't that right?
A. I don't have the exact date, but maybe. Maybe around that time, yes.

MR. KIM: Why don't we show Dr. Gadio what's been marked for identification as Defense Exhibit 160; 160 for identification only.

And can we do that side by side with 160T for identification only.

A. Yes, I saw it.
Q. Does that refresh your memory it was in June of 2015?
A. Yes, yes.

MR. KIM: You can take that down now. Thank you.

Q. Now another step in the process of negotiating for these

oil wells was for CEFC to conduct due diligence and do a feasibility study, right?
A. Yes.
Q. And isn't it true that as of January 2016, CEFC Energy still had not done that, correct?
A. Yes.
Q. And in fact, your understanding in January of 2016 was that CEFC Energy needed another six months to conduct due diligence and feasibility study, right?
A. Yes.
Q. Now I want to talk about the time period immediately following the meetings in Chad in December of 2014.
A. Yes.
Q. After those meetings happened, CEFC Energy went months without pushing forward the negotiations with Chad about the oil wells, right?
A. Yes. Yes.
Q. In fact, it was about a three-month delay, correct?
A. That's true.
Q. Now in December of 2014, after those meetings in Chad occurred, you were concerned about CEFC Energy's lack of responsiveness, right?
A. Yes.
Q. You started expressing your concerns to Dr. Ho, right?
A. That there was mainly -- if my recollection is correct,

mainly about our agreement not being finalized. That's what I was insisting more. And also, of course, hearing from CEFC on the way to -- how to move forward.
Q. So part of the reason you were concerned was you were concerned about CEFC Energy's interest in moving forward with a deal, right?
A. There was not a deal yet. Then -- then there was no deal at all. If you mention between December and March, there was absolutely no deal.
Q. I understand. My question, Dr. Gadio --
A. Yes.
Q. -- was whether part of your concern about the company's lack of responsiveness was related to your concern about whether a deal was going to get done or not.
A. Yes.
Q. Now in January of 2015 you expressed some of your concerns to Dr. Ho, right?
A. Yes.
Q. And isn't it true that in that month you were worried that everything was falling apart, right?
A. I mentioned the fact that I was not getting feedback from them, yes.
Q. And you were worried enough that you were considering whether you should travel to Chad and apologize to President Deby and move on to other opportunities, correct?

A. Okay. I don't have the exact dates, but yes, I did say something like that.
Q. And that was in January of 2015, is that right?
A. You give me the date. I don't have the documents under my eyes, but --
MR. KIM: Let's put up for the witness for identification only what's been marked as Defense Exhibits 1096 and 1097, side by side, please.
Q. If you can give that a read, Dr. Gadio.
A. I'm sorry?
Q. You can read those to yourself.
A. Okay. Okay.
Yes, that's from January, January 26, 2015.
Q. And on that day you said that you were considering traveling to Chad, apologizing to President Deby, and moving on to other opportunities, correct?
A. Yes, but in the previous email, I told Dr. Ho that he was no longer communicating with me and if -- and I cannot be communicating with his secretary. If he's no longer interested, I need to know and then -- and then I would go to Chad and apologize to the president.
MR. KIM: Your Honor, at this time can I just read a stipulation, please.
THE COURT: Yes, sir.
What brand of stipulation is it?

MR. KIM: Once I find it, your Honor, I will let the Court know.

It's a fact stipulation, your Honor.

THE COURT: All right. This is evidence for your consideration, ladies and gentlemen, and as you know, you must accept the facts stated as true.

Go ahead, sir.

MR. KIM: Thank you, your Honor. It's marked as DS01, and we'll offer it at this time.

MR. ZOLKIND: No objection.

THE COURT: Received.

(Defendant's Exhibit DS01 received in evidence)

MR. KIM: And can we please put that up, Mr. Calabrese.

Your Honor, the parties have stipulated that agents with the FBI arrested Cheikh Gadio on or about November 17, 2017. In connection with that arrest, agents seized from Gadio, among other things, the following electronic devices, which I won't read. They're listed on the document.

And if we could turn to page 2, please.

The Gadio phones were extracted onto reports by an FBI specialist, and the following defense exhibits contain true and correct copies of excerpts from the extraction reports of the Gadio phones. And listed on this is Defense Exhibits 1096 and 1097.

We can take that down.

BY MR. KIM:

Q. And Dr. Gadio, the text messages we were just talking about, were those Defense Exhibits 1096 and 1097?

A. Yes.

MR. KIM: Your Honor, we offer them.

MR. ZOLKIND: No objection.

THE COURT: Received.

(Defendant's Exhibits 1096 and 1097 received in evidence)

BY MR. KIM:

Q. Now as of March of 2015, you were still concerned about whether CEFC Energy was actually interested in pursuing a deal, right?

A. Yes.

Q. And your understanding at that time was that the Chadians could not believe that CEFC Energy would disappear for three months and not get back to them about important issues, correct?

A. Yes.

Q. And even as of July of 2015, you were concerned that the negotiations were not really moving, correct?

A. Yes.

Q. And you were concerned at that point about losing credibility, right?

A. Yes.
Q. Now after the meetings in Chad in December of 2014, Dr. Liu and Mr. Zang took over negotiations on behalf of CEFC Energy, right?
A. That I cannot confirm.
Q. Now you testified that Zang was a key element in the CEFC power structure, right?
A. Yes.
Q. You testified that he was the No. 2 guy in the organization, right?
MR. ZOLKIND: Objection, your Honor. Mischaracterizes.
THE COURT: Sustained.
You don't have to answer, sir. Go ahead.
THE WITNESS: Okay.
Q. Did you not testify that Mr. Zang was the No. 2 guy in the organization?
A. I did not -- I did not say -- I said Dr. Ho told me that Mr. Zang was a powerful man, the No. 2 -- he can be considered the No. 2 guy of the organization.
Q. And your understanding was that Zang was in charge of Beijing?
A. The Beijing office.
Q. Now you also testified that Dr. Liu was very powerful in the system, right?

A. I understood he was the chief engineer, from what I was told by the CEFC, by Dr. Ho, of course.
Q. Now at some point in the negotiation your understanding was that Dr. Ho was sidelined when it came to negotiating the purchase, correct?
A. That was not my understanding. That was what he told me when I kept sending him messages. Around the month of May, he told me that I need now to work with Mr. Zang directly.
Q. Then there did come a time in the negotiations when you started dealing with Zang and Dr. Liu directly, correct?
A. Yes.
Q. Now your understanding was that Zang and Liu were not very interested in actually getting a deal done, right?
A. Later in the process, yes, later.
Q. But you wanted to get the deal done, right?
A. Always wanted a deal for Chad, yes, and for myself.
Q. Now in April of 2015 you reached out to Dr. Ho to ask him if CEFC Energy was even interested in doing a deal, right?
A. Yes.
Q. Because President Deby was asking you to push for a deal with CEFC Energy, right?
A. Yes.
Q. In fact, President Deby was calling you every day?
A. Never. Head of state cannot call somebody -- someone every day.

Q. Your testimony is that President Deby was not calling you every day.
A. No, he was not calling me every day.
Q. Isn't it true that on April 9, 2015, you sent a text to Dr. Ho telling him that President Deby was calling you every day?
A. It's a way of speaking. Actually, President Deby does not call me directly. He sends me messages through his chief of staff, and it takes something very exceptional for him and me to get on the phone. So his chief of staff, yes, was telling me, the president wants to know, wants to hear about CEFC, where do we go from there, that's true.
Q. So your testimony is President Deby's chief of staff was calling you every day?
A. He was not -- when I say every day, it's, you know -- in French, it means like they're insisting, they're calling me, like several times. It can be twice a day; it can be two or three times a week. So that's what I was telling Dr. Ho, that I was under pressure, I was getting calls all the time, yeah.
Q. But you didn't send that text to Dr. Ho in French, right?
A. I'm sorry?
Q. You did not send that message to Dr. Ho in French.
A. Of course.
Q. Now I want to show you what's in evidence as Government Exhibit 141.

MR. KIM: And if we could turn to page 2, please. April 11th of 2015, the bottom email, please.

If you could blow that up. Thank you.

Q. Now as you wrote in this email that in the first line there, that "president of Chad has informed me that he is ready to finalize negotiations towards a fair and good deal with CEFC. He called me yesterday and today directly on my cellphone."

Now just to be clear, Dr. Gadio, did President Deby call you directly or was it his chief of staff that called you?

A. You know, it's like, you can check perhaps with diplomats. Head of states usually don't pick up their cellphone to call somebody. They ask their chief of staff to convey a message, and you consider it's a call from the president.

Q. Okay. So that's what you meant that --

A. Exactly.

Q. -- that he called you yesterday.

A. Mm-hmm.

Q. Now you sent this email to a number of individuals at CEFC Energy, correct?

A. Yes.

Q. But you did not hear back from anyone in response to your email until 12 days later, correct, if we move up?

A. Until?

Q. Until 12 days later?

A. Okay.
Q. You see at the top left the date that it was sent?
A. Yes, April 23.
Q. And in response to your email you received that message saying, Please see the following message from GM Zang.
A. Yes.
Q. And starting at the first full paragraph, it read, "However, my plate is full with meetings after meetings. Please forgive me for not being able to meet His Excellency the President. You, my dear friend, have my full trust, and I would propose that you meet His Excellency the President of Chad first and let him know that CEFC is very serious about this possible deal."
And further down it reads, "The price offered last time by the energy and mining minister of Chad is insincere and too far away from the international market value." Right?
A. Yeah, I can read that, mm-hmm.
MR. KIM: Your Honor, I think we have hit a natural point to break, if your Honor does.
THE COURT: All right. Would you like to take the lunch break now, friends?
And would you follow the normal instructions -- that is, of course, don't discuss the case among yourselves or with anyone else, don't do any research about the case, leave your books in the jury room, and most of all, have a pleasant lunch,

and please return in time to start at 2:15. Thank you, friends.

(Jury not present)

THE COURT: And audience, I'll let you go down the elevators first so you can be down and out of the jurors' way. Thank you.

Anything else on the record, friends?

MR. ZOLKIND: Not from the government, your Honor.

MR. KIM: Not from the defense.

THE COURT: Thank you. Off the record.

(Discussion off the record)

(Luncheon recess)

AFTERNOON SESSION

2:21 p.m.

(In open court; jury not present)

THE COURT: Good afternoon, ladies and gentlemen. Won't be you seated.

May we bring the jurors in, friends.

(Jury present)

THE COURT: Won't be you seated, ladies and gentlemen.

We continue with the cross-examination of Dr. Gadio.

Mr. Kim.

MR. KIM: Thank you, your Honor.

BY MR. KIM:

Q. Dr. Gadio, we were talking before the lunch break about the time period after the Chad meetings in December of 2014. I want to ask you some more questions about that.

A. Yes.

Q. Now it's true that in May of 2015 you were troubled by CEFC Energy's attitude towards Chad, right?

A. Yes.

Q. You found it difficult to work with partners who didn't even take the time to reply to your emails, right?

A. Yes.

Q. And you were even more troubled that urgent messages from President Deby himself were being ignored by CEFC Energy, right?

