UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 17 Cr. 779 (LAP)

CHI PING PATRICK HO,

Defendant. Jury Trial

------------------------------x

New York, N.Y.
November 30, 2018
10:03 a.m.

Before:

LORETTA A. PRESKA
District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: DANIEL RICHENTHAL
DOUGLAS ZOLKIND
CATHERINE GHOSH
PAUL HAYDEN
Assistant United States Attorneys

BENJAMIN ROSENBERG
EDWARD KIM
KATHERINE WYMAN
JONATHAN BODANSKY
JONATHAN BOLZ
Attorneys for Defendant

ALSO PRESENT: Ryan Carey, F.B.I.
Aashna Rao, Paralegal
Peter Calabrese, Paralegal

(Trial resumed; jury not present)

THE COURT: Good morning, ladies and gentlemen. Won't you be seated.

Off the record.

(Discussion off the record)

THE COURT: On the record.

MR. RICHENTHAL: Good morning, your Honor.

THE COURT: Good morning.

MR. RICHENTHAL: Just two quick things for the record. I don't think either is ripe for decision yet.

First, we had asked the defense a couple of nights ago for information concerning a certain individual it had identified as potentially calling in the defense case. We haven't heard back yet. We understand that there's a lot going on, but we just want to let your Honor know that there could be motion practice depending on the answers to our questions, if we're given answers. Hopefully we'll get answers soon.

THE COURT: Are we getting answers soon on that, friends?

MR. KIM: Yes, your Honor.

THE COURT: When is that?

MR. ROSENBERG: Late today, and I don't believe there will be a necessity for motion practice.

THE COURT: Thank you.

MR. RICHENTHAL: And then second, similarly, we asked

the defense yesterday after the trial day whether it presently anticipated that Mr. Ho would be testifying. We were told that they weren't prepared to commit one way or another at this time, which we could respect, but we do think it's appropriate to get reasonable notice.

THE COURT: When are we going to know, friends? And the government's telling us that they're going to rest Monday. I think that's what you're telling me, isn't it?

MR. RICHENTHAL: That's correct, your Honor.

THE COURT: All right.

MR. ROSENBERG: We think by early tomorrow afternoon.

THE COURT: Tomorrow is Saturday.

MR. ROSENBERG: Yes, your Honor. We intend to meet with our client in the morning.

THE COURT: Okay. If there's no resolution, that might cause us to have a delay in proceedings, so we need to know at the time you suggest.

MR. ROSENBERG: Understood, your Honor.

THE COURT: Yes, sir.

What else, friends?

MR. RICHENTHAL: Could I just have one moment, your Honor.

THE COURT: Mr. Rosenberg, I'm reading the transcript here.

MR. RICHENTHAL: Nothing else.

THE COURT: Excuse me. I think that you said, in response to Mr. Richenthal's first issue about the witness, that you thought it would not be a necessity for motion practice, is that right?

MR. ROSENBERG: That is what I said. I didn't notice that it didn't get correctly recorded, but I will endeavor to speak more slowly and loudly.

THE COURT: Oh, I see. Forgive me, Ms. Reporter. Forgive me. I didn't read it correctly.

All right. Anything else, friends?

MR. RICHENTHAL: Not from the government.

THE COURT: Thank you.

We will have a draft charge to you no later than sometime tomorrow, probably earlier rather than later. Depending on where we are today, I guess we would look forward to having the charge conference early Tuesday morning. And I'll ask you first thing Monday morning if you anticipate lengthy objections. Given where we were with the redline, I didn't think there would be lengthy objections no matter what, but I'll ask you that question first thing Monday morning, anticipating the charge conference early Tuesday morning so that then we can begin court proceedings at the usual time.

Anything else?

MR. RICHENTHAL: My assumption from what your Honor just said is that even if there were sufficient time to close

on Tuesday, that your Honor does not anticipate summations on Tuesday. In other words, if we do the charge conference Tuesday morning, I suppose it's theoretically possible we'd have sufficient time left in the day, but it might be quite a rush.

THE COURT: Do we need to do this scheduling stuff on the record? No, right?

MR. RICHENTHAL: I don't think so, your Honor.

THE COURT: All right. Off the record.

(Discussion off the record)

THE COURT: The jury is ready. May we bring them in.

(Continued on next page)

(Jury present)

THE COURT: Won't you be seated.

We continue with the government's case.

Who does the government call?

MR. ZOLKIND: Thank you, your Honor. The government calls FBI Special Agent Melissa Galicia.

(Witness sworn)

THE COURT: Counsel.

MR. ZOLKIND: Thank you, your Honor.

MELISSA GALICIA,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ZOLKIND:

Q. Good morning, Agent Galicia.

A. Good morning.

Q. Let me begin with some background questions.

Where do you work?

A. I work at the FBI.

Q. What's your title?

A. I'm a special agent.

Q. How long have you been a special agent with the FBI?

A. For over three years.

Q. Which FBI office do you work at?

A. I work in the New York office.

Q. And is that based here in Manhattan?
A. It is.
Q. Before joining the FBI, what did you do?
A. I was a lawyer.
Q. Okay. And do you work as a lawyer at the FBI?
A. No, I do not.
Q. Are you assigned to any particular FBI squad or group?
A. I'm assigned to Squad C4, which is a public corruption squad.
Q. Could you just describe in general what some of your duties and responsibilities are as a member of a public corruption squad with the FBI.
A. Sure. As I stated, we're a public corruption squad, so we investigate --

THE COURT: Slowly, clearly, loudly, into the microphone.

THE WITNESS: Okay. Sorry.

THE COURT: See those people in the back? Talk to them.

A. As I said, we're a public corruption squad, so we investigate corruption of public officials at all levels -- local, state, federal. Also corruption of law enforcement. We investigate bribery cases, foreign bribery, and also some fraud against the government cases.
Q. What are some of the techniques that you employ in

corruption investigations?
A. We have a wide variety of techniques that we use. For example, we can conduct interviews, serve grand jury subpoenas for information, analyze financial records, obtain search warrants, conduct surveillance. Those are just a few examples.
Q. You mentioned search warrants. Are you familiar with something known as an email search warrant?
A. Yes.
Q. And what are you able to obtain through an email search warrant?
A. You're able to obtain the contents of one's email account, as described in the warrant.
Q. Okay. Could that include accounts held at companies like Google and Yahoo and other internet providers like that?
A. Yes.
Q. In order to obtain an email search warrant, does the FBI need to obtain the approval of anyone?
A. Yes, it needs to be approved and issued by a federal judge.
Q. Now let me turn to your work in connection with this trial.
Agent Galicia, what role, if any, have you played in preparing for this trial?
A. To prepare for this trial, I reviewed two timelines and the underlying exhibits referenced in those timelines, and I confirmed that the information on the timelines were -- was correct and accurate.

Q. Okay. When you say you confirmed it as correct and accurate, you mean based on the exhibits that you reviewed?
A. Correct.
Q. And what type of exhibits did you review?
A. They were mostly emails, texts, and some documents.
Q. Okay. And when you say texts, what are you referring to?
A. Messages between phone type messages.
Q. Text messages?
A. Text messages, yes.
Q. Who decided which emails and text messages and other exhibits you should review?
A. Members of the investigative team.
Q. That would be the government team?
A. Correct.
Q. Did you review all of the emails and all of the text messages in this case?
A. I did not.
Q. Okay. And again, what was your specific assignment?
A. My specific assignment was just to confirm that the information on the timelines was correct, when reviewing the underlying exhibits that were referenced.
Q. Now with respect to the investigation that led to the charges in this case, was that investigation carried out at all by the squad that you're a member of at the FBI?
A. It was, yes.

Q. And were you the lead FBI agent on that investigation?
A. I was not.
Q. Were there some occasions where you assisted in various ways in that investigation?
A. Yes.
Q. Have you had any involvement in preparing for this trial other than verifying the information in the timeline?
A. No.

MR. ZOLKIND: Just before we get to those timelines, if we could bring up, Ms. Rao, Government Exhibit S-7, which is a stipulation between the parties. This is already in evidence.

It's titled Stipulation of Certain Items Seized from Chi Ping Patrick Ho and Cheikh Gadio.

If we could go to paragraphs 5 through 7. This reads that the parties have stipulated that:

Paragraph 5. "Agents with the FBI arrested Chi Ping Patrick Ho on or about November 18, 2017. In connection with that arrest, agents seized from Ho, among other things, an Apple iPad ('the Ho iPad')."

Paragraph 6. "The Ho iPad was extracted onto a report by an FBI specialist pursuant to a judicially-authorized search warrant."

Paragraph 7. "Government Exhibit 1300 contains a true and correct copy of an excerpt from the extraction report of

the Ho iPad relating to 'user accounts.'"

Pursuant to that stipulation, we offer Government Exhibit 1300.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 1300 received in evidence)

MR. ZOLKIND: Could we bring that up, please.

If we could zoom on just the first couple entries.

BY MR. ZOLKIND:

Q. Okay. Ms. Galicia, do you see this first page of Government Exhibit 1300 here?

A. Yes.

Q. And what do you understand this document to reflect?

A. I understand that these are the email addresses that were registered to the iPad.

Q. To the --

A. To the Ho iPad.

Q. Okay. All right. And if we could just go through some of the email addresses that were registered as user accounts on the defendant's iPad.

Do you see hocppatrick@gmail is listed?

A. Yes.

Q. And ho@chinaenergyfund.org is listed? I'm sorry. Head@chinaenergyfund.org. My apologies.

A. Yes.

MR. ZOLKIND: We can skip the next one. Keep going.
Q. Do you see secgen@chinaenergyfund?
A. Yes.
MR. ZOLKIND: And if we keep scrolling down.
Q. Do you see there hocppatrick@gmail?
A. Yes.
Q. And do you see at the bottom there cpho@chinaenergyfund.org?
A. Yes.
MR. ZOLKIND: All right. I think we may have scrolled past the one that reads kimosabe hk. If you go back up.
Q. Do you see kimosabehk@yahoo.com hk?
A. Yes.
Q. And some of these email addresses are ones that you saw that appeared to have been used by the defendant, based on the emails you reviewed?
A. Yes.
MR. ZOLKIND: Okay. All right. You can take that down.
Q. Let me show you what's been marked for identification as Government Exhibit 2601.
Do you recognize what's been marked here as 2601?
A. I do.
Q. And what do you recognize that to be?
A. This is the timeline with respect to events that occurred

with Chad.
Q. All right. And is this one of the timelines that you testified that you reviewed to confirm the accuracy of the descriptions?
A. Yes.
Q. And did you in fact confirm that the descriptions in this timeline are accurate reflections of portions of the exhibits that are referenced in the timeline?
A. Yes, I did.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 2601.
MR. ROSENBERG: No objection.
THE COURT: Received.
(Government's Exhibit 2601 received in evidence)
MR. ZOLKIND: If we could just publish the first page here.
BY MR. ZOLKIND:
Q. Okay. Just before we get into some more detail, now that it's in front of the jury, can you explain what, in general, information is contained in this timeline.
A. Sure. Generally, this timeline identifies certain dates, and below each date is a short entry or description that summarizes the exhibit that is referenced in the lower hand corner of the -- of each box, or bubble.
Q. Okay. And are those exhibits that you testified before

were emails or text messages or other documents?
A. Yes.
Q. Now again, to be clear, does the timeline contain all of the emails, text messages, and other documents that relate to events in Chad?
A. No.
Q. And again, who selected which emails and other documents to include in this timeline?
A. Members of the government team.
Q. And for each particular bubble that we see here, is there an associated date?
A. Yes, there is.
Q. Okay. And for each one is there one and sometimes more than one exhibit listed?
A. Yes.
Q. Okay. And then I see a description. To be clear, Agent, does the description capture all of the details about whatever exhibit is listed in the particular bubble?
A. No.
Q. What information is the description intended to capture?
A. The description is just a brief summary of a portion or portions of the underlying exhibit.
Q. Okay. And is it your understanding that the full exhibit will be available for the jury or others to review if they'd like to see them?

A. Yes.
Q. Okay. All right. Now let's start here with the Chad timeline. I'm not going to ask you to read every single bubble or every single exhibit. Some will already be familiar, but let's go through some of them.
If we could start with the first bubble on September 22nd, the second one. September 22, 2014. And if you could read that bubble.
A. "HO emails with Vuk Jeremic about gaining a channel to the President of Chad."
Q. Okay. And if we could read the next one, September 26, 2014, about four days later.
A. "HO and Cheikh Gadio meet in New York."
Q. And let's go to a couple weeks later, October 14, 2014.
A. "HO tells Zhang Ya that he wants to prepare certain reports, including Chad President report."
Q. Okay. And what exhibit number is referenced in this bubble?
A. Exhibit 9.
MR. ZOLKIND: Okay. And Ms. Rao, if we could -- you know what, your Honor, excuse me. What I meant to do is offer into evidence the various exhibits that are referenced in these timelines. It is a lengthy list of exhibits and so I can hand up a copy, if that would be useful for the Court, or the court reporter.

THE COURT: And has counsel reviewed the list?

MR. ROSENBERG: Your Honor, we've agreed that the exhibits cited, we have no objection.

THE COURT: Thank you.

Why don't you put an exhibit number on that list, please, counsel. Just make something up.

Call it Exhibit 9999. How's that? Is that okay?

MR. ZOLKIND: That is perfect.

THE COURT: Okay. Let's go.

MR. ZOLKIND: Would your Honor like me to read the underlying --

THE COURT: No. The jury doesn't want to hear it either. But I understand the government to be offering the exhibits listed on Government Exhibit 9999. I understand the defense has no objection, and accordingly, the exhibits listed on Government Exhibit 9999 are received.

(Government's Exhibits [listed on GX 9999] received in evidence)

MR. ZOLKIND: Thank you, your Honor.

All right. If we could bring up Government Exhibit 9, which is now in evidence.

BY MR. ZOLKIND:

Q. All right. Starting at the bottom, can you read the signature line through -- the first email in the chain is from?

A. From Zhang Ya, Principal Officer, China Energy Fund

Committee.

Q. Okay. And if you just look over your shoulder, do you see Zhang Ya on the chart photographed there, below the defendant in the middle?

A. Yes.

Q. Okay. And you see that going up one level in the chain, there's an email from "head," and again, who do you understand that to be?

A. I understand that belongs to Patrick Ho.

Q. Okay. All right. Do you see here that he wrote to Zhang Ya, "I'm going to BJ this Friday to see Ye on Saturday afternoon. Documents I want to send him beforehand in separate items are:" And then there's a numbered list 1 through 10. Do you see that?

A. Yes.

Q. I'll just read a few of them.

No. 3 says, "Chad president report (brief)."

And then 4 refers to Croatia oil company.

5 refers to PAZ Oil Company.

6 refers to Zheng Rong Zhuhai.

7 refers to Iranian connection.

8 refers to Husky Oil Team.

And then there's Nine and Ten listed as well.

And then if you could read the top email in the chain again from the defendant.

A. "I am enclosing the briefs on Item 3), 7), 8), 9), and 10). Some of the points can be extracted from the attachments sent you separately. Will call you tomorrow to fill in some of the blanks. Thanks."

Q. Okay. And if we turn to the next page, the attachment to this email.

Do you see here that the defendant attached what appear to be draft reports?

A. Yes.

Q. Okay. And could you read No. 3, the draft report titled Chad Republic.

A. "3. Chad Republic."

THE COURT: Slowly, please.

A. "At the UN gatherings, met an old friend, former foreign minister of Senegal, also a friend of Vuk Jeremic. He has served in the African Council with the President of Chad."

THE COURT: Slowly.

A. "And a good friend and supporter of the president. His name is Dr. Gadio.

"I met in confidence with Dr. Gadio and related to him our involvement with the Chinese company in Chad and wished to seek the help of the President in resolving the matter.

"Dr. Gadio agreed to help. He called the President on the phone and got an appointment to meet with the President in Chad on October 12."

Q. Okay. You can stop there. And if you could scroll down, do you see below that, defendant included a report titled Iranian Connection, or draft report titled Iranian Connection?
A. Yes.
Q. Could you read that as well.
A. "No. 7, Iranian Connection. A good friend of mine in Hong Kong is closely connected with the central leaders of the Iranian Revolutionary Army. He has been charged with two tasks in Hong Kong.

"Iran has money in a bank in China which is under sanction. Iran wishes to purchase precious metal with this money. The precious metal is available through a bank in HK which cannot accept money from the bank in China which holds the money but is under sanction. The Iranian agent is looking for a Chinese company acting as a middle man in such transactions and will pay commission. (Details to be presented orally)

"The Iranian connection has strong urge to establish trading relationship with us in oil and products, including the oil reserve initiative. We are asked to visit Iran again and bring with us concrete proposal for expedient discussion, negotiation, and agreement. They are open to what we want. (Details discussed in person)."

MR. ZOLKIND: Okay. And if we zoom out and just go to the next page.

Q. Do you see the defendant also provided a draft report entitled Husky Oil Team?
A. Yes.
Q. Okay. We don't need to read that.
MR. ZOLKIND: If we could go back to the Chad timeline, please.
Q. If you could read the next entry, which is the day after, October 15th.
A. "Zhang Ya sends HO draft reports."
Q. And if we could go to the next entry, the day after, October 16, 2014.
A. "HO provides a report to CEFC chairman regarding HO's meeting with Cheikh Gadio."
Q. Okay. All right. And what are the first two exhibits referenced here?
A. 11 and 11-TX.
MR. ZOLKIND: Let's go to Government Exhibit 11, which is now in evidence.
Q. And do you see that this is a Chinese language document?
A. Yes.
MR. ZOLKIND: Could we just turn to the attachment.
Q. Do you see it's Chinese language attachment?
A. Yes.
MR. ZOLKIND: All right. Let's go to Government Exhibit 11-TX, which has been stipulated as an English

translation. If you could zoom in on the top.
Q. Who is this email from?
A. It's from Zhang Ya.
Q. Who is it copied to?
A. To one of the email addresses used by Patrick Ho.
Q. All right. If you look at the body, how is it addressed?
A. It's addressed to the colleagues of chairman's office.
Q. Okay. And what email address do you see associated with chairman's office?
A. In the To line, zxbgs@cefc.co.
Q. And what is the subject line?
A. Subject is Collection of Reports by Secretary General Ho of China Energy Fund Committee.
Q. Secretary General Ho of China Energy Fund Committee?
A. Yes.
Q. And do you see No. 3 in the list of attachments?
A. Yes.
Q. What does that say?
A. "Attachment Documents 3-Attachment-Chad."
MR. ZOLKIND: All right. Let's go to the attachment.
Q. If you could read from the title through the first part of the next paragraph, please. Right through where it says "Gadio."
A. "Report on Chad visit. Chairman Ye, may I draw your attention to the following:

"Regarding the Chad project, I, while staying in New York earlier, paid a special visit to the former Foreign Minister of Senegal (a western Africa country), Gadio (Cheikh Tidiance Gadio) --"
Q. Why don't you finish that sentence.
A. "-- who had come to attend the conference of the 69th United Nations General Assembly."
MR. ZOLKIND: All right. And if we could skip to the last paragraph on that page.
Q. And read that through the beginning of the next page. Yup.
A. "I gave him a detailed account of the issue that the relevant Chinese energy enterprise had encountered in Chad, and informed him of our preliminary plans and ideas, hoping for his help to receive special attention and support from President Deby."
MR. ZOLKIND: All right. And if we could go just to the end of that report.
Q. How is it signed?
A. It's signed by Ho Chi Ping, Standing Vice Chairman and Secretary General of China Energy Fund Committee.
MR. ZOLKIND: All right. Could you go back to the timeline, please.
Q. And let's go to the next entry, about a week later, October 21, 2014.
A. "Gadio meets with President Deby in Chad."

MR. ZOLKIND: Okay. If we could back out.
Q. And if you could read the next sentence, same day.
A. "Gadio provides report to HO regarding Gadio's meeting with President Deby."
Q. Okay. All right. I won't ask you to read the next few bubbles, but do you see that they refer to various correspondence between the defendant and Gadio?
A. Yes.
Q. Okay. All right. Let's skip ahead to the bubble dated October 27/28, 2014.
A. "Gadio meets with HO and other CEFC executives in China."
MR. ZOLKIND: Okay. Take that down.
Q. And do you see that, again, without going through them individually, that the next several bubbles refer to further correspondence between the defendant and Cheikh Gadio?
A. Yes.
Q. Okay. If you could read the entry, the second entry on November 4, 2014.
A. "HO asks Gadio to request that President Deby 'make known to [CNPC] that the President knows how CEFC and likes how it operates, and welcomes CEFC as a major partner of [CNPC] in the Chad project.'"
MR. ZOLKIND: Okay. Back out of that.
And if we could just go ahead to the November 11, 2014 entry.

Q. And if you could read that.
A. "First CEFC meeting in Chad: HO and CEFC delegation, and Gadio, meet with President Deby in Chad."
MR. ZOLKIND: All right. If we could go to the entry three days after the first CEFC meeting in Chad, November 14th.
Q. And read that entry.
A. "HO provides a report to CEFC chairman on his meeting with President Deby in Chad."
Q. Okay. And what are the exhibits referenced there?
A. Exhibit 44 and 44-TX.
MR. ZOLKIND: All right. These are now both in evidence as well. Let's go to the English translation, 44-TX.
Q. And again, who is this email from?
A. It's from Zhang Ya.
Q. Okay. Who is blind-copied on the email?
A. Patrick Ho.
Q. Okay. Who do you understand it to be addressed to?
A. The chairman's office.
Q. Okay. If you could read the subject line.
A. "Classified documents-regarding report on visiting Chad President Idriss Deby."
MR. ZOLKIND: If we could go to the attachment.
Q. And do you see it begins, "Report on visiting Chad President Idriss Deby"?
A. Yes.

Q. It says, "Chairman Ye, Greetings:

"Late at night on November 11, our group, Chief Zang/Jian Jun and I, visited President Idriss Deby in N'Djamena, the capital of Chad. The meeting, from 8:30 p.m. to 10:15 p.m., lasted for a total of one hour and 45 minutes. Both sides had had an excellent feeling and thought it was very successful."

Do you see that?

A. Yes.

MR. ZOLKIND: Okay. We could skip ahead, Ms. Rao, to Bullet No. 7, a couple pages into the report.

