UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 17 Cr. 779 (LAP

CHI PING PATRICK HO,

Defendant.

------------------------------x

New York, N.Y.
December 3, 2018
9:30 a.m.

Before:

LORETTA A. PRESKA
District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: DANIEL RICHENTHAL
DOUGLAS ZOLKIND
CATHERINE GHOSH
PAUL HAYDEN
Assistant United States Attorneys

BENJAMIN ROSENBERG
EDWARD KIM
KATHERINE WYMAN
JONATHAN BODANSKY
JONATHAN BOLZ
Attorneys for Defendant

ALSO PRESENT: Ryan Carey, F.B.I.
Aashna Rao, Paralegal
Peter Calabrese, Paralegal

(Trial resumed; jury not present)

THE COURT: I had originally understood we had some document work to do, but I think I've heard that's not the case anymore?

MR. RICHENTHAL: I'm very please to report that after originally being told there would be no exhibits in the defense case, then told there were 28 exhibits in defense case, then told yesterday were 9 exhibits in defense case, now we are told there are three exhibits in defense case, which is nice. We don't object to those three. We understand they're not being offered for truth and the defense does not intend to argue the truth of any factual assertions therein, and there are actually a couple assertions therein.

The government hasn't decided if we intend to seek a limiting instruction at this time. We think we may see frankly whether the defense relies on them in whole or in part in its summation. So, otherwise with respect to those three exhibits, I think they will be moved in without objection. They are DX 204, 205 and 214.

THE COURT: All right. What would you like to do next?

MR. RICHENTHAL: I think from our perspective, it need not happen literally this second, but we think Mr. Ho probably should be allocuted on his decision not to testify.

THE COURT: We don't disagree, do we counsel?

MR. KIM: No, your Honor.
THE COURT: Do you want to do it now?
MR. KIM: Sure.
THE COURT: Dr. Ho, good morning.
THE DEFENDANT: Good morning, your Honor.
THE COURT: Sir, you understand that under our system you have the right to take the stand and testify in your own behalf, correct?
THE DEFENDANT: Yes, your Honor.
THE COURT: And, sir, you also understand that while there are a lot of decisions where the lawyers get to decide -- for example, which witnesses to call, which documents to put in, which objections to make -- this decision, the decision whether or not to testify in your own behalf, is yours and yours alone. Do you understand that, sir?
THE DEFENDANT: I do, your Honor.
THE COURT: And so you may, of course, take counsel's advise on that, but at the end of the day the decision whether or not to testify is yours, right?
THE DEFENDANT: Yes, your Honor.
THE COURT: After conferring with counsel, I understand that it is your decision not to take the stand. Is that right, sir?
THE DEFENDANT: That's correct, your Honor.
THE COURT: Anything else that you folks want me to

ask Dr. Ho about that decision?

MR. KIM: Not from the defense, your Honor.

THE COURT: Gents, front table?

MR. RICHENTHAL: No, I think that's sufficient, your Honor.

THE COURT: Good. Thank you, sir. Won't you be.

MR. RICHENTHAL: If it's helpful, I can outline a couple of things we expect will happen this morning.

THE COURT: Yes, sir.

MR. RICHENTHAL: So, first I don't think this needs to be done in front of the jury, and we have conferred with the defense about this point. We notice that Government Exhibit 2601, which is a summary chart, refers to nonredacted versions of certain e-mails of Mr. Vuk Jeremic. We're going to ask our graphics person to sub in the redacted version. She doesn't work for our office, and if we are able to accomplish that, we would then ask that the exhibit simply be substituted. If we are not able to accomplish that, we might ask your Honor to instruct the jury or otherwise make them aware that certain things refer to the redacted version. We could handwrite it in, but frankly I think it will not look very good, so I just want to let your Honor know --

THE COURT: And we're all about looking good, aren't we?

MR. RICHENTHAL: We do our best, your Honor.

THE COURT: All right. No objections, right, friends?

MR. ROSENBERG: No objection.

THE COURT: Thank you.

MR. RICHENTHAL: Second, just to give the Court a heads-up of sort of how we anticipate the tail end of our case proceeding -- and we think it's going to proceed quite quickly -- first, we are going to move a couple of exhibits in that we haven't moved in yet. Our understanding is that they are not objected to. Second, we're going to call one witness. And, third, we're going to call our final witness, and then we rest. We anticipate both witnesses, putting aside cross, in the aggregate are probably no more than an hour. So we anticipate resting well before lunch.

THE COURT: Cool. What else? And then what are we going to do then, friends?

MR. RICHENTHAL: So, we have not conferred on this point I'm about to make, which is we assume your Honor would like to do the charge conference today in light of what I just said, and in light of the narrow scope of the defense case. We're prepared to do that. We would like to have a little time before it, because we did get this letter from the defense last night which we reviewed, but we want to confer with some other folks in our office before heading to the charge conference.

THE COURT: OK. So, there is no reason not to do that.

Mr. Rosenberg, Mr. Kim, what are we going to do after the government rests, assuming a motion of course, and then what?

MR. KIM: Your Honor, I guess we will make our motion. I think at that point we will just maybe by stipulation offer exhibits and then we will rest.

THE COURT: OK. Why don't we do this. At the time the government rests, why don't you say may we deem our motion made. I will say yes. Then you will put in whatever you want to put in, then you'll rest, and then we'll send the jury home. Is that a plan?

MR. KIM: That sounds fine to us, your Honor.

THE COURT: Then as soon as the jury leaves, of course -- or whenever you want -- you may argue your motion, and then why don't we do the charge conference after lunch. Is that agreeable?

MR. RICHENTHAL: It is, your Honor.

MR. KIM: Sounds fine to us, your Honor.

THE COURT: Excellent. We have our plan.

MR. RICHENTHAL: I have an administrative type question. I don't know your Honor's practice on this. Does your Honor typically send the exhibits back with the jury or wait for them to ask?

THE COURT: I wait for them to ask. And we have 925 exhibits; we would have to have a dump truck bring them back,

right?

MR. RICHENTHAL: The second question is, I assume because your Honor is not going to send them back, that we need not prepare an exhibit list for the jury?

THE COURT: You don't have to do that. I think about 25 of them were taking notes, so I'm sure they know what exhibits they want.

What else, friends? Is there anything else you want on the record?

MR. ROSENBERG: Not from the defense.

MR. RICHENTHAL: Not from the government.

(Discussion held off the record)

(Recess)

MR. ZOLKIND: Your Honor, as the Court probably recalls, when we offered in the timeline summary charts, rather than reading all the exhibits that hadn't already been admitted, we just put them on a piece of paper marked as Government Exhibit 9999, and the Court ordered that all exhibits on that piece of paper would be admitted into evidence. The transcript does not yet reflect all the numbers of those exhibits, so what we propose to do is just provide the court reporter with Government Exhibit 9999 and have him enter into the transcript the actual exhibits that are set forth on that page.

THE COURT: Yes, sir. And thank you, Mr. Reporter.

(Jury present)

THE COURT: Good morning, ladies and gentlemen. Welcome back. Thank you for bringing such a spectacular day. I hope you had a nice weekend.

Be seated, ladies and gentlemen. We continue with the government's case. Who is the government calling?

MR. ZOLKIND: Your Honor, just before we call our next witness, if we could just offer three exhibits into evidence: The government offers Government Exhibit 1507B, like boy, 1512 and 1513.

THE COURT: Yes, sir.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government Exhibits 1507B, 1512 and 1513 received in evidence)

MS. GHOSH: The government calls Carol Calabrese.

CAROL CALABRESE,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT: Thank you. Won't you be seated, ma'am.

