Ic41ho1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                   17 Cr. 779 (LAP)

CHI PING PATRICK HO,

          Defendant.         Jury Trial

------------------------------x

                         New York, N.Y.
                         December 4, 2018
                         10:06 a.m.

Before:

                LORETTA A. PRESKA
                      District Judge

                  APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
BY:  DANIEL RICHENTHAL
    DOUGLAS ZOLKIND
    CATHERINE GHOSH
    PAUL HAYDEN
    Assistant United States Attorneys

BENJAMIN ROSENBERG
EDWARD KIM
KATHERINE WYMAN
JONATHAN BODANSKY
JONATHAN BOLZ
    Attorneys for Defendant

ALSO PRESENT:  Ryan Carey, F.B.I.
               Aashna Rao, Paralegal
               Peter Calabrese, Paralegal

Ic41ho1

(Trial resumed; jury not present)

THE COURT:  Good morning, ladies and gentlemen.  Won't you be seated.

We're all ready.  May we bring the jurors in?

MR. KIM:  Your Honor, Dr. Ho needs to be brought in.

THE COURT:  I'm so sorry.  Mr. Marshals, will you bring him out when he's ready.

MR. RICHENTHAL:  I have one small matter for the record.

THE COURT:  Sir.  On the record.

MR. RICHENTHAL:  Just, we conferred briefly with the defense this morning.  We understand that they may have made a sealed filing of some kind to your Honor yesterday.  We haven't seen that filing, but we confirm that the defense agrees with our understanding, which is that whatever issue or issues it raises, they need not be resolved prior to the jury having the case.  I spoke with Mr. Kim, and we intend to confer further at an appropriate time and will respond as may be needed.

THE COURT:  Yes, sir.

Let me just amend the request for declaration regarding the government's production of documents.  I would like to have a declaration as to documents produced for the first time after November 14, or made available to the defense for the first time.

MR. RICHENTHAL:  All documents or documents of a

certain type?

THE COURT:  I don't know.

Defense counsel, do you want to think about that and let me know later in the day?

MR. KIM:  We will, your Honor.

THE COURT:  Okay.  Thank you.

May we bring the jurors in, friends?

MR. KIM:  Yes, your Honor.

MR. ZOLKIND:  Yes, your Honor.

(Jury present)

THE COURT:  In response to your inquiry about tomorrow, although the court is closed in observation of the proceedings with respect to President Bush, we will be sitting. We will be deliberating.  If you are deliberating tomorrow, you will be sitting.  You will have the normal coffee.  We will be ordering lunch for you while you are deliberating tomorrow. The cafeteria people are all on board to take care of you folks.  So that's the plan.

Today, we will begin with the closing statements of counsel.  You will recall, of course, that nothing counsel says is evidence, and of course that applies to the closing statements.  Counsel might make arguments to you about what they think the evidence does and doesn't show.  To the extent counsel say anything to you about the evidence, if that differs from your recollection of the evidence, it's your recollection

of the evidence that controls.  And as I told you, when you do deliberate, you will have the opportunity to request any piece of evidence to be sent in to you.

So with that, we begin with the government.

Mr. Zolkind?

MR. ZOLKIND:  Thank you, your Honor.

The defendant offered and paid millions of dollars to the most powerful officials in Chad, in Uganda, and he did it to win business.  He committed bribery again and again.

In December 2014, the defendant led a CEFC delegation on a second trip to Chad.  The first trip, just a few weeks beforehand, had been a huge success.  The president of Chad had given CEFC the opportunity to acquire a major block of oil. The defendant wanted to seal the deal.  He didn't want to start that negotiation on an even playing field.  He wanted an advantage, to make sure negotiations went his way.  So he and his accomplices decided to cheat.  They flew into Chad on a private jet with $2 million in cash stuffed inside a bunch of gift boxes, and they offered that cash to the president.  A $2 million bribe.

The defendant followed the exact same corrupt playbook in Uganda.  He and his accomplices saw Uganda as a source of untapped riches, a country where they could drill for oil, build major infrastructure, establish a bank, develop hotels. But again, the defendant did not want to negotiate for these

deals on an even playing field.  Competition is risky.  So once again, the defendant cheated.  He wired half a million dollars to an account provided by the Ugandan foreign minister, he schemed to take half a million dollars in cash to the president of Uganda, and he explicitly promised both the foreign minister and the president of Uganda that if they steered business to CEFC, he'd give them a cut.  They could be CEFC's partners, so when CEFC cashed in, public officials would too.

Ladies and gentlemen, this is not how legitimate business is done.  It's bribery -- bribery that destroys the public faith in economic markets, that erodes the confidence people should have that their leaders are making decisions based on what's best for the public rather than what's best for themselves; it's bribery that is harmful and unfair to the businesses and the people who play by the rules.

The defendant's actions were corrupt and they were criminal, and he knew it.  That's why he carried out these schemes from his perch as the head of a nonprofit NGO, where he could gain access to world leaders under the guise of someone interested in humanitarian goals.  It's why the defendant called these bribes "donations" and "contributions."  And yet on that phone call, when he did not know he was being recorded, he said clearly that in this business it's give-and-take.  Real donations, real contributions are not give-and-take.  Give-and-take is another way of saying this for that.  And that

Ic41ho1                    Summation - Mr. Zolkind

was the defendant's intent -- money for foreign officials in return for business for CEFC.

You have now seen the evidence, and it's overwhelming. The defendant is guilty.

Let me take a step back and give you a sense of what you're going to hear today during the government's closing statement.

You saw and heard a lot of evidence in this trial. You saw the defendant's own words in emails and text messages and reports. You heard the defendant captured on a secretly recorded phone call. You heard from a number of witnesses, including Cheikh Gadio, the man who witnessed firsthand the defendant's efforts to bribe the president of Chad. What I hope to do today is take the different categories of evidence that you saw and heard in this trial and explain how it all fits together.

So I'm going to start by talking briefly about the key evidence that is not in dispute; next I'll cover the Chad and Uganda scheme in more detail; and finally, I'll go through the charts.

So first, we talked briefly about what is not really in dispute in this trial, because there are a lot of critical facts not seriously in dispute, and these indisputable facts alone are powerful evidence of the defendant's guilt. I want to highlight three indisputable facts in particular.

Ic41ho1                    Summation – Mr. Zolkind

There's no dispute that the defendant wanted business in Chad and Uganda.

There's no dispute that he wanted to influence the top officials in Chad and Uganda to take actions for CEFC's benefit.

And there's no serious dispute that the defendant directly participated in offering and paying all of the money that's at issue in this case.

So first, the defendant's interests in Africa, both Chad and Uganda, were exclusively business related.  Take Chad.  Here's Gadio's note from his very first meeting in Manhattan in September 2014 with the defendant.  During that meeting the defendant highlighted four areas of interest in Chad: drilling for oil; selling military equipment; building infrastructure projects; setting up financial institutions.  Business.

The defendant also made this clear in email after email.  He referred to "we," CEFC China Energy Company.  And he said their goal was developing the oil projects in Chad.  In the same email he talked about CEFC's broader interests in Chad, infrastructure development, financial and banking institution development.

In another email to Gadio, the defendant explained that CEFC's goal was to take over the Chadian operations of CNPC, the other Chinese oil company that was in Chad.  The defendant wrote that CNPC had started the initial investment

and now oil has been found and is becoming profitable --

"profitable" being the key word.

And it's the same for Uganda.  Take just the first phase of the Uganda scheme, right?  While Sam Kutesa was still serving as president of the UN General Assembly, or PGA, the defendant met repeatedly with Kutesa here in New York, in Manhattan, and he got those meetings through his nonprofit NGO position, but even during this period, the defendant made clear that his ultimate goal was business.

So what did the defendant's consultant, Vuk Jeremic, the first witness you heard from, what did he say to the defendant right after the defendant's first meeting with Kutesa?  That Jeremic will confirm to him, Kutesa, how fruitful the win-win cooperation with CEFC can be and he already insinuated this to him, Kutesa, over the phone.  This was the real goal, a relationship with Kutesa that was fruitful, meaning profitable.  And that involved win-win cooperation, as in we'll scratch your back, you scratch ours.  This for that. Money for business.

About a month later the defendant wrote to his boss, chairman of CEFC, that he met with Kutesa at his office here in New York for nearly three hours, and he wrote that Kutesa revealed that the current Ugandan president, Yoweri Kaguta Museveni, is Kutesa's brother-in-law.  He underlined it to show how important that fact was.  And the defendant talked about

how Museveni could help CEFC with energy projects, hydroelectric power grids, banking, financial projects in Uganda.

A few months later the defendant summarized another meeting with Kutesa, again here in New York, and he emphasized that Kutesa is more than happy to assist us, meaning the CEFC oil company, in the following -- for developed oilfield, the financial sector, other projects, like hydroelectric power grids, highways, trains, infrastructure.  No. 4, or arrangement can be made to meet President Yoweri Museveni in the shortest possible time.

So there just cannot be any dispute that the defendant's interests, focused in both Chad and Uganda, was exclusively on business and business for CEFC.

The second critical fact that cannot reasonably be disputed is that the defendant wanted to influence these officials.  He wanted to have the top officials of both countries use their official power to steer business to CEFC. This is plain as day from the defendant's own emails and reports.

Here's his first request to Vuk Jeremic.  "Do you happen to know personally President Deby of Chad Republic?  The company is undertaking some very major takeovers in that country which might need the endorsement of the Chief."

The defendant later reported to his boss, the

Ic41ho1                      Summation - Mr. Zolkind

chairman, that he met with Gadio, hoping for his help to receive special attention and support from President Deby.

And what did the defendant say to Gadio as soon as he learned that CNPC, that other Chinese oil company, had resolved its dispute with the Chadian government?  He said, "We are certain that we treasure an opportunity to meet and befriend the President in confidence."

And as the defendant put it very succinctly in a confidential report to his boss, right after meeting with President Deby, he said, "I deem that, through President Deby, China CEFC can use Chad as a standing point to break into the African market."  The defendant meant exactly what he said. "Through President Deby" meant through the use of the president's official power.

It was exactly the same in Uganda.  After Kutesa's term as PGA ended and he returned to Uganda as foreign minister, the defendant demanded an invitation to Museveni's presidential inauguration.  He said that CEFC and its entourage of executives would expect to be received warmly by Sam Kutesa and other heads of government, including the president.  He said the entire purpose of this visit is for us to meet privately with Sam Kutesa and his closest counsels, meet privately with the president, and attend his ceremony.

And after meeting these officials, the defendant explicitly requested that both Sam Kutesa and President

Ic41ho1                           Summation - Mr. Zolkind

Museveni assist CEFC with obtaining business in Uganda, starting with a very specific venture -- the acquisition of the Ugandan bank.

So the defendant wanted business in Chad and Uganda. He wanted to influence the top officials of both countries to take actions for CEFC's benefit.  Not in dispute.

What else?  What else can't be disputed?  That the defendant paid and offered what the law refers to as things of value.  Put simply, the defendant directly participated in each of the payments at issue in this case.

As to the Chad scheme, he led the CEFC delegation that flew into Chad on a private jet in December 2014, carrying boxes filled with $2 million cash.  He and his accomplices gave that cash directly to the president.  That's not in dispute.

He also advised his boss in writing to provide $500,000 cash to President Museveni of Uganda.

Let me back up.  As to the Ugandan scheme, the defendant personally directed a $500,000 wire, and it came from a bank account that he controlled.  There's no dispute about that.  As I said, he advised his boss in writing to provide $500,000 cash to President Museveni, and he wrote emails offering to cut Kutesa and Museveni in as partners if they steered business to CEFC.  There can't be any dispute about the defendant's personal involvement in offering and paying each of these things of value.

So the defendant wanted business in Chad and Uganda; he wanted to influence the top officials to take action for CEFC's benefit; and he offered and paid them money.  These indisputable facts provide powerful evidence of the defendant's guilt on both schemes.

Bribery involves the intended exchange of money for business.  The defendant wanted the business, and he offered the money to government officials who could make it happen. The only real question in this case is whether those two things were connected, whether it was the defendant's intent to exchange that money, to offer that money, as bribes for business advantages.  And the evidence in this case makes the answer overwhelmingly clear.  The defendant may have labeled these payments "donations" or "contributions," but they were not even close.  The defendant wanted business, and he paid money to get it.

So let's talk in more detail about how you know he intended these payments as bribes.

I'll focus first on the Chad scheme.  And there are at least five reasons that you know beyond a reasonable doubt that the defendant intended the $2 million cash as a bribe to President Deby and not as a donation.

I'll go through these one by one.

Reason No. 1.  The defendant treated the $2 million like a bribe.  Folks, you've all heard the expression, actions

Ic41ho1                    Summation – Mr. Zolkind

speak louder than words.  Keep that in mind.  The defendant's actions prove that even though he later called the $2 million a donation, he intended it from the start as a bribe.

Let's first talk about the sequence of events that led up to the bribe offer.  So the first meeting between CEFC and President Deby was on November 11, 2014.  That was the first time.  And the defendant immediately reported back to his boss, the chairman, about the opportunity to acquire the H Block oilfield in Chad.  The defendant also wrote in his report to the chairman that it was clear that it would be President Deby's own decision whether or not to sell this H Block oilfield to CEFC and it would be President Deby's decision at what price to sell it.  As the defendant put it in the report, the president would handle it personally, so CEFC had no need to negotiate with Chad's energy minister or other government officials.

What happened next?  Four days later, November 18th, the defendant emailed Gadio and requested a second meeting with President Deby, and he wanted that meeting right away.  He said, "We would be most grateful if the President could grant us an audience with him next week."

The defendant was so anxious, he texted Gadio again the same day as that email, and then the next day, he texted him again.

So then Gadio responded.  And Gadio wrote, "At this

stage our reaction should not be another trip for more discussion but rather we should carefully craft our offer to him." Meaning the offer for H Block. And in that email Gadio laid out the specific steps for CEFC to take. Send a technical team to investigate the characteristics of Block H; come up with a proposal for how much CEFC is willing to offer for the oil rights; and then you seek another meeting with the president, when you're ready to begin negotiations.

But how did the defendant respond? He barely acknowledged Gadio's advice. He just wanted another meeting with the president. He said so again. And then he said so again. "The most pertinent issue at this time is to arrange for a meeting with the President in Chad as soon as feasible."

So finally, Gadio did as the defendant requested. He arranged for that second meeting in Chad. And as you all know very well by now, this meeting in December was when the defendant and his accomplices flew in on a private jet, boxes stuffed with $2 million in cash for the president.

Folks, does that sequence of events sound like the actions of someone who planned to make a significant charitable donation to Chad? Use your common sense and think about why the defendant was frantically trying to arrange a meeting with the president before the negotiation over oil rights went any further. There was no business reason to have a second meeting so soon. Gadio told you that; the documents prove that. Why

would the defendant go through all that effort just to secretly smuggle in a humanitarian donation for the people of Chad?  He wouldn't and he didn't.  His actions only make sense if his plan was to offer that $2 million as a bribe.

Now the same is true of the defendant's actions after Deby, the president, confronted the CEFC delegation about the bribe.  Here's Gadio's testimony on this point, which the defense did not challenge at all.

"Q.  After the president made his initial remarks, referring to the accusation about the bribe, who was the first member of the CEFC delegation to respond?

"A.  Just as usual, Dr. Ho took the floor.

"Q.  And what did the defendant say?

"A.  Dr. Ho said, Mr. President, I'm very impressed by your reaction and your attitude, and your rejection of the gift, and this is why I believed I was right to propose Chad as the entry point for CEFC for doing business in Africa, and to be our gateway, gateway to Africa."

Think about that.  The president had just accused CEFC of trying to bribe him.  The president was furious.  And the defendant responded right away.  He didn't let Zang, his business associate, take the floor.  The defendant didn't deny the president's accusations.  He didn't tell the president he was mistaken.  The defendant did not even say that the money was intended as a donation.  He said he was impressed by the

president's rejection of it.  Why?  Because he was impressed. The defendant expected President Deby to pocket that cash.  And the defendant's response only makes sense if he had intended it as a bribe.  If the defendant had truly intended the money as a donation, his response would have been completely different.

Now let's look at the defendant's actions immediately after this meeting in Chad.

December 10, 2014, one day after leaving Chad.  A CEFC employee sends the defendant a draft contract between CEFC and Chad.  This is the MOU, or the memorandum of understanding, that the defendant wants.  And it states that the Chadian government will fully support CEFC in obtaining various oil rights in Chad.  Again, this is being drafted by CEFC.  So the defendant responds to the CEFC employee, and he begins by giving her comments on this draft contract.  And then in the exact same email, the defendant types up the first draft of that so-called donation letter to President Deby, saying that, "We wish to make a donation of 2 million US dollars to the people of Chad at your personal disposal," a three-sentence letter.

Ladies and gentlemen, it is no coincidence that the defendant was drafting this so-called donation letter at the exact same time, and in the exact same email, that he was working on an agreement to require the Chadian government to support CEFC in obtaining oil rights in Chad.  Those two things

Ic41ho1                    Summation - Mr. Zolkind

were directly connected.  It was always this for that.  Money for the president, business for CEFC.  The defendant may have labeled it a donation after the fact, but his actions prove he intended it as a bribe.

Reason No. 2.  Not only does the evidence show that the defendant treated the $2 million like a bribe, it also shows something else, that he did not treat it like a donation.  Not even close.

First off, the obvious.  Ladies and gentlemen, again, as we've said before, use your common sense.  The defendant gave the president of a foreign country millions of dollars in cash in gift boxes.  That is not how major corporations donate money.  So when the defense asks you to believe that this money was always intended as a donation, evaluate that claim for what it is -- nonsense.  It's a claim that asks you to check your common sense at the courthouse door.

If CEFC and the defendant were making a real donation, how would it have worked?  Well, you heard during this trial that real international donations follow a certain protocol, a procedure.  There's a formal announcement, a contract, and then the payment is made by wire transfer or formal check.  And in fact, that's how the defendant donated millions of dollars on behalf of CEFC to Vuk Jeremic's organization, and to the United Nations, and to flood zones, and to many other causes.  But the defendant did not follow any of those procedures here because

Ic41ho1                    Summation - Mr. Zolkind

he never intended that $2 million as a donation.

And make no mistake, the defendant knew exactly what he was doing.  Jeremic worked closely with the defendant for years.  Here's how he described him.  "Dr. Ho was somebody who, with a very sophisticated knowledge of how the world works, a good command of the English language, and the web of networks around the world, was somebody who in a way was helping the company grow and expand and get into different markets around the world."

Now this was not corporate giving.  From the beginning, the defendant was concerned with one thing only -- business.

Again, here's Gadio's notes of his very first meeting with the defendant in New York.  And as I said before, the defendant talked about oil and infrastructure and other lines of business, but what didn't he talk about?  A charitable donation.  If part of the defendant's plan was to build goodwill with the people of Chad by making a multimillion-dollar donation, don't you think he would have mentioned it to Gadio?  Wouldn't the defendant have wanted President Deby to know that information?  Of course.  But the defendant didn't mention it to Gadio even while he was asking Gadio to go broker a meeting with President Deby, because making a donation was never part of the defendant's plan.

Now Gadio told you he met with the defendant again in

Beijing and multiple times in Chad, and never once did the defendant say anything about planning a donation; at least not until President Deby confronted the CEFC delegation with the cash.

Throughout the scheme the defendant wrote reports to his boss, the chairman. He talked about opportunities for CEFC to drill for oil and to pursue other business projects, like building highways, railroads, and airports, power grids. He talked about being interested in entering Africa's evolving industries of petroleum and natural gas exploration. But the defendant never once mentioned an interest in making a charitable donation to Chad. There's no mention at all in these reports about trying to build goodwill with the local population.

Keep in mind, it is undisputed that this so-called donation letter came after the donation. That's not the way real donations work. Not when you're donating to your local church or charity, and especially not when you're a massive company donating millions of dollars to a sovereign country. If the defendant had intended to make a donation, he would have brought it up with Gadio and President Deby in advance. He wouldn't have waited until after the president discovered the money to call it a donation. The fact that the defendant kept the $2 million secret is powerful proof that he intended it as a bribe.

In fact, Gadio had provided the defendant with specific guidance about when and how to provide a donation to Chad. Gadio had advised the defendant that after CEFC sent the technical team to Chad and after CEFC had made an offer and negotiated with the president to buy the oil block, then and only then would it be time for CEFC to present what he described here as a nice financial package as an entry ticket, and he goes on to say the package should include money for social projects, for instance, a significant donation for his refugee camp. He goes on to talk about a major big investment, like a hospital or a building, or something of that nature.

But the defendant ignored Gadio's advice. He never spoke about it. He never even replied to his email; never asked about how you do an entry ticket. Why not? Because the defendant simply was not interested in any sort of charitable entry ticket package. He and his accomplices had their own plan, to try and pay off the president personally with a $2 million bribe.

How else do you know it was not a real donation? Well, even after writing that after-the-fact donation letter, the defendant still kept it totally secret. He and his accomplices made zero effort to gain any positive publicity from making such a significant donation. Does that make any sense, if it was a real donation, if the purpose was to generate goodwill? Of course not. You've seen the CEFC

websites.  They're in English and Chinese.  Translations are in evidence.  And just like the website of any other big company, the CEFC websites promoted and publicized the various things that CEFC wanted the public to know it was doing.  And sure enough, there are hundreds of press releases, including press releases about small donations and bigger ones, like the $1 million donation to the UN.

And in fact, you know that the defendant personally, personally was passionate about posting press releases whenever CEFC did something that made it look good.  David Riccardi-Zhu took the stand and told you that.

"Q.  Based on his," meaning the defendant's, "directions to you, did you get any sense of how important or unimportant press releases were to him?

"A.  I would say generally they were very important.

"Q.  What gave you that impression?

"A.  For one thing, the attention to the language; another was usually the urgency of the press release."

He went on:

"Q.  Did you ever learn of any donation the defendant was involved in making to the people of the Republic of Chad?

"A.  I did not.

"Q.  If the defendant had been involved in making a donation to Chad, what is your impression as to whether or not he would have mentioned that in a press release?

Ic41ho1                        Summation - Mr. Zolkind

"A.   Again, I believe that charitable donations would have reflected well on the NGO.

"THE COURT:  Does that mean you would have released a press release?

"THE WITNESS:  Yes, your Honor."

Here's an email the defendant sent in regard to a press release about that $1 million donation to the UN.  CEFC employee says, "Dear Dr. Ho, ...attached our preliminary Chinese press release."  And then the defendant responds, and you can see he's furious.  He gives specific directions to the CEFC press release.  He says, "Zhang Ya rewrite this ASAP!!!" He adds at the bottom, "You all should have learnt by now how to do this!!!!!"

The point here is that the defendant cared a ton about press releases.  When CEFC did something charitable, he wanted the world to know about it.  And folks, there's nothing wrong with that.  But the websites say nothing about any charitable donation to Chad.  There's no reference to the $2 million anywhere.

There's even a press release mentioning the CEFC's executives went on a trip to Chad to explore investment projects, but the press release doesn't mention the defendant or the NGO or any donation.

Ladies and gentlemen, do you remember during the defense's opening statement Mr. Rosenberg ended by saying that

you should ask yourselves, what does a bribe look like?  This is exactly what a bribe looks like.  $2 million in cash hidden in gift boxes, handed to the president by businessmen who are trying to win an oil deal.  That is a quintessential bribe.  It's classic, like something out of a movie.

Actions speak louder than words.  And the defendant's actions prove that this cash was intended as a bribe, not a donation.

Reason No. 3.  Gadio told you that he fully understood that the $2 million was an attempted bribe.

Now as I've already discussed, the defendant's own words and actions, captured in hundreds of emails and other documents, prove that he intended the $2 million as a bribe.  But you actually don't even need to rely on those documents because you can find the defendant guilty based on the testimony of Cheikh Gadio alone.

Gadio witnessed the events in Chad in December 2014 up close.  And based on what he saw and what he heard, and based on what he knew about the defendant's and CEFC's objectives in Chad, he knew right away that the defendant intended the 2 million as a bribe.

"Q.  When you learned about $2 million in those gift boxes, what was your reaction?

"A.  I was surprised and I was shocked, too.

"Q.  Why were you shocked?

"A.   Because in any way I can think of, $2 million in cash and in gift box, I can only think of bribery attempts."

Gadio told you that President Deby also immediately knew it was a bribery attempt.  That's why, when President Deby confronted the defendant and his accomplices, Deby said, at the bottom, "I was very angry because I don't know why people believe all African leaders are corrupt."

President Deby knew right off the bat that that money was meant for him as a bribe.

Gadio also told you about his own reaction when he heard the CEFC delegation's claim that they had intended the money as a donation.  And Gadio told you all the reasons that he didn't believe that excuse.  For one, he knew very well the established international protocols for major donations.  He said that real multimillion-dollar donations are sent by wire or check to the national treasury, or maybe to a charitable organization, but they're not paid in cash, stuffed into gift boxes, handed to the president at the end of a business meeting.

Gadio also emphasized that neither the defendant nor any one else from CEFC had said anything about the donation ahead of time.  They said nothing to Gadio; they said nothing to President Deby.  And this point was obvious to Gadio.  If it had been a real donation, the defendant and his accomplices would have said so beforehand.

For example, Gadio testified, "it was difficult to believe that a donation of $2 million could be made that way, like in a gift box, and then it was delivered, not even told to the person, like to the president."  At the bottom of the quote, he said, based on all of this, "I could not really believe that it was anything else but a bribery attempt."

Here's another example.  He testified, "I could not understand a delivery of $2 million once again in a gift box and in cash, and I believe it was smuggled in a pack of -- a series of gift boxes, and we were not informed, we were not aware, nobody knew."

And he says at the bottom, "We really believed it was... meant for the president, because when you make a donation of $2 million to a country, you know, everybody knows the way to do it properly."

How do you know that you can credit Gadio's testimony?  Three reasons: demeanor; incentive; and corroboration.

First, Gadio's demeanor was the same on direct examination as it was on cross-examination.  He sat on that witness stand over the course of three days.  He answered questions patiently from both sides.  He didn't dodge the difficult questions.  He straight up admitted that he continued to assist the defendant after learning that CEFC had tried to bribe the president.  He said, "I knew it was wrong and I continued to help CEFC to pursue its interests in Chad."

Gadio admitted that he was hoping to make millions of dollars if CEFC completed a deal in Chad.

Second, incentive.  Take a look at Gadio's nonprosecution agreement if you like.  It's in evidence. Here's how it works:  Tell the truth, don't get prosecuted; lie, get prosecuted.

Third, corroboration.  Think about whether what Gadio said, what he testified to, is supported by all the other evidence in this case.  And it absolutely is.  The documents show that back when these events were happening in realtime, Gadio viewed the $2 million as an attempted bribe.