A. Were not answered, yes.
Q. And you were doubtful that Chad was still a business target for CEFC Energy, right?
A. Yes.
Q. And you raised these concerns with Zang, correct?
A. Chairman Zang?
Q. GM Zang?
A. GM Zang. I don't remember exactly the emails, but I know I raised the concern, yes.
Q. Now as of June of 2015, your understanding was that President Deby still wanted to get a deal done, right?
A. Yes.
Q. But your understanding at the time was that Dr. Liu thought that the price was too high, right?
A. Yes.
Q. Now eventually you came to believe that CEFC Energy was not truly interested in a partnership with Chad, right?
A. Yes.
Q. Now you testified earlier about the specific purchase prices that were being offered, right?
A. Yes.
Q. On the one hand you had CEFC Energy proposing $200 million, right?
A. Yes.
Q. And on the other hand you had the government of Chad

proposing a price of -- what was it?
A. $1 billion.
Q. $1 billion.
A. Yes.
MR. ZOLKIND: Your Honor, my only objection is, I'm not sure it's clear which deal is being discussed.
Q. I'm talking about the time period after December of 2014.
A. My understanding is you're talking about a 10 percent purchase.
Q. 10 percent.
A. Not Block H, yes.
Q. That's correct.
A. Mm-hmm.
Q. So your answer is $200 million and a billion dollars applied to that 10 percent, right?
A. Yes.
Q. Now CEFC Energy executives were not pushing you for special treatment during their negotiations with Chad, right?
A. I need to understand your question exact. What do you mean?
Q. Well, isn't it true that executives from CEFC at one point suggested using a neutral party with international expertise to determine the fair value of that 10 percent of oil wells?
A. There was a discussion about opening a -- an international bid.

Q. Isn't it also the case that at one point CEFC Energy executives suggested using a neutral third party to determine what would be a fair price for that 10 percent block?

A. I don't remember the technical -- the details about that. What I remember is opening -- opening, you know, the 10 percent to an international bidding process, yeah.

MR. KIM: Can we put up on the screen for the witness Defense Exhibit 153 for identification; and alongside it, Mr. Calabrese, for identification only, 153T.

And if we can turn to the second page of both emails, please.

Q. And you can read, Dr. Gadio, the top of that document where the number 6 is to yourself.

A. Like starting at Point 6 or before?

Q. Yes, the number 6.

A. No. 6, yeah. "If the parties fail to agree --"

Q. You can read it to yourself, Dr. Gadio.

A. Oh, sorry.

Is it okay if I read more, because --

Q. Sure.

MR. KIM: If you can expand, Mr. Calabrese.

A. I still have just Point 6.

Q. Okay.

MR. KIM: Yeah, you can scroll up. Thank you, Mr. Calabrese.

A. Okay. Can we go back to Point 6 now.

Okay. And what was your question?

Q. Now does that refresh your memory that at one point CEFC executives requested, or suggested using a neutral third party with international expertise to determine the fair value of the 10 percent?

THE COURT: And Dr. Gadio, when counsel asks, does it refresh your recollection, counsel means, after reading whatever you read, do you then say, ah, yes, now I remember. Counsel is not asking you just to repeat what's on the screen.

THE WITNESS: Okay.

THE COURT: Do you want to do the question again, Mr. Kim, or do you want me to read it?

MR. KIM: I'll do it again, your Honor.

THE COURT: Go ahead.

BY MR. KIM:

Q. So Dr. Gadio, I was asking whether looking at this email refreshes your memory --

A. Yes, it does.

MR. KIM: You can take that down now, Mr. Calabrese. Thank you.

Q. Now I think when I was asking you this earlier, you had also said that somebody from CEFC Energy suggested opening it to -- opening up the bidding process, correct?

A. It was a suggestion. And even this one, the one that just

passed, it was a question they asked me to convey to the oil minister.

Q. Someone from CEFC Energy asked you to convey that request?

A. Yeah, that was the summary of the meeting we had, and they had a few questions they asked me to convey to the oil minister of Chad.

Q. And one of those requests was whether Chad could pursue an open bidding process, right?

A. Yes.

Q. Now an open bidding process would mean opening up the bidding for that 10 percent to other companies, right?

A. Yes.

Q. Now eventually CEFC Energy moved on to other opportunities, right?

MR. ZOLKIND: Objection. Personal knowledge. Personal knowledge.

THE COURT: Sir, are you able to answer that question through personal knowledge?

THE WITNESS: No.

Q. Your understanding was that CEFC Energy was not interested in aggressively pursuing the deal with Chad, right?

A. What I know is, we had a meeting, I reported back to the oil minister of Chad, and that was it. That I can say as a fact. But what was their personal feeling about Chad, I did not know.

Q. I'm sorry. You reported what to the oil minister of Chad?
A. The summary of the meeting we had in Beijing, the questions raised by CEFC, and in my understanding they were still interested in the oil of -- in the 10 percent, but they had specific questions they wanted the oil minister of Chad to -- to reply to.
Q. Now I'm going to focus your attention on a specific time frame.
A. Yes.
Q. December of 2016.
A. Mm-hmm.
Q. At that point your understanding was that Chad, the investment in Chad was no longer on CEFC Energy's investment list, right?
A. Could you please repeat the question.
Q. In December of 2016 your understanding was that the investment in Chad, the 10 percent, was no longer on CEFC Energy's investment list, right?
A. Yes.
Q. Now in about January of 2017, you informed CEFC Energy that the 10 percent acquisition was no longer available, right?
A. Yes.
Q. And you offered two other oil blocks in Chad to CEFC Energy, right?
A. I offered? I mentioned.

Q. And CEFC Energy declined that offer, correct?
A. Yes, if I remember well.
Q. Now throughout the course of the negotiations that we've been talking about, no one from CEFC Energy ever brought up with you the $2 million donation, right?
A. No.
THE COURT: Yes, that's right, or no, they didn't bring it up?
THE WITNESS: No, they did not bring it up.
THE COURT: Thank you.
Q. Now I'm going to direct your attention to Government Exhibit 49 in evidence.
MR. KIM: If we could put that up on the screen for the jurors, Mr. Calabrese.
Q. Now do you recall being asked a number of questions about this email yesterday, Dr. Gadio?
A. Yes, I do.
Q. And this was --
MR. KIM: If we can scroll down to the second page of this email. Actually, it starts with the third page.
Q. This was a November 18, 2014 email from Dr. Ho to you, right?
A. Yes.
Q. And in that email Dr. Ho was asking you to set up a second meeting with President Deby in late November, right?

A. Yes.

Q. Your testimony yesterday was that you thought that this meeting was too soon, correct?

A. Yes.

Q. And that's because you thought that instead of making another visit to the president, you thought that CEFC Energy first needed to send a technical team to Chad, right?

A. That we needed, yeah, to make some concrete steps.

MR. KIM: And Mr. Calabrese, if you could turn to the first page of that email, please, the bottom.

Q. The concrete steps you're referring to are included here, correct?

A. Yes.

Q. And one of those steps was preparing a mission of a technical team, right?

A. Yes.

Q. So your testimony is that in your view, CEFC Energy first had to take that step before you thought it appropriate to have another meeting?

A. Yes, I was suggesting that.

Q. Now did you also believe that CEFC Energy should make a financial offer before the next visit?

A. Not at this stage. I just made an articulation of three steps that need to be taken, and I do not put timeline on those steps.

Q. Well, I just want to clarify what you're saying, Dr. Gadio. Did you believe that the second visit, the second meeting with President Deby should happen before or after any of these steps were taken?
A. I believe that what was really urgent was step 1, having a prepared mission of a technical team to go on the field and do the assessment, try to know what the asset was worth first, yeah.
Q. And so I believe you testified about that a little earlier when I was asking you questions before lunch, right?
A. Yes.
Q. That would mean obtaining technical and financial information, right?
A. Yes.
Q. That would mean signing an NDA, correct?
A. NDA?
Q. A nondisclosure agreement, yes?
A. Yes.
Q. And that would mean doing a due diligence and a feasibility study, right?
A. Yes. But that -- at the condition that like talking -- you're referring more to the 10 percent to this discussion about Block H, because 10 percent, we knew they already had a data center, all the information were available, so which makes it like a different process from Block H.

Q. So in November of 2014 were you referring to Block H or the 10 percent?
A. CEFC never brought the issue of the 10 percent before March 2015, so everything that we are talking about now is about Block H.
Q. So if I understand correctly, you're saying that technical and financial information and a feasibility study could potentially take longer for Block H?
A. I had no idea. Like you asked earlier if I was an expert in, you know, the oil field, the oil area. I had no ex -- what I was suggesting was, this is like normal steps, you know, technical study, make a financial offer, and technical study means you find some of the data available or not available, so if they are -- there are no data at all, it takes more time.
Q. So at the time you were writing this email, Dr. Gadio, this was literally the first time you were advising another party on how to take steps like this, is that right?
A. I somewhat took advice from people who know better about this, how to deal with oil asset and oil value.
Q. I see. And who did you seek advice from?
A. That's Senegalese expert who runs big companies in Europe and who was a good friend of mine.
Q. What's that individual's name?
A. Mr. Ousmane Sy.
Q. Can you spell that, Dr. Gadio.

A. Okay. O-U-S-M-A-N-E, and Sy is S-Y.
Q. So you spoke with Ousmane Sy in order to draft this email?
A. It was very informal. I think he was even visiting me, so I told him we are working on this kind of project, and I understand from him that it takes a technical -- mission of technical team and then assess the -- try to assess the -- the asset to know how much was the value of the asset, etc. That's like information he provided, you know, very informal conversation.
Q. And how long did this conversation last, Dr. Gadio?
A. Cannot remember conversation four years ago. It was just a visit and a friend of mine, and I knew he's an engineer, specialist of oil, so I was just asking questions about this.
Q. And was he the only source of information for the advice you included in this email?
A. Yes.
Q. Now when you drafted this email, you understood that that first step, prepare a mission of a technical team, could take months, right?
A. Sir, I already answered that question that I had no idea how long it would take. I said prepare a technical mission and go collect the data, and I indicated if -- if the data were available, it would not take long. If they are not available, they have to collect them themselves.
Q. So your testimony is you literally had no idea how much

time that first step could take, is that right?
A. Yes.
Q. Now your testimony earlier was that you felt that CEFC Energy should not visit President Deby in December because they first needed to take this Step No. 1, prepare a mission of a technical team, right?
A. Yeah, they needed to send a mission of a technical team, yes.
Q. Now at the time you wrote this, when you were disagreeing with CEFC Energy, what would have been an appropriate time to visit President Deby, in your view?
A. If at least a technical team were -- was on the ground, if a technical team was on the ground sent by CEFC, then if they want to meet the president for let's say other project, other things that may be of interest, it would have made more sense. My concern was just to have meeting after meeting, discussion, and not really getting concrete about Chad's interest in selling Block H or even other important projects.
Q. So is it your testimony that it wasn't so much the length of time but the fact -- it wasn't so much the length of time that was the issue, it was whether or not they would have a technical team on the ground; is that your testimony?
A. That back-to-back meetings without really making any concrete move would not be a good thing.
Q. Now you testified that the dates that Dr. Ho was proposing