Q. All right. If you could read just that paragraph.

A. "7. During the meeting, President Deby placed heavy emphasis on the H Block oilfield located in northeast of Chad which is in the corner of where Northern Sudan, Egypt, and Libya meet. The oilfield, proven through exploration that it's rich in oil storage and contains high quality crude oil, produces light oil. Its underground layout is that it connects locations in Northeast Chad, Northern Sudan, Egypt, and Libya into a great mass. Presently, Sudan, Egypt, and Libya have respectively begun drilling and extracting large quantity of crude oil within the territory of their countries. As such, President Deby is also anxious to develop its own within the border. The crude oil extracted locally can be exported through the Egyptian oil pipelines. Previously the original

contract between China National Petroleum Corp. (CNPC) and the Chad government also mentioned about this piece of oilfield. However, President Deby has taken the project out of the contract when the two parties are revising it."

MR. ZOLKIND: Ms. Rao, if you could now highlight the next paragraph.

Q. And Agent Galicia, if you could read that.

A. "President Deby emphasized that Brazil is highly interested in it, giving an all-out effort to get the right to develop the oilfield. He stated laughingly that the Brazilian aspect had already 'bribed' to convince his subordinate/subordinates who is/are in charge, and he has been given a lot of pressure. However, he is personally willing to give this oilfield project to China CEFC, to work in it jointly.

"(After our delegation departed Chad, President Deby sent over a special message. Regarding the oilfield project, our parties can reach him directly through Gadio (former Senegal Foreign Minister) and he would handle it personally. He emphasized repeatedly that our side had no need to deal with Chad's energy minister and other government officials.)"

MR. ZOLKIND: Ms. Rao, if you could now move down to the next two paragraphs.

Q. And Agent Galicia, if you could please read those.

A. "Finally, our group expressed our gratitude to President Deby for the reception and arrangement, and, on behalf of you,

Mr. Chairman, invited him and his family to visit China CEFC. He stated that there is an opportunity for him to visit China early next year. We extended an invitation to him to stay an extra day or two beyond his official business in China, to be a guest in Shanghai or Hong Kong.

"In summary, President Deby was in high spirits throughout the meeting, and filled with expectation with the future cooperation between us. President Deby has been a staunchest member and forceful promoter of the African Union Movement. He is the longest reining president (has been 24 years) out of all the African countries, and a leader who is firmly in power. I deem that, through President Deby, China CEFC can use Chad as a standing point to break into the African market."

MR. ZOLKIND: And Ms. Rao, if you could just go to the very end of the report to the signature line.

Q. Who is this report signed by?

A. It's signed by Ho Chi Ping, Standing Vice Chairman and Secretary General of China Energy Fund Committee.

MR. ZOLKIND: Okay. If we could go back to the timeline, please.

Q. So again, Agent Galicia, on your timeline here, what was the date of the first CEFC meeting in Chad?

A. November 11th.

Q. And if you could read the entry that comes after the report

you just read, November 18, 2014.
A. "HO requests that Gadio arrange a second meeting with Deby on November 28 or 29."
Q. And if you could read the next entry on the same day.
A. "HO texts Gadio: Please read email."
Q. If you could now read the entry that appears -- the first entry on the next day.
A. "HO reiterates to Gadio 'our need to contact the President.'"
Q. If you could now read the second entry on November 19th.
A. "Gadio advises HO not to seek an immediate second meeting with President Deby, and explains the steps CEFC should follow to pursue an oil deal. Gadio also repeats his request for a 'legally binding agreement' between CEFC and Gadio's firm."
MR. ZOLKIND: Let's skip ahead slightly to the second entry on November 26, 2014.
Q. Could you read that one.
A. "HO tells Gadio that 'the most pertinent issue at this time is to arrange for a meeting with the President in Chad as soon as feasible.' He notes that the CEFC delegation will arrive 'via the company plane.'"
MR. ZOLKIND: All right. And let's go now to December 8, 2014.
Q. If you could please read that.
A. "Second CEFC meeting in Chad: HO and CEFC delegation, and

Gadio, meet with President Deby in Chad."
Q. All right. And if you could read the second entry on the very next day.
A. "Gadio texts HO, 'The boss just called. He wants to see you and me now. I am coming to pick you up.'"
Q. And if you could read the second entry from the very next day after that.
A. "HO works on an agreement between CEFC and the government of Chad; and HO drafts a letter to President Deby regarding CEFC's 'wish to make a donation of USD two million to the people of Chad at your personal disposal to support your social and other programs as you see fit.'"
Q. And what exhibits are listed for this entry?
A. Exhibits 66, 66-TX, 67, and 67-TX.
MR. ZOLKIND: Okay. Let's pull each of those up. If we go first to Government Exhibit 66.
Q. All right. We see that this is a Chinese language communication dated December 10, 2014?
A. Yes.
MR. ZOLKIND: Okay. Let's go to 66-TX. If we could just zoom in right there.
Q. Okay. And do you see that this is an email from someone named Audrey? Who do you recognize to be in the To line?
A. Patrick Ho.
Q. Okay. What's the subject line?

A. "Memorandum on CEFC China and Chad."
Q. Okay. And if you could just read the text in the email.
A. "Secretary-General: Please see the attached memorandum. Thanks."

MR. ZOLKIND: If we could pull up the attached memorandum.

Q. Okay. Do you see it's titled Memorandum (Draft)?
A. Yes.
Q. And then in the beginning it says, "The memorandum is signed by (the agency or department designated by the president) and CEFC China Energy Company Ltd.," and then if we could go down to the numbered list, and if you could read Nos. 1 and 2 in this draft memorandum.
A. "1. The Chadian side will fully support CEFC China's participation in the CNPC's Chad project.

"2. The Chadian side states that, whether is regarding oilfield exploration block or oil pipeline, so long as the Chadian side has the right over such pipeline and oilfield exploration block, it can cooperate with CEFC China in all of them.

"Regarding oil pipeline and oilfield exploration blocking that the Chadian side doesn't have the right over, so long as CEFC China is interested in their participation, the Chadian side is willing to give assistance."

MR. ZOLKIND: Okay. All right. And if we just go

down to the bottom of the memorandum.
Q. And who is it contemplated to be signed by?
A. On one side, signed by the agency or department designated by the president, and the other, CEFC China Energy Co. Ltd.
MR. ZOLKIND: Okay. Let's go now to Government Exhibit 67.
Q. And do you see at the bottom of the chain here, the chain starts with the email we just looked at?
A. Yes.
MR. ZOLKIND: Let's go to the English translation, 67-TX.
Q. Okay. Do you see that the chain starts with the email we just looked at?
A. Yes.
MR. ZOLKIND: Okay. And let's go up and take a look at the defendant's response.
If we could highlight first the top half. Yeah.
Q. Okay. And do you understand this to be the defendant responding to the draft, or the email containing the draft memorandum that we just looked at?
A. Yes.
Q. Okay. And do you see at the top here the defendant writes:
"Thanks Audrey, for the draft. Suggestion:" And then he includes certain suggestions about revisions or changes to make to that draft agreement?

A. Yes.

MR. ZOLKIND: Okay. If we could just scroll down in the same email.

Q. Do you see just below that, the defendant writes, "Also, about the letter to the president about the donation, a draft as follow for consideration:"

And if you could please read the defendant's draft letter.

A. "Your Excellency Mr. President: We, CEFC company, are very much impressed by your able leadership in your country and the way that you care for your people. To express our admiration and pledge support to your cause, and as a token of our sincerity in building a strategic partnership with your good self and our long-term friendship, we wish to make a donation of USD 2 million to the people of Chad at your personal disposal to support your social and other programs as you see fit. We would be most honored and grateful if our wish could be accommodated."

Q. Agent Galicia, based on the documents you've reviewed, did the defendant draft this letter to President Deby before or after that December 2014 trip to Chad?

A. Based on my review, it would be after the meeting.

Q. And based on the documents you reviewed, was this email the first draft of the letter or did you see any prior draft?

A. This was the first draft.

MR. ZOLKIND: All right. If we could go back to the timeline.

If we could go to the entry the next day, December 11, 2014.

Q. And if you could read that, please.

A. "HO receives a revised draft of the letter to President Deby, and approves it to be transmitted to the President."

MR. ZOLKIND: Okay. And I see listed there are Government Exhibits 69, 69-TX, and 70. Let's pull up 69-TX.

Q. All right. Again, this is an email from Audrey to the defendant now on December 11, 2014. If you could read the subject line of that email.

A. "Letter to His Excellency President Deby of the Republic of Chad."

MR. ZOLKIND: And if we could go to the next page.

Q. Okay. Do you see there this is the revised letter to the president?

A. Yes.

MR. ZOLKIND: And if we could go to Government Exhibit 70.

Q. All right. Do you see that this chain starts again at the bottom with the email we just looked at from Audrey?

A. Yes.

MR. ZOLKIND: And if we can zoom in on the defendant's response.

Q. Hocppatrick, is that another email address you understand to be used by the defendant?
A. Yes.
Q. Do you see he writes, "Letter is fine with me. The rest seek Gadio's view"?
A. Yes.
Q. Okay. And let's go up to Audrey's response, if you could read that.
A. "Sure. I'll send the English version to him and cc to you as well."
MR. ZOLKIND: If we could go up to the top email in the chain.
And Ms. Rao, if you could just highlight the first two lines.
Q. The defendant responds, "Let me have the revised version of the MOU. The donation letter, which is translated into French, can be sent to Gadio's to pass onto the President." Do you see that?
A. Yes.
MR. ZOLKIND: Okay. Okay. You can take that down and go back to the timeline.
Q. If you could read the first entry on December 18, 2014.
A. "HO provides a report to CEFC chairman regarding compensation of Gadio."
MR. ZOLKIND: All right. And it references Government

Exhibit 79-TX. Let's bring that up.
Q. Okay. And again, is this another email from Zhang Ya copying the defendant to the email address that you understood to be the chairman's office?
A. Yes.
Q. And if you could please read the subject line.
A. "Report on Hiring Former Senegal Foreign Minister Gadio as a Fund Committee Adviser."
MR. ZOLKIND: Let's go to the attachment.
Q. Could you read the title through the first paragraph.
A. "Report on Hiring Former Senegal Foreign Minister Gadio as a Fund Committee Adviser.
"Chairman Ye, Greetings:
"We have benefited chiefly from the recommendation and assistance of former Senegal Foreign Minister Cheikh Tidiance Gadio (Cheikh Tidiance Gadio met with you, Mr. President, in Shanghai on October 28) in our present focus on cultivating business with Chad President (Idriss Deby)."
MR. ZOLKIND: If we could skip to the last paragraph and highlight that, please.
Q. If you could read that.
A. "If we are interested in entering Africa's evolving industries of petroleum and natural gas exploration, Gadio would be an excellent guide and long-term partner in assisting us in Africa. Therefore, I would like to suggest hire Gadio as

a senior adviser to the China Energy Fund Committee, for a term of one year with an annual salary of $300,000. Simultaneously, a donation of $100,000 would be made to the 'African Peace Conference' held in March 2015 in Chad which organized by his party."

Q. Okay. And if you could just go down to the signature.

Who signed that?

A. Patrick Ho.

MR. ZOLKIND: We could take that down and go back to the timeline.

And if we could go now to the next entry on the same day.

Q. If you could read that.

A. "Gadio emails HO to request 'swift action' on (1) entering into a contract with Gadio, (2) compensating Gadio for his work, and (3) making a contribution to the forum being hosted by Gadio's organization."

Q. Okay. If we go back now, pull up the entry on December 21st, about three days later.

A. "Gadio's son asks Gadio for 'any feedback from our friends in China,' stating that 'their attempt to buy the president to put us to the side did not work.'"

Q. If we could bring up the bubble on January 5th, a week or two later.

A. "Gadio revises CEFC's letter to President Deby, to state

that CEFC 'would like to express its sincere support for your development policies by making available to you a donation of two million US dollars intended for your social actions for the most vulnerable groups....'"
Q. If you could read the next entry on January 12th.
A. "HO's secretary sends Gadio a signed version of the letter to President Deby."
Q. And the next entry, the same day.
A. "Gadio sends the signed letter to President Deby's aide."
Q. Okay. And then the last entry on the Chad timeline that I'll ask you about is about a month after that, three weeks or so after that, February 5, 2015.
A. "Gadio responds to CEFC's offer of compensation."
MR. ZOLKIND: If you could bring up the exhibit referenced there, 104.
And if we could just zoom in on the header there.
Q. Who do you recognize that email to be from?
A. From Cheikh Gadio.
Q. Okay. Do you see that it's to Anna Wong and copied to the defendant and others?
A. Yes.
Q. Anna Wong, secretary or assistant to Patrick Ho. Do you see the defendant is listed on the cc line there?
A. Yes, I do.
MR. ZOLKIND: Okay. Let's go to the attachment.

Q. I'll just draw your attention to the second page in the last paragraph.

MR. ZOLKIND: And Ms. Rao, if you could highlight the line beginning, "Also, it is difficult."

Q. And Agent Galicia, if you could just read the highlight there.

A. "Also, it is difficult to comprehend a two million dollar gift to the president and only one hundred thousand dollar to the facilitator who made all of this possible."

MR. ZOLKIND: We could take that down.

Q. Now, Agent Galicia, I'd like to go back to the letter that you just looked at a moment ago and that you testified about regarding the $2 million that was described as a donation. Do you recall testifying about seeing that letter?

A. Yes.

MR. ZOLKIND: Okay. Could we bring up Government Exhibit 67.

Q. Do you recall testifying about this email where the defendant provides the initial draft of that letter?

A. Yes.

MR. ZOLKIND: Ms. Rao, if you could just scroll down a little bit.

Okay. Back up a little.

If you could just go a little bit higher.

Thank you.

Q. Okay. Do you see here the defendant wrote about the letter to the president, about the donation, a draft as follows? As you read this draft, does the letter describe it being on behalf of the CEFC NGO or the CEFC company?
A. On behalf of the company.
MR. ZOLKIND: If you could highlight as well below where it says "Sincerely."
Q. And that's on behalf of the company?
A. Yes.
MR. ZOLKIND: Okay. And if we could pull up Government Exhibit 95.
Q. All right. Do you recall seeing the entry in the timeline referring to when Gadio transferred the letter to President Deby's aide, signed letter?
A. Yes.
MR. ZOLKIND: Okay. And let's go to the attachment.
If we could just scroll all the way up to the top.
If you could zoom in on the logo and the signed letter.
Q. Would you read the name of the entity described in the letterhead here.
A. China CEFC Energy Company Limited.
Q. Okay. So again, do you understand that to be the NGO or the oil company?
A. The oil company.

MR. ZOLKIND: All right. We could take that down.

If we could bring up Government Exhibit S-11, which is a stipulation between the parties that is already in evidence. A stipulation of certain websites.

I'm going to read a few paragraphs of this into the record.

If we could go back to first paragraph.

No. 1 reads, "The following government exhibits contain accurate copies of pages from the CEFC China Energy Company Limited website (cefc.co) as those pages existed as of the approximate dates set forth below."

THE COURT: Slowly.

MR. ZOLKIND: Thank you, your Honor.

And then the exhibits listed are Government Exhibit 800, 801, 802, and 809. And I'll offer now Government Exhibits 800, 801, 802, and 809.

MR. ROSENBERG: No objection, your Honor.

THE COURT: Received.

(Government's Exhibits 800, 801, 802, and 809 received in evidence)

MR. ZOLKIND: And your Honor, pursuant to the parties' stipulation regarding translations, I'll also offer Government Exhibit 800-TX and 802-TX.

MR. ROSENBERG: Same, your Honor.

THE COURT: Received.

(Government's Exhibits 800-TX and 802-TX received in evidence)

MR. ZOLKIND: All right. If we could bring up Government Exhibit 800, please.

BY MR. ZOLKIND:

Q. Agent Galicia, did you have an opportunity to review this screenshot of the CEFC oil company's website in advance of your testimony today?

A. I did.

MR. ZOLKIND: Okay. And let's bring up the English translation.

Q. Okay. Do you see at the top there it says CEFC China News Center?

A. Yes.

Q. And generally speaking, as you reviewed -- it's a lengthy document that we can go through a little bit, but as you reviewed this document, did you get an understanding of what type of information is contained on this CEFC website?

A. My understanding was that these were press releases with respect to the company.

MR. ZOLKIND: Okay. And if we just go, Ms. Rao, to the last page quickly.

Q. All right. And what dates do you see referenced on the last page of the press release website?

A. There's a reference to 2012 and 2013.

MR. ZOLKIND: Okay. And let's go to the first page.

Q. And what dates do you see referenced on the first page?

A. There's a reference to December 2017.

(Continued on next page)

BY MR. ZOLKIND:
Q. And, so, was it your understanding that this includes press releases between the time period of roughly 2013 and 2017?
A. Yes.
Q. And as you reviewed the press releases on this web page, did you see press releases that related to donations or other charitable humanitarian work?
A. Yes, I did.
Q. For example, Ms. Rao, if you could bring up page 83, and if you could just highlight the first item listed there. And if you could read that.
A. "Beijing CEFC International launched a donation program."
Q. Let's go to page 84, and again if you look at the first item on the list there.
A. "Hainan CEFC made the donation to Nangpu Rulan Community Elderly Activity Center."
Q. And another example on page 96, number 2 there, do you see that?
A. Yes.
Q. Could you read that, please?
A. "CEFC China hosted the 'The Victory of the Allies-the Anti-Japanese War,' the Shanghai premiere and donation ceremony was successfully held."
Q. And another example on page 156, item number one.
A. "CEFC China donated $5 million yuan to support the

reconstruction for the typhoon in Hainan."

Q. Did you have an opportunity to look up approximately how much U.S. dollars corresponds to 5 million yuan?

A. I did.

Q. Approximately how much it?

A. It's about $720,000.

Q. Were there other examples of donations on this website as well?

A. Yes.

Q. And based on your review of documents -- and you can feel free to refer back to the Chad timeline chart -- what was the date of the defendant's and CEFC's second meeting in Chad?

A. The second meeting occurred on December 8, 2014.

Q. And approximately when was the donation letter sent to President Deby or his aide?

A. I believe it would be in January 2015.

Q. And so would those dates -- the date of the December 2014 meeting and the date of when the donation letter was sent to the president -- would they fall within the date range of press releases on the website here?

A. Yes.

Q. Agent Galicia, in your review of the CEFC website regarding the press releases, did you see any reference to a $2 million U.S. donation to the People of Chad?

A. I did not.

Q. Did you see anything on this website about any sort of charitable or humanitarian assistance provided to the Chadian people?
A. I did not, no.
Q. Now, on the website did you see any news alerts that related to Chad just more generally?
A. I did, yes.
Q. So, for example, let's go to page 144. And you see the second item there?
A. Yes.
Q. Could you read that, please?
A. "CEFC China delegation visits Chad to investigate investment projects."
Q. OK. And if we could bring up Government Exhibit 802, and now the English translation 802-TX. OK. And do you see again this is based on the top here this is still in the news center part of the website?
A. Yes.
Q. If you could, Ms. Rao, just zoom in on the headline and text of the press release at the bottom.
Could you read the headline, please.
A. "CEFC China delegation visits Chad to investigate investment projects."
Q. And what is the date of the trip referenced in this press release?

A. The date is November 11, 2014.

Q. OK. And does that correspond to what you identified in the time line as the date of the first CEFC meeting in Chad?

A. Yes.

Q. Did you see in your review of the CEFC websites any press release regarding the second trip in December 2014?

A. No.

Q. And do you see anything in this press release about any sort of $2 million donation to Chad?

A. No.

Q. We can take that down. Let's bring up Government Exhibit 801. And was this another exhibit that you reviewed in advance of your testimony today?

A. Yes, it is.

Q. OK. And just generally speaking, what was your understanding of what sort of information is contained on this web page?

A. Again, it seems to be press releases with respect to the company.

Q. CEFC, that is?

A. CEFC, yes.

Q. And what's the main difference between as far as you can tell between this web page and the one we looked at just a moment ago?

A. The original here is in English.

Q. OK. And the other one the original was Chinese, and we were looking at the translation. This is the original English; is that right?
A. Yes.
Q. And does the English web page regarding press releases also contain entries between in or about 2013 and 2017?
A. Yes.
Q. OK. And on this English version, did you see certain press releases that relate to donations or other charitable or humanitarian work just in general?
A. I did, yes.
Q. And just to take one example, if you go to page 15 and take a look at number 2, if you can just read the headline there.
A. "CEFC Shanghai charity fund donates RMB three million at the ..."
Q. And then it gets cut off.
OK. You can back out of that. Did you see other examples of donations as well?
A. Yes.
Q. Did you see anything on this website about a $2 million U.S. donation to Chad?
A. I did not.
Q. Anything about any charitable or humanitarian work in Chad?
A. No.
Q. All right. Take that down.

Let's turn to the Uganda summary chart. If you could bring up for identification Government Exhibit -- it's not in evidence yet -- Government Exhibit 2602.

Do you recognize this document?

A. I do.

Q. What do you recognize it to be?

A. This is the timeline with respect to events in Uganda.

Q. All right. And did you confirm that the descriptions were accurate based on the exhibits that were referenced in the bubbles for each entry?

A. I did, yes.

MR. ZOLKIND: Your Honor, the government offers Government Exhibit 2602.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government Exhibit 2602 received in evidence)

Q. All right. Agent Galicia, I'm going to ask you to walk through each of these bubbles since they won't be as familiar. If we could just start with the first one, and if you could read the entry, please.

A. "Ho asks his secretary to seek an appointment with 'the new PGA Kutesa' during Ho's trip to the U.S."

Q. I see it references Government Exhibit 250. Let's bring that up. Do you see this is an e-mail from defendant to his assistant Anna Wong?