DIRECT EXAMINATION

BY MS. GHOSH:

Q. Good morning, Ms. Calabrese.

A. Good morning.

Q. Where do you work?

A. HSBC Bank.
Q. And where is your office located?
A. Buffalo, New York.
Q. What is HSBC Bank?
A. It is a global bank.
Q. Where does it have offices?
A. It has offices around the world. U.S., London, Asia.
Q. Which department of HSBC Bank do you work in?
A. I work in the U.S. payment operations department.
Q. What's your title?
A. I am a senior vice president over payments and investigations.
Q. What services does your department, the payment operations department, provide?
A. We process U.S. dollar payments and investigations.
Q. You mentioned oversight a moment ago. What is that?
A. It's to ensure that all of the transactions as well as investigations are handled in the appropriate manner.
Q. And when you say transactions, what sort of transactions does your department have involvement in?
A. U.S. dollar wire payments.
Q. Are you familiar with the term correspondent banking?
A. Yes, I am.
Q. What's that?
A. It is a conduit to transfer transactions between

institutions that do not hold a direct relationship.
Q. What do you mean by institutions?
A. Financial institutions.
Q. Does HSBC Bank U.S.A. sometimes act as a correspondent or intermediary bank?
A. Yes, we do.
Q. Based on your experience, what involvement, if any, does HSBC Bank U.S.A. have when international branches of HSBC engage in U.S. dollar transactions?
A. It is a mechanism again to transfer nonfinancial and financial transactions between the two institutions.
Q. Does HSBC typically process the transactions electronically or manually?
A. Electronically.
Q. When U.S. dollar transactions are processed by HSBC Bank USA, what country are the transactions processed in?
A. It can be all around the world.
Q. And when HSBC Bank USA, the entity that you work for, is processing the transactions -- are those transactions processed all around the world or in a particular country?
A. All around the world.
Q. What kind of records does HSBC keep of such transactions?
A. Electronic.
Q. I'd like to read from stipulation S1, which is already in evidence. If Ms. Rao could bring that up on the screen. And I

will be reading from paragraph 2. This is a stipulation as to bank accounts.

THE COURT: So, ladies and gentlemen, you recall that this is evidence for your consideration, and you must --

Is it fact, counsel?

MS. GHOSH: Yes, your Honor.

THE COURT: You must consider the facts stated therein as true.

MS. GHOSH: Government Exhibit 2005 consists of true and correct copies of wire transfer records that were made at or near the time of their creation by, or from information transmitted by a person with knowledge of the matters set forth in the records, and that were kept in the course of a regularly conducted activity of Mashrek Bank New York branch as a regular practice of that activity. Mashrek Bank processed and cleared the wire transfers in New York, New York in its capacity as an intermediary bank.

Turning to paragraph 3. Government Exhibit 2006 consists of true and correct copies of wire transfer records that were made at or near the time of their creation by, or from information transmitted by, a person with knowledge of the matters set forth in the records, and that were kept in the course of a regularly conducted activity of HSBC Bank USA NA as a regular practice of that activity.

Paragraph 4. Government Exhibit 2007 consists of true

and correct copies of wire transfer records that were made at or near the time of their creation by or from information transmitted by a person with knowledge of the matters set forth in the records and that were kept in the course of regularly conducted activity of Deutsche Bank Trust Company Americas, as a regular practice of that activity. Deutsche Bank processed and cleared the wire transfers in New York, New York in its capacity as an intermediary bank.

And paragraph 5. Government Exhibit 2008 consists of true and correct copies of wire transfer records that were made at or near the time of their creation by or from information transmitted by, a person with knowledge of the matters set forth in the records, and that were kept in the course of a regularly conducted activity of Hong Kong and Shanghai Banking Corporation Limited, or HSBC Hong Kong, as a regular practice of that activity.

Pursuant to this stipulation, the government offers Government's Exhibits 2005, 2006 and 2007.

MR. KIM: No objection.

THE COURT: Received.

(Government Exhibits 2005, 2006 and 2007 received in evidence)

MS. GHOSH: Ms. Rao if you could please pull up Government Exhibit 2008, which is already in evidence.

Q. Ms. Calabrese, do you see that on your screen?

A. Yes.
Q. And, generally speaking, what is this document?
A. It's a copy of a wire transaction.
Q. What sort of information is contained in this type of document?
A. All of the relevant information pertaining to the debit side and the origination side, as well as the credit side or beneficiary side.
Q. Starting on page 1, what is the date of this transaction?
A. This payment is dated from March 25, 2015.
Q. And just to be clear, the date there is written 25/03/2015. Is it your understanding that the day is listed first and then the month?
A. The day and then the month, that is correct.
Q. Which bank originated this transaction?
A. HSBC Bank in Hong Kong.
Q. Who is the customer at HSBC in Hong Kong who originated the transaction?
A. CEFC Limited.
Q. In this transaction, was CEFC Limited sending or receiving money?
A. Sending.
Q. How much money did CEFC Limited send?
A. $200,000 even U.S. dollar currency.
Q. Can you walk us through where the $200,000 moved after it

left CEFC's account at HSBC in Hong Kong?
A. Yes, it came through to the HSBC U.S. Corporation for correspondent in the U.S. dollar flow, HSBC Bank USA NA.
Q. And where did it go after HSBC Bank USA?
A. It went to Mashrek Bank in New York, U.S. location.
Q. And where did it go after the New York location of Mashrek Bank?
A. Mashrek Bank, New York as an intermediary sent it through to the beneficiary bank Mashrek Bank in Dubai.
Q. Which customer received the funds at Mashrek Bank Dubai?
A. Sarata International Consultancy.
Q. What was HSBC Bank USA's role with respect to this transaction?
A. The U.S. correspondent bank.
Q. Was this transaction completed?
A. Yes.
Q. Did HSBC process this transaction in the U.S.?
A. Yes.
Q. Ms. Rao, if you could please turn to page 4 of Exhibit 2008.
Ms. Calabrese, are you familiar with this type of form?
A. Yes.
Q. What is it?
A. It's a manual data collection form for the customer to

complete information at a branch for the branch to further instruct the payment message.
Q. I'm going to show you now what is marked for identification as Government Exhibit 2604. Do you have that up on your screen?
A. Yes, I do.
Q. If you can just flip through so the witness can see it. Ms. Calabrese, do you recognize this document?
A. Yes, I do.
Q. Did you review it prior to testifying today?
A. Yes.
Q. Generally speaking, what is this document?
A. It's a pictural view of the payment message that we just reviewed.
Q. Did you compare this document to any records?
A. Just the one we previously looked at.
Q. OK. And does this exhibit accurately summarize certain information in those records?
A. Yes, it does.
MS. GHOSH: Your Honor, the government offers Government Exhibit 2604 as an aid to the jury.
MR. KIM: No objection.
THE COURT: Received.
(Government Exhibit 2604 received in evidence)
MS. GHOSH: Ms. Rao, if you could please publish that

exhibit and turn to page 2.
Q. Ms. Calabrese, what does this page show?
A. It shows the payment instruction starting out at HSBC Hong Kong for CEFC Limited, sending $200,000 on March 25, 2015 through to HSBC Bank USA as the intermediary bank.
Q. And is this the first step of the transaction that we were just discussing a moment ago?
A. Yes, it is.
Q. Ms. Rao, if you could turn to page 3. What does this page show?
A. It shows the flow going from HSBC Bank USA, the intermediary, to Mashrek Bank in New York USA as the intermediary for the beneficiary bank.
Q. And turning to page 4, please, what does this page show?
A. It shows the final leg going from Mashrek Bank, New York USA through to the beneficiary bank Mashrek Bank in Dubai for final credit to the beneficiary Sarata National Consultancy.
Q. Let's go back to Government Exhibit 2008. Ms. Rao, if you could please take us to page 5.
Ms. Calabrese, what is the date of this transaction?
A. This is July 3rd of 2015.
Q. And what amount is this transaction?
A. $200,000 even U.S. dollar currency.
Q. Who sent the $200,000?
A. CEFC Limited was the originator.

Q. Can you please describe how this money moved after leaving CEFC's account at HSBC Hong Kong?
A. HSBC Hong Kong was the remitting bank, sending the funds through to HSBC Bank USA as a correspondent for further credit to Mashrek Bank in New York USA as the correspondent for the beneficiary bank Mashrek Bank in Dubai, for final credit to the beneficiary Sarata International Consultancy.
Q. Was this transaction processed by HSBC Bank USA in the United States?
A. Yes.
Q. Ms. Rao, could you please put up Government Exhibit 2604 again and go to page 5.
Ms. Calabrese, can you please explain what this page shows.
A. Again it's a pictural view of the payment instruction that we just walked through.
Q. And is this the first step of this transaction?
A. That is correct.
Q. The next page, please, Ms. Rao.
And what does this show?
A. This shows HSBC Hong Kong originating from CEFC for $200,000 U.S. July 3, 2015 through to HSBC Bank US as intermediary to Mashrek Bank, New York U.S. for the intermediary of the beneficiary bank.
Q. Page 7, please. What does this show?