Let's just take two easy examples right off the bat.

Couple weeks after the December 2014 meeting in Chad, Gadio was exchanging text messages with his son, who was also his business partner.  And they were discussing the fact that CEFC still had not responded to Gadio's repeated requests for a formal contract.  And here's what Gadio's son wrote.  He said, "I sincerely think they will reply favorably... their attempt to buy the president to put us to the side did not work."

That was December 21, 2014, three years before Gadio was arrested in this case.  And back then, just days after the incident in Chad, Gadio and his son viewed the $2 million as an attempt by the defendant and his accomplices to buy the president.  In other words, right from the start, Gadio understood that the defendant had offered a bribe, plain and

Ic41ho1                       Summation - Mr. Zolkind

simple.

Here's another example.  In early February 2015, Gadio sent a letter responding to the defendant's proposal to pay him only a hundred thousand dollars.  And what did Gadio say to the defendant?  "It is difficult to comprehend a 2 million dollar gift to the president and only one hundred thousand dollar to the facilitator who made all of this possible."  Gadio sent this letter about two months after the incident in Chad and about three weeks after the defendant and Gadio had sent that so-called donation letter to President Deby.  And yet in this letter to the defendant, Gadio didn't mince words.  He didn't call it a $2 million donation to the people of Chad.  He called it a gift to the president.  Because he knew full well, and the defendant knew full well, that CEFC had intended that money for the president's personal benefit.  In fact, that's the whole reason why Gadio was comparing the amount that the defendant proposed to pay him to the amount that the defendant had already paid the president.  Gadio knew that from the defendant's perspective, both payments, to the president and to Gadio, both payments were just costs that CEFC was willing to pay to get business in Chad.  There was nothing charitable about either one.

Ladies and gentlemen, Gadio's testimony was absolutely devastating.  And it was completely supported by the other evidence in this case.  If you believe Gadio, that's it.  The

Ic41ho1                    Summation - Mr. Zolkind

defendant is guilty on the Chad scheme.  But there's even more evidence, and let me keep going.

Fourth reason.  You know the defendant intended the $2 million as a bribe because his actions in Chad were not an isolated event.  This was not the only time he called something a donation or a contribution when it was really part of an exchange.  This for that.  Money for business.  In fact, there are at least three other examples of the defendant doing essentially the same thing.

First, there's the entire Uganda scheme.  Now I'm going to discuss that scheme in detail, so I'm not going to spend time on it right now, but just think about the fact that in that scheme, the defendant wired $500,000 at the explicit request of a foreign official and at the exact same time that the defendant was pursuing business in Uganda.  And the defendant called that a donation too.  The fact that the defendant carried out the same corrupt playbook in Uganda gives you tremendous insight to what he intended in Chad.  He may have called it a $2 million donation, but he meant it as a bribe.

Second, there's the phone call; the recorded phone call you heard regarding a major contribution to John Ashe.  Think about what the defendant said when he did not know he was being recorded.  John Ashe was the president of the UN General Assembly, or PGA, during the year before Sam Kutesa.

Here's the transcript of that call.

PGA's associate calls the defendant and asks, "Have you made some contribution to him?"

The defendant responds, "Yeah, we already paid."  And then the defendant goes on, "Well, it's not a whole lot, but it's a token on a couple of occasions.  But I think the major contribution will come in after we talk about what he can -- what he can help us with."

And then PGA's associate says, "Okay, all right.  What do you mean major contribution?  After he leaves the job?"

And the defendant says, "Yes, yes."

And by the way, I'll get to this when I get to the Uganda scheme, but keep in mind, when did the defendant wire that $500,000 to the account provided by Sam Kutesa?  Just shortly after Kutesa left his position as PGA.

(Continued on next page)

MR. ZOLKIND:  So the defendant says, yes, yes.

And then the PGA's associate says, OK.  He may need some money before he leaves the job.

The defendant responds, well, I think it's something that we can talk and negotiate, you know.  And he says, yeah, we've done something like that already.  And he says, we did -- that's how we got him in Hong Kong.  And he goes on to say that's not a problem.  The problem is -- it's give and take.

And PGA's associate says, yes, give and take. That's -- of course.  This is the business, right?

And then the defendant responds, yeah, right.

Folks, it's all right there in a four minute phone call.  The defendant said he was willing to provide a major contribution to Ashe, but it would depend on what Ashe could help us with, meaning what would CEFC get in return.

The defendant literally said it's give and take.  The give was the money that Ashe wanted, and the take -- the take was exactly what the PGA's associate said clearly, it's business.  And the defendant agreed 100 percent it was business.

Real donations, real contributions, are not give and take.  Charity is about giving, maybe hoping to build some good will in the process, but it is not about giving and getting something back in return.  But that's what the defendant was focused on in this phone call, and that tells you everything

you need to know about what he really meant and what he really intended when he provided that $2 million so-called donation to President Deby.

Finally, let me give you a third example of the defendant calling something a donation when that's not at all how he intended it.

As you may recall, the defendant promised Gadio that CEFC would donate $100,000 to host a nonprofit event in Senegal. But the event came and went, and the defendant failed to make good. What did he do instead? The defendant just lumped a $100,000 so-called donation into what he described as Gadio's consulting fees.

Now, as Gadio testified, this made no sense. A donation to a nonprofit organization should be completely separate from payment to Gadio for his work. But to the defendant it was all the same: Call it a donation, call it a consulting fee, it was just money the defendant was willing to spend to get CEFC business in Chad. That's why the defendant wired the full amount straight to Gadio's business account at Sarata. The defendant did not even pretend to separate out this so-called donation.

Finally, the fifth reason you know the defendant is guilty of scheming to bribe President Deby is the deception he used throughout the scheme.

First, there is the overriding deception of the

defendant doing the bidding of a powerful oil company from his perch as the head of a nonprofit charitable NGO.  Now, you may remember in the defense's opening statement Mr. Rosenberg said that there is nothing unusual about a big company having a nonprofit foundation, and he said, "Part of the defendant's job was to look for business opportunities for CEFC Energy, to network and to build good will around the world for CEFC Energy," and he said, "There was nothing at all hidden about this."

Folks, it may be normal for big companies to have nonprofit foundations, but there was nothing at all normal or above-board about the way the defendant operated in this.  If he had simply introduced CEFC executives to Gadio and then gone back to his nonprofit work at the UN, that would be one thing, but right through mid-2015 the defendant remained the key player from CEFC trying to win an oil deal in Chad.

Here is a text message from the defendant to Gadio in March 2015, during his third trip to Chad.  The defendant was literally negotiating the deal terms, offering $200 million in U.S. dollars along with arms and discount renminbi loans in exchange for those ten percent oil rights held by the Chadian government.  This is from the defendant.  That's a far cry from how he presented himself at those UN events and NGO meetings.

Think about David Riccardi-Zhu's testimony.  Remember, he worked at the CEFC NGO, reported directly to the defendant,

and said that he had no idea that the defendant was jetting around the world negotiating business deals for CEFC.

"Q.  Did the defendant ever tell you whether he did any work on behalf of the CEFC company?

"A.  He did not.

"Q.  Through your work at the NGO, did you ever learn of any connection between the work of the NGO and the work of the company that funded it?

"A.  I did not know of any official connection."

Vuk Jeremic also testified about this.  Remember Jeremic was paid over $300,000 a year to help the defendant open doors for the CEFC oil company around the world.  But he told you that when the defendant made public speeches at the UN and at NGO events -- many of which Jeremic attended -- Jeremic never heard the defendant mention the company.

"A.  I don't recall him talking about the company in those speeches."

Ladies and gentlemen, the defendant maintained a public persona as the head of a nonprofit UN-affiliated NGO, with an office right here in the United States; he gave speeches and held meetings on global policy issues; and that gave him access to world leaders right here in Manhattan, in the halls of the UN, and at the restaurants, hotels and apartments that surround it, but secretly he was trying to score concrete business deals for the company.  This deceptive

arrangement was anything but normal.

Another major act of deception in the Chad scheme was the defendant's after-the-fact effort to write a letter characterizing the bribe as a donation.  Now, as the defendant initially drafted it, the letter was a downright lie.  He wrote that CEFC would wish to make a donation, as if the money had not already been handed over.  But even setting aside that specific falsehood, the whole concept of the donation letter was deceptive.  From CEFC's perspective, it was all just an effort to paper over a bribe and make the problem go away.

By the way, in the defense's opening statement Mr. Rosenberg told you that the $2 million was accepted as a donation by the government of Chad.  Ladies and gentlemen, whether or not that is true, it is totally irrelevant.  The crime was complete at the moment the cash was offered as a bribe.  And for the conspiracy count the crime is complete even earlier, at the moment the defendant and his accomplices agreed to bribe the president of Chad.  Nothing that happened afterwards could undo the crimes that the defendant had already committed.  A bribe cannot be transformed into a donation with an after-the-fact letter.  As of the moment that those gift boxes were presented to President Deby, the defendant was guilty of the Chad scheme.

What else was deceptive about the Chad scheme?  The defendant wrote a lot of reports to his boss, the chairman.

You have seen those records; you have seen the English translations. Did you notice there is no report regarding the $2 million payment? Not even a report calling it a donation. The whole subject is literally never mentioned.

Well, here is an e-mail from the defendant to his assistant Zhang Ya on November 20, 2014. That's about a week after CEFC's first meeting in Chad but before the second, and the defendant wrote, "jobs for these two days," and he included a list of various tasks. Number five was reports to Ye. That's the chairman. And the defendant included a list, including Croatia oil company, Israel oil company.

Let's go to item H on the list: Chad business with the president and his friend and middleman Dr. Gadio. Discussion in person."

Why discussion in person? Because some subjects are too sensitive even for a confidential report.

When you put all of this evidence together, there can be no question that the defendant is guilty beyond a reasonable doubt of scheming and conspiring to bribe the president of Chad.

Let's turn to the Uganda scheme. Now, I have already talked about three critical facts that cannot reasonably be disputed as to the Uganda scheme: The defendant wanted business in Uganda; he wanted to influence foreign minister Kutesa and President Museveni to take actions for CEFC's

benefit; and he directly participated in paying and offering things of value to both officials.

So, again, like the Chad scheme, that really only leaves one question:  Was there a connection?  When the defendant offered and paid this money to Kutesa and Museveni, did he intend to obtain business advantages for CEFC in return?  And the answer is a resounding yes.  Just like the Chad scheme, there are five reasons you know beyond a reasonable doubt that the defendant intended these payments and these offers as bribes.

Reason number one, I want to start by focusing on the $500,000 that the defendant wired to the account provided by the foreign minister Sam Kutesa.  As I said before, actions speak louder than words.  The defendant may have called that wire a donation to a so-called foundation, but his actions prove he intended it as a bribe.

So, let's start with the initial solicitation. February 2016 Sam Kutesa, back in power as foreign minister of Uganda; President Museveni has just won reelection.  Kutesa's wife Edith e-mails the defendant, copying her husband, and she requests a "contribution/donation for a foundation which Sam Kutesa wishes to launch as soon as possible."

Here is how the defendant replies.  The defendant says, "We want to reconnect and catch up with you and renew our friendship as well as our mutual agreement and commitments."

IC47HO2                          Summation – Mr. Zolkind

That's his first response to the request.  He didn't even mention the so-called foundation.  He couldn't have cared less of how Kutesa labeled it.  Instead, the defendant chose very deliberate language:  "We want to renew our mutual agreement and commitments."

Ladies and gentlemen, charitable donations are not about mutual commitments.  There is nothing mutual about charity.  You give a charitable donation maybe hoping to build good will, but not expecting to get something directly in return.  But here the defendant was not even pretending that this was about a charitable donation.  The language he used, "mutual agreements and commitments," should remind you of something.  You have heard very similar language before.

(Audio played)

Mutual commitment, give and take, they are both just another way of saying this for that.  And, folks, that is bribery, not charity.

OK.  So, how did Kutesa and his wife respond?  Well, they pushed again for the contribution, but this time they dangled a tantalizing business opportunity in the exact same email.  They said Barclay Bank in Africa may be for sale, and they called it a great opportunity in the banking sector in Africa, because the Kutesas understood the winks and the nods, and they were playing along.

Remember in the Chad scheme I talked about the fact

that the defendant drafted that so-called donation letter in the exact same e-mail in which he worked on a contract to require the Chadian government to help CEFC get oil rights? Well, this is the same point.  The defendant and the Kutesas were supposedly talking about a charitable contribution, but the context makes clear what was really going on:  They were negotiating an exchange of money for business advantages.

The defendant wrote back next.  He had spoken to his boss the chairman, and he was onboard.  So the defendant wrote, "Yes, the chairman will make good his pledge of donation to support Sam," meaning Kutesa.  Once again, the defendant did not make any reference to a foundation.  Just from the defendant's perspective, all he knew was that this money was going to benefit the Kutesas one way or another.

Instead, the defendant got right down to business, making clear what he and CEFC expected in return for this money.  They wanted "VIP invitations to witness the president's inaugeration," meaning President Museveni.  And the defendant demanded a list of all the major projects from infrastructure, energy, agriculture, finance and banking.  He said they would bring in an entourage of business executives from CEFC to kick-start each project.  This was the exact same e-mail that the defendant promised to provide a so-called donation to support Sam Kutesa.  And again, folks, money for business is bribery, not charity.

The Kutesas replied the same day, asking how many people would be in the CEFC entourage, and the defendant immediately responded, "The size of the entourage is actually dependent on the number of projects the president and Sam" -- meaning Kutesa -- "want to engage China with.  It can be anything from energy, agriculture, infrastructure, tourism, banking and finance to stock market.  Our company is now holding interests in all of these fields and sectors."  The defendant closed by saying, "What can come out of this occasion can only be limited by what can be imaged."

Keep in mind, ladies and gentlemen, the defendant had not wired the money yet.  He had promised it, but first he wanted to ensure what he and CEFC would get in return.  He sent multiple e-mails to follow up back and forth; I won't go through all of them.  But about a week later the defendant sent yet another e-mail on the same subject.  He said, "CEFC has most recently signed deals in Czech" -- meaning Czech Republic, Eastern Europe -- "amounting in excess of $1.8 billion U.S." He goes on to say, "While almost every Eastern European country is now trying to get CEFC to repeat what we did in Czech, we wish to engage Uganda as our first stop in Africa."

This should sound familiar too.  It's almost exactly what the defendant told Gadio, only about Chad -- not Uganda -- that CEFC wanted to make Chad its gateway to Africa.  The defendant had a clear mission:  To bring CEFC into Africa.  And

IC47HO2                         Summation - Mr. Zolkind

he was more than willing to throw money at public officials to pave the way.

Sure enough, once he felt assured of what CEFC would be getting in return, the defendant wired $500,000 to the account that the Kutesas had provided.  Actions speak louder than words.  And by his actions the defendant treated this money as a bribe.

So then the defendant and his accomplices flew into Uganda on a private jet; they attended President Museveni's inaugeration; they attended a private dinner at foreign minister Sam Kutesa's home, along with other government officials.  They met privately with Uganda's oil and energy minister.  In fact, you can see them staring up at a map at what appears to be oil fields.  And they got their private meeting with President Museveni.

Folks, the $500,000 wire was not just a payment for a series of high-level meetings, not by a long shot.  Here is an e-mail that the defendant sent to his assistant Zhang Ya about a day after returning from Uganda.  Subject line:  Main points of Uganda possibilities.

And the defendant provided a list of specific ventures for CEFC to select from, a menu of business advantages purchased through bribery:

Number one, Energy:  Still some blocks to be licensed out.

Number two, infrastructures.

Number three, Finance:  Possibility of acquiring Barclay Bank.

Four, agriculture.

Five tourism.  They agreed to give us a piece of land by the lake, or an island in the lake to develop into a resort area with hotels, shopping centers, casino, recreation parks, and a Chinatown, boosting tourism from China.

In a report to his boss the chairman the defendant described how successful the trip had been, and with respect to Uganda's oil field the defendant wrote, "No matter which aspect we are interested in, participation is possible.  Even if the bidding process for a project is completed, it can be reversed and restart again."

Think about how unfair that is to business people who follow the rules, who didn't pay bribes to get an advantage. Do you think President Museveni was going to reverse and restart the bidding process for them?

In the same report the defendant also talked about business opportunities in banking, infrastructure, tourism and other sectors.

Finally, here is the culmination.  About a week later the defendant and others at CEFC had considered that menu of Uganda options, and they had decided that CEFC's first priority would be to buy a bank.  The defendant e-mailed Kutesa and his

IC47HO2                    Summation - Mr. Zolkind

wife Edith, and he said, "We are particularly interested in the possibility of acquiring controlling shares of Barclays Bank Africa in Uganda, and would like very much to request your assistance in going about doing so.  If this first step is successful, the doors are widely open for any future undertakings in the country and in the region.  This will be our first priority and please work with us to accomplish this."

In the same e-mail the defendant also tried to make clear that the $500,000 wire, that was just the first taste of what he had called their mutual agreement and commitments.  He said, "CEFC wants to work with you and the Kutesa family."

Now, Edith Kutesa wrote back right away, copying her husband, and she said, "We appreciate your interest in Uganda and are excited to work together."  But that wasn't really the concrete commitment the defendant expected, so he wrote back right away, and this time he was much firmer.  Instead of starting with "Dear Edith," he just said "Edith," and he wrote and emphasized, "Please allow me to reiterate our decision and strategies regarding Africa.  CEFC would like to partner with the Kutesa enterprise and would like to invest through you and with your family businesses (and the President's) who can be the local operators."

What was the defendant saying here?  It is crystal clear:  Steer this business deal to us, and as CEFC profits, you and the president will cash in too.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ladies and gentlemen, it was no surprise that the defendant was making these serious demands of the highest public officials in Uganda.  He and CEFC had paid good money for that privilege.  Would he be making those demands if CEFC had merely donated $500,000 to a charity in Uganda?  Of course not.  You know he intended that money as a bribe because he treated that money as a bribe.

And, sure enough, the defendant got what he wanted.  A few months later Kutesa's wife reached out again, subject line: Opportunity to invest in banking sector.  And she wrote, giving the defendant an inside track on a very confidential and urgent process, to sell a bank.  This for that.  Money for business.

Reason number 2.  Not only does the evidence show that the defendant treated the $500,000 like a bribe; it also shows overwhelmingly that he did not treat it anything like a real charitable donation.

For starters, if the defendant had wanted to make a charitable donation to build good will in Uganda, why didn't he do it during the year that Sam Kutesa was serving as PGA in New York?  Why did he instead wait until Kutesa had returned to Uganda as foreign minister?  Because that was when Kutesa was finally in a position to steer business to CEFC.

And then after the Kutesas solicited the payment in February 2016, the defendant didn't ask a single question or write a single e-mail about any so-called foundation.  In all

of the e-mails with Sam and Edith Kutesa and his internal CEFC e-mails you saw in this case, never once did you see an example of him even mentioning -- even mentioning -- a so-called foundation, let alone discussing its mission or its work.

Now, days after wiring that $500,000, the defendant led a CEFC delegation on a trip to Uganda, and you have seen photos and various e-mails and reports summarizing what happened during that trip.  Did they visit the supposed foundation?  No.  Was there any ceremony where the defendant presented a big check to the foundation?  No.

If this had been a real donation in Uganda, at a bare minimum -- bare minimum -- the defendant would have issued a press release.  If the defendant and his NGO had truly made a $500,000 donation to a charitable donation in Uganda, they absolutely would have issued a press release.  And again you know this because you have seen the press releases they issued.

For example, "CEFC works with UN DESA to support small scale artisanal fisheries."  That's just one example.  But if that deserved a press release, don't you think a $500,000 donation did too?

You have also seen the press releases about CEFC's donations to the UN, a million dollar donation and other causes.  And in fact CEFC, the NGO, did issue a press release about this Uganda trip.  We can see there is the defendant shaking hands with President Museveni with Sam Kutesa just next

to Museveni, and yet this press release doesn't say a thing about any sort of donation -- you can read it; it's in evidence -- and why not?  Because it wasn't a donation.

Here is what Riccardi-Zhu testified:

"Q.  So now let me ask you, if he" -- meaning the defendant -- "had been involved in making charitable donations in Uganda, what is your impression as to whether or not he would have mentioned it in a press release?

"A.  My impression is that it would have been mentioned in a press release if it reflected well on the NGO.

"Q.  While you were working at CEFC, did you ever learn of any donation that the defendant was involved in to a Ugandan charity or foundation?

"A.  I did not."

Again, ladies and gentlemen, I said it again and again, actions speak louder than words.  The defendant may have labeled it a donation, but his actions proved that he intended it as a bribe.

Reason number three.  The $500,000 wire was not the only bribe offer in Uganda.  The defendant also schemed to offer two additional bribes.  One of them I have already talked about, and that's the defendant's offer to give President Museveni and Sam Kutesa a cut of CEFC's future profits from any venture in Uganda.

Do you think the defendant did any sort of due

diligence to see whether Museveni and Kutesa's so-called family businesses or enterprises were competent to operate a bank as part of a joint venture with CEFC?  Of course not.  This was just days after the defendant's trip to Uganda.  But this was the president and the foreign minister of the country, and that's what mattered, not whether they would be helpful business partners.  This promise to partner with them was in and of itself a distinct bribe offer.

OK.  Now let's talk about the defendant's scheme to provide $500,000 in cash to President Museveni.  Here is the report the defendant sent to his boss, the chairman of CEFC, as the defendant was preparing to travel to Uganda.  He labeled the report, you can see at the top highly confidential, super urgent.  And he wrote, "Regarding your early promise of support of campaign funds of $500,000 to President Yoweri" -- Museveni -- "it was also brought forward euphemistically by the party.  If you would make this trip to Kampala" -- the capital -- "it's suggested that it would be best to give it to the president's representatives directly in the form of cash."

Then about a week and a half later the defendant's assistant Zhang Ya received an e-mail from a CEFC employee, and the employee stated that "the $500,000 U.S. donation to the Ugandan presidential re-election campaign will be dispatched today."  Zhang Ya forwarded that e-mail to another employee while copying her boss, the defendant, and she wrote and

instructed that that employee contact the bank for the matter of getting $500,000 U.S. ready on May 10. That's one day before they flew to Uganda.

The defendant also e-mailed Sam Kutesa an urgent request before they took off for Uganda, and he said, "We are preparing to bring with us some very "nice" gifts to your president and to Minister Kutesa" and he said, "We shall require special assistance with your customs procedure."

Now, was the defendant referring here to $500,000 cash? It is certainly a fair inference. You do know from the photos that you've seen that the CEFC delegation brought actual gifts with them to Uganda, but then you also know from the Chad scheme that the gift boxes presented to President Deby had cash in them. Ultimately it doesn't matter, because the documents make clear that the defendant schemed and conspired to offer $500,000 in cash to President Museveni, and that is a crime separate and apart from the $500,000 wire to the account provided by Foreign Minister Kutesa.

Nor does it matter that the defendant characterized this cash as a campaign donation. In the exact same report to his boss, he said explicitly that President Museveni had already been re-elected. In fact that was in the first e-mail from Kutesa back in February 2016. And in this his report the defendant also wrote that "since the last of names of the new-term cabinet ministers of Uganda won't be announced until

after May 12, the party is also planning that, on the following day of the announcement of the cabinet selection, to arrange for meetings and specific project negotiations between the newly selected ministers in the relevant fields (such as energy, finance and transportation) and our"-- meaning CEFC's -- "counterparts."  It was money for business.

Folks, remember I said before that a bribe cannot be transformed into a donation just by calling it one?  The same is true here.  The defendant's words and actions make clear that despite labeling it campaign contribution, he intended the money as a bribe.

Reason number four.  As in the Chad scheme, the Uganda scheme was not an isolated event.  I have already gone through this, so I won't repeat it here.  But the bottom line is that the defendant has done the same thing again and again and again, and that should give you tremendous insight into his intent.  The $2 million in cash to President Deby, the $500,000 wire to Kutesa, the $500,000 cash to President Museveni, the offer to give Kutesa and Museveni a share of CEFC's profits in Uganda, and that recorded phone call about giving a major contribution to the PGA John Ashe as part of a give-and-take, after seeing how Ashe could help CEFC, this pattern of conduct proves what the defendant's intent was in this case:  To offer money to foreign officials in exchange for business for CEFC.

The fifth and final reason you know the defendant is

guilty on the Uganda scheme.  Like the Chad scheme, it's his deception.  The defendant used the same overriding deception as the Chad scheme.  He portrayed himself as acting on behalf of a charitable nonprofit NGO based in part in the United States, while his true agenda was to get business for the oil company.

Look at how the defendant introduced himself when he was first trying to get a meeting with Sam Kutesa, the new PGA of the UN.  He wrote to Kutesa's chief of staff, "This is Patrick Ho, deputy chairman and secretary general of China EnergyFund Committee, a Chinese think tank registered in Hong Kong and also in the USA as a public charity.  We are also granted special consultative status from UN's Economic and Social Council."  Not a peep about the oil company.  Because it wasn't until the defendant got behind closed doors with Kutesa that he made his and CEFC's true intentions known.  As I said before, the arrangement was deceptive and it was deliberate.

The Uganda scheme shares another similarity to the Chad scheme.  The defendant wrote lengthy reports to his boss, the chairman of CEFC.  Never once did he say anything about a foundation in Uganda.  Never once did he say anything about any sort of charitable donation in Uganda.  If the $500,000 had been a real donation, don't you think that the defendant would have mentioned somewhere in one of these reports that Kutesa thanked CEFC for its generous donation?  Of course he would have.

Now, in the defense's opening statement Mr. Rosenberg said that the defendant "asked for and received a letter from the foundation acknowledging the donation."  Mr. Rosenberg was presumably referring to this e-mail from Kutesa's wife Edith: In October 2016, nearly six months after the defendant wired the money, Kutesa's wife e-mailed the defendant a short letter as a receipt.  The letter was backdated to June 2016.  Folks, this was a bare minimum effort to create just enough of a paper trail to justify that wire.  And, as you saw, they sent the letter to CEFC's bank, HSBC Hong Kong, to avoid raising any suspicion about that massive wire.  Because remember what happened to Gadio when he couldn't provide a contract to justify the payments that he had received from CEFC?  The bank shut down his account.  It was just a charade, just like the $2 million cash offered to President Deby, the $500,000 looked nothing like a real donation.  No publicity, no press release, no contract, just an after-the-fact effort to try and cover it up.

Finally, let's talk about the charges.  There are eight separate counts.  Counts One through Five relate to violations of the Foreign Corrupt Practices Act or the FCPA.  Counts 6 through 8 relate to money laundering.  I will cover the FCPA charges first.