seemed like they were too soon to you, right?
A. Yes.
Q. Now isn't it true that you yourself, as you looked at this email, thought that even a date as late as December 18th was too far away, is that right?
A. I don't know exactly what you are referring to.
Q. Well, I'll show you on the document.
A. Please.
Q. Actually, let me put up Government Exhibit 56, which is in evidence.
Just so we have the full context, that email up at the top is an email from Dr. Ho to you, correct?
A. Yes.
Q. Now in this email Dr. Ho was saying that the CEFC Energy team could not go on December 3rd to 5th, the soonest they would be able to make preparations would be to meet the president on December 7th, right?
A. Yes.
Q. And that timing is the timing that you thought was premature, right?
A. Can I see the mail he was replying to?
Q. Sure.
MR. KIM: Why don't we blow the email out.
A. This is the one that is underneath?
Q. We can scroll down. You can keep reading. Read as much as

you need.
A. Okay. Thank you.
Okay.
Q. Now I'm going to focus your attention on that second paragraph on the page, midway through the sentence that starts, "Therefore, let me suggest a trip."
"Therefore, let me suggest a trip to Chad between December 3rd and 5th, which will allow me to return on the 6th, eight days before the forum. If this is not doable, we may then consider doing it right after the forum on Thursday, December 18, which, as your main advisor in this process, I see as being far or even too far. We want to protect the president's decision to allocate Block H to us, and time may be of essence, because he reminded us that several companies are knocking at his door."
A. Yes, I read it.
Q. So when you testified yesterday that you thought Dr. Ho was proposing a visit too soon, your testimony is you thought -- now that meeting eventually occurred on December 8, 2014, right?
A. Actually, if you read back also my emails and a series of exchange with Dr. Ho, I was really insisting that a visit just to come and speak to the president again was not necessary. It was high time to make some concrete move and concrete steps. So that's what I was discussing with him. And if that is not

presented, then this doesn't, you know, fit the whole context. I was insisting that the only way it would be interesting for the president to see the delegation again is to listen to concrete propositions, and it's in the previous emails.
Q. Now on December 8, 2014, the CEFC Energy team actually came with the technical team, right?
A. Yes. Yes, they did.
Q. So in your view that meeting actually was coming at an appropriate time?
A. Yes, in terms of the email sent by Dr. Ho where he proposed three steps, like three reasons why they wanted to meet the president, and one of them was that they would bring a technical team. They were somewhat agreeing with me, so I was comfortable moving forward for the -- this meeting.
MR. KIM: We can take that down now, Mr. Calabrese.
Q. Now I'm going to turn your attention to December 8, 2014.
A. Yes.
Q. Which is the first day of meetings you had in Chad in December, right?
A. Yes.
Q. And the meetings that you had were with representatives from CEFC Energy, Dr. Ho, President Deby, right?
A. Yes.
Q. And your understanding was that Zang was organizing the trip?

A. Sorry. Who?
Q. Your understanding was that Zang, Z-A-N-G, was organizing the trip?
A. Like I said, my understanding, as long as Dr. Ho was involved, we were working together very closely as the main facilitators. I received a mail from him saying that Mr. Zang will be organizing this trip. I had no idea what it meant exactly, and I did not ask.
Q. Now it's true that your understanding was that Dr. Ho was going to be traveling to Chad on a commercial flight from Paris, right?
A. I think that was the initial message I received from him.
Q. And that Zang and others would be traveling separately from Beijing, correct?
A. That was the initial message, yeah.
Q. You testified that the meeting with President Deby on December 8 took place around 5 p.m., is that right?
A. That's what I believe, yeah, in the afternoon.

(Continued on next page)

BY MR. KIM:
Q. And you testified that you and your son Boubker attended from Sarata.
A. Yes.
Q. And Dr. Ho, Mr. Zang, Dr. Liu, a French translator and maybe one or two other people from CEFC were there, right.
A. Yes.
Q. And President Deby and his chief of staff were there?
A. Yes.
Q. What is the chief of staff's name?
A. Mr. Choinai -- C-h-o-i-n-a-i, I think.
Q. Do I have the last name right, Elimi? E-l-i-m-i?
A. A-l-i-m-i, yes.
Q. Now, after that meeting concluded, President Deby left, and then CEFC executives, and you left as well, right?
A. Yes, at the end of the meeting? Yeah, when all was said and done, we all left, yeah.
Q. I want to talk a little bit about what happened during that meeting.
A. Yes.
Q. You testified that the meeting lasted and hour and a half or two hours, right?
A. Yeah.
Q. And were any agreements reached about Block H during that meeting?

A. There was a lot of discussion about Block H, and I think -- not a formal agreement, no.

Q. What about any informal agreements?

A. The president from the first meeting has already told CEFC that he was interested in making Block H available to them, so in that second meeting my understanding was we went back and CEFC was more concrete in terms of saying that they brought a technical team they will leave behind, and they are interested in getting more information about Block H, and showing more interest to the president.

Q. Was there any discussions of specific prices during that meeting?

A. Not at all.

Q. Were there any discussion about next steps during that meeting?

A. Yes, the next step was the one set by CEFC -- presented by CEFC -- that they would leave their technical team behind to start the assessment, the technical study.

Q. Were there any other next steps discussed during that meeting, Dr. Gadio?

A. What I remember is precisely the technical team preparing for, you know, to go visit the field and prepare, yeah, like the technical evaluation of the asset, yeah.

Q. So there is no ambiguity, your testimony is the only next step discussed during that meeting was for a technical team to

stay behind?

MR. ZOLKIND: Objection. Asked and answered.

THE COURT: About five times. I think we've got it. Go ahead.

A. I think I testified also that --

MR. ZOLKIND: Your Honor, I'm not sure there is a question pending.

THE COURT: It is my failing in not saying that you didn't have to answer. I apologize.

Mr. Kim.

MR. KIM: Your Honor, can I just clarify, is there any other next steps discussed? Your Honor, if there are no other steps, then he will say there were none.

THE COURT: Any other steps discussed, sir, at that meeting?

THE WITNESS: I believe that other projects were discussed. Like CEFC was not just discussing Block H. Block H was the main focus of the meeting, but the president, like I said, presented several important projects to him like the international airport, roads, you know, I believe even a pipeline -- extension of the pipeline. Those projects were also raised in that meeting.

But if your question is about concrete steps taken that day, I do not want to like say it's only Block H. CEFC showed interest in the international airport and other

infrastructure that the president was talking about. It was, like I say, almost a two hour discussion.
Q. You testified that as the delegation from CEFC Energy was leaving, a woman from CEFC Energy came running to remind certain members about gifts they had, right?
A. Yes.
Q. And you described those gifts, right?
A. Yeah.
Q. How many packages did you see?
A. I said I did not count them, but I think it would be like six, seven, eight. You know, when you don't count, you don't have the exact figure, but it was a group of important like -- several packages.
Q. At the point when those gifts were given, how many people were at this meeting?
A. Everybody was there. People were about to leave but everybody was there, everybody was present.
Q. Everybody was present.
A. Yeah, like everybody who had attended the meeting, they were still there in the compound. Some of them already left the president's office, and they were called back because of the gifts being brought in.
Q. People were called back into the meeting because --
A. People who were leaving, yeah, they were told to come back.
Q. You said after that meeting concluded you left the

presidential compound, right?
A. Yes.
Q. And did you leave the compound without speaking to President Deby?
A. Yes. We did not speak, no. We were supposed to work to another commitment.
Q. And then you stayed at -- you went to your hotel, right?
A. Yes.
Q. And you were staying at a different hotel than the hotel where members of the CEFC were staying, right?
A. Yes.
Q. They were staying at the Soluxe Hotel?
A. Yes.
Q. And you were staying at the Kempinsky Hotel.
A. Exactly.
Q. K-e-m-p-i-n-s-k-y.
A. Yes.
Q. And with traffic it took you about an hour to get back to your hotel, right?
A. Overall, yeah. It was an approximation, yeah.
Q. Your testimony was that shortly after you got back to your hotel, you got a call from reception, right?
A. Yes.
Q. They said that a driver from the president's office wanted to speak with you, right?

A. Exactly.
Q. And you were told President Deby wanted you to come back immediately, right?
A. Yes.
Q. And when you got to the presidential compound, you met with Deby and his chief of staff, right?
A. Yes.
Q. That was Elimi?
A. Yes.
Q. Now, approximately what time did that meeting happen?
A. Like I said, it was in the evening, perhaps maybe 8 o'clock or a little bit before eight.
Q. Around 8 o'clock you said or a little before eight?
A. Or right after eight. It was around that time. I did not really at the time look at my watch to know exactly when I get back to see the president.
Q. Now, you testified that President Deby told you that he wanted to put CEFC delegation on a plane and kick them out of the country, right?
A. Exactly.
Q. And your testimony is he said he was even thinking of getting the special forces to go get the members of the delegation to kick them out, right?
A. He told me that was the first thing that came to his mind once he discovered the problem.

Q. But your testimony is that President Deby's chief of staff told him that it would be fair to call you first, right?
A. Exactly.
Q. Now, your testimony is that President Deby expressed shock about this payment, right?
A. Pain and shock, yeah.
Q. You were asked some questions yesterday about his demeanor during this meeting, right?
A. Yeah.
Q. You testified that you had never before seen President Deby in this state, right?
A. In our relationship, yeah.
Q. And you said he was furious, right?
A. Yes.
Q. He was furious for the whole meeting?
A. I'm sorry?
Q. He was furious for the entire meeting?
A. What I said is even despite the fact that he was very angry, very furious, when I walked in he smiled at me because that's our relationship, so he couldn't be like agitated or furious the whole meeting. He was very angry and it showed.
Q. And my question is: Was he angry for the entire meeting?
A. Once he told me -- yeah, he was uncomfortable, upset. But can I judge if he was like the same level of anger when he started talking until the end? I don't know if I can assess

that. What I know is he was angry and furious when I walked in.
Q. Now, President Deby asked you if you had known about the money, right?
A. He asked me if I knew that our friends, in the package given to him in the boxes that there was $2 million cash, and told him absolutely not.
Q. Now, at the time of that conversation you cared very much about your standing with President Deby, correct?
A. Always care about my standing with President Deby.
Q. You still care about it, right?
A. 200 percent.
Q. Now, this incident was potentially damaging to your relationship with him, right?
A. If he thought I was involved in that incident, it would have been catastrophic.
Q. Catastrophic.
A. In our relationship, most definitely.
Q. So you had your own emotional reaction, right?
A. I was surprised, I was shocked. I was, like I said, concerned how the president would feel, because I'm the one who brought the visitors who presented the gifts.
Q. Mr. Gadio, were you afraid at any point in that conversation?
A. We don't have that type of relationship, me and the

president. I knew him more as an African hero, and he respected me dearly, so we don't get into a relationship of fear.
Q. And, Dr. Gadio, at any point did you feel a sense of anger towards CEFC executives?
A. Of course I was very disappointed. I was surprised, I was very disappointed.
Q. Were you angry?
A. If disappointment can mean anger, yes.
Q. Well, did it mean anger in your case?
A. You know, the way I saw the president and how furious he was, and how disrespected he felt, as an African I was 200 percent in solidarity with him about how people treat African people in general in this world, so I shared his anger, his frustration, his disappointment.
Q. Is it fair to say that you felt betrayed by CEFC Energy at that point?
A. Maybe the word betrayed did not come to my mind immediately. What came to my mind was why, why this, why get us into this situation and embarrass everybody and get the president so angry and so furious. And, like I say, why so people -- like the president say, why do they think all African people are like this, corrupt and everything.
Q. Now, how long did this meeting last, Dr. Gadio?
A. Maybe, what, half an hour, 45 minutes, not too long.