A. Yes.
Q. What's the subject line?
A. "My U.S. visit."
Q. And if you could please read the e-mail.
A. "You should be planning my appointments in the U.S. for the first ten days. Start with the meeting at the UN, write Jeremic about the appointed time I'm meeting him and his friends (especially the ones from Mongolia and the one from the UAE and Kuwait), I would also appreciate an appointment with the new PGA Kutesa through Jeremic. I want to meet with Mario of Brazil, Steve Olin of NCUSCR, and Bud McFarlane. I also need to meet with Lou Haitian, and also Jeremic's friend about Croatia. Anna please start making these appointments with ZY helping. Thanks."
Q. Let's look at the next entry on the timeline, about a week later, September 22, 2014.
A. "Ho tells Jeremic that he is in New York and is "tasked" with various "missions," including meeting with Kutesa."
Q. And if we could bring up Government Exhibit 251 that's referenced there. And if you could zoom, Ms. Rao, right onto number 4.
Do you see that the defendant wrote to Jeremic requesting assistance to meet briefly with the incoming PGA Kutesa, inviting him to Hong Kong to meet Ye?
A. Yes.

Q. You can take that down. Let's bring up the next entry about a week later on September 29, 2014. If you could read that.

A. "Ho introduces himself to PGA Sam Kutesa's aide and requests a meeting with Sam Kutesa."

Q. Let's bring up the exhibit that's referenced there, 252. Ms. Rao, can we go down to the first e-mail in the chain from the defendant to Mr. Kafeero.

Do see the defendant begins the e-mail "Dear Mr. Kafeero?"

A. Yes.

Q. Ms. Rao, bring up Government Exhibit 2302, which is already in evidence. You see this is an organizational chart from Sam Kutesa's office to the president of the UN General Assembly?

A. Yes.

Q. And if you could just read the position listed right under Sam Kutesa.

A. President.

Q. And the position of the person right below him?

A. Chef de cabinet.

Q. And that's Arthur Kafeero?

A. Yes.

Q. Let's go back to 252, the first e-mail in the chain at the bottom, please.

If you could read the defendant's e-mail here to

Mr. Kafeero.
A. "Dear Mr. Kafeero. This is Patrick Ho, deputy chairman and secretary general of China Energy Fund Committee, a Chinese think tank registered in Hong Kong and also in the U.S. as a public charity. We are also granted special consultative status from the UN's economic and social council.
"We would be most grateful if an appointment could be set up with the PGA Kutesa between October 8-12, while we are in the U.S. The purpose of the meeting is to introduce ourself to the PGA, and to extend to His Excellency personally our invitation to him to visit with us in Hong Kong and in China."
Q. You can stop there. And then if we move up, you see that Mr. Kafeero responds, Dear Patrick, it's good to hear from you", and says they will make arrangements?
A. Yes.
Q. And then if we go to the top you see that the defendant responds here saying that he is back in New York and will be here until October 12 and would be most appreciative if an audience with the PGA could be arranged. Do you see that?
A. Yes.
Q. All right. Let's go back to the timeline. And about a week and a half later, October 10, could you read that entry.
A. "Ho meets with PGA Sam Kutesa in New York."
Q. All right. And same day, go to the next entry, October 10.
A. "Vuk Jeremic tells Ho that he can confirm to Sam Kutesa

"how fruitful the win-win cooperation with CEFC can be.""
Q. OK. And if we go about a month later, the next entry is November 20, 2014.
A. "Ho directs Zhang Ya to prepare various reports."
Q. Let's pull up that Exhibit 256.
Do you see the e-mail is from Secgen. Again, who do you understand that to be?
A. Patrick Ho.
Q. To Y. Zhang?
A. Yes.
Q. What is the subject line?
A. The subject is jobs for these two days.
Q. You see it begins with a numbered list. Number 5 says report to Ye, and then there is a list of A through J. Do you see that?
A. Yes.
Q. And I will just read a few of these. B refers to PGA Kutesa. C refers to Croatia oil company. D refers to Israel oil company. H refers to Chad business with the president and his friend and middleman Dr. Gadio. Discussion in person. I refers to Israel Mossat's interest in working with China. Discussion in person. J, Russian connections, getting to know a very influential figure, introductions to various opportunities. Discussion in person.
Do you see all of those?

A. Yes.
Q. We can take that down.
Back to the timeline. The next day, would you read the entry on November 21.
A. "Zhang Ya sends draft reports to Ho."
Q. OK. And let's go two days later, November 23, 2014. Would you read that.
A. "Ho provides a report to CEFC chairman regarding Ho's meeting with PGA Sam Kutesa in New York."
Q. OK. And I see that references Government's Exhibits 258 as well as the translation. Let's pull up the translation, 258-TX.
All right. Does this follow the same pattern as other reports that were transmitted from the defendant to the chairman?
A. Yes.
Q. OK. If you could read the subject line.
A. "Urgent document - part 1 a series of reports by secretary general Ho of China Energy Committee".
Q. And if you could read in the last of attachments, document 2.
A. "Document 2, report on the meeting with 69th United Nations General Assembly President Sam Kutesa."
Q. Let's take a look at the attachment. If you could read the headline through the first paragraph.

A. "Report on the meeting with 69th United Nations General Assembly President Sam Kutesa."

"Chairman Ye, may I draw your attention to the following:

"The newly termed 69th president of the United Nations General Assembly, Sam Kutesa, succeeded the 68th president John Ashe on September 27, 2014, and has begun fulfilling the one-year term duty."

Q. Let's skip down to the paragraph, same page, beginning "On October 19 ..." If you could read just until you get to number one there.

A. "On October 19, I had a lengthy conversation with Kutesa and his son Isaac Kutesa (Isaac Kutesa) at his office for nearly three hours. After sorting out its contents, summary of the event is listed below:"

Q. If we zoom out, you see the first item listed there is United Nations affairs. And if we go down to number 2 it's listed visit China. Do you see under visit China, the third line the defendant writes that he lobbied that Sam Kutesa should visit China. Do you see that?

A. Yes.

Q. If you could read the last three lines beginning "Furthermore" in that same section.

A. "Furthermore, he agreed to stay one extra day, outside of the arranged schedule, to visit chairman Ye, CEFC China and

China Energy Fund Committee, either in Shanghai or Hong Kong."
Q. OK. Do you see the next item on the defendant's report is titled number 3, Uganda energy project.
A. Yes.
Q. If you could read just the first line.
A. "Uganda energy project. Kutesa is still holding the position of foreign minister of Uganda."
Q. Go to the next page, about halfway down, the top paragraph, the sentence beginning "Most parts of the country..."
A. "Most parts of the country are situated in the Eastern Africa Plateau, with numerous lakes, average altitude in the 1,000 to 12,000 meters. It's nicknamed "water town of the plateau". It has abundant minerals, fishery resources, hard woods and confirmed underground petroleum."
Q. Let's go to the last paragraph on that page. Do you see that the defendant wrote here: Additionally, he -- referring to Kutesa -- revealed that the current Ugandan president Yoweri Kaguta Museveni is his brother-in-law. President Yoweri is a renowned African politician. Since being elected the first Democratic Ugandan president in May of 1996, he has been in office for five terms in succession for 18 years.

If you go down to the last paragraph in that same section.

Here the defendant wrote, "If we are interested in developing relevant energy projects, hydroelectric power grid,

banking and financial projects in Uganda, and forming a long term strategic partnership, Kutesa is more than happy to assist us and able to arrange a meeting with president Yoweri" -- referring to Museveni -- "directly in the shortest time possible."

Do you see that?

A. Yes.

Q. Let's skip to the end of the report. Who is it signed by?

A. It's signed by Patrick Ho.

Q. And again, just scroll slightly down. What date is the report?

A. November 20, 2014.

Q. And can you just refer back -- and perhaps you recall from the Chad timeline -- what was the date of the defendant's first meeting in Chad with President Deby?

A. It was dated November 11, 2014.

Q. So that was about nine days before this report regarding Kutesa; is that right?

A. Yes, that's correct.

Q. OK. Let's go back to the Uganda chart.

About a week after this report there is an entry dated December 2, 2014. Read that.

A. "Ho e-mails Zhang Ya regarding another meeting with PGA Sam Kutesa."

Q. And let's pull up Government Exhibit 259.

Do you see the chain begins with the defendant writing, "Please make appointments for me while I'm in New York. PGA, office visit Friday p.m." If you could read Zhang Ya's response to the defendant.

A. "Dear boss, I talked with Isaac last week. The PGA will travel to Peru on December 6. He is available to meet with you at 12:30 p.m. on December 5 at his office. But you will participate in the first meeting of advisory council and the followed official lunch from 10 a.m. to 2:30 p.m."

Q. If you could read the second paragraph, please.

A. "Today Isaac suggested that you come over to the PGA's residence for the 3 p.m. meeting. I am awaiting further information."

Q. OK. Go back to the timeline about four days later, an entry on December 6, 2014. Please read that.

A. "Ho asks Isaac Kutesa to have Sam Kutesa appoint the chairman of CEFC as a "special advisor" to the PGA."

Q. And the next entry on the timeline about two weeks later, December 18, 2014, could you read that.

A. "Ho provides a report to CEFC chairman on his meeting with PGA Sam Kutesa."

Q. OK. And I see you referenced there 261 as well as the English translation. Let's go to the English translation. And so again is this transmitted by Zhang Ya to the chairman's office?

A. Yes.
Q. If you could read the subject line.
A. "2014-12-17, report on president of 69th United Nations General Assembly Sam Kutesa's China visit."
Q. If you go to the report, do you see the title, "Report on 69th United Nations General Assembly President Sam Kutesa's China visit." It begins Chairman Ye. Then two paragraphs down it says, "The afternoon of December 5 I met with Kutesa again in his New York residence." Highlight that top line.
Let me just pause on that sentence for a moment. Going back to the Chad timeline, agent Galicia, what was the date of the second meeting between the defendant and CEFC in and Chad?
A. The second meeting was on December 8, 2014.
Q. So this meeting between the defendant and Kutesa here in New York would have been about three days before that meeting with President Deby in Chad; is that right?
A. Yes.
Q. If we can zoom back out and go to the next page. We can take it down. OK.
About a months after that, the next entry on the timeline is January 14, 2015. If you could read that.
A. "Ho e-mails Isaac Kutesa regarding Ho's interest in CEFC participating in various UN events."
Q. OK. And the next entry is about two weeks after that,

February 3.
A. "Ho e-mails the PGA's aide to seek an invitation to speak at a UN event, and to meet with PGA Sam Kutesa in New York."
Q. OK. About three weeks after that, the next entry is February 21, 2015. Could you read that one.
A. "Ho e-mails the PGA's aide to seek another meeting with PGA Sam Kutesa in New York.""
MR. ZOLKIND: Your Honor, I'm happy to take a midmorning break, if the Court is inclined to do so. I'm also happy to keep going.
THE COURT: How are you feeling, ladies and gentlemen? What's your preference? Would you just confer among yourselves and let me know what you would like to do.
JUROR: Take a break if that's all right.
THE COURT: I think it sounds like we want to have a break here. Let's do that, ladies and gentlemen. Please follow the normal rules and don't discuss the case. We will see you as soon as you're ready.
(Continued on next page)

(Jury not present)

THE COURT: Counsel, would someone take the witness out. Anything else on the record?

MR. RICHENTHAL: Ms. Rao -- the most important member of our team -- has begun to review what has been admitted, what hasn't been admitted, etc., and she has indicated she thinks that your Honor admitted Government Exhibit 254 instead of 254R. The fault is almost certainly mine; I suspect I said 254 instead of 254R.

THE COURT: Well, I'm certain I have it memorized. Whatever Ms. Rao says.

MR. RICHENTHAL: So, it was during Mr. Jeremic's testimony. 254R reflects redactions to which the parties jointly agreed, so I would just request that 254R be substituted for 254.

MR. KIM: That's fine.

THE COURT: So ordered.

(Government Exhibit 254R received in evidence)

(Recess)

(Continued on next page)

(Jury present)

THE COURT: Welcome back, ladies and gentlemen. Thank you for being so prompt.

Did anyone look out the window? Is it doing anything? Oh, good. We continue with the direct examination of the agent.

Counsel.

MR. ZOLKIND: Thank you, your Honor.

MELISSA GALICIA, resumed.

DIRECT EXAMINATION (Continued)

BY MR. ZOLKIND:

Q. If we could please bring back up the Uganda scheme timeline. I believe we were on the entry for February 3, 2015.

All right. If you could read that.

A. "Ho e-mails the PGA's aide to seek an invitation to speak at a UN event, and to meet with PGA Sam Kutesa in New York."

Q. All right. And then the next entry is about three weeks later, February 21, 2015. Read that.

A. "Ho e-mails the PGA's aide to seek another meeting with PGA Sam Kutesa in New York."

Q. And about two weeks after that, March 5, 2015, if you could read that.

A. "Ho reiterates his request that PGA Sam Kutesa appoint the chairman of CEFC as a special advisor to the PGA."

Q. And the next entry about a week after that is March 12,

2015. Could you read that.
A. "Ho provides a report to CEFC chairman regarding Ho's discussions with PGA Sam Kutesa in New York."
Q. All right. And I see the exhibit references 277 and 277-TX. Let's bring up the English translation.
All right. Here do you see that this is again from Zhang Ya to the chairman office copying the defendant?
A. Yes.
Q. And could you read the subject line.
A. "2015-3-12, report on recent diplomatic activities at the United Nations."
Q. All right. If we turn to the attachment, please. Do you see it says, "Chairman Ye, may I draw your attention to the following."
Do you see it describes the defendant making a speech at a United Nations event?
A. Yes.
Q. And if you go down to the next paragraph, and if you could read that paragraph going on to the next page.
A. "In the subsequent days, I had met with 69th United Nations General Assembly president Sam Kutesa several times. In the especially arranged party at his home, I also met the President of Liberia, Ellen Johnson Sirleaf; President of Croatia, Grabar Kitarovic; Prime Minister of Turkey, Ahmet Davutoglu; Mr. and Mrs. Ban Ki-Moon of UN Secretary General; and Mr. and Mrs. Jan

Eliasson, deputy secretary general of the United Nations."
Q. All right. At the bottom of that page, beginning "additionally," if you could read just that paragraph.
A. "Additionally, I met with Kutesa and his son Isaac yesterday, March 12, at his office in United Nations again to have a lengthy conversation. Summary of the event is listed below."
Q. And, Agent Galicia, do you recall -- going back to the Chad chart -- approximately the date of the third meeting between CEFC and the defendant and President Deby?
A. It was on March 30.
Q. Of 2015?
A. Of 2015, yes.
Q. All right. So is it your understanding based on this document that the defendant's meeting with Deby was about two weeks after the meeting that is referenced in here with Sam Kutesa?
A. Yes.
Q. Turn to the next page of the report. If you could read just that first paragraph.
A. "1, staunch support of the fund committee's activities in the United Nations in 2015. Kutesa is very willing to cooperate closely with China Energy Fund Committee, fully supporting and coordinating the fund committee's efforts in unfolding several activities in United Nations in the near

future."
Q. If we could zoom out, do you see there is a list there of various UN activities?
A. Yes.
Q. OK. And turn to the next page, do you see it says China visit, and if you could read the first paragraph under that.
A. "2, China visit. On March 9, the office of president of the United Nations General Assembly formally submitted a document to foreign ministry of China regarding Kutesa's plan to visit China from April 14 through April 19, 2015. Furthermore, it made known to the China authority that, with exception of the arranged two-day official visit, all other non-official activities will be coordinated and safeguarded by China Energy Fund Committee."
Q. If we go to the next page, do you see the header that says, number 2, special advisor to the president of the UN General Assembly?
A. Yes.
Q. Do you see this talks about Kutesa appointing the chairman of CEFC as a quote special advisor to the PGA?
A. Yes.
Q. And if we go to number 3, titled Uganda Energy Project. Do you see that?
A. Yes.
Q. It refers to the fact that Sam Kutesa was still holding the

position of foreign minister of Uganda even while he was president of the General Assembly; is that right?
A. Yes.
Q. Let's a few portions of this section. If you go to the next page he is talking about Uganda, the sentence beginning "It has abundant minerals," the second line.
A. "It has abundant minerals, fishery resources, hard woods and confirmed underground petroleum. Its lake Victoria is one of the largest producers of fresh water fish with a potential hydroelectric power of 2,000 mega watts."
Q. Let's go down to the text that the defendant underlined. If you could just read the underlined text.
A. "The current Ugandan president Yoweri Kaguta Museveni is Kutesa's brother-in-law."
Q. And if you go to the next page. And you see paragraph beginning "If you are interested"?
A. Yes.
Q. Read that entire paragraph.
A. "If we are interested in developing relevant energy projects, hydroelectric power grid, highway and train construction, banking and financial projects in Uganda, and forming a long term strategic partnership, Kutesa is more than happy to assist us in the following:
"1. He is very familiar with the Uganda's current four developed oil fields;

"2. Regarding the financial sector, shares of national banks can be purchased, but percentage of the share can't excess 50 percent; trans sections between governments can be settled in the currency of renminbi.

"3. Projects, such as hydroelectric power grid, highway and train, infrastructure, fee collection/payment system, can be won through open bids.

"4. Or arrangement can be made to meet President Yoweri in the shortest time possible."

Q. Let's go to the end of that report. Who is it signed by?

A. It's signed by Patrick Ho.

Q. If we go back to the timeline. I believe that was March 12. So the next one is about five days later on March 17. Could you read that.

A. "Sam Kutesa's wife e-mails Ho regarding business issues, including the possibility of acquiring a bank in Uganda."

Q. Let's go to that Exhibit 280. First go to the bottom of the page, the signature line. I'm sorry, just the bottom of the first page.

Do you see the signature line on the top there?

A. Yes.

Q. And whose name is listed?

A. Edith G. Kutesa.

Q. And if we just pop back for a moment to 277-TX, the defendant's report we were just looking at and go to page 9.

Do you see in the last paragraph there a reference to who Edith Kutesa is?
A. Yes.
Q. And at the very top Edith Kutesa. Who does the defendant describe her as?
A. As the wife of PGA Sam Kutesa.
Q. The wife of PGA Sam Kutesa?
A. Yes.
THE COURT: Agent, this wonderful man is taking down everything you say; that's why it has to come out clearly so he can hear every sound.
Q. All right. Let's go back to Government Exhibit 280. And if we start on the first e-mail from Edith Kutesa and highlight from "Dear Patrick" through where it says "to recap what concerns me".
A. "Dear Patrick, it was so nice to have such quality time to talk and discuss about different opportunities of investing in East Africa and in Uganda in particular. Thank you so much, we enjoyed having you. To recap on what concerns me ..."
Q. If we can keep going to the next paragraph, just number one.
A. "(i) we talked about banking sector with the possibility of acquiring the bank and also engaging Bank of Uganda in a deeper reflection about creating a direct link between our currencies, a project for which I would be happy to facilitate and we

should discuss this further when we meet in HK."

(Continued on next page)

MR. ZOLKIND: Okay. We can take that down.
Q. Now next entry on the timeline, about four months later, July 29, 2016.
A. "HO emails the PGA's aides regarding PGA Sam Kutesa's 'impending visit to Hong Kong' where he will meet with the chairman of CEFC."
MR. ZOLKIND: Okay. And let's bring up Government Exhibit 282.
All right. And if we start at the bottom of the page, the July 29th email, 5:17 a.m. If you could zoom in on that. Just the top is fine.
Q. Okay. Do you see the defendant wrote to Arthur Kafeero, the PGA's chief of staff:
"Dear Arthur, As we are all very excited about the PGA's impending visit to Hong Kong, we stand ready to receive your party and to make certain that your stay will be a memorable one, albeit being a short one.
"One of the important purposes of this visit is for the PGA to meet and discuss with our chairman Mr. Ye about further collaborations between Uganda and CEFC and many other more exciting projects, and it is important that adequate time is allotted to this meeting."
Do you see that?
A. Yes.
MR. ZOLKIND: All right. Let's go up to the top email

in the chain. If you could zoom in from that whole top email through "Patrick."

Q. Who is this email from?

A. From Patrick Ho.

Q. Okay. And that's to the PGA's chief of staff, Arthur Kafeero, is that right?

A. Yes.

Q. And I'll just read this third paragraph.

MR. ZOLKIND: Ms. Rao, if you could zoom in there. "If the PGA."

Q. Defendant writes there, "If the PGA could not further adjust his departure to Hong Kong from Beijing to an earlier flight, then we will just have to make do with the present arrangement by waiting for his and your arrival in Hong Kong on August 2, and as soon as you touch down, the delegation will be transported immediately to the Villa and we will have a night meeting with midnight snacks, however late it might be."

MR. ZOLKIND: We could take that down.

Q. The next entry on the timeline is four days later, August 2, 2015. If you could please read that.

A. "PGA Sam Kutesa meets with HO and CEFC chairman in Hong Kong and appoints the chairman as a special honorary consultant to the PGA."

Q. Okay. After this meeting in Hong Kong, the next entry on the chart is just a reference to September generally, is that

right?
A. Yes, that's correct.
Q. Okay. And what took place in September of 2015?
A. "Sam Kutesa completes his one-year term as PGA and returns to Uganda as Minister of Foreign Affairs."
Q. All right. The next entry after Sam Kutesa's return to Uganda as Foreign Minister is on February 24, 2016. If you could read that.
A. "Sam Kutesa's wife emails HO, copying Sam Kutesa, to inform HO that Yoweri Museveni won re-election as President of Uganda, and to request a 'contribution/donation' for Sam Kutesa's 'foundation which he wishes to launch as soon as possible,' and she provides the bank account information."
MR. ZOLKIND: Let's pull up Government Exhibit 283 referenced in that bubble.
Q. At the top in the header there, who is the email from?
A. It's from Edith Kutesa.
Q. Who is it to?
A. To Patrick Ho.
Q. Who is copied?
A. Sam Kutesa.
Q. And what is the subject line?
A. Subject is Reconnection.
Q. All right. And if you could go ahead and read that whole email.

A. "Dear Patrick,

"Long time! We hope and pray that this message find you well.

"After our one year stay in New York we had a very busy return in Uganda with various obligations and the most demanding was the recently completed campaign for the Presidential and Parliamentary elections, which took place on February 18th, 2016.

"We are happy to share with you our joy of the great victory of our party. The president won with 60.75 %. Sam was unopposed and this was a blessing for us to be free and campaign for the president. We can now relax and reprogram the projects we discussed about with your chairman when we were in Hong Kong last August.