A. Final destination to Mashrek Bank Dubai as the beneficiary bank to credit to their beneficiary Sarata International Consultancy.
Q. Going back to Government Exhibit 2008, Ms. Rao, could you please turn to page 9. Ms. Calabrese, what is the date on this transaction?
A. May 6th of 2016.
Q. What bank originated this transaction?
A. HSBC Bank in Hong Kong.
Q. Who is the customer at HSBC Hong Kong that originated?
A. CEFC Limited.
Q. And how much money did CEFC Limited send?
A. $500,000 even U.S. dollar currency.
Q. Again, can you please describe the movement of this $500,000.
A. From HSBC Hong Kong on behalf of CEFC Limited as the originator, through to HSBC Bank US as the US correspondent for credit to Deutsche Bank in New York US as a correspondent for the beneficiary bank Stambic Bank in Uganda, for final credit to the beneficiary Food Security and Sustainable Energy Foundation.
Q. What was HSBC Bank USA's role with respect to this transaction?
A. US correspondent.
Q. Did HSBC process this transaction in the US?

A. Yes.
Q. Ms. Rao, can you please put up Government Exhibit 2604 again and go to page 8.
Ms. Calabrese, can you explain what this page shows.
A. It's a pictural view of the flow, showing HSBC Hong Kong initiating on behalf of CEFC Limited a $500,000 transaction from May 6, 2016 for credit to HSBC Bank US as the intermediary.
Q. Page 9, please, Ms. Rao.
What does this page show?
A. Credit from HSBC Bank US to Deutsche Bank in New York US for the intermediary bank to the beneficiary bank.
Q. And page 10, please, what does this page show?
A. Final credit to the beneficiary bank, Stambic Bank in Uganda, for credit to their client Food Security and Sustainable Energy Foundation.
MS. GHOSH: May I just have one moment, your Honor?
THE COURT: Yes, ma'am.
MS. GHOSH: No further questions, your Honor.
THE COURT: Cross-examination, counsel, please.
MR. KIM: Thank you, your Honor.
CROSS EXAMINATION
BY MR. KIM:
Q. Good morning, Ms. Calabrese.
A. Good morning.

Q. You testified about three wire payments that were made; is that right?

A. That's correct.

Q. Each of those wires was sent from an account of CEFC Limited in HSBC Hong Kong, right?

A. Correct.

Q. CEFC Limited was the account holder of HSBC Hong Kong?

A. Correct.

Q. It was not an account holder for HSBC US, right?

A. Correct.

Q. And the wire transactions you were asked about did not involve any CEFC accounts at HSBC US, correct?

A. Correct.

Q. And the beneficiaries of those wires were not customers of HSBC, correct?

A. Correct.

Q. Now, are you aware of any HSBC procedures by which customers are informed that the wires they're initiating with the originator will be sent through the United States?

MS. GHOSH: Objection, your Honor.

THE COURT: Relevance, counsel?

MR. KIM: Foreseeability, your Honor.

MR. RICHENTHAL: May we approach?

THE COURT: Certainly.

(Continued on next page)

(At the side bar)

MR. RICHENTHAL: Your Honor, that's not the law.

THE COURT: I can't hear you.

MR. RICHENTHAL: That's not the law. To be more precise, this is a jurisdictional element, not a mens rea element. Period. It's an irrelevant question. It gives the jury a misimpression that it must determine whether Mr. Ho could foresee the wire or wires at issue going into or out of the United States, which is not a correct statement of law. I don't know if your Honor is going to instruct the jury on the law. Because it's not a correct statement of law, it's an irrelevant question.

MR. KIM: Your Honor, I agree it goes to the jurisdictional issue. It's a due process issue. And if the court wants to take that question outside the presence of the jury, we can do that, but I think it's relevant.

THE COURT: What's it relevant to?

MR. KIM: Foreseeability, your Honor.

THE COURT: Why does the foreseeability of the wire transfer's path have anything to do with the case?

MR. KIM: It goes to the question of whether Dr. Ho could reasonably expect to be held in US court for these charges, your Honor.

THE COURT: Not with respect to the wire transfer.

Did you want to add anything?

MR. RICHENTHAL: It sounds like Mr. Kim -- although he hasn't used this word -- appears to be invoking the principal of extra territoriality. It doesn't apply here because, among other things, the statutes are expressly territorial.

To the extent what the defense is advancing is a theoretical due process claim, it can advance that claim if it wishes to do so, but it plainly should not be eliciting evidence in front of the jury that has to do with that claim, which is a pure question of law for your Honor's consideration -- assuming it hasn't been waived.

MR. KIM: Your Honor, I think I just repeat what I said.

THE COURT: OK.

MR. KIM: And we could take this question outside the presence of the jury. It does go to due process.

THE COURT: Sustained.

(Continued on next page)

(In open court)

BY MR. KIM:

Q. Ms. Calabrese, you have no personal knowledge about the allegations in this case, right?

A. Correct.

Q. And you have no personal knowledge about purpose of the wires that were sent that you were asked to discuss.

A. No, I do not.

MR. KIM: No further questions, your Honor.

THE COURT: Thank you. Redirect, counsel?

MS. GHOSH: No, your Honor.

THE COURT: Thank you. You may step down, ma'am.

(Witness excused)

MR. RICHENTHAL: The government calls Melissa Penland.

DELEASSA PENLAND,

called as a witness by the government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. RICHENTHAL:

Q. Good morning, Agent Penland.

A. Good morning.

Q. Where do you work?

A. I work at the U.S. Attorney's office for the Southern District of New York.

THE COURT: Ma'am, I'm going to ask you to get closer

to that microphone and belt it out so that the folks under the painting can hear you.
Q. What is your title there?
A. I'm a special agent.
Q. For approximately how long have you worked at the U.S. Attorney's office?
A. Almost four years.
Q. What are your principal duties and responsibilities as a special agent with the U.S. Attorney's office?
A. I conduct criminal investigations primarily focused on public corruption and complex frauds.
Q. What did you do before you joined the U.S. Attorney's office?
A. I worked for the Internal Revenue Service.
Q. Is that also known as the IRS?
A. That's correct.
Q. What did you do for the IRS?
A. I was a revenue agent.
Q. In sum, what is a revenue agent?
A. I conducted tax examinations on individuals and businesses, as well as assisted in criminal investigations and testified in criminal trials.
Q. For approximately how long did you serve in that capacity?
A. About 12 and a half years.
Q. Based on your work, are you generally familiar with how to

read bank and wire records?
A. I am.
Q. Now, were you involved in the investigation that led to this particular trial?
A. I'm not.
Q. Did there come a time when you were asked to take on a project designed to assist with this trial?
A. I did.
Q. What project?
A. That was reviewing some bank records.
Q. Who asked you to do that?
A. The trial team.
Q. Did you select which records to review?
A. I did not.
Q. Now, before asking you some questions about those records, I'm going to ask Ms. Rao to put something up on the screen.
Ms. Rao, can you put up Government Exhibit 1195 already in evidence, please.
Agent Penland, do you see an address in the top message on the right?
A. I do.
Q. What is that address?
A. It says Trump Tower on First and 47th, apartment 78B.
Q. Ms. Rao, can you now put up Government Exhibit 2743 already in evidence pursuant to stipulation S13.