So, in Count One the defendant is charged with conspiring to violate the FCPA.  And, as I expect Judge Preska

will instruct you, a conspiracy is just another word for an agreement to break the law.  He is charged with conspiring or agreeing with fellow members of CEFC to violate the FCPA.  And if you find beyond a reasonable doubt he conspired to bribe officials in Chad, or Uganda, or both, he is guilty under Count One.

Counts Two through Five charge the defendant with substantive violations of the FCPA.  There's two counts for each scheme because there are two different types of FCPA violations.  So, let me just briefly go through the elements of the FCPA charges.  Again, remember Judge Preska will instruct you on the law; this is just meant as an overview.

The first element is that the defendant offered, paid, promised or authorized the payment of any money or gift or thing of value.  First of all, an offer or an attempted bribe is itself a violation of the law.  It does not matter whether the offer is accepted or rejected.

So, in the Chad scheme the defendant offered the $2 million in cash.  In the Uganda scheme he paid a $500,000 wire, a scheme to offer another $500,000 in cash, and he explicitly offered a share of the profits of any future venture.

The second element is that the thing of value is offered or paid either to a foreign official or to any person or any entity knowing that there is a high probability that that person or entity will offer or pay it to the foreign

official.  So, as to the Chad scheme the $2 million was offered directly to the president; as to the Uganda scheme, the $500,000 was wired directly to an account provided by the foreign minister.

So, on the Uganda scheme, this element is satisfied if you find either that the defendant knew there was a high probability that the $500,000 in whole or in part would benefit Kutesa personally, or if you simply find that by funding Kutesa's personal so-called foundation the defendant intended to provide Kutesa with a thing of value.  And the evidence in this case shows that both are true.

You can also find this element satisfied on the Uganda scheme based on the other financial benefits that the defendant offered directly to both Kutesa and Museveni, which I've already talked about.

The third element is that the defendant acted corruptly and willfully.  Judge Preska will define these terms for you, but it's not complicated.  This is the main element that's in dispute in this trial; it's what I have spent most of my time this morning talking about.  If you find that the defendant offered or paid those things of value as bribes rather than as donations, then this element is satisfied.

The bottom line is that the defendant acted corruptly and willfully because for all the reasons talked about today he knew that what he was doing was wrong.

The fourth element is that the defendant took these actions at least in part to influence the official acts of a foreign official or to secure any improper business advantage. I've already talked a lot about this too. The defendant and his accomplices did not want to compete for business on an even playing field. In both Chad and Uganda they offered and paid these bribes to influence top officials to take actions in their official capacities, to give CEFC an unfair advantage.

One other point. The FCPA does not require proof that CEFC actually obtained any business as a result of these bribe offers. As long as the defendant intended to obtain an unfair business advantage, he is guilty.

The fifth and final element is that the defendant falls within the FCPA's jurisdiction. Now, I mentioned there are two types of FCPA violations. So, Counts Two and Three are what is referred to as the domestic concern accounts.

In order to convict on these counts, you must find that the defendant took actions in his capacity as an officer or director of what is called the domestic concern -- which is a fancy word for an entity that is based here in the United States. This element is also easily satisfied.

You heard about CEFC USA, which is the U.S. branch of the CEFC NGO. From at least 2014 to 2017, the whole time period of this case, the defendant was an officer and a director of that entity based in Virginia. The defendant was

IC47HO2                      Summation - Mr. Zolkind

the secretary general of the CEFC NGO, and you saw and heard that he was a signatory on CEFC's bank account at HSBC in Hong Kong, and you saw that that was an account that he used to provide hundreds of thousands of dollars in funding to the U.S. branch.

You have also seen extensive evidence in this case about how the defendant used his status as the head of a nonprofit NGO registered as a charity here in the United States to carry out these schemes. He gained access to Gadio and Kutesa through meetings at the UN here in New York, in Manhattan. His NGO position also gave him cover to call these payments bribes

Now, for the other FCPA charges, Counts Four and Five, the jurisdictional element is satisfied if you find the defendant took actions within the territory of the United States in furtherance of this corrupt scheme, and for these counts you don't need to worry or think about any domestic concern.

This chart, Government Exhibit 2603, shows 12 separate trips the defendant took to the United States during the time period of this case. In the last column you can see a selection of relevant e-mails and text messages that the defendant sent from the United States in furtherance of this corrupt scheme. Every time he sent a text message or an e-mail from the United States in furtherance of the Chad scheme or the

Uganda scheme, it satisfies this element of FCPA.  And this element is also satisfied by the defendant's meetings right here in the United States, like his meeting with Gadio at Trump World Tower in Midtown, Manhattan, and his multiple meetings with Kutesa at his New York residence and at the United Nations.

Finally, let me turn to the money laundering charges. Counts Six through Eight charge money laundering.  Count Six is the conspiracy count.  In order to convict the defendant, you need to find that he agreed with one or more associates of CEFC to violate the money laundering statute as to the Chad scheme or the Uganda scheme or both.

Counts Seven and Eight charge substantive violations of the money laundering statute, again one for each scheme.

So, the money laundering statute has two elements: First, the defendant sent money into the United States or out of the United States or both.  And that's easy.  For the Chad scheme the defendant sent two wires -- each one of $200,000 -- to compensate Gadio.  And for the Uganda scheme he sent a wire of $500,000 to that account provided by Sam Kutesa.

You can see easily -- and Ms. Calabrese from HSBC testified to this -- you can see that each of these wires went from Hong Kong in China to New York, and then from New York to a foreign bank account either in Dubai or Uganda.  So in each case the wires entered the U.S. and exited the U.S.

IC47HO2                    Summation - Mr. Zolkind

The second element is that the defendant transferred the money to promote foreign bribery crimes. And of course his wires to Gadio and Kutesa promoted the Chad and Uganda schemes. He needed to pay Gadio in order to get access to President Deby. And the wire to Kutesa was the bribe itself. This element, by the way, can alternatively be satisfied if you find that the defendant violated Chadian or Ugandan bribery law and that the wires promoted those violations. And Judge Preska will instruct you on Chadian and Ugandan law.

Ladies and gentlemen, I'm about to sit down. I'd like to leave you with just a few final thoughts. Why is it that the defendant offered and paid millions of dollars to the most powerful officials in Chad and Uganda at the exact same time that he was pressing them for business? Was it because he thought that $2 million cash stuffed inside a bunch of gift boxes and presented to the president of Chad would go to benefit children and refugees in Chad? Was it because he thought $500,000 wired to an account provided by the foreign minister of Uganda would benefit a foundation he never mentioned even once in a single e-mail or report? Was it because he thought $500,000 cash would support the re-election of the campaign of President Museveni of Uganda, who had been in office for 18 years and just been reelected? Was it a sheer coincidence that the defendant offered and paid this money at the exact same time that he was seeking to influence these

officials to steer business to CEFC?  After the evidence you heard at this trial, the answers to these questions are clear: Of course not.  The defendant offered and paid this money because he believed it would benefit these officials personally and because he believed that by paying this money he would secure business advantages for the oil company he served.

The defendant committed serious federal crimes, and make no mistake, what he and his accomplices did caused harm. As I said before, foreign corruption undermines the public's confidence in international markets; it destroys people's faith in their leaders; and it is deeply unfair to the people who play by the rules.

The only verdict consistent with the law, the overwhelming evidence, and your common sense, is that the defendant is guilty.

THE COURT:  Thank you, counsel.

Now, ladies and gentlemen, one way or the other we're going to take a break.  I understand from defense counsel that they estimate that their closing will be about 90 minutes. Would you let me know if you want to take a break and come back and hear it now, or if you want to take a lunch break and hear it after.  Confer among yourselves and let me know.

Just so you know, defense counsel will make a closing, and then the government will make a rebuttal closing -- which obviously will not be this long -- and then hopefully I will

have time to charge you today.  So that's the plan.  So let me know what suits your convenience.

JUROR:  I think we'll take a lunch break, your Honor.

THE COURT:  All right, we will do that.

Before you go, I want to point something out.  As you know, as you have been walking in and out of the courthouse we have those beautiful sketches downstairs depicting various trials.  Two people who made many of them are with us today. Aggie, stand up.  Jane -- stand up, Ms. Rosenberg.

When you go downstairs, watch, and look at those beautiful sketches and see the ones by Ms. Kenney and Ms. Rosenberg.

Now, as you take a lunch break, would you be kind enough to follow the usual instructions:  Don't discuss the case; don't do any research about the case; leave your notes. Let's try to do it in an hour.  So let's run back and be ready to start at one o'clock, please.

Thank you, ladies and gentlemen, for your attention this morning.

(Jury not present)

THE COURT:  Ladies and gentlemen, let's let the jurors go down so they can get back up fast.  So if you would stay in the courtroom until we get word that they're down, please.

Anything else on the record, friends?

MR. KIM:  Not from the defense, your Honor.

MR. ZOLKIND:  Your Honor, one very short issue. Government Exhibit 2603 makes reference to a number of government exhibits, two of which were ultimately not offered or admitted at trial.  We took them off the exhibit.  We sent it to defense counsel last night, so we're just requesting that the originally admitted exhibit be replaced with the new one.

THE COURT:  Yes, sir.

MR. ROSENBERG:  No objection.

THE COURT:  Off the record.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

1:04 p.m.

(In open court; jury present)

THE COURT:  Won't you be seated, ladies and gentlemen.

Ladies and gentlemen, we are now moving to the closing on behalf of the defense.  And the same rules apply.  Nothing the lawyer says is evidence.  Anything that the lawyers say about the evidence that conflicts with your recollection of the evidence, it's your recollection that controls.

So here we go.  Mr. Kim.

MR. KIM:  Thank you, your Honor.

Last Monday, you walked into this courtroom and you sat in this jury box.  You heard that this case involved bribery -- a Chinese company doing business, making payments in Africa, in cash.  And maybe you decided right then and there, that's all you needed to know.  And you know what, I get it.  It's not pretty.

Now the prosecutors want you to believe that just because there was a cash payment, this case is open and shut.  They don't want you to dig deeper.  They don't want you to look at what came before or after.  And they certainly don't want you to look too closely at their star witness, Cheikh Gadio.  Instead, the prosecutors want you to look at the cash, to be blinded by that cash, and call it a day.  Well, you cannot do that, because there is so much more to this case than that.

And if you dig deeper, if you look at the bigger picture, if you use your common sense, you'll see that there is reasonable doubt everywhere and that Dr. Ho is not guilty.

Now you've heard the government's closing argument, and now it's Dr. Ho's turn to argue his case.  But I'm not going to argue with you, ladies and gentlemen.  Instead I'd like to speak to you, about the facts, about the reasonable conclusions you can draw from those facts.

Now we're here today because the government has accused Dr. Ho, the head of a think tank based in Hong Kong, with helping a Chinese company pay bribes in Africa.  But ladies and gentlemen, there is something deeply flawed about this case.  Something rotten about the man in the middle of it, Cheikh Gadio, the man who lied from that witness stand to get a free pass.  And there is something rotten about the leaps of faith the government is asking you to make here.

Now before I go further, I want to talk a little bit about what the core issues are in this case.  And then I'm going to speak a little bit about Chad, and then I'm going to talk about Uganda.  And then I'm going to talk to you about the government's overall case.

So let's talk about the core issues here.

Now there's no dispute payments were made, and that CEFC Energy made those payments to benefit the company. There's no dispute about that.  No one is claiming these

payments were made selflessly, that they were made only because of a desire to help needy people.  We told you that at the very start of this case.  These were corporate donations.

So what does that mean?  Of course companies don't give money for nothing.  They give money because they want something.  But that doesn't make every corporate donation a bribe.  What they want is goodwill.  They want people to think well of the company, to think well of the brand.  And that's what CEFC Energy was looking for in this case.

So what's the issue?  The real issue is whether these were payments to build goodwill or whether they were bribes to obtain business.  What's the difference between those two?  What's the difference?  Bribes involve corrupt intent.  They're made with bad purpose or evil motive.  Bribes are intended to get a foreign official to misuse the official's position.  Was there corrupt intent here?  Absolutely not.  What does that tell you?  These were not bribes.  These were payments to generate goodwill for CEFC.

And remember, ladies and gentlemen -- and please keep this in mind as we discuss the evidence today -- it's the government's burden to prove beyond any reasonable doubt these payments are made with corrupt intent.

Now I want to talk a little bit more about intent.  It's actually the most important thing in this case.  You're going to hear a lot about it when Judge Preska instructs you on

Ic41ho3                        Summation - Mr. Kim

the law.  In a nutshell, you have to ask yourselves, what was going on in Dr. Ho's mind when everything happened.  And this is important.  You have to believe beyond a reasonable doubt that Dr. Ho acted with corrupt intent.  By any standard, ladies and gentlemen, the government has failed to do that.  Yes, money was passed.  And the government would love for you to make a decision based solely on that.  But you have to decide based on what was in Dr. Ho's mind at the time.  And how do you that?  You do that by looking at how he acted.  What does it tell you?  That he made no real attempt to hide what he was doing.  What does it tell you that he asked for nothing in return?  These are all windows into Dr. Ho's intent.  They're critical windows.  Because people who are committing a crime do not act this way.  People who are paying bribes and know what they're doing is wrong do not act this way.

So every time you hear Judge Preska instruct you on intent, ask yourselves, does someone who is paying bribes act like this, because the obvious answer is no.  Bribers don't write letters to document bribes, they don't email and text to negotiate the amount of the bribe, and they certainly don't walk away from the payment if they were promised something in return.  And because Dr. Ho did not act corruptly, he is not guilty of any of the charges against him.

Now I've talked a little bit about some of the core issues, and we're going to keep talking about them.  But I want

to talk now about what the government says happened in Chad. And I want to start by talking about the man in the middle of it all, Cheikh Gadio.

Now make no mistake, ladies and gentlemen. The government's case is built around Cheikh Gadio. And guess what? It is rotten at its core. I sat and I listened to Mr. Zolkind, I listened carefully, and I hope you'll do that with me as well. And as I listened to him, I kept waiting for him to come out and talk about the part of this case that just cries out. But of course he did not acknowledge it, because it's the one thing that makes the government's case fall apart. What is that thing? What is it, ladies and gentlemen? It's a simple fact. Cheikh Gadio, the government's star witness in this case, he lied to you. He tried to get CEFC Energy to bribe the president of Chad. That's right. Gadio was telling CEFC Energy to bribe President Deby. And he did it more than once. And that's why CEFC Energy distanced themselves from him. Gadio suggested to Dr. Ho that CEFC Energy should pay a bribe to Deby. He lied about that to the government, he lied about that on the witness stand, and he has never taken responsibility for his actions. He has never been held accountable. Instead, all the charges against him were dismissed. The word of Cheikh Gadio may be enough for the government, but it cannot be enough for you. With Dr. Ho's fate in the balance, it cannot. And if you can't believe

Gadio's testimony, you must acquit Dr. Ho.  If you don't believe his testimony, Dr. Ho is not guilty.  There's not enough evidence beyond a reasonable doubt of any of the charges against Dr. Ho.

So let's talk about Gadio's lies on the witness stand.  And there weren't just one or two.  And I'm not going to cover them all because, frankly, there were so many.  But here are some of the lies that stood out.

Government Exhibit 16, we spent a lot of time talking about this document.  On October 21, 2014, Gadio sent Dr. Ho a report of a meeting he had had with President Deby.  Remember, one of the sections of that was called main points from discussion of your offer.  "The president was pretty impressed when I talked about you, your work, and your offer to him, being the following."  And in this email Gadio described this point as part of the offer he made President Deby, and of course -- and remember we focused on this -- secret or very confidential financial assistance.  He told you that wasn't true, that he had not conveyed that to President Deby, that it was really his idea.  He had never spoken with Dr. Ho about it.  Gadio told Dr. Ho that CEFC should give Deby secret or very confidential financial assistance for his political campaign.  Secret or very confidential financial assistance.  It sounds a lot like a bribe, right?  Well, it turns out it was.  Remember, I asked Gadio about that.  And as it turns out, it's something

Gadio has experience with.  Remember when I first asked him if he had ever received secret financial assistance?

"Q.  Now, Dr. Gadio, you have in the past received such secret financial assistance, correct?

"A.  Me?

"Q.  Yes.

"A.  No."

What was his first response?  His instinctive response, ladies and gentlemen, was to lie.

"Q.  Isn't it true that you personally received 10 million Central African francs in cash during the campaign?

"A.  10 million Central African?  I'm from West Africa."

Now you remember Mr. Zolkind talking about Gadio's testimony on the stand.  I'm not sure if we were sitting in the same trial.  He said Gadio did not dodge questions.  He dodged questions left and right.  And he lied repeatedly.  And only after lying and trying to avoid the questions did he finally admit it.

"Q.  Did you or did you not receive cash during a campaign?

"A.  In my last -- my first presidential campaign, yes, I did.

"Q.  And isn't it true that you received this cash from an unknown courier on behalf of a Senegalese businessman?

"A.  Yes."

That's a bribe, ladies and gentlemen, and Gadio was suggesting that CEFC do the same with President Deby.

Now Gadio described this as a good old political tradition back home.  Do you remember that?  He can call it whatever he wants, ladies and gentlemen.  It's a bribe.  And within just one month of meeting Dr. Ho, Gadio was urging CEFC to offer that very kind of bribe to President Deby.  Ladies and gentlemen, that tells you all you really need to know about Gadio and the rest of his testimony.

But there were more lies.  More fabrications.  That same exhibit, Government Exhibit 16, had another section.  It was called My Apprehensions from Past Experiences.  And here's what Gadio had to say.  "China gave several millions of US dollars to our former president and I received nothing.  The president kept the whole thing for himself and I complained to my Chinese counterparts and they never did anything despite several promises which end up being broken promises."

Now Gadio told you he was the Foreign Minister of Senegal when this happened, a government official.  And in this email he's complaining about not having gotten his cut of bribe payments.

Now when he testified, he couldn't get his story straight about this.  On direct, he says this email was out of character, that he had never taken a bribe, never asked for

one.  On cross-examination he apologized for a totally different reason, because he claimed he made the whole thing up.  And the really crazy thing is, he'd already admitted on the witness stand ten minutes before that he did receive the secret cash payment from a Senegalese businessman, a bribe.

And there's more in this email, ladies and gentlemen. He goes on to write, "Actually, this has been my fate with several similar situations where 10 to 20 millions of US dollars were allocated to the president and between 40 and 50 percent were intended for me and not one dollar came my way."

Several similar situations.  Gadio was hunting for bribes.  And he's describing having missed out on his cut of other bribes.

Now remember what Gadio said about this section when he testified.  He claimed that he wrote those things because he wanted to explain why he needed a contract from CEFC Energy. Ladies and gentlemen, that explanation is laughable.  It makes no sense at all.  He makes up a story about bribes that he never got in order to convince a company to give him a contract?  Is it any wonder that CEFC Energy refused to give him the formal contract he wanted?  This is a man who thought politics was a for-profit business.

And there's more.  You see more of the same in another Gadio email from October of 2014.

Ic41ho3                     Summation - Mr. Kim

He writes, "Imagine me at the helm of Senegal very soon." Remember, he absolutely wants to be the next president, or president of Senegal. "What it would mean for China African policies not only in Senegal but in the entire African continent both for the public and private sectors." As always, Gadio is trying to get paid. And what does he say to CEFC to get them to pay up? "Imagine me at the helm of Senegal... what it would mean for China..." His message is clear: You pay up now and I'll help you once I'm in power.

Gadio was talking about bribes, over and over again. And he wasn't being subtle about it. But on the witness stand, he flatly denied it. His denials were lies.

And let's talk about yet more lies. The entry ticket email, Government Exhibit 49. This is the email that Gadio wrote to advise CEFC on the next steps it should take with Chad. And you'll remember we spent a lot of time on this email. Because it's blatant. Now one of three steps he advised CEFC to take was to reward him, President Deby, with a nice financial package as an entry ticket in the Chadian oil market. Remember, this piece of advice was separate from the actual offer for the oil deal. Now Gadio gave a long explanation for what entry tickets are. He said they were like bonuses. He tried to make them sound legitimate. You give them right after an agreement but right before the signing ceremony.

Ic41ho3                        Summation - Mr. Kim

Let me cut to the chase.  Entry tickets are bribes. Any other explanation is ridiculous.  Remember, these negotiations stretched on, and Gadio was writing this at the very start.  He wasn't telling CEFC to take these steps sometime in the future.  He told them they were the only right moves CEFC has to make at this juncture, at this time.  He was telling CEFC to offer a bribe to Deby.

Now the government made a lot of the fact that Dr. Ho never followed up about entry tickets, but Dr. Ho did respond to that email.  Government Exhibit 54A.

Dr. Ho writes, "We wish to be guided by the president's suggestion of how we should package this cooperation for the benefit of the Chad people.  I seek the president's position as it would be pompous for us to assume that we understand the need of the Chad people more than their president."

Now keep in mind, Dr. Ho received that email from Gadio, a man who had been hounding him for weeks about money, talking about secret cash payments, and complaining about not having gotten a cut of some other bribes.  Dr. Ho was being polite.  He did not want to bribe anybody.  He didn't need to. President Deby had already embraced working with CEFC as a partner, and CEFC was not looking for improper favors.  So Dr. Ho found a way to turn Gadio's suggestion of a bribe into something proper, a donation.  And Dr. Ho's message was clear:

Ic41ho3                    Summation - Mr. Kim

This is going to be a donation.

Now we've talked a lot about Gadio's lies. But he wasn't just dishonest on the witness stand. He was dishonest in his dealings with CEFC Energy. Naturally, Gadio denied this when he testified. He flat out lied. Do you remember, he said he always acted loyally on behalf of CEFC Energy, but then he admitted that while he was supposed to be helping CEFC, he was actively trying to find other buyers for the same deal. That tells you, it tells you something important. If there was one person who really wanted to get this deal done, it was Cheikh Gadio.

Now obviously Gadio cannot be believed. He has lied at every single stage of this case. He started lying to Dr. Ho within one month of meeting him; he lied to the government; and he lied to you during this trial. He's a man who uses, quote-unquote, diplomatic language when it's convenient for him. You remember that, ladies and gentlemen? "It's what I call diplomatic language. I use it when it's convenient." "Diplomatic language" means one thing, ladies and gentlemen -- lies. And even on the witness stand, he could not admit that these were lies. Even on the witness stand, he insisted on calling his lies "diplomatic language." Stunning. Lies are a casual thing for Gadio.

Now imagine, just imagine, what would Gadio do if much more was at stake? What would Gadio do if he were actually

afraid of something happening to him?  What would he do if the only way out for him was to falsely point the finger at someone else?  Unfortunately, you don't have to use your imagination. Remember what Gadio's reaction was when he was arrested in this case.  He was worried this case would destroy his life.  You saw the results of what Gadio decided to do firsthand, when he testified.  He lied, or what he would call using "diplomatic language."  He lied over and over again.  He lied to Dr. Ho and he lied to you.  And the worst part, he's taking no responsibility for any of it.  He was charged and arrested in this case, and the government let him go scot-free, just so long as he would testify against Dr. Ho.

MR. RICHENTHAL:  Objection.

THE COURT:  Sustained.

MR. KIM:  Now Cheikh Gadio took this witness stand and he lied.  You saw it.  You heard it.  And that, ladies and gentlemen, is enough to acquit Dr. Ho.

Now I've spent a lot of time talking about Gadio.  I want to talk now about the holes in the government's case, why the case in Chad does not add up.

There are a lot of reasons we know that the $2 million was not meant as a bribe.  And let me start first with the issue of timing.  For starters, it made no sense to pay a bribe in December of 2014.  The government mentioned, Mr. Zolkind, that the technical team hadn't gone, but you'll recall that in

Ic41ho3                    Summation - Mr. Kim

the second meeting in Chad, the technical team did go to Chad. Supposedly, CEFC was trying to lock down Block H with a bribe, but at that point CEFC did not even know anything about Block H.  Before this December 2014 visit, CEFC hadn't yet sent their technical team.  And remember, they had to have a technical team do an evaluation.  You can't assess an oil block without a technical evaluation.  Why pay a bribe to lock down something that might be worthless?  It makes no sense.  If you're going to pay a bribe, you wait until you have some idea how much the thing is even worth.  And CEFC never did that.  It wasn't a bribe.  This was not a trade, not money for contract.

So what else doesn't add up?  For starters, the things the government says happened on December 8th and December 9th, those second set of Chad meetings, what the government says happened on those days is built on Gadio's story.  Their house is built on sinking sand.  Mr. Zolkind said we did not challenge parts of Gadio's story.  Ladies and gentlemen, that's because you can reject it all.  All the details of what was said in those meetings comes from Gadio.  And his story does not add up.

So what does Gadio say happened in Chad on December 8th and December 9th? December 8th.  You remember Gadio talking about that meeting at night.  And Gadio testified that President Deby was furious.  You remember that?  He said he went back to the hotel, he got a call to come back to the

presidential compound, and he met with the president and said Deby was furious.  He said Deby wanted to kick the CEFC delegation out of the country, and he even thought about using special forces soldiers to do that.  Now according to Gadio, Deby was mad.  Gadio's story was dramatic.  I'll give him that.  But it was a lie.  How do you know?  For starters, your common sense.  Deby, a righteous man, angry about an attempted bribe, he's so angry and outraged, he's on the verge of kicking people out of his country, and then, on a dime, he's suddenly okay, just because, on the spot, CEFC agrees to write him a letter?  That's not how the world works.  If Deby thinks these people just tried to bribe him, he's going to kick them out with their money, letter or no letter.

I have a lot more to say about that, but first, I want to start with a smaller detail that tells you Gadio's story was a lie.

And it's Gadio's text message on the morning of December 9th, the first one he sends to Dr. Ho.  You remember Gadio told you that he was upset too after he met with Deby on the night of December 8th.  He was so upset, he told you he called his wife.  He was feeling anger, frustration, disappointment.  But what is the very first thing Gadio did the next morning?  He sent a text message, Government Exhibit 1061.  And as I said, this is the very first message Gadio sent Dr. Ho the next morning.  It's the very first contact Gadio has with

Ic41ho3                      Summation - Mr. Kim

anyone from CEFC after that December 8th meeting.  It's the message where he's talking about his contract and the one where he talks about the MOU, the memorandum of understanding.  And he says, "MOU with the big boss will be reviewed by us on his request for any final deal."

So why did this message matter?  Why is it important?  First, it totally does not jibe with what Gadio said just happened.  If someone you personally vouched for insulted and embarrassed the president with a bribe, is this the text message you send -- hey, let's talk about my contract?  It doesn't make sense.