Q. And aside from this cash that was passed, is it your testimony you discussed anything else at this meeting with President Deby and his chief of staff?
A. I think that's mainly -- that was the reason why he called me back; that's what he wanted to discuss.
Q. And you testified that President Deby wanted protocol and security to see if they could go get the CEFC delegation to come back to the presidential compound that night, right?
A. He asked his chief of staff to double check with protocol and security, if it was possible to organize a meeting immediately, yes, he did ask that.
Q. But that did not happen that night?
A. That did not happen that night.
Q. Now, so that night President Deby decided to have a meeting the next morning; is that right?
A. Next -- yeah, like he said tomorrow around 12 noon I will try to organize something, yeah -- end of the day -- end of the morning. Sorry.
Q. End of the morning.
A. Yeah.
Q. Now, during that meeting with President Deby and the chief of staff, did you talk about any other steps that would be taken?
A. Steps about what exactly?
Q. Other than meeting the next day at 12 o'clock, did you

discuss with him anything else?

A. I'm trying to understand the question, honestly.

After we discussed the incident and that the president decided that we will meet again the next day, so are you asking if we discussed something else?

Q. Any other topic, but I'm also asking whether you discussed taking any other steps with respect to what had just happened.

A. No, that was the decision, that we will have a meeting. Like I said in my testimony, his chief of staff suggested that after asking me, it would be fair to have the CEFC delegation ask them the question of what happened and why this happened.

Q. So, at that point it was still undecided what President Deby was going to do with the delegation?

A. Yes. Yeah, he wanted to meet them and to listen to them.

Q. Now, did you speak again with President Deby that evening after that meeting?

A. No.

Q. Now, it's your testimony that the CEFC delegation was called back to the presidential compound the next day, right?

A. Yes.

Q. And you testified yesterday that you did not speak with Dr. Ho after your meeting with President Deby on the evening of December 8, correct?

A. We did not discuss the issue -- the incident that happened. That's what I said. We did not discuss the incident -- I did

not discuss the incident with Dr. Ho, that's what I said.
Q. I'm talking about the evening of December 8, Dr. Gadio.
A. Yes.
Q. Did you have any discussions with Dr. Ho after you left that second meeting?
A. No, I don't remember that.
Q. Did you have discussions with anyone from CEFC Energy on the evening of December 8 after you left the presidential compound that second time?
A. No.
Q. So, the first contact you had with anybody from the CEFC delegation was the next morning, correct?
A. Yes.
Q. That's the morning of December 9, right?
A. Yes.
Q. And the first contact was with Dr. Ho, correct?
A. Two text messages, yes.
Q. Two text messages?
A. Yes.
Q. Now, you were asked about Government Exhibit 1062 in evidence. If we can put that up, please.
You wrote, "Dr. Ho, the boss just called. He wants to see you and me now. I'm coming to pick you up." And the time it was sent was 10:35 a.m., right, Dr. Gadio?
A. Yes.

Q. Now, that was not the first text message you sent to Dr. Ho, right?

A. If my recollection is correct, we were supposed to meet the next day. Before I learned about the incident, we were supposed to meet and discuss bilateral relations between CEFC and our company, our consulting firm. So, I think the first message I sent was about that, and then this was the second message when I got the call from the president.

Q. Now I'm going to show you what is in evidence as Government Exhibit 1062. I'm sorry, 1061. And that was the first message you sent to Dr. Ho on December 9, right?

A. Yes. Yes, sir.

Q. And in that you wrote, "Dear Dr. Ho, we need to see you before you and us leave. Honestly we are not very happy with the agreement between Sarata International Consulting and CEFC because there is none in fact."

A. Yes.

Q. "MOU with the big boss will be reviewed by us on his request before any final deal. Therefore Sarata needs to sit with you and clearly agree on something."

Now, what were you referring to when you wrote MOU?

A. In that meeting before the incident -- the lengthy meeting we had between CEFC, the president and ourself -- I believe at the end of the meeting there was some form of agreement, some form of accord that an agreement will be drafted between -- an

agreement that we can call MOU, memorandum of understanding between the government of Chad and CEFC. And the president told us, Sarata, that we have to oversee the preparation of this MOU.

So that's what I was reminding Dr. Ho, that we still had leverage in this process, MOU with the big boss will be reviewed by us on his request before any final deal, so that's what we were trying to explain.

Q. So, if I understand correctly, your testimony is MOU refers to a memorandum of understanding? Is that right?

A. Yes.

Q. Your testimony is that on the first meeting on December 8 the parties discussed drafting an MOU?

A. At the end of the meeting I believe we agreed that like an MOU, yes, will be prepared.

Q. Dr. Gadio, I asked you a series of questions about next steps that were discussed during that same meeting a little while ago. Do you remember that?

A. Yes.

Q. You said the only next step that was discussed was leaving a technical team behind. Do you recall that?

A. Yes. Yes, I said -- but I added a lot of other issues that were discussed. I referred to the main topic, main issue being like Block H, and the other issues were discussed, that's what I said.

Q. Sure, you said other issues like airport, right?
A. Yes.
Q. Infrastructure, right?
A. Yes.
Q. But to be totally clear, the MOU concerned Block H, right?
A. I have to double check that one, because I believe the MOU could like try to structure the relationship between CEFC and the government of Chad, and that was also the desire of CEFC in that meeting, to engage in a more formal relationship with the government and to discuss a series of, you know, areas of interest between the two. So, I have to either try to get back to this MOU to know exactly what was the main focus of the MOU.
Q. Your testimony is you recall discussion of a general MOU at this meeting?
A. I'm sorry?
Q. Is it your testimony that you discussed a general MOU at this meeting on December 8?
A. I'm saying that it may be an MOU to kind of capture all the themes and interests discussed between Chad and CEFC, but I know whatever it was, it was mainly about Block H.
Q. The MOU was mainly about Block H; is that correct?
A. Even if other projects were mentioned, it was mainly about Block H.

MR. KIM: You can take that down, Mr. Calabrese. Thank you.

Q. Now, you have also testified about a meeting the next day on December 9, 2014, right?
A. Yes.
Q. And at this meeting it was you, President Deby, the chief of staff and members of the CEFC delegation, right?
A. Yes.
Q. And that delegation included Dr. Ho, Mr. Zang, Dr. Liu, right?
A. Yes, and translator.
Q. And a translator. Your testimony is that President Deby was still angry at this meeting, right?
A. Yes.
Q. And is it true that this was a very tense meeting?
MR. ZOLKIND: Objection. From whose perspective?
THE COURT: Mr. Kim?
Q. From your perspective, Dr. Gadio, was this meeting very tense?
A. The beginning of the meeting was very, very tense, yes.
Q. Now, you talked about the fact that President Deby asked the delegation certain questions, right?
A. Yes.
Q. And he asked whether they thought all African leaders were corrupt, right?
A. All African leaders, yeah.
Q. And he said that he had been thinking he might expel them

from Chad, right?
A. He even mentioned it clearly, "my first reaction was," that's what he said.
Q. And President Deby also asked this, the delegation for an explanation for what had been done, right?
A. Yes.
Q. And you testified that Dr. Ho responded first, right?
A. Yes.
Q. And then Mr. Zang responded through a translator; is that right?
A. Yes.
Q. And he apologized on behalf of CEFC, right?
A. Who? Mr. Zang?
Q. Yes.
A. Yes.
Q. Now, at that point President Deby told the Chinese delegation to take the money back with them and take it to China, right?
A. Yeah, he told him if it was a donation, the best thing to do is to take it back and put it through the proper channel.
Q. And I believe you testified that the chief of staff eventually came up with a different solution; is that right?
A. Yeah, he made a suggestion.
Q. And he suggested that the money could be sealed and stored in Chad, and then terms of the donation could be worked out,

right?
A. Yes.
Q. Now, you testified today that nothing was said at that meeting about what would happen to the money after that, right?
A. I'm sorry?
Q. You testified earlier today that nothing was said about what would happen to the money after that, right?
A. Yeah. They were dealing with the first step, which is how to fix the problem that we were dealing with, and the issue was the delegation -- the proposal was that the delegation send a letter about the donation. That's what the chief of staff said.
Q. And yesterday didn't you testify that the chief of staff said something else as well?
A. That I recognized it was a mistake, because the link that I made was to me having experience of donation, you know, when a country, especially a government, receives a donation, it is taken to the cabinet meeting and all of that, so I think I speculated a little bit and added those things. Because to me that was the only way to make sense of writing a letter to the government and explaining that it was a donation.
Q. So, in your testimony yesterday you were speculating?
A. No, not at all, I did not say that. I said specifically when I was explaining the process, the proposal by the chief of staff, I should have just stopped to what he exactly said.

What I did was, based on my experience, I explained, trying to explain what is done with a letter of donation. So, whatever I said after that is on me.

The chief of staff just stopped with his suggestion that the CEFC delegation as soon as they land back home to write and explain that with a letter of donation.

Q. Now, at the end of that meeting on December 9, what was your understanding of President Deby's emotions?

A. Well, can I judge or understand internally how he felt about this whole situation? Very difficult from me.

Q. Well, you had no difficulty judging his emotional state at the start of the meeting, right?

A. Because it was so obvious when we walked in and before that.

Q. And by the end of that meeting you were not able to detect what he was feeling?

A. Let's say if you want me to give you almost his last sentence, it will give you an idea of how he felt. He said, I don't know what arrangement you're going to make, but I don't want this money in my compound; it has to go. That at least he said clearly.

Q. Your testimony is those were President Deby's last words at that meeting?

A. I would say that was like his concluding remarks. After this meeting, when the chief of staff made the suggestion that

the money can be sealed and kept until a letter is sent back, the president said, listen -- he almost said I don't want to hear about any type of arrangement you make; whatever you decide, the money is not staying in my compound. That at least I can say.

Q. Now, after the back-and-forth that you testified about where President Deby gave some remarks and then Dr. Ho and Mr. Zang spoke, was there any discussion about proceeding with the deal?

A. You remember yesterday --

MR. ZOLKIND: Objection, your Honor. Again which deal is being referred to?

Q. Proceeding with the deal for H Block.

A. There was no discussion of H Block at that particular meeting of clarification of the incident; it was all about the incident.

And, like I said, when the CEFC delegation explained what they meant by this gesture, the president's reaction was to say that, you know, this is not the traditional way of making a donation, and then he explained how it is usually done. And then the chief -- and then he said the best thing to do is just to take the money back and then we'll proceed by proper channels; and that's when the CEFC delegation said it will be humiliating to do that.

Q. I want to turn to a different topic, Dr. Gadio. Isn't it

true that Chad initially had two primary potential partners for Block H?
A. I understand from the --
MR. ZOLKIND: Objection, your Honor.
THE COURT: Sir?
MR. ZOLKIND: Personal knowledge, foundation.
Q. Well, Dr. Gadio, through your involvement in negotiations with Chad and CEFC Energy, isn't it true that your understanding was that Chad initially had two primary potential partners for Block H?
A. My understanding was the president gave us the information that he had signed an MOU with a Brazilian company, and that once they left, they never came back. And after six months I explained yesterday you have the right to seek new partners. And I believe also there was a time -- I wasn't clear if it was the Brazilians or the Malaysians -- but I think he said the Brazilians signed an MOU with him and then they disappeared.
Q. And by September of 2015, your understanding was that Chad had opened up bidding to the 10 percent to other potential partners, right?
A. I don't remember all the details of all of those hundreds and hundreds of e-mails, so -- you say December 2015?
Q. So you don't remember if it was December 2015?
A. I remember a lot of things about December 2015 but not specifically this point, yeah.