"Sam would like in particular to catch up with you regarding his foundation which he wishes to launch as soon as possible and would appreciate to receive the contribution/donation promised by the chairman. Please find hereafter the bank details for your consideration."

Q. All right. And then you see bank account information there for wire transfer?

A. Yes.

Q. And what's the beneficiary name listed on the bank account?

A. Food Security and Sustainable Energy Foundation.

MR. ZOLKIND: Okay. Let's take that down.

Q. The next entry on the chart, four days later, February 28, 2016, please read that one.
A. "HO replies to Sam Kutesa and his wife, including stating that 'we want to reconnect and catch up with you and renew our friendship as well as our mutual agreement and commitments.'"
MR. ZOLKIND: Okay. Let's bring up the exhibit referenced there, 284.
Q. Do you see that this chain begins with the email from the Kutesas that we just looked at?
A. Yes.
Q. At the bottom. Okay. And then let's go up to the defendant's response.
He replies here, "Dear Edith --" I should ask first, who is this from, who is it to, and who's copied?
A. It's from Patrick Ho to Edith Kutesa, copying Sam Kutesa.
Q. All right. And he writes there:
"Dear Edith, So nice to hear from you and all the good news about your victory in your country.
"We have not touched base for so long and have been wondering how have you been doing.
"The chairman and I want to congratulate Sam and your president on the re-election and the popularity of the votes and wish to fortify our relationship after this long period of waiting.
"We want to reconnect and catch up with you and renew

our friendship as well as our mutual agreement and commitments.

"Personally, I think it would be a wonderful gesture if an invitation could be sent to the chairman to be a VIP guest at the inaugural or similar ceremony when the President ascends into a new term, with a note of thanks to the chairman for the support which he will then make good. This is only my personal suggestion to facilitate the exchange."

Do you see that?

A. Yes.

MR. ZOLKIND: All right. You can take that down.

Q. The next entry in the timeline is the next day, February 29th. Could you read that one.

A. "Sam Kutesa's wife asks HO to 'confirm the contribution' and advises HO of an opportunity in the 'banking sector in Africa.'"

MR. ZOLKIND: And let's bring up Government Exhibit 285 referenced there.

Q. All right. And do you see here that Edith Kutesa, copying Sam Kutesa, is replying here to the email that we just looked at from the defendant?

A. Yes.

Q. All right. And she says in her response, "Dear Patrick, Thank you for your quick response and yours and the chairman's appreciation."

Next paragraph refers to Sam Kutesa being out of the

country.

And the paragraph after that says, "Would it be possible for you to confirm the contribution to his foundation so that he can launch it not so late after the campaign. It was one of our commitments to job creation for youth in our constituency and as you know, youth are impatient."

And then if you could read the last paragraph of her email here to the defendant.

A. "By the way, Barclays Bank is in Africa which is represented in 12 different countries (Uganda, Kenya, Tanzania, Botswana, Ghana, Mauritius, Mozambique, Seychelles, South Africa, Zambia, Egypt, and Zimbabwe) is soon quoting the continent." Should be quitting the continent. "The main reason being the South Africa Rand depreciation, mining crisis, and the low price of oil. Considering the growing trade between China and Africa, this is a great opportunity in banking sector in Africa."

MR. ZOLKIND: All right. We can take that down.

Q. Next entry on the timeline is the next day, March 1, 2016. Could you read that entry.

A. "HO provides a report to CEFC chairman regarding 'support of Uganda president Yoweri Kaguta Museveni's 5th re-election campaign.'"

Q. Okay. I see that the exhibits referenced are 287 and 287-TX. Let's go to the English translation.

All right. So on 287-TX, do you see here this starts, like the other reports, as an email from Zhang Ya, copying the defendant, to the chairman's office?
A. Yes.
Q. All right. Could you read the subject line.
A. "2016-3-2. Report on Support of the President of Uganda Yoweri Kaguta Museveni's Re-Election Campaign."
Q. If you turn to the next page. What confidentiality level does the defendant apply to this report?
A. It's marked Highly Confidential.
Q. And what urgency level does he apply?
A. Extra Urgent.
Q. Okay. And what does it say just under there, under Secretary General's Approval/Directive?
A. "Submission for chairman's approval/directive. Ho Chi Ping. March 2, 2016."
MR. ZOLKIND: Okay. Let's turn to the next page.
Q. And the report reads -- title is Report on Support of Uganda President Yoweri Kaguta Museveni's 5th Re-Election Campaign, and it says:
"Chairman Ye, may I draw your attention to the following:
"On August 2, 2015, you met then-president of the 69th UN General Assembly Sam Kutesa and his accompanied staff in Hong Kong. You accepted Kutesa's invitation to be a special

honorary consultant to the President of the UN General Assembly during this meeting, and conveyed through him your sincere regards, praise and support to Uganda President Yoweri Kaguta Museveni, who has won his 5th re-election campaign to be president of Uganda.

"You also expressed you're willing to actively promote close contact and extensive cooperation amongst CEFC China, Uganda, and the five countries of Central Africa in the future. I'm very pleased to support President Yoweri's re-election campaign with the fund of 500,000 US dollars. At present, more than half of the year had passed, defeated his opponent last month (February 20, 2016). President Yoweri has been successfully re-elected to be the President of Uganda again for his fifth term, after being elected for four terms in succession and in public office for over 30 years. And Kutesa has now returned to continue assuming his positions of Foreign Minister and Minister of Foreign Affairs of Uganda (President Yoweri is Kutesa's brother-in-law). After the completion of his," meaning Kutesa's, "term as the 69th President of the UN General Assembly in late September 2015.

"Last Friday, Kutesa sent out a letter announcing the good news and euphemistically mentioned the matter of your earlier promise of support with funds. And he, on behalf of President Yoweri, solemnly invites you to be available to attend the Uganda's new term presidential inauguration on

May 12, 2016."

Do you see that?

A. Yes.

Q. All right. And if we just go to the end of the report, who is it signed by?

A. It's signed by Patrick Ho.

Q. All right. The next entry on the timeline is about six days later, March 7, 2016. Could you read that.

A. "The CEFC chairman responds to HO's report."

MR. ZOLKIND: All right. And let's pull up the English translation, 288-TX.

Q. This email chain, do you see at the bottom begins with this email from the chairman's office?

A. Yes.

Q. And it goes to Zhang Ya?

A. Yes.

Q. As well as someone named Chen Qiu Tu?

A. Yes.

Q. And then Zhang Ya forwards it to the defendant. Do you see that?

A. Yes.

Q. Do you see the next email is head@chinaenergyfund?

A. Yes.

Q. Okay. Let's look at the attachment.

Do you see where it says Chairman's

Approval/Directive?
A. Yes.
Q. And what is indicated as the chairman's approval/directive?
A. "Agreed. Please transmit/forward to Director Chan."
MR. ZOLKIND: Okay. And if we go to the attachment.
We can go to the next page.
Q. Do you see that this is the report that the defendant had submitted to the chairman?
A. Yes.
Q. All right. And do you see there in yellow there's a portion that's indicated to have been underlined in hand in the version that was sent back by the chairman?
A. Yes.
Q. Could you just read the portion that's now underlined in hand.
A. "You also expressed you're willing to actively promote close contact and extensive cooperation amongst CEFC China, Uganda and the five countries of Central Africa in the future, and very pleased to support President Yoweri's re-election campaign with the fund of five hundred thousand US dollars."
MR. ZOLKIND: All right. If we go back to the timeline.
Q. The next entry is about two and a half weeks later, March 26, 2016. If you could read that.
A. "HO tells Sam Kutesa and his wife that 'the chairman will

make good his pledge of donation to support Sam,' and says that HO will attend President Museveni's inauguration along with 'an entourage' of executives who can engage on projects in Uganda 'from infrastructure, energy, agriculture, to finance and banking.'"

MR. ZOLKIND: If we pull up Government Exhibit 289.

If we go to the top email here.

Q. Who is it from?

A. It's from Patrick Ho.

Q. Who is it to?

A. Edith Kutesa.

Q. Who is copied?

A. Sam Kutesa.

Q. Who is in the blind copy?

A. Zhang Ya and Patrick Ho.

Q. Okay. And if you could read, beginning with, "Dear Edith," the defendant's email that he wrote here.

A. "Dear Edith, have not heard from you since your last mail a month ago.

"Yes, the chairman will make good his pledge of donation to support Sam.

"At the same time we are all awaiting news of the VIP invitations to witness the President's inauguration in May, as the chairman and I need to make traveling plans. We will also bring an entourage of CEOs to Uganda to directly dovetail with

your heads of business. Just give me a list of all the major projects, from infrastructure, energy, agriculture, to finance and banking, and we will bring the relevant heads to your country to kickstart each project. If that happens, we would expect to be received warmly by Sam and other heads of the government, including the President.

"As time is getting short, please let me know if Sam and the president are receptive to this suggestion."

MR. ZOLKIND: All right. Now, Ms. Rao, if you could just highlight the second line where it says, "make good his pledge of donation to support Sam."

Q. Do you recall, Ms. Galicia, that in the initial email from the Kutesas there was a request to the defendant and CEFC for a donation/contribution to a foundation? Do you recall that?

A. Yes, I do.

Q. Okay. Do you see any reference in this email to any sort of foundation?

A. No.

MR. ZOLKIND: Okay. If we just go back a moment to the report from the defendant to the chairman of CEFC that we were looking at a moment ago, 287-TX.

Q. And again, what's the title of this report?

A. Report on Support of Uganda President Yoweri Kaguta Museveni's 5th Re-Election Campaign.

Q. And did you see any reference in this report to anything

about a foundation?
A. I did not.
MR. ZOLKIND: Okay. And then if we go to the report that was the response to the chairman in this report, and that was 288-TX.
If we could go to the next page, please.
Sorry. One back.
Q. Do you see where the chairman's approval/directive says, "Agreed. Please transmit/forward to Director Chan"?
A. Yes.
Q. Okay. And then when we go to the portion that the chairman's office underlined, do you see any reference there to any sort of foundation involving Sam Kutesa?
A. No.
Q. Okay. Do you see any reference to financial support or anything other than President Museveni's re-election campaign?
A. No.
MR. ZOLKIND: And if we go back to Government Exhibit 289.
Q. It refers to pledging a donation to support Sam. In the emails that you reviewed, did you see any emails in which the defendant asked any questions about that donation that has been referred to in the initial solicitation?
A. I did not.
MR. ZOLKIND: We could take that down.

Q. The next email in the timeline is about -- actually, it's a day later, March 27, 2016. If you could read that.
A. "Sam Kutesa's wife asks HO about the number of people in CEFC's delegation."

MR. ZOLKIND: If we bring up Government Exhibit 290 referenced there.

And if we just zoom in on the top.

Q. Do you see that this is from Edith Kutesa, copying Sam Kutesa, addressed to the defendant?
A. Yes.
Q. And about four lines down, the sentence beginning, "We also need to know," do you see that?
A. Yes.
Q. She writes, "We also need to know in advance the number of your delegation and how many days you plan to stay."

And then in the next sentence down, she writes, "I need some more days to work on possible available project in your area of interest but I may be able to come back to you not later than April 10th which will still give you a month for preparation."

The next item on the timeline is the same day, March 27th. If you could read that bubble.
A. "HO replies that the size of the delegation 'depends on the number of projects the President and Sam want to engage China with. It can be anything from energy, agriculture,

infrastructures, tourism, banking and finance, to stock market.'"

MR. ZOLKIND: Let's pull up the exhibit referenced there, 291.

And Ms. Rao, if you could zoom in on the top email.

Q. And again, who is this from and to and who's copied?

A. It's from Patrick Ho to Edith Kutesa, copying Sam Kutesa, and Zhang Ya.

Q. Okay. And if you could read just the first paragraph of what the defendant writes here.

A. "I shall ask my office to prepare the bios of the chairman and myself for your purposes. The size of the entourage is actually dependent on the number of projects the President and Sam want to engage China with. It can be anything from energy, agriculture, infrastructures, tourism, banking and finance, to stock market. We can bring heads of enterprises from China to engage with yours to start the process of discussion, since our company is now holding interests in all of these fields and sectors. The length of stay will also depend on how much business discussion you can plan for us. Myself and the chairman will only stay the length of the official events."

MR. ZOLKIND: Ms. Rao, if you could highlight the next sentence.

Q. If you could read the next sentence from the defendant.

A. "What can come out of this occasion can only be limited by

what can be imagined."

Q. And then finally, the last sentence.

A. "I am in New York for these few days, and if Sam is also here, maybe we can meet or at least chat over the phone."

Q. The next item on the timeline I believe is about a week and a half later, April 8, 2016. If you could read that.

A. "HO, following up on a call with Sam Kutesa's wife, emails her regarding 'potential areas of investment and joint ventures in Uganda.'"

MR. ZOLKIND: All right. If we could bring up Government Exhibit 293.

Q. And let's start on the second page of the exhibit. Do you see at the bottom the email on March 29th at 6:07 p.m.?

A. Yes.

Q. Okay. So the chain starts here with the defendant writing, "Can we have a telephone conversation in the next couple of days. Let me have your number to call and your preferred time."

And then the next email up is the reply from Edith Kutesa. Do you see that?

A. Yes.

Q. Okay. What does she say?

A. "Hi, Patrick. I can be reached on 256 755 522 344 or we can Skype now if you are available now so that we can include Sam in our discussion. My Skype account is edith.kutesa."

MR. ZOLKIND: And if we go up to the defendant's reply.

Q. He replies, "I shall call you tomorrow March 30 around 9 a.m. New York time. Hope to catch you."

And Edith's response?

A. "Very fine, will be in Nairobi but will be roaming. Nice to talk then."

MR. ZOLKIND: All right. And if we go up to the next email, April 8th, about a week later.

Q. And the defendant writes that he's just following up on their telephone conversation, and in the last paragraph of his email he says, "We are also awaiting your list of potential areas of investment and joint ventures in Uganda so that we can organize the stakeholders for the trip."

And if we go up to Edith's response. And if you could just read the sentence beginning, "Please send us the name of the chairman."

A. "Please send us the name of the chairman and I promise to send you a tentative list of projects you may be interested in no later than the end of this week."

MR. ZOLKIND: And let's go up to the front page.

Could we zoom in first on the top of the email.

Q. Do you see the defendant here replies again, and the second line, it says, "The chairman of CEFC China Energy Company is Mr. Ye Jian Ming."

And then if we look below where he writes -- where he signs his name, "Best, Patrick," do you see right below that it says, "Below is the company brief as listed in Wiki"?

A. Yes.

MR. ZOLKIND: Okay. And let's scroll down.

Q. What does this appear to be to you?

A. It appears to be an entry from Wikipedia.

Q. On what entity?

A. On CEFC China Energy.

Q. Okay. I'll just read a portion of it. It says here, "CEFC China Energy is a private Chinese conglomerate with revenue of 220 billion CNY, 35 billion US dollars in 2014. The company is among the ten largest private companies in China. In 2014 the company generated revenue mainly from oil and gas, 60 percent, and financial services, 25 percent, but operates also in a wide range of other sectors like transport infrastructure, forestry, asset management --"

THE COURT: Slowly.

MR. ZOLKIND: I apologize, your Honor.

THE COURT: Asset management.

Q. "-- asset management, hotel management, warehousing services, real estate development, and logistic services. A large portion of CEFC's assets is in concentrated overseas markets. Since 2013 the company has been listed on the Fortune Global 500 list."

In the next paragraph, it goes on to state, "In May 2015 the company acquired a 5 percent stake in Slovak J & T Financial Group. This increased to 9.9 percent in September 2015. In September 2015, the company acquired multiple assets in the Czech Republic, a majority stake in a brewery, 10 percent stake in an airline, 60 percent in a football club," and the next sentence says, "CEFC also bought a stake of between 50 and 90 percent in Czech online travel agents."

Okay. I'll stop there.

I believe the next entry, if you go back to the timeline, is about a week and a half later, April 20, 2016.

A. Do you want me to read it?

Q. Please, yes.

A. "HO describes CEFC's business deals in the Czech Republic and says that 'we wish to engage Uganda as our first stop in Africa.'"

MR. ZOLKIND: And if we could pull up the exhibit referenced there, 296.

We can zoom in just at the top, through the end.

Q. Who is this email from and to?

A. It's from Patrick Ho, to an individual at China Energy Fund.

MR. ZOLKIND: All right. If we zoom in on the sentence beginning, "The entire purpose of the visit," right on that line there. And we could bring it down to the end.

Q. Okay. And the defendant writes here:

"The entire purpose of the visit for us is to meet privately with Sam, and his closest counsels, meet privately with the President and attend his ceremony.

"Please also prepare a list of project which the President wishes China to invest in cooperative ventures. CEFC has most recently signed deals in Czech amounting in excess of 1.8 billion USD and acquired controlling shares of J & T Bank, a few historic buildings in Prague, its football team, its airline, a local tourism company, a TV and radio station, a media group, a beer manufacturing company, contract to build a nuclear --"

THE COURT: Slowly.

MR. ZOLKIND: I'm sorry.

Q. "-- contract to build a nuclear power station in Czech, and wholesale representation of top name Czech exports to China..."

The last sentence of the email says, "While almost every Eastern European country is now trying to get CEFC to repeat what we did in Czech, we wish to engage Uganda as our first stop in Africa, along our 'One Belt One Road' initiatives."

I believe the next entry on the timeline is the same day, April 20, 2016. Would you read that, please.

A. "Sam Kutesa's wife, copying Sam Kutesa, sends HO the invitations to President Museveni's inauguration and conveys

Sam Kutesa's advice regarding a meeting with President Museveni."

Q. All right. Let's keep going. The next entry is about four days later, April 24, 2016. Could you read that one.

A. "HO provides a report to CEFC chairman regarding HO's upcoming attendance at President Museveni's inauguration, including a suggestion to provide Museveni with $500,000 campaign donation in cash."

MR. ZOLKIND: Let's bring up the referenced exhibit, the English translation, 296-TX.

Q. Okay. And again, is this report sent by Zhang Ya to the chairman's office, copying the defendant?

A. Yes.

Q. All right. Could you read the subject.

A. "Super urgent mail. Report on the attendance of the Ugandan president's re-election inauguration ceremony on May 12th."

Q. If you turn to the next page.

What confidentiality level has the defendant assigned to his report?

A. Highly Confidential.

Q. And what urgency level has the defendant assigned?

A. Super Urgent.

Q. And let's turn to the next page.

If you could read the headline through the first

paragraph.

A. "Report on the Attendance of the Ugandan President's Re-Election Inauguration Ceremony on May 12th.

"Chairman Ye, may I draw your attention to the following:

"On April 22, we received an express mail from Uganda Foreign Minister Sam Kutesa who, entrusted by Uganda President Yoweri Kaguta Museveni, on behalf of the Uganda government, sincerely invited you to attend the Ugandan president re-election inauguration ceremony in the capital Kampala on May 12th (see --"

Q. You can stop there.

If we turn to the next paragraph, and if you could read that, please.

A. "The Uganda side is earnestly looking forward to your presence and preparing to arrange for you a meeting and private dinner with President Yoweri before the May 12th inauguration ceremony. Since the list of names of the new term cabinet ministers of Uganda won't be announced until after May 12th, the party is also planning that, on the following day of the announcement of the cabinet selection, to arrange for meetings and specific project negotiations between the newly selected ministers in the relevant field (such as energy, finance and transportation, etc.) and our counterparts."

Q. And the last paragraph beginning, "Additionally"?

A. "Additionally, regarding your early promise of support of campaign fund of $500,000 to President Yoweri, it was also brought forward euphemistically by the party. If you would make this trip to Kampala, it's suggested that it would be the best to give it to the President's representative directly in the form of cash?"
Q. And if you scroll down, who signed this?
A. It's signed by Patrick Ho.

MR. ZOLKIND: All right. If we go back to the timeline.

Q. The next entry is I believe a week and a half later, on May 4th of 2016. If you could read that.
A. "Zhang Ya, copying HO, instructs a CEFC employee to 'contact the bank for the matter of getting USD 500,000 ready on May 10th.'"

MR. ZOLKIND: If we could pull up the document referenced there, the English translation of 298-TX.

Starting on the second half at the bottom, where it begins, "Forwarded message." Yeah, right there. The first email is from Ying Ling through the bottom.

Just beginning right where it says "Sorted Message" in the middle of the screen, at the top.

Thank you.

BY MR. ZOLKIND:

Q. All right. Do you see that this chain starts with an email

from someone named Ying Ling? Or Ying Jing?
A. Yes.
Q. Okay. If you look at the signature on the bottom, what entity is that person associated with?
A. CEFC China Energy Co. Limited.
Q. Who is it to?
A. To Zhang Ya.
Q. All right. And do you see in the email it says, "Director Zhang, Just received a notice from the account department. The 500,000 US dollars donation to the Ugandan presidential re-election campaign and last month's remaining unpaid daily funding will be dispatched today." Do you see that?
A. Yes.
MR. ZOLKIND: Okay. All right. Let's go up to the top email in the chain.
And if we could zoom in on that.
Q. All right. Who is this from?
A. From Zhang Ya.
Q. Okay. Who is it addressed to?
A. To the accounting department.
Q. Who is copied?
A. Zhang Ya and Patrick Ho.
Q. And if you could read Zhang Ya's email here.
A. "Tracy, Please have Florence check the account tomorrow, and then contact the bank for the matter of getting USD 500,000

ready on May 10th."

MR. ZOLKIND: If we could just zoom out for a moment and scroll down.

I'm sorry. If we could zoom out and scroll back down.

Q. Do you see the initial email here refers to the -- sorry. The initial email that you read refers to the $500,000 as a donation to the Ugandan presidential re-election campaign?

A. Yes.

Q. To be clear, do you see any reference in this email chain to any sort of donation to any sort of foundation in Uganda?

A. No.

MR. ZOLKIND: And if we could just go back up again.

Q. The reference here to having the bank get the 500,000 US dollars ready, what's the date that it's to be ready on?

A. May 10.

Q. That's 2016?

A. Yes.

Q. Okay. All right. If we go back to the timeline. The entry on the very next day, May 5, 2016, could you read that, please.

A. "HO forwards to Zhang Ya the account information provided by the Kutesas."

MR. ZOLKIND: All right. Let's bring up Government Exhibit 299.