Agent Penland, for what apartment does this appear to be a purchase package?
A. Apartment 78-B.
Q. Is that the same apartment?
A. That's correct.
Q. Ms. Rao, could you turn to page 4, please.
What is the name of the purchasing entity?
A. Hong Kong Huaxin Petroleum Limited.
Q. And, Ms. Rao, could you now turn to page 31.
Do you see that name on this page as well?
A. Yes.
Q. Is there an e-mail address listed for it?
A. There is.
Q. What is the domain of that e-mail address?
A. Huangliwen@cefc.Co.
Q. Ms. Rao, can you flip ahead three pages to page 34, please.
Agent Penland, could you read the description of the business of the purchaser on this page, please.
A. Hong Kong Huaxin Petroleum Limited's main business consists of importation/exportation of rubber, petroleum and chemical products as well as coal and other coal-related business trading.
Q. Now, Ms. Rao, could you turn to page 60.
Agent Penland, does this concern the same entity or does it appear to concern the same entity?

A. It does.
Q. Could you read the first paragraph, please.
A. Hong Kong Huaxin Petroleum Company Limited is a wholly owned subsidiary of CEFC Shanghai Oil Group Company Limited. In 2011, the company achieved revenue of $5 billion HKD. Currently the company has 66 employees.
Q. Ms. Rao, can you now flip ahead to page 109. If you go to the next page. The next page, please.
Agent Penland, do you recognize this document?
A. I do.
Q. What kind of document is this?
A. It's an application for an employer identification number.
Q. In short, what is that?
A. It's a document that an individual uses to apply for an employer number to pay employment taxes.
Q. And what's the name of the entity on this page?
A. Huaxin Petroleum (USA) LLC.
Q. With what address?
A. 2 Wall Street, 21st floor.
Q. And what county and state does it indicate as the principal place of business for that entity?
A. New York County, New York.
Q. Is New York County also known as Manhattan?
A. That is correct.
Q. You can take that down.

All right. Agent Penland, I now want to turn to the bank records.

First, your Honor, I would like to read a portion of stipulation S-1 which is already in evidence.

THE COURT: Yes, sir.

MR. RICHENTHAL: If we can go to paragraph 1, please.

Government Exhibit 201 consists of true and correct copies of account records, including account information, statements, records of debit and credit, wire and electronic transfer records, and records of deposit for the Capital One Bank USA NA and Capital One NA, together Capital One, account held in the name of China Energy Fund Committee USA Inc. (account number ending in 3223).

The government offers Government Exhibit 2001.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government Exhibit 2001 received in evidence)

MR. RICHENTHAL: Your Honor, at this time we would also like to offer S-15.

THE COURT: S-15?

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government Exhibit S-15 received in evidence)

MR. RICHENTHAL: Pursuant to that stipulation, we offer Government Exhibit 2010.

MR. ROSENBERG: No objection.

THE COURT: Received.

(Government Exhibit 2010 received in evidence)

MR. RICHENTHAL: Let's start with the stipulation first. Could you put on the screen Government Exhibit S-15. And could you blow up the first paragraph, please.

Government Exhibit 2010 consists of true and correct copies of account records, including account information, statements, records of debit and credit, wire and electronic transfer records, and records of deposit for the Hong Kong and Shanghai Banking Corporation Limited (HSBC Hong Kong") account held in the name of the defendant, "HO Chi Ping Patrick, account number ending in 3888.

You can take that down, Ms. Rao.

Now, I'm going to ask you in a moment about Exhibit 2010.

Can I have one moment, your Honor?

But before I do, Ms. Rao, could you put up Exhibit 2009 already in evidence from last week.

Your Honor, if I may, let me note that pursuant to stipulation S-1, these are also HSBC records for an account ending in 2838 for an entity known as CEFC Limited, as is now on the public screen.

THE COURT: Yes, sir.

Q. Before I ask you specific questions, Agent Penland, are you

familiar generally with what is known as account opening documentation?

A. I am.

Q. In short, what is that?

A. They are the documents that are signed by an individual in the bank when an account is opened.

Q. Ms. Rao, could you go to page 52 of the exhibit, please.

Do you recognize what is on this page?

A. I do.

Q. Is that a form of that kind of account opening documentation?

A. That's correct.

Q. According to this form, who was the signatory or account name on this particular account?

A. Ho Chi Ping Patrick.

Q. Do you recognize what appears to be a signature to the right and below that name?

A. I do.

Q. And could you now look at the second item.

Ms. Rao, could we scroll down slightly.

Are there other names that are also on this account?

A. There are.

Q. Could you read them please.

A. The spelling is Ye Jianming.

Q. That's number 2?

A. That's correct.
Q. And could you read number 3?
A. Chan, spelling C-h-a-i-l-t-o.
Q. Ms. Rao, could you now scroll back to the statements themselves to page 36, and could you blow up the transaction information.
Agent Penland, I'm going to ask you a specific question, but in general can you orient ourselves how to read this page?
A. There is a currency on the far left-hand side that states the currency of the transaction. Following that is a date of the transaction. There is transaction details noted next to that. Following that are the deposit or withdrawal amounts, followed by the balances in the account.
Q. Thank you. Now, do you see a deposit of just under $500,000 in United States currency on May 4?
A. I do.
Q. And let me pause for a second. Of what year is this record?
A. 2016.
Q. So that's May 4, 2016?
A. That's correct.
Q. Ms. Rao, could you highlight that line, please.
Could you go to the next page, Ms. Rao, page 37 of the exhibit.

Agent Penland, what appears on this page?
A. This appears to be wire instructions.
Q. What do you mean by that?
A. These are the instructions that a bank takes when a wire is made, stating where the money is coming from and where it is going to.
Q. What is the date of this record?
A. It is April 5, 2016.
Q. April 5?
A. Sorry, May 4, 2016. Thank you.
Q. Is that the same date as the deposit you just testified about?
A. That's correct.
Q. Now, what in sum occurred, according to this record?
A. A $500,000 wire.
Q. In what direction?
A. Was made to CEFC Limited.
Q. From?
A. From the Shanghai Huaxin Group.
Q. The deposit came in on May 4; is that right?
A. That's correct.
Q. And then a wire went out?
A. That's correct.
MR. RICHENTHAL: Now, Ms. Rao, can you go to a different exhibit, 2008 already in evidence, and go to page 9,

please.

(Continued on next page)

BY MR. RICHENTHAL:
Q. Agent Penland, what is on this page?
A. This is again wire instructions showing the wire on May 6, 2016 that reads CEFC Limited and goes to Food Security and Sustainable Energy Foundation, in the amount of $500,000.
MR. RICHENTHAL: Ms. Rao, you can take that down now.
Let's pull up different bank records, 2001. For the record, these are Capital One bank records ending in 3223.
Q. For what entity or entities is this account, according to the record?
A. China Energy Fund Committee USA Inc.
Q. A minute or two ago I asked you about funds from or to an entity known as CEFC Limited. Did you have a chance to review the statements in this exhibit?
A. I did.
Q. Did it include any indication of deposits, or credits from the same entity, that is, CEFC Limited?
A. That is correct.
MR. RICHENTHAL: Ms. Rao, can you scroll down on that page a bit.
You can pause there.
Q. Do you see any on this page, and if so, can you point it out.
A. Yes. On September 2nd, there is a deposit from CEFC Limited of $7,000; and again on September 25th.

Q. Now were those the only examples you saw of transfers in or deposits from CEFC Limited in this account?
A. No.
MR. RICHENTHAL: Ms. Rao, could you go to page 3, please.
Q. And again, same question. If you see anything on this page from that entity, if you could point it out.
A. On October 28th there's a wire transfer deposit from CEFC Limited of $7,000.
MR. RICHENTHAL: Ms. Rao, could you now flip to page 7.
Q. And again, do you see an example on this page of a transfer in or deposit from that entity?
A. Yes, on October 31st.
Q. And finally --
THE COURT: October?
A. I'm sorry. December 31st.
MR. RICHENTHAL: Finally, Ms. Rao, could you flip two pages later to page 9.
Q. Again, could you point out the deposit or deposits from the same entity on this page.
A. On December 2nd, there is a deposit of $7,000; and on December 4th, there is a CEFC Limited deposit of $350,000; and on December 31st, there is another $7,000 deposit.
Q. Now again, are these the only examples of deposits in these

records from CEFC Limited?
A. No.
MR. RICHENTHAL: Ms. Rao, I'd like you now to turn towards the back end of the exhibit, page 37, please.
Q. Do you recognize this kind of document, Agent Penland?
A. I do.
Q. Just in general, what is this?
A. This is saying who the beneficiary -- who the originator was of the funds that are transferred.
Q. Is this what's sometimes known as backup documentation?
A. That's correct.
Q. In general, how does one read this kind of a document?
A. From top to bottom? I'm not quite sure what you're asking me. I'm sorry.
Q. Let me ask it this way. What does the word "beneficiary" mean in this kind of document?
A. Who is sending the money -- I'm sorry. Who's receiving the money is the beneficiary. The originator is who's sending the money.
MR. RICHENTHAL: Okay. Ms. Rao, can you highlight those two lines on this page, please.
Could I have one moment, your Honor.
THE COURT: Yes.
MR. RICHENTHAL: Okay. Let's now move to an exhibit we introduced a couple minutes ago; that is 2010.