But it also highlights another lie, ladies and gentlemen.  It's the lie when Gadio says he did not know what Deby was going to do next.  According to Gadio, Deby was furious at the end of that meeting on December 8th.  The only decision that had been made, according to Gadio, was to confront the Chinese the next day.  So according to Gadio, no one knows what's going to happen.  According to his story, for all he knows, the Chinese could get kicked out of the country the next day.  No more negotiations, no more deal.  But this message shows Gadio's frame of mind.  He's not acting like someone waiting for the other shoe to drop.  This message tells you that Gadio knew that discussions were going to continue.  This is proof that Deby was not mad at CEFC that night.  Gadio knew it.

What else does this tell you?  No one thought it was a bribe.  Was anyone upset?  If anyone, it was Gadio and his son Boubker.  The Chinese were not following Gadio's advice.  They were keeping a distance from Gadio.

Now you also know that Deby was not mad because of all of his actions after December of 2014.  Government Exhibit 80.  December 18th of 2014.  Gadio's writing an email.  And he's talking about the meeting he had with Deby.  "Afterwards we met in his suite and talked a lot about CEFC and ongoing projects and future prospects."This is only ten days after the meetings in Chad; ten days after Deby supposedly wanted to kick the Chinese out.

Later that month, December 29th, Gadio writes, "By the way, the President Deby has asked me to join him in N'Djamena first week of January to give him assurances that things are on track with CEFC."

March of 2015.  Gadio writes again about President Deby, "He has insisted that because of the war situation and the need for extreme confidentiality, he wants to meet a very small delegation, ideally you and me, only to a maximum of three."  Deby obviously was not mad.  He was eager to do business with CEFC Energy.

So you might ask yourselves, well, why wasn't Deby mad?  It's a natural question.  And there are two possibilities.  The first is that Deby was in on it.  He took a

Ic41ho3                    Summation - Mr. Kim

bribe from the Chinese.  But that is not supported by the evidence.  You'd expect to see CEFC Energy chasing Deby for business if that were the case, or making demands.  Hey, Deby, we just gave you $2 million; where's our oil, where's our deal?  That's what I'm going to talk about in a little while.  It didn't happen.  There were no deals.  CEFC Energy asked for nothing and got nothing.

Now the second possibility is that Deby wasn't mad because it wasn't an attempted bribe.  And this is consistent with what you see.  CEFC Energy is not very interested.  Deby is the one who's pursuing CEFC.

Now it wasn't just Deby's behavior following those December meetings that tells you there was no bribe.  CEFC's behavior after those meetings in Chad also tells you there was no bribe.

Now Gadio's messages from that time tell you he was trying to chase after CEFC, not the other way around.  December 22nd of 2014, Government Exhibit 1085.  Gadio was sending a message to Dr. Ho.  "Seasons greetings.  I am truly worried about your silence, after all my emails and unanswered questions regarding our partnership.  Is there any problem?"

January 26 of 2015, Gadio's writing to Dr. Ho.  "You must be going through some serious issues and tough time in order for you to refuse communication with me."  And he writes, "If you have a change of heart about Chad, though the President

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

will be very disappointed at me, tell me the truth.  After all our hard work, you and me, everything is now falling apart and trust is fading away.  So please call me.  If you prefer to say nothing, I will travel to Chad next week and apologize to the boss," that's Deby, "and we will move on to other opportunities."

If anyone wanted this deal to happen, it was Gadio. He was constantly pushing to make the deal happen.  Why? Because he wanted to get paid.

And Dr. Ho's lack of response, what does that tell you?  First, it wasn't a bribe; second, he had no criminal intent, no corrupt purpose.

So I've talked about a number of reasons why the government's theory on Chad doesn't add up.  And I'm going to talk about some of the arguments you heard from the government about Chad.

So why was this donation made in cash, and why did CEFC not publicize it?  First, CEFC knew very early on that Deby wanted to keep discussions confidential.  Confidentiality was Deby's request from the start.  Government Exhibit 16, Gadio's writing, in October of 2014, "Enemies and lobbyists who introduce other financial loops may not like this attempt at reconciliation with the Chinese partners and soil the whole thing.  I would rather bring my Chinese friends here in the quietness of the village in the middle of the desert for us to

Ic41ho3                     Summation - Mr. Kim

cut a good deal."  It was Gadio writing about what Deby wants.

Government Exhibit 1014.  Gadio says, about Deby, "He wants you to come immediately with a very small and confidential delegation.  You will fly to the village and find solutions to the problem."

The next Exhibit, Government Exhibit 17, Gadio writes to Dr. Ho, "I'm trying to avoid N'Djamena altogether to safeguard the confidentiality of our meeting with the president."

Government Exhibit 118.  "He has insisted," Deby has insisted, "that because of the war situation and the need of extreme confidentiality, he wants to meet a very small delegation."  So there was at the time a real desire for secrecy, given the political situation.

And by the way, I'm not asking you to take Gadio's word for it, I'm asking you to look at what was written during that time, because you cannot trust Gadio's testimony.

So why no publicity?  Well, CEFC had no need for publicity about this.  With respect to the goodwill it was looking to generate, it had a small audience.  Deby and his advisors were the decision-makers in Chad, so it didn't really matter if the general public knew about the donation.  What was important was that Deby and his leadership, the leadership of Chad, understood that CEFC was a serious partner for the country.

Now the prosecutors want you to believe that the fact that CEFC brought cash is the end of the story, that it's the smoking gun, but it's no gun and it isn't smoking.  Look at the emails at the time.  Everyone was concerned with confidentiality.  A $2 million wire transfer is not confidential and neither is a press release.  This cash payment is a big red herring in this case.  It's the government's giant void.  But if you look at it in context, look at what came before.  Look at what came after.  Look at what didn't come after.  You'll see that the fact that the payment was in cash just isn't that important.  So it's understandable that the Chinese would think to bring money confidentially, and it's culturally unusual here in the West but much more understandable when considering the context of their interaction.

And most importantly, you need to judge this case based on the actual results.  What actually happened as a result of that money?  You know the answer, ladies and gentlemen.  Nothing.

I want to talk about another argument the government makes, and this one is about that MOU, the memorandum of understanding.  Government Exhibit 66-TX.  This is another thing that the government says is some kind of a smoking gun.  But look at it closely, ladies and gentlemen.  It's hard to imagine a more generic document.  Is this what a $2 million

bribe gets you?

Now Government Exhibit 67-TX, the same day that Dr. Ho receives this draft, he sends an email and he suggests adding what CEFC Energy would do in return.  Items 1 to 3 are all about Chad obligations.  "I think to make this palatable and fair to the other party, we have to mention what CEFC company will do in return.  Otherwise, as it stands right now, Chad is bound to amend and add a few items to specify CEFC's obligations.  Better we do this ourselves."

Is that what a briber says?  Add things that we're supposed to do?  So what does this say about Dr. Ho's intent?  It says he had no criminal intent, no corrupt purpose.  It sounds like a pretty normal negotiation.  But here's the punchline.  There is no evidence this MOU was ever even sent.  That's how little interest CEFC Energy had after December of 2014.  Not the way a company acts if it has just paid a bribe.

That lack of interest from CEFC Energy that we've been talking about continued, even when they started discussing a different deal, that 10 percent deal you heard about.

Government Exhibit 141.  This is now April of 2015.  Gadio writes, "President of Chad has informed today me that he is ready to finalize negotiations towards a fair and good deal with CEFC.  He called me yesterday and today directly on my cellphone."

"Decision about this deal will be made only between

Ic41ho3                          Summation – Mr. Kim

you and me and our Chinese friends."

Now he has to wait 12 days for someone from CEFC to respond.  What is the message he gets back?  It's from Zang, and basically it says, I'm busy.  "My plate is full with meetings after meetings.  I would propose that you meet His Excellency of Chad first and let him know that CEFC is very serious about this possible deal."  And he adds at the end, "The price offered last time by the Energy and Mining Minister of Chad is insincere, too far away from the international market value."

So ladies and gentlemen, you might ask yourselves, well, why would the company even give $2 million?  Why?  Why give that much money?  This was never about a specific deal. It's about a strategic partnership, from the very start.  CEFC Energy is investing in a long-term relationship with Chad. Government Exhibit 45.  Dr. Ho writes to Gadio on November 18, 2014, "follow-up on a few initiatives we discussed and present some of our thinkings about strategic partnership with the president."

Now I want to pause now and talk about what CEFC got for that payment.  There's not really a dispute about this. CEFC Energy didn't get anything in return for $2 million.  The government's explanation is that it was an attempted bribe that was rejected, that it magically transformed into a donation, and that's why nothing happened after that failed attempt.  But

that version of events doesn't add up.  And let's talk about why.

The government spent a lot of time trying to throw mud on CEFC Energy and Dr. Ho, and they tried to paint both of them as bribers, all around the world.  But if that is true, if CEFC Energy was really trying to bribe President Deby, then just because somebody makes them write a letter, that isn't going to change how they're thinking about this deal.  They're still thinking the same thing.  Hey, Deby, you can call it whatever you want, you can call it a donation, but I just gave you $2 million.  I want something in return.  That's how a briber thinks.  But you know that isn't what happened here.  CEFC Energy gave $2 million in December of 2014.  And then what?  And then what?  Did CEFC start pressing for every advantage?  Did they demand special favors?  No.  They were silent.  After all that, a big old yawn.  They were not very interested in pursuing a deal.  Does that strike you as behavior of a company that just paid a $2 million bribe?  Even if someone told them it was going to be a donation?  Absolutely not.  They were pushing off negotiations.  They were clearly not interested in the deal.  But they didn't want to offend.  Their actions are consistent with a company that's investing in long-term goodwill.

Now in response, the government argues that there was an attempted bribe and nothing that came after really mattered.

You know why they're arguing this, ladies and gentlemen, because they have to.  The government wants you to ignore the best and the most compelling evidence that these payments were not illegal, not corrupt, not bribes, not a this for that. They want you to ignore the best evidence of why CEFC made that payment.  And that evidence is what happened after the payment was made.  The government wants you to -- don't let them pause this movie on the day of the meeting with President Deby.  So when you look at all of the evidence that happened before and after that day, the only reasonable conclusion is that it was not a bribe.  Now of course, an unsuccessful bribe attempt is still illegal.  That's not what happened here.

Now I want to talk about the letter that was sent after the December 2014 meetings in Chad.  The government has said a lot about it.  And before I say more about the letter itself, I want to talk about the timing.  The government makes, or has made a lot of the fact during trial that this letter was sent to Chad in January of 2015.  And they argue that means that CEFC Energy was somehow reluctant to put things in a letter.  But look at Government Exhibit 67-TX.  The day after the December 9th meeting, Dr. Ho is giving instructions to draft a letter.  And then what?  You know it has to get sent somewhere else for someone else's signature because the draft that gets sent to Gadio is signed by Zang.  Clearly no one was dragging their feet, and certainly not Dr. Ho.  Remember what I

said about how important intent is.  Think about that here.  Dr. Ho responded the next day.  He's giving instructions about the letter, the very next day.  No criminal intent, no corrupt purpose.

Now how else do you know that payment to Chad was not a bribe?  Let's talk about Gadio's testimony about the revised draft of that donation letter.  First let's look at Government Exhibit 81, which is CEFC's draft.  "We would like to make a donation of $2 million to the government of Chad."  You heard a lot about verb tense, ladies and gentlemen, and Gadio, who testified about the revisions he made to that letter -- you saw his version of the letter, Government Exhibit 92-TX, and he testified that he had two concerns.  He said first, well, the French wasn't really good, and the second, he claimed he changed the letter because he would not feel comfortable saying people "are promising" to send a donation that was already delivered.  Well, look at the change in the section for yourself, ladies and gentlemen.  And this is Gadio's.  "CEFC would like to express sincere support for your development policies by making available to you a donation."  There's no real change there, ladies and gentlemen.  Just like CEFC's draft, Gadio's draft was written as if it came before there was already a donation.  Gadio made it sound like his draft was so different.  It wasn't.

Now I spent a lot of time talking about what happened

in Chad, and maybe you're thinking something to yourselves. Doesn't the fact that Gadio was asking for a bribe, does that just make it more likely that Dr. Ho helped pass a bribe?  You might be tempted to think that at first.  But let's take a step back and look at the bigger picture.  CEFC was not particularly interested in Block H.  They were wary of Gadio.  They were looking to form longer relationships with Chad.  It's all consistent with the business.  They wanted to build relationships and do business in Africa, just not on Gadio's terms, and he knew it.  You see plenty of emails and texts in which he's worrying about being cut out, scheming that it's time to get paid.  CEFC didn't want to do it Gadio's way.  They didn't want to play by Gadio's rules.  They wanted to build relationships in Chad but on their terms.  Ladies and gentlemen, if you agree that Gadio lied, you cannot convict, because the evidence is not enough.

And keep one other thing in mind, ladies and gentlemen, as you think about Gadio.  The smartest liars are ones who lie about as little as possible.  They change only the smallest details.  For instance, was Deby really angry at those meetings in Chad, or was it a calm discussion to talk about next steps?  Because the more you make up, the more likely you are to get caught.  And make no mistake, Gadio is very sophisticated.  He's charming.  You saw that.  He's a politician, and he knows how to talk, how to read a room and

Ic41ho3                    Summation - Mr. Kim

win over an audience.  But ladies and gentlemen, contrary to what Mr. Zolkind said, you did notice a change in his demeanor when he was testifying on cross-examination versus direct examination.  He couldn't answer a question straight.  His attitude changed.  The way he answered questions changed.  He dodged, he lied.  He's a man who will lie, especially if he thinks there's nothing out there to contradict him.  Gadio was careful, but not careful enough.  Here's a funny thing about truth, ladies and gentlemen.  It comes out.

Now Gadio is a man who takes secret bribes during campaigns, talks about a tradition of bribes.  He uses diplomatic language.  And the government is asking you to vote guilty based on his word.  They're asking you to make a decision about Dr. Ho's life based on what Gadio has said.  And despite all of his lies, the government dismissed the charges against him and put him in that witness box, and they put him in front of you as someone you should believe.

But that's not all.  The government's failures go beyond going along with Gadio, beyond telling you to believe him when he said that Dr. Ho committed a crime but not innocent Cheikh Gadio, and the government's failures spill over into Uganda too.  So I'm going to turn now and talk about what the government says happened in Uganda.

First of all, let me just say that the charges involving Uganda are a total throwaway.  The Chad charges are

so flawed, the government is grasping at straws for something else, so they can argue to you --

MR. RICHENTHAL:  Objection.

THE COURT:  Sustained.

MR. KIM:  -- they can argue to you that even if you don't believe what happened in Chad, look at what happened in Uganda.  There's nothing here.  Their story on Uganda does not add up.  And the government has glossed over this.

The government has not called a single witness who knows anything about what happened in Uganda.  They've just cobbled together a handful of emails and slapped them in front of you, and in their hurry to pull something out of nothing, they were sloppy.  They made mistakes, from the big picture down to the smallest details.  And I'm going to point out some examples of that.

Look closely at the facts on Uganda, and you'll see what's wrong with what the government is telling you.

So right off the bat, let's get one thing straight. CEFC Energy never received a contract or completed a deal in Uganda before or after the money was passed.  There really can't be a serious dispute about that.  The government makes half-hearted attempts to talk about other benefits, but those don't pass the smell test.  The reality is that CEFC Energy never received an improper benefit of any kind through Uganda. They never asked for one, period.

Now let me start with Sam Kutesa.  There's no question when Sam Kutesa was the foreign minister.  When he was president of the General Assembly, no question he met with Dr. Ho.  He went to Hong Kong.  There's nothing wrong with that.  The government's own witness, Vuk Jeremic, he did the same thing when he was PGA.  And he encouraged Kutesa to do the same thing.

But just as it was with Chad, the government's story about Uganda has been sloppy.  What they're telling you is just flat out wrong.  And I'm going to talk about three reasons you know why the government is wrong.

Now first, they're just wrong about two payments and the, quote-unquote, nice gifts.

Second, the timeline doesn't add up.

And three, there were no benefits.

So let's talk about Reason No. 1, those two payments.  Now the government has argued, they've suggested that there were two payments in Uganda -- a payment to Museveni in the form of a campaign contribution; and a payment to Kutesa in the form of a donation to his foundation.  Now the government has just got it wrong here, ladies and gentlemen.  The evidence shows there was one payment, not two.  Now the government kind of shrugs and says, well, you can make a reasonable inference, when Mr. Zolkind was talking about that email.  They're just wrong.  And I'm going to show you why.

The payment that was originally supposed to be a campaign contribution was instead given as support to the foundation, because by the time the money was sent, the campaign was over.  You have to look closely at the facts, which the government has not done here.

Now that initial pledge on August 2, 2015, Chairman Ye says he's very pleased to support President Museveni's re-election campaign with $500,000.  What happens after this pledge?  Well, for six months, nothing.  And then, on February 24, 2016, Edith Kutesa emails Dr. Ho.  She shares that Museveni and Kutesa have won re-election.  She says the president won with 75 percent, "Sam was unopposed, and this was a blessing for us to be free and campaign for the president. Sam would like in particular to catch up with you regarding his foundation, which he wishes to launch as soon as possible and would appreciate to receive the contribution/donation promised by the chairman."  So it's clear he wants that commitment to be sent instead to the foundation.

Dr. Ho reports that the chairman confirmed this. About a week after that email from Edith, Dr. Ho submits a report to the chairman.  Government Exhibit 287.  And he reminds the chairman that he had offered to contribute $500,000 to Museveni's re-election campaign.  And he also reports that Museveni has won re-election, and he flags that Edith had followed up about that commitment.

Ic41ho3                    Summation – Mr. Kim

Now about a week later, the chairman agrees to honor that commitment.  You can see he says, "Agreed.  Please transmit/forward to Director Chan."  So why is Dr. Ho still calling it a promise of support of campaign contributions?  Because that was the initial pledge made by the chairman.  Remember, he's the head of this very large company.  He gets memos with boxes checked with priority and urgency.  He's a busy man.  He needs reminding.

(Continued on next page)

MR. KIM:  All of this is confirmed by the payment records, how the payment of the funds is eventually made.  You see a lot of e-mails going back and forth about $500,000 being sent to the think tank.  And then there is discussion about whether it should be by cash or wire.  Government Exhibit 300-TX, they decide they should wire the mob money instead of using cash.  They say, "USD $500,000 has been in our account.  The process fee for wire transfer is approximately USD 50.  If cash is withdrawn, the charge is 12.5 percent."  And you see that they write, "Settled, I am using wire transfer.  Specific account information will be sent to you later."  Then the cash is sent and the wire gets sent out.  And that's what the bank records show, Government Exhibit 2009, 500,000 in, 500,000 out.  And after that, there is never any mention of another $500,000 payment of any kind, because that was the one and only payment.

Ladies and gentlemen, details matter, and the government flat out got it wrong here.  They have thrown these documents in front of you.  They're trying to spoon feed you conclusions, trying to tell you what to decide, trying to convince you that there were two payments.  But if you look closely, it's clear the payments are one in the same.  And don't take my word for it.  Ask for the exhibits when you're in the jury room.  You can piece it together for yourself.  Government Exhibits 285, 287, 289, 296, 298, 300, 301, 305, 309, 310, 2009, you can ask for all of them and piece it

IC47HO4                   Summation - Mr. Kim

together for yourselves.

The government is just flat out wrong. The government was careless here. Dr. Ho deserves better; he deserves your careful consideration of the facts. When you consider the facts, he's not guilty.

Now, let's talk about another mistake, what we call the nice gifts mistake under reason number one, and here is another example of something the government got wrong.

On May 9, Dr. Ho tells Kutesa's assistant that "CEFC will bring very nice gifts to your president and to minister Kutesa to celebrate the occasion." The government suggests that the nice gifts were actually cash bribes, but that's just not true. Now, maybe you see nice gifts and you think something sinister, but if you look at the evidence, it's clear that this has nothing to do with a cash bribe.

First off, if the point of using cash is to leave no trace, then why e-mail about it ahead of time? It defeats the purpose. But you know these gifts were not cash for another reason. Just the day before, on May 8, Dr. Ho's assistant tells him "Shanghai wants us to suggest what kind of gift to the president, Kutesa, China ambassador and other for spare, then we will purchase tomorrow."

Remember that trip is May 10. Now, first, if this is a reference to the $500,000 campaign promise, then there would be no need for Dr. Ho to suggest what kind of gift to provide.

Second, if this was a reference to $500,000 in cash, there would be no need to purchase anything. Now, claiming that the nice gifts were $500,000 in cash makes no sense; it's not supported by the facts. In fact, the evidence supports just the opposite, that the gifts were what the e-mail said they were, of the kind that were often given on trips like this.

So why did I just spend so much time walking through those e-mails and records? Because it's proof, proof that the government got it wrong. In their hurry to cobble together charges, they got it wrong again and again.

Now, I want to turn to reason number two, about the timeline in Uganda; it doesn't add up.

The government says that its timeline tells you the story, but it doesn't tell the story the government thinks it does. That timeline is not consistent with a bribe. And let's look at the government's timeline and the things that don't make sense. And I'm going to talk about five flaws in their timeline.

First, Edith Kutesa's offer to help with buying a bank. It comes on March 17, 2015, long before any promise or payment from the chairman or anyone else at CEFC. The offer to help is clearly not an exchange for any bribe. At this point there is no mention of any promise to donate anything.

Now, let me note one thing here. Edith Kutesa made

IC47HO4                    Summation - Mr. Kim

this offer herself as a CEO of a financial company.  She is often referred to simply as Sam Kutesa's wife, but she is of course more than that; she was a successful business woman and fully capable of making offers on her own behalf, not just on behalf of Sam Kutesa.

Second, for months there is no follow-up after chairman Ye's pledge of campaign support.  The meeting in Hong Kong where the chairman made a campaign pledge was on August 2, 2015.  And then what happened?  You generally make an offer of a bribe if you want something, right?  So what happens next?  Crickets, nothing, for six months total radio silence on this until February of 2016.  Half a year passes after a supposed offer of a bribe.

On February 24 Edith Kutesa sends a follow-up e-mail to Dr. Ho that we talked about, and that's when she finally follows up on the earlier pledge from the chairman.  Does that make any sense?  The chairman supposedly offers a bribe of $500,000, and neither side follows up for six months?

Third, on March 26, 2016 Dr. Ho repeats the promise of a donation before receiving any confirmation from Edith about the inauguration invitations or business meetings.  Now, at the time Dr. Ho says, yes, we will make good on that pledge, Edith had not promised anything, and yet Dr. Ho still repeated that they would make the donation.  These are not the actions of a man with a corrupt purpose.  It's simply not this for that.

The fourth problem with the timeline.  CEFC actually wires the $500,000 without any assurances about any business opportunities.  On April 10, 2016, Edith promises only to send a tentative list of projects you would be interested in.  Then on April 20 she sends the invitation to the inauguration but suggests putting off discussions with business leaders and states -- and this is really important -- "Now there will be no commitment no firm commitment."  The government totally skipped over this e-mail when they were talking about Uganda just now.

So, after this clear statement "There will be no commitment no firm commitment," you know what happens next?  The very next thing that happens is that CEFC wires $500,000.  That's right, without any further communication, CEFC makes a payment.  Now, not only did they not pay the money in exchange for some promise, but they had just been explicitly told that there were no promises, no commitments.  This is not this for that.  This is this for nothing.

Now, the fifth problem with the timeline.  What does CEFC do next?  They ask for a receipt.  You see the e-mails on May 7, 2016 requesting a receipt.  None of this adds up to a bribe.

Now, despite all of these holes, the government made a big deal of the fact there was no press release announcing a donation in Uganda.  And just as in Chad there was no need for publicity here.  What was important was that the leadership of

Uganda understood CEFC's commitment to that country.  And, as you know, everything was documented, nothing was hidden.

Now I'll turn to reason number three about how you know the government got it wrong in Uganda.  This is another major hole in the government's case, and it's a flaw we saw in the case with Chad too.  For something to be a bribe, there has to be a this for that, and that just doesn't exist here.  As I said earlier, CEFC Energy never received a contract or completed a deal in Uganda before or after money was passed. There can be no real dispute about that.

So, what does the government say that CEFC Energy got for their money if not a contract or a deal?  Well, they've thrown a lot of different options at you.  They mentioned invitations to the inauguration, meetings with business people, heads-up about a potential bank deal.  They have thrown all of these at you, but in the end they don't add up; they don't add up to anything.  The government is grasping at straws.

Let's take them one at a time.

Earlier in this case the government claimed that the benefits CEFC got was meetings with Ugandan officials and invitation to the inauguration.  That is ridiculous.  As I said earlier, the timeline here doesn't make sense.  At the time CEFC made the payment, not only had they not been promised meetings with business people, but Edith had told Dr. Ho that there would be no commitment.  And then the wire gets sent.

Now, even if what the government is claiming were true, there is nothing illegal about it.  For something to be a bribe, you have to pay money corruptly; you have to seek some misuse of the official's position.  And there is no evidence that setting up meetings was a misuse of anyone's position.  And in fact you heard that meetings with foreign investors was an important part of a foreign minister's role.

So, the timing makes clear the donation, the payment, was not in exchange for business meetings, since there were none scheduled or promised at the time.

So, in the end the $500,000 was for a couple of tickets to the inauguration.  Is that really what the government is relying on here?

Now, the government also claimed that CEFC received another benefit.  They claim that CEFC got the inside track on profitable business opportunities in Uganda.  Now, the government can certainly identify a bunch of areas that CEFC wanted to invest in, but what specifically did CEFC get an inside track on?  Nothing.  What concrete benefit did CEFC receive?  None.  The only thing -- the only thing the government can come up with is that potential opportunity to buy a Ugandan bank.  But let's take a closer look at that.  What actually happened?

For one thing, Edith first mentioned that potential bank sale back in March of 2015.  She talks about banking

IC47HO4                         Summation - Mr. Kim

sectors, the possibility of acquiring a bank.  She is talking about a potential bank sale long before any promise or donation from CEFC.  Happens after the payment is made?  Nothing.  They talk about it some more in Uganda and after that nothing, again, for months.  Then, finally, in October of 2016 -- over five months after the payment -- Edith sends Dr. Ho this e-mail, express your interest, and asking for more information in a simple letter addressed to the vice governor of the bank of Uganda.

Now, Dr. Ho sends that letter, and then what?  What happens after that letter is sent?  Nothing.  Almost a half year after that donation was made Edith gave CEFC a heads-up that there might be a chance to buy a bank.  She tells Dr. Ho to e-mail the banking official, and it goes nowhere.  That's it.  Ladies and gentlemen, this was not a bribe.

Mr. Zolkind spoke a little bit about Dr. Ho's e-mails that express the hope that CEFC could have joint ventures with the Kutesa and Museveni families, and Mr. Zolkind suggested that the desire for that joint venture is a smoking gun, but it's not, for the same reason that the wire payment to Mr. Kutesa's foundation is not:  This was relationship building, not bribing.  Nothing specific was discussed at all, no this for that.