Q. Let's show the witness what has been marked for identification as Defendant's Exhibit 311.

Now, focusing on the bottom of that page, Dr. Gadio. Read as much of it as you like.

A. OK. Can you go down a little bit. Yes, I understand now.

Q. Does that refresh your memory?

A. Yes, it does, yeah.

Q. So, at that point in time the bidding had been opened up for other companies; is that right?

A. If you read carefully the two paragraphs, it says that the president said he had offers. So, therefore, the president has decided for the sake of time to open up this opportunity to two other interested companies that have been seeking this opportunity for a long time alongside CEFC. But he had not considered their offers until now because he had reserved this affair for CEFC due to his relationship with Dr. Gadio. These two companies are currently negotiating with the government over the price. He has not accepted any offer as of yet.

MR. KIM: Your Honor, we will offer Defendant's Exhibit 311.

MR. ZOLKIND: No objection.

THE COURT: Received.

(Defendant's Exhibit 311 received in evidence)

MR. KIM: Why don't we put it up on the screen for the jury.

Q. Earlier I think you said December of 2015, and I meant to say September of 2015, which is when these e-mails were written; is that right, Dr. Gadio?
A. Yes. What is the question?
Q. I'm sorry. I was just clarifying. I think when I asked you the question earlier I think I said December. I should have said September.
A. Yes. OK.
Q. Now, Dr. Liu responded to the e-mail that had been sent to him, right? Up at the top.
A. Yes.
Q. And he said that, "As for the 10 percent of the H Block in Chad, the maximum we can go is $500 million USD. However, this offered price is subject to the final approval of the board of directors of CEFC and the result of the due diligence study." right?
A. Um-hum.
MR. KIM: You can take that down, Mr. Calabrese.
Q. You mentioned earlier in your testimony that Chad was experiencing difficulties with Boko Haram; is that right?
A. Not difficulties with Boko Haram. Chad was living the war of the Sahelian countries, several countries in the block, against terrorist organizations, and three of them are Al Qaeda, ISIS and Boko Haram in Nigeria.
Q. And you were lobbying CEFC Energy to use its influence to

get the Chinese government to provide arms to Chad, right?
A. Provide arms to Chad?
Q. To supply arms or weapons to Chad.
A. To help -- to help Chad, yeah.
Q. To help Chad?
A. Yes, militarily.
Q. And this was something you felt you needed to discuss confidentially, correct?
A. Yeah, every time we mentioned -- yeah, you're right.
Q. I'm sorry. You were going to say every we mentioned --
A. Every time we mentioned like a confidential discussion, you know, it's basically about the war situation in the zone.
Q. When you say "every time it was mentioned," you're referring to your communications with Dr. Ho?
A. With Dr. Ho, with CEFC in general, especially with Dr. Ho.
Q. Now, you were testifying earlier that you had never received a formal contract from CEFC Energy, right?
A. That's true.
Q. You received a letter of appointment in February 2015; is that right?
A. That's true.
Q. And pursuant to that letter, CEFC Energy paid you twice, right?
A. They paid us like in two installments, yes.
Q. Of $200,000 each, right?

A. Um-hum.
Q. In March 2015 and July 2015, right?
A. And July, yes.
Q. Now, you didn't take those payments in order to help CEFC Energy bribe President Deby, did you?
A. I'm sorry?
Q. You did not take those payments in order to help CEFC Energy bribe President Deby, did you?
MR. ZOLKIND: Objection. Vague.
A. I took --
THE COURT: Excuse me. I'm not sure I get it either. Would you try it a different way, please, Mr. Kim.
MR. KIM: I will try to break that down.
THE COURT: Yes, sir.
Q. You received $200,000 in March of 2015, right?
A. Yes.
Q. Did you take those funds in order to help CEFC Energy bribe President Deby?
THE COURT: Are you able to answer that question, sir?
THE WITNESS: Oh, yes.
A. I took that payment to compensate all the hard work that I had done and I was not fairly compensated by CEFC.
Q. And the hard work you had done that you're testifying about, that wasn't hard work to bribe President Deby, was it?
MR. ZOLKIND: Objection, your Honor. From whose

perspective?

MR. KIM: From Dr. Gadio's perspective.

Q. From your perspective, Dr. Gadio.

A. Can you please repeat the question.

Q. When you were talking about taking that money as compensation for your hard work, right --

A. Yes.

Q. -- in your view, was that hard work aimed at helping to bribe President Deby?

A. I already replied to your question, that the $200,000 that we were paid was supposed to compensate the hard work we did on behalf of CEFC: More than ten trips to Chad, sleeping in an international airport without connection because Chad is in central Africa, taking all of this time to convince the president that this is an interesting company, you should work with them. That has absolutely nothing to do with bribe.

Q. And the same applies to the second payment of $200,000; is that right?

A. The second payment of $200,000, as you may have seen in all the trail of letters and e-mail exchanges, we really thought we were not compensated fairly. And I should remind you the first $200,000 -- we had a $100,000 committed by CEFC for the Dakar forum. That was a broken promise, and we had to pay out of the 200,000 the Dakar forum. And we felt we were not compensated fairly. So, absolutely nothing to do with bribery -- or

bribing anybody.
Q. Now, you were initially charged in this case, correct?
A. Yes.
Q. You were charged with participating in crimes with Dr. Ho; is that right?
A. Yes.
Q. And you were arrested, right?
A. Yes.
Q. In November of 2017?
A. November 2017.
Q. And after your arrest, you were taken to the F.B.I. office and you were questioned, right?
A. Yes, I was questioned by the F.B.I., yes.
Q. And the agents asked you questions about some things that you testified about today, right?
A. Yes.
Q. When you were arrested, you were concerned about the impact the case could have on your political career, right?
A. I was concerned by much more than that, much more than my political career.
Q. Well, you were also worried that the case could destroy your political career, right?
A. I even went further, sir, I said it would destroy my life.
Q. And agents when they interviewed you told you that they were interested in Dr. Ho, right?

A. I don't remember specifically. Even if they had said it, I do not recall paying attention to the sentence you just said.
Q. Well, you were asked a lot of questions about Dr. Ho, right?
A. I was asked a lot of questions about myself, and then Dr. Ho, and then CEFC, and then Senegal, yes.
Q. And since your arrest, you have met many times with agents and prosecutors, right?
A. We did, yes.
Q. Now, Dr. Ho approached you to work as a consultant for CEFC Energy, right?
A. Yes.
Q. And as a consultant for CEFC Energy, you had certain obligations to work on behalf of the company, right?
A. Yes.
Q. But you didn't always do that, right?
A. What do you mean?
Q. Well, you didn't always act in the best interests of CEFC Energy, right?
A. I reject that statement completely.
Q. So, while you were working with CEFC Energy, your testimony is that you acted on their behalf in their best interests?
A. I was so loyal to CEFC, and so frustrated the way I was treated, that I mentioned it in several e-mails sent to Dr. Ho.
Q. Now, you were working on behalf of CEFC Energy all the way

through 2016, right, Dr. Gadio?
A. Yes, through -- yeah, yes.
Q. And your testimony is that during that entire time period you were acting loyally on behalf of CEFC Energy?
A. Always.
Q. Now, during 2015 you told CEFC that you were negotiating on its behalf for buying the 10 percent, right?
A. That I was helping them, yeah, negotiate the 10 percent.
Q. But isn't it true that in 2015 you and your son Boubker were trying to find other potential partners for that same deal?
A. The same deal of what? The ten percent?
Q. Yes.
A. Yeah, if we had other people interested, yeah.
Q. So while you were negotiating on CEFC Energy's behalf, you were also looking for other bidders for the same block of oil wells?
A. And you can understand the frustration we had through all of our communications with CEFC, no response to urgent messages. We did not feel that we were treated right. We never got a contract. We never got a signed agreement. And we were not quite convinced that CEFC perceived the sense of urgency we were putting in helping the president get Block H or the 10 percent quickly sold to a potential partner. And we were not hiding what we were doing. CEFC knew that.

And I should say also that the contract was not like an exclusivity contract. We did not have an exclusivity contract with CEFC because there was no contract.

Q. So, is it your testimony that by looking for other bidders for that block of oil wells, you were acting loyally to CEFC?

A. Acting loyally. As long as CEFC and I were together working, I never did anything wrong to CEFC. I never took a commitment with CEFC that I betrayed later. And they knew how committed personally I was to the president of Chad and the desire to help the country get out of its situation. They knew that; I wasn't hiding it.

Q. I want to turn your attention now to Government Exhibit 16, which is in evidence, and that is an e-mail that you sent to Dr. Ho on October 21, 2014, right?

A. Yes.

Q. This is about a month after Dr. Ho had approached you to serve as a consultant for CEFC Energy, right?

A. That's true.

Q. And you were writing this e-mail. You attached a report to this e-mail, correct?

A. Yes.

Q. And the purpose of this report was to update CEFC Energy on steps you had taken on its behalf with Chad, right.

A. Yes.

Q. Now, Dr. Gadio, we're going to talk about this report in

detail, but is it your testimony that everything in this report is true?
A. It was a report trying to build the relationship between a company and a country.
Q. I don't think you answered my question, Dr. Gadio.
Is it your testimony that everything in this report was true?
A. That's why I answered the way I did. This is like a diplomatic work also, trying to build a relationship between a country and a company.
Q. You said it's like diplomatic work?
A. Exactly.
Q. Diplomatic work, does that mean there are things in this report that are not true?
A. That may not be accurate or not translate exactly what was said, yes.
Q. May not translate directly what was said?
A. Exactly what was said, yes. For instance, when I say to --
Do you want me to give an example?
Q. Sure.
A. When I say that the president is very enthusiastic, you know, to work with CEFC, he's looking forward to this and that, sometimes, you know, diplomats put their own words to make it look very, very, you know. But the president may perhaps just say, you know, this is very interesting, I'm ready to offer

CEFC. But then when you present it, you tell CEFC the president was very enthusiastic, he was, you know -- that's what I call diplomatic language.

Q. Let's turn to the report itself, and specifically let's look at paragraph 3, and it's titled "The President's Reply".

Focus on that first bullet, starting, "Listen, you are a friend and a brother ..."

You testified yesterday that it was almost verbatim what President Deby had said to you, right?

A. I'm sorry?

Q. You testified yesterday --

A. Yes.

Q. -- that that section was almost verbatim of what President Deby had said to you, right?

A. Exactly.

Q. So that paragraph was not written in diplomatic language?

A. No, no, not at all.

Q. Let's turn to the second bullet of paragraph 3, please, on the following page. Dr. Gadio, was this paragraph written in diplomatic language?

A. Let me read it. Yes, this is accurate.

Q. So it is not in diplomatic language?

A. It's not always that I use diplomatic language. I use it when it's convenient. That's how a diplomate operates. So, this is accurate.

Q. You said you use diplomatic language when it's convenient for you?
A. Yes, that's what diplomacy is about.
Q. Let's turn to the first page of this report, please, paragraph -- page 2 -- yes. That's great. Thank you -- paragraph 2, please: "Main Points From Discussion Of Your Offer:"

"The president was pretty impressed when I talked about you, your work and your offer to him, being the following:"

The first bullet says: "Cutting a deal to reduce and lessen the outstanding fine in place."