Q. All right. Do you see that this chain starts with the

email from Edith Kutesa containing that account information that was sent back on February 25, 2016?
A. Yes.
MR. ZOLKIND: All right. And Ms. Rao, if you could highlight the bank information at the bottom.
Q. Okay. And then do you see at the top here the defendant forwards this on May 5, 2016?
A. Yes.
Q. All right. Who does he forward it to?
A. To Zhang Ya.
Q. And what does he write in the email?
A. "Note bank info."
MR. ZOLKIND: We could take that down.
Q. Next entry in the timeline is the same day, May 5, 2016. Could you read that, please.
A. "CEFC wires $500,000 to the account requested by the Kutesas."
MR. ZOLKIND: All right. And the exhibits referenced are 300 and 300-TX. Let's start at 300-TX.
Bottom email on that page from Zhang Ya, if you could zoom on the whole page.
Q. Do you see that Zhang Ya wrote Tracy, "Please wire 500,000 US dollars to the account below"? Do you see that?
A. Yes.
Q. Okay. And this appears to be like a screenshot of the

email that the defendant forwarded, is that right?
A. Yes.
MR. ZOLKIND: Okay. If we go up to the next email in the chain.
Q. All right. And you see that it's from someone at the chinaenergyfund.org?
A. Yes.
Q. And do you see the defendant there in the cc line?
A. Yes.
Q. Okay. And what's the subject line?
A. "Matter related to USD 500,000."
Q. Okay. And if you could read the email that's contained there.
A. "Miss Zhang: Have already been to the bank to wire the amount of money. The receipt is hereby attached. Please check and review. In addition, should the purpose of this amount of money be filled in the column for (executive, other expense-unexpected expense?) Thanks Tracy."
Q. Okay. Again, the subject line refers to "Matter related to USD 500,000." Do you see any reference in this email chain to any sort of foundation in Uganda?
A. No.
MR. ZOLKIND: Okay. Let's go take a look at the attachment, which will be on the original, Government Exhibit 300.

Q. All right. Do you see the wire receipt attached here to the email?
A. Yes.
MR. ZOLKIND: Okay. If we could zoom in at the top.
Q. Do you see the date on the top right?
A. Yes.
Q. What is it?
A. May 5, 2016.
Q. Okay. And on the next line, Payment Details, do you see the currency and the amount?
A. Yes.
Q. What's the amount, what's the currency?
A. The amount is 500,000 and the currency is US dollars.
Q. Okay. And if you look where it says Beneficiary Details, do you see the name of the beneficiary on the right there?
A. Yes.
Q. What's the name of the beneficiary?
A. Food Security and Sustainable -- I believe it's cut off, and it continues, Energy Foundation.
Q. Okay. And does that match the name of the account that was listed or that roughly matched the name of the beneficiary that was listed on the email from the Kutesas where they requested the donation/contribution?
A. Yes.
MR. ZOLKIND: All right. We could take that down.

Q. The next entry on the timeline is the same day, May 5, 2016. Could you read that.
A. "Zhang Ya, copying HO, directs a CEFC employee to classify the $500,000 wire under 'other professional expenses.'"
MR. ZOLKIND: If we could bring up the exhibit referenced there, and take a look at the English translation, 301-TX. And if we just zoom on the top half.
Q. All right. Who is this email from?
A. It's from Zhang Ya.
Q. Okay. And do you see the defendant included on the email chain?
A. I do, yes.
Q. And again, what's the subject line?
A. "Matter related to USD 500,000."
Q. And if you could just read the first sentence of Zhang Ya's email here.
A. "Tracy, this amount of money is one of the expense items included in 'other professional expenses' submitted in the April application."
MR. ZOLKIND: Your Honor, I'm about to play a recording. This might be a reasonable time to take a lunch break, if we're getting close.
THE COURT: How is that, ladies and gentlemen? Want to go to lunch? Maybe you'll get out and back before it rains or does anything.

Would you be kind enough to follow the normal rules. Please don't discuss the case with anyone, don't do any research on the case, leave your books in the room. Have a wonderful lunch.

Let's get ready to come back to start at ten after 2, please. I'll expect the usual weather report, please.

(Jury not present)

THE COURT: Audience, we'll send you down the elevators before the jurors, so let's run, run, run. Thank you.

Anything else on the record, friends?

MR. ZOLKIND: Not from the government, your Honor.

MR. ROSENBERG: Not from the defense, your Honor.

THE COURT: Thank you. Off the record.

(Discussion off the record)

(Luncheon recess)

A F T E R N O O N S E S S I O N

2:15 p.m.

(Jury not present)

THE COURT: Good afternoon, ladies and gentlemen. Counsel, did you want any kind of a limiting instruction as to the timeline?

MR. ROSENBERG: Yes, your Honor, we would.

THE COURT: What do you want?

MR. ROSENBERG: Something to the effect that it's not a substitute for evidence, and they should review the materials that underlie it and are cited, but I will write an appropriate instruction.

THE COURT: Sure, whenever you're ready.

MR. ROSENBERG: Thank you, your Honor.

MR. ZOLKIND: Mr. Kim reminds me, we're getting -- in the next few minutes or so, after I resume, I plan to play the recorded call that was the subject of the 404(b) ruling. I understand the defendant is requesting, and of course the government is consenting to a 404(b) instruction.

THE COURT: OK. What do you want?

MR. KIM: Judge, do you have a standard one you use? If not, we will propose one.

THE COURT: I don't know that I have it in front of me, but generally to the effect that this evidence is being played for you, not to show any tendencies, but to show lack of

mistake, intent, motive or plan.

Tell me what you want.

MR. ZOLKIND: I will confer with the defense.

THE COURT: Please do.

May we bring the jurors in.

(Continued on next page)

(Jury present)

THE COURT: Good afternoon, ladies and gentlemen. We continue with the direct examination of the agent.

Counsel.

MR. KIM: Your Honor, we apologize, but can we approach at sidebar?

THE COURT: Oh, sure.

(At the sidebar)

THE COURT: People have been killed for less than this.

MR. KIM: I apologize. I didn't realize the government was going to play this recording so soon, so I think --

THE COURT: What do you want?

MR. KIM: OK. So this evidence should be considered -- is being offered solely as to the issue of defendant's intent, lack of mistake.

MR. ZOLKIND: Intent, knowledge, lack of mistake or accident.

Do you want something like the defendant is not on trial for any crimes other than those charged in the indictment?

MR. KIM: Yes, that's fine.

THE COURT: OK.

MR. RICHENTHAL: Just for the record, can your Honor

just read what your Honor intends to say so that the defense can say if it agrees or doesn't agree?

THE COURT: This evidence is being offered solely with respect to the defendant's intent, knowledge, lack of mistake or accident. Defendant is not on trial for any crimes other than those on which he has been indicted.

MR. KIM: That's fine, your Honor.

THE COURT: OK. Let's go. Just tell me when you want it said.

MR. ZOLKIND: Do you want it before or after the recording?

MR. KIM: Maybe after the recording.

THE COURT: Done.

(Continued on next page)

(In open court)

THE COURT: Mr. Zolkind.

MELISSA GALICIA, resumed.

DIRECT EXAMINATION (Continued)

BY MR. ZOLKIND:

Q. Thank you, your Honor. Good afternoon, Agent Galicia.

A. Good afternoon.

Q. All right. Do you recall just before we broke for lunch you were testifying about records reflecting that CEFC wired $500,000 to an account that had been provided by Sam Kutesa and his wife?

A. Yes.

Q. Could we bring up just briefly Government Exhibit -- I apologize. If I could have just one moment, your Honor.

If we could bring up Government Exhibit 287-TX, which we have already looked at.

Do you recall testifying before about this report from the defendant to the chairman of CEFC in regard to President Museveni in Uganda, his reelection?

A. Yes.

Q. If we could go into the report for a moment. If we could bring up Government Exhibit 258-TX.

THE COURT: Here we thought you had all of this memorized.

MR. ZOLKIND: Not quite. I appreciate the confidence.

Q. If you could turn to the next page, and if you could just read the first paragraph of the defendant's report to the chairman.
A. "Chairman Ye, may I draw your attention to the following: The newly termed 69th president of the United Nations General Assembly, Sam Kutesa, succeeded the 68th president John Ashe on September 27, 2014, has begun fulfilling the one-year term duty."
Q. So in the defendant's report here it refers to Sam Kutesa as the PGA who replaced John Ashe; is that right?
A. Yes.
Q. OK. At this time I'd like to read a stipulation between the parties, your Honor.
Ms. Rao, if you could bring it up, I think it's S13 -- S14. Let me begin by offering Government Exhibit S14.
MR. ROSENBERG: No objection.
THE COURT: Received.
(Government Exhibit S14 received in evidence)
Q. The stipulation provides as follows. It's a stipulation regarding a recorded phone call. It provides that the parties agree:
1. Government Exhibit 2750 is a recording of a telephone call between Chi Ping Patrick Ho, the defendant, and Shiwei Yan, also known as Sheri Yan, which took place on or about July 6, 2014. The recording was judicially-authorized

and made without the knowledge of either participant.

2. Government Exhibit 2750-T is a fair and accurate transcript of the recording contained in Government Exhibit 2750. The reference to "John" at page 2, line 9 of the transcript is a reference to John Ashe.

3. If called to testify, the person identified here as Witness-1 would testify as follows in substance:

B. John Ashe served as president of the UN General Assembly (PGA) from approximately September 2013 to September 2014. During that period, he also served as permanent representative (i.e. chief ambassador) of Antigua and Barbuda to the United Nations.

B. Witness-1 and Shiwei Yan were business associates. Together, among other things, they worked to raise money for Ashe's PGA office and for Ashe personally.

C. Ashe introduced Yan and Witness-1 to Chi Ping Patrick Ho, the defendant, whom Ashe said was the head of China Energy Fund Committee or CEFC. Ashe stated that CEFC was connected to a major Chinese energy company and that Ho could therefore be a potential source of funding for Ashe and/or his office. Witness-1 does not know whether Ho or CEFC actually provided funding to the office of the PGA or to Ashe.

D. In or about April 2014, at the invitation of Ho and CEFC, Ashe traveled to Hong Kong in his capacity as PGA and met with Ho and others from CEFC, as well as others not

affiliated with CEFC.

E. Witness-1 recalls that, around early July 2014, Ho had requested the assistance of Yan and Witness-1 in securing Ashe's attendance at an event at the UN that Ho and CEFC were hosting.

THE COURT: And, ladies and gentlemen, you know that that is evidence for your consideration, and you must consider the material in the stipulation as true, and that the witness would have given that testimony. How you weigh that testimony is up to you.

MR. ZOLKIND: At this time, your Honor, we offer Government Exhibit 2750 as well as Government Exhibit 2750-T. The latter we're offering as an aid to the jury.

MR. ROSENBERG: No objection.

MR. ZOLKIND: If I may, we have copies of the transcript, if I could distribute them.

THE COURT: Yes, please.

And, ladies and gentlemen, the actual evidence is the recording. The transcript is an aid to you to assist you in listening to the recording.

MR. ZOLKIND: Ms. Rao, will we be able to bring the transcript up on the screen as well.

(Audio recording played)

MR. ZOLKIND: Your Honor, at this time we would request the agreed-upon instruction.

THE COURT: Yes, sir.

Ladies and gentlemen, this evidence was offered solely with respect to the defendant's intent, knowledge, lack of mistake or accident. The defendant is not on trial for any crimes other than those for which he has been indicted here.

MR. ZOLKIND: Your Honor, if I could have just one moment to confer with defense counsel.

THE COURT: Yes, sir.

For the record 2750 and 2750-T are received.

(Government Exhibits 2750 and 2750-T received in evidence)

MR. ZOLKIND: Ms. Rao, we can take that down.

Your Honor, we were just conferring. The stipulation that was read prior to the recording referred to someone by the name of Shiwei Yan. The transcript referred to that person as Associate-1. The parties are simply stating for the record that Associate-1 refers to Shiwei Yan.

THE COURT: Yes, sir.

Q. All right. Agent Galicia, if we could bring back up the --

Ms. Rao, if you could please bring up the Uganda timeline.

Agent Galicia, remind us what was the date that CEFC wired the $500,000 to the account requested by the Kutesas?

A. May 5, 2016.

Q. Let's go to the bubble two days later, May 7, 2016. Could

you read that, please.
A. "Ho asks a CEFC employee to inform Sam Kutesa's wife "about the remittance" and to "request a formal receive for our accounting purposes.""
Q. And if we go to the next bubble, the next day, May 8, 2016. Could you read that, please.
A. "Ho tells Sam Kutesa's wife that he will lead the CEFC delegation and that they look forward to meeting with Sam Kutesa and President Museveni and to discussing "how CEFC the company can play a major role in the future development of Uganda.""
Q. All right. Let's bring up that Exhibit 304.
Ms. Rao, if you could just zoom in on the first half of that e-mail at the top.
All right. And who is this e-mail from?
A. It's from Patrick Ho.
Q. And who is it to?
A. To Edith Kutesa.
Q. What's the date on it?
A. May 8, 2016.
Q. So, as you understand it, based on your review of documents, how much time has passed since that $500,000 wire?
A. That would be three days.
Q. And do you see the e-mail reads as follows. The defendant says, "Thanks, Edith. We are on our way to your beautiful

country, arriving in the evening of the 10th and departing the evening of the 12th. The chairman sends his regret because he was just called to Beijing. He was making every effort to come and that is why we held out to this very late to organize the delegation. However, he sends his most able deputy and general managers and I have been asked to lead the team which is empowered to represent the company."

If we could go down.

"We look forward to discussing in details with Sam in confidence about the various ways we can bring our two countries together through joint ventures and development, and also look forward to meeting and discussing with the president how CEFC the company can play a major role in the future development of Uganda."

All right. If we go back to the Uganda timeline, the same day, next entry, also on May 8, if you could please read that.

A. "Ho schedules meeting to discuss gifts for Ugandan officials."

Q. Let's bring up that exhibit, 305. All right. We can zoom in on the whole e-mail.

Do you see that the first e-mail in the chain is from someone named Roger Fong?

A. Yes.

Q. And his title there at the bottom is chief

officer-coordination, and he writes, "Dear Mr. Ho, Shanghai wants us to suggest what kind of gift to the president, Kutesa, China ambassador and other for spare, then they will purchase on tomorrow."

And if you could read the defendant's response.

A. "Let us meet tomorrow first thing in the morning at 9:30 a.m."

Q. All right. If we go back to the timeline, the next date, the entry on May -- the next day, the entry on May 9. If you could read that.

A. "Ho tells Sam Kutesa's wife that they are bringing "some very nice gifts to your president and to Minister Kutesa" and that they will need "special assistance with your customs procedure.""

Q. All right. Let's bring up that Exhibit, 309.

All right. Do you see the chain starts here with an e-mail from the defendant addressed to someone named Steven. Do you see that?

A. Yes.

Q. And he says, as you just read, "As we are about to board the plane to Uganda, we are preparing to bring with us some very "nice" gifts to your president and to Minister Kutesa to celebrate the occasion. We will shall require special assistance with your customs procedure."

And if you could read the response from Edith Kutesa.

A. "Dear Patrick, we will be there at your arrival. Very best, and travel well. So excited to see you, Edith."

Q. If we could bring up Government Exhibit 310. Do you see that it starts this chain here starts with the same e-mail from the defendant that we just looked at. Do you see that?

A. Yes.

Q. And who does he forward the e-mail to at the top?

A. It's forwarded to Sam Kutesa.

Q. Let's bring up back to the timeline, the same day, there is another entry on May 9. Read that one.

A. "Sam Kutesa's wife, copying Sam Kutesa, e-mails Ho recording the agenda for Ho's trip to Uganda."

Q. And let's bring up that exhibit, if we could, 311.

If we look at the e-mail at the top, who is it from?

A. It's from Edith Kutesa.

Q. All right. And do you see whether the defendant is involved in the chain?

A. Yes, he is copied on the e-mail.

Q. And how about Sam Kutesa?

A. He is as well.

Q. All right. If we go, Ms. Rao, to the middle paragraph, the sentence beginning "We have planned ..."

"We have planned a dinner at our home on the 10th with some officials, such as the permanent secretary of the ministry of mining and energy, the deputy governor of the central bank,

the minister of finance and ourselves."

All right, we can take that down.

Back to the timeline. Same date, there is another entry on May 9, 2016.

A. "CEFC employee states that Ho "highly expects the delegation can meet some key persons at energy and financial sectors.""

Q. Let's bring up that Exhibit, 312. And if you could just zoom in on the top e-mail.

Agent Galicia, if you could tell us who that is from and to and then read the e-mail.

A. It's from Roger Fong to Edith Kutesa, copying Sam Kutesa, Patrick Ho and Zhang Ya.

"Dear Mrs. Kutesa, sounds great. This is first time to bring the business peoples to Kampala, both Chairman Ye and Dr. Patrick Ho are highly expect the delegation can meet some key persons at energy and financial sectors."

Q. And again back to the timeline, there is another e-mail on the same day, May 9, 2016.

A. "CEFC employee states that "the meeting with the president is our main goal on this visit.""

Q. And if we bring up Government Exhibit 313 and zoom in right at the top. Again, is this another e-mail from Roger Fong?

A. Yes.

Q. And is the defendant included in this chain as well?

A. He is, yes.
Q. All right. And I will just read it, it says, "Dear Mrs. Kutesa, as you mentioned that you are arranging to meet the president on May 13 morning, hence we change the return flight to May 13 afternoon. Please understand that the meeting with the president is our main goal on this visit. Please try your best to make this happen."
All right. The date on that is May 9; is that right?
A. Yes.
Q. All right. Let's go to on the timeline the next entry May 12, 2016. Could you read that.
A. "Ho and CEFC delegation attend the inauguration of President Museveni."
Q. Let's bring up Government Exhibit 321, and if we go to the next page. What do you understand these attachments to be?
A. I understand these are photos taken from the inaugeration.
Q. Let's just flip through them. If we could go back to the timeline, same date, May 12, if you could read the next entry, please.
A. "Ho and CEFC delegation attend dinner at Sam Kutesa's home, along with other Ugandan government officials."
Q. Let's go to Government Exhibit 325, and if we could turn to the attachment. What do you understand these to be photos of?
A. I understand these are photos taken from the dinner.
Q. OK. And if we could flip through those, Ms. Rao.

326 was also listed. Let's go to that one. If you could just flip through these photos for the jury.

All right. Back to the timeline. The next date, one day later, May 13, would you read the first entry on that.

A. "Ho and CEFC delegation meet with Uganda's Department of Energy and Mineral Resources."

Q. Let's pull up Government Exhibit 324.

Ms. Rao, if you go back up to the first photograph in the chain. If you would zoom in on that top one. OK. We can take that one down.

The same date there is another entry in the timeline, May 13.

A. "Ho and CEFC delegation meet with President Museveni."

Q. If we could bring up Government Exhibit 327. What do you understand these photos to be?

A. These are photos from that meeting.

Q. And let's go to Government Exhibit 328. All right. We can take that down.

The next day there is an entry on the timeline from May 14, 2016. Could you read that.

A. "Zhang Ya forwards Ho a company overview with the file name "CEFC company Pack 20160509-trip to Africa. PDF.""

Q. Can we bring up that Exhibit, please. the English translation.

I apologize, Ms. Rao. Why don't we bring up the

original first and then we will go to the translation. If we could go to the attachment. If you could just flip through it.

Agent Galicia, does this appear to be an English version of the attachment?

A. Yes.

Q. All right. And then followed by a Chinese version?

A. Yes.

Q. All right. Now let's bring up 406-TX, the English translation of the Chinese version. If you could go to the page that reads company profile, Ms. Rao. Let's stop there for a moment.

And Agent Galicia, if you could read the company profile?

A. "Company profile: CEFC China is an institutional private enterprise with a group of companies dedicated to integrated energy investment and financial services.

"Established in 2002, headquartered in Shanghai with subsidiaries and branch offices all over China, and three subsidiaries listed respectively in Mainland China, Hong Kong and Singapore.

"Leading private energy company in China.

"2015 group revenues: $41 billion.

"Fortune 500 ranking by revenues: 2014: Number 349. 2015: Number 342.

"CEFC Shanghai is the largest private company in

Shanghai.

"China CEFC headquarters. Extensive global exposures. Europe, central Asia, Middle East, Asia Pacific, Africa, China, North America.

Q. All right. And if we could skip ahead to the page that says "key financials" on top. If you could just read the top of that page.

A. "key financials. In 2015, the revenue contribution from CEFC China's main business exceeded $41 billion, mainly from business of financial product, industrial income, crude oil and gas, etc."

Q. If we could go I think it's two pages to the upstream asset focus. Agent Galicia, if you could just point out in the African continent what countries are identified as being CEFC's upstream asset focus.

A. Chad, Egypt and Uganda.

Q. We can take that down.

Let's go to the next entry on the tomorrow line is on the timeline is May 15, 2016. Could you read that.

A. "Ho e-mails Zhang Ya a list of "main points of Uganda possibilities," including in energy, infrastructure, finance, agriculture, and tourism sectors."

Q. Let's bring up Government Exhibit 316, please, and if we can zoom in on the whole e-mail.

Who is this from and to?

A. This is from Patrick Ho to Zhang Ya.
Q. What's the date?
A. May 15, 2016.
Q. So would that be about a day or two after the trip to Uganda?
A. Yes.
Q. And you see the subject line is main points of Uganda possibilities?
A. Yes.
Q. All right. I will just read a few of them.

It says:

"1. Energy: Still some blocks to be licensed out; refinery contracted to RT Global Resources (Russian) conglomerates, but they need partners; oil pipe through Tanzania contracted to Total (French) but they also need partner; Energy Industrial Park can be given to us (suggest to include real estates, airport, second refinery, etc.): Other minerals such as plutonium, long term wants to build nuclear power, electric grid (transmission power lines worn and have to be replaced).

"2. Infrastructures: Roads, high speed rails, airports.

"3. Finance: Possibility of acquiring Barclay Bank Africa; possibility to include RMB based clearing and settlement currency.

"4. Agriculture.

"5. Tourism: Rebuild Uganda airline, agreed to give us a piece of land by the lake, or an island in the lake to develop into a resort area with hotels, shopping centers, casino, recreation parks, and a China-town; boosting tourism from China."