Ms. Rao, you can take that down.

Now this is pursuant to Stipulation S-15 I read earlier, your Honor, the defendant's bank records.

THE COURT: Yes, sir.

MR. RICHENTHAL: Ms. Rao, could we start with page 7. And blow that up, the top part.

Thank you.

BY MR. RICHENTHAL:

Q. Now, Agent Penland, on this page, do you see an indication of who the account holder or account holders are?

A. Yes.

Q. Who was the account holder or account holders?

A. Mr. Ho, Chi Ping Patrick.

Q. What email address, if any, is listed for him?

A. Hocppatrick@gmail.com.

Q. And I should have asked this earlier, but is there a date on this document?

MR. RICHENTHAL: Ms. Rao, could you highlight the date, if it exists.

A. July 17, 2008.

Q. Now looking below the email address, what job, if any, is listed for Mr. Ho?

A. Self-employed as a management consultant.

MR. RICHENTHAL: Ms. Rao, could you flip ahead two pages to page 9, please.

Q. Agent Penland, do you see where it says "Sole Account Holder"?
A. I do.
Q. Who is listed as the sole account holder?
A. Mr. Ho, Chi Ping Patrick.
Q. Now I'm going to ask you some questions about the statements themselves.
But first, in general, did you review bank statements that are part of this exhibit?
A. I did.
Q. For approximately what time frame?
A. September 2014 to February of 2017.
Q. Now through your review --
MR. RICHENTHAL: Actually, you can take that down, Ms. Rao.
Q. Through your review -- actually, let me back up for a second.
Are you familiar with the term "recurring deposit" or "recurring credit"?
A. I am.
Q. In the context of a bank statement or bank records, what are those terms? What's a recurring deposit or recurring credit?
A. It's a deposit or a credit that you see happen in a reoccurring manner, usually like at the same time of the month

or at like every two weeks or once a month; you see it happening over and over again.
Q. Now in your review of this exhibit -- that is, these bank statements -- did you identify any recurring deposits or recurring credits?
A. I did.
Q. Approximately when did those take place?
A. Starting in September of 2014, they were taking place around the 15th of every month, and then later on they switched to occurring toward the end of every month.
Q. Do you recall approximately the amount of that recurring deposit or deposits?
A. Originally it was about 1,900 something dollars, and then later on it went up to like 3,700, I believe.
Q. Let me back up for a second. Are you speaking in Hong Kong dollars or US dollars?
A. I believe those bank records were in Hong Kong dollars.
MR. RICHENTHAL: Ms. Rao, just as an example, can we turn to statements from say March 2015.
THE COURT: We don't need to pull it up. I have it all memorized. As the jurors do, I'm sure.
MR. RICHENTHAL: Or really any time after March 2015 would be fine.
BY MR. RICHENTHAL:
Q. Okay. So on the screen now is a statement for September

2015, is that right?
A. That's correct.
Q. Could you point out for us the deposit or credit that's the recurring one to which you're referring.
A. On August 31st, there is a deposit from CEFC Limited in the amount of 307,250 Hong Kong dollars.
Q. Now prior to this time were there recurring deposits or credits to which you referred, all from that entity?
A. That's correct.
Q. Now I think you said that the amount had gone up over time, is that right?
A. That's correct.
Q. Is this before or after it went up?
A. This is after.
Q. This is the later figure, that is, the bigger figure?
A. That's correct.
Q. And you said this is in what currency, the 307,250?
A. Hong Kong dollars.
Q. Now do these records indicate -- actually, let me back up for a second.
Are you familiar with what's known as currency conversion rate or currency exchange rate?
A. I am.
Q. For anyone who may not know, what is that?
A. It's the rate you use when you're converting a certain

currency to another currency, so from US dollars to Hong Kong dollars is a rate of conversion.
Q. Do the records in this exhibit indicate the rate of conversion on a monthly basis?
A. It does.
Q. Just using this as an example, can you point out where one would find that, please.
A. It's on the first page of the statement at the bottom.
MR. RICHENTHAL: Ms. Rao, can you point to an example of that, please.
You may have to go back a page.
Q. Could you point out on the screen where that line is.
A. It's at the bottom where it says "Exchange Rate," and then it has various currencies listed. There's US dollars, 7.750050.
Q. To use this as an example, what does that rate mean? That is, if one wanted to go from Hong Kong dollars to US dollars in that month, what would one do?
A. I would take the amount of Hong Kong dollars, dollars, divide it by 7.750050, and that should give me the US dollars.
Q. Now prior to testifying today, did you do that analysis, at least roughly, with respect to 7.7?
A. I did.
MR. RICHENTHAL: And if we go one page ahead, Ms. Rao, if we could.

Q. Now one more time, how much was a recurring deposit once it grew from CEFC Limited?
A. 307,250 Hong Kong dollars.
Q. Using the currency exchange rate of roughly 7.7, how much is that in US dollars?
A. $40,000.
Q. That's $40,000 a month?
A. Correct.
Q. Now what does that equal over the course of a year?
A. It's around $478,000.
Q. That's US dollars.
A. US dollars.
Q. Now I think I'd asked you whether up until this time the entity was always that entity, the CEFC Limited. Do you recall that question?
A. I do.
Q. Now did there come a time in which the statements didn't indicate the entity?
A. That's correct.
Q. Were you nevertheless able to tell what the entity was?
A. Yes.
Q. How?
A. There were checks deposited and we -- I reviewed source documents of those checks, so copies of those checks.
Q. In other words, going beyond the statement itself?

A. That's correct.

MR. RICHENTHAL: Ms. Rao, could you go to page 106 of the same exhibit, please.

Q. Do you recognize what's on your screen now?

A. I do.

Q. What is that?

A. That's a copy of one of the checks I reviewed.

Q. Is that an example of the checks to which you just referred?

A. That's correct.

Q. Now did you review every check or just a sample?

A. Just a sample.

Q. Based on the sample, were these payments, once they stopped being listed on the statements, from the same entity, that is, CEFC Limited?

A. That's correct.

Q. Now did there come a time when the entity name appeared to change, albeit slightly?

A. Yes.

Q. And by the entity, I mean the entity making the payments.

A. That's correct.

Q. Do you recall approximately when that time was?

A. I believe it was January of 2017, or like the last few months that I looked at.

Q. And do you recall the name of the entity at that time?

A. It was CEFC Management. I don't know if that was the full name, but I do know it had management. It was a little different.

MR. RICHENTHAL: You can take that down, Ms. Rao.

Q. Now you've been testifying for a couple minutes about what I've called the recurring deposits or recurring credits. Were there months when there was more than one such deposit or credit?

A. There were a few.

Q. Now I've also asked you a few questions about an entity known as CEFC Limited. Were the credits or deposits I've shown you the only credits or deposits from CEFC Limited?

A. No.

MR. RICHENTHAL: Ms. Rao, staying in the same exhibit, can we go to page 91, please.

Q. Let me also ask, were the only deposits or credits from the entity CEFC Limited?

A. No.

MR. RICHENTHAL: Page 91, Ms. Rao.

Could we blow up the next page, actually. In the middle, Transaction Information.

Actually, first, let's scroll to the top.