And the government again glosses over an important point here.  It continues to treat Edith as simply Sam Kutesa's

assistant, referring to her only as his wife.  But, as we said earlier, Edith was a legitimate business woman in her own right.  She was the CEO of a financial services company.  And if you want to know more about her business, look at Government Exhibit 280, and there is a complete presentation about Edith and her company MCASH.

Ladies and gentlemen, the Uganda charges don't add up. The government has skimmed over the facts and asked you to do the same.  But don't make the same mistake.  Look closely at the evidence.  When you do that, you will see there is reasonable doubt all over Uganda.

Now, I have talked about Chad, I've talked about Uganda, I've told you about the problems with the government's case, and I'd like to talk now a bit about the problems across this entire case.

Now, if the government's view of the case were right, then CEFC Energy paid bribes and got nothing for any of them -- no contracts, no deals.  In Chad, $2 million for nothing.  In Uganda, $500,000 for nothing.  Maybe once you're unlucky, but twice -- or as the government says three times?  They must be the worst bribers in the world.  Not only that, they're the nicest bribers in the world.  There is not one piece of evidence that anyone from CEFC Energy even raised a hand to complain.  Not even a hint of a complaint.  What does that tell you?  These were not bribers.  The evidence of bribes is weak,

IC47HO4                    Summation - Mr. Kim

and the government has spent a lot of time in this case trying to make innocent things look sinister.

One example:  Take that phone call, the recording that they played.  There is no evidence that anything happened. They throw it at you and say that somehow it's evidence that Dr. Ho was trying to pay bribes in this case.  There is absolutely no basis for that.

Then there is all the time they spent talking about Dr. Ho's work at CEFC Energy.  But as we told you at the start of this case, Dr. Ho's relationship to the company was not hidden.  He was open about his work on behalf of the company. He talked to Vuk Jeremic openly about that.  And all of that is perfectly appropriate.  It's normal for think tanks and NGOs to approach PGAs.  It's normal for PGAs to work with think tanks. It's normal for heads of think tanks to do paid consulting work and get paid for finding business opportunities.  Vuk Jeremic did the same thing.  And if all that wasn't enough, the government threw a number of bank records at you yesterday showing how much Dr. Ho was paid.  Who cares?  Dr. Ho was doing work all over the world for the company.  There is absolutely no evidence that the money he was paid was tied to anything illegal.  These are desperate attempts to muddy the waters.

Now, ladies and gentlemen, I'd like to take a step back and talk a little bit again about intent.  It's that important.  The government has spent a lot of time taking shots

at CEFC Energy the company, but here is the thing:  You are not here to give a verdict on the company.  You have a different job.  No matter how you think the company did business, the issue in this case is Dr. Ho's intent -- not Gadio's intent, not CEFC's intent -- Dr. Ho's intent.  You have to be convinced beyond a reasonable doubt that he acted corruptly, that Dr. Ho acted with bad purpose or evil motive beyond any reasonable doubt.  There is no evidence that he did.

Ladies and gentlemen, in your everyday lives you make promises all the time, but it's not every day that you're asked to swear an oath.  But you all did that at the start of this trial.  You raised your right hand; you swore to fulfill your solemn duty as jurors.  We spent a lot of time during jury selection, and each of you are here because you were trusted to uphold the oath, trusted that you are capable of looking at the facts in case carefully.

It's so easy to think in tag lines and to oversimplify, to rush to judgment.  It's too easy.  It's tempting to think of $2 million in cash and to think that something just had to be wrong.  It's tempting to think of a Chinese company doing business in Africa and think something was wrong.

But we beg you to avoid the temptation to make snap judgments.  It's not easy to dig into the evidence, to look behind fancy charts and graphs, to pour through e-mails and

other documents, to look at facts in light of all the legal instructions you're going to receive.  It's not easy, but it's necessary, especially in this case.  You obviously can't take the government's word for it -- and I'm not asking you to blindly accept mine.

You need to be the judges of the facts.  And if you look carefully past the one-liners, past the fancy arguments, you're going to see a very different picture than the one the government painted for you.

Now, the government gets to have the last word in this case, but don't let the last word be the only word.  Mr. Richenthal is going to stand up soon, and I suspect he is going to fill your ears with lots of arguments.  But as you listen to him, I'm going to ask that you keep some things in mind.  See if he can answer some critical questions.  I hope he will answer them as soon as he stands up.

First, can the government prove that there were two payments in Uganda?  See how he answers that question, and then go back in the jury room, and check the exhibits when you go back, and check them against what he says to you, see for yourselves.

Second and most importantly, is the government going to stand behind Gadio's lies?  Or is it going to admit that the man they called as a witness, their star witness, the man they let off the hook, is that man a liar?  If you believe Gadio

lied, you cannot convict.

Now, the prosecutors may ask you to do something here. They might say, well, ladies and gentlemen, even if you put Gadio's testimony to the side, you can still convict.  If the government tries to say something like that, it should be a red flag to you; they're trying to run away from their star witness.  Don't let them run away from a witness they asked you to believe.  They are the ones who brought him into this courtroom; make them own it.  If you conclude that Gadio lied, you must acquit.

Now, I'm about to sit down, and before I do, I want to say something that's very important.  If you have real questions about whether these payments were payments for good will and not bribes, if it strikes you as odd that no one ever asked for anything in return for these payments, if it's puzzling to you that they're being called bribes when they were documented in writing, or if you question whether Cheikh Gadio told you the truth from the witness stand, whether the government's star witness lied to you sitting right over there, then you have a reasonable doubt.  Reasonable doubt requires a not guilty verdict.  That is the end of the story.

There is reasonable doubt here, and that reasonable doubt means that Dr. Ho is not guilty.  Go back into the jury room and do justice, vote not guilty on all counts.

THE COURT:  Thank you, counsel.

Ladies and gentlemen, let's take a quick break, and we will return for the government's rebuttal summation.  So let's try to go as quickly as we can so that we get a lot of work done today.  Thank you.  Follow the normal rules, please.

(Jury not present)

THE COURT:  Anything else on the record, friends?

MR. RICHENTHAL:  Not from the government, your Honor.

THE COURT:  Anything off the record?

MR. KIM:  No, your Honor.

(Recess)

(Jury present)

THE COURT:  Welcome back, ladies and gentlemen.  Thank you for being so prompt.  We move on to the government's rebuttal summation.  The same rules apply.

MR. RICHENTHAL:  Thank you, your Honor.  Good afternoon.  You may be thinking from listening to Mr. Kim talk for a couple hours this is all really complicated.  You have to decide how many wires went in Uganda.  Was it cash?  Was it a wire?  Was it a donation?  Was it a contribution?  When was it made?  You have to decide precisely what e-mail means what and when.  And if you want to do those things, you can -- the evidence is all there -- but you don't have to do that, because this case is actually really simple.  When a sophisticated international businessman puts $2 million in boxes and gives it to the leader of a country he wants business from, then says he

is impressed when called out for having done that very thing, and then he moves on to another country when the bribe is rejected, and sends -- whether you want to call it a donation, a contribution, or a wire -- to more leaders from another country he wants business from, and every e-mail in which he talks about it, every one mentions business, there is only one way that makes any damn sense:  They're bribes.

You can look at all the e-mails.  You should look at all the e-mails.  This is a court.  I get to speak, Mr. Kim gets to speak, Mr. Rosenberg, Mr. Zolkind, but we're just lawyers; it doesn't matter what we say.  What matters is the evidence, the facts.  And it doesn't make any sense unless the defendant is guilty.  But it's not because I say that; it's because you have learned that over the past week.

So, I want to start with something simple but important.  You have learned there was zero publicity -- zero publicity -- about the alleged donation to Chad and the alleged donation to Uganda.  And you've learned that that also makes no sense, because of all the things you know, you know the defendant loves publicity.  So why wasn't there any?

Mr. Kim tells you it's because there was quote no need for publicity and in any event it was all supposed to be confidential.  First of all, no need for publicity?  This defendant wrote an e-mail yelling at other people about a press release not coming fast enough, not promoting CEFC enough.  And

IC47HO4                      Rebuttal - Mr. Richenthal

if you look at the e-mail, you will see there actually was a press release from the UN about the things he's talking about, but he wanted his own.  In his world there was never no need. And, according to Mr. Kim, the reason there particularly wouldn't be any here is because this was all supposed to be confidential.  All right, except look at Government Exhibit 802-TX.  That's a press release.  It's about CEFC China visiting Chad to investigate investment projects.  There was publicity; it just doesn't say a damn thing about a donation, not a word.  So, it's not they didn't want any publicity; it's they didn't want publicity about the money, because the money was dirty -- really, really dirty.

I'm going to show you one other document, and then I'm going to step back for a minute.  Mr. Kim also says, well, wait a second, maybe that's true about Chad, but Uganda, Uganda there was no firm commitment, so how can it be a bribe.

I'm just going to show you one document; they are all in evidence.  By the way, I agree with him, you should look at every one.  Never take my word for anything.  I am just a lawyer.  What speaks in court is facts and evidence.

So, one more document.  Can we put up the Uganda report, please.  This is 296-TX.  Remember, TX just means translation.

OK.  Mr. Kim said that the last communication involving Uganda was in April 20.  That's the communication in

which Edith Kutesa talks about no commitment.  Then he said the money is paid.  That's just not true.  This is the last communication before the money is paid, four days later.  And in this communication the defendant makes very clear he knew exactly what Edith Kutesa meant.  What she meant was no commitment meaning the actual officers in power aren't there yet because there has just been an election, but absolutely there is a commitment to do business.

Go down, please, and maybe just blow up the bottom.

It says the list of names of the new-term cabinet ministers of Uganda won't be announced until after May 12.  The party is planning that -- the next day, that's when we'll have our meeting.

The defendant knew exactly what Edith Kutesa meant. This wasn't confusing to him.  They had been talking for a long time.  And instantly the defendant moves to money.

Now, those are just two documents.  I want to step back for a second.  OK?

So, Mr. Kim spent a tremendous amount of time talking about Cheikh Gadio.  He has challenged me, I guess, to defend him.  It's not my job to defend anybody, but let me just talk about Cheikh Gadio for a second.  It's a little silly I think to ask you to believe him or not believe him -- you do that in your everyday lives -- but I just want to highlight a couple of things with Mr. Gadio.

First, do you remember when he said when men are panicked they call their wives?  You guys remember that, right?  Can you think of a more human moment than that?  Do you think that was like a canned thing, he just waited?  He was up there as a human being, not a robot, not some sophisticated liar, a man.  And when he was asked about things he did that he was not proud of, should not be proud of, he admitted it.  Time and again he told you, yeah, I said that I hadn't gotten a cut of the bribes because I wanted to get paid.  Time and again he told you I should have walked away, it was wrong, I wanted the money.  That wasn't easy to admit, but he said it.

Now, Mr. Kim says, well, wait a second, he lied about some $20,000 campaign donation years ago?  Ask for the transcript.  You have your memory, you were there.  He was asked about confidential assistance; he clearly didn't know what he was being asked; he then was asked did you take a donation.  What was his answer?  Yes.  Instantly, yes.  He was asked was it from a businessman.  Yes.  No hesitation.  Did he seem fearful to answer that question?  You judge people's credibility in your everyday lives, but that man wasn't lying to you.

And, by the way, just to pause for one second, if he was lying to you, if this was like some amazingly sophisticated thoughtful invention, couldn't he have done a little better?  I don't mean credibility.  He told you the truth.  I mean the

story itself.  Like why not say, yeah, the defendant told me he offered a bribe, he apologized for it.  Why not say, yeah, he told me he was getting a cut of it.  Like couldn't he have come up with better lies?  What kind of person comes up with lies like that?  He's asked ten different ways did Mr. Ho ever tell you he paid a bribe.  Every time he says no.  Why not just say yes once?  If he is truly risking his liberty and his career to lie to you, why not make them better?  It's because he is not lying to you.  Life is not that simple.  He told you what he experienced.  That included what he didn't know.

And I would add, if he is lying to you, does he also have a time machine?  Because what Mr. Kim didn't show you was that text message from his son, the managing partner at Sarata, that said their attempt to buy the president failed, unless Cheikh Gadio traveled back in time, that happened when it happened.  So then is the idea he is so sophisticated that he asked his son -- mind you, there is no evidence that this happened, but OK -- he asked his son to send this message years ago, in case he ever got arrested, so he could make up a story about a defendant, in case that man also got arrested, in order to get himself off the hook for something he did and the defendant did not do?  Do you actually believe that?  That is preposterous.  That didn't happen.  You know that didn't happen.  Why did he say buy the president?  Because that's what happened, they tried to buy the president.

Now, before I continue I want to make something very clear:  The defendant has no burden, period.  If you're not convinced beyond a reasonable doubt by the documents -- not what I say -- the documents, the evidence, the testimony, Mr. Kim is right, you have to acquit him, it is your duty.

But in this case, you can have no such doubt.  This is not a close case; this is not a complicated case.

I'm going to talk about Chad, I'm going to talk about Uganda.

Chad.  Now I have talked to you about Cheikh Gadio.  You know he is telling you the truth.  But it's not just because he is telling you the truth; it's because nothing else in the case makes any sense if he's not telling you the truth.

Mr. Kim kept talking about bank records.  You should look at them; they're in evidence.  Do you want to know what is not in them?  $2 million cash.  Not in them.  There are all these reports to chairman Ye.  What is not in them?  $2 million cash.  What's not in the press release?  $2 million cash.  Did Cheikh Gadio invent those things too?  Did he remove them from reports he was never copied on and never saw before he took the stand ever?  Did he hack into computers and do that?  No.  They weren't mentioned because it was a bribe, period.

When the defendant says I am impressed that you rejected the gift, do you have any doubt what he meant?  This is a sophisticated man; he gives speeches for a living, he

writes articles for a living; he says things in e-mails like subtilely fund think tanks.  In multiple reports to the chairman, the boss, he talks about someone euphemistically mentioning a donation.  You know what euphemistically means.  It's means, well, the real thing doesn't sound so good but I want to signal to you what's going on.  Like when you say "let go" when you mean fired.  He chooses his words very carefully.  "I'm impressed" was no accident.  He was impressed.  And that, by the way, is why everything that happens after in Chad is utterly irrelevant.  Mr. Kim must have spent at least a quarter of his summations talk about Block H versus 10 percent, CEFC wasn't interested, CEFC was interested, maybe it was interested, it stopped being interested.  First of all, read the e-mails.  It was very interested.  But it doesn't matter.  The reason those negotiations broke down is self evident:  They weren't dirty.  The president had rejected the bribe, accepted the money for his poor country -- that is not a crime -- and then acted honorably and was not will to put up with CEFC's demands for unreasonable praising.  It's in the e-mails.  Of course they didn't get advantage from a bribe that was rejected.

But compare it to what happened in Uganda.  Do you seriously think that the defendant forgot to give the donation or contribution until he was reminded?  Remember Mr. Kim said Mr. Richenthal has no explanation for why they waited until

February.  What?  The reason they waited until February is that Sam Kutesa was in this city before that.  That doesn't help the energy company get oil.  Manhattan does not have oil.  But Uganda does.  So when he is back in power they remind the defendant he is back in power; they tell him he has been reelected; and the defendant's response is clear.  Remember what I said earlier, he chooses his words so carefully.  "Mutual agreement and commitments."  Mr. Zolkind talked about that.  I am not going to go on at length about it.  That is crystal clear:  We have an agreement, we have commitments, I'm ready to talk turkey because you're back in power and my company wants business.

Now, Mr. Kim suggested maybe the business isn't connected to the officials of Uganda, maybe it's Edith Kutesa.  Edith Kutesa copies her husband on those e-mails, and in those e-mails the defendant keeps talking about business in Uganda.  He keeps talking about meeting with ministers of Uganda.  He keeps talking about oil fields in Uganda.  Do you want to know what MCASH isn't?  In oil business in Uganda or anywhere else.  Obviously CEFC wanted business from the government of Uganda.

Now, if that weren't clear enough from the e-mails, just look at the meeting, the one with the photographs.  Does he meet with Edith alone?  Is he in an office building for MCASH?  No, he is meeting with the ministers of Uganda; they're around the table.  You remember the photograph.  He is looking

at oil fields on a map.  What in heaven's name does that have to do with Edith Kutesa?  Nothing.

Now, Mr. Kim also challenged me to tell you whether we have proof of -- I wrote it down -- two payments or one in Uganda.  Well, first of all, it's pretty clear that the defendant wanted there to be two, one to the foundation and one in cash.  His report to chairman Ye is crystal clear on this.  So that's clear.  Whether the second one happened in cash, a hundred percent less clear.  Does it matter?  Not one whit.  Why?  Because the foundation one was so clearly a bribe.  Now, according to Mr. Kim, it was originally a campaign donation, then it was a foundation donation, then maybe it was something else.  Does that make any sense?  No, except in the mind of the defendant, because he couldn't have cared less.  Whether you call it a charitable donation, a campaign contribution, something else, it doesn't matter.  Sam Kutesa wanted to get paid, CEFC wanted business, deal.

Now, the crime is done then.  So I could sit down and not talk about what happened next, but I want to talk briefly about what happened next, because it's just not true they got nothing for their money.  Do you think it's easy to buy a bank?  Do you think that the Chinese oil company didn't care that they had an inside track to buy a bank?  The defendant sure as heck acted like he cared.

Which leads me to another point I want to make.  It is

correct you have to look in his head.  I mean that.  You have to decide if he acted corruptly.  It's going to be in the Judge's instructions.  But that doesn't mean you have to get an MRI machine and look in his brain.  Because you know what he said.  You know when he said it.  You know what he didn't say and when he didn't say it, and that tells you a ton.  And so does something else.  Everyone around him thought these were bribes.  Cheikh Gadio thought the cash was a bribe.  His son thought the cash was a bribe.  The president of Chad thought the cash was a bribe.  The chief of staff of the president of Chad thought the cash was a bribe.  Edith Kutesa and Sam Kutesa absolutely thought the cash was a bribe -- excuse me -- the wire's a bribe.  How do you know that, the last part?  Look at what she said when she sends that receipt.  The same e-mail talks about the bank.  And right before the receipt the defendant talks about we want to move on to the second opportunity.  What's the second opportunity?  The bank.  She sure as heck thought those things were linked.  Did the defendant miss that?  He never says you're wrong.  He also never says to Cheikh Gadio I have no intention of paying a bribe; how dare you suggest to the contrary; I have no intention of giving you a cut of the bribe; how dare you suggest to the contrary.  Nothing.  If someone wrote you an e-mail and basically said point blank, you know, I've been involved in a lot of bribery in the past, and I haven't gotten

paid, this time I'm getting paid, and that person was a person you were negotiating a business deal with, wouldn't you be like what the heck are you talking about; I may do business with you, I'm not giving you a cut of a bribe because I'm not paying you a bribe; I'm offended you would suggest that.  Does the defendant say anything like that ever?  Not once.  Not once.  Why?  There is no answer to that question, except that's exactly what he planned to do, so there was nothing to respond to.  That was the plan.

Now, if Mr. Kim is right and Cheikh Gadio was also part of that plan, that sure doesn't make the defendant not guilty; it just means that Cheikh Gadio was also guilty.  Maybe some of you think that.  Maybe some of you think Cheikh Gadio did get off too easy.  I think that was a phrase Mr. Kim used. You are entitled to your view.  But you took an oath to judge that man as to what he did.  You would be violating that oath if you let him off for what you know he did because you think someone else did it with him who isn't here.

And, by the way, Mr. Kim called those references from Cheikh Gadio blatant requests for bribes.  You might agree, but if they're blatant requests for a bribe, that sure doesn't make the defendant not guilty.

Now, Mr. Kim talked about a lot of other things -- you have been listening to a lot of lawyers today, and I don't plan to talk much more -- but I do want to make a couple of small

IC47HO4                          Rebuttal - Mr. Richenthal

points.

There is a suggestion Mr. Kim made that there is nothing secret in this case.  Now that's obviously not true for the press releases that it be non-press releases, but he suggested that, well everything else was totally above board. Ladies and gentlemen, not a single speech did the defendant say he was doing business, not a single speech did he say he was going to give a donation to Chad, or for that matter was even interested in doing business with Chad.  The people who knew him best, Mr. Jeremic, Mr. Riccardi-Zhu, they had no idea.  His own company, by the way, when they pay the wire -- you remember this -- what did they tell the accounting person?  Professional expenses.  Why lie to your own company?  Because it's a big company.  You don't need everyone to know what's going on. Just a handful of people who have agreed to do something they know they don't want to be asked questions about.

(Continued on next page)

MR. RICHENTHAL:  Just a handful of people who have agreed to do something they know they don't want to be asked questions about, that they know there cannot be a press release about, that they know there can't be an internal entry about. Just the core group.  No one else needs to know.  That is the very definition of secret.  When someone does something that secret, that much discussion, at the same time it advances something he desperately wants.

Mr. Jeremic said to advance the energy company's business, he would love to do that.  That's a quote.  He would love to do that.  When someone's doing that and they don't tell a soul, there's only one reason why -- because they know they're not playing by the rules, and they're hoping no one else finds out.

At the end of the day, there are facts that happen in the world, right?  A lack of press releases about the payments. Those things happen.  And while the defendant has no burden, you have to decide why they happened, because there's no dispute they in fact happened.  And the only way for the defendant to not be guilty about these things that happened is if he is truly the unluckiest man in the world.

In 2014, he is caught on a recording talking about how he is only giving a major contribution if he learns what the person can do for him and his company.  Totally separately, right?  He expresses an interest in business in Chad,

infrastructure, oil.  He flies there on a private jet, doesn't tell anyone he's making a donation, doesn't tell anyone he's making a contribution.  Never expresses a drop of concern for people in that country.  Gives cash to the president.  Remember, under this version of the story, that cash is in fact a donation, even though he didn't tell anyone.  The president says, what are you doing trying to bribe me, in so many words, and he inadvertently admits doing that, even though, remember, under this version of the story, he didn't do it, right?  So he forgets to say, no, it wasn't a bribe.  He says, I'm impressed.  That's truly unlucky.

Then the same man that set this up for him refers to the money -- which, remember, under this version, is not a bribe -- as a gift for the president.  Remember that other email, Cheikh Gadio to the defendant?  He never corrects him.  Must have forgotten.

Then after this thing that wasn't a bribe was rejected and the negotiations aren't going so well, he moves on to Uganda, another country.  Uses the same language:  I want to make this a gateway.  Holds back a donation he's apparently been thinking about for a year.  Just waits on it until the person he's talking to says, we're back in power, what do you want to do?  Then he says, let's renew our mutual agreement and commitment.  Not, you're right, I forgot, let me make that donation.  And then he still doesn't pay, right?  They talk

Ic41ho5                         Rebuttal - Mr. Richenthal

more about business, email after email after email, but he still doesn't pay.  Even though, remember, according to this theory, this is all a donation.  So contrary to everything you've learned in a week, he is not a sophisticated international businessman, he doesn't know anything about how the world works, and he repeatedly forgets what he promised, he repeatedly forgets what he's done, he repeatedly declines to respond to emails that strongly suggest everyone around him thinks is a bribe, and he repeatedly uses language that no one uses, like "mutual agreement," to talk about charity.  He is incredibly unlucky.

And he's also incredibly lucky.  Because in Uganda, they think it's a bribe, and they start giving him business meetings, talking to him about banks.  In other words, he's getting exactly what he wants, even though this apparently isn't linked, in his mind.  So he's both incredibly unlucky and incredibly lucky, all at the same time.

If you have any doubt about why he did these things -- and you shouldn't -- remember, he didn't just do it for the oil company.

And remember Mr. Jeremic's email, at the end of one of them?  You want to know what it says?  Government Exhibit 413-R.  They talked about business.  And by the way, multiple countries.  And at the end of the whole thing, you see that?  "2014 should have us laughing to the banks.

Ic41ho5                          Rebuttal - Mr. Richenthal

(Figuratively and physically)."  Do you have any doubt about what that meant?  Money.

Can you go to the top.

What's the date of this email?  Early 2014.  He thinks it's going to be a good year.  What happens in 2014?  Everything you learned about in this case, right?  It all starts by the fall, goes into the following year.  Remember, this is a man who describes himself as a member of the Beijing oil team.  This is business all the way.

Now I've been talking for some time.  As I said, you've listened to lawyers all day.  So I'm going to sit down.  But sometimes not just actions speak louder than words -- I agree with Mr. Zolkind -- but photos speak louder than anything.

So what does bribery look like?  Right.  The question you're going to have to answer.  Government Exhibit 324.

Just blow up the top.

After everything you've learned over the past week.  Because that happened, right?  That's not fake.  Cheikh Gadio didn't fake that.  That's Uganda.  That's not even Chad.  After everything you've learned over the past week, you honestly think the reason the defendant is standing there is he gave a charitable donation?  You know why he's standing there, looking at oilfields.  Because he paid for it.

And the story doesn't even end there.  You know what

Ic41ho5                          Charge

happens next.  All the other discussion of business.  And do you have any doubt that he knows that's why he's standing there, that he paid to stand there?  That is what bribery looks like.  An international businessman staring at oilfields that he bought his way into, he cheated his way into.  That is what it looks like.  You don't have to say "bribes."  You're too smart for that.  You've got euphemistic terms.  "Commitment." "Donation."  Oh, no, I mean "contributions."  Because you want to stand there.  That's unfair.  It's criminal.  It's why we're here.  That's what bribery looks like.

THE COURT:  Thank you, Mr. Richenthal.

Ladies and gentlemen, you've been listening to lawyers all day.  Now you're going to listen to me a little bit.

We are going to pass out to you a copy of the Court's charge and a copy of the indictment for you to bring into the jury room with you.  You may write on them, whatever.  As soon as they're passed out, I'm going to start talking.

I'll tell the reporter I'm going to go faster than I allowed the lawyers to go, but I will try my best not to change one word.

Thank you, ladies and gentlemen, for your help.

You should have a fat document and a skinny document. Is there anyone who doesn't have one or the other?

All right.  I'm going to start on page 5 of the fat document.

Ic41ho5                         Charge

Members of the jury, we've reached the final stage in these proceedings before you begin your deliberations.  That stage is called the Court's charge -- or instructions -- to the jury.

I've tried to make this charge as clear and concise as possible, but it is necessarily still quite long and somewhat complex.  Your close attention is required and will be appreciated.

I've given each of you a copy of the charge, and you may take that copy with you into the jury room.  For now, as I read the charge to you, you may follow along in your own copy, or put the copy down and simply listen.  The choice is yours.

The charge does three basic things.  First, it explains certain rules and procedures generally applicable to all criminal jury trials.  Second, it explains the rules of law applicable to the specific statutes which the defendant is accused of violating.  Third, and finally, it explains the procedures by which you may ask questions, request exhibits, and, in general, conduct your deliberations.