Now, Dr. Ho had raised this issue with you, correct?
A. I'm sorry. If he --
Q. Dr. Ho had raised this issue with you, correct?
A. Yes. Yes.
Q. And you in fact discussed this issue with President Deby when you met with him, right?
A. Yes. Yes, I did.
Q. Let's highlight the second bullet, please.

"Change his status with China from a good partner to a best friend. Given the current regional situation where neighboring countries such as Libya, Mali and Niger are all on their knees or have collapsed."

You previously discussed this with Dr. Ho as well,

right?
A. Yes.
Q. Let's move to the fourth bullet, please, "Establishing a Trust Fund." You also had discussed this previously with Dr. Ho, right?
A. Yes, establishing a trust fund to support his -- yeah, I made the suggestion.
Q. And then -- I'm sorry. You had made this suggestion to Dr. Ho previously, right?
A. In previous discussion, yeah.
Q. And that last bullet point says, "Help him establish or reform his banking system," right?
A. Yes.
Q. And you had previously discussed that with Dr. Ho as well.
A. Yes.
Q. Now, I want to focus your attention on the third bullet.
"Make him politically your key ally in the most strategic region today, Sahel and central African regions combined in one country."
Dr. Gadio, had you previously discussed that with Dr. Ho?
A. Yes.
Q. Now, the second sentence of that bullet reads, "Secret or very confidential financial assistance will be provided to him for his political campaigns in his country."

Now, the "him" and "his" in that sentence refers to President Deby, correct?
A. Yes.
Q. You had not ever discussed this with Dr. Ho, correct?
A. That's true.
Q. And by "secret or very confidential financial assistance," you were referring to secret campaign assistance; is that right?
A. Yes, campaign financial assistance, yes.
Q. You were recommending that CEFC Energy be prepared to give President Deby secret financial assistance for his campaign, correct?
A. Yes.
Q. Now, to be fair, you were making -- your testimony is that you put this line in this bullet because you wanted to recommend it as a course of action for CEFC Energy?
A. As a way of suggestion to CEFC. And I explained that corporations operating in Africa, because of the structure of our campaign finance laws, usually companies do help, you know, the leaders they work with, so that's why I made the suggestion. The only reason they use secret and confidential is because companies who do that don't want the opposition to be aware of it or, you know, that type of issue.
Q. Now, this bullet is in a section called "Main Points From Discussion of your Offer," right?

A. I'm sorry. This?
Q. The heading of this section is "Main Points From Discussion of your Offer," right?
A. Yes.
Q. And it say, "The president was pretty impressed when I talked about you, your work and your offer to him, being the following:"
A. Yes.
Q. Now, your testimony is that those words apply to everything in this list except for the secret or very confidential financial assistance?
A. Yeah, but I was writing to Dr. Ho, so when I write that to him confidently, it means that he would understand it's a way of suggestion.
Q. Now, Dr. Gadio, you have in the past received such secret financial assistance, correct?
A. Me?
Q. Yes.
A. No.
Q. Isn't it true that you personally received $10 million central African francs in cash during a campaign?
A. $10 million central African? I'm from west Africa.
Q. Did you or did you not receive cash during a campaign?
A. In my last -- my first presidential campaign, yes, I did get assistance from business people.

Q. And isn't it true that you received this cash from an unknown courier on behalf of a Senegalese businessman?
A. Yes.
Q. What was the businessman's name, Dr. Gadio?
A. What was the businessman's name?
Q. Yes.
A. Do I have to disclose the businessman's name?
Q. There is no objection pending. You can answer the question.
A. OK.

MR. ZOLKIND: Your Honor, a brief side bar might be useful.

THE COURT: Certainly.

Ladies and gentlemen, we're going to sit until about five. Do you want to have a little break now while we go to the side bar?

All right, let's do that. And of course remember not to discuss the case. See you in five minutes.

(Continued on next page)

(Jury not present)

THE COURT: Counsel, why don't you take the witness out.

Won't you be seated. Gentlemen?

MR. ZOLKIND: Your Honor, the witness has certainly admitted that he received a campaign contribution from a businessman. He clearly knows the person's name and has expressed reluctance to say it in open court. As he just explained, the reason that business people in Africa do these campaign contributions secretly is because they don't want to know -- they don't want the governing leaders to know that they were contributing to the opposition.

Dr. Gadio has testified on direct examination he's not the governing leader. So, understandably I think it could be very embarrassing to him and to the person -- whoever it may be that donated the money -- for that fact to become public in a courtroom and it's just not remotely relevant.

So, we would ask that under Rule 611 -- which provides considerable leeway for the Court to "protect witnesses from harassment or undue embarrassment" -- and 611(b) -- which of course provides extensive leeway for the Court to limit the scope of cross-examination -- that the Court preclude questioning as to the name of the specific individual who made that contribution.

THE COURT: Is there any relevance to the identity of

the individual?

MR. KIM: Your Honor, I think this is the same witness who is going to say that when he wrote about secret money that was given at another time, that he was lying about it or that it didn't actually happen, so I think I'm entitled to explore through cross-examination the details of this incident.

THE COURT: Now answer my question: Is there any relevance to the identity of the individual?

MR. KIM: I think it's relevant. It's all leading to a very relevant line of inquiry about this witness's credibility, your Honor.

THE COURT: I don't hear you telling me why the identity is relevant.

MR. KIM: Well, I think it's relevant to explore every detail of this story, frankly.

THE COURT: Anything else? Mr. Zolkind, anything else?

MR. ZOLKIND: Nothing else, your Honor.

THE COURT: All right. I will sustain the objection in order to protect the witness from harassment or undue embarrassment.

Also, under Rule 611(b), I don't hear any explanation as to why the identity of the witness has any bearing -- I'm sorry -- the identity of the donor has any bearing on the credibility of this witness. Accordingly, the objection is

sustained.

Anything else before we go out?

MR. KIM: Nothing.

THE COURT: Yes, sir?

MR. RICHENTHAL: For the record, over the lunch break I provided your Honor with a letter to which I alluded this morning and the enclosures. I also provided it to cleared defense counsel. At the time I provided it, I directed his attention to the second category in the letter. For reasons that may be self explanatory, I was not asked further questions.

THE COURT: Is there anything else that either side feels needs to be done here?

MR. KIM: No, your Honor.

THE COURT: Thank you, friends. Off the record, just so you know the witness gave me the name of the chief commercial judge in the Commercial Court of the Francophone Countries.

Thank you. See you in five, counsel.

(Recess)

(Continued on next page)

(In open court; jury present)

THE COURT: Won't you be seated.

We continue with the cross-examination of Dr. Gadio.

Mr. Kim.

MR. KIM: Thank you, your Honor.

If we could please put up Government Exhibit 16 on the screen.

BY MR. KIM:

Q. Now, Dr. Gadio, before we broke, I was asking you about secret campaign or financial assistance you had received during a campaign, right?

A. Yes.

Q. You said that was during a campaign for the presidency of Senegal?

A. Yes.

Q. Now the businessman who passed you that cash, were you in a position to help that individual?

A. Not at all. And if I may clarify, you mentioned 10 million CFA. It's 20,000 US dollars. 20,000 US dollars.

Q. Okay. But it was CFA then?

A. Yes, CFA. West Africa CFA.

Q. Now when you received that money, you did not consider that to be inappropriate at the time?

A. Not at all. It's the political tradition back home. Political tradition back home. And usually those

businesspeople, they help like six candidates, eight candidates. They don't focus on one candidate.
Q. I see. So the businessman you received money from, your understanding is that businessman paid other candidates too?
A. You say paid, but they take it as a contribution to candidate for different reasons.
Q. Now I want to direct your attention to paragraph 3 of this same document.
I'm sorry. It's page 3, paragraph 5. I apologize.
The title is My Apprehension From Past Experiences.
A. Mm-hmm.
Q. Now you write, "Although I trust you and respect you very much, I would like to establish a clear process in moving forward with you based on my past experiences where people I had assisted did not fulfill their commitments towards me once they obtained the results I helped them achieve."
A. Yes.
Q. Do you see that, Dr. Gadio?
A. Yes, yes, I do.
MR. KIM: Now let's turn to the following page, please.
And let's zoom in on the top of that page.
Q. And that's titled Re-establishing Ties With china Experience. You write, "Through the process to re-establish ties with your country, I was not fairly compensated for my

hard work and efforts. As you may or may not know I am the one as foreign minister who fought hard during a six-month marathon to resume the diplomatic ties between China and my country (Senegal). Taiwan did everything to oppose my move. They poured money, bought allies, but I was determined to succeed. We all know how Senegal is strategically important for Chinese African policy. When all was said and done and I had the privilege to sign on October 25, 2005 the resumption of Senegal/China diplomatic relations before the entire world."

That portion that I just read, is that truthful?

A. Yes, sir.

Q. And you go on to write that "China gave several millions of US dollars to our former president and I received nothing although I was the principal mediator. The president kept the whole thing for himself and I complained to my Chinese counterparts and they never did anything despite several promises which end up being broken promises."

Dr. Gadio, is that portion that I just read accurate?

A. I already commented that portion yesterday and said that it was a terrible statement from me because I had no facts to back up what I'm saying here and I -- I deeply regret writing this because it's not accurate and it's not the truth.

Q. So your testimony is that you did not have the facts to back up the portion I just read?

A. The portion you just read, yes, that's what I'm saying,

that I don't have facts to back it up, and I went too far in terms of trying to explain why I should be compensated. I should have used other arguments than this one because this one was -- was completely out of character for me. I have never been involved in these issues and I should not have written it at all.
Q. Did you even believe those words to be true when you wrote that?
A. I'm sorry?
Q. Did you believe those words to be true when you wrote them?
A. Of course I knew it was not.
Q. You knew it was not true, is that your testimony?
A. The part -- the last part you read, yes, about the president of Senegal and so on, absolutely. I knew it was not true.
Q. Now you were writing this section as justification for why there needs to be a clear and written agreement in place, right?
A. I'm sorry?
Q. You were writing this section as justification for why there needed to be a clear and written agreement between you and CEFC Energy, right?
A. Yes, and the compensation defined, yeah.
Q. And your testimony is that you made up this lie as justification for why you needed a clear contract and

agreement?
A. I thought it was a good argument, but obviously it was a very bad argument because like I said, I don't have facts to back up what is written here.
Q. Now I want to read a portion of this that you did not review yesterday. The next line says, "Actually this has been my fate with several similar situations where 10 to 20 millions of US dollars were allocated to the president and between 40 and 50 percent were intended for me and not one dollar came my way."
Dr. Gadio, was that statement a lie?
A. It's not true.
Q. So you were making up the amounts that you had listed here?
A. I was building arguments that I thought would be compelling, but they were wrong.
Q. So when you wrote "10 to 20 millions of US dollars," you just made that number up?
A. I said that what I wrote was wrong, completely.
Q. And when you wrote 40 and 50 percent, those amounts were made up?
A. The whole package is wrong.
Q. So none of that is true, that's your testimony?
A. Not the whole -- not the whole paragraph except -- but the -- the one that we pointed together, you and me, those -- those were wrong.