If we could zoom out. And we can take that down.

Back to the timeline on the same day, there is another entry from May 15.

A. "Zhang Ya sends a report regarding the CEFC delegation's meeting at Sam Kutesa's residence."

Q. Let's pull up 329-TX, please.

Does this appear to be another report e-mailed from Zhang Ya to -- excuse me -- this one is from Zhang Ya to the defendant; is that right?

A. Yes.

Q. OK. Could you read the subject line.

A. "Conference news 2016-5-11 Ugandan foreign minister Kutesa meeting with the CEFC delegation."

Q. If we could turn to the report. If you could read the headline and the first two paragraphs.

A. "Ugandan foreign minister Kutesa met with the CEFC delegation.

"In the evening of May 12, 2016, Uganda local time, Ugandan foreign minister Sam Kutesa met with Ho Chi Ping,

executive vice chairman and secretary general of CEFC, Su Wei Zhong, executive director, Song Ren Zhan and Wang Sha Li, consultants, and others, who have got an invitation to visit his official residence. Fred Kabagambe-Kaliisa, executive secretary general of the Department of Energy and Mineral Resource of Uganda, and Louis Austin Kasende, Vice President of the Central Bank also took part in the conversation.

"The parties had an in-depth exchange on issues of the Ugandan energy development, infrastructure construction, financial trade, agriculture, and tourism, etc."

Q. Next entry on the timeline is about three days later, May 18, 2016. If you could read that one.

A. "Ho e-mails Sam Kutesa and his wife regarding CEFC's involvement in Chad."

Q. All right. Let's go on to the next one a day later, May 19, 2016. Could you read that one.

A. "Ho provides a report to CEFC chairman summarizing the trip to Uganda."

Q. All right. Let's bring that up, the English translation 333-TX.

All right. So is this again an e-mail from Zhang Ya to the chairman office copying the defendant?

A. Yes.

Q. And could you read the subject line.

A. "Extra urgent: Summary of the Ugandan visit from May 11th

to 13th."
Q. Turn to the next page, what's the confidentiality level?
A. It's marked highly confidential.
Q. And the urgency level?
A. Super urgent.
Q. Who is it submitted by?
A. It's submitted by the defendant.
Q. And could we go to the next page. It's a lengthy report, I will just ask you to read a few portions of it. If you could start with the title and the first paragraph?
A. "Summary of the Ugandan visit from May 11 to 13th.

"Firstly, I would like to report that the group, including independent director Su Wei Zhong, deputy chief Song Ren Zhan, chief Wang Sha Li (Investment Committee Project Group) and I, made first visit to Ugandan capital, Kampala from May 11th to 13th. Everything lives up to expectations. The two-day visit and discussion have been successful."
Q. And if you turn to the next page, if you can read the paragraph beginning "during the visit..."
A. "During the visit, respectively, we visited Chinese embassy to Uganda, M-Cash Financial Company, foreign ministry, Department of Energy and Mineral Resource, the presidential palace; met with foreign minister Sam Kutesa, secretary general of Department of Energy and Mineral Resource Fred Kabagambe-Kaliisa, vice president of Central Bank Louis Austin

Kasakende, and President Xi Jin Ping's special envoy, and deputy chairman of the National People's Congress Yan Jun Qi; attended President Museveni's inauguration ceremony, and was received by President Museveni at last."

Q. If we could go to the last sentence on that page and read that, please.

A. "The impression of the trip, after being summed up and sorted out, is written as follows, for reference only:"

Q. All right. So let's go to the first section. I'm sorry. If we can go back to that page.

OK. Do you see at the top of the first section there, one, if you could just read the section header.

A. "One: The political environment is stable and folk customs are simple and pure."

Q. And then we can skip ahead to section 2, just read the section header.

A. "Two: A survey of the country and its objective environment".

Q. And if you skip ahead to section 3. Sorry. I think that's a subsection 3. If we go back. All right. We don't have page numbers, but right there. Section 3 begins at the very bottom there.

A. "Three: Meeting with the president regarding five major sectors.

Q. Could you read the section that follows below that.

A. "In the morning of May 13 before meeting with President Museveni, the delegation, accompanied by the wife of foreign minister Sam Kutesa during the entire trip, had discussions with Fred Kabagambe-Kalissa, executive secretary general of Department of Energy and Mineral Resource of Uganda and Louis Austin Kasekende, vice president of Central Bank respectively. They exchanged ideas extensively on issues related to Uganda's energy industry development, infrastructure construction, financial trade, agriculture, and tourism, etc.; especially on a new-style industry park, oil field development, bidding, construction of petroleum export pipelines in the future, capital investment, refinery, etc."

Q. If you go to the next page, please. And if you could read the paragraph beginning "later".

A. "Later, when President Museveni received the delegation, we brought up a total of five categories of the potential cooperation and development sectors, including energy, infrastructure construction, financial trade, agriculture, and tourism. As a result, President Museveni was affirmative and highly supportive of all of them. He said that Kutesa had already reported to him comprehensively about the entire process of CEFC China's investment development in Czech Republic, and the glorious history of establishing the enterprise's European second headquarter in Prague. Thus, he hoped, in the future, that Kampala of Uganda would be CEFC

China's stronghold in East Africa and the African third headquarter."

Q. Zoom out of that and go to the subsection titled "one: Energy Sector".

If you could read that paragraph.

A. "(1) Energy sector. The discussed topics involved the discovery of the oil fields in Simliki Basin near the border areas of Western Uganda and Congo (Jin), and in the vicinity of Lake Albert, and even the upstream, midstream and downstream energy industry in Uganda. No matter which aspect we are interested in, participation is possible. Even if bidding process for a project is completed, it can be reversed and restarted again."

Q. Ms. Rao, if you could zoom out and go to the next page. Subsection 2.

If you could read just the first three lines of that section.

A. "(2) The Financial Sector.

"President Museveni suggested that we, using Czech Republic's J&T Bank as the main body, could purchase a local bank in Uganda, to directly get involved in the financial system of East Africa."

Q. OK. If we go to the next page, Ms. Rao if you could just highlight subsection 3, it reflects the discussion about infrastructure construction. And if you turn to the next page,

if you could highlight the paragraph begin "our focus" just above that.

The defendant writes, "Our focus should be on the Entebbe International Airport's second phase terminal construction an airport expansion controlled by the Kutesa family, Ugandan domestic railway, high speed rail, and highway construction, etc. Ugandan government would use petroleum to offset the investment.

If you could zoom out and if you could just highlight subsection 4 reflects a discussion about agricultural opportunities.

If you go to section 5, tourism sector. And if you could highlight paragraph beginning "President Museveni also agreed..."

"President Museveni also agreed to carve out a large piece of land near Lake Victoria, or designate an island in the middle of the lake, using for our side to develop it into a high-end tourist resort, which would include a five-star hotel, casino, luxury shopping area, safari, and single house development etc. It's even possible to build a man-made island in the middle of the lake, to develop a water-amusement park, to build the first water airport in Africa, etc."

And if you could just go to the end of this report, who is it signed by?

A. It's signed by Patrick Ho.

Q. All right. The next entry on the timeline, about two days later, May 21, if you could read that one.
A. "Kutesa's wife tells Ho that Kutesa is in contact with President Deby's aide regarding a meeting with CEFC."
Q. All right. If you go to the entry after that about five days later, May 26.
A. "Ho tells Sam Kutesa and his wife that CEFC is "very enthusiastic" and about "working with you and the Kutesa family" in "joint ventures in Uganda," and that CEFC's "first priority" is to "acquire controlling shares of bar clay bank Africa in Uganda.""
Q. Let's go to that Exhibit 336, and if we could zoom in on the whole e-mail.
OK. Agent Galicia, based on your review of documents, would this have been about two weeks or so after the trip to Uganda?
A. Yes.
Q. Who is the e-mail from?
A. It's from Patrick Ho.
Q. Who is it to?
A. It's to Edith Kutesa and Sam Kutesa.
Q. And what's the subject line?
A. Follow up.
Q. All right. I will read it.
"Dear Edith and Sam, thank you very much for hosting

our last visit to your beautiful country. We all had a very enjoyable and eye-opening time and learned quite a bit about your country and continent. We have since reported the details of this trip to the board and the chairman, and I was instructed to acknowledge your hospitality and thank you and your president formally.

"We at CEFC are very enthusiastic about the prospect of joint ventures in Uganda. In particular, in working with you and the Kutesa family. We would like to be considered by you as a partner in business ventures that you would like us to join in, such as in the areas of infrastructure building, airport and agriculture.

"We are particularly interested in the possibility of acquiring controlling shares of Barclays Bank Africa in Uganda, and would like very much to request your assistance in going about doing so. If this first step is successful, the doors are widely open for any future undertakes in the country and in the region.

"This will be our first priority and please work with us to accomplish this. Our interest in Chad can wait for the time being while we concentrate on this very important and strategic initial step in Uganda."

The next entry on the timeline is one day later, May 27. Please read that.

A. "Sam Kutesa's wife, copying Sam Kutesa, replies that she is

"writing to quickly acknowledge" Ho's e-mail before "traveling in countryside for a few days.""

Q. All right. Let's bring that up, 337. And if you could just zoom, Ms. Rao, on the top e-mail in the chain.

Agent Galicia, if you could read just the second paragraph beginning "I'm writing to quickly knowledge" from Edith to the defendant.

A. "I am writing to quickly acknowledge your nice message before traveling in the countryside for a few days. I will reconnect with you next Thursday first to agree on the way forward with you after discussion with Sam. He is very busy now with the visits of the president of South Korea followed by the president of Turkey."

Q. And the next line is what?

A. "hope you are all well with your team and thank you again for making Uganda your priority for investment."

Q. The next entry on the chart is the same day. If you could read that entry.

A. "Ho responds to "reiterate our decision and strategies re Africa," stating that "CEFC would like to partner with the Kutesa enterprise and would like to invest through you and with your family business (and the president's) who can be the local operators.""

Q. Let's bring up Government Exhibit 338.

THE COURT: 338?

MR. ZOLKIND: 338, yes.
Q. Agent Galicia, do you see that this page starts with the e-mail from the defendant followed by the response from Edith Kutesa that we've just reviewed?
A. Yes.
Q. All right. And, Ms. Rao, if you could zoom in on the top e-mail in the chain. And is this the defendant's response to those e-mails?
A. Yes.
Q. OK. I will read it. The defendant writes, "Edith, please allow me to reiterate our decision and strategies re Africa. CEFC would like to partner with the Kutesa enterprise and would like to invest through you and with your family businesses (and the president's) who can be the local operators.

"The key is to get the bank in Uganda up and running to become the first offshore RMB (Chinese money) exchange center in Africa. Then we can establish relationship through this bank in Uganda with other banks in China and J&T Bank in Europe, and this route of cash flow to Africa would enable us to invest in a host of ventures.

"Please relay there to Sam and to the president.

"Please look into the opportunity with the Barclays. Best Patrick."

(Continued on next page)

MR. ZOLKIND: All right. We can take that down and go back to the timeline.

BY MR. ZOLKIND:

Q. I believe the next entry is five months later, October 13, 2016. If you could read that.

A. "Sam Kutesa's wife emails HO regarding an opportunity to acquire a Ugandan bank, Crane Bank."

MR. ZOLKIND: Let's go to Government Exhibit 340.

Q. And who is this email from?

A. This is from Edith Kutesa.

Q. Who is it to?

A. To Patrick Ho.

Q. And what's the subject line?

A. "Opportunity to Invest in Banking Sector."

Q. All right. And if you could read the first paragraph of that email.

A. "In your last communication with us, you have mentioned that you would be interested to first invest in banking sector in Uganda before expanding your scope to other sectors.

"The central bank official you met during your visit has contacted us to inform you about the possible acquisition of a local bank but as you know, selling a bank is a very confidential and urgent process. Please check the bank's profile on www.cranebanklimited.com and express your interest and asking for more information in simple letter addressed to:

"Dr. Luis Kasekende, Vice Governor, Bank of Uganda."

MR. ZOLKIND: Okay. We can take that down.

Q. Next email on the timeline is I believe a day later. If you could read that.

A. "HO writes a letter to a Ugandan Central Bank official, expressing interest in the possibility of acquiring Crane Bank."

MR. ZOLKIND: Let's bring up Government Exhibit 341.

Q. All right. And who is this email from?

A. It's from Koch Lee from the China Energy Fund.

Q. Does this appear to be addressed to the Ugandan Central Bank official that Edith Kutesa had written to the defendant about?

A. Yes.

Q. And who is copied on the email?

A. Edith Kutesa and Patrick Ho.

MR. ZOLKIND: All right. And if we could go to the attachment.

Q. All right. Who is it addressed to?

A. It's addressed to Dr. Luis Kasekende.

Q. Of what title and institution?

A. Vice Governor, Bank of Uganda.

Q. All right. And the defendant writes:

"Dear Dr. Luis Kasekende,

"It has been brought to my attention that a local bank

in your country may be available for acquisition. We are interested in this possibility and would like more information regarding this. Thank you for your attention.

"Sincerely," and then his stamped signature.

I believe the next entry on the timeline is about ten days later, October 25th. If you could read that one.

A. "HO asks Zhang Ya to direct the bank acquisition matter to the attention of another CEFC executive."

MR. ZOLKIND: All right. Let's bring up Government Exhibit 344.

If we start with the email further down the chain.

Q. All right. And do you see that this email is from someone by the name of Ben Sekabira, subject line, Possible Bank Acquisition, and addressed to the defendant?

A. Yes.

Q. And it says:

"Dear Dr. Patrick Ho,

"I hope this email finds you well."

He goes on to say that he is within the Bank of Uganda and says, "I have twice called your office telephone number but was unable to speak to you. I am particularly seeking to know whether your institution is still interested in acquiring a banking institution in Uganda or whether that interest can be rekindled."

MR. ZOLKIND: And then if we can go up and read the

defendant's email.
Q. Who does he send the email to?
A. To Zhang Ya.
Q. Okay. What does he say?
A. "Can you redirect this to either So's office or Ye's office."

MR. ZOLKIND: Okay. And we can take that down.

Q. And I believe the final entry on the Uganda timeline is about two days later, October 27, 2016. Could you read that.
A. "Sam Kutesa's wife provides a letter dated June 10, 2016, signed by Sam Kutesa, thanking CEFC for its $500,000 contribution."

MR. ZOLKIND: Let's bring up Government Exhibit 345.

And if we could zoom in on the top email.

Q. Who is it from?
A. From Edith Kutesa.
Q. Who is it to?
A. To Roger Fong, copying Patrick Ho.
Q. Okay. And in her email Edith writes:

"Dear Roger, I hope my message finds you well.

"Finally, I got the letter signed and please find it herewith attached. Once again present our thanks to Dr. Ho and to the chairman.

"Concerning Barclays, it is the South African Group ABSA which is in charge to sell all the 16 branches in Africa.

I think your group has to make a decision if you want to buy all the branches before we do more research."

MR. ZOLKIND: Let's go to the attachment.

Q. Now you see this is a letter?

A. Yes.

Q. Okay. Who is the letter addressed to at the top left?

A. It's addressed to Patrick Ho, China Energy Fund Committee.

Q. Who is it signed by at the bottom left?

A. It's signed by Sam Kutesa.

Q. Okay. And do you see that in the top paragraph here, Sam Kutesa is thanking CEFC for its valuable contribution of 500,000 US dollars to the Food Security and Energy Sustainability Foundation?

A. Yes.

MR. ZOLKIND: Okay. We can zoom out.

Q. If you can refer back to the Uganda timeline, it's helpful. What was the date of that $500,000 wire?

A. It was May 5, 2016.

Q. Okay. What date is this email, Government Exhibit 345?

A. The date is October 27, 2016.

MR. ZOLKIND: And Ms. Rao, if you could just bring up Government Exhibit 345 again.

Q. The date on the email is what?

A. October 27, 2016.

MR. ZOLKIND: And if we go to the attachment.

Q. What's the date on the top left of the attachment?
A. The date is June 10, 2016.
MR. ZOLKIND: Okay. We can take that down.
Your Honor, Government Exhibit S-1 is a stipulation between the parties which is already in evidence. I'd like to just bring it up and read one paragraph.
THE COURT: Yes, sir.
MR. ZOLKIND: Paragraph 6.
Paragraph 6 reads -- I should note it's a stipulation regarding bank and financial records.
"Government Exhibit 2009 consists of true and correct copies of account records, including account information, statements, records of debit and credit, wire and electronic transfer records, and records of deposit for the HSBC Hong Kong account held in the name of CEFC Limited (account number ending 2838), that were made at or near the time of their creation by, or from information transmitted by, a person with knowledge of the matters set forth in the records, and that were kept in the course of a regularly conducted activity of HSBC Hong Kong as a regular practice of that activity."
Pursuant to that stipulation, the government offers Government Exhibit 2009.
MR. ROSENBERG: No objection.
THE COURT: Received.
(Government's Exhibit 2009 received in evidence)

MR. ZOLKIND: Ms. Rao, if you could bring up Government Exhibit 2009.

BY MR. ZOLKIND:

Q. And Agent Galicia, do you see that these are HSBC Hong Kong records of CEFC Limited?

A. Yes.

MR. ZOLKIND: We can go back to the first page.

Q. Do you see CEFC Limited at the top left?

A. Yes.

MR. ZOLKIND: Okay. And Ms. Rao, if you could bring up page 226.

Q. Do you see here that the same letter from Kutesa dated June 10, 2016 regarding the $500,000 quote-unquote contribution was also contained within CEFC's bank records at HSBC Hong Kong?

A. Yes, I do.

MR. ZOLKIND: We can take that down.

Your Honor, would this be a convenient time for a midafternoon break?

THE COURT: How are you feeling, ladies and gentlemen?

JUROR: How late are we going?

THE COURT: They haven't shared that information with me. It won't be later than 5. How do you feel? We can break now or we can break at a different time. Confer with yourselves and let me know what you want.

THE JURORS: Break.

THE COURT: You'd like a break.

Thank you, counsel.

All right, ladies and gentlemen. You know the rules. No talking about the case.

You may leave those there on the jury rail, on the rail in front of you, and we'll pick them up. Thank you, ma'am.

(Jury not present)

THE COURT: Anything else on the record, friends?

MR. ZOLKIND: Not from the government, your Honor.

THE COURT: Anything off the record?

(Discussion off the record)

(Recess)

(In open court; jury present)

THE COURT: Won't you be seated.

We continue with the direct examination of the agent.

Mr. Zolkind.

MR. ZOLKIND: Thank you, your Honor.

Ms. Rao, could we please bring up Government Exhibit 300-TX, which is in evidence.

BY MR. ZOLKIND:

Q. Agent Galicia, do you recall testifying about this document regarding the $500,000 wire?

A. Yes.

MR. ZOLKIND: And if we could go to the original Government Exhibit 300. And go to the attachment.

And if we could zoom in.

Q. Do you recall testifying about this wire record regarding the $500,000 wire?

A. I do.

MR. ZOLKIND: Okay. If we could go to the -- if you could just zoom in on the lower left where the name of the entity is listed.

Q. Do you see the name of the account holder from which the wire was sent?

A. Yes.

Q. And what entity is that?

A. CEFC LTD.

MR. ZOLKIND: If we could bring up Government Exhibit 2009, which is in evidence. And it's stipulated among the parties to be bank records of CEFC Limited held in HSBC Hong Kong. And if we could go -- I'm not sure if I misspoke. Bank records of CEFC Limited held at HSBC Hong Kong. And if we could go to page 52, please.

BY MR. ZOLKIND:

Q. Do you see the name of the entity on the top left?

A. Yes.

Q. What entity is that?

A. CEFC Limited.

Q. And do you see in the section below that, it lists the authorized signatures on the account?
A. Yes.
Q. And who's the first name listed?
A. Patrick Ho.
Q. Okay. Do you see his signature to the right?
A. Yes.
MR. ZOLKIND: Okay. We can take that down.
Q. Agent Galicia, based on these documents and other documents you've reviewed and testified about, do you have an understanding as to whether CEFC Limited is an entity that is the CEFC oil company or the CEFC NGO?
A. My understanding is that it's the NGO.
Q. Okay. All right. So as you understand it, am I correct that the $500,000 wire came from an account held by the NGO?
A. Yes.
Q. Okay. And do you recall testifying earlier with respect to the $2 million so-called donation in Chad and do you recall testifying about the website for the CEFC company?
A. Yes.
Q. Okay. I'd now like to ask you about websites of the CEFC NGO.
MR. ZOLKIND: So let's bring up Government Exhibit S-11, which is a stipulation between the parties in evidence.
And if we could go to paragraph 2.

Sorry. Not paragraph 2. Paragraph 3.

Going on to the next page.

Okay. This reads, "The parties stipulate that the following government exhibits contain accurate copies of pages from the China Energy Fund Committee website (cefc-ngo.co or cefc.org.hk) as those pages existed as of the approximate dates set forth below."

And then there's a series of government exhibits listed with corresponding dates.

Pursuant to this stipulation, your Honor, we offer Government Exhibits 803 and 804.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibits 803 and 804 received in evidence)

MR. ZOLKIND: And pursuant to the parties' stipulation over translations, we also offer 803-TX.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 803-TX received in evidence)

MR. ZOLKIND: All right. Could we please bring up, Ms. Rao, Government Exhibit 803.

BY MR. ZOLKIND:

Q. Okay. Agent Galicia, have you had a chance to look at this exhibit in advance of your testimony today?

A. I have.
Q. All right. And what name do you see on the top left of the website and what logo do you see?
A. The China Energy Fund Committee, CEFC Hong Kong Nongovernmental Fund.
MR. ZOLKIND: Okay. All right. If you go and scroll to the bottom of this page. If you could keep going.
Q. Do you see in the web address at the bottom, about halfway through it, it refers to cefc-ngo? Do you see that?
A. Yes.
MR. ZOLKIND: Okay. All right. Let's take that down. And bring up the English translation, 803-TX.
Q. All right. Just generally speaking, based on your review of this website, what's your understanding of the sort of information contained on this CEFC website?
A. These appear to be press releases with respect to the China Energy Fund Committee.
Q. Okay. In other words, CEFC NGO?
A. Yes.
Q. If you go to the last page, what year do you see reflected here?
A. 2015.
Q. And if you go to the first page, what year do you see reflected?
A. 2017.