Q. Agent Penland, for what period of time is this statement?

A. The statement is dated December 13, 2014.

MR. RICHENTHAL: Ms. Rao, can you now go to the

Transaction Information.
Q. Agent Penland, do you recognize a deposit or credit on November 14, 2014?
A. I do.
MR. RICHENTHAL: Ms. Rao, could you highlight that.
Q. What is the amount of that deposit or credit?
A. It's 4,999,992 Hong Kong dollars.
Q. Now according to the statement, what entity made that deposit or credit?
A. China Ocean Fuel Oil.
Q. Was that the only deposit or credit from that entity in these statements?
A. No.
MR. RICHENTHAL: Ms. Rao, could we scroll forward a little to page 103.
And can we maybe just blow up the top.
Perfect.
Q. Agent Penland, what is on this page?
A. These are wire instructions related to that deposit.
Q. That is the same deposit you just testified about?
A. That's correct.
Q. And again, what's the date of the transaction?
A. November 14, 2014.
Q. And the amount?
A. The amount is -- it was 5 million Hong Kong dollars, there

were some fees, which reduced it to the 4,999,992-dollar deposit.

Q. And the sender?

A. The sender is --

Q. Or originator?

A. China Ocean Fuel Oil.

Q. And finally, the beneficiary?

A. Mr. Ho, Chi Ping Patrick.

Q. Now prior to testifying today, did you run the same conversion you testified about a few minutes ago, that is, using 7.7 to figure out how much this is in US dollars?

A. I did.

Q. Roughly how much is it?

A. Around 650,000 US dollars.

Q. Before taking this off the page, what address, if any, is listed for the sending entity, the China Ocean Fuel?

A. It's Room 1002, 10 at Star House, 3 Salisbury Road, TSIMSHATSUIKLN HONG KON.

MR. RICHENTHAL: Ms. Rao, just for one moment, could you put up Government Exhibit 2705 already in evidence. And just go to the top, if you could.

Q. Agent Penland, do you recognize the same entity on this page?

A. I recognize the China Ocean Fuel Oil.

Q. That's what I was referring to.

A. Yes.

MR. RICHENTHAL: Could you go to the bottom, Ms. Rao.

Q. Is there an address?

A. There is.

Q. How does it compare to the address that you just read on the sender of the wire to Mr. Ho's account?

A. It appears to be the same address.

MR. RICHENTHAL: We can take that off, Ms. Rao.

Q. And again, what was the date of this wire?

A. November 14th. I can't remember the year off the top of my head right now.

Q. Just go back to the record for a second.

A. 2014.

Q. November 14, 2014?

A. That's correct.

MR. RICHENTHAL: Ms. Rao, could you put up Government Exhibit 2601 in evidence.

And go to three days earlier -- that is, November 11, 2014.

Q. Agent Penland, could you read what's listed under November 11, 2014.

A. "First CEFC meeting in Chad: HO and CEFC delegation, and Gadio, meet with President Deby in Chad."

Q. And could you now read the entry for three days later, that is, the date of the wire, November 14, 2014.

A. "HO provides a report to CEFC Chairman on his meeting with President Deby in Chad."

Q. Is that the same day as the wire?

A. That is correct.

MR. RICHENTHAL: No further questions.

THE COURT: Thank you.

Cross-examination, please, counsel.

MR. ROSENBERG: Yes, your Honor. Very briefly.

CROSS-EXAMINATION

BY MR. ROSENBERG:

Q. Agent Penland, you testified you have reviewed these records but you were not part of the investigation in this case, correct?

A. I'm sorry. I cannot hear you.

Q. I'm sorry.

THE COURT: Closer in.

MR. ROSENBERG: And slower.

THE COURT: Get your mouth closer to that microphone. Thank you, sir.

Q. I believe you testified you were not part of the investigation of this case, is that right?

A. That's correct.

Q. So you haven't explored why any of the payments you've talked about have been made, is that right?

A. That is correct.

Q. Okay. I believe you also said, in reference to the last exhibit you reviewed, Government Exhibit 2010, that there were other payments from the Washine (ph) Ocean Company that were made to Mr. Ho.

MR. RICHENTHAL: Misstates the name of the entity.

THE COURT: You forgot the name. I need you to speak more loudly into the microphone, please, sir.

Q. Do you recall testifying about a payment from China Ocean Fuel to Dr. Ho?

A. That's correct.

Q. And that was in November 2014, is that correct?

A. Correct.

Q. Did you see other payments from China Ocean Fuel to Dr. Ho?

A. I did.

Q. Did you in fact see a payment to Dr. Ho from China Ocean Fuel in February of 2016?

A. I believe that's correct, but I would need to see the records to verify for sure the dates.

MR. ROSENBERG: May I ask, please, Mr. Calabrese, to put up Exhibit 2010, at page -- I think it's account statement pages March 12, 2016. Page 153660.

MR. RICHENTHAL: Your Honor, the record speaks for itself. We agree there is a wire on or about that date.

THE COURT: Okay.

MR. ROSENBERG: Okay. And I think we have it.

BY MR. ROSENBERG:
Q. And Ms. Penland, my question to you is --
MR. ROSENBERG: If you go to the next page, please.
Q. -- going down to February 23rd, does that also show a payment that you were referring to from China Ocean Fuel to Dr. Ho?
A. That's correct.
Q. And that's in the same amount, correct, 5 million Hong Kong dollars?
A. That's correct.
MR. ROSENBERG: Thank you. Nothing further.
MR. RICHENTHAL: No redirect, your Honor.
THE COURT: You may step down, Ms. Penland.
(Witness excused)
THE COURT: Counsel?
MR. RICHENTHAL: Your Honor, at this time we'd like to offer a few exhibits we've referred to but I think weren't formally received into evidence.
THE COURT: Yes, sir.
MR. RICHENTHAL: Specifically 6, 7B as in boy, 111, 112, 177, and 286. These are referred to, among other places, in Government Exhibit 2603, which is in evidence, and one maybe subject to our discussion earlier regarding redactions.
MR. KIM: No objection.
THE COURT: Received.

(Government's Exhibits 6, 7B, 111, 112, 177, and 286 received in evidence)

MR. RICHENTHAL: The government rests.

THE COURT: Thank you.

MR. KIM: Your Honor, we would like to make a motion we alluded to earlier.

THE COURT: Motion is deemed made now.

MR. KIM: And we also offer at this time Defense Exhibits 214 -- 2-1-4 -- and corresponding translation by stipulation, 214-T.

MR. RICHENTHAL: No objection.

THE COURT: Received.

(Defendant's Exhibits 214 and 214-T received in evidence)

MR. KIM: The defense rests.

THE COURT: Thank you.

Rebuttal.

MR. RICHENTHAL: No, your Honor.

THE COURT: Thank you.

Ladies and gentlemen, as you've heard, we have concluded taking the evidence in the case. Before we disperse, though, I wanted to take one moment to acknowledge the passing of president George H.W. Bush. President Bush nominated me to this court in 1992. It was his practice to call nominees the night before their nomination. When he called me, I was at my

parents' home and told him that we would go out to dinner that night and toast him and Mrs. Bush. He said that he and Mrs. Bush were going to the movies that night because he said, You know, you have to get out of the White House from time to time. He was gracious and generous and was a wonderful man. He was a person of great character, and it is a great loss to our nation that he has passed. But I didn't want this moment to pass without acknowledging to him my great debt of gratitude.

Now that counsel have finished with the presentation of the evidence, we are going to do our work this afternoon preparing the instructions for the jury. So we will release you for the day. We will expect you tomorrow morning ready to start -- and I tell you, ladies and gentlemen, ready to start -- at 10:00. You know your coffee will be ready for you long before that. If somebody is late, we all wait.

So the plan for tomorrow is for counsel to sum up, and after that, I will give the Court's instructions on the law, which I'll tell you will be more than a page or two. So we would like to get all of that finished tomorrow, so we ask your indulgence. Try to get here at 9:30.

Remember, the case has not been given to you. You haven't heard the summations and you haven't heard the Court's instructions on the law. So continue to follow the instructions of not discussing the case with anyone; don't do

any research on the case. Leave your jury books in the jury room, please, and come back tomorrow ready to start even early. If you're here early, we'll start early. And if we start early, we finish early. So thank you for your attention, ladies and gentlemen. Go out and enjoy the beautiful day.