Let me begin my remarks by thanking you for your patience and attentiveness during the trial.  Having paid careful attention to the evidence as it was presented to you during the trial, you're fully prepared to reach a verdict as to whether or not the government has sustained its burden of proof beyond a reasonable doubt as to each count against the

Ic41ho5                    Charge

defendant.

We've heard all the evidence in the case as well as the final arguments of the lawyers for both sides. My duty at this point is to instruct you as to the law. It's your duty to accept these instructions of law and apply them to the facts as you determine them.

On these legal matters, you must take the law as I give it to you. If any attorney has stated legal principles different from any that I state to you in my instructions, it is my instructions that you must follow. You shall not single out any instruction as alone stating the law, but you should consider my instructions as a whole when you retire to deliberate in the jury room. You should not, any of you, be concerned about the wisdom of any rule that I state. Regardless of any opinion that you have as to what the law may be or ought to be, it would violate your sworn duty to base a verdict upon any view of the law other than that which I give you.

Your final role as jurors is to pass upon and to decide the fact issues in the case. You, the members of the jury, are the sole and exclusive judges of the facts. You pass upon the weight of the evidence; that is, you determine the credibility of the witnesses, you resolve such conflicts as there may be in the testimony, and you draw whatever reasonable inferences you decide to draw from the facts as you have

Ic41ho5                        Charge

determined them.  I'll discuss how to pass upon the credibility -- that is, the believability -- of the witnesses a bit later on in the charge.

In determining the facts, you must rely on your own recollection of the evidence.  What the lawyers have said in their opening statements, in their closing statements, in their objections or in their questions is not evidence.  In this connection, you should specifically bear in mind that a question put to a witness is not itself evidence.  It is only the answer, taken in the context of the question that was asked, which is evidence.  Nor is anything I may have said during the trial or may say during these instructions with respect to a fact matter to be taken in substitution for your own independent recollection.

As I told you at the beginning of the trial, note-taking is allowed.  If you took notes, they are to be used solely to assist you, and your notes are not to substitute for your own recollection of the evidence in the case.  The fact that a juror has taken notes -- the fact that a particular juror has taken notes entitles that juror's view to no more weight than those of any other juror, and your notes are not to be shown or read to any other juror during the course of deliberations.

The evidence before you consists of the answers given by the witnesses -- the testimony they gave, as you recall

Ic41ho5                        Charge

it -- the exhibits that were received into evidence, and the
stipulations of the parties.

However, you may not consider any answer, testimony,
or exhibits that I directed you to disregard or that I directed
to be stricken from the record.  If an answer has been
stricken, it must be entirely disregarded as though the words
were never spoken.  Similarly, if an objection to a question
was sustained before the witness answered, you must disregard
the question entirely.  You may draw no inferences from the
wording of the question or speculate about what the witness
might have answered.

Your verdict must be based solely upon the evidence
developed at trial or the lack of evidence.  All persons are
entitled to the presumption of innocence, and it would be
improper for you to allow any feelings you might have about the
nature of the crimes charged to interfere with your
decision-making process.  To repeat, your verdict must be based
exclusively upon the evidence or the lack of evidence in the
case.

Now because you are the sole and exclusive judges of
the facts, I do not mean to indicate any opinion as to the
facts or what your verdict should be.  The rulings that I've
made during the trial are not any indication of my views of
what your decision should be as to whether or not the guilt of
the defendant has been proven beyond a reasonable doubt.

Ic41ho5                         Charge

I also ask you to draw no inference from the fact that upon occasion, I asked questions of certain witnesses.  These questions were intended only for clarification or to expedite matters, but were not intended to suggest any opinions on my part.  You are expressly to understand that the Court has no opinion as to what verdict you should render in this case.

You should also note that it's the duty of the attorneys on each side of the case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible.  Counsel also have the right and the duty to ask the Court to make rulings of law and request conferences at the sidebar out of the hearing of the jury.  All those questions of law must be decided by me, the Court, and you should not show any prejudice against an attorney or his client because the attorney objected to the admissibility of evidence or asked for a conference out of the hearing of the jury, or asked the Court for a ruling on the law.

I don't think this happened, but I'll do it anyway. During the course of the trial, I might have had to admonish or reprimand an attorney because I didn't believe what he was doing was proper.  You should draw no inference against the attorney or his client.  It is the duty of the attorneys to offer evidence and to press objections on behalf of their side. It's my function to cut off counsel from an improper line of

Ic41ho5                     Charge

argument or questioning or to warn counsel when I think it's necessary.  But you should draw no inference from that.  It's irrelevant whether you like a lawyer or whether you believe I like a lawyer.  The issue before you is not which attorney is wittier or more likeable or the better attorney.  The issue is whether or not the government has sustained its burden of proof beyond a reasonable doubt.  In addition, you should note that the attorneys themselves do not have any personal knowledge of the facts of this case.  Their role is that of advocates, not witnesses.

You are to perform your duty of finding the facts without bias or prejudice as to any party.  You are to perform your final duty in an attitude of complete fairness and impartiality.

The fact that the government is a party and that the prosecution is brought in the name of the United States of America does not entitle the government or its witnesses to greater consideration than that accorded to any other party. All parties, whether the government or individuals, stand as equals before the bar of justice.

As you know, the defendant has been indicted on eight counts, and you each have a copy of the indictment which you may take into the jury room to assist you in your deliberations.

It's important for you to understand, as I said at the

very outset of the trial, that the indictment is merely an accusation.  It's not evidence of the crime charged.  It's not proof of the defendant's guilt.  The indictment is merely a method or procedure under the law whereby persons accused of crimes by the grand jury are brought into court to have their case tried by a trial jury, such as yourself.  Therefore, the indictment must be given no evidentiary value but should be treated by you only as an accusation.  No weight or significance whatsoever is to be given to the fact that an indictment has been brought against the defendant.

The defendant has pleaded not guilty and thus the government has the burden of proving the charges against him beyond a reasonable doubt.  This burden never shifts to the defendant for the simple reason that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

The law presumes the defendant to be innocent of all the charges against him.  I therefore instruct you that the defendant is to be presumed by you to be innocent throughout your deliberations until such time, if ever, that you as a jury are satisfied that the government has proved him guilty beyond a reasonable doubt.

A defendant begins a trial with a clean slate.  And this presumption of innocence alone is sufficient to acquit a defendant unless you as jurors are unanimously convinced beyond

a reasonable doubt of his guilt, after a careful and impartial consideration of all of the evidence in the case.

Now I've said that the government must prove a defendant guilty beyond a reasonable doubt, and the question naturally arises, what is a reasonable doubt?  The words almost define themselves.  It is a doubt based on reason and common sense.  It is a doubt that a reasonable person has after carefully weighing all of the evidence.  And it's a doubt which would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.  Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

The law does not require the government to prove guilt beyond all possible doubt.  Proof beyond a reasonable doubt is not a caprice or a whim.  It's not a speculation or suspicion. It's not an excuse to avoid the performance of an unpleasant duty.  And it is not sympathy.

Let me repeat, however, that it is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt.  The defendant is under no duty to present any evidence or to challenge the evidence presented by the government.  Nor do you have to accept the testimony of any witness, even one who has not been

Ic41ho5                        Charge

contradicted or impeached, if you find that witness not to be credible.  You must decide which witnesses to believe and which facts are true.  To do this, you must look at all of the evidence, drawing on your own common sense and personal experience.

If, after a fair and impartial consideration of all of the evidence, you have a reasonable doubt as to the guilt of the defendant, then it is your duty to acquit the defendant.  On the other hand, if, after a fair and impartial consideration of all of the evidence, you are satisfied of the defendant's guilt beyond a reasonable doubt, then you should vote to convict.

Now I've said several times that your verdict must be based upon the evidence or lack of evidence.  Let me now give you some rules about the various types of evidence and how you should evaluate the testimony of the witnesses.  After that, I'll discuss the specific charges against the defendant and what the government must show in order to satisfy its burden of proof.

The law recognizes two types of evidence, direct and circumstantial.  You may rely upon either in reaching your decision.  Evidence is direct when the facts are shown by exhibits which are admitted into evidence or when the facts are sworn to by witnesses who have actual knowledge of them from something they've derived from the exercise of their senses --

Ic41ho5                          Charge

something they heard, something they saw, something they

smelled, something they touched, and so on.

Circumstantial evidence is evidence which tends to

prove a disputed fact by proof of other facts.  And there's a

simple example of circumstantial evidence which is often used

in this courthouse.  Assume that when you came into the

courthouse this morning, the sun was shining and it was a nice

day.  Assume that the courthouse shades are drawn and you

couldn't look outside.  As you're sitting here, someone walked

in with an umbrella that was dripping wet.

Now you can't look outside the courtroom and you

cannot see whether or not it's raining, so you have no direct

evidence of that fact.  But on the combination of facts that

I've asked you to assume, it would be reasonable and logical

for you to conclude that it had been raining.

That's all there is to circumstantial evidence.  You

infer on the basis of reason and experience and common sense

from an established fact the existence or nonexistence of some

other fact.

Circumstantial evidence is of no less value than

direct evidence.  And it's a general rule that the law makes no

distinction between direct and circumstantial evidence but

simply requires that before convicting a defendant, the jury

must be satisfied of the defendant's guilt beyond a reasonable

doubt from all of the evidence in the case.

During the trial you've heard the attorneys use the word "inference."  In their arguments they have asked you to infer, on the basis of your reason, experience, and common sense, from one or more established facts the existence or nonexistence of some other facts.

An inference is not a suspicion or a guess.  It's a reasoned, logical decision to conclude that a disputed fact exists, on the basis of another fact which you know exists.

There are times when different inferences may be drawn from the facts, whether proved by direct or circumstantial evidence.  The government asks you to draw one set of inferences, while the defense asks you to draw another.  It's for you, and for you alone, to decide what inferences you will draw.

The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a deduction which you, the jury, are permitted to draw, but are not required to draw, from the facts which have been established by either direct or circumstantial evidence.  In drawing inferences, you should exercise your common sense.

So while you're considering the evidence presented to you, you're permitted to draw from the facts you find to be proven such reasonable inferences as are justified in light of your experience.

Here again, however, let me remind you, whether based

Ic41ho5                        Charge

upon direct or circumstantial evidence, or upon the logical, reasonable inferences drawn from such evidence, you must be satisfied of the guilt of the defendant beyond a reasonable doubt before you may convict.

Now there's been a great deal said in the openings and the summations of counsel about whether various witnesses should be believed.  And I'm sure it's clear to you by now that you are being called upon to resolve various factual issues under the counts of the indictment (which I'll discuss shortly), in the face of very different pictures painted by the government and the defense which cannot be reconciled.  You will have to decide whether the government has proven guilt beyond a reasonable doubt, and an important part of that decision will involve making judgments about the testimony of the witnesses you've listened to and observed.  In making those judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence which may help you to decide the truth and the importance of each witness' testimony.

Let me give you some general guidance about how to evaluate testimony.  After that I'll discuss some additional issues raised by the witnesses who have testified in this case.

There is no magic formula for evaluating testimony. You bring into this courtroom all of the experience and

Ic41ho5                         Charge

background of your lives in your everyday affairs.  You determine for yourself every day and in a multitude of circumstances the reliability of statements which are made to you by others.  The same tests you use in your everyday matters of importance are the tests that you should use in your deliberations.

Your decision whether or not to believe a witness may depend on how the witness impressed you.  Was the witness candid, frank, forthright, or did the witness seem as if he or she was hiding something, being evasive or suspect in some way?  How did the way in which the witness testified on direct examination compare with the way he or she testified on cross-examination?  Was the witness's testimony consistent or self-contradicting?  Did the witness appear to know what he or she was talking about and did the witness strike you as someone who was trying to report his or her knowledge accurately?

How much you choose to believe a witness may be influenced by the witness' bias.  Does the witness have a relationship with the government or the defendant which might affect how he or she testified?  Does the witness have some incentive, loyalty, or motive that might cause him or her to shade the truth?  Or does the witness have some bias, prejudice, or hostility that may have caused the witness, consciously or not, to give you something other than a completely accurate account of the facts he or she testified

about?  You should also consider the witness' ability to express him- or herself.  Ask yourselves whether the witness' recollection of the facts stands up in light of all the other evidence in the case.

If you find that any witness has wilfully testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety.  On the other hand, even if you find that a witness has testified falsely or inaccurately about one matter, you may reject as false or inaccurate that portion of his or her testimony and accept as true any other portion of his or her testimony which recommends itself to your belief or which you may find corroborated by other evidence in the case.

In essence, what you must try to do in deciding credibility is to size the person up in light of his or her demeanor, the explanations given, and all the other evidence in the case, just as you would do in any important matter where you're trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

In deciding the issue of credibility, remember that you should use your common sense, your good judgment, and your experience.

If you find that any witness whose testimony you are considering may have an interest in the outcome of the trial, then you should bear that factor in mind in evaluating the

credibility of his or her testimony, and accept it with great care.  And this is not to say that every witness who has an interest in the outcome of a case will testify falsely.  It's for you to decide to what extent, if any, the witness' interests affected or colored his or her testimony.

The defendant, Chi Ping Patrick Ho, who is also known as Patrick C.P. Ho or He Zhiping, is formally charged in an indictment.  As I've instructed you already, the indictment is not evidence of a crime and is simply a way for the government to present the charges in this case.  Before you begin your deliberations, you've already been provided with a copy of the indictment.  I will not read the entire indictment to you at this time.  Rather, I'll just summarize the offenses charged in the indictment and then explain in detail the elements of each offense.

The indictment contains eight counts against the defendant.  I'm basically going to summarize each count and then give you the law in greater detail.

Count One alleges that the defendant, together with others known and unknown, engaged in a criminal conspiracy, or agreement, to violate the Foreign Corrupt Practices Act, which we've been calling the FCPA.

Counts Two, Three, Four, and Five each allege that the defendant violated the Foreign Corrupt Practices Act.

Count Six alleges that the defendant, together with

Ic41ho5                    Charge

others known and unknown, engaged in a criminal conspiracy, or

agreement, to commit money laundering.

Counts Seven and Eight each allege that the defendant

committed the crime of money laundering.

The defendant has denied that he is guilty of these

charges.

Count One.  As I said, Count One of the indictment

charges the defendant with participating in a conspiracy to

violate the FCPA.

The relevant statute on this subject, conspiracy,

provides:

"If two or more persons conspire... to commit any

offense against the United States..., and one or more such

persons do any act to effect the object of the conspiracy, each

[is guilty of an offense against the United States]."

As I said, Count One charges a conspiracy to violate

the FCPA.  A conspiracy is a kind of criminal partnership -- a

combination or agreement of two or more persons to join

together to accomplish some unlawful purpose.

The crime of conspiracy -- or unlawful combination or

agreement -- to violate the FCPA, as charged in Count One of

the indictment, is an independent offense.  That is, a

conspiracy is separate and distinct from the actual violations

under specific federal law.  The actual violation of any

specific federal laws is referred to as a "substantive crime."

Ic41ho5                    Charge

Counts Two through Five, which I'll discuss in a few moments, charge the defendant with the substantive violations of the FCPA.  But Count One charges him only with conspiring or agreeing to violate the FCPA.

Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the object or goal of the conspiracy is not achieved.  This is because collective criminal activity is believed to pose a greater threat to the public safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.

Here, the defendant is charged both with conspiracy to violate the FCPA and with the substantive crimes of violating the FCPA.  Given that a conspiracy and a substantive crime are distinct and independent offenses, you may find the defendant guilty of the crime of conspiracy even if you find that he never actually committed any of the substantive crimes that were the object or goals of the conspiracy.  By the same token, you can find the defendant guilty of committing the substantive crime or crimes with which he's charged -- here, violating the FCPA -- even if you find him not guilty of conspiracy to violate the FCPA.

In order to sustain its burden of proof with respect to the conspiracy charged in Count One, the government must prove beyond a reasonable doubt the following three things,

which we call the elements:

First, the existence of the conspiracy charged, that is, an agreement or understanding to violate certain laws of the United States;

Second, that the defendant knowingly and wilfully became a member of the conspiracy charged; and

Third, that any one of the conspirators -- that is, the defendant or any member of the conspiracy -- knowingly committed at least one overt act during the life of the conspiracy.

Now let us separately consider each of the three elements.

Starting with the first element, what is a conspiracy? As I mentioned just a few moments ago, a conspiracy is a combination or agreement or an understanding between two or more people to accomplish by joint action a criminal or unlawful purpose. The indictment charges that the defendant and at least one other person agreed to violate the FCPA.

The gist, or essence, of the crime of conspiracy is the unlawful combination or agreement of two or more people to violate the law. As I mentioned earlier, the ultimate success of the conspiracy, or the actual commission of the crime that is the object of the conspiracy, is not required for a conspiracy to have existed.

The conspiracy alleged here in Count One, therefore,

Ic41ho5                    Charge

is an agreement to violate the FCPA.  As I instructed you before, it's an entirely distinct and separate offense from the substantive crime of violating the FCPA charged in Counts Two, Three, Four, and Five.

Now to prove a conspiracy, the government is not required to show that two or more people sat around a table and entered into a pact, orally or in writing, stating that they had formed a conspiracy to violate law and spelling out all of the details.  You need not find that the alleged conspirators stated in words or writing what the scheme was, its object or purpose, or every precise detail of the scheme, or the means by which the object or purpose was to be accomplished.  What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other, to accomplish an unlawful act.

It's rare that a conspiracy can be proven by direct evidence of an explicit agreement.  Rather, in determining whether there has been an unlawful agreement as alleged in the indictment, you may consider the actions and conduct of all the alleged co-conspirators that were taken to carry out the apparent criminal purpose.  The old adage, "actions speak louder than words," applies here.  Often, the only evidence that is available with respect to the existence of the conspiracy is that of disconnected acts and conduct on the part of the alleged individual co-conspirators.  When taken all

together and considered as a whole, however, these acts and conduct may warrant the inference that a conspiracy existed just as conclusively as more direct proof, such as evidence of an express agreement.

So you must first determine whether or not the evidence established beyond a reasonable doubt the existence of the conspiracy charged in the indictment.  In considering this first element, you should consider all of the evidence that's been admitted with respect to the conduct and statements of each alleged co-conspirator, and any inferences that may reasonably be drawn from them.  It is sufficient to establish the existence of the conspiracy, as I've already said, if, from proof of all of the relevant facts and circumstances, you find beyond a reasonable doubt that the minds of at least two alleged co-conspirators met in an understanding way to accomplish, by the means alleged, at least one object of the conspiracy.

The objects of a conspiracy are the illegal goal or goals the co-conspirators agree or hope to achieve.  The two objects of the conspiracy charged in Count One are:

(i) violating the FCPA as an officer, director, employee, or agent of a domestic concern (which is a term I'll define in a moment) by offering to pay, paying, promising to pay, or authorizing the payment of money or anything of value to a foreign official -- here, any or all of the following

individuals, among others -- the President of Chad; the Foreign Minister of Uganda; or the President of Uganda -- for certain specified business purposes, which I'll explain further.

(ii) violating the FCPA while in the territory of the United States by offering to pay, paying, promising to pay, or authorizing the payment of money or anything of value to any or all of the following individuals, among others -- the President of Chad, the Foreign Minister of Uganda, or the President of Uganda -- again, for certain specified business purposes, which I'll explain further.

I'll give you more detailed instructions regarding the elements of each object of the conspiracy when I explain Counts Two, Three, Four, and Five, which pertain to the substantive crimes of violating the FCPA.

In considering the two alleged objects of the conspiracy, you should keep in mind that you need not find that the conspirators agreed to accomplish each of these two objects or goals. Instead, an agreement to accomplish either one of the two objects is sufficient. However, you must all agree on the specific object or objects the conspirators agreed to try to accomplish, and you may find that they agreed to try to accomplish more than one.

If the government fails to prove that either of the two objects set forth on the indictment was an object of the alleged conspiracy, then you must find the defendant not guilty

on the conspiracy count.  However, if you find that two or more persons agreed to accomplish at least one of the objects charged in the indictment, the illegal purpose element will be satisfied, regardless of whether or not that object was in fact accomplished -- that is, regardless of whether that goal succeeded.

If you conclude that the government has proved beyond a reasonable doubt that the conspiracy charged in Count One of the indictment existed, then you must next determine the second question -- whether the defendant participated in the conspiracy with knowledge of its unlawful purpose or purposes, and in furtherance of its unlawful objective or objectives.

In this regard, what the government must prove beyond a reasonable doubt is that the defendant knowingly and wilfully entered into the conspiracy and that the defendant agreed to take part in the conspiracy to promote and cooperate in one or both of its unlawful objective or objectives.

To act "knowingly" means to act intentionally and voluntarily and not because of ignorance, mistake, accident, or carelessness.

"Wilfully" means to act knowingly and purposefully, with an intent to do something the law forbids -- that is to say, with a bad purpose, either to disobey or disregard the law.  However, the government need not prove that the defendant knew that he was breaking any particular law or any particular

rule or was aware of any particular law or rule.  The government must only show that the defendant was aware of the generally unlawful nature of his acts.

Now science has not yet devised a manner of looking into a person's mind and knowing what the person is thinking.  However, you have before you evidence of certain acts, conversations, and statements alleged to involve the defendant and others.  The government contends that these acts, conversations, and statements show beyond a reasonable doubt the defendant's knowledge of the unlawful purpose of the conspiracy.

It is not necessary for the government to show that the defendant was fully informed as to all of the details of the conspiracy in order for you to infer knowledge on his part. To have guilty knowledge, the defendant need not have known of the full extent of the conspiracy or all of the activities of all of the participants.  It's not even necessary that the defendant knew each and every other member of the conspiracy. Nor is it necessary that the defendant received any monetary benefit from participating in the conspiracy, or had a financial stake in the outcome.  It is enough if the defendant participated in the conspiracy knowingly and wilfully, as I've defined those terms.

The duration and extent of the defendant's participation in the alleged conspiracy has no bearing on the

issue of the defendant's guilt.  A defendant need not have joined the conspiracy at the outset.  He may have joined it at any time -- at the beginning, in the middle, or at the end.

Each member of a conspiracy may perform separate and distinct acts.  Some conspirators play major roles, while others play minor roles.  An equal role is not what the law requires.  In fact, even a single act may be sufficient to draw a defendant within the scope of a conspiracy.

I want to caution you, however, that the defendant's mere presence at the scene of an alleged crime does not by itself make him a member of the conspiracy.  Similarly, mere association with a member of the conspiracy does not make a person a member of the conspiracy, even if that association is coupled with knowledge that a conspiracy is occurring.

In other words, knowledge of a conspiracy, without agreement to participate in it, is not sufficient.  Moreover, the fact that the acts of a defendant without knowledge merely happen to further the purpose or objectives of the conspiracy does not make a defendant a member.  More is required under the law.  What is necessary is that the defendant participated in this conspiracy with knowledge of its unlawful purposes, and with an intent to aid in the accomplishment of its unlawful objectives.

In sum, a defendant, with an understanding of the unlawful nature of the conspiracy, must have intentionally

Ic41ho5                          Charge

engaged, advised, or assisted in the conspiracy for the purpose of furthering an illegal undertaking. That defendant thereby becomes a knowing and willing participant in the unlawful agreement -- that is to say, a conspirator.

A conspiracy, once formed, is presumed to continue until either its objective is accomplished or there is some affirmative act of termination by its members. So too, once a person is found to be a member of a conspiracy, he or she is presumed to continue membership in the venture until its termination, unless it is shown by some affirmative proof that the person withdrew and disassociated himself from the conspiracy.

The third element is the requirement of an overt act. To sustain its burden of proof with respect to the conspiracy charged in the indictment, the government must show beyond a reasonable doubt that at least one overt act was knowingly committed in furtherance of that conspiracy by at least one of the co-conspirators -- either the defendant or any other member of the conspiracy. The defendant need not be the person who committed the act.

Count One of the indictment contains a section that describes certain alleged "overt acts."

The government does not need to prove any of the specific overt acts alleged in the indictment. You may find that overt acts were committed in furtherance of the conspiracy

that are not alleged in the indictment. Ultimately, the only requirement is that one of the members of the conspiracy -- again, not necessarily the defendant -- has knowingly and wilfully taken some step or action in furtherance of the conspiracy during the life of the conspiracy.

In other words, the overt act element is a requirement that the agreement went beyond the mere talking stage, the mere agreement stage. The requirement of an overt act is a requirement that some action be taken during the life of the conspiracy by one of the co-conspirators in order to further that conspiracy.

You need not reach unanimous agreement on whether a particular overt act was committed in furtherance of the conspiracy. You just need to all agree that at least one overt act was so committed.

You should also bear in mind that the overt act standing alone may be an innocent lawful act. Frequently, however, an apparently innocent act loses its harmless character if it is a step in carrying out, promoting, aiding, or assisting the conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act that in and of itself is criminal or constitutes an objective of the conspiracy.

The indictment alleges that the conspiracy existed from at least in or about the fall of 2014 through in or about

January 2017.  It's not essential that the government prove that the alleged conspiracy started and ended on specific dates.  The law only requires a substantial similarity between the dates alleged in the indictment and the date established by the testimony or the exhibits.

Now you will recall that I've admitted at this trial evidence of the acts and statements of other individuals, because such acts were committed and such statements were made by a person who, the government claims, was also a confederate or co-conspirator of the defendant.

The reason for allowing this evidence to be received against the defendant has to do in part with the nature of the crime of conspiracy.  As I've said, a conspiracy is often referred to as a partnership in crime.  As in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Therefore, the reasonably foreseeable acts or statements of any member of the conspiracy, committed in furtherance of the common purpose of the conspiracy, are deemed under the law to be acts and statements of all of the members, and all of the members are responsible for such acts or statements.

If you find, beyond a reasonable doubt, that the defendant was a member of the conspiracy charged in the

Ic41ho5                          Charge

indictment, then any act done or statements made in furtherance of the conspiracy, by a person also found by you to have been a member of the same conspiracy, may be considered against the defendant.  This is so even if such acts were committed, or such statements were made, in the defendant's absence and/or without his knowledge.

However, before you may consider the acts or statements of a co-conspirator in deciding the fate of the defendant, you must first determine if the acts were committed or statements were made during the existence, and in furtherance of, the unlawful scheme.  If the acts were done or the statements were made by someone whom you do not find to have been a member of the conspiracy, or if they were not in furtherance of the conspiracy, then they may not be considered by you in deciding whether the defendant is guilty or not guilty.

Count Two of the indictment charges the defendant with the substantive crime of violating the FCPA.  The FCPA makes it a federal crime for certain individuals to offer to pay, pay, promise to pay, or authorize the payment of, money or anything of value to a foreign official for one or more specified business purposes, which I'll explain.