Q. Now I want to turn to another exhibit that we talked about yesterday, Government Exhibit 49 in evidence. We talked about this a little earlier, right, Dr. Gadio?
A. Yes.
Q. Now I want to focus your attention on the bottom third of this document, where it starts, "Therefore, I strongly suggest."
"Therefore, I strongly suggest that the only right moves CEFC have to make at this juncture is to," and then you list a number of steps, right?
A. Yes.
Q. Talked about preparing a mission of a technical team, right?
A. Yes.
Q. And we talked about making a financial offer to the president, right?
A. For the allocation of this huge block, yes.
Q. Now No. 3 on your list is, "Reward him with a nice financial package as an entry ticket --"
A. Mm-hmm.
Q. "-- in the Chadian oil market." Now when I asked you about this document earlier, you said you had spoken informally with a friend Ousmane Sy, correct?
A. Yes.
Q. Did Mr. Sy tell you about the entry ticket step?

A. The entry ticket is -- I'm the one. I'm 100 percent the author of the entry ticket, the paragraph on the entry ticket. It's me.
Q. Okay. So you were the only one who came up with the entry ticket paragraph.
A. Because I -- I practiced that before. I know what it is.
Q. Now I think you testified before that this was the very first oil deal that you were trying to broker, right?
A. Yes.
Q. And when you wrote about including a nice financial package as an entry ticket, was it your understanding that this is a common feature of oil deals?
A. Actually, it's like major commercial agreement between a government and private company. That's when we raised the issue of entry ticket. It can even be between government and government.
Q. And is it accurate to say, according to your testimony, that an entry ticket refers to some kind of an after-the-deal bonus?
A. Like a signing bonus, yes. Equivalent in English would be a signing bonus.
Q. Signing bonus.
A. Yeah.
Q. You testified that this would come after a technical study is done, right?

A. Yes.
Q. It would come after a financial offer is ready and that there's a general agreement in place, right?
A. Yes, and the lawyers have done their job and we are ready to sign the contract.
Q. And the steps we've just talked about could literally take months or years even, right?
A. Talking about what?
Q. The steps that we just talked about, the technical team, or the technical study, the financial offer, the negotiation, those steps could literally take months, right?
MR. ZOLKIND: Your Honor, I think this has been asked and answered.
THE COURT: We already did this. We really did.
Q. Now --
MR. KIM: I have a short memory, your Honor. Sorry.
Q. Now --
THE COURT: You're too young for that.
Q. Now you were writing this email in November of 2014, right?
A. Yes.
Q. And the negotiations about the deal in this case stretched out into 2017, right?
A. Not -- not really, because once again, you have to perhaps have in mind the two steps, the two stages. One was engaging Chad for Block H. The second step taken six months later by

CEFC was to switch gears to something else, the 10 percent. So if you present it as like negotiation from November to 2017, it's like talking about the same asset, and here you're talking about two different assets.

Q. And you were writing this before the CEFC Energy team had even met with President Deby, correct?

A. It was a way of suggestion that I made, and I don't know if I can answer your question about the time it takes. I said before that if Block H had a data center and all the information were available, the technical team would only complete and compare the technical data, that will not take too long. But if it was ground zero, absolutely no information, it would take time.

Q. So your testimony is that you included this sentence about an entry ticket as a suggestion for CEFC Energy?

A. Yes, I was telling CEFC that it would be a good idea if they want to help Chad to think of an entry ticket, because I have had experience of entry ticket.

Q. And I think you testified that an entry ticket is given before a contract is actually signed, is that right?

A. I said when everything is said and done, before signing the contract, often countries make suggestions about the entry ticket.

Q. Well, yesterday you testified that before the signing ceremony at the buying of the asset --

A. Yes.
Q. -- that's where the entry ticket is discussed, right?
A. It is discussed, yes.
Q. Because if you discuss it afterwards, it's too late at that stage; that was your testimony, right?
A. That's true.
Q. Now fair to say that even as you've defined this term, entry tickets can sometimes be bribes, right?
A. I'm sorry?
Q. Entry tickets can sometimes be bribes, right?
A. No, no.
Q. Well, isn't it true that good heads of state will ask for entry tickets to be given to their countries, right?
A. Yes.
Q. And bad heads of state will pretend the entry ticket is for the country but will ask for it to be given directly to them? Is that right?
A. Yeah. You are quoting me? You are quoting what I said?
Q. I only want to know if that's accurate, Dr. Gadio.
A. Yeah, it is accurate.
Q. Returning to my original question, entry tickets, even as you define them, can sometimes be bribes?
A. If -- if the meaning of entry ticket is changed to something else, yes, it becomes bribe.
Q. Now, Dr. Gadio, how much experience do you have with entry

tickets?
A. Oh, I have a few, a few experience. I described yesterday, I gave an example of an entry ticket, when Senegal resumed diplomatic ties with China. Because I said entry ticket could be between a corporation and a government, it could be between two -- two governments. When Senegal resumed diplomatic ties with China, I was negotiating, and China wanted to offer a package to replace Taiwan's cooperation with Senegal, and then we suggested ours, like China coming back to the Senegalese, not only diplomatic ties but diplomatic -- commercial, economic relations, that we wanted -- we wanted some financing from Chad -- from China, and we listed seven priority entry ticket projects to China, and they approved almost all the projects, and I was saying that one of the most important projects was just -- will be launch -- will be finalized and they're giving to Senegal on December 6, and that was back to 2005. So that's -- I have experience of that type of entry ticket.
Q. Is it true that your purpose in writing this was because you wanted to warn CEFC about entry tickets because it was CEFC's first deal in Africa?
A. Not warn but inform that it would be a good idea, if they want to help Chad, this may be the right way to go.
Q. But you never had a detailed conversation about specifics of entry tickets with anyone from CEFC Energy, right?
A. We did not discuss it, and they did not reply to this

letter, this suggestion.
Q. You had no discussions with Dr. Ho about this topic, correct?
A. No.
Q. Dr. Gadio --
MR. KIM: We can take this down, Mr. Calabrese. Thank you.
Q. As of January 2017, you were still preparing for a presidential election in Senegal, right?
A. January '17. Perhaps, yes.
Q. I'll show you what's been marked for identification as Defense Exhibit 316.
You can read that email, see if it refreshes your memory.
A. Yes.
Q. So in January of 2017, you were still preparing for presidential elections in 2017, right?
A. Yeah, I was hoping to be able to run in 2017.
Q. And isn't it true that at that time you hoped you would be CEFC's candidate?
A. I made a suggestion to Dr. Ho, yes, to --
MR. KIM: No further questions, your Honor.
A. Okay.
THE COURT: Thank you.
Redirect, counsel.

MR. ZOLKIND: Thank you, your Honor.
REDIRECT EXAMINATION
BY MR. ZOLKIND:
Q. Dr. Gadio, do you recall that Mr. Kim started cross-examination by asking you a series of questions about CEFC's status with respect to Chad in the late 2015 time period and 2016 time period?
A. Yes.
Q. Do you recall those questions?
A. Yes, I do.
Q. Do you recall being asked, for example, about whether it seemed like CEFC was losing interest and whether you still wanted a deal? Do you recall those discussions?
A. Yes, I do.
Q. Dr. Gadio, in the late 2015 into 2016 time period, was this defendant part of the CEFC team that was focused on Chad, as you understood it?
A. No.
Q. And as you understood it, around what time period did the defendant cease to be the focal point from CEFC to Chad?
A. We were notified in May, May 2015.
Q. Okay. Let me go back to CEFC's first meeting with President Deby. And that was in November 2014, is that right?
A. Yes.
Q. Okay. And at that time what was your understanding of the

defendant's role with respect to Chad?
A. Yeah. He was the main facilitator of the relationship between CEFC and Chad.
Q. Do you recall Mr. Kim asking you on cross-examination whether at the end of that very first meeting in Chad, President Deby made an offer to CEFC? Do you recall that question?
A. Yes.
Q. Now during that first meeting in Chad, was the subject of Block H brought up?
A. Yes.
Q. Okay. Who brought that subject up during the meeting?
A. The president.
Q. And was CEFC and the defendant and the other members of the delegation interested in Block H?
A. Yes.
Q. During that meeting was there any discussion about the price that CEFC would need to pay for Block H?
A. No.
Q. Was there any negotiation at all about the other terms of the deal, if it were to take place?
A. No.
Q. Do you recall -- well, and let me just ask you: What was your general understanding as to the potential length of the negotiation that would have to take place if CEFC indeed wanted

to move forward with acquiring Block H?
A. Yes. What I explained was, the president gave a lengthy presentation of how Block H was important to him, to the country, and was a major asset for Chad, and he also talked about other interests, other important projects that he had. And my understanding was that if the technical team takes a look at Block H, depending on what was available in terms of data center, technical details, information, then they would be able to assess and tell CEFC and tell the president that it would take whatever length of time. But it takes an assessment from the technical team to know that.
Q. Now do you recall testifying about how, after that first meeting in Chad, the defendant sent you a series of communications requesting a second meeting in Chad?
A. Exactly.
Q. Now at that point had CEFC made its opening proposal of how much it was willing to pay for Block H?
A. Not at all.
Q. Had any negotiation at all taken place over the price?
A. No.
Q. What was your understanding in terms of who would make the final decision as to whether to sell Block H and at what price?
A. The president.
Q. As of the December 2014 meeting in Chad, so the second meeting in Chad --

A. Yes.
Q. -- at the moment that the $2 million in the boxes was handed over to the president, at that moment had President Deby yet made any final decision to sell Block H to CEFC or at any particular price?
A. No.
Q. Had there even been a negotiation yet over the price at the time that that cash was handed over?
A. No.
Q. Now if President Deby had wanted to, is it your understanding that he had the power to sell Block H for a low price?
A. Yes, he had the power, yes.
Q. And what was your understanding as to whether CEFC wanted to pay a higher price or a lower price for Block H?
A. What was my understanding?
Q. Yeah. What was your understanding as to whether CEFC, as an oil company, would rather pay a higher price or would rather pay a lower price?
A. Always want to pay a lower price, yeah.
Q. Do you recall at one point Mr. Kim asked you if it was true that the defendant said that he was going to fly in to Chad for that December meeting separately from the rest of the delegation?
A. Yeah, I got a memo like that -- email like that, yes.

Q. You responded that that was something you had initially heard, right?
A. Yes.
MR. ZOLKIND: Ms. Rao, could we please bring up Government Exhibit 56.
Q. Do you see that this is an email --
MR. ZOLKIND: This is in evidence. We can publish it to the jury.
Q. And you see that this is an email from the defendant, the defendant to you on November 26th --
A. Yes.
Q. -- 2014? So about a week or so before that December 2014 meeting, is that right?
A. Yes.
MR. ZOLKIND: And Ms. Rao, if you could just highlight and zoom in on the last two lines of the defendant's email.
Q. You see that he wrote, "We will probably arrive via the company plane early in the morning of December 7th and leave around midnight of the same day after the meeting with the president"?
A. Yes.
MR. ZOLKIND: Okay. And Ms. Rao, if we could bring up Government Exhibit 202.
If we could go to -- I think it's the third page. This is also in evidence. Yeah. Sorry. Just the prior page

going into the third page.
Q. Do you see this email here from Anna, the defendant's assistant, on December 5, 2014?
A. Yes.
Q. And that's about a day or so before the meeting in Chad, is that right?
A. Yes.
Q. You see that she wrote there, "Dear Dr. Gadio, Please see the delegation private jet schedule"?
A. Yes.
Q. Did she list any separate travel details for the defendant?
A. That's what I have. That's what I had, yeah.
MS. GHOSH: All right. We could take that down.
Q. Do you recall Mr. Kim asking you questions about the MOU that was discussed during that December 2014 meeting in Chad?
A. Yes.
Q. Do you recall Mr. Kim asking if it was true that the MOU was mostly about Block H?
A. Yes, I remember.
MR. ZOLKIND: Ms. Rao, if we could bring up -- this is not in evidence -- Government Exhibit -- I believe it's 67TX. Sorry. Let's bring up first Government Exhibit 66. And 66TX.
Your Honor, the government offers Government Exhibits 66 and 66TX.
MR. KIM: Objection, your Honor. I don't think the

witness has ever seen this document.