Q. And so is it fair to say that this website appears to contain press releases in about July of 2015 and March of 2017?
A. Yes.
Q. Okay. And did you see in here references to certain charitable or other donation type activities with the CEFC NGO?
A. I did.
Q. So for example, go to page 6 at the bottom. And you see a reference in the last entry there to first Million Energy Awards will be presented at the UN Development Summit? Do you see that?
A. Yes.
Q. And if you go to page 2 of this exhibit, go to item 3 on page 2, you see another reference to a press release regarding the UN-CEFC Energy Award?
A. Yes.
Q. Okay. Again, just remind us, what was the date of the $500,000 wire to the account provided by the Kutesas?
A. It was May 5, 2016.
Q. And so is that within the date range of press releases contained on this web page?
A. Yes.
Q. Did you see anywhere on this web page any reference to a $500,000 US dollar donation to a charitable foundation in Uganda?
A. I did not, no.

Q. Did you see anything within these press releases regarding any sort of charitable or humanitarian assistance provided to Uganda?
A. No.
MR. ZOLKIND: If we could bring up Government Exhibit 804.
Q. Okay. And have you had an opportunity to review this web page in advance of your testimony today as well?
A. Yes, I have.
Q. Okay. And again, generally speaking, what sort of information is contained on this web page?
A. Again, these appear to be press releases.
Q. Okay. Is this an English language web page associated with the CEFC NGO?
A. Yes.
MR. ZOLKIND: Okay. And Ms. Rao, if you could scroll to the top for a moment.
Q. Okay. You see the URL includes cefc.org?
A. Yes.
Q. Okay. And again, if you go to the last page, what year do you see?
A. 2015.
Q. Okay. If you go to the first page, at the very top in the banner, do you see the text highlighted in yellow, December 7, 2017?

A. December 22, 2017.
Q. Sorry. December 22, 2017?
A. Yes.
Q. Okay. And for example, if you just look at the first item listed in the press releases here --
MR. ZOLKIND: Zoom in on the first one.
Q. -- you see it refers to, "CEFC works with UN DESA to support small-scale artisanal fishers"? Do you see that?
A. Yes.
Q. Okay. Was there anything in this website about a $500,000 US dollars donation to a charitable foundation in Uganda?
A. I did not see anything in this website.
Q. And anything more generally about charity or humanitarian efforts in Uganda?
A. No.
MR. ZOLKIND: We can take that down.
Finally, also pursuant to the parties' -- let's bring up Government Exhibit S-11, the stipulation about websites again.
Under No. 1, it refers to websites of the CEFC China Energy Company Limited. Government Exhibit 809 is listed there. I'm not sure if I offered this already, but if not, we offer Government Exhibit 809.
MR. ROSENBERG: We have no objection.
THE COURT: Received.

(Government's Exhibit 809 received in evidence)

MR. ZOLKIND: And let's bring up Government Exhibit 809.

BY MR. ZOLKIND:

Q. Did you have an opportunity to review this website in advance of your testimony today?

A. I did.

Q. Okay. And do you see that if you look at sort of the top area, it says Current Position: Home>Corporate Responsibility>Global High-End Think Tank?

A. Yes.

Q. Okay. And just generally speaking, what sort of information is reflected on this web page?

A. Seems to be just a general overview of the NGO.

Q. Okay. If you go to the second page, first bullet point, you see that there's a discussion here about CEFC helping to establish and fully fund the Center for International Relations Sustainable Development (CIRSD), an international cooperation platform, with Vuk Jeremic, do you see that?

A. Yes.

Q. Okay. And if we go to the second bullet point, you see that there is a discussion about CEFC joining hands with the UN, as part of its donation to the UN? Do you see that?

A. Yes.

Q. In fact, above there, there's a life-sized photo of a

$1 million donation to the UN, do you see that?
A. Yes.
MR. ZOLKIND: We can zoom out of there.
Q. The last website I'll ask a question about, but do you see any reference on this website to any $2 million donation to the people of Chad or any $500,000 donation to charity in Uganda?
A. I did not, no.
MR. ZOLKIND: All right. We can take that down.
Q. Let me ask you now, Agent Galicia, just about a few other emails.
MR. ZOLKIND: If we could bring up for identification only Government Exhibit 407.
Q. Okay. And do you recognize this as an email chain involving the defendant?
A. Yes.
MR. ZOLKIND: Your Honor, the government offers Government Exhibit 407.
MR. ROSENBERG: No objection.
THE COURT: Received.
(Government's Exhibit 407 received in evidence)
MR. ZOLKIND: If we could publish this, please.
And Ms. Rao, if you could zoom in on the second email in the chain at 9:36.
BY MR. ZOLKIND:
Q. And Agent Galicia, if you could tell us the date of this

email and then read it into the record.

A. It is dated December 14, 2016. And it says:

"Dear Dr. Ho,

"Sure. Here attached our preliminary Chinese press release, written by Ms. Xiang ST, Steven and me, due be handed out to the press before the Grant starts. And the final version will be sent out ASAP once the event is over. Please have a preview. Thanks, Wanda."

MR. ZOLKIND: Okay. We can zoom out.

Q. And I should have asked, at the very top, what's the subject line?

A. The subject is Energy Award Press Release by CEFC (Chinese).

Q. Okay. Who is the top email from here?

A. From Patrick Ho.

Q. He responds to that email as follows:

"Look, this is exactly what I was speaking about.

"CEFC press release should be centered upon CEFC and its Chairman and Secretary General, all the rest including UN and its SG plays second place.

"That is why we have to put out our own press release independent of the UN's.

"Of course, the UN press release puts UN and its SH in the center, and that is why we cannot use the UN's.

"Zhang Ya rewrite this ASAP! You all should have

learnt by now how to do this!!!"

MR. ZOLKIND: We can take that down.

Bring up for identification Government Exhibit 411.

Q. Agent Galicia, do you recognize this as an email chain involving the defendant?

A. Yes.

MR. ZOLKIND: And your Honor, the government offers Government Exhibit 411.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 411 received in evidence)

MR. ZOLKIND: And if we could just publish that and zoom in on the top.

BY MR. ZOLKIND:

Q. And who is this email to?

A. It's to Patrick Ho.

Q. What's the subject line?

A. Subject is Urgent Draft Press Release.

Q. Okay. And if you could just read the first paragraph there.

A. "Attached please find a Chinese version of the press release about the news on donation. Besides that, the media may want to clarified the unit of the donation, USD/HKD?"

MR. ZOLKIND: Okay. If we could scroll down, to the attachment.

Keep going.

Q. Okay. Do you see that this is a draft CEFC press release regarding $100,000 donation for Serbian flood relief?

A. Yes.

MR. ZOLKIND: Okay. We can take that down.

Let me move on to another topic. Bring up for identification Government Exhibit 403.

Q. Agent Galicia, do you recognize this as another email chain involving the defendant?

A. Yes.

MR. ZOLKIND: We offer Government Exhibit 403.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 403 received in evidence)

MR. ZOLKIND: Okay. If you could just publish that for the jury.

And the attachment.

Okay. And just zoom in on the very top header there.

BY MR. ZOLKIND:

Q. And do you see that this is a document that pertains to China Energy Fund Committee (USA), Inc.?

A. Yes.

MR. ZOLKIND: Okay. Zoom out of that. And go back to the email now.

And zoom in on the email.

Q. Who's the recipient of this email?
A. Patrick Ho.
Q. And what's the subject line?
A. "2014 Annual Report to Sign Pls."
Q. All right. And third paragraph, I'll just read. It says:
"Please sign the enclosed 2014 annual reports for CEFC and CECO and send them back to me."
MR. ZOLKIND: Let's go back to the attachment again.
If we go to the next page.
Next page.
Q. Do you see that this is the 2014 annual report of China Energy Fund Committee (USA) Inc. to be filed in the Commonwealth of Virginia?
A. Yes, I do.
MR. ZOLKIND: Okay. We can back out of that.
And if we could bring up for identification Government Exhibit 404.
Q. Do you recognize this, Agent Galicia, as another email involving the defendant?
A. Yes.
MR. ZOLKIND: Your Honor, we offer Government Exhibit 404.
MR. ROSENBERG: No objection.
THE COURT: Received.
(Government's Exhibit 404 received in evidence)

MR. ZOLKIND: If we could publish that and zoom in on the top, please.

BY MR. ZOLKIND:

Q. All right. Who is this email from?

A. This is from Patrick Ho.

MR. ZOLKIND: Okay. And why don't we zoom out for a moment.

Q. Okay. Do you see that he's replying here to the email we just looked at?

A. Yes.

Q. Okay. If you could read Patrick Ho's response to that email.

A. "Mr. Lo, Please kindly execute these documents on my behalf. Anna can affix my scanned signature to all places requiring such."

MR. ZOLKIND: Okay. We can take that down.

Let's bring up for identification Government Exhibit 409.

Q. Do you recognize this as another email involving the defendant?

A. Yes.

MR. ZOLKIND: And your Honor, the government offers Government Exhibit 409.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 409 received in evidence)

Q. Who is this email from?

A. It's from Patrick Ho.

Q. And do you recognize who it's to?

A. No.

Q. Okay. Someone at chinaenergyfund.org?

A. Yes.

Q. And how about who is bcc'd?

A. Zhang Ya.

Q. Okay. What's the subject line?

A. "DC Event."

Q. Okay. And I'll just read a portion of the defendant's email, starting on the third line. He writes:

"Can you please string-fence our commitments and tighten control over Vivian and Roger in case they send out too many rain checks unknowingly.

"We have to stick by the principle that we are the Host and Organizer, and the initiator of the event. We are a charitable NGO with limited funding."

And then let me go to the last paragraph.

The defendant writes:

"I am snowed under with projects for Ye and mega-geopolitical deals."

MR. ZOLKIND: You can take that down.

Okay. Just a few other items.

If we could go to -- quickly, if we could bring up again Government Exhibit 2601, the Chad timeline.

BY MR. ZOLKIND:

Q. Do you see the September 26, 2014 entry?

A. Yes.

Q. It says that the defendant and Gadio met in New York?

A. Yes.

MR. ZOLKIND: Okay. Let's bring up Government Exhibit 1195, briefly.

And if you could zoom in, Ms. Rao, on the top text message in that chain.

Q. Do you see where the text message refers to the address of the meeting?

A. Yes.

Q. What address is listed there?

A. Trump Tower on First and 47th, apartment 78b, cefc.

Q. Okay. And that's 78b like boy.

MR. ZOLKIND: I'd like to now read a stipulation, your Honor, marked as Government Exhibit S-13.

THE COURT: Yes, sir.

MR. ZOLKIND: Let me offer that into evidence first.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit S-13 received in evidence)

MR. ZOLKIND: Okay. We can publish that.

This is titled Stipulation Regarding Condominium Purchase Records.

Paragraph 1 provides, "Government Exhibit 2743 is a true and correct copy of the Trump World Tower condominium purchase package for the sale in or about February 2012 of 845 United Nations Plaza, Apartment 78B, New York, New York 10017."

Pursuant to this stipulation, we offer Government Exhibit 2743.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 2743 received in evidence)

MR. ZOLKIND: Ms. Rao, could you please publish 2743.

Could I have just one moment.

THE COURT: Yes, sir.

MR. ZOLKIND: Your Honor, apologies for the suspense. We're going to hold that exhibit until Monday.

THE COURT: I don't know if I will be able to sleep.

MR. ZOLKIND: Okay. Okay. Could we bring up another stipulation between the parties, S-5. This reads, Stipulation Regarding Chi Ping Patrick Ho.

Paragraph 1. During the time period of at least -- excuse me. Let me offer Government Exhibit S-5 first.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit S-5 received in evidence)

MR. ZOLKIND: It reads as follows: "During the time period of at least 2014 through 2017, Defendant Chi Ping Patrick Ho was not a citizen, national, or resident of the United States."

Paragraph 2. "Government Exhibit 901 is a true and correct copy of Defendant Chi Ping Patrick Ho's passport."

Pursuant to that stipulation, we offer Government Exhibit 901.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 901 received in evidence)

MR. ZOLKIND: I regret to say I have another stipulation to read. It is marked S-2.

And first, let me offer Government Exhibit S-2.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit S-2 received in evidence)

MR. ZOLKIND: This is titled Stipulation Regarding Certain Travel Records and provides, in paragraph 1:

"Government Exhibits 902 and 903 are true and correct copies of the TECS - Person Encounter Lists for Chi Ping Patrick Ho, the defendant, and Zhang Ya, respectively, for the periods of time described in the records."

Back out of that.

Paragraph 2 provides various details about the

records, which I will not read at this time.

We now offer Government Exhibits 902 and 903.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibits 902 and 903 received in evidence)

MR. ZOLKIND: I'd now like to offer stipulation S-6, titled Stipulation Regarding Hotel Records, and we offer that into evidence first.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit S-6 received in evidence)

MR. ZOLKIND: Okay. And if I can do just a bit of summarizing, this stipulation provides that Government Exhibit 2101 and 2102 are true and accurate records of the Millennium Hotel for 2101 and the Residence Inn by Marriott for 2102.

The government will offer Government Exhibits 2101 and 2102.

MR. ROSENBERG: Of course no objection.

THE COURT: Received.

(Government's Exhibits 2101 and 2102 received in evidence)

MR. ZOLKIND: Could we bring up Government Exhibit S-9, which is a stipulation that is already in evidence.

I'm just going to read paragraph 2. It provides that, "Government Exhibit 2301 is a log of the entries and exits of Chi Ping Patrick Ho, the defendant, into and out of the UN's headquarters in New York, New York, between approximately October 2014 and July 2016."

We now offer Government Exhibit 2301.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 2301 received in evidence)

MR. ZOLKIND: Your Honor, this is the last stipulation I'd like to read.

THE COURT: Bestill my heart.

MR. ZOLKIND: Government Exhibit S-12. Let me offer that into evidence first.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit S-12 received in evidence)

MR. ZOLKIND: This is titled Stipulation as to Summary Chart, and it provides that:

"Government Exhibit 2603 is a fair and accurate summary of selected information from the government exhibits referenced therein relating to trips taken by defendant Chi Ping Patrick Ho to and from the United States between in or about September 21, 2014, and December 15, 2016."

And we'll now offer Government Exhibit 2603.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government's Exhibit 2603 received in evidence)

MR. ZOLKIND: Ms. Rao, could you please bring up Government Exhibit 2603.

BY MR. ZOLKIND:

Q. Okay. Agent Galicia, have you had a chance to look over this summary chart?

A. Yes, I did.

Q. Okay. Could you just generally describe in your own words what information is reflected on this summary chart.

A. Generally it contains travel information of when Patrick Ho made trips to the United States.

Q. Okay. If we could just go through it briefly.

In the leftmost column titled Date of Defendant's Entrance to the US, what does that reflect?

A. That is the date he entered the US.

Q. Okay. And is that based on the US Customs and Border Protection records marked as Government Exhibit 902?

A. Yes.

Q. Okay. And the next column is Date of Defendant's Exit from the US. Is that also based on US CBP records?

A. Yes.

Q. All right. The next column, what does that reflect?

A. Those are the entry stamps on his passport.

Q. Okay. And those are entry stamps corresponding to the dates he entered the US, is that right?
A. Yes, that's correct.
Q. Okay. Next column, what does that reflect?
A. That is the record of the NYC hotel booking.
Q. Okay. All right. And are the records there for Residence Inn and the Millennium Hotel as may be available?
A. Yes.
Q. Okay. Next column, what does that refer to?
A. Record of UN Entry.
Q. Okay. And does that reflect dates that the UN recorded the defendant entering the headquarters in Manhattan, is that right?
A. Yes, I believe so.
Q. Okay. All right. And lastly, what's set forth in the column titled Selected Emails or Text Messages Sent from Defendant?
A. These are emails and text messages that were sent during the time period.
Q. Okay. So those are emails or text messages sent during the period in which, according to these records, he was here in the United States, is that right?
A. Yes, that's correct.
Q. Okay. And so if I could just bring up one or two examples.
With respect to the second trip to the US beginning

November 12, 2014, do you see that one of the emails listed there is Government Exhibit 45?
A. Yes.
MR. ZOLKIND: Okay. And Ms. Rao, could you just bring up Government Exhibit 45.
Q. Okay. And do you recall, when we were going over the Chad timeline, describing this email as one in which the defendant requests a second meeting in Chad following the first meeting in November?
A. Yes.
MR. ZOLKIND: Okay. Take that down.
Just as another example, if we can bring up -- if we could go back to the summary chart, 2603.
Q. Do you see, during the trip on March 27, 2016, reference there to Government Exhibit 291.
MR. ZOLKIND: And Ms. Rao, if we could bring up Government Exhibit 291.
Q. Okay. And do you recall testifying about this email in connection with the Uganda scheme, the Uganda timeline?
A. Yes, I do.
Q. Okay. And do you see that this is an email where the defendant writes to Edith Kutesa, copying Sam Kutesa, saying, for example, "We can bring heads of enterprises from China to engage with yours, start the process of discussion, since our company is now holding interests in all of these fields and

sectors. The length of stay will also depend on how much business discussion you can plan for us"? Do you see that?
A. Yes.
MR. ZOLKIND: No further questions.
THE COURT: Thank you.
Cross-examination, counsel.
MR. ROSENBERG: Thank you, your Honor.
CROSS-EXAMINATION
BY MR. ROSENBERG:
Q. Good afternoon, Special Agent Galicia.
A. Good afternoon.
Q. I just want to understand what your role was in the case, in the preparation of these charts.
You were not involved in preparing this case for trial, is that right?
A. That's correct.
Q. But you were involved in ensuring that the emails that appear on this chart, in reviewing them to make sure the descriptions were matched to emails, is that right?
A. Yes, I confirmed that the information on the timelines was correct when reviewing the underlying exhibit.
Q. Okay. That you believe they accurately reflect the underlying information?
A. Yes.
Q. Did you select the emails that went on the chart?

A. I did not.
Q. Okay. Who did?
A. Members of the government team.
Q. And do you have an understanding of how they determined what to give you to put on the chart?
A. I do not, no.
Q. So they reviewed, your understanding, many, many emails and gave you only a very small selection of them, is that right?
MR. ZOLKIND: Objection, your Honor. Personal knowledge.
THE COURT: Do you know one way or the other, ma'am?
THE WITNESS: I don't know how many were reviewed.
THE COURT: Overruled.
Q. Can you estimate there were a lot of emails they reviewed?
MR. ZOLKIND: Objection. I think it lacks foundation, at a minimum.
THE COURT: You don't know all the emails in this case, do you?
THE WITNESS: No, I don't.
THE COURT: Sustained.
BY MR. ROSENBERG:
Q. They simply gave them to you and you made sure that the chart accurately reflected them.
A. Correct.
Q. Okay. Now I'd like to talk about the Uganda chart, if I

may.

A. Okay.

MR. ROSENBERG: I wonder if, Mr. Calabrese, you can put up the Uganda chart, and in particular -- get my pages in order here -- the chart from August 2015 through February 2016. Could you show that.

Okay. That's all.

Q. Do you recall testifying that in August of 2015, you saw documents that led you to conclude there was a commitment made to pay funds to Mr. President Museveni? Do you recall that?

MR. ZOLKIND: Objection. Mischaracterizes the testimony.

THE COURT: Sustained.

Q. Let me refer you to February 24, 2016. And you have an entry here which reads, "Sam Kutesa's wife emailed Ho, copying Sam Kutesa, to inform Ho that Yoweri Museveni won re-election as president of Uganda, and to request a 'contribution/donation' for Sam Kutesa's 'foundation which he wishes to launch as soon as possible,' and she provides the bank account information."

Can you take a look at that exhibit, Exhibit No. 283.

You read part of this on your direct. I'm going to ask you to look at it again.

And in particular, in the third paragraph, it says, "We are happy to share --" thank you.

"We are happy to share with you our joy of the great victory of our party. The president won with 60.75 %. Sam was unopposed and this was a blessing for us to be free and campaign for the president. We can now relax and reprogram the projects we discussed about with your chairman when we were in Hong Kong last August."

And now if we can read the next paragraph.

"Sam would like in particular to catch up with you regarding his foundation which he wishes to launch as soon as possible and would appreciate to receive the contribution/donation promised by the Chairman."

Do you know what contribution/donation was promised by the Chairman?

A. Do not, no.

Q. And so you don't know that that was a contribution or donation promised on or about August 2nd of 2015.

A. Based on this document, it just references a contribution/donation promised by the Chairman.

(Continued on next page)

BY MR. ROSENBERG:
Q. Based on all the documents you have seen and testified about today, do you have an understanding that that was promised on August 2, 2015?
A. Could I refer to the chart?
Q. Of course.
A. Sorry. Could you say it again.
Q. Based on everything that you have seen and reviewed, do you have an understanding that the commitment referred to was made on or about -- on August 2, 2015?
MR. ZOLKIND: Your Honor, I think it's an objectionable question. The witness has testified all she did was review the e-mails to confirm the accuracy of the chart.
THE COURT: Counsel?
MR. ROSENBERG: I believe the witness has testified her understanding of things today on other matters, and I just want to confirm that that's the contribution -- her understanding that that's the contribution referred to -- if she can give it. If she can't, I'll move on.
THE COURT: I think the witness has testified on her understanding as to one document at a time. I don't think she was asked about the entire narrative.
MR. ROSENBERG: Very well, your Honor.
Q. I refer you to Government Exhibit 28. Well, let me go back. Take a look at the chart for August 2, 2015, and there

it says, "PGA Sam Kutesa meets with Ho and CEFC chairman in Hong Kong and appoints the chairman as a special honorary consultant to the PGA." Do you see that?
A. Yes.
Q. And it refers to Government Exhibit 287 and 287-TX?
A. Yes.
Q. Let's take a look at 287-TX, if we could. And on the first page -- the next page after this --

This is a report on support of Uganda president Yoweri Kaguta Museveni's fifth reelection campaign, correct?
A. Yes.
Q. And it refers in the first full paragraph to a meeting that the chairman held with Mr. Kutesa on August 2, 2015, correct?
A. Yes.
Q. And it was a meeting in Hong Kong, correct?
A. Yes.
Q. And now referring to the next paragraph it states, "You also expressed your willing to actively promote close contact and extensive cooperation amongst CEFC China, Uganda and the five countries of Central Africa in the future, and very pleased to support President Yoweri's reelection campaign with the fund of $500,000 U.S." Do you see that?
A. I do see that.
Q. Between the promise reflected here, here on August 2, 2015, and the e-mail on February 24 -- Government Exhibit 283 that we

just saw -- were there any communications of which you are aware between Mr. Kutesa, Yoweri and anyone from CEFC?
A. None of those e-mails were provided to me for my review.
Q. So as far as you are aware there were none based on what you've seen.
A. Based on -- I do not see any.
Q. And that's a period of approximately seven months, correct?
A. Yes.
Q. Now, the next communication -- I direct your attention to five days later, February 29. If we can go back to the chart, another e-mail that you testified about earlier, and you say, "Sam Kutesa's wife asks Ho to "confirm the contribution" and advises Ho of an opportunity in the "banking sector of Africa."" Do you see that?
A. Yes.
Q. Why don't we turn now to Government Exhibit 285. Do you see where it says in the third paragraph, "Would it be possible for you to confirm the contribution to his foundation" -- that's referring to Mr. Kutesa's foundation. Do you understand that?
A. Yes, I believe that's correct.
Q. -- "So that he can launch it not so late after the campaign. It was one of our commitment to job creation for youth in our constituency and, as you know, youth are impatient." OK?