Thank you for your attention.

(Jury not present)

THE COURT: Won't you be seated, counsel.

Would you like to make your motion now.

MR. ROSENBERG: Yes, your Honor.

THE COURT: Yes, sir.

MR. ROSENBERG: Move pursuant to Rule 29 --

THE COURT: If I can't hear you, you can't make the motion.

MR. ROSENBERG: Move pursuant to Rule 29 to dismiss the claims on the grounds it's insufficient evidence as to each of them.

Your Honor, in particular, there's insufficient evidence that the defendant acted on behalf of a domestic concern, and that pertains to both Counts Two and Three, that he assisted a domestic concern to obtain or retain business for itself or anyone else. There was considerable evidence, or the government's position appears to be that he was working on behalf of CEFC Energy, which is not a domestic concern.

In addition, there's insufficient evidence of corrupt

intent. The evidence does not support the proposition that there was a *quid pro quo* intended by either of the payments.

Your Honor, also, as to the money laundering count, the transfer of funds, as to the first count -- that's Count Seven -- that came many months after the alleged bribe. It was therefore not intended to promote the bribe that is required under the statute.

And as to the latter count -- that is, Count Eight -- it was evidence that, again, because there's no evidence of an underlying crime because of lack of corrupt intent, the money transfer was not to promote the underlying crime.

Also, for those two counts there is no evidence that the transfer took place in the Southern District of New York. The only testimony or evidence is that it took place in New York, New York, or both transfers were to New York, New York, which includes the Southern and Eastern Districts; nothing confining it to the Southern District.

Those are our points, your Honor.

THE COURT: Does the government wish to be heard?

MR. RICHENTHAL: A couple of those arguments rested on misstatements of law. The last one rested on misstatement of law. In fact, New York, New York, is Manhattan. Certainly your Honor can take judicial notice of that. Beyond that, I don't think it requires any discussion, though I'm happy to answer any questions the Court may have.

THE COURT: The motion is denied.

Is there anything else on the record, friends?

MR. RICHENTHAL: No, your Honor.

MR. KIM: No, your Honor.

THE COURT: Thank you.

I see a hand in the back. Sir?

UNIDENTIFIED SPECTATOR: With the trial now over, I just wanted to make sure that the exhibits that were entered into evidence --

THE COURT: You're right. I'm reminded that apparently we have not been uploading the exhibits. We need to get those exhibits up so the public has access to them.

MR. RICHENTHAL: We'll do so, your Honor. One note on that. Some of the exhibits, given their volume, were not previously redacted with respect to, say, for example, the defendant's birthdate, or Social Security numbers, things like that. And the defense in particular expressed a concern to us this morning about Exhibit 2010. That is Mr. Ho's personal bank account. So what I think we'll do is we'll endeavor to redact as warranted. Rule 49.1 doesn't technically apply, but I think we'll use that as our guide star and we'll work with defense to get those uploaded properly.

THE COURT: Can you do this -- upload everything else so that they're out there so that the folks have access to them, and then the ones that have to be redacted, put them up

as soon as you can.

MR. RICHENTHAL: I think the only ones that are going to be redacted are Mr. Ho's passport and bank records.

THE COURT: That's fine. But put the other ones up promptly, please.

MR. RICHENTHAL: Will do.

THE COURT: Thank you for reminding me, sir.

MR. RICHENTHAL: On a related note, certain exhibits identified in the stipulations were not moved into evidence. The parties previously agreed to redact those lines, effectively, so the jury doesn't speculate, so we'll do that, but I think in the interest of the press, I think we can upload them as is now and then redact those lines out before the jury gets them for their deliberations, assuming the defense is okay with that.

MR. KIM: No objection.

THE COURT: Thank you very much.

Anything else, friends?

MR. RICHENTHAL: No, your Honor.

What time would your Honor like to see us for the charge conference?

THE COURT: Is 2:00 convenient?

MR. RICHENTHAL: That's fine for the government.

THE COURT: Thank you.

Is that all right with you, Mr. Rosenberg and Mr. Kim?

MR. ROSENBERG: Of course.

MR. KIM: Yes.

THE COURT: See you then.

All right. Thank you, counsel. Good afternoon. The jury is down.

Mr. Kim.

MR. KIM: Thank you, your Honor. Just for the record, we are waiving Dr. Ho's presence at the charge conference.

THE COURT: He's a wise man. Thank you, counsel.

(Luncheon recess)

AFTERNOON SESSION

3:42 p.m.

(In open court; jury not present)

THE COURT: Counsel and I have had a very lengthy conversation off the record about Court Exhibit 1, which is the draft jury charge which was sent to counsel on Saturday. I'd like to first put on the record the items that we have agreed to.

Page 22, we will delete the portion about the defendant's having testified.

We will keep in the "if applicable" portion stating that the jurors will be provided with a copy of the indictment.

Off the record.

(Discussion off the record)

THE COURT: Page 38, "conscious avoidance" is deleted.

Page 51, third line, "includes" is deleted and "is" is inserted.

Page 53, the end of the second paragraph, after the words "with any person," we are going to add the words, "or company."

Page 65, we're deleting the words, in the middle of the page "[and conscious avoidance, if applicable.]"

Page 67, line 3 --

MR. ROSENBERG: Your Honor, is this an appropriate time to note another point that was agreed to?

THE COURT: Yes, please.

MR. ROSENBERG: Forgive me, your Honor. On page 64 --

THE COURT: Yes, sir.

MR. ROSENBERG: -- at the end of the Court's instruction on Counts Two, Three, Four, and Five, and just before the instruction on Count Six, we had discussed that the parties have agreed and we submit to the Court a proposed instruction regarding category of persons.

THE COURT: Yes, sir. We'll mark that, please, Court Exhibit 1A, if you would hand it up.

MR. ROSENBERG: Yes.

THE COURT: And the government is on board with that, right?

MR. RICHENTHAL: We are, your Honor. Let me note we don't think this is legally required, but we're not objecting to it at the defense request.

THE COURT: Yes, sir.

And we're going to put back "after time of conspiracy" on 66, right?

MR. RICHENTHAL: Yes, your Honor.

THE COURT: Thank you.

MR. ROSENBERG: Oh, wait.

THE COURT: Before Count Six --

MR. ROSENBERG: Before Count Six.

THE COURT: Yes, sir.

MR. ROSENBERG: Yes.

THE COURT: Thank you.

Page 67, line 3, after "intent to promote," we will insert "one or more of."

Counsel, with respect to the rider we have proposed that we are putting in at the end of Count Five, would you confer and let us know overnight what you want the title to be. Currently it says, "Count One: Conspiracy to Violate the Foreign Corrupt Practices Act," and the subhead is "Category of Persons." Before you leave, tell us what you want that heading to be, please.

We have also agreed, page 90, "conscious avoidance" is deleted.

Page 95, nonprosecution agreements, we're going to make it singular. So the first line will read, "You have heard testimony of a witness who has testified pursuant to a nonprosecution agreement with the government."

Page 96, the first sentence of the first full paragraph will read, "In evaluating the testimony of such a witness, you should..."

Page 100, "Transcripts of Recordings" will say "Transcript of Recording," singular, and we've agreed to a number of changes that make it singular. I won't read them all, but we're just making it singular.

Page 102, "Use of Evidence Obtained Pursuant to

Searches and Seizures." The first two lines will read, "You have heard testimony about evidence seized in searches of locations, devices, and email accounts. Evidence obtained from said searches was properly admitted," etc., etc.

Page 103, "Summary Charts" will be titled "Summary Charts and Graphics."

In the first two lines, after the word "charts," the words "and graphics" will be added.

At the end of the second line, after "in order to," we will add "make the other evidence more meaningful, and (2)" and then the next word is "aid," A-I-D.

Similarly, in the fifth line in that paragraph, after the word "charts," we will add the words "and graphics."

The first line of the next paragraph, after "summary charts," we will add "and graphics."

The next to the last line on the page, after "charts," we will add "and graphics."

In page 104, "Redaction of Evidentiary Items," in the next to the last line, we will say, "'Redacted' means that part of the document was taken out or covered up."