The indictment charges four FCPA substantive counts. Counts Two and Three charge the defendant based on his status as an alleged officer, director, employee, or agent of a

Ic41ho5                    Charge

domestic concern, which is a term I'll define shortly, or as a stockholder of a domestic concern acting on behalf of such domestic concern.  Count Two pertains to Chad and Count Three pertains to Uganda.

Counts Four and Five, by contrast, charge the defendant based not on his alleged association with the domestic concern but rather based on actions he has alleged to have taken within the territory of the United States.  Count Four pertains to Chad, and Count Five pertains to Uganda.

I'll begin by explaining the elements of Count Two -- the charge which relates to Chad and charges the defendant based on his alleged association with a domestic concern.

To meet its burden of proof on Count Two, the government must establish beyond a reasonable doubt each of the following seven elements:

First, at the relevant time or times, the defendant was an officer, director, employee, or agent of a domestic concern, or a stockholder thereof, acting on behalf of such domestic concern;

Second, that the defendant acted corruptly and wilfully;

Third, the defendant made use of or caused another to make use of the mails or any means or instrumentality of interstate commerce, such as email, in furtherance of the offense;

Fourth, the defendant offered, paid, promised to pay, or authorized the payment of money or a gift or anything of value;

Fifth, that the offer, promise to pay, or authorization of the payment of money or a gift or anything of value was either (a) to a foreign official, or (b) to any other person or entity while the defendant knew that all or a portion of the payment would be offered, given, or promised, directly or indirectly, to a foreign official;

Sixth, that the payment was intended for any one of three purposes relevant to this action: (a) to influence any act or decision of a foreign official in his official capacity; (b) to induce such foreign official to do or omit to do any act, in violation of the lawful duty of such sworn official; or (c) to secure any improper advantage; and

Seventh, the payment was made to assist the domestic concern in obtaining or retaining business for or with, or directing business to, any person or company.

The first element that the government must prove for Count Two is that the defendant was an officer, director, employee, or agent of a domestic concern, or a stockholder thereof acting on behalf of such domestic concern.

A "domestic concern" is: (a) any individual who is a citizen, national, or resident of the United States; or (b) any corporation, partnership, association, joint stock company,

Ic41ho5                    Charge

business trust, unincorporated organization, or sole proprietorship that has its principal place of business in the United States, or that is organized under the law of a state of the United States, or a territory, possession, or commonwealth of the United States.

The terms "officer," "director," and "employee" have their ordinary meaning.  An agent is a person who by express or implicit agreement with another person or entity, called the principal, undertakes to represent, or to act on behalf of, the principal in performing some service for the principal.  Joint participation in a partnership or joint venture, whether formal or informal, suffices to make each partner or joint venturer an agent of the other.

An agent is acting within the scope of the agent's authority if the agent is engaged in the performance of duties that were expressly or implicitly assigned to the agent by the principal.

Proof of agency need not be in the form of a formal agreement between the agent and the principal.  Rather, it may be inferred circumstantially and from the words and actions of the parties involved.

In order to find this element has been satisfied, you must agree unanimously on the applicable domestic concern.

The second element that the government must prove for Count Two is that the defendant acted corruptly and wilfully.

Ic41ho5                        Charge

An act is corruptly done if it is done voluntarily and intentionally and with a bad purpose or evil motive of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.  The term "corruptly" in the FCPA means that the offer, payment, or promise was intended to induce a foreign official to misuse his or her official position.

The term "wilfully" means that the defendant committed the act voluntarily and purposefully and with knowledge that his conduct was, in a general sense, unlawful.  That is, the defendant must have acted with a bad purpose to disobey or disregard the law.  The government need not prove that the defendant was aware of the specific provision of the law that he is charged with violating, or any other specific provision.

The third element that the government must prove for Count Two is that the defendant, or someone acting at his direction or with his authorization, made use of the mails or any other instrumentality of interstate commerce, such as email, in furtherance of the offense.

The term "interstate commerce" means trade, commerce, transportation, or communication among the several states, or between any foreign country and any state, or between any state and any place outside thereof, and such term includes interstate use of (a) telephone or other means of communication, such as email, text message, or fax, between the

states or between the United States and a foreign country, or a transfer of money by wire between states or between the United States and a foreign country; or (b) any other interstate commerce instrumentality. If such mechanisms as trade, transportation, and communication are utilized by persons in goods passing between various states, or between United States and a foreign country, they are instrumentalities of interstate commerce. I instruct you that, as a matter of law, sending an international wire transfer through a US bank constitutes the use of a means or instrumentality of interstate commerce. So if you find that such a thing occurred, by the defendant or someone acting at his direction, in furtherance of the offense, you may find that this element has been proved.

As I previously told you, the fourth element that the government must prove beyond a reasonable doubt for you to convict the defendant of violating the FCPA in Count Two is that the defendant offered, paid, promised to pay, or authorized the payment of money or a gift or anything of value. A "thing of value" can take any form, whether cash, check, wire transfer, gifts, donations, contributions, or anything else.

It's not required that the defendant provide or offer the thing of value himself. Rather, a defendant who engages in bribery of a foreign official indirectly, through any other person, is liable under the FCPA just as if the defendant had engaged in the bribery directly. Thus, if you find that the

Ic41ho5                    Charge

defendant authorized another person to pay a bribe, that authorization alone is sufficient for you to find that this element has been proved.

Furthermore, it's not necessary that the payment actually take place.  Instead, it's the offer or the authorization that completes the crime.  You may find this element satisfied if you find that the defendant promised or authorized an unlawful payment, even if you believe that the payment was not actually made.  It is sufficient simply if the defendant believed that a bribe would be offered or paid or that he promised or authorized the offer or payment.

The fifth element that the government must prove beyond a reasonable doubt for Count Two is that the offer to pay, payment, promise to pay, or authorization of payment was to a foreign official, or to any person or entity, while the defendant knew that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official.  For the purpose of Count Two, the alleged foreign official is Idriss Deby, the President of Chad.

For purposes of the FCPA, a person's state of mind is knowing with respect to conduct, a circumstance, or result if: (1) such a person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or (2) such person has a firm belief that such circumstance exists or such result is

Ic41ho5                          Charge

substantially certain to occur.

For purposes of the FCPA, a person is deemed to have knowledge of a circumstance if the evidence shows that he or she was aware of a high probability of the existence of such circumstance, unless he or she actually believes that such circumstance does not exist.

The term "foreign official" means any official or employee of a foreign government, or any department or agency thereof, or of a public international organization, such as the United Nations, or any person acting in an official capacity for or on behalf of such government or department or agency thereof, or for or on behalf of any such public international organization.

These six elements that the government must prove beyond a reasonable doubt is that the payment or offer was intended for any one of three purposes relevant to this action: (a) to influence any act or decision of a foreign official in his or her official capacity; (b) to induce such foreign official to do or omit to do any act, in violation of the lawful duty of such foreign official; or (c) to secure any improper advantage.

(Continued on next page)

THE COURT:  The government need not prove that the offer to pay, payment, promise to pay, or authorization of payment was for all of these purposes.  If the government proves that the offer to pay, payment, promise to pay, or authorization of payment was for any of these purposes, or more than one, this element has been met.

The seventh and final element the government must prove for Count Two is that the payment was made to assist the domestic concern in obtaining or retaining business for or with, or directing business to, any person or company.

It is not necessary for the government to prove that any person or company actually obtained or retained any business as a result of the unlawful offer, payment, promise, or gift, only that the defendant intended to assist the domestic concern in obtaining or retaining business for or with any person or company.

Count three charges the defendant with another substantive violation of the FCPA.  Like Count Two, Count three charges the defendant based on his alleged association with a "domestic concern."  That is, Count Three alleges that the defendant was an officer, director, employee, or agent of a domestic concern, or a stockholder thereof acting on behalf of such domestic concern.  Whereas Count Two pertained to Chad, Count Three pertains to Uganda.

To meet its burden of proof on Count Three, just as

IC47HO6                        Charge

with Count Two, the government must establish beyond a reasonable doubt the seven elements I described previously. The only difference is what the government must establish in connection with the fifth element of Count Three.  The fifth element that the government must prove beyond a reasonable doubt is that the offer to pay, payment, promise to pay, or authorization of payment was to a foreign official, or to any other person or entity, while the defendant knew that all or a portion of the payment or gift would be offered, given or promised, directly or indirectly, to a foreign official.

Like Count Two, for Count Three, a person's state of mind for purposes of the FCPA is "knowing" with respect to conduct, a circumstance, or a result if:  (1), such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or (2) such person has a firm belief that such circumstance exists or that such result is substantially certain to occur.  For purposes of the FCPA, a person is deemed to have knowledge of the circumstance if the evidence shows that he or she was aware of a high probability of the existence of such circumstances, unless he or she actually believes that such circumstance does not exist.

For Count Three, the alleged foreign officials include Sam Kutesa, the Foreign Minister of Uganda, and/or Yoweri Museveni, the President of Uganda.

In order to find that this element has been satisfied, you must agree unanimously on the applicable foreign official or officials.  That is, you must unanimously agree that the defendant bribed or offered to bribe either Kutesa or Museveni.  You need not unanimously agree that he bribed or offered to bribe both individuals.

Counts Four and Five of the indictment charge the defendant with substantive violations of the FCPA -- Count Four pertains to Chad, and Count Five pertains to Uganda -- but unlikes Counts Two and Three, Counts Four and Five do not charge the defendant based on his alleged association with a "domestic concern."  Rather, they charge him based on actions alleged to have been taken by the defendant in the territory of the United States.  Specifically, Counts Four and Five allege that the defendant, while in the territory of the United States, corruptly used the mails and any means or instrumentality of interstate commerce, or did any other act, in furtherance of an offer, payment, promise to pay or authorization of payment of any money, gift, or anything of value to a foreign official, for one or more specified business purposes, which I described earlier and will discuss again in a moment.

In order to meet its burden of proof as to Count Four, the government must establish beyond a reasonable doubt each of the following seven items:

IC47HO6                    Charge

First, the defendant was not a domestic concern;

Second, the defendant, while in the territory of the United States, used the mails or any means or instrumentality of interstate commerce, or did any act, in furtherance of a corrupt offer, payment, promise to pay, or authorization of the payment or money or a gift or anything of value;

Third, the defendant acted corruptly and willfully;

Fourth, the defendant offered, paid, promised to pay, or authorized the payment of money or a gift or anything of value;

Fifth, the payment or offer was to a foreign official or to any other person or entity, while the defendant knew that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official;

Sixth, that the payment or offer was intended for any one of three purposes relevant to this action:  (a) to influence any act or decision of a foreign official in his or her official capacity; (b) to induce such a foreign official to do or omit to do any act in violation of the lawful duty of such a foreign official, or (c) to secure any improper advantage; and

Seventh, the payment was made to assist the defendant, in obtaining or retaining business for or with, or directing business to, any person or company.

As you can see, many of the same elements that apply to a violation of the FCPA based on a defendant's association with a "domestic concern" (Counts Two and Three) also apply to a violation committed based on the defendant's actions within the territory of the United States (Counts Four and Five).  The main differences are that, under Counts Four and Five, (i) the defendant must have engaged in any act in furtherance of the corrupt payment, offer, promise or authorization to pay while in the territory of the United States, and (ii) there is no requirement that the defendant made use of the mails or any means or instrumentality of interstate commerce.

The first element that the government must prove for Count Four is that the defendant was not himself a domestic concern.  That is, the government must prove that the defendant was not a citizen, national, or resident of the United States at the time of the charged events.  The defendant could still have been an officer, director, employee, or agent of a domestic concern.

The second element that the government must prove for Count Four is that the defendant, while in the territory of the United States, made use of the mails, or any means or instrumentality of interstate commerce, or did any other act, in furtherance of a corrupt payment or offer.  The territory of the United States includes the 50 states and the District of Columbia.  I explained earlier what it means to make use of the

IC47HO6                        Charge

mails or any means or instrumentality of interstate commerce. Bear in mind that unlike the "domestic concern" counts (Counts Two and Three), which require the government to proffer that the defendant made use of the mails or any means or instrumentality of interstate commerce, Counts Four and Five do not require such proof.  Rather, under Counts Four and Five, it is sufficient if the government proves that the defendant, while in the territory of the United States, took any act (regardless of whether it involved the mails or any means or instrumentality of interstate commerce) in furtherance of a corrupt offer or payment.

The third element that the government must prove beyond a reasonable doubt for Count Four, just as with Counts Two and Three, is that the defendant acted corruptly and willfully.  I have previously defined these terms in connection with the FCPA statute and those definitions apply here.  Unless of course you want me to repeat them.  Thank you.  I wanted to be sure you were paying attention.

The fourth element that the government must prove beyond a reasonable doubt for you to convict the defendant of violating the FCPA in Count Four is that the defendant offered, paid, promised to pay, or authorized the payment of money or a gift or anything of value, as I have already defined.

The fifth element the government must prove beyond a reasonable doubt for Count Four is that the offer to pay,

IC47HO6                          Charge

payment, promise to pay, or authorization of payment was to a foreign official or to any other person or entity, while the defendant knew that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official, as I have defined previously.  For purposes of Count Four, the alleged foreign official is Idriss Deby, the President of Chad.

The sixth element the government must prove beyond a reasonable doubt for Count Four is that the offer to pay, payment, promised to pay, or authorization of payment was for one or more of the three purposes I outlined previously.

The seventh and final element the government must prove beyond a reasonable doubt for Count Four is that the payment was made to assist the defendant in obtaining or retaining business for or with, or directing business to, any person or company, as I have defined previously.

As I have said earlier, it's not necessary for the government to prove that any person or company actually obtained or retained any business whatsoever as a result of an lawful offer, payment, promise, or gift, only that the defendant intended to assist in object taping or retaining business for or with any person or company.

Count Five charges the defendant with another substantive violation of the FCPA.  Like Count Four, Count Five charges the defendant based on actions taken within the

IC47HO6                        Charge

territory of the United States.  That is, Count Five alleges that the defendant, while in the territory of the United States, did any act in furtherance of a corrupt offer, payment, promise to pay, or authorization of payment of any money, gift, or other thing of value to a foreign official.  Whereas Count Four pertained to Chad, Count Five pertains to Uganda.

To meet its burden of proof as to Count Five, just as with Count Four, the government must establish beyond a reasonable doubt the seven elements I described previously. The only difference is that, for Count Five, the alleged foreign official is Sam Kutesa, the Foreign Minister of Uganda, and/or Yoweri Museveni, the President of Uganda.

As I explained to you in connection with Count Three, in order to find that this element has been satisfied, you must unanimously agree that the defendant bribed or offered to bribe either Kutesa or Museveni.  You need not unanimously agree that he bribed or offered to bribe both individuals.

For each of the substantive FCPA Counts -- Counts Two, Three, Four and Five -- it does not matter who suggested that a corrupt offer, payment, promise or gift be made.  The FCPA prohibits any corruptive offer or payment or gift, if made for one of the business purposes I described, regardless of who first suggested it.  It is not a defense if the offer or payment or gift was first suggested or requested by someone other than the defendant, or demanded on the part of a foreign

official as a price for continuing to do business or other benefit, or that the business may have been harmed if the payment was not made.

Now, I have instructed you on the counts involving the alleged substantive violations of the FCPA. Let me go back to Count One, which charges a conspiracy to violate the FCPA, to add one qualification, which might have been too confusing if I had spoken about it before instructing you on the substantive counts.

To sustain its burden of proof with respect to the conspiracy charged in the indictment, the government must also show beyond a reasonable doubt that the defendant qualifies as the category of person who may be prosecuted for the substantive offense of the FCPA.

If you find that the government has not met its burden of proof beyond a reasonable doubt that the defendant was an officer, director, employee, or agent of such domestic concern or a stockholder thereof acting on behalf of such domestic concern in connection with the Chad scheme, or if you also find that the government has not met its burden of proof beyond a reasonable doubt that the defendant committed any act in furtherance, or caused another to commit any act in furtherance, of the Chad scheme while he was present in the United States, then you must find that he did not conspire to violate the FCPA by participating in the Chad scheme.

IC47HO6                    Charge

Likewise, if you find that the government has not met its burden of proof beyond a reasonable doubt that the defendant was an officer, director, employee or agent of such domestic concern or a stockholder thereof acting on behalf of such domestic concern in connection with the Uganda scheme, and if you also find that the defendant did not commit any act in furtherance, or caused another to commit any act in furtherance, of the Uganda scheme while he was present in the United States, then you must find that he did not conspire to violate the FCPA through the Uganda scheme.

Count Six of the indictment charges the defendant with conspiracy to commit money laundering from in or about the fall of 2014 through in or about January 2017, in violation of 18 United States Code, Section 1956(h).  In order to satisfy its burden of proof, the government must establish the following two elements beyond a reasonable doubt:

First, the existence of the conspiracy charged, that is, an agreement or understanding to violate a certain law of the United States; and

Second, that the defendant knowingly and willfully became a member of the conspiracy charged.

I instructed you regarding these two elements in my instructions for Count One.  These same instructions apply here, as do my instructions for Count One concerning liability for the acts of coconspirators.

The second element that the government must prove beyond a reasonable doubt is that the defendant participated in the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful objective.

I have already instructed you on this element in connection with Count One.  You should apply the same instructions here.

As you heard me say a moment ago, there are only two elements to Count six.  For this conspiracy count, unlike the conspiracy charged Count One, you need not find an overt act was committed by anyone in furtherance of the conspiracy.

The indictment alleges that the conspiracy existed from at least in or about the fall of 2014 through in or about January 2017.  As I said earlier with respect to Count Two, it is not essential that the government prove that the conspiracy alleged started and ended on any specific dates.  The law only requires a substantial similarity, between the dates alleged in the indictment and the date established by the testimony or exhibits.

The indictment alleges one element -- one object of the conspiracy charged in Count six:  To transport, transfer, or transmit money internationally with an intent to promote one or more of certain criminal offenses.  These objects are charged as substantive crimes in Counts Seven and Eight, which I will explain next.

IC47HO6                    Charge

Remember, though, as I said with respect to Count One, a conspiracy and a substantive crime are entirely distinct and independent offenses, and you may find the defendant guilty of the crime of conspiracy -- even if you find that he never actually committed the substantive crimes that were the object of the conspiracy.  By the same token, you can find the defendant guilty of committing the substantive crimes, even if you find him not guilty of conspiracy.

Count Seven charges the defendant with the substantive crime of international money laundering, which as I have explained, is also one of the objects of the conspiracy charged in Count Six.  The international money laundering statute makes it a crime to transport, transfer or transmit, or attempt to transport, transfer, or transmit, funds or monetary instruments to or from the United States, with an intent to promote certain other crimes, known as specified unlawful activity.

The relevant statute on this subject provides:

Whoever transports, transmits, or transfers, or attempts to transports, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States ... with the intent to promote the carrying on of specified unlawful activity shall be guilty of a crime.

To prove the defendant guilty of international money

laundering as to Count Seven, the government must prove the following two elements beyond a reasonable doubt:

First, that the defendant transported or transferred or transmitted, or attempted to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

Second, that the defendant did so with the intent to promote the carrying on of specified unlawful activity.

The first element which the government must prove beyond a reasonable doubt is that the defendant transported or transferred or transmitted, or attempted to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States.

The term "monetary instrument" means coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and negotiable instruments in bearer form or otherwise in such form that title thereto passes upon delivery.

The term "funds" refers to money or negotiable paper

IC47HO6                    Charge

which can be converted into currency.

"Transported" or "transferred" or "transmitted" are not words that require a definition; they have their ordinary, everyday meaning.  The government need not prove that the defendant physically carried funds or monetary instruments in order to prove that he is responsible for transferring or transporting or transmitting.  All that is required is proof that the defendant caused the funds or monetary instrument to be transported or transferred or transmitted by another person or entity.

To satisfy this element, the government must also prove that the funds or monetary instruments were transported from somewhere in the United States to or through someplace outside the United States or to someplace in the United States from or through someplace outside the United States.

The second element which the government must prove beyond a reasonable doubt is that the defendant acted with the intent to promote the carrying on of one or more crimes, referred to as specified unlawful activity.

I instruct you, as a matter of law, that for this count, the term "specified unlawful activity" includes: (i) violations of the FCPA pertaining to Chad, as charged in Count Two and Four; and (ii) bribery of foreign officials, in violation of one or more of the laws the Chad.  I have already explained to you the elements of the first specified unlawful

activity -- violating the FCPA.  Shortly, I will explain the elements of the second specified unlawful activity -- bribery of foreign officials, in violation of the laws of Chad.

To act intentionally means to act deliberately and purposefully, not by mistake or accident, with the purpose of promoting, facilitating or assisting the carrying on of (i) violations of the FCPA, or (ii) bribery of foreign officials, in violation of one or more of the laws the Chad.  If you find that the defendant acted with the intention or deliberate purpose of promoting, facilitating, or assisting in the carrying on of any or all of these specified unlawful activities, then the third element is satisfied.  Keep in mind, though, as I have instructed you earlier with respect to the FCPA, the government need not prove that the defendant was aware of the specific provision of the law that he is charged with violating or any other specific provision, providing that he had knowledge that his conduct was, in a general sense, unlawful.  You also need not find that these activities actually occurred, but merely that the defendant acted to promote, facilitate, or assist them to occur.

As noted above, the second specified unlawful activity charged in Count Seven is bribery of foreign officials, in violation of the laws of Chad.  The laws of Chad outlaw corruption under certain circumstances.  Specifically, the law of Chad prohibits corruption -- the law of Chad that prohibits

IC47HO6                    Charge

corruption is Order No. 011/PR/2012 on the System for

prevention and Repression of Corruption and Similar or

Connected Infractions in the Republic of Chad.  I am going to

describe multiple provisions of this order, but in considering

Count Seven you need not find that the defendant intended to

promote a violation of all of them.  Rather, as I described

previously, it is sufficient if you find that he acted with an

intent to promote a violation of the FCPA, or a violation of

one or more laws of Chad, or both.

In order for a public official to be found in

violation of the law against passive corruption, the following

elements have to be proved.

First:  The public official illegally, directly or

indirectly, solicited or accepted offers or promises, or

received gifts or presents or other undue advantages, for

himself or for another person or entity.

Second:  The public official did so in exchange for

performing or refraining from performing an action.

Third:  The action was one within the duties or job of

the public official, for which no remuneration was legally due.

A "public official" is a person who holds a

legislative, executive, administrative or judicial mandate,

either appointed or elected; any person who holds a public

post; and any other person defined as a public agent in

existing legislation or regulations.

In order for an individual to be found in violation of the law against active corruption, the following three elements have to be proved.

First:  The individual illegally, directly or indirectly, offered or granted to a public official promises, gifts, presents or undue advantages, for him or for another person or entity.

Second:  The individual did so in order for the public official to perform or refrain from performing an action.

Third:  The action was within the duties or job of the public official, whether just or not, and was not subject to remuneration.

"Public official" has the same definition I previously provided.

Chadian law makes it illegal for anyone to attempt to commit a corruption offense.  In order for an individual to be found in violation of the law against attempted corruption, the following two elements have to be proved.

First:  The individual attempted to commit an act of corruption of a public official.

Second:  The individual acted intentionally. "Intentionally" means deliberately, and not by accident.

Chadian law makes it illegal for anyone to serve as an accomplice to a corruption offense.  In order for an individual to be found in violation of the law against complicity, the

IC47HO6                          Charge

following two elements have to be proven.

First:  The individual either (a) by contributions, promises, threats, abuse of power or authority, schemes or culpable contrivance, provoked such action or gave instructions to commit an action of corruption of a public official; or (b) aided in the commission or corruption of a public official.

Second:  The individual acted knowingly.  "Knowingly" means consciously.

Count Eight of the indictment charges the defendant with substantive crime of international money laundering, which as I explained, is also an object of the conspiracy charged in Count Six.  Whereas Count Seven pertains to Chad, Count Eight pertains to Uganda.  I have previously defined the international money laundering statute and that definition applies here.

To prove the defendant guilty of money laundering as to Count Eight, just as to Count Seven, the government must prove beyond a reasonable doubt the following two elements:

First, that the defendant transported or transferred or transmitted, or attempted to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

Second, that the defendant did so with the intent to

IC47HO6                    Charge

promote the carrying on of specific unlawful activity.

The first such element which the government must prove beyond a reasonable doubt is that the defendant transported, or transferred or transmitted, or attempt to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States.

I have previously defined these terms in connection with the international money laundering statute and those definitions apply here.

The second element which the government must prove beyond a reasonable doubt is that the defendant acted with intent to promote the carrying on of specific -- of specified unlawful activity, specifically:  (i) violations of the FCPA pertaining to Uganda, as charged in Counts Three and Five; and/or (ii) bribery of foreign officials, in violation of one or more of the laws of Uganda.  I have already explained to you the elements of the first specified unlawful activity -- violating the FCPA -- and I will soon explain the elements of the second specified unlawful activity -- bribery of foreign officials, in violation of one or more of the laws of Uganda. As to acting intentionally, I have previously defined that term in connection with the international money laundering scheme and that definition applies here.

IC47HO6                    Charge

As noted above, the second specified unlawful activity charged in Count Eight is bribery of foreign officials, in violation of one or more of the laws of Uganda.  The laws of Uganda outlaw bribery under certain circumstances.

Under the laws of Uganda, the statute that prohibits bribery of publish officials is the Anti Corruption Act of 2009.  I am going to describe multiple of these statutes, but in considering Count Eight, you need not find that the defendant intended to promote a violation of all of them.  Rather, it is sufficient if you find that he acted with an intent to promote a violation of the FCPA, or a violation of one or more of these laws of Uganda, or both.

In Uganda, the Anti Corruption Act of 2009 prohibits bribery of public officials.  In order for an individual to be found in violation of Section 2(a) of the Uganda's Anti Corruption Act, the following three elements have to be proved:

First:  The individual was a public official.  A "public official" is an office holder who discharges any duty in the discharge of which the public are interested, such as the Foreign Minister or President.

Second:  The individual directly or indirectly, solicited or accepted any goods of monetary value, or benefits, such as a gift, favor, promise, advantage or any other form of gratification for himself or herself or for any other person or entity.  The term "gratification" includes any money or gift,

IC47HO6                    Charge

loan, fee, reward, commission, valuable security or other property or interest in property of any description, whether movable or immovable.

Third:  The individual did so in exchange for any act or omission in the performance of his or her public function.

In order for an individual to be found in violation of Section 2(b) of Uganda's Anti Corruption Act, the following three elements must be proved:

First:  The individual offered or granted, directly or indirectly, any goods of monetary value, or other benefit, such as a gift, favor, promise or advantage or any other form of gratification for himself or herself or for another person or entity.

Second:  The individual offered or granted the goods of monetary value, or other benefit, to a public official.  The term "public official" has the same meaning as above.