MR. ZOLKIND: Well, let me do it this way, your Honor. If we go to the -- we can leave this on the witness' screen and go to the attachment.

BY MR. ZOLKIND:

Q. Dr. Gadio, did you see the date on the cover email here?

MR. ZOLKIND: If you can just back up again.

Q. Do you see the date there?

A. Yeah, it's --

Q. You don't need to read it aloud, but do you see the date?

A. Yes, I do.

Q. Okay. Now take a look at the attachment.

MR. KIM: We withdraw our objection. We withdraw our objection.

THE COURT: All right. Go ahead, counsel.

MR. ZOLKIND: All right. We'll offer Government Exhibit 66 and the English translation, 66TX.

THE COURT: Received.

(Government's Exhibits 66 and 66TX received in evidence)

MR. ZOLKIND: All right. And if we could bring 66TX up on the screen.

BY MR. ZOLKIND:

Q. All right. And do you see that this is an email that the defendant received on December 10, 2014?

A. Yes.

Q. How long was that after the meeting in Chad?

A. The next day.

MR. ZOLKIND: All right. If we go to the attachment.

Q. You see that this is a draft memorandum?

A. Mm-hmm, yes.

Q. Does it appear to be the draft of a memorandum of understanding of the type that was discussed during the meeting in Chad?

A. Yes.

Q. I'll just read --

MR. ZOLKIND: Ms. Rao, if you could zoom in on 1 and 2.

It says here:

"The Chadian side will fully support CEFC China's participation in the CNPC's Chad project.

"No. 2. The Chadian side states that, whether is regarding oilfield exploration block or oil pipeline --"

THE COURT: Slowly.

MR. ZOLKIND: I apologize.

"-- regarding oilfield exploration block or oil pipeline, so long as the Chadian side has the right over such pipeline and oilfield exploration block, it can cooperate with CEFC China in all of them."

THE COURT: Try harder.

MR. ZOLKIND: I'll do that, your Honor. I apologize.

BY MR. ZOLKIND:

Q. Dr. Gadio, as you read this draft MOU, is it confined exclusively to Block H or does it encompass other oil opportunities in Chad?

A. Yes, it's talking about pipeline, oilfield exploration, seems that it's talking about some other aspects.

MR. ZOLKIND: Okay. We can take that down.

Q. Do you recall, Dr. Gadio, Mr. Kim asking you on cross-examination about the two wires of $200,000 that you received from the defendant, from CEFC?

A. Yes, I do.

Q. Okay. Was it part of your responsibility as a consultant to the defendant to help broker his access to the president of Chad?

A. Yes.

Q. Okay. And you've testified that as you understood it, the $2 million that was provided to the president of Chad was, as you understood it, a bribery attempt, is that correct?

A. Yes.

Q. And as you understand it, if you had not brokered his access to the president of Chad, would the defendant have had the opportunity to make that bribery attempt?

A. No.

MR. ZOLKIND: If we could bring up Government

Exhibit 16.

And I'd like to go to -- I think it's Section 5 on reestablishing China ties.

If we could zoom in there.

Q. All right. Dr. Gadio, you recall a series of questions about the statements that you wrote here in your report to the defendant?

A. Yes.

Q. Okay. And just to step back, what were you trying to persuade the defendant of? What was the reason that you were writing this?

A. To -- to get an agreement, formal agreement and to be -- to be sure that I would be compensated.

Q. Okay. You wrote here, halfway down, you had the privilege to sign in October 25, 2005, "the resumption of Senegal/China diplomatic relations before the entire world. China gave several millions of US dollars to our former president and I received nothing although I was the principal mediator."

Let me just pause there.

THE COURT: Good thing.

Q. You've testified clearly that you didn't have any personal knowledge as to whether or not the former president of Senegal in fact took payments from Chinese businesses, is that right?

A. Exactly.

Q. Okay. Now, Dr. Gadio, did you make this up or had you

heard that fact?
A. I heard it, and what I was complaining -- what I was saying was, I heard it, I had no like concrete information to back up this, and yet I still used it. That's what I was concerned about.
Q. You didn't invent this story out of thin air, is that right?
A. No, no, was not invented.
Q. Okay. And when you went on to say, "The president kept the whole thing for himself and I complained to my Chinese counterparts," was it in fact true that you had heard that the president kept the whole thing?
A. That's what I heard, yes.
Q. Okay. And had you also in fact heard that some of the money was designated for you? Is that true?
A. That's also what I heard.
Q. Okay. You didn't make those up; you just didn't have personal knowledge of them, is that right?
A. And personal confirmation, yes.
Q. You hadn't confirmed it.
A. Yeah, no.
Q. Okay. Was it true that you did not indeed get any cut of those payments?
A. Yes, it was true.
Q. Now, Dr. Gadio, after you described a history of Chinese

businesspeople paying bribes to the president of Senegal, did the defendant respond in any way to your statements in this paragraph?
A. No.
MR. ZOLKIND: We can take that down.
Q. Dr. Gadio, do you recall some questions on cross-examination about the email you wrote in which you outlined the roadmap for pursuing a deal, including the technical team, negotiating over the price, the offer, and then rewarding with an entry ticket package? Do you recall that?
A. I remember, yes.
Q. Okay. And you recall some questions about the entry ticket concept?
A. Yes.
Q. First of all, Dr. Gadio, did the defendant ever at any point tell you that the $2 million in cash was an entry ticket?
A. Never.
Q. Did anyone else from CEFC ever describe, either before the cash was discovered by the president or after, ever try to describe that as an entry ticket?
A. No.
Q. Dr. Gadio, you were also asked about your prior experiences with entry tickets when you were serving as Foreign Minister of Senegal. Do you recall that?
A. Yes.

Q. Okay. And you said you had had some experiences, is that right?
A. Yes.
Q. Had you ever experienced an entry ticket that was paid multimillion dollars in cash?
A. No, never.
Q. Had you ever heard of an entry ticket that was provided where the money was given without some discussion beforehand about the fact that the donor would be donating an entry ticket?
A. No.
Q. Have you ever had an entry ticket that was surprisingly given at the end of a business meeting?
A. No, no.

I did mention once the case of this French oil leader of this company, ELF (ph), who signed a business deal with Chad precisely, and then before -- when they signed, just -- he asked to see the president, President Deby, precisely, and then he asked the president, what is your cut? Like how much do you want? And the president told him, I don't understand your question, he explained, and he said, if you want to make a donation to Chad, please write a check to the treasurer and take the check to the treasurer, but don't give me -- don't talk to me about giving me money. And the guy wrote a whole book and explained the situation.

Q. Just to be clear, are you testifying about something that you know personally or this is something that you've heard or read about?
A. I read about it, I heard about it.
Q. Okay.
A. Yes.
Q. But again, to be clear, if someone at the end of a business deal had simply provided a chunk of cash to the president personally, would you have viewed that as a legitimate entry ticket?
A. Completely, yeah.
Q. You would have or you would not have?
A. It's not -- I would -- I would not say it's an entry ticket.
Q. Okay. Dr. Gadio, do you recall some questions about the time period when you were running for president of Senegal?
A. Yes.
Q. And you recall being asked about a campaign contribution that you were given by a businessman?
A. Yes.
Q. And I think you testified that the amount of money was the rough equivalent of about 20,000 US dollars, is that right?
A. Exactly.
Q. At that time were you a public official?
A. No.

Q. In other words, were you in a position of government power in your country?
A. I was a private citizen.
Q. Okay. Was the person who gave you money seeking a multimillion-dollar deal that you had to be a party to approve or not approve?
A. Not at all.

MR. ZOLKIND: I have no further questions.

THE COURT: Thank you.

Recross, counsel?

MR. KIM: No recross, your Honor.

THE COURT: Thank you. You may step down, sir.

(Witness excused)

THE COURT: What do you want to do? Do you want to call it a night or what do you want to do?

MR. ZOLKIND: I think that makes sense, your Honor.

THE COURT: All right. Ladies and gentlemen, we're going to toss you out into the cold winter night.

JUROR: Oh, no.

THE COURT: Would you follow your normal instructions. Don't discuss the case, leave your books in the jury room, don't do any research about the case. And have a pleasant evening.

Tomorrow morning, on time, ready to start, 10:00. Coffee at 9:15.

Good evening. Thank you for your attention.

(Jury not present)

THE COURT: Anything else on the record, counsel?

MR. KIM: Not from the defense.

MR. ZOLKIND: No, your Honor.

THE COURT: Thank you.

(Adjourned to November 30, 2018, 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

CHEIKH TIDIANE GADIO

Direct By Mr. Zolkind . . . . . . . . . . . . . 490

Cross By Mr. Kim . . . . . . . . . . . . . . . . 566

Redirect By Mr. Zolkind . . . . . . . . . . . . 658

GOVERNMENT EXHIBITS

Exhibit No. Received

203, 204 and 205 . . . . . . . . . . . . . . . 491

1085 . . . . . . . . . . . . . . . . . . . . 494

86 . . . . . . . . . . . . . . . . . . . . . 495

89 . . . . . . . . . . . . . . . . . . . . . 497

92 and 92TX . . . . . . . . . . . . . . . . . 499

94 . . . . . . . . . . . . . . . . . . . . . 502

95 and 95TX . . . . . . . . . . . . . . . . . 503

1096 and 1096TX . . . . . . . . . . . . . . . 504

99 . . . . . . . . . . . . . . . . . . . . . 518

100 . . . . . . . . . . . . . . . . . . . . 525

104 . . . . . . . . . . . . . . . . . . . . 526

105 . . . . . . . . . . . . . . . . . . . . 534

107 . . . . . . . . . . . . . . . . . . . . 536

S-1 . . . . . . . . . . . . . . . . . . . . 537

2008 . . . . . . . . . . . . . . . . . . . . 538

118 . . . . . . . . . . . . . . . . . . . . 546

117 . . . . . . . . . . . . . . . . . . . . 549

1126 . . . . . . . . . . . . . . . . . . . . 550
1129 . . . . . . . . . . . . . . . . . . . . 555
141 . . . . . . . . . . . . . . . . . . . . . 560
176 . . . . . . . . . . . . . . . . . . . . . 563
1510, 1510A and 1510B . . . . . . . . . . . 565
66 and 66TX . . . . . . . . . . . . . . . . 664

DEFENDANT EXHIBITS

Exhibit No. Received

DS01 . . . . . . . . . . . . . . . . . . . . 581
1096 and 1097 . . . . . . . . . . . . . . . 582
311 . . . . . . . . . . . . . . . . . . . . . 627