A. Yes.
Q. Now, so -- excuse me. The e-mail goes on and describes a business opportunity; is that right?
A. The e-mail, yes, regarding Barclays Bank.
Q. And I think you also read this as well, and you talked about how Barclays is quitting the continent. It was a typo and you corrected it. Do you recall that?
A. Yes.
Q. It's trying to sell several branches, correct?
A. I'm sorry?
Q. Barclays was trying to sell several branches of its bank.
MR. ZOLKIND: Objection. Personal knowledge.
Q. According to the e-mail.
A. It just says Barclays Bank, which is represented in 12 different countries is quitting the continent.
Q. Trying to sell its branches, its business there, right?
THE COURT: Same question.
Q. And Ms. Gasana, is it fair to say, appears to want to interest CEFC in buying Barclays' business -- seeing CEFC's interest in buying Barclays' business. Correct?
MR. ZOLKIND: Objection for the request for the witness to interpret the e-mail. It speaks for itself.
MR. ROSENBERG: Well, your Honor, she was able to summarize the e-mails.
THE COURT: I don't understand what we're doing here.

The witness said that she reviewed the e-mails to confirm that what was on the timeline was accurate. Asking her to interpret I don't think is within the scope.

MR. ROSENBERG: Very well, your Honor.

Q. There were further communications as reflected in the Uganda chart in March and April of 2016, correct?

THE COURT: If there were, there were. Whatever.

Q. Referring, special agent, to March 26, it says that, "Dr. Ho tells Sam Kutesa and his wife that "the chairman will make good his pledge of a donation to support Sam," and says that Ho will attend President Museveni's inauguration along with a "entourage" of executives who can engage on projects in Uganda "from infrastructure, energy, agriculture, to finance and banking." Did I read that correctly?

A. Yes.

Q. And that is reflected -- your reflection in Exhibit 290.

THE COURT: 289. 289.

MR. ROSENBERG: Forgive me, your Honor. I stand corrected, 289.

Q. Now, in any of the e-mails -- withdrawn.

Referring to Government Exhibit 290, you read this earlier. This is the e-mail in March 27, 2016 in which Dr. Ho stated that he was trying to get an invitation to the chairman Museveni's inauguration, correct?

A. This e-mail is dated March 26, 2016.

Q. And he is trying to get an invitation to President Museveni's inauguration, correct?

MR. ZOLKIND: Your Honor, I object to any question phrased in terms of what someone was trying to do as opposed to what the document says.

THE COURT: Right. And, counsel, the question referred to the March 27 e-mail, but, as the witness said, we had the March 26 e-mail up on the screen.

MR. ROSENBERG: I have too many pieces of paper.

THE COURT: Boy, you and me both.

MR. ROSENBERG: I will correct that, your Honor.

THE COURT: Yes, sir.

MR. ROSENBERG: Thank you, your Honor.

Q. The March 26 e-mail, this is Mr. Ho telling Edith that he is expecting to be received warmly by Sam and other heads of the government including the president; is that correct?

A. Yes, that is written in the e-mail.

Q. Now, in any of the e-mails that you reviewed and included in your chart, were there any commitments made Mr. Kutesa, Mr. Museveni or anyone else about anything that they would do in exchange for a pledge of donation?

MR. ZOLKIND: Objection. It calls for an interpretation.

MR. ROSENBERG: Your Honor, I'm asking what they say, did they ever say there was.

THE COURT: I'm not sure we can expect to have this witness have these e-mails all memorized. I mean you have the e-mails. If there is one you want to show her, ask her.

MR. ROSENBERG: Very well.

Q. Let me show you an e-mail that the government did not show you, special agent. Let me refer you to your chart on April 20, 2016 -- excuse me, yes, April 20. Thank you. And the second description you have, the second e-mail says, "Sam Kutesa's wife, copying Sam Kutesa, sends Ho the invitations to President Museveni's inauguration and conveys Sam Kutesa's advice regarding a meeting with President Museveni." Correct?

A. Yes.

Q. Can we please pull up Exhibit 289, and I want to read through it. It is from Ms. Gasana to Dr. Ho, correct?

A. Yes.

Q. The subject is invitations to the president's inauguration, correct?

A. Yes.

Q. It says, "Please find herewith attached copy of your invitation. The original will be sent to you. Please send me your physical address. I misplaced your business card.

"Regarding other team to bring for investment purposes, Sam suggests that we organize ourselves later when the new cabinet is put in place end May. He suggests that during the audience with the president you express your

investment interest in area of your choice so that he can invite you later to participate. Now there will be no commitment, no firm commitment." Did I read that correctly?
A. Yes.
Q. OK. Now, is it correct that that's the last communication that there was between the Ugandan officials and including -- well, the Ugandan officials and CEFC before the donation you testified about on May 5, 2016, as reflected in your chart?
THE COURT: Are we expecting the witness to memorize it?
A. Sorry. Could you say that one more time.
Q. As reflected in your charts, isn't that the last communication between Ugandan officials and the donation on May 5 -- excuse me -- May 8?
A. Yes, the other two items in between the dates are between Ho and the CEFC chairman and Zhang Ya copying Ho.
Q. Thank you. Now, referring to the payment on May 5, I'd refer you, please, to Exhibit 299, Government Exhibit 299. Do you recall you testified about this earlier?
A. Yes, I did.
Q. Now, Government Exhibit 299, just to orient ourselves, this is the e-mail from Dr. Ho to Ya Zhang, the top one is?
A. Yes.
Q. He says bank information?
A. Yes, he notes bank information.

Q. And the banking information was provided to him back in February by Mr. Kutesa's wife, Edith Kutesa, correct?

A. Correct.

Q. OK. Then in Government Exhibit 300 you see that -- you recall this exhibit -- this is an e-mail from -- I'm sorry. 300-TX. I'm sorry. Thank you. This is the e-mail you talked about earlier about sending money to the account. Do you see that?

A. Yes.

Q. OK. Now, can we go to the beginning of that e-mail -- sorry, the bottom of it. And the first one is on May 5 from Huang Su Hua who wrote to Ms. Zhang. And Huang Su Hua is Tracy, correct?

A. Tracy is the name at the bottom?

Q. Yes. And you previously identified her as being someone in the account department of CEFC, correct?

MR. ZOLKIND: Objection. Mischaracterizes the testimony.

THE COURT: Sustained.

Q. OK. Let's read her e-mail. I will read it into the record. "To Ms. Zhang. $500,000 has been in our account. Would like to ask if wire transfer will be used in sending the money? If so, where it is wired to? The process fee for wire transfer is approximately USD 50.

"1. If cash is ordered in the bank but failing to

retrieve, the bank would charge a process fee (equal to $187,500 USD (of 37.5 percent) of the total withdrawal amount. If cash is withdrawn, the charge is 12.5 percent (of the total withdrawal amount) for withdrawing U.S. dollars from U.S. currency accounts. The bank's processing fee is (USD $62,500 presuming an entire amount could be obtained at once). The headquarters and branches may not have sufficient amount. So it is possible that the withdrawal would be made from different branches would need to know the purpose of the large amount of cash withdrawal."

And what's the response to that that Ms. Zhang answered? Can you please read that.

A. Sure. "Settled on using wire transfer. Specific account information will be sent to you later."

Q. Then the e-mail chain continues, and she does indeed send the wire information, correct?

A. Yes.

Q. And then the final e-mail is the confirmation that it was sent by wire, the $500,000, correct?

A. Yes.

Q. Now, you have referred several times to Edith Kutesa, and you identify her in the chart as Sam Kutesa's wife; is that correct?

A. It was in a document that I reviewed, she was described as Sam Kutesa's wife.

Q. Based upon the documents you have seen, do you understand that she is also a business woman in Uganda?
A. Yes, that's correct.
Q. And do you know based upon the documents you've seen what business she runs?
A. I think I saw with her signature block MCASH.
Q. Referring to Government Exhibit 280, is that the signature block that you're referring to?
A. Yes.
Q. And if you could go to the document that she sent, the beginning of that e-mail -- this is 280 -- do you recall -- no, forgive me -- the document itself, the e-mail. I'm sorry.
You read from this e-mail earlier the first two paragraphs in which there was a discussion about the banking sector. Do you recall that?
A. Point 1, yes.
Q. The remainder of this e-mail discusses MCASH, does it not and OCTOPUS? Do you recall that?
A. I can see references, yes, to OCTOPUS.
Q. Do you understand -- withdrawn.
And do you see also the attachment -- now let's go to the attachment that Edith Kutesa sent to Dr. Ho about MCASH?
A. Yes.
Q. And it includes a company overview and operation?
A. Yes.

Q. You testified about the e-mails regarding nice gifts -- do you recall that -- that were brought to Uganda?
A. Yes.
Q. I refer you, please, to some of the photographs that you looked at and specifically Government Exhibit 325. And can we look at the photos there. We went through them briefly. Can we blow up the picture now. And do you see that -- do you see Mr. What Mr. Kutesa is holding in his hand, the gentleman in the middle?
A. Yes.
Q. Does that appear to be a box of some kind?
A. Yes.
Q. And do you have an understanding whether -- well, withdrawn.
Does it appear to be a gift that's being given to him?
A. I have no idea.
Q. OK. Continue down to the next photo. Stop right there, please, and again blow that up.
And you see Dr. Ho in the middle?
A. Yes.
Q. And do you understand who the woman to his right is?
A. I do not, no.
Q. Does it appear that Dr. Ho is giving a gift to the woman on the right?
THE COURT: Counsel, why are we asking this witness

this question? The jurors can look at the documents just as well as this witness. Why are we doing this?

MR. ROSENBERG: Just to identify something that the jurors may want to look at when they go back in the jury room.

THE COURT: Well, you do that in your summation; you don't use a witness for that.

MR. ROSENBERG: Very well, your Honor.

Q. You testified that there were about several e-mails and communications regarding banks and about Barclays Bank, correct?

A. There were e-mails I read that mentioned Barclays Bank.

Q. And there was also an e-mail regarding Crane Bank.

A. Yes.

Q. Were there any other -- you saw no other e-mails, and you reviewed none other that involved banks, is that right, other than what you have put on this chart?

MR. ZOLKIND: Your Honor, it's vague in a couple of ways. It mischaracterizes her role with respect to the chart.

THE COURT: I think the witness has already testified that she certainly did not review all of the e-mails in this case. Her job was to assure that the items noted on the timeline were accurate. I don't think it's fair to ask her to search her memory as to each and every one of the e-mails that she was shown. Again, that's not her job. If you have an e-mail you want to show her that shows that something isn't

accurate, do it, but it is not her job to have memorized all those e-mails.

MR. ROSENBERG: Very well, your Honor. I have one final e-mail -- or two.

Q. Turning to the Chad timeline, if we could, and in particular December 10, 2014. And on that date you say that "Ho works on an agreement between CEFC and the government of Chad; and Ho drafts a letter to President Deby regarding CEFC's "wish to make a donation of $2 million to the people of Chad at your personal disposal to support your social and other programs as you see fit.""

Do you see that?

A. Yes.

Q. OK. Now, if you could look at Exhibit 67-TX. Forgive me. If we could begin with 66, an e-mail from Audrey Hsu to Dr. Ho. Correct?

A. Yes.

Q. It says, "Please see attached memorandum."

A. Yes.

Q. Now look at the memorandum. Do you recall it says, "A memorandum is signed by the agency of department designated by the president and CEFC China Energy company (herein referred to as CEFC China). Chad is referred to as party A and CEFC is referred to as party B."

And it reads, "To further the promotion of strategic

cooperation between the two parties, party B met with your excellency, the president of Chad. As an outcome of the meeting, the parties have reached the following understanding in the field of energy:

"1. The Chadian side will fully support CEFC's participation in the CNPC's Chad project.

"2. The Chadian side states that, whether is regarding oil field exploration, block or oil pipeline, so long as the Chadian side has the right over such pipeline and oil field exploration block, it can cooperate with CEFC into in all of them.

"Regarding all oil pipeline and oil field exploration block that the Chadian side doesn't have the right over, so long as CEFC China is interested in their participation, the Chadian side is willing to give assistance."

And it continues:

"3. The two parties will hold separate negotiations regarding unsettled affairs."

Is that correct? Did I read that correctly?

A. Yes.

Q. And Dr. Ho then responds to this, does he not, in 67 -- in Government Exhibit 67?

A. He does, yes.

Q. OK. And looking at 67-TX, in the first part of that, he -- leaving aside -- thank you.

Point 2 he says, "Items 1 through 3 are all about Chad obligations. I think to make this more palatable and fair to the other party, we have to mention what CEFC company will do in return. Otherwise, as it stands right now, Chad is bound to amend and add a few items to specify CEFC's obligations. Better we do this ourselves."

Is that correct?

A. Yes, it says "this palatable" not "more palatable".

Q. Thank you. And also he says about the letter to the president as "a draft as follows for consideration". Do you know whose consideration that would be?

MR. ZOLKIND: Objection.

MR. ROSENBERG: You know, I will withdraw the question.

THE COURT: Yes, sir.

MR. ROSENBERG: Your Honor, I have nothing further.

THE COURT: Thank you.

Redirect, counsel.

MR. ZOLKIND: Just very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. ZOLKIND:

Q. Just one point with respect to the Uganda timeline.

Ms. Rao, if you could please bring that up, Government Exhibit 2602. And if we could go to the entry on April 20, 2016, second entry on that date.

OK. Agent Galicia, do you recall defense counsel reading this entry: "Sam Kutesa's wife, copying Sam Kutesa, send Ho the invitations to President Museveni's inauguration and conveys Sam Kutesa's advice regarding a meeting with President Museveni"?

A. Yes.

Q. And let's pull up Government Exhibit 295, and if we could zoom in on the top e-mail there.

OK. And the e-mail reads -- this is from Edith Kutesa to the defendant copying Sam Kutesa; is that right?

A. Yes.

Q. OK. In the middle paragraph it says, "Regarding other team to bring for investment purpose. Sam suggests that we organize ourselves later when the new cabinet is put in place end May. He suggests that during the audience with the president you express your investment interest in area of your choice so that he can invite you later to participate. Now there will be no commitment no firm commitment".

Do you recall Mr. Rosenberg asking you if this was the last e-mail you saw between the defendant and an official in Uganda prior to the $500,000 wire?

A. Yes, I do.

Q. OK. Let's go to the next entry on the chart, April 24, 2016, and this reads, "Ho provides a report to CEFC chairman regarding Ho's upcoming attendance at President Museveni's

inauguration, including a suggestion to provide Museveni with a $500,000 campaign donation in cash."

Do you see that?

A. Yes.

Q. And let's bring up 296-TX. And what's the date on this e-mail?

A. April 24, 2016.

Q. So based on your review of documents, was this still before the $500,000 wire?

A. Yes.

Q. All right. And this is a report sent -- this is a report from the defendant to the chairman being e-mailed here by Zhang Ya, right?

A. Yes.

Q. If you could go to the report. If we can scroll down. My apologies. The last paragraph going into the top of this page. And we can go right down -- let's go from there to the end of the page, if we could.

Do you see here the defendant wrote, "The Ugandan side is earnestly looking forward to your presence and preparing to arrange for you a meeting and private dinner with President Yoweri before the May 12 inauguration ceremony. Since the list of names for the new term cabinet ministers of Uganda won't be announced until after May 12, the party is also planning that on the following day of the announcement of the cabinet

selection, to arrange for meetings and specific project negotiations between the newly selected ministers in the relevant field (such as energy, finance and transportation, etc.) and our counterparts.

"Additionally, regarding your early promises of support of campaign fund of $500,000 to President Yoweri, it was also brought forward euphemistically by the party. If you would make this trip to Kampala, it's suggested that it would be the best to give it to the president's representatives directly in the form of cash."

Do you see that?

A. Yes.

Q. OK. And again based on documents that the defendant had written, that you had reviewed, what had he said, the defendant, in his e-mails about whether or not by this point the president had already been reelected?

MR. ROSENBERG: Objection. The witness doesn't have personal knowledge and has been asked not to characterize numerous e-mails.

THE COURT: I think the witness was asked what was said in an e-mail she reviewed with respect to whether President Yoweri had been reelected.

Are you able to answer that, ma'am?

THE WITNESS: Yes.

Q. Let me just ask the question very clearly. Based on the

e-mails you reviewed in confirming the accuracy of this chart, did you see any e-mails from the defendant in which he talked about whether or not President Museveni had already been reelected by this point?
A. Yes.
Q. OK. And what had the defendant said about whether or not President Museveni had already been reelected?
A. He had been reelected.
MR. ZOLKIND: No further questions.
THE COURT: Any recross, counsel?
MR. ROSENBERG: No, your Honor.
THE COURT: Thank you. We're going to stop for the day, and we will let the jurors go down first. So, audience stay nice and comfortable.
Ladies and gentlemen, you are going to want to hear this. Please, follow the normal instructions: Don't talk to anyone about the case; don't do any research about the case.
Counsel have authorized me to tell you that they expect that we will be summing up Tuesday or Wednesday and, therefore, you will get the case Wednesday or Thursday at the latest. I know there is someone who has a doctor's appointment. When that comes, of course you will go to the doctor's appointment.
So, no research over the weekend Monday morning on time, ready to start at 10 o'clock and have your coffee at

9:15.

Thank you for your attention. Have a lovely weekend, ladies and gentlemen.

(Jury not present)

THE COURT: Anything else on the record?

MR. RICHENTHAL: Not from the government.

MR. ROSENBERG: Not from the defense.

THE COURT: OK. Off the record.

(Discussion held overall the record).

(Trial adjourned to December 3, 2018 at 10 a.m.)

INDEX OF EXAMINATION


Examination of: Page

MELISSA GALICIA

Direct By Mr. Zolkind . . . . . . . . . . . . . 681

Cross By Mr. Rosenberg . . . . . . . . . . . . . 836

Redirect By Mr. Zolkind . . . . . . . . . . . . 855


GOVERNMENT EXHIBITS


Exhibit No. Received

1300 . . . . . . . . . . . . . . . . . . . . 686

2601 . . . . . . . . . . . . . . . . . . . . 688

1,9,10,10-TX,11,11-TX,19,25,30, 44, 44-TX, 50, 53, 53-TX, 67, 67-TX, 69, 69-TX, 70, 79, 79-TX, 106, 134, 201, 250, 251, 252, 253, 256, 257, 257-TX, 258, 258-TX, 259, 260, 261, 261-TX, 262, 264, 266, 272, 277, 277-TX, 280, 281, 282, 283, 284, 285, 287, 287-TX, 288, 288-TX, 289, 290, 291, 293, 294, 295, 296, 296-TX, 298, 298-TX, 299, 300, 300-TX, 301, 301-TX, 303, 304, 305, 309, 310, 311, 312, 313, 316, 321, 321-TX, 324, 324-TX, 325, 325-TX, 326, 326-TX, 327, 327-TX, 328, 328-TX, 329, 329-TX, 330, 333, 333-TX, 334, 336, 337, 338, 340, 341, 344, 345, 402, 402-TX, 406, 406-TX, 1097, 1124, 1125, 1125-TX, 1132 . . . . 691

800, 801, 802, and 809 . . . . . . . . . . . . 715

800-TX and 802-TX . . . . . . . . . . . . . . 716
2602 . . . . . . . . . . . . . . . . . . . . 723
254R . . . . . . . . . . . . . . . . . . . . 735
S14 . . . . . . . . . . . . . . . . . . . . . 780
2750 and 2750-T . . . . . . . . . . . . . . 783
2009 . . . . . . . . . . . . . . . . . . . . 810
803 and 804 . . . . . . . . . . . . . . . . 815
803-TX . . . . . . . . . . . . . . . . . . . 815
809 . . . . . . . . . . . . . . . . . . . . . 820
407 . . . . . . . . . . . . . . . . . . . . . 821
411 . . . . . . . . . . . . . . . . . . . . . 823
403 . . . . . . . . . . . . . . . . . . . . . 824
404 . . . . . . . . . . . . . . . . . . . . . 825
409 . . . . . . . . . . . . . . . . . . . . . 827
S-13 . . . . . . . . . . . . . . . . . . . . 828
2743 . . . . . . . . . . . . . . . . . . . . 829
S-5 . . . . . . . . . . . . . . . . . . . . . 829
901 . . . . . . . . . . . . . . . . . . . . . 830
S-2 . . . . . . . . . . . . . . . . . . . . . 830
902 and 903 . . . . . . . . . . . . . . . . 831
S-6 . . . . . . . . . . . . . . . . . . . . . 831
2101 and 2102 . . . . . . . . . . . . . . . 831
2301 . . . . . . . . . . . . . . . . . . . . 832
S-12 . . . . . . . . . . . . . . . . . . . . 832
2603 . . . . . . . . . . . . . . . . . . . . 833