Page 105, the last line of the runover paragraph, after the word "deleted," we will add, "or covered up."

In Uncalled Witnesses, third line, "After one or more of the attorneys," we will insert, "may have referred," etc.

We are deleting "Character Witnesses" on 106.

We are deleting "Defendant's Testimony" on 107.

We are deleting "Expert Testimony" on 109.

And I forgot what else we had agreed to. Was there the venue issue?

MR. RICHENTHAL: Yes, your Honor. The parties had jointly drafted a substitute to the venue instruction accounting in substance for the defendant's concerns expressed in his letter of yesterday, December 2, 2018. We transmitted it by email to your Honor's law clerk, and I think the parties jointly request that it be substituted in, although to be clear, the government thinks your Honor's instruction was accurate as is.

THE COURT: Do you want it on page 89, friends?

MR. ROSENBERG: Yes, your Honor. Substitute it in for the instruction that's there now.

THE COURT: Okay. So as counsel have set out, the venue instruction will be substituted with Rider 1B, Court Exhibit 1B.

Is there anything else that we've agreed to that I've forgotten?

MR. RICHENTHAL: I don't know that it falls in the category of agreed to, but I note that during our discussions, the defendant withdrew his objection to inclusion of an instruction with respect to liability for acts and declarations of co-conspirators.

THE COURT: All right. What other comments, objections, and the like do you want to put on the record for the Court of Appeals?

MR. ROSENBERG: Thank you, your Honor. We continue to assert objections regarding the *Hoskins* case that is set forth in my letter to the Court.

THE COURT: What do you want in and why do you want it?

MR. ROSENBERG: Your Honor, we want an instruction in that the defendant was required to have been acting on behalf of a domestic concern for him to be found guilty under Counts Two and Three, which allege violations of 78dd-2 and dd-3. Therefore, we object to Count Two, the section providing violating the Foreign Corrupt Practices Act domestic concern - Chad, indictment; Count Two, violating the Foreign Corrupt Practices Act domestic concern - Chad, elements of the offense; Count Two, violating the Foreign Corrupt Practices Act domestic concern - Chad, first element, domestic concern; and Count Three, violating the Foreign Corrupt Practices Act domestic concern - Uganda. Those were on pages 42, 44, 45, and 53 of the Court's instruction, Court Exhibit 1.

And the proposed instructions, those set forth in the defendant's proposed instructions starting at No. 151-1, proposed instructions 12, 13, 14, and 21.

We also object, your Honor, to the instruction with

respect to Counts Seven and Eight of the indictment, for the reasons that we, again, set forth in our letter.

THE COURT: I can't do that. You know that's insufficient. I'm trying to help you out here.

MR. ROSENBERG: Your Honor, because those instructions provide that the specified unlawful activity include 78dd-2, 78dd-3, and substantive laws of Chad and Uganda respectively, we submit that 78dd-3, the jury should not be able to find that 78dd-3 is specified unlawful activities for purposes of the money laundering statute. Our proposed instruction regarding the specified unlawful activities are requests at No. 40 and 45 of Docket No. 151-1.

THE COURT: Thank you.

Mr. Richenthal.

MR. RICHENTHAL: I think our position on the various issues was set forth in a letter of a few weeks ago. I don't think there's a need to expand on that.

I'm happy to if your Honor would like me to.

THE COURT: I think you need to put the government's position on the record. You don't have to go on for 20 minutes.

MR. RICHENTHAL: I'll take them one at a time.

With respect to *Hoskins*, the Second Circuit decision, the government's view is that *Hoskins*, which wasn't about this issue, doesn't control. Specifically, the defense has

advocated for the view that a defendant, as an agent, employee, officer, etc. of a domestic concern, needs to be acting on behalf of the domestic concern. That's not the language in the statute. In fact, the statute is very, very clear. The words "on behalf of" occur at the end of the statute and modified the word "stockholder" and only modified the word "stockholder." *Hoskins* does not. To the contrary, and indeed the structure of the statute would make little sense if "on behalf of" was deemed to modify the rest of it.

The government understands that the defendant also raised a second *Hoskins* objection, which is that the jury should be instructed with respect to category of persons covered by the statute. That objection we understand has been mooted by the agreement to which the Court referred a couple minutes ago, so we understand the only remaining objection is what I'll call the "on behalf of" objection, and we believe it's without merit for the reasons I've stated and also described in our letter of a couple weeks ago.

THE COURT: Do you want to respond to that? Anything more on that, Mr. Rosenberg?

MR. ROSENBERG: No, your Honor.

THE COURT: Thank you.

I agree with the government. The statute is completely plain that "acting on behalf of" modifies only "stockholder" and does not modify officer, director, employee,

or agent. Accordingly, the objection is overruled.

MR. RICHENTHAL: And the defendant also advanced an argument in his papers and again a moment ago that only one of the two subsections of the FCPA here applies on a money laundering statute. That argument is also without merit. The money laundering statute refers directly to the Foreign Corrupt Practices Act. It doesn't distinguish between the two subsections in particular, and there's no basis in the statute, or, for that matter, in logic, to believe that Congress would have distinguished either.

THE COURT: Anything more on that, Mr. Rosenberg?

MR. ROSENBERG: Only, your Honor, to the point I made earlier. Just so it's clear on the record, our position is that when the money laundering statute refers to Foreign Corrupt Practices Act, it included only 78dd-2. It did not include 78dd-3. Our position is the addition of 78dd-3 in 1998 does not change the meaning of the money laundering statute.

THE COURT: I disagree. As counsel pointed out, the statute refers to the FCPA generally, and if the prohibited acts related only to statutes in effect at the time the statute was passed, then there would be zillions of statutes, different new drugs and the variety of other things which would not be included. That is not the language of the statute. The statute is clear that whatever the specified acts are at the time and place of the indictment are the ones that control.

Accordingly, the objection is overruled.

Is there anything else?

MR. RICHENTHAL: The government only notes that our nonobjection to the deletion of the standalone conscious avoidance instruction was predicated, in our understanding, that the defense does not intend in its summation tomorrow to make arguments that are inconsistent with that provision. If the defense were to make arguments inconsistent with that, we respectfully reserve the right to ask your Honor to put it back in the instruction.

THE COURT: Yes, sir.

Anything else, friends?

MR. RICHENTHAL: I have a couple things off the record but nothing on the charge, your Honor.

THE COURT: Thank you. Thank you for acting like grownups.

(Discussion off the record)

MR. RICHENTHAL: I'm sorry. I forgot one thing.

In the defendant's letter of yesterday with respect to *Hoskins*, he also objected to your Honor's aiding and abetting instruction on grounds similar to the objection with respect to conspiracy. After conferring, it's our understanding that the defendant believes that your Honor's aiding and abetting instruction is accurate as written and does not have the problems which he alluded to in his letter of yesterday and

therefore is not asking for wording changes to the charge.

MR. ROSENBERG: The only objections we had to the charge were the ones I stated.

MR. RICHENTHAL: Thank you.

THE COURT: Okay. Thank you.

(Adjourned to December 4, 2018, at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

CAROL CALABRESE

Direct By Ms. Ghosh . . . . . . . . . . . . . . 870

Cross By Mr. Kim . . . . . . . . . . . . . . . . 881

DELEASSA PENLAND

Direct By Mr. Richenthal . . . . . . . . . . . . 885

Cross By Mr. Rosenberg . . . . . . . . . . . . . 910

GOVERNMENT EXHIBITS

Exhibit No. Received

1507B, 1512 and 1513 . . . . . . . . . . . . . 870

2005, 2006 and 2007 . . . . . . . . . . . . . 874

2604 . . . . . . . . . . . . . . . . . . . . 877

2001 . . . . . . . . . . . . . . . . . . . . 890

S-15 . . . . . . . . . . . . . . . . . . . . 890

2010 . . . . . . . . . . . . . . . . . . . . 891

6, 7B, 111, 112, 177, and 286 . . . . . . . . 913

DEFENDANT EXHIBITS

Exhibit No. Received

214 and 214-T . . . . . . . . . . . . . . . . . 913