Third:  The offer or grant was in exchange for any act or omission by the public official in the performance of hills or her public functions as a public official of Uganda.

In order for an individual to be found in violation of Section 2(e) of Uganda's Anti Corruption Act, the following element has to be proved:

The individual offered, gave, solicited or accepted, directly or indirectly, or promised any undue advantage to or by any person who asserts or confirms that he or she is able to

IC47HO6                    Charge

exert any improper influence over the decision making of any person performing functions in the public or private sector in consideration of the undue advantage, whether the undue advantage is for himself or herself or for any other person, as well as the request, receipt, or the acceptance of the offer or the promise of the advantage, in consideration of that influence, whether or not the supposed influence leads to the intended result.

In order for an individual to be found in violation of Section 2(g) of Uganda's Anti Corruption law, the following element has to be proved:

The individual either, (a) aided in the commission of an act of corruption under Section 2(a) or 2(b) or both; or, (b) attempted or conspired to commit that act of corruption under Sections 2(a) or (b) or both.

For an individual to be found in violation of Section 5(a) of Uganda's Anti Corruption Act, the following two elements have to be proved:

First:  The individual offered, conferred, gave or agreed to offer any gratification, directly or indirectly or through any other person, to a member of a public body.  The term "public body" includes the government of Uganda, any department, services or undertaking of the government of Uganda, such as the Ministry of Foreign Affairs, as well as the Cabinet, Parliament or any Court of Uganda.  The term

IC47HO6                    Charge

"gratification" includes any money or any gift, loan, fee, reward, commission, valuable security or any other property or interest in property of any description, whether movable or immovable.

Second:  The individual did so as an inducement or reward to that member of a public body, in exchange for (a) a vote or abstention from a vote at any meeting of that public body in favor of or against any measure, resolution or question submitted to that public body; (b) performing or abstaining from performing the member of the public's body's duty in procuring, expediting, delaying, hindering or preventing the performance of any official act; and/or (c) aid in procuring or preventing the passing of any vote or the granting of any contract or advantage in favor of any person.  An "official act" is an act taken in the performance of a public official's public functions.

In order for an individual to be found in violation of the Section 5(b) of Uganda's Anti Corruption Act the following two elements have to be proved.

First:  The member of the public body, directly or indirectly, solicited or accepted any gratification for himself or herself or for any other person, by himself or herself, or through any other person.

Second:  The member of the public body did so as an inducement or reward in exchange for (a) a vote or abstention

IC47HO6                    Charge

from a vote at any meeting of that public body in favor of or against any measure, resolution or question submitted to that public body; (b) performing or abstaining from performing the member of the public body's duty in procuring, expediting, delaying, hindering or preventing the performance of any official act; and/or (c) aid in procuring or preventing the passing of any vote for the granting of any contract or advantage in favor of any person.  "Gratification" and "official act" have the same meaning as above.

Section 52 of the Anti Corruption Act also prohibits attempts, preparations, abetments and criminal conspiracies under Section 5.  In order for an individual to be found in violation of Section 52(a), (b) or (c) of the Anti Corruption Act, the following element has to be proved.

The individual either (a) attempted to commit an offense under the Anti Corruption Act Sections 5(a) or 5(b) or both; (b) did a thing which was preparatory to, or in furtherance of the commission of an offense under the Anti Corruption Act sections 5(a), (b) or both; or (c) abetted or engaged in a criminal conspiracy to commit an offense under the Anti Corruption Act Sections 5(a) (b) or both.

In addition to charging the defendant with violating the FCPA and money laundering, Count Two, Three, Four, Five, Seven and Eight of the indictment, (that is, all the counts except the conspiracy counts) also charge that the defendant

IC47HO6                      Charge

"aided and abetted" and/or "willfully caused" another person to commit each of these crimes.  I will take each of those concepts -- aiding and abetting and willfully causing a crime -- in turn.

The federal aiding and abetting statute provides that:

Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

Under this statute, it is not necessary for the government to show that the defendant physically or personally committed each of the criminal violations for which he is charged in order for you to find him guilty.  Thus, if you do not find beyond a reasonable doubt that the defendant himself committed the crime charged, you may, under certain circumstances, still find the defendant guilty of that crime as an aider and abettor.

A defendant who aids and abets another in the commission of a crime is just as guilty of that offense as if the defendant committed it himself.  Accordingly, you may find the defendant guilty of the substantive crime if you find beyond a reasonable doubt that the government has proved that another person actually committed the crime, and that the defendant aided and abetted that person in the commission of the crime.

So, as you can see, the first requirement is that

another person has committed the crime charged.  No one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person in the first place.  But if you do find that a crime was committed, then you must consider whether the defendant aided and abetted the commission of the crime.

In order to aid and abet another to commit a crime, it is necessary that the defendant willfully and knowingly associated himself in some way with the crime, and that the defendant willingly and knowingly did some act to make the crime succeed.

Participation in a crime is willful if the action is taken voluntarily and intentionally, or, in the case of a failure to act, with the specific intent to fail to do something the law requires to be done; that is to say, with a bad purpose either to disobey or to disregard the law.

The mere presence of the defendant where a crime is being committed, even if coupled with knowledge by the defendant that a crime is being committed, or merely associating with others who were committing a crime is not sufficient to establish aiding and abetting.  One who has no order knowledge that a crime is being committed, or is about to be committed, but who inadvertently does something that aids in the commission of a crime is not an aider and abettor.  An aider and abettor must know that the crime is being committed

and act in a way that is intended to bring about the success of the criminal venture.

To determine whether the defendant aided and abetted the commission of the crimes with which he is charged, ask yourself these questions:  Did the defendant participate in the crime charged as something he wished to bring about?  Did the defendant associate himself with the criminal venture knowingly and willfully?  Did the defendant seek, by his actions, to make the criminal venture succeed?

If the defendant did, then he is an aider and abettor, and therefore guilty of the offense.  If the defendant did not, then the defendant is not an aider and abettor.

With respect to Counts Two, Three, Four and Five -- the substantive FCPA counts -- in order to find that the defendant aided and abetted a violation of the FCPA, you must find that the defendant falls into one of the categories covered by the statute; specifically that the defendant (1) was an officer, director, employee or agent of a domestic concern, or a stockholder thereof acting on behalf of such domestic concern; or (2) was himself a domestic concern -- let me do it again -- or (2) was himself not a domestic concern, and took any act within the territory of the United States in furtherance of the offense.  If the defendant fits within one of these categories, you need not find the defendant himself corruptly offered, paid, promised to pay, or authorized the

payment of money or a gift or anything of value to a foreign official, so long as he willfully and knowingly aided and abetted someone else in the committing of the offense.

Now I will describe what it means to "willfully cause "another to commit a crime.  Federal law provides that:

Whoever willfully causes an act to be done which, if directly performed by him, would be an offense against the United States, is punishable as a principal.

What does the term "willfully caused" mean?  It does not mean that the defendant need have physically or personally committed the crime or supervised or participated in the actual criminal conduct charged in the indictment.  The meaning of the term "willfully caused" can be found in the answers to the following questions:

Did the defendant intend the crime to occur?

Did the defendant intentionally cause another person or persons to engage in the conduct constituting the crime?

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is "yes," then the defendant is guilty of the crime charged just as if the defendant himself had actually committed it.

To prove the defendant guilty in this way, the government need not prove that he acted through a guilty person, that is, a defendant can be found liable even if he acted through someone who is entirely innocent of the crimes

IC47HO6                      Charge

charged in the indictment.  However, again, as to the substantive FCPA counts -- Count Two, Three, Four and Five -- the defendant can only be found guilty of willfully causing an FCPA violation if you first conclude that he falls within one of the two categories covered by the statute.

In addition to all of the elements of the crimes charged that I have described for you, you must decide whether each crime occurred, in whole or in part, within the Southern District of New York, referred to as "venue."  You are instructed that the Southern District of New York includes the following counties:  The Bronx, Manhattan, or New York County (that is, New York, New York), Dutchess, Orange, Putnam, Rockland, Sullivan, and Westchester Counties.  In addition, the Southern District of New York includes the water surrounding Long Island and Manhattan, as well as the air space above the district or the waters in the district.

I should note that on this issue, and this issue alone, the government need not prove venue beyond a reasonable doubt but only by a mere preponderance of the evidence, that is, simply that it is more likely than not.

Specifically, with respect to Count One, you need to find that it is more likely than not that an overt act in furtherance of the charged conspiracy was committed or caused to be committed in the Southern District of New York by the defendant or a coconspirator during the life of the conspiracy.

With respect to each of Counts Two through Five, you need to find that it is more likely than not that any element of the crime you are considering occurred, in whole or in part, in the Southern District of New York.

With respect to Count six, you must find that it is more likely than not that either an overt act in furtherance of the charged conspiracy was committed or caused to be committed in the Southern District of New York by the defendant or a coconspirator during the life of the conspiracy, or that the financial or monetary transfer that you are considering took place in or passed through the Southern District of New York. You need not find both of these things.

With respect to Counts Seven and Eight, you must find that it is more likely than not that the financial or monetary transfer which you are considering took place in or passed through the Southern District of New York.

If you find that the government has failed to prove this venue requirement by a preponderance of the evidence, then you must acquit the defendant of that charge because he has a right to be tried only in the district where venue is proper.

You will note the indictment alleges certain acts occurred on or about various dates or that a certain amount of money was involved. It does not matter if the evidence you heard at trial indicates that a particular act occurred on a different date or that the amount of money involved was

different.  The law only requires a substantial similarity between the dates alleged in the indictment and the dates established by the evidence or the amounts alleged in the indictment and the amounts established by the evidence.

With respect to all counts, it is not a defense that, had there been no offer or giving of a corrupt payment or offer of payment, the Chadian public officials or Ugandan public officials might have performed the same act or acts, or that the actions taken by the Chadian public officials or the Ugandan public officials or the acts that the defendant intended to be taken by them may have been desirable or beneficial to the public or to any particular country, or would not have harmed the public, or any particular country.  Nor is it a defense that the actions taken by the Chadian public officials or Ugandan public officials as a result in whole or in part of the alleged bribes may have been only the first step in an otherwise lawful or proper process.  The laws in this case are not concerned with the results of an offer or giving of corrupt payments, but rather that such offers and payments not be made.

You have heard testimony from witnesses employed as law enforcement officers and employees of the government.  The fact that a witness may be employed as a law enforcement official or employee does not mean that his or her testimony is necessarily deserving of more or less consideration or greater

IC47HO6                        Charge

or lesser weight than that of an ordinary witness.

At the same time, it's quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all of the evidence, whether to accept the testimony of a law enforcement or government employee witness and to give that testimony the weight you find it deserves.

Now, you have heard the testimony of a witness who has testified pursuant to a non-prosecution agreement with the government.

Let me say a few things that you should consider during your deliberations on the subject of the testimony of these types of witnesses.

Experience will tell you that the government sometimes must rely on evidence of cooperators and other witnesses who have participated in crimes. For those very reasons, the law allows the use of testimony from these types of witnesses. Indeed, it is the law in federal courts that the testimony of even one such witness may be enough in itself for conviction, if the jury finds that the testimony establishes guilt beyond a reasonable doubt. The testimony of such witnesses is properly considered by the jury.

However, because of the possible interest a witness with a nonprosecution agreement may have in testifying, the witness's testimony should be scrutinized with care and caution.  The fact that a witness has a nonprosecution agreement can be considered by you as bearing upon his or her credibility.  It does not follow, however, that simply because a person has participated in a crime or has entered into such an agreement, he is incapable of telling the truth, and it is no concern of yours why the government made an agreement with the witness.  Your sole concern is whether a witness has given truthful testimony here in this courtroom before you.

In evaluating the testimony of such a witness, you should ask yourselves whether the witness would benefit more by lying, or by telling the truth.  Was his or her testimony made up in any way because he or she believed or hoped that he or she would somehow receive favorable treatment by testifying falsely?  Or did he or she believe that his or her best interests would be best served by testifying truthfully?  If you believe that the witness was motivated by hopes of personal gain, was the motivation one that would cause him or her to lie, or was it one that would cause him or her to tell the truth?  And did this motivation color his or her testimony?

If you find that the testimony was false, you should reject it.  However, if, after a cautious and careful examination of a witness's testimony and demeanor on the

witness stand, you are satisfied that the witness told the truth, you should accept it as credible and act on it accordingly.

As with any witness, let me emphasize that the issue of credibility need not be decided on an all-or-nothing basis. Even if you find that a witness testified falsely in one part, you may still accept his or her testimony in other parts, or you may disregard all of it.  That determination is entirely up to you, the jury.

Additionally, I must caution you again that it is no concern of yours why the government has made an agreement with a witness.  Your sole concern is whether a witness has given truthful testimony here in this courtroom before you.

Now, you have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are evaluating the witness's credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he will be questioned about, focus on those subjects and have an opportunity to review relevant exhibits before being questioned about them.  Such consultation helps conserve your time and the Court's time.  In factor, it

would be unusual for a lawyer to call a witness without such consultation.

Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

You have heard evidence that the defendant made certain statements in the past in which he claimed that his conduct was consistent with innocence and not with guilt.  The government claims that these statements in which he exonerated or exculpated himself are false.

False exculpatory statements are circumstantial evidence of a defendant's consciousness of guilt and have independent probative value.  If you find that the defendant gave a false statement in order to divert suspicion from himself, you may, but are not required, to draw the conclusion that the defendant believed that he was guilty.  You may not, however, draw the conclusion on the basis of this alone, that the defendant is, in fact, guilty of any crime for which he is charged.

Whether or not the evidence as to the defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to such evidence, are matters for you, the jury, to decide.

The government has offered evidence that it claims

IC47HO6                         Charge

shows that on a different occasion the defendant engaged in conduct similar to the charges in the indictment.

In that connection, let me remind you that the defendant is not on trial for committing this act not alleged in the indictment.  Accordingly, you may not consider this evidence of a similar act as a substitute for proof that the defendant committed the crime charged.  Nor may you consider this evidence as proof that the defendant has a criminal personality or bad character.  The evidence of the other similar act was admitted for a much more limited purpose and you may consider it only for that limited purpose.

If you determine that the defendant considered the acts -- committed the acts charged in the indictment and the similar acts as well, then you may, but you need not draw an inference that in doing the acts charged in the indictment, the defendant acted knowingly and intentionally and not because of some mistake, accident or other innocent reasons.

Evidence of similar acts may not be considered by you for any other purpose.  Specifically, you may not use this evidence to conclude that because the defendant committed the other act he must also have committed the acts charged in the indictment.

A recording of a telephone conversation and a transcript of that recording have been admitted into evidence. Whether you approve or disapprove of the recording of that

IC47HO6                     Charge

conversation may not enter into your deliberations.

          (Continued on next page)

Ic41ho7                        Charge

THE COURT:  I instruct you that this recording was made in a lawful manner and that no one's rights were violated and that the government's use of this evidence is entirely lawful.

You must, therefore, regardless of any personal opinion, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proved beyond a reasonable doubt the guilt of the defendant.  It is, of course, for you to determine what weight to give to that evidence.

You've been presented with English translations of certain pieces of evidence that were originally in Chinese and/or French.  I instruct you that it is the English translations of these items that are in evidence.  I emphasize to you that even if you understand Chinese or French, it is still the English translation that is the evidence.  The original Chinese and French words do not constitute evidence.

You've heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities.  There is no legal requirement that the government prove its case through any particular means.  While you are to consider carefully the evidence presented by the government, you need not speculate as to why they used the techniques they did or why they did not use other techniques.  The government is not

Ic41ho7                        Charge

on trial, and law enforcement techniques are not your concern.

Your concern is to determine whether or not, based on the evidence or lack of evidence, the guilt of the defendant has been proven beyond a reasonable doubt.

Now you've heard testimony about evidence seized in searches of locations, devices, and email accounts.  Evidence obtained from said searches was properly admitted in this case and may be properly considered by you.  Whether you approve or disapprove of how it was obtained should not enter into your deliberations because I now instruct you that the government's use of this evidence is entirely lawful.

You must, therefore, regardless of your personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proved the defendant's guilt beyond a reasonable doubt.

The government has presented exhibits in the form of summary charts and graphics.  These charts and graphics were shown to you in order to make the other evidence more meaningful and to aid you in considering the evidence on which they're based.  They are not themselves independent evidence. Therefore, you are to give no greater consideration to these summary charts and graphics than you would give to the evidence upon which they're based.

It is for you to decide whether the summary charts and

Ic41ho7                        Charge

graphics correctly present the information contained in the exhibits on which they're based.  You are entitled to consider the summary charts and graphics if you find that they are of assistance to you in analyzing and understanding the evidence.

A stipulation of testimony is an agreement between the parties that, if called, a witness would give certain testimony.  You must accept as true the fact that the witness would have given that testimony.  However, it's up to you to determine the effect and the weight to be given to that testimony.

Some of the evidence in the case has been presented in the form of stipulations.  Stipulation of fact is an agreement between the parties that a certain fact is true.  You must regard the agreed facts as true.

We have, among the exhibits received in evidence, some documents that were redacted.  "Redacted" means that part of the document was taken out or covered up.  You are to concern yourself only with the part of the item that has been admitted into evidence.  You should not consider any possible reason why any other part of it has been deleted or covered up.

There are several persons whose names you heard during the course of the trial but who did not appear here to testify, and one or more of the attorneys may have referred to their absence from the trial.  I instruct you that each party has an equal opportunity, or lack of opportunity, to call any of these

Ic41ho7                    Charge

witnesses.  Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called.  Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

You've heard references to other persons who were allegedly involved in the activities described in the indictment.  You may not draw any inference, favorable or unfavorable, toward the government or the defendant on trial from the fact that any other persons in addition to the defendant are not on trial here.  You also may not speculate as to the reasons why other persons are not on trial.  These matters are wholly outside of your concern and have no bearing on your function as jurors.

The defendant did not testify in this case.  Under our Constitution, the defendant has no obligation to testify or to present any evidence, because it's the government's burden to prove the defendant guilty beyond a reasonable doubt.  That burden remains on the government throughout the entire trial and never shifts to the defendant.  The defendant is never required to prove that he's innocent.

You may not attach any significance to the fact that

Ic41ho7                         Charge

the defendant did not testify.  No inference against him may be drawn because he did not take the witness stand.  You may not consider this against the defendant in any way in your deliberations in the jury room.

Your verdict must be based solely on the evidence developed at trial or the lack of evidence.  It would be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings you might have about the defendant's race, religion, national origin, sex, or age.  Similarly, it would be improper for you to consider any personal feelings you may have about race, religion, national origin, sex, or age of any witness or anyone else involved in the case.  The defendant is entitled to a trial free from prejudice, and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

Proof of motive is not a necessary element of any of the crimes with which the defendant is charged.  Proof of motive does not establish guilt, nor does the lack of proof of motive establish that the defendant is not guilty.  If all the elements of the crimes are proven beyond a reasonable doubt, it is immaterial what a defendant's motive for the crime may be or whether the defendant's motive was shown at all.  The presence or absence of motive is, however, a circumstance which you may consider as bearing upon the intent of the defendant.

During this trial, the defendant has contended that his actions and the actions of others were motivated in whole or in part by considerations that were not corrupt.  It is no defense to any count that the defendant or those with whom he interacted may have been motivated by both proper and improper motives.  A defendant may be found to have the requisite corrupt intent even if he also possesses another intent -- that is, an unlawful intent and also a proper or neutral intent.  In short, to find the defendant guilty, you need not find that the defendant only had corrupt intent but rather that he had such intent, at least in part.

Under your oath as jurors, you cannot allow a consideration of possible punishment that may be imposed upon a defendant if convicted to influence you in any way or in any sense to let it enter into your deliberations.  The duty of imposing sentence is mine and mine alone.  Your function is to weigh the evidence and to determine whether the government has proved beyond a reasonable doubt that the defendant is guilty of the charge you are considering on the basis of the evidence and the law.

I therefore instruct you not to consider punishment or possible punishment in any way in your deliberations in this case.

Under your oath as jurors, you are not to be swayed by sympathy.  You are to be guided solely by the evidence in this

Ic41ho7                      Charge

case, and the crucial, hard-core question that you must ask yourselves as you sift through the evidence is:  Has the government proven the guilt of the defendant beyond a reasonable doubt?

It is for you alone to decide whether the government has proven the defendant is guilty of the crimes charged solely on the basis of the evidence and subject to the law as I charge you.  It must be clear to you that once you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

If you have a reasonable doubt as to the defendant's guilt, you should not hesitate for any reason to find a verdict of acquittal.  But on the other hand, if you should find that the government has met its burden of proving a defendant's guilt beyond a reasonable doubt, you should not hesitate, because of sympathy or any other reason, to render a verdict of guilty.

Now let me talk briefly about the procedure to be followed from now on.

When you begin your deliberations in the jury room, your first order of business will be to elect a foreperson.

If during your deliberations you wish to see any exhibit, the procedures are as follows:  You will be in the jury room, and a United States Marshal will be immediately

outside the jury room.  If you wish to see an exhibit, the foreperson should just write a note, knock on the door, and hand it to the Marshal, and the Court will respond by sending you in the requested exhibits.  All notes from the jury should be signed by the foreperson.

Similarly, if in the course of your deliberations, your recollection as to any part of the testimony should fail or you should find yourself in doubt concerning my instructions to you on the law, you should simply write a note, knock on the door, and hand it to the Marshal.  If you request testimony to be read to you, I ask that you be as specific as possible in making that request so that counsel and I will be clear on exactly what testimony is requested.

In the course of your writing to the Court, you should not disclose how you may stand or what your vote on any issue may be.  In other words, sometimes jurors send in a note that would indicate how divided they are in their votes.  That's a matter for you and for you alone, and so I ask that you not disclose that information in any note to the Court.

You will be given a verdict sheet on which to record your verdict and which should also be signed by the foreperson. Although there's a title for each count in the indictment and a short description of that count, the title and description are for convenience only and are not meant to substitute for my instructions on the law.  It's my instructions that you must

Ic41ho7                        Charge

follow.

It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement. You may only deliberate when all jurors are present. Present does not mean in the restroom. Each of you must decide the case for himself or herself, but you should do so only after consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you're not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

And finally, I say this not because I believe it's necessary but it is a tradition in our court. I advise the jurors to be polite and respectful to each other so that in the course of your discussions in the jury room, each juror may have his or her position made clear.

The manner in which you conduct your deliberations is wholly in your discretion. You may follow any procedure you choose, provided that each juror is given an ample opportunity

Ic41ho7                    Charge

to express his or her views and that you only deliberate as a full jury.  That way, when you do reach a verdict, you'll know that it's a just one, made with the full participation of all jurors, and that you will have faithfully discharged your oath, which is to decide the case without fear or favor, solely in accordance with the evidence and the law.

So, ladies and gentlemen, I'm going to impose on you for one more second while I confer with the lawyers at the sidebar, to be sure that I haven't misread anything.

Counsel.

(At the sidebar)

THE COURT:  Counsel.

MR. RICHENTHAL:  Your Honor, by our ear, we caught some minor, immaterial, I think, misreadings.  We did catch one that we think could conceivably change the meaning.  I think Mr. Rosenberg caught it as well.

THE COURT:  What's that?

MR. RICHENTHAL:  On page 62.  Both parties --

THE COURT:  Sure.  Let me hear it.

MR. RICHENTHAL:  -- heard the same misreading, which is roughly halfway through the second paragraph on that page, your Honor, specifically --

THE COURT:  Yes, sir.

MR. RICHENTHAL:  I'm going to start before so it's clear.  The instruction reads, "In connection with the Chad

Ic41ho7                     Charge

scheme, and that you also find."  And I think both Mr. Rosenberg and the government team heard your Honor say "or if you also find."  So it should be --

THE COURT:  Turn it around so I can see it.

MR. RICHENTHAL:  I think Mr. Rosenberg heard the same --

MR. ROSENBERG:  I believe your Honor said "or."

THE COURT:  So it should be "and" instead of "or."

MR. RICHENTHAL:  We concur.  We think your Honor said "or."

THE COURT:  I'll reread it.

Needless to say, I'm going to dismiss the three alternates, tell them to continue to observe the rules, and then send them out.  Okay?

MR. ROSENBERG:  Very well.

(In open court)

THE COURT:  Ladies and gentlemen, the eagle-eared lawyers inform me that I misread something on page 62.  And I'll tell you specifically what it is.  It's in the fifth line in that big paragraph.  The word "and" appears.  I think I said "or."  So now I'm going to read it to you again so you have it properly.

If you find that the government has not met its burden of proof beyond a reasonable doubt that the defendant was an officer, director, employee, or agent of such domestic concern,

Ic41ho7

or a stockholder thereof acting on behalf of such domestic concern in connection with the Chad scheme, and if you find that the government has also not met its burden beyond a reasonable doubt that the defendant committed any act in furtherance, or caused another to commit any act in furtherance of the Chad scheme while he was present in the United States, then you must find that he did not conspire to violate the FCPA by participating in the Chad scheme.

Mr. Marshal, would you come forward, please.

(Marshal sworn)

THE COURT:  Thank you.

Ladies and gentlemen, needless to say, we're going to break for the day.  Thank you for your attention.  I think this will give us a leg up tomorrow.

May I excuse Ms. Rodriguez, Mr. Lamagna, and Ms. Glasgow.  But I'm going to ask you to continue to observe the regular rules.  Don't talk about the case, don't do any research about the case, just as we've been doing it the last two weeks.  And the reason for that is this:  If the jury deliberates for some number of days and let's just say someone gets run over by a bus, one of you will be called back to fill in.  So we want you in just the same pure state that your mind is now.  As soon as the verdict is reached, we will call you, and then you're free to do whatever you like.  But from now until you're called about a verdict, would you be kind enough

Ic41ho7

to observe the same rules.

You're welcome to take your jury books home with you if you want.  Same rules, though.  Don't read them to anybody.

So you three are excused, with the thanks of the Court.

(Alternate jurors excused)

THE COURT:  Ladies and gentlemen of the jury, I assume you're going to go home now.  Would you inform us what time you want to return in the morning to start deliberating, and we will order your coffee ahead of that.  So for example, if you want to come in at 10:00, we'll order your coffee for 9:15.  Do you want to go in the jury room and tell me?  Do you want to tell me now?

THE JURORS:  10:00 is fine.

THE COURT:  Very good.  Your coffee will be here.  And remember, you can't elect your foreperson or start deliberating until everyone is here.  Thank you again for your attention this evening.  I know it was long and difficult, but I thank you for your attention.  Good evening.  Have a pleasant night.

THE JURORS:  Thank you.  Good night.

(Jury not present)

THE COURT:  Anything else on the record, friends?

ALL COUNSEL:  No, your Honor.

THE COURT:  Thank you.

(Adjourned to December 5, 2018, at 10:00 a.m.)